GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A Shah
Proposed Counsel for Debtors
And Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

| | |
|---|---|
| SOUND SHORE MEDICAL CENTER OF WESTCHESTER, et al. | Chapter 11<br>Case No. 13-_____ (RDD) |
| Debtors. | (Joint Administration Pending) |

------------------------------------------------------------x

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SECURED, SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)

The Motion of Sound Shore Medical Center of Westchester ("**SSMC**"), The Mount Vernon Hospital, Inc. ("**MVH**"), and Howe Avenue Nursing Home d/b/a Schaffer Extended Care Center ("**SECC**"), each one of the above-captioned debtors and debtors-in-possession herein (each a "**Debtor**" and collectively, the "**Debtors**")[1], for the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**") and other related relief, (the "**Motion**").

In support of the Motion, the Debtors shall rely on the Affidavit of John Spicer, the President and Chief Executive Officer of SSMC Pursuant to Local Rule 1007-2 and in Support

---

[1] Certain additional affiliates also filed voluntary Chapter 11 petitions, but each of these have limited operations and assets. They include: Sound Shore Health System, Inc., NRHMC Services Corporation, The M.V.H. Corporation, and New Rochelle Sound Shore Housing, LLC. There are certain additional affiliates of the Debtors who are not debtors in these Chapter 11 Cases and have not sought relief under Chapter 11.

of the First Day Motions (the "**Spicer Affidavit**"), which the Debtors filed concurrently with this

Motion. In further support of this Motion, the Debtors respectfully represent as follows:

## I.    RELIEF REQUESTED

1.    By this Motion, the Debtors seek entry of the Interim Order and the Final Order

(together the "**Financing Orders**"), pursuant to Sections 105(a), 361, 362, 363, 364(c) and

364(d) of Title 11, United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and

9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2

of the Local Rules for the United States Bankruptcy Court for the Southern District of New York

(the "**Local Rules**"), granting:

(a)    authorization under sections 364(c) and 364(d) of the Bankruptcy Code
and Rule 4001(c) of the Bankruptcy Rules for SSMC, MVH, and SECC to obtain
secured, superpriority postpetition financing consisting of the following:

(i)    a revolving facility with a principal amount of up to **Twenty-
Three Million Dollars ($23,000,000)** (the "**DIP Revolving Facility**")[2] as set
forth in that certain Debtor in Possession Revolving Credit and Security
Agreement, dated as of May ___, 2013 (the "**DIP Revolving Loan Agreement**"),
a copy of which is attached to this Motion as Exhibit A, by and between the
Debtors and MidCap Financial, LLC ("**MidCap**") or one of its affiliates (as
lender, the "**DIP Revolving Lender**" and as agent, the "**DIP Revolving Agent**");
and

(ii)    a term loan facility in the principal amount of **Ten Million Dollars
($10,000,000)** (the "**DIP Term Loan**", and together with the DIP Revolving
Facility, the "**DIP Financing**") as set forth in that certain term sheet (the "**DIP
Term Loan Term Sheet**"), a copy of which is attached hereto as **Exhibit B**, and
which shall be governed by terms substantially similar to those contained in the
DIP Revolving Loan Agreement with such revisions as are customary for a term
loan facility.  The DIP Term Loan is to be memorialized in a Debtor In Possession
Term Loan Agreement ( the "**DIP Term Loan Agreement**" and, together with
the DIP Revolving Loan Agreement, the "**DIP Credit Agreement**")[3] entered into

---

[2]    The actual available principal amount at any time under the DIP Revolving Facility shall be the Revolving
Loan Availability (as defined in the DIP Revolving Loan Agreement.  As further described in the DIP Revolving
Loan Agreement, until payment in full of the outstanding Prepetition Revolving Loan Obligations (as defined
herein), the Borrowing Base will be solely comprised of (a) the postpetition Eligible Accounts generated by SSMC
and SECC and (b) the prepetition and postpetition Eligible Accounts generated by MVH.
[3]    Capitalized terms used in this Motion, unless herein defined, are used with the meanings ascribed to such
terms in the DIP Credit Agreement.

by and between the Debtors and MidCap or one of its affiliates (as lender, the "**DIP Term Loan Lender**" and as agent, the "**DIP Term Loan Agent**")[4];

(b)    authorization under section 363 of the Bankruptcy Code and Rules 4001(b) and 6004 of the Bankruptcy Rules for the Debtors to use any cash collateral the Debtors are holding or may obtain, and to use the proceeds from the DIP Financing for the payment of: (i) the Prepetition Revolving Loan Obligations (as defined below) owing to MidCap Funding IV, LLC ("**MidCap Funding**"); (ii) pay the fees and expenses due DIP Agent under the DIP Credit Agreement; (iii) pay all Prepetition Term Loan Obligations as they become due under the Prepetition Term Credit Agreement; (iii) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (iv) the costs and expenses associated with these Chapter 11 cases (the "Chapter 11 Cases"), all in accordance with the terms of the Debtors' proposed budget (the "Budget"), a copy of which is annexed hereto as Exhibit C;

(c)    authorization for the Debtors to grant security interests, liens, superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code), and related protections to the DIP Agent and DIP Lender to secure all DIP Obligations, in accordance with the provisions of the Financing Orders and as set forth in DIP Revolving Agreement and DIP Term Loan Agreement;

(d)    authorization for the Debtors to execute and deliver the DIP Revolving Loan Agreement, the DIP Term Loan Term Sheet, the DIP Term Loan Agreement, a postpetition amendment to the Prepetition Revolving Credit Agreement, the Prepetition Term Loan Amendment (as defined below) and all other loan documents related thereto (collectively, the "**DIP Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and pursuant to the provisions of the Financing Orders;

(e)    the approval of certain stipulations by the Debtors with respect to the Original Loan, Prepetition Revolving Loan, Prepetition Term Loan, and Prepetition Debt (each as defined herein), and the liens and security interests arising with respect thereto;

(f)    subject only to and effective upon entry of a Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(g)    authorization for the Debtors to continue to use the "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") of the Secured Creditors (as defined herein);

---

[4]    The DIP Term Loan Lender, together with the DIP Revolving Loan Lender, shall be referred to as the "**DIP Lender**".  The DIP Term Loan Agent, together with the DIP Revolving Loan Agent, shall be referred to as the "**DIP Agent**".

2422510v.10

(h)    authorization for the Debtors to grant the DIP Agent allowed, superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (as defined herein) for the DIP Financing and all obligations owing thereunder and under the DIP Documents (collectively, the "**DIP Obligations**");

(i)    authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents to the extent, and as they become due;

(j)    authorization for the Debtors to use the proceeds of the DIP Financing in all cases in accordance with the Budget, and as otherwise provided in the DIP Documents;

(k)    authorization for the Debtors to provide adequate protection to the Secured Creditors (as defined herein) pursuant to the terms of the Financing Orders for any diminution in value of their respective interests in the Prepetition Collateral (as defined below);

(l)    to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the Financing Orders; and

(m)    to waive any applicable stay as provided in the Bankruptcy Rules and provide for the immediate effectiveness of the Financing Orders.

2.    Access to the DIP Financing and the use of Cash Collateral is essential to ensure that the Debtors can fund their postpetition operating requirements and preserve and maintain their properties and the infrastructure of their businesses pending a sale of a substantial portion of their assets to Montefiore Medical Center ("**MMC**")[5]. As fully operational acute care facilities, it is essential that continued operations be maintained in order to ensure patient safety, maintain the employee workforce and provide an essential community service to an underserved population. Having adequate financing in place also will provide the Debtors' vendors and suppliers with the comfort of knowing that the Debtors will have the financial ability to fund the ongoing purchase of goods and services and otherwise pay their postpetition obligations as they

---

[5]    Simultaneous with the filing of the petitions initiating these Chapter 11 Cases and the instant motion, the Debtors have filed a motion, *inter alia*, seeking the approval of proposed bid procedures and the sale of a substantial portion of the Debtors' assets to MMC.

2422510v.10

become due. Of no less import is the fact that absent adequate funding, the Debtors would not have the ability to satisfy the conditions of their sale agreement with MMC, effectuate an orderly sale of their assets and preserve value for the benefit of their creditors.

3.      The DIP Revolving Loan Agreement, DIP Term Loan Agreement, and all other DIP Documents have been negotiated at arms' length with all parties represented by experienced counsel. Further, as set forth below, the proposed financing is on terms better than the Debtors could obtain from other lenders. If anything, the historical business relationship between the Debtors and the DIP Lender and DIP Agent affords a level of comfort and familiarity that will facilitate postpetition access to funding.

## II.    **JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This mater is a core proceeding under 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

## III.   **BACKGROUND**

5.      On May ___, 2013 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee of unsecured creditors has been appointed in these cases.

6.      **SSMC**: SSMC is a not-for-profit 252-bed, community-based teaching hospital offering primary, acute, emergency and long-term health care to the working class residents of

southern Westchester. Founded in 1892 and located at 16 Guion Place, New Rochelle, New York 10802, SSMC is a major teaching affiliate of New York Medical College. SSMC is home to a comprehensive orthopedic program, stroke and bariatric centers of recognized excellence, the only trauma center in southern Westchester and a reputable level 3 perinatal hospital.

7.      SMMC employs approximately 1,236 people of which 550 belong to the local chapter of the Service Employees International Union (the "**Local 1199**"), and 250 belong to the New York State Nurses Association ("**NYSNA**"). SSMC's monthly payroll is approximately $6.5 million inclusive of wage related benefits. As of December 31, 2012, SSMC's total unrestricted assets as reported on its balance sheet were just under $100 million and its liabilities totaled just under $140 million. SSMC's revenues for the year 2012 totaled just under $152 million and expenses aggregated over $170 million.

8.      **MVH**: MVH is a voluntary, not-for-profit, 196-bed hospital located at 12 North Seventh Avenue, Mount Vernon, New York, serving the City of Mount Vernon, the Pelhams, East Yonkers, New Rochelle and North Bronx. MVH also operates the Dorothea Hopfer School of Nursing, chartered by New York State since 1901. Since its founding in 1891, MVH and its affiliated physicians have been providing a full range of diagnostic and therapeutic medical and surgical services and a wide range of specialty programs. The MVH facilities include twenty-five ambulatory clinics and also offer comprehensive inpatient and outpatient behavioral health programs consisting of psychiatric services designed specifically for individuals whose needs have not been met through traditional approaches.

9.      MVH employs approximately 590 people of which 291 belong to Local 1199, and 104 belong to NYSNA. As of December 31, 2011, MVH's total unrestricted assets as reported on its balance sheet were just under $19.9 million and its liabilities totaled just under $46.7

6

million. For the year ending December 31, 2012, MVH's revenues totaled more than $70.4 million and expenses aggregated over $77.5 million.

10. **SECC**: Established in 1971, SECC is a 150-bed, comprehensive facility offering short-term rehabilitation/sub-acute care, as well as skilled long-term care. SECC dedicates 100-beds for long-term skilled medical management for individuals with chronic conditions or disabilities who are no longer capable to live independently. The remaining 50-beds are utilized for short-term stays and rehabilitation to accommodate patients recovering from heart surgery, heart attacks, strokes, and orthopedic surgery.

11. SECC employs approximately 160 people of which 108 belong to the Local 1199, and 24 belong to NYSNA. SECC's monthly payroll is approximately $800,000 inclusive of wage related benefits. As of December 31, 2011, SECC's total unrestricted assets as reported on its balance sheet were just under $8.2 million and its liabilities totaled just under $10.9 million. SECC's revenues for 2012 totaled just under $20.2 million and expenses aggregated over $20 million. For the year ending December 31, 2011, SECC had over $17.4 million in total revenue and expenses aggregated just over $19.2 million.[6]

12. **Charitable Mission**: In furtherance of their charitable mission, the Debtors provide critical healthcare services to uninsured and indigent populations. As a designated safety net provider, SSHS has been recognized by the State of New York as a leading provider of charitable care to the residents of southern Westchester County. The Debtors provide discounted or free care on a sliding scale basis to patients who are financially unable to pay for services

---

[6]    The Other Debtors have limited or no operations. NRHMC is a for-profit corporation whose business activities consists primarily of locating, negotiating and providing physicians and other healthcare entities with real estate rentals. MVH, also a not-for-profit corporation, holds the membership interest in the parking garage located adjacent to the MVH property. Its average revenues for the last three years have been less than $25,000 per year. It does not have any current operations, existing debt or other liabilities. NRSSH owns the Goldstein Pavilion which is leased to SSMC and used as part of the hospital space. Finally, SSHS was a system formed in 1997 when four affiliated healthcare institutions joined together to create one of the largest regional healthcare systems between New York City and Albany. SSHS holds the membership interests in SSMC, MVH and SECC.

rendered. The Debtors do not pursue amounts due for charity care through collection. Accordingly, any such amounts due to the Debtors are not reported as revenue. However, the Debtors are entitled to distributions from the New York State Charity Care pools due to the provision of such charitable care. In 2011, the Debtors provided over $22.3 million in charitable care.

13. **Events Leading to Filings**: As is true with many community hospitals serving a working class constituency, the Medical Centers have been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors. Commencing in 2006 and increasingly each year thereafter, the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix. Operating revenues decreased, leading to significant losses in the years preceding these filings. Cash book balances were frequently negative, and vendor payables increased to over 225 days past due. With a substantial portion of their assets encumbered, the Debtors had limited ability to obtain sufficient working capital financing. Simultaneously, the Debtors are faced with increased competition from other regional healthcare providers.

14. The Debtors sought to address one component of this liquidity crisis, vendor payables, through a voluntary restructuring and reduction of unsecured indebtedness and in 2008 effectuated a creditor compromise. More than $20 million of unsecured indebtedness obligations were settled at significant discounts. Coupled with cost cutting measures, the Debtors were repositioned to improve financially.

15. Additionally, in order to increase overall efficiency in their operations, in October 2011, MVH and SSMC executed a conversion to a new electronic medical record and billing

8

system. Multiple problems were encountered during the conversion process which still have not been fully remedied. Major delays in billing and cash collections resulting from the conversion led to increased patient account denials and bad-debt write offs. To avoid continued delays and losses, it became necessary (at significant cost) to dedicate additional resources to resolve the conversion issues, resulting in a further drain on available cash and resources. As a consequence, liquidity again became a pressing issue, this time preventing the Debtors from implementing critical system updates vital to improving its infrastructure and physical plant.

16.     Liquidity delays have also extended vendor disbursements. The mounting trade payable liabilities led, in some cases, to the immediate termination of necessary service relationships. In other cases, the Debtors were forced to renegotiate existing terms and payment of outstanding liabilities. Simultaneously, the Debtors were facing a decrease in volume and a shift over the course of the last two years from the provision of inpatient care to increased ambulatory care at lower reimbursement rates. During this same period of time, provider costs continued to increase.

17.     **Marketing Process**: As the Debtors' financial condition continued to deteriorate, the Debtors began to actively search for a viable healthcare partner or other affiliation for the Debtors' medical centers (the "**Medical Centers**"). The Debtors recognized that a merger or affiliation with a strong healthcare partner was critical to their ability to maintain operations and their charitable mission, achieve administrative efficiencies and reduce overhead costs, attract and retain quality physicians, gain increased access to much needed capital, make necessary capital improvements and implement long overdue technological upgrades.

18.     Thus, commencing in or about, August 2012, the Debtors set out to explore a potential strategic transaction with another hospital or healthcare institution. Working with their

9

financial advisor, Alvarez & Marsal ("**A&M**"), the Debtors looked at the downstate market and attempted to identify those hospitals or healthcare systems that might have an interest and the financial wherewithal to partner with the Debtors.   The Debtors also consulted with NYS Department of Health ("**DOH**"), which would have to approve any transaction.   DOH advised that it would only accept an active parent arrangement, i.e. where the acquirer would commit meaningful financial support to the transaction and the ongoing system.   Given the not-for-profit hospital structure in New York, the list of potential acquirers was limited and excluded almost all out of state prospects as the substantially majority of those are for profit institutions.   The active parent requirement further limited the pool of likely partners.

19.     The Debtors and A&M concluded that Westchester County Health Care Corporation ("**WCHCC**"), the owner of Westchester Medical Center, was the only likely candidate in the Westchester area; that no other hospital or system in the region would have the financial ability, experience and strategic design to absorb the Medical Centers. Potential active parents in the New York Metropolitan region included: Montefiore Medical Center ("**MMC**"), North Shore-LIJ Health System, ("**NS/LIJ**") and NYU Medical Center ("**NYU**").   The lone out of state prospect, given its size and not-for profit ownership was Yale-New Haven Health System ("**Yale**").

20.     Each of those potential candidates were approached and provided a sizeable and comprehensive package of information regarding the Debtors, a detailed description of the proposed strategic arrangement and the financial requirements.   Furthermore, the process was not run in secret.   DOH and DASNY (as defined herein) were kept advised of the Debtors efforts, and the search for a strategic partner was known generally to the healthcare community at large. Thus, any other party certainly could have expressed interest, but did not.   NS/LIJ advised the

10

Debtors early in the review process that the Westchester market was not a priority in their long range strategic plan. Each of NYU and Yale discussed possibilities with the Debtors on a number of occasions but each ultimately opted out as well. The only two seriously interested parties were MMC and WCHCC. The Debtors' board met and determined to first pursue the WCHCC proposal given WCHCC's expressed desire to pursue the transaction without a bankruptcy.

21.     In November 2012, SSHS and WCHCC entered into a memorandum of understanding which contemplated a full asset merger between the parties and several months of extensive negotiations followed. However, the parties were unable to finalize a transaction with sufficient purchase consideration.

22.     As a result, the Debtors re-commenced discussions with MMC regarding a potential transaction. Following intensive, arms length, good faith negotiations among the Debtors and MMC, the parties entered into an asset purchase agreement (the "**Purchase Agreement**"). As part of their restructuring strategy, the Debtors intend to sell all of their Owned Real Property, Furniture, Fixtures, Inventory, Assigned Contracts and related operating assets, which collectively comprise the Acquired Assets (all as defined in the Purchase Agreement), to MMC. The aggregate Purchase Price for the Acquired Assets totals $54 million, plus the appraised value of the Furniture, Fixtures and Inventory, payable in cash at the closing subject to adjustments. These adjustments include, *inter alia*, any repayment of the DIP Term Loan or DIP Revolving Facility made by MMC pursuant to its guaranty, any Assumed Liabilities, any Cure Amounts (not to exceed $3 million) and any assumed Employee Liabilities.

23.     It is a condition of the Purchase Agreement that the sale of the Debtors' assets be consummated pursuant to the provisions of section 363 of the Bankruptcy Code, and subject to

11

higher and better offers. In furtherance of that effort, the Debtors' respective boards voted to approve the filing of voluntary petitions pursuant to Chapter 11 of the Bankruptcy Code for each of the Debtors.

## IV.    PREPETITION SECURED DEBT

**A.    MidCap Prepetition Revolving Credit and Term Loan Facilities**

24.    Pursuant to that certain Credit and Security Agreement dated April 8, 2011 and related financing documents (the "**Original Credit Agreement**") by and between SSMC and MidCap, as agent and lender (the "**Prepetition Revolving Loan Agent**"), the Prepetition Revolving Loan Agent made available to SSMC a revolving credit facility in an amount up to Fifteen Million Dollars ($15,000,000) (the "**Original Loan**"), which Original Loan was secured by SSMC's accounts receivable arising out of the performance or delivery of any medical, surgical, diagnostic, dental or other professional services and/or the supply of goods related to such services (the "**Prepetition Accounts**"). The Prepetition Revolving Loan Agent immediately assigned its rights and obligations as agent under the Original Credit Agreement to MidCap Funding.

25.    Subsequently, pursuant to a certain Amended and Restated Credit and Security Agreement dated June 8, 2011, and related financing documents (the "**Prepetition Revolving Credit Agreement**"), the Original Credit Agreement was modified to add SECC as a borrower and increase the amount of the Original Loan to a revolving loan in an amount up to Eighteen Million Dollars ($18,000,000) (the "**Prepetition Revolving Loan**"). In addition, in connection with the Prepetition Revolving Credit Agreement and Prepetition Revolving Loan, each of SSMC and SECC granted a lien in their respective Prepetition Accounts to secure the Prepetition Revolving Loan and a certain Prepetition Term Loan (as defined below). The outstanding

12

principal balance of the obligations owing under the Prepetition Revolving Loan is approximately $16.2 million (the "**Prepetition Revolving Loan Obligations**").

26.    On the same date, SECC and MidCap, as lender and agent, entered into a Credit and Security Agreement and related Mortgage, Assignment of Leases and Rents and Security Agreement (collectively, the "**Prepetition Term Loan Agreement**"), pursuant to which MidCap extended SECC a $7 million term loan (the "**Prepetition Term Loan**") secured by a first priority mortgage lien (the "**Prepetition Mortgage**") on SECC's real property at 75 Glover Johnson Place, New Rochelle, NY (the "**SECC Property**" and, together with the Prepetition Accounts, the "**MidCap Prepetition Collateral**").    The Prepetition Term Loan Agent immediately assigned its rights and obligations as agent under the Prepetition Term Loan Agreement to MidCap Funding.    The outstanding principal balance of obligations under the Prepetition Term Loan is approximately $5.8 million (the "**Prepetition Term Loan Obligations**").

27.    On or prior to the closing of the DIP Revolving Loan Agreement, SECC and MidCap Funding shall amend the Prepetition Term Loan Agreement (the "**Prepetition Term Loan Amendment**") to, *inter alia*, add the DIP Revolving Loan Agreement to the defined term "**Affiliated Financing Documents**" and the DIP Revolving Facility to the defined term "**Affiliated Obligations**".

B.    **Sun Life Assurance Company of Canada (US) ("Sun Life").**

28.    On April 4, 2006, SSMC executed a Promissory Note (the "**Sun Life Note**") and Mortgage and Security Agreement (the "**Sun Life Mortgage**") in favor of Sun Life in the original principal amount of $12 million, secured by a first mortgage on the SSMC real property which constitutes the main hospital campus and SSMC's ambulatory care facility and clinics (the

"**SSMC Property**"). There is currently due to Sun Life approximately $8.98 million under the Sun Life Note and Mortgage

## C.    **Pension Benefit Guaranty Corporation ("PBGC").**

29.    SSMC sponsored the Cash Balance Retirement Plan  for the benefit of its employees (the "**SSMC Pension Plan**") which is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation (the "**PBGC**") under Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), 29 U.S.C. §§ 1301-1461, et seq.  The Pension Plan is subject to the minimum funding requirements of ERISA and § 412 of the  Internal Revenue Code.

30.    SSMC failed to meet the terms of its minimum funding waiver under the SSMC Pension Plan for the 1995 and 1997 years, and to secure its obligations to the PBGC for those amounts (the "**SSMC Pension Plan Claim**") granted the PBGC mortgage liens in the original principal amount of $2.582 million in April 1997 and $3.488 million in November 1998 encumbering certain parking lots (the "**SSMC Lots**") situated on the SSMC hospital campus (the "**PBGC Lot Mortgages**").  As of the Petition Date, the outstanding amount of the SSMC Pension Plan Claim is approximately $5.763 million

31.    In 2003, SSMC was again unable to meet its minimum funding requirements under the SSMC Pension Plan and a voluntary distress termination of the plan ensued.  On October 31, 2003, as amended on December 31, 2008, SSMC and the PBGC entered into a Settlement Agreement pursuant to which SSMC remains obligated under a note to PBGC for termination payments aggregating approximately $15.820 million (the "**Settlement Amount**"). In addition to the lien on the SSMC Lots under the PBGC Lot Mortgages, the Settlement Amount was further to be secured by a subordinated security interest in the amount of $9.620 million on the SSMC hospital campus (the "**PBGC Subordinated Lien**").  It does not appear,

14

however, that the PBGC Subordinated Lien was ever perfected by the filing of a mortgage or other recording instrument.

32.    On July 31, 2010, MVH terminated the Mount Vernon Hospital Employees' Retirement Plan (the "**MVH Pension Plan**").  PBGC asserted a claim for unfunded benefit liabilities as of the Plan termination date, *i.e.* the shortfall in plan assets necessary to pay all benefits promised under the MVH Pension Plan in the alleged amount of $4.032 million (the "**MVH Pension Plan Claim**").  On July 15, 2010, PBGC filed a Notice of Federal Lien under IRC Section 412(n) against MVH's real and personal property (the "**PBGC MVH Lien**").

**D.**    **Dormitory Authority of the State of New York ("DASNY").**

33.    Pursuant to a First Amended Reimbursement Agreement, dated as of February 13, 2008, DASNY loaned $2 million to SSMC (the "**First Amended Reimbursement Agreement**") to fund working capital requirements.    The First Amended Reimbursement Agreement consolidated SSMC's obligations to DASNY under a prior reimbursement agreement, dated January 29, 2002, pursuant to which SSMC had received the first installment of a restructuring pool loan in the amount of $1 million (the "**Original Reimbursement Agreement**").  The loans were based on SSMC's participation and qualification for the Health Facility Restructuring Program established by DASNY and the New York State Housing Finance Agency.  Neither the Original Reimbursement Agreement nor the First Amended Reimbursement Agreement provided for the grant of a security interest in favor of DASNY.

34.    On April 14, 2008, DASNY and SSMC executed a Second Amended Reimbursement Agreement (the "**Second Amended Reimbursement Agreement**"), pursuant to which DASNY agreed to advance an additional $2 million to SSMC.  At the time the Second Amended Reimbursement Agreement was executed , there was a remaining balance of $2,146,606.91 under the Original Reimbursement Agreement and the First Amended

15

Reimbursement Agreement. Thus, following the execution of the Second Amended Reimbursement Agreement, the aggregate principal loan amount due to DASNY was $4,146,606.91. The additional funds loaned by DASNY under the Second Amended Reimbursement Agreement were also issued on an unsecured basis.

35.    Subsequently, on August 11, 2009, the parties agreed to enter into a second Reimbursement Agreement (the "**2009 Reimbursement Agreement**") which provided for advances by DASNY in the amount of $5 million to SSMC (the "**DASNY 2009 SSMC Loan**") for the purpose of providing working capital to SSMC and facilitating refinancing of SSMC's existing credit facility with CIT with a facility from MidCap. As security for the DASNY 2009 SSMC Loan, DASNY was granted a lien in SECC's real property. To later facilitate the refinancing of SSMC's credit facility under the Prepetition Revolving Credit Agreement, DASNY agreed to subordinate its mortgage lien on SECC's real property to MidCap Funding. As of the Petition Date, the outstanding amount of the DASNY 2009 SSMC Loan was approximately $5.187 million.

36.    On October 1, 2010, DASNY entered into a First Amended Reimbursement Agreement with MVH (the "**MVH Amended Reimbursement Agreement**"), providing for a $2 million pool loan to MVH. This advance was in addition to a $500,000 loan previously issued to MVH under the first MVH Reimbursement Agreement, dated as of August 31, 2010. Following the execution of the MVH Amended Reimbursement Agreement, the aggregate principal amount of the MVH debt to DASNY was increased to $2.5 million. The funds loaned by DASNY under the MVH Amended Reimbursement Agreement were originally secured by a HEAL grant which was received and utilized by MVH. Thus, this obligation remains unsecured.

16

37.    Finally, on August 14, 2012, DASNY and SSMC executed an additional reimbursement agreement (the "**2012 SSMC Agreement**"), pursuant to which DASNY loaned the amount of $2.9 million to SSMC for working capital purposes ("**DASNY 2012 SSMC Loan**"). As security for the DASNY 2012 SSMC Loan, DASNY was granted a second lien and security interest on the MVH real property and a lien on the proceeds of any HEAL NY Grants awarded to SSMC. As of the Petition Date, the outstanding balance of the DASNY 2012 SSMC Loan is approximately $2.92 million..

E.    **Hudson Valley Bank ("HVB").**

38.    On April 6, 2004 and October 28, 2005, MVH procured two revolving lines of credit from HVB in the amounts of $2 million and $3 million respectively, which were ultimately consolidated into a single revolving line of credit (the "**HVB Revolving Loan**") in the aggregate amount of $5 million pursuant to a mortgage modification and extension agreement, dated as of October 28, 2005. As security for the HVB Revolving Loan, MVH was granted a first lien in the MVH real property (the "**MVH Real Property**"). In addition, HVB was granted a first lien on all of MVH's revenues, receipts, income, accounts, accounts receivables, inventory, personal property and general intangibles (the "**MVH Personal Property**", and together with the MVH Real Property, the "**MVH Property**"). As part of the arrangement, MVH also executed an Assignment of Leases and Rents, assigning all of MVH's rights as lessor under any leases affecting the MVH Property. As of the Petition Date, HVB was owed approximately $702,790.

F.    **Internal Revenue Service ("IRS")**

39.    On April 16, 2013, the IRS filed a Notice of Federal Tax Lien against the property of MVH in the amount of $736,805.90 ("**MVH Tax Lien**"). The lien covered unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30

17

and September 30, 2012. Any underlying tax and interest has been paid. Since the filing of the MVH Tax Lien, the IRS has issued a waiver of penalties. Thus, although there has been no formal release of lien as of the Petition Date, the underlying liability has been satisfied and the lien is of no force and effect.

40.     On March 28, 2013, the IRS filed a Notice of Federal Tax Lien against the property of SSMC in the amount of $1,461,400 ("**SSMC Tax Lien**" and, together with the MVH Tax Lien, the "**Tax Liens**"). The lien covered unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30 and September 30, 2012. The underlying taxes and interest have been paid. There is pending a request for the waiver of penalties. If granted, the lien will be of no force and effect. If not, the Debtors believe the SSMC Tax Lien is otherwise voidable on multiple grounds.

**G.     Other Judgments and Liens (the "Other Judgment and Lien Creditors").**

41.     1199 SEIU Healthcare Workers, one of the Debtors' principal unions, has obtained multiple judgments against each of SSMC and MVH for unpaid contributions and benefit payments due the 1199 Funds and has recorded the judgments against SSMC and MVH real property. 1199 currently asserts judgments liens on the SSMC and MVH real property in the amount of $6,083,497.19 and $4,156,460.01 respectively. The New York State Department of Labor, in turn, has recorded judgments against SSMC in the aggregate amount of $21,800 and against MVH in the aggregate amount of $117,670.

42.     Various mechanics lien have also been asserted of record as follows: (a) with respect to SSMC: (i) Graybar Electric Company, Inc, recorded a lien as of May 29, 2012 in the amount of $17,458; (ii) D&D Elevator Maintenance, Inc. recorded a lien as of August 22, 2012 in the amount of $525,880; and (iii) Omega Environmental Services, Inc. recorded a lien on

February 13, 2013 in the amount of $138,742; and (b) with respect to MVH: StonCor Group, Inc. recorded a lien on May 25, 2012 in the amount of $4,995.40.

43.    Sun Life, PBGC, DASNY, HVB, IRS and the Other Judgment and Lien Creditors are collectively referred to herein as the "**Secured Creditors**". The prepetition liens and claims of the Secured Creditors and MidCap Funding are collectively referred to the "**Prepetition Liens**"), and the real and personal property in which the Secured Creditors and MidCap Funding hold Prepetition Liens is collectively referred to herein at the "**Prepetition Collateral**"). The prepetition claims and obligations of the Secured Creditors secured by their respective Prepetition Liens in Prepetition Collateral are collectively referred to as the "**Prepetition Obligations**".

## IV.    PROPOSED DIP LOAN FACILITY AND USE OF CASH COLLATERAL

### A.    The Need for Postpetition DIP Financing.

44.    As noted above, in order to maximize the value of their existing asset base, the Debtors intend to sell a substantial portion of their real property assets and related personalty to MMC which will thereafter continue operations at the Debtors' former facilities under their own auspices. Such a sale will not only permit the continuation of the Debtors' charitable not-for-profit mission, it will provide an important source of health care to an underserved population in the Southern Westchester community. It is a condition of the sale to MMC that, *inter alia*, there be no material adverse change in the business or assets of the Debtors and operations pending the closing continue in the ordinary course.

45.    Absent the DIP Financing the Debtors will not have sufficient sources of working capital to continue as a community based acute care provider of essential medical services and maintain the value of their assets. The ability of the Debtors to pay their medical staff and other employees, provide critical patient care, maintain business relationships with vendors and

19

suppliers, purchase new inventory, and otherwise finance their operations is essential to the Debtors' continued viability and the ultimate sale process. Without the DIP Financing, serious and irreparable harm could result, not only to the operations but to the very persons who depend on the Debtors and are unable to protect their interests, including, but not limited to, the Debtors' underserved patient population. The purpose of the DIP Financing thus will be to preserve and maintain the going concern value of the Debtors and to protect patients and other persons dependent on the Debtors' services while the sale process unfolds.

46.     Given the Debtors' financial condition, current financing arrangements, and capital structure, the Debtors do not have significant unencumbered funds and are otherwise unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. As detailed more fully below, financing on a postpetition unsecured or solely on a superpriority basis is not available. The DIP Lender is willing to provide the DIP Financing pursuant to section 364(c)(1) of the Bankruptcy Code, provided that the DIP Lender has priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens  (including priming liens) upon the property described below pursuant to sections 364(c) and 364 (d) of the Bankruptcy Code. The Debtors have made inquiry of other lenders and are unable to obtain from another lender the necessary postpetition financing that they need on terms more favorable in the aggregate than those provided in the DIP Credit Agreement (as discussed below). Four other potential lenders were contacted. Two passed on the opportunity after initial due diligence. The other two presented proposals containing collateral and guaranty terms which were less advantageous or

20

otherwise could simply not be satisfied by the Debtors.  Thus, MidCap presented the only viable program for postpetition financing.

**B.    The Economic Terms of the Postpetition Financing;**
**      DIP Liens and Superpriority Claim**

47.    Under the proposed DIP Credit Agreement, the DIP Lender will make cash advances and other extensions of credit in a maximum principal amount not to exceed $33.0 million on a revolving credit ($23 million) and term basis ($10 million) under and subject to the terms and conditions of DIP Documents.

48.    The proceeds of the DIP Revolving Facility and DIP Term Loan under the DIP Documents will be used by the Debtors to: (i) repay the Prepetition Revolving Loan Obligations owing to MidCap Funding; (ii) pay the fees and expenses due DIP Agent under the DIP Credit Agreement; (iii) pay all Prepetition Term Loan Obligations as they become due under the Prepetition Term Credit Agreement; (iii) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (iv) the costs and expenses associated with these Chapter 11 Cases, including the fees, costs, expenses and disbursements of professionals retained by the Debtors and any statutory committee appointed in these Chapter 11 Cases (the "**Committee**"), and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, .all in accordance with the terms of the Budget.

49.    The proposed DIP Revolving Facility will operate in two stages.  First, under the proposed Interim Order, the initial loans and advances, as limited by the terms of the DIP Revolving Loan Agreement, will be used to pay for the Debtors' working capital needs and operating requirements prior to the entry of the Final Order, pursuant to the Budget.  Upon approval at the final hearing (the "**Final Hearing**") and subject to and upon entry of the Final

Order, the Debtors seek on a final basis to use proceeds of the DIP Revolving Facility to refinance the Prepetition Revolving Loan Obligations. However, until entry of the Final Order, the Debtors shall pay to MidCap Funding, as adequate protection payments, all of the proceeds of any Prepetition Accounts collected, and MidCap Funding shall apply such proceeds to the reduction of the Prepetition Revolving Loan Obligations. Upon entry of the Final Order, any remaining availability under the DIP Revolving Facility, together with the proceeds of the DIP Term Loan, will become available for the Debtors' use subject to the DIP Documents.

50. The other significant terms of the DIP Financing and DIP Documents include the following[7]:

> (a) <u>DIP Revolving Facility</u>: The DIP Revolving Facility shall be in the maximum amount of $23 million. Funding is based on the Borrowing Base. Subject to certain limitations in the DIP Revolving Credit Agreement, the Borrowing Base shall be: (i) the product of (A) eighty-five percent (85%) multiplied by (B) the aggregate net amount at such time of the Eligible Accounts; minus (ii) the amount of any reserves and/or adjustments provided for in the DIP Revolving Loan Agreement (including, without limitation, the Carve-Out Reserve[8] and the Term Loan Reserve); provided, that (X) at no time shall the Borrowing Base for SSMC exceed $16,000,000, (Y) at no time shall the Borrowing Base for SECC exceed $2,000,000, and (Z) at no time shall the Borrowing Base for MVH exceed $5,000,000. DIP Revolving Loans shall be subject to Agent's continuing right to withhold from the Borrowing Base reserves,

---

[7]    The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Documents, copies of which are available upon request to Counsel for the Debtors. The description of the terms of the DIP Documents set forth in this Motion is provided for the convenience of the Court and the parties-in-interest. In the event of any inconsistency between the description of the terms of the DIP Documents contained in this Motion and the actual DIP Documents, the terms of the DIP Documents shall govern.

[8]    The "Carve Out" shall encompass the following expenses: (a) following the occurrence of an Event of Default): (i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtors (the "**Debtors' Professional Fee Payments**") in an aggregate amount for all the Debtors' Professional Fee Payments not to exceed [$250,000] incurred after the Triggering Event; (ii) allowed fees and reimbursements for disbursements of professionals retained by any Committee appointed by this Court (the "**Committee's Professional Fee Payments**") in an aggregate amount for all of the Committee's Professional Fee Payments not to exceed [$150,000] incurred after an Event of Default (collectively, (i) and (ii), the "**Carve Out Amount**"); (iii) quarterly fees pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees payable to a chapter 7 trustee in an aggregate amount not to exceed [$15,000]; and (b) without reducing the Carve Out Amount, all Debtors' Professional Fee Payments and Committee's Professional Fee Payments allowed, or subsequently allowed, and payable under sections 330 and 331 of the Bankruptcy Code, to the extent incurred prior to such Event of Default (the "Pipeline Period"). Nothing herein shall be construed as a waiver of the right of the Lender to object to the allowance of any Professional Fees and Disbursements. The Carve Out shall be senior to the DIP Liens and the Replacement Liens.

and to increase and decrease such reserves from time to time if and to the extent that in Agent's good faith credit judgment and discretion such reserves are necessary. Debtors shall maintain an average Minimum Balance of 85% of the average Borrowing Base for the preceding month.

(b)     Term Loan Facility.  The DIP Term Loan shall be in principal amount of $10 million.

(c)     Interest, Fees and Expenses:  Interest on the outstanding balance of the DIP Revolving Loans shall be payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 2.50% floor) plus 7.50%, reset monthly.  Interest on the outstanding balance of the DIP Term Loan shall be payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 2.50% floor) plus 6.50%, reset monthly Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.  Funds transferred from the Payment Account for application to any DIP Revolving Loans shall be subject to a six business day clearance period and Interest shall accrue on the Revolving Loans during such period.  Debtors shall also pay the following fees monthly in arrears: (i) a collateral management fee of 1.20% per annum on the average outstanding balance of the Revolving Loans (which shall not be less than the Minimum Balance; (ii) an unused line fee equal to 0.50% per annum of the average unused portion of the Revolving Loan Commitment; (iii) a non-refundable origination fee equal to 1.0% of the Revolving Loan Commitment; (iv) a fully earned exit fee due upon the indefeasible payment in full of all Obligations equal to 2.0% of the Revolving Loan Commitment; (v) the costs and expenses (including the fees of counsel and other professionals) in connection with the negotiation, preparation, approval and closing of the DIP Documents and the enforcement of any rights thereunder; and (vi) the fees and expenses of Agent's audits, wire fees and late charges

(d)     Collateral for the DIP Revolving Facility:  As security for the full and timely payment of DIP Revolving Facility, MidCap, as the DIP Revolving Loan Agent, shall be granted, pursuant to sections 364(c) and (d): (i) first priority security interests in and liens on, and pledges of, such now existing and hereafter acquired assets of SSMC and SECC to the same extent as described in the Prepetition Revolving Credit Agreement; (ii) first priority security interests in and liens on the "Collateral" (as defined in Schedule 9.1 of the DIP Revolving Loan Agreement); (iii) subject and subordinate to any pre-existing liens (collectively, the "**Permitted Liens**"), including the first mortgage lien presently existing in favor of Sun Life , any judgment liens in favor of the 1199 Funds and any other pre-existing liens of any Other Judgment and Lien Creditor, security interests in and liens on all of the real and personal property comprising the Sound Shore Medical Center located at 16 Guion Place, New Rochelle, NY; (iv) subject and subordinate to any pre-existing liens, including the first mortgage lien presently existing in favor of HVB, any liens in favor of DASNY and PBGC, any judgment liens in favor of the 1199 Funds, and any other pre-existing lines of any Other Judgment and Lien Creditor, security interests in and liens on all of the real and

23

personal property comprising the Mount Vernon Hospital located at 12 N 7th Ave, Mt. Vernon, NY 10550; (v) subject and subordinate to any pre-existing liens, including the first mortgage lien presently existing in favor of MidCap Funding as per that certain Subordination Agreement, as may have been amended from time to time, made as of June 8, 2011 by and among DASNY and MidCap Funding, as successor to the Prepetition Term Loan Agent, any liens in favor of DASNY and PBGC, and any other pre-existing lines of any other Judgment and Lien Creditor, security interests in and liens on all of the real and personal property comprising Howe Avenue Nursing Home, d/b/a Schaffer Extended Care Center located at 16 Guion Place, New Rochelle, NY 10801; and (vi) all proceeds and products of the foregoing.[9]  (collectively, "**DIP Revolving Loan Facility Collateral**")  The DIP Revolving Loan Facility Collateral excludes any and all causes of action and proceeds therefrom of the Debtor or any of their estates under sections 544, 545, 547, 548, 550 and 724 of the Bankruptcy Code (the "**Avoidance Actions**").

(e)     Collateral for the Term Facility.  The DIP Term Loan Agent, as security and collateral for the DIP Term Loan, shall receive: an irrevocable, unconditional, transferable standby letter of credit, with an initial expiration date of not less than one (1) year and with an evergreen provision, provided by MMC in favor of DIP Term Loan Agent; (the "**DIP Term Loan Collateral**" and together with the DIP Revolving Facility Collateral, the "**DIP Collateral**").

(f)     Superpriority Administrative Expense Claim; Carve-Out; Waiver under Section 506(c).  Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall have the status of an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**").  The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out, and shall otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code.   The DIP Superpriority Claims shall not extend to (i)

---

[9]      As set forth more fully in the Revolving Loan Agreement, in connection with the proposed sale of the Debtors' assets, MidCap required, and MMC as purchaser agreed, to guarantee any shortfall in the collection of outstanding obligations under the DIP Revolving Loan Agreement after seventy-five (75) days after closing of such sale up to a maximum amount $5,000,000, plus any costs of enforcement, and secure all such guaranteed obligations with a first priority security interest on all "Collateral" (as defined in Schedule 9.1 of the DIP Revolving Loan Agreement) generated by or in connection with the operation of the Debtors' assets acquired in such sale pursuant to a guaranty in a form mutually agreeable to DIP Agent and MMC  In addition, as the stalking horse bidder, MidCap required, and MMC agreed to provide, inter alia, an additional guaranty in an amount of $7 million to $10 million to collateralize Postpetition Term Loan Obligations.  Absent the Guaranty, MidCap would not have provided the DIP Financing

24

2422510v.10

commercial tort claims or (ii) any Avoidance Actions under chapter 5 of the Bankruptcy Code except claims arising under section 549 of the Bankruptcy Code.

(g)     Use of Proceeds:  The proceeds of the DIP Financing will be used to: (i) pay in full the Prepetition Revolving Loan Obligations owing to MidCap; (ii) pay the fees and expenses due DIP Agent under the DIP Credit Agreement; (iii) pay all Prepetition Term Loan Obligations as they become due under the Prepetition Term Credit Agreement; (iv) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (v) the costs and expenses associated with these Chapter 11 Cases, including the fees and expenses of counsel and other retained professionals, all in accordance with the terms of the Budget.

(h)     Limitation on Use of Proceeds.  The DIP Credit Agreement provides that no portion of the Revolving Loans, the Collateral, the Carve-Out funds or cash collateral of Agent or Lenders may be used, among other things, to fund any activities: (i) preventing, hindering, or delaying any of the Agent's or the Lenders' enforcement or realization upon any of the Collateral; (ii) using or seeking to use Agent's or any Lenders' cash collateral or selling or otherwise disposing of any of the Collateral without the consent of the Agent and the Required Lenders; (iii) objecting or challenging in any way any claims, Liens, or Collateral; (iv) asserting any claims or causes of action including, without limitation, any action under Chapter 5 of the Bankruptcy Code, against any of Agent, the Lenders, or any of their respective agents, attorneys, advisors, professionals, officers, directors, and employees; (v) prosecuting an objection to, or contesting in any manner, or raising defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens of the Agent or Prepetition Agent securing the Obligations or the Prepetition Obligations, or (vi) taking any action which (A) has or could have the effect of adversely modifying or compromising the rights and remedies of the Agent, the Lenders, Prepetition Agent, or Prepetition Lenders, (B) is contrary, in a manner that adverse to the Agent, the Lenders, Prepetition Agent or the Prepetition Lenders, to any term or condition set forth in any of the Financing Documents or the Financing Orders or (C) results in the occurrence of an Event of Default.

(i)     Joint and Several Liability.  Each Borrower shall be jointly and severally liable for all of the obligations of all Borrowers under this Agreement.  Each Borrower acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Debtors named as the Borrowers herein, the joint and several liability of all such Debtors, and the cross-collateralization of the collateral of all such Debtors.

(j)     Lockboxes and Cash Management.  Debtors shall maintain their cash management procedures reasonably satisfactory to MidCap, including blocked account and lockbox agreements that will provide for full dominion and automatic daily sweeps into a collection account controlled by the Agent.

25

2422510v.10

(k)     Term:  All obligations and commitments of DIP Lender under the Interim Order and Final Order, and the Debtor's authorization to borrow funds pursuant to the DIP Documents shall terminate on the earlier of (i) twelve (12) months from the date of closing or if, earlier, the Asset Sale Effective Date, or (b) the occurrence of an Event of Default (as defined below) (in either case, the "**Termination Date**").

(l)     Termination and Default:     Each of the following, among other items set forth in the DIP Credit Agreement, shall constitute a Default (an "**Event of Default**") under the DIP Documents: (a) a failure to pay when due any principal, interest, premium or fee or other amount due under any of the DIP Loan Documents, (ii) there shall occur any default in the performance of or compliance of any of the terms, covenants and conditions of the DIP Documents which are not cured within the applicable grace period; (iii) material breach of any representation, warranty, certification or statement made in any of the DIP Documents; (iv) any Lien created by any of the DIP Documents shall at any time fail to constitute a valid and perfected Lien on the Collateral purported to be encumbered thereby; (v) the institution of criminal proceedings against any Borrower or Guarantor; (vi) a default or event of default occurs under any Guarantee of any portion of the Obligations; (vii) the occurrence and continuance unremedied for more than ten (10) days of any fact, event or circumstance (other than the filing of the Bankruptcy Cases) that could reasonably be expected to result in a Material Adverse Effect; (viii) if any of the Chapter 11 Cases is converted to a case under Chapter 7 of the Bankruptcy Code, or any of the Chapter 11 Cases is dismissed; (ix) if a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Borrowers' business is appointed in any of the Chapter 11 Cases; (x) except with respect to the Carve-Out, the grant to any other person of any super-priority administrative expense claim or any Lien that is pari passu with or senior to those of the Agent and the Lenders; (xi) if any Borrower or Guarantor shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Order and the Final Order; (xii) the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the Interim Order, the Final Order, the Asset Sale Order or any other order of the Bankruptcy Court affecting DIP Loan Document or the Asset Sale, in any manner not acceptable to Agent and the Required Lenders; (xiii) Debtors' failure to satisfy certain Reorganization Milestones; and (xiv) Debtors' breach of the Budget Compliance Covenant.

(m)     Rights and Remedies on Default.  Upon an Event of Default, the DIP Agent, may declare: (a) all DIP Obligations to be immediately due and payable; (b) the termination, reduction or restriction of any further lending commitment; and/or (c) the termination of the DIP Credit Agreement and any other DIP Document (a "**Termination Declaration**").  The DIP Obligations become due and payable, without notice or demand, on the Termination Declaration Date. Notwithstanding, only beginning on the seventh (7th) day after the Termination Declaration Date (such seven day period being the "**Remedies Notice Period**"), the DIP Agent shall be entitled to exercise all rights and remedies against the DIP

26

Collateral in accordance with the DIP Documents  During the first five (5) days of the Remedies Notice Period, the Debtors or any Committee appointed by this Court shall be entitled to: (i) continue to use cash on hand, including any Cash Collateral, in accordance with the Budget; and (ii) seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the Court determines during the Remedies Notice Period that an Event of Default has not occurred and/or is not continuing, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and the DIP Agent shall be permitted to exercise all remedies set forth in the DIP Documents.

(n)    Adequate Protection Obligations:  The DIP Documents also provide for the adequate protection for the Secured Parties (as described more fully below), including the granting of replacement liens on the Postpetition Collateral.

(o)    Bankruptcy Court Approval:  The Lender's commitment to fund is subject to entry of a Final DIP Order that is satisfactory to the Lender in its sole discretion.

## C.    Use of Cash Collateral

51.    In the ordinary course of business, the proceeds of substantially all of the Debtors receivables, including the Prepetition Accounts and any payments from the rental from the hospital offices and Parking Lots, are deposited in the lockbox accounts and MidCap Funding, as prepetition lender, applies the Prepetition Accounts against its loans and passes through and reimburses the Debtors' operating accounts with the non-collateral proceeds such as lease payments and parking fees.  These funds had been used by the Debtors to fund ongoing operations.  By this Motion, the Debtors propose to use the proceeds of the Secured Creditors' and MidCap Funding's Cash Collateral in accordance with the Budget, and to provide the Secured Creditors and MidCap Funding with Adequate Protection Liens (as defined below).

52.    Cash Collateral shall include: (a) all cash proceeds of Prepetition Collateral in which the Secured Creditors and MidCap Funding have an interest, whether such interest existed as of the Petition Date or arises thereafter, and (b) proceeds of the MidCap Prepetition Debt or the Prepetition Obligations.  With respect to collections of Cash Collateral after the Petition Date

27

that are proceeds of the MidCap Prepetition Collateral, the Debtors propose that such proceeds be applied against the Prepetition Revolving Loan Obligations and, after payment, in full of the Prepetition Revolving Loan Obligations, such amount shall be remitted to the DIP Revolving Agent for application against the DIP Revolving Facility Obligations.

**D.**    **Granting of Additional and Adequate Protection Liens**

53.    As noted above, the Debtor's obligations under the DIP Documents will be secured by (a) first priority liens on, and security interests in, all of the Collateral, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code subject and junior only to (i) the Carve Out, (ii) the senior Permitted Liens.

54.    Pursuant to sections 361, 364 and 507(b) of the Bankruptcy Code, as adequate protection to the Secured Creditors and MidCap Funding against any diminution of their respective interests in the Prepetition Collateral (to the extent they hold valid and perfected Prepetition Liens therein) resulting from, among other things, their subordination to the Carve Out and the DIP Liens and the Debtors' use, sale or lease of such Prepetition Collateral ( the "**Diminution in Value**"), the Debtors propose to grant the Secured Creditors and MidCap Funding automatically perfected, replacement liens on the DIP Collateral (an "**Adequate Protection Lien**") to the same extent and priority of their respective Prepetition Liens and against each Debtor in which such Secured Creditor and MidCap Funding holds an Adequate Protection Lien (an "**Applicable Debtor**"). The Adequate Protection Liens shall be deemed a Permitted Lien within the meaning of the DIP Revolving Loan Agreement. The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases.

55.    The Adequate Protection Liens proposed to be granted to the Secured Creditors and MidCap Funding shall not be (i) subject to any lien that is avoided and preserved for the

28

benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien under section 363 and 364 of the Bankruptcy Code.

**E.**    **Granting of Super-Priority Administrative Expense Claims**

56.    Only to the extent Adequate Protection Liens fail to protect the Secured Creditors and MidCap Funding against any Diminution in Value, the Secured Creditors and MidCap Funding shall be entitled, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases of the Applicable Debtors (collectively, the "**Prepetition Secured Creditor Superpriority Claims**"). The Prepetition Lender Superpriority Claims, if permitted, shall be subordinate in payment and priority only to the DIP Superpriority Claims and the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code. Notwithstanding, the Prepetition Secured Creditor Superpriority Claims shall not extend to (i) commercial tort claims or (ii) any Avoidance Actions (except claims under section 549 of the Bankruptcy Code).

**F.**    **Carve Out**

57.    Notwithstanding the granting of the DIP Liens, the Adequate Protection Lien, the DIP Superpriority Claims, and the Prepetition Secured Creditor Superpriority Claim, the Carve Out shall have priority in payment over the claims of the DIP Agent, the DIP Lender and the Secured Creditors, such that all proceeds received by such parties shall be subject to the prior payment of the Carve Out.

2422510v.10

## G.   Extraordinary Provisions of the Proposed DIP Loan Facility

58.    Pursuant to this Court's Guidelines for Financial Requests, adopted by General

Order No. M-274, the Debtors are required to highlight any "Extraordinary Provisions"

contained in the proposed DIP Documents. The Extraordinary Provisions are as follows:

(i)    "Roll Up": As discussed above, in order to increase the Borrowing Base and to eliminate the delay in providing funds, the Debtors and MidCap have agreed that on entry of the **[Final]** Order, the DIP Revolver Agent shall advance sufficient DIP Revolving Loans to repay all Prepetition Revolving Loan Obligations.[10]  The Debtors acknowledge that the Prepetition Liens granted to MidCap Funding pursuant to and in connection with the Prepetition Revolving Credit Agreement are: (i) valid, binding, perfected, enforceable, first-priority liens and security interest (the "**MidCap Prepetition Liens**") in the MidCap Prepetition Collateral; and (ii) not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law. Further, it appears the value of the MidCap Prepetition Collateral far exceeds the aggregate amount of the indebtedness, such that MidCap does not have any material collection risk with respect thereto.  The Financing Orders shall expressly provide that the Court shall have the right to unwind the repayment of the Prepetition Revolving Loan Obligations should there be a timely and successful challenge to the validity, enforceability, extent, perfection or priority of the MidCap's liens in the MidCap Prepetition Collateral, or a determination that MidCap was undersecured as of the Petition Date.

(ii)    "Section 506(c) Waivers":    The DIP Credit Agreement is conditioned upon the Financing Orders providing that the surcharge provisions of section 506(c) of the Bankruptcy Code shall not be imposed upon DIP Agent and the DIP Lender or any of their property or Collateral. The Carve Out includes, however, unpaid Court allowed fees and expenses of a trustee under section 726(b) of the Bankruptcy Code, in an amount not to exceed $15,000.

(iii)    "Lien Challenges":  In addition to the limitation on use of the proceeds of the DIP Financing as set forth in Paragraph 50(h) above, the Debtors waive the right to challenge the validity, enforceability, perfection and priority of the MidCap Prepetition Revolving Loans and MidCap Prepetition Liens. Notwithstanding, the Committee and any other party in interest may file a complaint seeking to invalidate, subordinate, or otherwise challenge (collectively, the "**Challenges**") the MidCap Prepetition Liens; provided, however, that any such Challenges must be filed in this Court within the later of sixty (60) days after the entry of a Final Order or any subsequent date ordered by the Bankruptcy Court, or that may be agreed to in writing by MidCap Funding with respect to the time to file any such Challenges. If no such Challenges are filed within such time

---

[10]    The MidCap Prepetition Term Loan will not be repaid with the proceeds of the DIP Financing.

period, then any and all Challenges shall be, without further notice to or order of the Court, deemed to have been forever released and waived as to such Committee and other parties in interest.

(iv)    The Lenders would not have agreed to provide financing to the Debtor absent such extraordinary provisions.

## V.    **EFFORTS TO OBTAIN FINANCING**

59.    Prior to the Petition Date, the Debtors explored other potential DIP financing arrangements but no other parties proposed more favorable terms than those provided in the DIP Documents with MidCap. Four other potential lenders were contacted. Two passed on the opportunity after initial due diligence. The other two presented proposals containing collateral and guaranty terms which were less advantageous or otherwise could simply not be satisfied by the Debtors.

60.    Thus, MidCap presented the only viable program for postpetition financing to meet the Debtors working capital needs within the Debtors' time constraints and without some of the contingencies which were tied to the other proposals. As negotiated, the DIP Financing will enable the Debtors to maintain their infrastructure, pay their post-petition operating expenses and costs of case administration and maximize the value of their assets and properties. The Debtors' ability to effectuate a sale(s) or other transaction(s) and realize the maximum value for the Debtors' assets is dependent upon its ability to obtain the postpetition credit sought herein so that the assets and properties can be effectively marketed. The DIP Financing is the best alternative available to the Debtors.

61.    The Debtors are otherwise unable to obtain an adequate unsecured revolving credit facility allowable under section 503(b)(1) of the Bankruptcy Code. The DIP Agent and DIP Lender also conditioned all advances to be made under the DIP Documents upon the grant to it of (a) the DIP Superpriority Claim allowable under section 503(b) of the Bankruptcy Code

32

with priority over any and all expenses and claims of any kind or nature whatsoever specified in

any other section of the Bankruptcy Code, including, without limitation, sections 503(b) and

507(b) of the Bankruptcy Code, subject only to the Carve Out, (b) first priority and senior liens

on and security interests in the Postpetition Collateral (subject only to Permitted Liens and the

Carve Out), all in accordance with sections 364(c)(1), 364(2) and 364(3) of the Bankruptcy

Code, and (c) the granting of the Priming Lien in a portion of the Postpetition Collateral, senior

in right to the Secured Parties in accordance with section 364(d) of the Bankruptcy Code.

62.    Given the nature of the Debtors' financial condition, the Debtors submit that the

financing proposed to be provided under the DIP Credit Agreement is fair and reasonable and

represents the best financing available to the Debtors under all of the circumstances herein.

Certainly, without the DIP Financing, it is likely that the Debtors would have to close the

Medical Centers, which would have a tragic effect on an underserved population that relies

heavily upon the facilities.

## VI.    BASIS FOR RELIEF REQUESTED

63.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured

credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary

course of business, and (c) obtaining credit with specialized priority or security.  If a debtor in

possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the

debtor to obtain credit or incur debt, repayment of which is entitled to superpriority

administrative expense status or is secured by a lien on unencumbered property, a junior lien on

encumbered property, or a combination of these protections.  11 U.S.C. § 364(c).  A debtor in

possession may also obtain postpetition credit secured by liens senior to prior existing liens

pursuant to Section 364(d) of the Bankruptcy Code.  Section 363(c)(2) of the Bankruptcy Code

also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the consent of secured parties. Courts may authorize such use if adequate protection is provided pursuant to section 363(e).

## A.      The DIP Financing Should be Approved Under Section 364 of the Bankruptcy Code

64.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c). See e.g., In re Photo Promotion Assocs., 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.)

65.      In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992). A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c) and 364(d). See e.g. In re Snowshoe, 789 F.2d. at 1088. When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

66.      As described in this Motion and the Spicer Affidavit, the Debtors' management has concluded after appropriate investigation and analysis that DIP Agent's and DIP Lender's proposal was the best -and only viable alternative available to them for postpetition financing. Postpetition financing cannot realistically be procured on an unsecured basis. Negotiations with

34

the DIP Agent and DIP Lender have been arms' length and conducted on a good faith basis. The DIP Agent and the DIP Lender are only willing to extend Postpetition Financing on the terms outlined above, including the additional protections of Liens on the Collateral subject only to Permitted Liens and the Carve Out.

67.     Given the immediacy of the Debtors' financing needs, and the pressing need to move the sale process quickly to stem consistent and mounting losses, the Debtors were required to move quickly and in a targeted manner to ensure that the Debtors would be able to negotiate a new financing facility to preserve ongoing operations. There is no reason to believe that a different postpetition lender offering terms more favorable than DIP Agent and DIP Lender could have been located, and certainly not before all of the Debtors' limited cash resources were depleted. The Debtors' decision to proceed with the proposed DIP Financing with DIP Agent and DIP Lender was a reasonable exercise of business judgment.

**B.     The Priming Lien Under the Postpetition Financing Should be Approved Under Section 364(d) of the Bankruptcy Code**

68.     The Debtors also seek approval of the DIP Financing under section 364(d)(1) of the Bankruptcy Code to permit the Debtors to grant priming liens on a portion of the Prepetition Collateral, specifically, the Postpetition Accounts (collectively, the "Primed Accounts"). The statutory requirement for obtaining postpetition credit under section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In addition, the secured creditors whose liens are being "primed" by a new postpetition lender under section 364(d) of the Bankruptcy Code must be provided with adequate protection of their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F. 3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it

35

bargained pre-bankruptcy); In re Dunes Casino, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting

that '[a]dequate protection is designed to preserve the secured creditor's position at the time of

the bankruptcy"). The proposed DIP Liens would "prime" the alleged lien of the IRS.

69.    As set forth above, to obtain postpetition financing, the Debtors and their advisors

approached several commercial lenders which provide financing to distressed entities and

chapter 11 debtors.  After such inquiry, the Debtors determined that no other financing is

available on terms better than proposed under the DIP Credit Agreement based on responses that

the Debtors received.

70.    In addition, under section 364(d)(1) of the Bankruptcy Code, if interests in

collateral are to be "primed," then such "primed" parties must be adequately protected.  11

U.S.C. §364(d)(1).  The principal purpose of adequate protection is to safeguard the interests of

the secured creditor in the collateral against diminution in the value of that interest postpetition.

See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating

that the goal of adequate protection is to safeguard the secured creditor from diminution in value

of its interest during the chapter 11 case); In re Continental Airlines, Inc., 154 B.R. 176, 180

(Bankr. D. Del. 1993) (same);  In re Beker Indus Corp., 58 B.R. 725, 738 (Bankr. S.D.N.Y.

1986) (same).

71.    Courts determine the means for providing adequate protection on a case by-case

basis.  See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest

Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992);  In re Beker Indus. Corp., 58 B.R. 725 (Bankr.

S.D.N.Y. 1986);  see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987);  In re Martin,

761 F.2d 472 (8th Cir. 1985).

72.     The means by which adequate protection can be provided are addressed in section 361 of the Bankruptcy Code.  Section 361 sets forth three non-exclusive forms of adequate protection:  (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property;  (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property;  and (c) such other relief as will result in a entity realizing the indubitable equivalent of its interest in property.  11 U.S.C. § 361.  As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection.  In re O'Connor, 808 F. 2d 1393, 1396-97 (10th Cir. 1987).  Ultimately, adequate protection is determined on a case-by-case basis in light of the particular facts and circumstances presented.  Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis); In re 495 Central Park, 136 B.R. at 631 (stating that, although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive and suggests a broad and flexible definition); In re Constable Plaza Assocs., L.P. 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion); Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n. 3 (Bankr. E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles." (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 339 (1977)).

73.     In this case, the Debtors do not believe the IRS holds valid Tax Liens against the Postpetition Accounts of SSMC or MVH.  There has been a waiver of penalties by the IRS

37

against MVH and SSMC, and, upon information and belief, the alleged liens were intended to only cover such now discharged penalty obligations. Further, the Debtors contend such liens are voidable as preferences having attached within 90 days of the filing. Finally, even if the Tax Liens are valid, the IRS would remain adequately protected with a junior continuing lien on the SSMC and MVH Prepetition Accounts and a junior Adequate Protection Lien in the SSMC and MVH Postpetition Accounts. SSMC's and MVH's combined average net collectable accounts receivable base is in excess of $26 million, far in excess of the $21 million MidCap Postpetition Revolving Loan Commitment relating to these two entities. The Tax Liens at a maximum do not exceed $1.5 million. The Debtors submit that their equity in the Accounts constitutes sufficient adequate protection for the IRS to the extent its Tax Liens are valid.

74.    Moreover, as set forth above, the holders of Prepetition Liens, including the IRS, will be granted Adequate Protection Liens to the extent of any Diminution in Value of their interests in their Prepetition Collateral as well as a Prepetition Secured Creditor Superpriority Claim. The Debtors submit that the foregoing suffices as adequate protection in a case that is anticipated to be expeditiously conducted.

C.    **The Postpetition Financing is Necessary to Preserve the
Assets of the Debtors' Estates**

75.    The Debtors' need for immediate access to a new working capital facility is apparent. As described above and in the Spicer Affidavit, the immediate access to credit is necessary to meet the substantial day-to-day operating needs associated with the operation of the Hospital while the sale process proceeds. Continuation of operations with no deterioration in performance or census is a precondition to the closing. Thus, access to sufficient cash is therefore critical to the continuation of patient care. In the absence of immediate access to cash and credit, the Debtor's suppliers and third party vendors will likely refuse to sell critical

38

supplies to the Debtor on reasonable trade terms on which the Debtor's business depend, and absent which the Debtor will be unable to meet its current obligations.

**D.      The Terms of the DIP Financing are Fair, Reasonable and Appropriate and Represent the Sound Exercise of Business Judgment**

76.      As outlined in detail, to the extent possible the Debtor has canvassed the available credit markets and has been unable to obtain financing on an unsecured basis or on terms that were more advantageous. In the Debtor's business judgment, the DIP Financing was the best financing option available under the circumstances of these cases.

77.      The proposed terms of the DIP Financing were negotiated in good faith and at arms' length among the parties. They are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of other parties in interest. As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Financing is to enable the Debtors to maintain the value of their estates while formulating a confirmable plan of reorganization. See generally, In re First S. Sav. Assn, 820 F.2d 700, 710-15 (5th Cir. 1987).

78.      Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Banr. S.D. Ohio 1983) (Business judgments should be left to the board room and not to this Court.). See also, In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis,

and within the scope of his authority under the Code." <u>Curlew Valley</u>, 14 B.R. at 513-14 (footnotes omitted).

79.    The Debtors submit that they have exercised their sound business judgment in determining the merits and necessity of the DIP Financing and have aptly demonstrated that its terms are fair and reasonable and are in the best interests of the Debtors' estates. Accordingly, the Debtors should be granted the requested relief to borrow funds from the DIP Agent and DIP Lender on a secured and superpriority basis, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.

**E.    The Other Secured Creditors are Adequately Protected**

80.    The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in collateral during the reorganization process, not to compensate the creditor for the delay imposed by the bankruptcy on its ability to pursue non-bankruptcy remedies against the property. <u>See</u> <u>In re Beker Indus.</u> Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); <u>In re Saypol</u>, 31 B.R. 796, 799-802 (Bankr. S.D.N.Y. 1983).

81.    To the extent that the value of a debtor's collateral as of the filing of the bankruptcy case exceeds the value of the claimed lien, such equity cushion can itself constitute adequate protection. <u>See, e.g.</u>, <u>In re Triplett</u>, 87 B.R. 25, 26 (Bankr. W.D. Tex. 1988) (holding that an equity cushion is generally considered to be sufficient, although not necessary, to a finding of adequate protection);

82.    Furthermore, where a debtor's proposed use of cash collateral augments the value of the secured creditor's collateral, adequate protection exists. <u>See</u> <u>In re Pine Lake Village Apartment,</u> 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral). In fact, such use would generally give rise to a claim under section 506(c) of the Bankruptcy Code, which

provides that a debtor may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving such property, to the extent of any benefit to the holder of such claim. 11 U.S.C. § 506(c); see also, In re Trim-X, Inc., 695 F.2d 296 (7th Cir. 1982).

83.      Adequate protection also exists for the Secured Creditors who are receiving Adequate Protection Liens in the DIP Collateral.  Fundamentally, their positions will not change. The Debtor thus submits that the proposed adequate protection is fair and reasonable beyond any question.

**F.      Modification of the Automatic Stay is Warranted**

84.      As set forth more specifically in the Interim and Final Orders, the proposed DIP Financing contemplates a modification of the automatic stay pursuant to section 362 of the Bankruptcy Code to permit the DIP Agent and DIP Lender, in their sole discretion, (a) to file financing statements, deeds of trust, mortgages or other similar documents to evidence their respective security interests under the DIP Financing, the Interim Order, and the Final Order, (b) subject to certain notice requirements, to execute upon such security interests or exercise other remedies under the DIP Documents following an Event of Default under, or other termination of, the DIP Financing, and (c) to take other actions required or permitted by the DIP Documents.  In addition, the proposed DIP Financing contemplates the further modification of the automatic stay in order to enable MidCap Funding to apply the proceeds of the MidCap Prepetition Collateral to the Prepetition Revolving Loan Obligations.  Stay modification provisions of this sort are ordinary and usual features of a postpetition financing and, in the Debtors' business judgment, are reasonable under the circumstances of this Chapter 11 case.  The Bankruptcy Court accordingly should modify the automatic stay to the extent contemplated by the Loan Documents, and the Emergency, Interim and Final Orders.

## G.    The Debtor's Request for Interim Relief is Appropriate

85.    Pending the Final Hearing, the Debtors require immediate financing for, among other things, the purchase of new supplies, the funding of payroll obligations, the operation of their healthcare facilities and other working capital needs required for the provision of critical patient care. The Debtors' interim request represents the minimum amount of cash necessary to operate during the period prior to the Final Hearing. It is essential that the Debtors immediately stabilize their operations and resume paying ordinary operating expenses postpetition in order to minimize the damage occasioned by its current cash flow problems, facilitate the sale process, and maximize the value of its assets.

86.    Absent immediate financing for their continuing business operations, the Debtors will not have any funding to pay operating expenses and, therefore, will be unable to continue to conduct their business pending the Final Hearing. Consequently, if the emergency relief sought herein is not obtained, the Debtor's attempt to continue operations without compromising patient care and ultimately realize the maximum values of their assets will likely be immediately, if not irreparably, jeopardized, to the detriment of their estates, their creditors and other parties in interest.

87.    Accordingly, the Debtors request that, pending the Final Hearing, the Court conduct an interim hearing (the "**Interim Hearing**") as soon as practicable to consider the Debtor's request for authorization to use Cash Collateral and to obtain the DIP Financing in accordance with and pursuant to the terms and conditions contained in the DIP Documents and the Interim Order.

88.    Bankruptcy Rule 4001 (b) and (c) permits a court to approve a debtor's request for use of cash collateral or to incur postpetition financing during the 15-day period following the filing of a motion requesting such authorization the extent "necessary to avoid immediate and

2422510v.10

irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., Simasko, 47 B.R. at 449. After the 15-day period, a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. See, e.g., Simasko, 47 B.R. at 449. Under this standard, as described herein and in the Spicer Affidavit, the Debtors' request for entry of the Interim and Final Orders, in the time periods and for the financing amounts requested herein, is appropriate.

## VIII.  NOTICE

89.    Notice of this Motion where possible will be provided by facsimile, electronic transmission, overnight mail or hand delivery (except as noted otherwise) to (a) United States Trustee; (b) the Debtors' material prepetition and postpetition secured lenders or any agent therefore; (c) the holders of the 30 largest unsecured claims on a consolidated basis; (d) the following state and local taxing and regulatory authorities:   (i) the Centers for Medicare and Medicaid Services, (ii) the New York State Department of Health ("DOH"), (iii) the United States Attorney for the Southern District of New York, (iv) the Attorney General of the State of New York; (v) the Westchester County Attorney; (vi) the New Rochelle City Attorney; (vii) the Mount Vernon City Attorney; (viii) the Internal Revenue Service; (ix) the New York State Department of Taxation and Finance; (e) counsel to MMC; (f) the United States Department of Justice, Commercial Litigation; (g) the United States Department of Health and Human Services; (h) all parties known by the Debtors claiming to have Liens on or security interests in any of the Collateral; and (i) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 ("**Notice Parties**"). The Debtors submit that no other notice need be given..

90.    No prior request for the relief sought in this Motion has been made to this or any

other court in connection with these Chapter 11 Cases.

## IX.    CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court (a) enter an Interim Order

substantially in the form annexed hereto as Exhibit D and a Final Order after an Interim Hearing

and Final Hearing, respectively, (i) authorizing the Debtors to use Cash Collateral and granting

Adequate Protection therefor, (ii) authorizing the Debtors to incur Postpetition Financing on a

secured basis and with administrative superpriority pursuant to the terms and conditions of the

DIP Documents; (iii) authorizing the Debtors to satisfy the MidCap Prepetition Revolving Loans

by paying in full all amounts due with respect thereto on the Initial Funding Date; (iv) granting

Liens (including Replacement Liens), and a Superpriority Claims, (iv) modifying the automatic

stay to allow certain actions with respect to the Debtors' postpetition indebtedness, and (b) grant

such other and further relief as the Court may deem just and proper.

Dated: Great Neck, New York
       May 29, 2013


                              GARFUNKEL WILD, P.C.


                              By: _____
                              Burton S. Weston
                              Afsheen A. Shah
                              111 Great Neck Road
                              Great Neck, NY  11021
                              Telephone: (516) 393-2200

                              *Proposed Attorneys for the Debtors and
                              Debtors in Possession*


44

Exhibit A

DIP Revolving Loan Agreement