# DEBTOR IN POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT

dated as of _____ \_\_\_, 2013

by and among

**SOUND SHORE MEDICAL CENTER OF WESTCHESTER,**

**HOWE AVENUE NURSING HOME, INC., and**

**THE MOUNT VERNON HOSPITAL,**

collectively, as Borrowers,

and

**MIDCAP FINANCIAL, LLC,**

as Administrative Agent and as a Lender,

and

**THE ADDITIONAL LENDERS**

**FROM TIME TO TIME PARTY HERETO**



10844575.1
10844575v.1

## DEBTOR IN POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT

THIS DEBTOR IN POSSESSION REVOLVING CREDIT AND SECURITY AGREEMENT (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "*Agreement*") is dated as of _____ ___, 2013, by and among **SOUND SHORE MEDICAL CENTER OF WESTCHESTER**, a New York not-for-profit corporation ("*Medical Center*"), **HOWE AVENUE NURSING HOME, INC.**, a New York not-for-profit corporation ("*Nursing Home*"), **THE MOUNT VERNON HOSPITAL**, a New York not-for-profit corporation ("*Mt. Vernon*"), and any additional borrower that may hereafter be added to this Agreement (each individually as a "*Borrower*", and collectively as "*Borrowers*"), **MIDCAP FINANCIAL, LLC**, a Delaware limited liability company, individually as a Lender and as Agent, and the financial institutions or other entities from time to time parties hereto, each as a Lender.

### RECITALS

A.      On June 8, 2011, MidCap Funding IV, LLC ("*Prepetition Agent*"), a subsidiary of Agent, acting in its capacity as agent, the financial institutions party as "Lenders" thereto (the "*Prepetition Lenders*"), Medical Center and Nursing Home entered into that certain Amended and Restated Credit and Security Agreement (as may have been amended or modified from time to time, the "*Prepetition Revolving Credit Agreement*") and certain other Financing Documents (as defined in the Prepetition Revolving Credit Agreement), pursuant to which, among other things, the Prepetition Lenders agreed to make revolving loans in the maximum aggregate principal amount of $18,000,000 to Medical Center and Nursing Home.

B.      On May ___, 2013 (the "*Petition Date*"), Medical Center, Nursing Home and Mt. Vernon each filed a separate voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") and are continuing to operate their respective businesses and manage their properties as debtors and debtors in possession under sections 1107 and 1109 of the Bankruptcy Code.

C.      On May ___, 2013, Borrowers and certain of their Affiliates entered into an Asset Purchase Agreement (the "*Stalking Horse Asset Purchase Agreement*") with Montefiore SS Operations, Inc., Montefiore MV Operations, Inc., Montefiore HA Operations, Inc., Montefiore SS Holdings, LLC, Montefiore MV Holdings, LLC, and Montefiore HA Holdings, LLC (collectively, "*Montefiore*"), in which Montefiore has agreed to purchase substantially all of the assets of Borrowers in a "363 sale" pursuant to Section 363 of the Bankruptcy Code.

D.      Borrowers have requested that Lenders provide a revolving credit facility to Borrowers in the maximum aggregate amount of $23,000,000 subject to the terms set forth herein, in the Financing Orders and pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the proceeds of which will be used solely for (i) the Prepetition Repayment Advance, (ii) payment of all Prepetition Term Loan Obligations as they come due pursuant to the Prepetition Term Credit Agreement, (iii) payment of all fees and expenses due to Agent and Lenders pursuant to Section 2.2, (iv) financing ongoing debtor in possession working capital needs, general corporate purposes relating to postpetition operations and related costs,

fees and expenses of the Bankruptcy Cases, and (v) payment of the costs of administration of the Bankruptcy Cases as approved by the Bankruptcy Court. After the Asset Sale Effective Date, the repayment of such revolving credit facility will be guaranteed by Buyer up to an amount equal to $5,000,000 of principal and interest, plus Agent's enforcement costs, and secured by a continuing first-priority security interest in the Accounts and Accounts-related assets generated by the Borrowers' facilities sold pursuant to the Asset Sale.

E.     Borrowers have also requested that Agent (or one or more affiliates of Agent) provide a term loan credit facility to Borrower in an original principal amount of $10,000,000 subject to the terms set forth in the Financing Orders and in a Debtor in Possession Term Loan Credit and Security Agreement (the "*DIP Term Credit Agreement*") by and among Borrowers, MCF or an Affiliate of MCF, and the lenders party thereto, the proceeds of which will be used for Borrowers' general working capital prior to the consummation of the Asset Sale.

F.     Lender has agreed to provide a revolving credit facility to Borrowers pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code on the terms and conditions of this Agreement and in the Financing Orders so long as such postpetition credit obligations are secured by Liens granted, or purported to be granted, by Borrowers pursuant to this Agreement and the other Financing Documents and given super-priority status as provided in the Financing Orders.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, Lenders and Agent agree as follows:

## ARTICLE 1 - DEFINITIONS

**Section 1.1**    Certain Defined Terms.    The following terms have the following meanings:

"*Acceleration Event*" means the occurrence of an Event of Default (a) in respect of which Agent has declared all or any portion of the Obligations to be immediately due and payable pursuant to Section 10.2, or (b) pursuant to Section 10.1(a), and in respect of which Agent has suspended or terminated the Revolving Loan Commitment pursuant to Section 10.2.

"*Acceptance Notice*" shall have the meaning set forth in Section 4.12.

"*Accounts*" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred, including but not limited to (a) the third party reimbursable portion of accounts receivable owing to any Borrower (whether billed or unbilled) arising out of the delivery by any Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by a Borrower or a third party), including all rights to reimbursement under any agreements with an Account Debtor and any amounts received in settlement of a dispute, appeal or other arrangement with Medicare or Medicaid, (b) all accounts, general intangibles, rights, remedies, guarantees, and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under this Agreement in respect of the foregoing, (c) all information and data compiled or derived by a

2

Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law, and (d) all proceeds of any of the foregoing. The term *"Accounts"* includes health-care insurance receivables. Notwithstanding anything else herein to the contrary, the term *"Accounts"* or "accounts" shall be not be deemed to include payments received from a Governmental Authority in respect of grants or gifts issued to Borrower pursuant to the following state and federal programs: the Women, Infant and Children program (WIC grants), the Healthcare Workforce Retraining Initiative program (HWRI grants), the Health Care Efficiency and Affordability Law program (HEAL grants), the Health Resources and Services Administration program (HRSA grants), the National Bioterrorism Hospital Preparedness Program (Bioterrorism grants), and the Women's Health program, and the foregoing grants shall not be deemed to part of Agent's Collateral.

*"Account Debtor"* means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

*"Agent"* means MCF, in its capacity as administrative agent for itself and for Lenders hereunder, as such capacity is established in, and subject to the provisions of, Article 11, and the successors and assigns of MCF in such capacity.

*"Affiliate"* means, with respect to any Person, (a) any Person that directly or indirectly controls such Person, (b) any Person which is controlled by or is under common control with such controlling Person, and (c) each of such Person's (other than, with respect to any Lender, any Lender's) officers or directors (or Persons functioning in substantially similar roles) and the spouses, parents, descendants and siblings of such officers, directors or other Persons. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote five percent (5%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise. In addition, for purposes of this Agreement, (i) the following entities shall be deemed to be Affiliates of Medical Center: Sound Shore Health System, Inc., Nursing Home, Mt. Vernon, New Rochelle Sound Shore Housing, LLC, NRHMC, Inc., Guion Place Housing Company, Inc., Lockwood Avenue Housing Company, Inc., Sound Shore Medical Center of Westchester Foundation, Inc., Sound Shore Pharmacy, Inc., and NRHMC Services Corporation; (ii) the following entities shall be deemed to be Affiliates of Nursing Home: Medical Center, Mt. Vernon, New Rochelle Sound Shore Housing, LLC, NRHMC, Inc., Guion Place Housing Company, Inc., Lockwood Avenue Housing Company, Inc., Sound Shore Medical Center of Westchester Foundation, Inc., Sound Shore Pharmacy, Inc., and NRHMC Services Corporation, and (iii) the following entities shall be deemed to be Affiliates of Mt. Vernon: Medical Center, Nursing Home, New Rochelle Sound Shore Housing, LLC, NRHMC, Inc., Guion Place Housing Company, Inc., Lockwood Avenue Housing Company, Inc., Sound Shore Medical Center of Westchester Foundation, Inc., Sound Shore Pharmacy, Inc., and NRHMC Services Corporation.

*"Affiliated Financing Documents"* means any credit, loan, letter of credit or related documents which are, by their terms or by the terms of this Agreement, cross-defaulted with the Financing Documents, and for which a Credit Party hereunder is liable or contingently liable for payment or as security for which a Credit Party hereunder has pledged, assigned or subjected any assets. Affiliated Financing Documents shall include, without limitation, (i) the DIP Term Credit

3

Documents, (ii) the Prepetition Revolving Credit Agreement, (iii) the Prepetition Term Credit Agreement, and (iv) the agreements, documents and certificates executed or delivered in connection with each of the foregoing.

"***Affiliated Obligations***" means all "Obligations", as such term is defined in the Affiliated Financing Documents.

"***Allowed Fees***" means, in each case with respect to the Bankruptcy Cases, fees and reimbursement for distributions of professionals retained by the Borrowers and/or a statutory committee of unsecured creditors allowed or otherwise payable pursuant to an order of the Bankruptcy Court, including, without limitation, pursuant to monthly fee statements, that has not been vacated, stayed, appealed or objected to by Agent, under sections 327, 328 or 1103 of the Bankruptcy Code.

"***Anti-Terrorism Laws***" means any Laws relating to terrorism or money laundering, including, without limitation, Executive Order No. 13224 (effective September 24, 2001), the USA PATRIOT Act, the Laws comprising or implementing the Bank Secrecy Act, and the Laws administered by OFAC.

"***Applicable Margin***" means, with respect to all Revolving Loans and all other Obligations, seven and one half percent (7.50%), provided, that with respect to Revolving Loans that bear interest at the Base Rate pursuant to Section 2.1(b)(v)(C), the Applicable Margin shall be four percent (4.00%).

"***Asset Disposition***" means any sale, lease, license, transfer, assignment or other consensual disposition by any Credit Party of any asset.

"***Asset Purchase Agreement***" means the Stalking Horse Asset Purchase Agreement or such other Asset Purchase Agreement effecting any higher and better bid approved by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code.

"***Asset Sale***" the sale of substantially all of the Borrowers' assets pursuant to the Asset Purchase Agreement approved by the Bankruptcy Court in the Asset Sale Order, in form and substance satisfactory to Agent, pursuant to Section 363 of the Bankruptcy Code.

"***Asset Sale Documents***" means, collectively, the Asset Purchase Agreement and any and all other agreements, documents and certificates executed and delivered in connection therewith.

"***Asset Sale Effective Date***" means the date on which the Asset Sale is consummated after all conditions to closing of the Asset Sale have been satisfied.

"***Asset Sale Motion***" means a motion, in form and substance satisfactory to Agent, filed in the Bankruptcy Cases seeking entry of an order by the Bankruptcy Court approving the Asset Sale, procedures for the Asset Sale, and the form of the Asset Purchase Agreement.

"***Asset Sale Order***" means an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving the Asset Sale and distribution of proceeds to Agent.

"***Bankruptcy Cases***" means the following cases pending before the Bankruptcy Court: [_____].

"***Bankruptcy Code***" means Title 11 of the United States Code entitled "Bankruptcy", as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"***Bankruptcy Court***" has the meaning specified therefor in the recitals to this Agreement.

"***Base LIBOR Rate***" means, for each Interest Period, the rate per annum, determined by Agent in accordance with its customary procedures, and utilizing such electronic or other quotation sources as it considers appropriate (rounded upwards, if necessary, to the next 1/100%), to be the rate at which Dollar deposits (for delivery on the first day of such Interest Period or, if such day is not a Business Day on the preceding Business Day) in the amount of $1,000,000 are offered to major banks in the London interbank market on or about 11:00 a.m. (Eastern time) two (2) Business Days prior to the commencement of such Interest Period, for a term comparable to such Interest Period, which determination shall be conclusive in the absence of manifest error.

"***Base Rate***" means a per annum rate of interest equal to the greater of (a) six percent (6.00%) per annum, and (b) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate," with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate; provided, however, that Agent may, upon prior written notice to Borrower, choose a reasonably comparable index or source to use as the basis for the Base Rate.

"***Blocked Person***" means any Person: (a) listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (b) owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, Executive Order No. 13224, (c) with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (d) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, or (e) that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list or is named as a "listed person" or "listed entity" on other lists made under any Anti-Terrorism Law.

"***Borrower***" and "***Borrowers***" mean the entity(ies) described in the first paragraph of this Agreement and each of their successors and permitted assigns.

"***Borrower Representative***" means Medical Center, in its capacity as Borrower Representative pursuant to the provisions of Section 2.9, or any successor Borrower Representative selected by Borrowers and approved by Agent.

"***Borrowing Base***" means, with respect to each Borrower:

5

(a)    the product of (i) eighty-five percent (85%) *multiplied by* (ii) the aggregate net amount at such time of the Eligible Accounts; *minus*

(b)    the amount of any reserves and/or adjustments provided for in this Agreement (including, without limitation, the Carve-Out Reserve, the Term Loan Reserve and other reserves customarily imposed by Agent and consistent with past practices with Borrower);

provided, however, that at no time shall Accounts that have not been billed or invoiced to the appropriate Account Debtor exceed thirty percent (30%) of the aggregate net amount at such time of the Eligible Accounts as described in clause (a)(ii) above for any Borrower's Borrowing Base; and provided, further, that (x) at no time shall the Borrowing Base for Medical Center exceed $16,000,000, (y) at no time shall the Borrowing Base for Nursing Home exceed $2,000,000, and (z) at no time shall the Borrowing Base for Mt. Vernon exceed $5,000,000.

"***Borrowing Base Certificate***" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit C hereto.

"***Budget***" means the budget attached hereto as Exhibit E, depicting on a weekly basis cash revenue, receipts, expenses, disbursements, outstanding advances under the Revolving Loans and other information for the 13 fiscal week period following the Closing Date, together with the updates thereto in form and substance satisfactory to Agent in its sole discretion, delivered to Agent and the Lenders pursuant to Section 4.1(a).

"***Business Day***" means any day except a Saturday, Sunday or other day on which either the New York Stock Exchange is closed, or on which commercial banks in Washington, DC and New York City are authorized by law to close.

"***Buyer***" means Montefiore or such other purchaser of the Borrowers' assets pursuant to the Asset Purchase Agreement and the Asset Sale Order.

"***Buyer Guaranteed Obligations***" has the meaning set forth in Section 10.1(cc).

"***Carve-Out***" has the meaning set forth in the Financing Orders.

"***Carve-Out Amount***" has the meaning set forth in the Financing Orders.

"***Carve-Out Reserve***" means a reserve against the Borrowing Base in an amount equal to the Carve-Out Amount effective as of the Closing Date, which may be increased or decreased from time to time in Agent's sole discretion.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 *et seq.*, as the same may be amended from time to time.

"***Change in Control***" means any of the following: (a) any change in the legal or beneficial ownership of the capital stock, partnership interests or membership interests, in the capital structure, or in the organizational documents or governing documents (excluding

6

Permitted Modifications), of the applicable Person; (b) any pledge, assignment or hypothecation of or Lien or encumbrance on any of the legal or beneficial equity interests in the applicable Person; (c) any change in the legal or beneficial ownership or control of the outstanding voting equity interests of the applicable Person necessary at all times to elect a majority of the board of directors (or similar governing body) of each such Person and to direct the management policies and decisions of such Person; (d) the applicable Person shall cease to, directly or indirectly, own and control one hundred percent (100%) of each class of the outstanding equity interests of each Subsidiary of such Person; and (e) any "Change of Control", "Change in Control" or terms of similar import under any document or instrument governing or relating to Debt of or equity in such Person or under any Affiliated Financing Document. Notwithstanding the foregoing, the replacement of Pinnacle Healthcare, in its capacity as the sole corporate member of Sound Shore Health System, Inc. by a not-for-profit health system shall not be considered a ***"Change in Control."***

"***Closing Date***" means the date of this Agreement.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" means all property, now existing or hereafter acquired, mortgaged or pledged to, or purported to be subjected to a Lien in favor of, Agent, for the benefit of Agent and Lenders, pursuant to this Agreement and the Security Documents, including, without limitation, all of the property described in Schedule 9.1 hereto.

"***Commitment Annex***" means Annex A to this Agreement.

"***Commitment Expiry Date***" means the earlier of (i) twelve (12) months from the Closing Date, and (ii) the Asset Sale Effective Date.

"***Compliance Certificate***" means a certificate, duly executed by a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit B hereto.

"***Confirmation Date***" means the date on which the Confirmation Order is entered in the docket on the Bankruptcy Court.

"***Confirmation Order***" means an order of the Bankruptcy Court, in form and substance satisfactory to the Agent, confirming the Plan of Reorganization.

"***Consolidated Subsidiary***" means, at any date, any Subsidiary the accounts of which would be consolidated with those of Sound Shore Health System, Inc. (or any other Person, as the context may require hereunder) in its consolidated financial statements if such statements were prepared as of such date.

"***Contingent Obligation***" means, with respect to any Person, any direct or indirect liability of such Person: (a) with respect to any Debt of another Person (a "***Third Party Obligation***") if the purpose or intent of such Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such Third Party Obligation that such Third Party Obligation will be paid or discharged, or that any agreement relating thereto will be complied

7

with, or that any holder of such Third Party Obligation will be protected, in whole or in part, against loss with respect thereto; (b) with respect to any undrawn portion of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for the reimbursement of any drawing; (c) under any Swap Contract, to the extent not yet due and payable; (d) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (e) for any obligations of another Person pursuant to any Guarantee or pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to preserve the solvency, financial condition or level of income of another Person. The amount of any Contingent Obligation shall be equal to the amount of the obligation so Guaranteed or otherwise supported or, if not a fixed and determinable amount, the maximum amount so Guaranteed or otherwise supported.

"*Controlled Group*" means all members of any group of corporations and all members of a group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Sections 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"*Credit Exposure*" means any period of time during which the Revolving Loan Commitment is outstanding or any Loan or other Obligation remains unpaid; provided, however, that no Credit Exposure shall be deemed to exist solely due to the existence of contingent indemnification liability, absent the assertion of a claim, or the known existence of a claim reasonably likely to be asserted, with respect thereto.

"*Credit Party*" means, other than Buyer, any Guarantor under a Guarantee of the Obligations or any part thereof, any Borrower and any other Person (other than Agent, a Lender or a participant of a Lender), whether now existing or hereafter acquired or formed, that becomes obligated as a borrower, guarantor, surety, indemnitor, pledgor, assignor or other obligor under any Financing Document; and "*Credit Parties*" means all such Persons, collectively.

"*Debt*" of a Person means at any date, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, (c) all obligations of such Person to pay the deferred purchase price of property or services, except trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business, (d) all capital leases of such Person, (e) all non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument, (f) all equity securities of such Person subject to repurchase or redemption otherwise than at the sole option of such Person, (g) all obligations secured by a Lien on any asset of such Person, whether or not such obligation is otherwise an obligation of such Person, (h) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (i) all Debt of others Guaranteed by such Person; (j) off-balance sheet liabilities and/or Pension Plan or Multiemployer Plan liabilities of such Person; (k) obligations arising under non-compete agreements; and (l) obligations arising under bonus, deferred compensation, incentive compensation or similar arrangements, other than those arising in the Ordinary Course

8

of Business. Without duplication of any of the foregoing, Debt of Borrowers shall include any and all Loans and Letter of Credit Liabilities.

"*Default*" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"*Deposit Account*" means a "deposit account" (as defined in Article 9 of the UCC), an investment account, or other account in which funds are held or invested for credit to or for the benefit of any Borrower.

"*Deposit Account Control Agreement*" means an agreement, in form and substance satisfactory to Agent, among Agent, Borrower and the applicable financial institution, which agreement satisfies the definition of "control agreement", as defined in the UCC, thereby providing Agent with a perfected Lien on the applicable Deposit Account and the monies deposited therein, and includes such other provisions that are customarily agreed upon among such parties to a "control agreement."

"*DIP Term Credit Agreement*" has the meaning set forth in the recitals.

"*DIP Term Credit Documents*" means, collectively, the DIP Term Credit Agreement and the "Financing Documents" referred to therein.

"*DIP Term Loan*" means a term loan by MCF or an Affiliate of MCF to the Borrowers on the terms and conditions set forth in the DIP Term Credit Documents.

"*DIP Term Loan Effective Date*" means the date upon which the Agent (as defined in the DIP Term Credit Agreement) determines in its sole discretion that all conditions to closing and the making of loans set forth in the DIP Term Credit Documents have been satisfied.

"*Dollars*" or "*$*" means the lawful currency of the United States of America.

"*Eligible Accounts*" means, subject to the criteria below, an account receivable of a Borrower, which was generated in the Ordinary Course of Business, which was generated originally in the name of a Borrower and not acquired via assignment or otherwise, and which Agent, in its good faith credit judgment and discretion, deems to be an Eligible Account. The net amount of Eligible Accounts at any time shall be (a) the face amount of such Eligible Accounts as originally billed *minus* all cash collections and other proceeds of such Account received from or on behalf of the Account Debtor thereunder as of such date and any and all returns, rebates, discounts (which may, at Agent's option, be calculated on shortest terms), credits, allowances or excise taxes of any nature at any time issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time, and (b) adjusted by applying percentages (known as "*liquidity factors*") by payor and/or payor class based upon the applicable Borrower's actual recent collection history for each such payor and/or payor class in a manner consistent with Agent's underwriting practices and procedures. Such liquidity factors may be adjusted by Agent from time to time as warranted by Agent's underwriting practices and procedures and using Agent's good faith credit judgment. Without limiting the generality of the foregoing, no Account shall be an Eligible Account if:

9

(a)      the Account remains unpaid more than one hundred and one hundred fifty (150) days past the claim or invoice date (but in no event more than one hundred eighty (180) days after the applicable goods or services have been rendered or delivered);

(b)      the Account is subject to any defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment of any kind (but only to the extent of such defense, set-off, recoupment, counterclaim, deduction, discount, credit, chargeback, freight claim, allowance, or adjustment), or the applicable Borrower is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial process;

(c)      if the Account arises from the sale of goods, any part of any goods the sale of which has given rise to the Account has been returned, rejected, lost, or damaged (but only to the extent that such goods have been so returned, rejected, lost or damaged);

(d)      if the Account arises from the sale of goods, the sale was not an absolute, bona fide sale, or the sale was made on consignment or on approval or on a sale-or-return or bill-and-hold or progress billing basis, or the sale was made subject to any other repurchase or return agreement, or the goods have not been shipped to the Account Debtor or its designee or the sale was not made in compliance with applicable Laws;

(e)      if the Account arises from the performance of services, the services have not actually been performed or the services were undertaken in violation of any law or the Account represents a progress billing for which services have not been fully and completely rendered;

(f)      the Account is subject to a Lien other than a Permitted Lien, or Agent does not have a Lien on such Account;

(g)      the Account is evidenced by Chattel Paper or an Instrument of any kind, or has been reduced to judgment, unless such Chattel Paper or Instrument has been delivered to Agent;

(h)      the Account Debtor is an Affiliate or Subsidiary of a Credit Party, or if the Account Debtor holds any Debt of a Credit Party;

(i)      more than fifty percent (50%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under subclause (a) above (in which case all Accounts from such Account Debtor shall be ineligible);

(j)      without limiting the provisions of clause (i) above, fifty percent (50%) or more of the aggregate unpaid Accounts from the Account Debtor obligated on the Account are not deemed Eligible Accounts under this Agreement for any reason;

(k)      the total unpaid Accounts of the Account Debtor obligated on the Account exceed twenty percent (20%) of the net amount of all Eligible Accounts owing from all Account Debtors (but only the amount of the Accounts of such Account Debtor exceeding such twenty percent (20%) limitation shall be considered ineligible);

10

(l)      any covenant, representation or warranty contained in the Financing Documents with respect to such Account has been breached in any respect;

(m)      the Account is unbilled for more than thirty (30) days after the date of discharge of the recipient of the services or has not been invoiced to the Account Debtor within thirty (30) days after the date of discharge of the recipient of the services in accordance with the procedures and requirements of the applicable Account Debtor; provided, however, that, Accounts that are unbilled or not invoiced shall be properly recorded on Borrowers' accounting systems at all times;

(n)      the Account is an obligation of an Account Debtor that is the federal (or local) government or a political subdivision thereof, unless Agent has agreed to the contrary in writing and Agent has received from the Account Debtor the acknowledgement of Agent's notice of assignment of such obligation pursuant to this Agreement; provided, however, that in no case shall Accounts owing from Medicare in respect of outpatient services be Eligible Accounts;

(o)      the Account is an obligation of an Account Debtor that has suspended business, made a general assignment for the benefit of creditors, is unable to pay its debts as they become due or as to which a petition has been filed (voluntary or involuntary) under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or the Account is an Account as to which any facts, events or occurrences exist which could reasonably be expected to impair the validity, enforceability or collectibility of such Account or reduce the amount payable or delay payment thereunder;

(p)      the Account Debtor has its principal place of business or executive office outside the United States;

(q)      the Account is payable in a currency other than United States dollars;

(r)      the Account Debtor is an individual;

(s)      the Borrower owning such Account has not signed and delivered to Agent notices, in the form requested by Agent, directing the Account Debtors to make payment to the applicable Lockbox Account;

(t)      the Account includes late charges or finance charges (but only such portion of the Account shall be ineligible);

(u)      the Account arises out of the sale of any Inventory upon which any other Person holds, claims or asserts a Lien;

(v)      prior to entry of the Final Order, with respect to any Account of Medical Center or Nursing Home, such Account arises from or relates to goods sold or services provided, or was otherwise generated, by Medical Center or Nursing Home prior to the Petition Date; or

(w)      the Account or Account Debtor fails to meet such other specifications and requirements which may from time to time be established by Agent in its good faith credit

11

judgment and discretion, such discretion to be applied in a manner that is consistent with Agent's then current credit standards and not inconsistent with other similar credit parties in Agent's portfolio of asset-based revolving loans.

"***Environmental Laws***" means any present and future federal, state and local laws, statutes, ordinances, rules, regulations, standards, policies and other governmental directives or requirements, as well as common law, pertaining to the environment, natural resources, pollution, health (including any environmental clean up statutes and all regulations adopted by any local, state, federal or other Governmental Authority, and any statute, ordinance, code, order, decree, law rule or regulation all of which pertain to or impose liability or standards of conduct concerning medical waste or medical products, equipment or supplies), safety or clean-up that apply to any Borrower and relate to Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*), the Federal Water Pollution Control Act (33 U.S.C. § 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. § 5101 *et seq.*), the Clean Air Act (42 U.S.C. § 7401 *et seq.*), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. § 136 *et seq.*), the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 *et seq.*), the Occupational Safety and Health Act (29 U.S.C. § 651 *et seq.*), the Residential Lead-Based Paint Hazard Reduction Act (42 U.S.C. § 4851 *et seq.*), any analogous state or local laws, any amendments thereto, and the regulations promulgated pursuant to said laws, together with all amendments from time to time to any of the foregoing and judicial interpretations thereof.

"***Environmental Liens***" means all Liens and other encumbrances imposed pursuant to any Environmental Law, whether due to any act or omission of any Borrower or any other Person.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"***ERISA Plan***" means any "employee benefit plan", as such term is defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which any Borrower maintains, sponsors or contributes to, or, in the case of an employee benefit plan which is subject to Section 412 of the Code or Title IV of ERISA, to which any Borrower or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five (5) years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"***Event of Default***" has the meaning set forth in <u>Section 10.1</u>.

"***Final Order***" means an order of the Bankruptcy Court in the Bankruptcy Cases which approves the transactions contemplated by this Agreement, including, without limitation, the Prepetition Repayment Advance, and the other Financing Documents on a final basis and is in form and substance acceptable to Agent and the Lenders, as the same may be amended, modified or otherwise supplemented from time to time in compliance with this Agreement.

10844575.1
10844575v.1

"*Financing Documents*" means this Agreement, any Notes, the Security Documents, any subordination or intercreditor agreement pursuant to which any Debt and/or any Liens securing such Debt is subordinated to all or any portion of the Obligations and all other documents, instruments and agreements related to the Obligations and heretofore executed, executed concurrently herewith or executed at any time and from time to time hereafter, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"*Financing Orders*" means the Interim Order or, when applicable, the Final Order.

"*Financing Transaction*" shall have the meaning set forth in Section 4.12.

"*GAAP*" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination.

"*General Intangible*" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"*Governmental Authority*" means any nation or government, any state or other political subdivision thereof, and any agency, department or Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any corporation or other Person owned or controlled (through stock or capital ownership or otherwise) by any of the foregoing, whether domestic or foreign.

"*Guarantee*" by any Person means any obligation, contingent or otherwise, of such Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), provided, however, that the term Guarantee shall not include endorsements for collection or deposit in the Ordinary Course of Business. The term "*Guarantee*" used as a verb has a corresponding meaning.

"*Guarantor*" means any Credit Party that has executed or delivered, or shall in the future execute or deliver, any Guarantee of any portion of the Obligations.

"*Hazardous Materials*" means petroleum and petroleum products and compounds containing them, including gasoline, diesel fuel and oil; explosives, flammable materials;

radioactive materials; polychlorinated biphenyls and compounds containing them; lead and lead-based paint; asbestos or asbestos-containing materials; underground or above-ground storage tanks, whether empty or containing any substance; any substance the presence is prohibited by any Environmental Laws; toxic mold, any substance that requires special handling; and any other material or substance now or in the future defined as a "hazardous substance," "hazardous material," "hazardous waste," "toxic substance," "toxic pollutant," "contaminant," "pollutant" or other words of similar import within the meaning of any Environmental Law, including: (a) any "hazardous substance" defined as such in (or for purposes of) CERCLA, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (b) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (c) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (d) any petroleum or petroleum by-products, including crude oil or any fraction thereof; (e) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (f) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (g) any toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls (*"PCB's"*), flammable explosives, radioactive materials, infectious substances, materials containing lead-based paint or raw materials which include hazardous constituents); and (h) any other toxic substance or contaminant that is subject to any Environmental Laws or other past or present requirement of any Governmental Authority.

*"Hazardous Materials Contamination"* means contamination (whether now existing or hereafter occurring) of the improvements, buildings, facilities, personalty, soil, groundwater, air or other elements on or of the relevant property by Hazardous Materials, or any derivatives thereof, or on or of any other property as a result of Hazardous Materials, or any derivatives thereof, generated on, emanating from or disposed of in connection with the relevant property.

*"Indemnitees"* has the meaning set forth in Section 12.14.

*"Instrument"* means "instrument", as defined in Article 9 of the UCC.

*"Intellectual Property"* means, with respect to any Person, all patents, patent applications and like protections, including improvements divisions, continuation, renewals, reissues, extensions and continuations in part of the same, trademarks, trade names, trade styles, trade dress, service marks, logos and other business identifiers and, to the extent permitted under applicable law, any applications therefore, whether registered or not, and the goodwill of the business of such Person connected with and symbolized thereby, copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative works, whether published or unpublished, technology, know-how and processes, operating manuals, trade secrets, computer hardware and software, rights to unpatented inventions and all applications and licenses therefor, used in or necessary for the conduct of business by such Person and all claims for damages by way of any past, present or future infringement of any of the foregoing.

*"Interest Period"* means any period commencing on the first day of a calendar month and ending on the last day of such calendar month.

14

"*Interim Order*" means the order of the Bankruptcy Court entered in the Bankruptcy Cases, in form and substance satisfactory to Agent, approving this Agreement, the other Financing Documents, the DIP Term Loan and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated thereby on an interim basis, which shall be in full force and effect until the entry of the Final Order approving this Agreement, the DIP Term Credit Documents and other Financing Documents and the Liens and Guaranties granted hereunder and thereunder and the other transactions contemplated hereby and thereby, and which shall not have been stayed, reversed, vacated or otherwise modified (other than with the consent of the Required Lenders in their sole discretion).

"*Inventory*" means "inventory" as defined in Article 9 of the UCC.

"*Investment*" means any investment in any Person, whether by means of acquiring (whether for cash, property, services, securities or otherwise), making or holding Debt, securities, capital contributions, loans, time deposits, advances, Guarantees or otherwise. The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto.

"*Laws*" means any and all federal, state, provincial, territorial, local and foreign statutes, laws, judicial decisions, regulations, ordinances, rules, judgments, orders, decrees, codes, injunctions, permits, governmental agreements and governmental restrictions, whether now or hereafter in effect, which are applicable to any Credit Party in any particular circumstance. "*Laws*" includes, without limitation, Healthcare Laws and Environmental Laws.

"*Lender*" means each of (a) MCF, in its capacity as a lender hereunder, (b) each other Person party hereto in its capacity as a lender hereunder, (c) each other Person that becomes a party hereto as Lender pursuant to Section 11.17, and (d) the respective successors of all of the foregoing, and "*Lenders*" means all of the foregoing.

"*LIBOR Rate*" means, for each Loan, a per annum rate of interest equal to the greater of (a) two and one half percent (2.50%) and (b) the rate determined by Agent (rounded upwards, if necessary, to the next 1/100th%) by *dividing* (i) the Base LIBOR Rate for the Interest Period, *by* (ii) the sum of one *minus* the daily average during such Interest Period of the aggregate maximum reserve requirement (expressed as a decimal) then imposed under Regulation D of the Board of Governors of the Federal Reserve System (or any successor thereto) for "Eurocurrency Liabilities" (as defined therein).

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind, in respect of such asset. For the purposes of this Agreement and the other Financing Documents, any Borrower or any Subsidiary shall be deemed to own subject to a Lien any asset which it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset.

"*Litigation*" means any action, suit or proceeding before any court, mediator, arbitrator or Governmental Authority.

"*Loan Account*" has the meaning set forth in <u>Section 2.6(b)</u>.

"*Loan(s)*" means the Revolving Loans, or any combination of the foregoing, as the context may require.

"*Lockbox*" has the meaning set forth in <u>Section 2.11</u>.

"*Lockbox Account*" means an account or accounts maintained at the Lockbox Bank into which collections of Accounts are paid, which account or accounts shall be, if requested by Agent, opened in the name of Agent (or a nominee of Agent).

"*Lockbox Bank*" has the meaning set forth in <u>Section 2.11</u>.

"*Management Agreement*" has the meaning set forth in <u>Section 8.3(c)</u>.

"*Material Adverse Effect*" means, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, (a) a material adverse change in, or a material adverse effect upon, any of (i) the condition (financial or otherwise), operations, business, properties or prospects of any of the Credit Parties, (ii) the rights and remedies of Agent or Lenders under any Financing Document, or the ability of any Credit Party to perform any of its obligations under any Financing Document to which it is a party, (iii) the legality, validity or enforceability of any Financing Document, (iv) the existence, perfection or priority of any security interest granted in any Financing Document, (v) the value of any material Collateral, (vi) any Credit Party's or Operator's ability to accept, admit and/or retain patients or residents, (vii) the rate at which any Third Party Payor reimburses a Credit Party for goods or services provided by such Credit Party, (viii) the use or scope of any Healthcare Permits, (ix) the continued participation by any Credit Party in the Medicaid or Medicare programs or any other Third Party Payor Program at then current rate certifications or levels; (b) an impairment to the likelihood that Eligible Accounts in general will be collected and paid in the Ordinary Course of Business of any Borrower and upon the same schedule and with the same frequency as such Borrowers' recent collections history; or (c) the imposition of a fine against or the creation of any liability of any Credit Party or Operator to any Governmental Authority under any Healthcare Law in excess of $50,000.00. Notwithstanding the foregoing, the filing of the Bankruptcy Cases and the consummation of the Asset Sale shall not constitute Material Adverse Effects.

"*Material Contracts*" has the meaning set forth in <u>Section 3.17</u>.

"*Maximum Lawful Rate*" has the meaning set forth in <u>Section 2.7</u>.

"*MCF*" means MidCap Financial, LLC, and its successors and assigns.

"*Minimum Balance*" shall mean, at any time, an amount that equals the product of: (i) the average Borrowing Base (or, if less on any given day, the Revolving Loan Commitment) during the immediately preceding month multiplied by (ii) the Minimum Balance Percentage for such month.

"*Minimum Balance Percentage*" means eighty-five percent (85%).

"*Montefiore*" has the meaning set forth in the recitals.

"*Multiemployer Plan*" means a multiemployer plan within the meaning of Section 4001(a)(3) of ERISA to which any Borrower or any other member of the Controlled Group (or any Person who in the last five years was a member of the Controlled Group) is making or accruing an obligation to make contributions or has within the preceding five plan years (as determined on the applicable date of determination) made contributions.

"*Non-Funding Lender*" has the meaning set forth in Section 11.18.

"*Notes*" has the meaning set forth in Section 2.3.

"*Notice of Borrowing*" means a notice of a Responsible Officer of Borrower Representative, appropriately completed and substantially in the form of Exhibit D hereto.

"*Obligations*" means all obligations, liabilities and indebtedness (monetary (including post-petition interest, whether or not allowed) or otherwise) of each Credit Party under this Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"*OFAC*" means the U.S. Department of Treasury Office of Foreign Assets Control.

"*OFAC Lists*" means, collectively, the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) and/or any other list of terrorists or other restricted Persons maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders.

"*Offer*" shall have the meaning set forth in Section 4.12.

"*Operating Lease*" means any lease of any Project to an Operator entity, and all amendments thereto and extensions thereof, as has been previously approved by Agent as required hereunder.

"*Operative Documents*" means the Financing Documents, Affiliated Financing Documents, Management Agreements, Subordinated Debt Documents, the Asset Sale Documents and each other agreement, documents and certificate executed or delivered in connection therewith.

"*Option Period*" shall have the meaning set forth in Section 4.12.

"*Ordinary Course of Business*" means, in respect of any transaction involving any Person, the ordinary course of business of such Person, as conducted by such Person in accordance with past practices.

10844575.1
10844575v.1

"*Organizational Documents*" means, with respect to any Person other than a natural person, the documents by which such Person was organized (such as a certificate of incorporation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) and which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"*Payment Account*" means the account specified on the signature pages hereof into which all payments by or on behalf of each Borrower to Agent under the Financing Documents shall be made, or such other account as Agent shall from time to time specify by notice to Borrower Representative.

"*Payroll Taxes*" means, collectively, any and all withholdings, payroll or similar taxes due from Borrowers to the applicable Government Authorities, together with any and all interest, fees, penalties and similar amounts owing in respect of or relating to such taxes.

"*PBGC*" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"*Pension Plan*" means any ERISA Plan that is subject to Section 412 of the Code or Title IV of ERISA.

"*Permits*" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals required under all applicable Laws and required in order to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"*Permitted Affiliate*" means with respect to any Person (a) any Person that directly or indirectly controls such Person, and (b) any Person which is controlled by or is under common control with such controlling Person. As used in this definition, the term "control" of a Person means the possession, directly or indirectly, of the power to vote eighty percent (80%) or more of any class of voting securities of such Person or to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Permitted Asset Dispositions*" means the following Asset Dispositions, provided, however, that at the time of such Asset Disposition, no Default or Event of Default exists or would result from such Asset Disposition: (a) dispositions of Inventory in the Ordinary Course of Business and not pursuant to any bulk sale, (b) dispositions of furniture, fixtures and equipment in the Ordinary Course of Business that the applicable Borrower or Subsidiary determines in good faith is no longer used or useful in the business of such Borrower and its Subsidiaries, (c) dispositions approved in writing by Agent, and (d) the Asset Sale pursuant to Asset Sale Documents in form and substance satisfactory to Agent in its reasonable discretion.

"*Permitted Contest*" means, with respect to any tax obligation or other obligation allegedly or potentially owing from any Borrower or its Subsidiary to any governmental tax authority, a contest maintained in good faith by appropriate proceedings promptly instituted and

18

diligently conducted and with respect to which such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made on the books and records and financial statements of the applicable Credit Party(ies); provided, however, that (a) compliance with the obligation that is the subject of such contest is effectively stayed during such challenge; (b) Borrowers' and their Subsidiaries' title to, and its right to use, the Collateral is not adversely affected thereby and Agent's Lien and priority on the Collateral are not adversely affected, altered or impaired thereby; (c) Borrowers have given prior written notice to Agent of a Borrower's or its Subsidiary's intent to so contest the obligation; (d) the Collateral or any part thereof or any interest therein shall not be in any danger of being sold, forfeited or lost by reason of such contest by Borrowers or its Subsidiaries; (e) Borrowers have given Agent notice of the commencement of such contest and upon request by Agent, from time to time, notice of the status of such contest by Borrowers and/or confirmation of the continuing satisfaction of this definition; and (f) upon a final determination of such contest, Borrowers and its Subsidiaries shall promptly comply with the requirements thereof.

"*Permitted Contingent Obligations*" means (a) Contingent Obligations arising in respect of the Debt under the Financing Documents; (b) Contingent Obligations resulting from endorsements for collection or deposit in the Ordinary Course of Business; (c) Contingent Obligations outstanding on the date of this Agreement and set forth on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to the indebtedness underlying such Contingent Obligations other than extensions of the maturity thereof without any other change in terms); (d) Contingent Obligations incurred in the Ordinary Course of Business with respect to surety and appeal bonds, performance bonds and other similar obligations not to exceed $25,000 in the aggregate at any time outstanding; (f) Contingent Obligations arising under indemnity agreements with title insurers to cause such title insurers to issue to Agent mortgagee title insurance policies; (g) Contingent Obligations arising with respect to customary indemnification obligations in favor of purchasers in connection with dispositions of personal property assets permitted by Agent hereunder; and (h) other Contingent Obligations not permitted by clauses (a) through (g) above, not to exceed $25,000 in the aggregate at any time outstanding.

"*Permitted Debt*" means: (a) Borrowers' and its Subsidiaries' Debt to Agent, Agent's Affiliates and each Lender under this Agreement, the other Financing Documents and, prior to the Asset Sale, the DIP Term Credit Documents; (b) Debt incurred as a result of endorsing negotiable instruments received in the Ordinary Course of Business; (c) purchase money Debt not to exceed $2,000,000 at any time (whether in the form of a loan or a lease) used solely to acquire equipment used in the Ordinary Course of Business and secured only by such equipment; (d) Debt existing on the date of this Agreement and described on Schedule 5.1 (but not including any refinancings, extensions, increases or amendments to such Debt other than extensions of the maturity thereof without any other change in terms), all of which accrues interest at the rate described on Schedule 5.1; (e) Debt in the form of insurance premiums financed through the applicable insurance company; (f) trade accounts payable arising and paid on a timely basis and in the Ordinary Course of Business; (g) Subordinated Debt (if any); and (h) Permitted Refinancing Indebtedness.

"*Permitted Investments*" means: (a) Investments shown on Schedule 5.7 and existing on the Closing Date; (b) (i) cash equivalents, and (ii) any similar short term Investments permitted

by Borrowers' and its Subsidiaries' investment policies, as amended from time to time, provided, however, that such investment policy (and any such amendment thereto) has been approved by Agent; (c) Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the Ordinary Course of Business; (d) Investments consisting of travel advances and employee relocation loans and other employee loans and advances in the Ordinary Course of Business; (e) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the Ordinary Course of Business; and (f) Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the Ordinary Course of Business, provided, that this subpart (f) shall not apply to Investments of Borrowers in any Subsidiary.

"*Permitted Liens*" means: (a) deposits or pledges of cash to secure obligations under workmen's compensation, social security or similar laws, or under unemployment insurance (but excluding Liens arising under ERISA) pertaining to a Borrower's or its Subsidiary's employees, if any; (b) deposits or pledges of cash to secure bids, tenders, contracts (other than contracts for the payment of money or the deferred purchase price of property or services), leases, statutory obligations, surety and appeal bonds and other obligations of like nature arising in the Ordinary Course of Business; (c) carrier's, warehousemen's, mechanic's, workmen's, materialmen's or other like Liens on Collateral, other than any Collateral which is part of the Borrowing Base, arising in the Ordinary Course of Business with respect to obligations which are not due, or which are being contested in good faith; (d) Liens on Collateral, other than Accounts, for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or the subject of a Permitted Contest; (e) attachments, appeal bonds, judgments and other similar Liens on Collateral other than Accounts, for sums not exceeding $1,000,000 in the aggregate arising in connection with court proceedings; provided, however, that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being contested in good faith; (f) with respect to real estate, easements, rights of way, restrictions, minor defects or irregularities of title, none of which, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Security Documents, materially affect the value or marketability of the Collateral, impair the use or operation of the Collateral for the use currently being made thereof or impair Borrowers' ability to pay the Obligations in a timely manner or impair the use of the Collateral or the ordinary conduct of the business of any Borrower or any Subsidiary and which, in the case of any real estate which is part of the Collateral, are set forth as exceptions to or subordinate matters in the title insurance policy accepted by Agent insuring the lien of the Security Documents; (g) Liens and encumbrances in favor of Agent under the Financing Documents; (h) Liens on Collateral, other than Collateral which is part of the Borrowing Base, existing on the date hereof and set forth on Schedule 5.2; (i) any Lien on any equipment securing Debt permitted under subpart (c) of the definition of Permitted Debt, provided, however, that such Lien attaches concurrently with or within twenty (20) days after the acquisition thereof; (j) Liens and encumbrances in favor of the holders of the Affiliated Financing Documents; and (k) Liens in favor of the United States Internal Revenue Service existing on the Closing Date and set forth on Schedule 5.2 that are subordinated in right of payment to the Obligations pursuant to the terms of the Financing Orders.

"**Permitted Modifications**" means (a) such amendments or other modifications to a Borrower's or Subsidiary's Organizational Documents as are required under this Agreement or by applicable Law and fully disclosed to Agent on the first Compliance Certificate due to be delivered after such amendments or other modifications have become effective; and (b) such amendments or modifications to a Borrower's or Subsidiary's Organizational Documents (other than those involving a change in the name of a Borrower or Subsidiary or involving a reorganization of a Borrower or Subsidiary under the laws of a different jurisdiction) that would not adversely affect the rights and interests of the Agent or Lenders and fully disclosed to Agent on the first Compliance Certificate due to be delivered after such amendments or other modifications have become effective.

"**Permitted Refinancing Indebtedness**" means, with respect to the loan from Sun Life Assurance Company of Canada listed on Schedule 5.1 hereto, any Debt that renews, refinances or replaces the same; provided that (a) if the Debt being renewed, refinanced or replaced is subordinated in right of payment to the Obligations, such renewal, refinancing or replacement Debt shall be subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Debt being renewed, refinanced or replaced, and (b) such renewal refinancing or replacement Debt has a final stated maturity date that is after the Termination Date.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any Governmental Authority.

"**Plan Documentation**" means the Plan of Reorganization and all documentation related thereto or referenced therein, including without limitation any amendments, modifications or supplements to any of the foregoing, including any subsequent plans of reorganization, any motions related thereto and the Confirmation Order.

"**Plan of Reorganization**" means, as the same may be amended, modified or otherwise supplemented in compliance with this Agreement, a joint plan of reorganization of the Borrowers in their Bankruptcy Cases which either (a) provides for indefeasible payment in full cash and in accordance with the terms of the this Agreement of all Obligations due and owing as of the effective date of such plan of reorganization, including any Prepetition Obligations, or (b) is otherwise in form and content acceptable to Agent and the Lenders.

"**Postpetition**" or "**postpetition**" means the time period commencing on the Petition Date and ending on the Reorganization Effective Date.

"**Prepetition**" or "**prepetition**" means the time period prior to the Petition Date.

"**Prepetition Agent**" has the meaning set forth in the recitals.

"**Prepetition Lender**" has the meaning set forth in the recitals.

"**Prepetition Obligations**" means, collectively, the Prepetition Revolving Loan Obligations and the Prepetition Term Loan Obligations.

10844575.1
10844575v.1

"***Prepetition Repayment Advance***" means a Revolving Loan made by Agent, in Agent's sole discretion, on or after the Prepetition Revolving Loan Termination Date in the amount of the outstanding Prepetition Revolving Loan Obligations, including, without limitation, all accrued and unpaid interest, fees, costs, expenses, indemnities and premiums thereon or with respect thereto and all other amounts due and payable thereon, the proceeds of which shall be transferred directly to the Prepetition Agent for payment of the Prepetition Revolving Loan Obligations.

"***Prepetition Revolving Credit Agreement***" has the meaning set forth in the recitals.

"***Prepetition Revolving Loan Obligations***" means any and all "Obligations," as defined in the Prepetition Revolving Credit Agreement.

"***Prepetition Revolving Loan Termination Date***" means the date the Final Order approving the Prepetition Repayment Advance is entered.

"***Prepetition Term Credit Agreement***" means that certain Credit and Security Agreement dated as of June 8, 2011 by and among MidCap Funding IV, LLC, as administrative agent and as a lender (as assigned to it by MCF), and Howe Avenue Nursing Home, Inc., as borrower.

"***Prepetition Term Loan Obligations***" means any and all "Obligations," as defined in the Prepetition Term Credit Agreement.

"***Pro Rata Share***" means (a) with respect to a Lender's obligation to make Revolving Loans, the Revolving Loan Commitment Percentage of such Lender, (b) with respect to a Lender's right to receive payments of principal and interest with respect to Revolving Loans, such Lender's Revolving Loan Exposure with respect thereto; and (c) for all other purposes (including, without limitation, the indemnification obligations arising under <u>Section 11.6</u> of this Agreement) with respect to any Lender, the percentage obtained by *dividing* (i) the sum of the Revolving Loan Commitment Amount of such Lender (or, in the event the Revolving Loan Commitment shall have been terminated, such Lender's then existing Revolving Loan Outstandings), *by* (ii) the sum of the Revolving Loan Commitment (or, in the event the Revolving Loan Commitment shall have been terminated, the then existing Revolving Loan Outstandings) of all Lenders.

"***Protected Health Information***" means "protected health information" as defined in 45 C.F.R. § 160.103.

"***Release***" has the meaning set forth in 42 U.S.C. §9601 (22).

"***Reorganization Effective Date***" means the effective date the Plan of Reorganization.

"***Reorganization Milestones***" means (a) filing by the Borrowers of the Asset Sale Motion on or before the date that is ten (10) days after the Petition Date, (b) entry of an order by the Bankruptcy Court satisfactory to Agent approving the procedures for the Asset Sale set forth in the Asset Sale Motion on or before the date that is 35 days after the Petition Date, (c) entry of the Asset Sale Order on or before the date that is 100 days after the Petition Date, and (d) closing of the Asset Sale on or before December 6, 2013.

22

"*Required Lenders*" means at any time Lenders holding (a) sixty-six and two thirds percent (66 2/3%) or more of the Revolving Loan Commitment, or (b) if the Revolving Loan Commitment has been terminated, sixty-six and two thirds percent (66 2/3%) or more of the *sum of* (i) the then aggregate outstanding principal balance of the Loans *plus* (ii) the then aggregate amount of Letter of Credit Liabilities.

"*Responsible Officer*" means any of the Chief Executive Officer, Chief Financial Officer or any other officer of the applicable Borrower acceptable to Agent.

"*Restricted Distribution*" means as to any Person (a) any dividend or other distribution (whether in cash, securities or other property) on any equity interest in such Person (except those payable solely in its equity interests of the same class); (b) any payment by such Person on account of (i) the purchase, redemption, retirement, defeasance, surrender, cancellation, termination or acquisition of any equity interests in such Person or any claim respecting the purchase or sale of any equity interest in such Person, or (ii) any option, warrant or other right to acquire any equity interests in such Person; (c) any management fees, salaries or other fees or compensation to any Affiliate or any Person holding an equity interest in a Borrower or a Subsidiary of a Borrower, an Affiliate of a Borrower or an Affiliate of any Subsidiary of a Borrower; (d) any lease or rental payments to an Affiliate or Subsidiary of a Borrower, except for those listed on Schedule 5.8 hereto; or (e) repayments of or debt service on loans or other indebtedness held by any Affiliate or any Person holding an equity interest in a Borrower or a Subsidiary of a Borrower, an Affiliate of a Borrower or an Affiliate of any Subsidiary of a Borrower, unless permitted under and made pursuant to a Subordination Agreement applicable to such loans or other indebtedness.

"*Revolving Lender*" means each Lender having a Revolving Loan Commitment Amount in excess of zero (or, in the event the Revolving Loan Commitment shall have been terminated at any time, each Lender at such time having Revolving Loan Outstandings in excess of zero).

"*Revolving Loan*" has the meaning set forth in Section 2.1(b)(i).

"*Revolving Loan Availability*" means, at any time, the Revolving Loan Limit *minus* the Revolving Loan Outstandings.

"*Revolving Loan Borrowing*" means a borrowing of a Revolving Loan.

"*Revolving Loan Commitment*" means, as of any date of determination, the aggregate Revolving Loan Commitment Amounts of all Lenders as of such date.

"*Revolving Loan Commitment Amount*" means, as to any Lender, the dollar amount set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Amount" (if such Lender's name is not so set forth thereon, then the dollar amount on the Commitment Annex for the Revolving Loan Commitment Amount for such Lender shall be deemed to be zero), as such amount may be adjusted from time to time by any amounts assigned (with respect to such Lender's portion of Revolving Loans outstanding and its commitment to make Revolving Loans) pursuant to the terms of any and all effective assignment agreements to which such Lender is a party.

23

"*Revolving Loan Commitment Percentage*" means, as to any Lender, (a) on the Closing Date, the percentage set forth opposite such Lender's name on the Commitment Annex under the column "Revolving Loan Commitment Percentage" (if such Lender's name is not so set forth thereon, then, on the Closing Date, such percentage for such Lender shall be deemed to be zero), and (b) on any date following the Closing Date, the percentage equal to the Revolving Loan Commitment Amount of such Lender on such date *divided by* the Revolving Loan Commitment on such date.

"*Revolving Loan Exposure*" means, with respect to any Lender on any date of determination, the percentage equal to the amount of such Lender's Revolving Loan Outstandings on such date *divided by* the aggregate Revolving Loan Outstandings of all Lenders on such date.

"*Revolving Loan Limit*" means, at any time, the lesser of (a) the Revolving Loan Commitment, and (b) the *sum of* (i) the Borrowing Base for Medical Center (which shall not exceed $16,000,000), *plus* (ii) the Borrowing Base for Nursing Home (which shall not exceed $2,000,000), *plus* (iii) the Borrowing Base for Mt. Vernon (which shall not exceed $5,000,000).

"*Revolving Loan Outstandings*" means, at any time of calculation, (a) the *sum of* the then existing aggregate outstanding principal amount of Revolving Loans, and (b) when used with reference to any single Lender, the *sum of* the then existing outstanding principal amount of Revolving Loans advanced by such Lender.

"*Revolving Loans*" has the meaning set forth in Section 2.1(b).

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Account*" means a "securities account" (as defined in Article 9 of the UCC), an investment account, or other account in which investment property or securities are held or invested for credit to or for the benefit of any Borrower.

"*Securities Account Control Agreement*" means an agreement, in form and substance satisfactory to Agent, among Agent, any applicable Borrower and each securities intermediary in which such Borrower maintains a Securities Account pursuant to which Agent shall obtain "control" (as defined in Article 9 of the UCC) over such Securities Account.

"*Security Document*" means this Agreement and any other agreement, document or instrument executed concurrently herewith or at any time hereafter pursuant to which one or more Credit Parties or any other Person either (a) Guarantees payment or performance of all or any portion of the Obligations, and/or (b) provides, as security for all or any portion of the Obligations, a Lien on any of its assets in favor of Agent for its own benefit and the benefit of the Lenders, as any or all of the same may be amended, supplemented, restated or otherwise modified from time to time.

"*Stalking Horse Asset Purchase Agreement*" has the meaning set forth in the recitals.

24

"**Subordinated Debt**" means any Debt of Borrowers incurred pursuant to the terms of the Subordinated Debt Documents and with the prior written consent of Agent, all of which documents must be in form and substance acceptable to Agent in its sole discretion.

"**Subordinated Debt Documents**" means any documents evidencing and/or securing Debt governed by a Subordination Agreement, all of which documents must be in form and substance acceptable to Agent in its sole discretion.

"**Subordination Agreement**" means any agreement between Agent and another creditor of Borrowers, as the same may be amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, pursuant to which the Debt owing from any Borrower(s) and/or the Liens securing such Debt granted by any Borrower(s) to such creditor are subordinated in any way to the Obligations and the Liens created under the Security Documents, the terms and provisions of such Subordination Agreements to have been agreed to by and be acceptable to Agent in the exercise of its sole discretion.

"**Subsidiary**" means, with respect to any Person, (a) any corporation of which an aggregate of more than fifty percent (50%) of the outstanding capital stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, capital stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person or one or more Subsidiaries of such Person, or with respect to which any such Person has the right to vote or designate the vote of more than fifty percent (50%) of such capital stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person and/or one or more Subsidiaries of such Person shall have an interest (whether in the form of voting or participation in profits or capital contribution) of more than fifty percent (50%) or of which any such Person is a general partner or may exercise the powers of a general partner. Unless the context otherwise requires, each reference to a Subsidiary shall be a reference to a Subsidiary of a Borrower.

"**Taxes**" has the meaning set forth in Section 2.8.

"**Term Loan Reserve**" means a reserve against the Borrowing Base in an amount up to $10,000,000 effective as of the DIP Term Loan Effective Date, which, so long as no Default or Event of Default shall have occurred and be continuing, shall be decreased on a weekly basis by an amount equal to the projected negative Net Cash Flow from Operations set forth in the Budget for such week as approved by Agent pursuant to Section 4.1.

"**Termination Date**" means the earlier to occur of (a) the Commitment Expiry Date, (b) any date on which Agent accelerates the maturity of the Loans pursuant to Section 10.2, and (c) the termination date stated in any notice of termination of this Agreement provided by Borrowers in accordance with Section 2.12.

"**UCC**" means the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

10844575.1
10844575v.1

"*United States*" means the United States of America.

**Section 1.2**    Accounting Terms and Determinations.    Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including, without limitation, determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP applied on a basis consistent with the most recent audited consolidated financial statements of each Borrower and its Consolidated Subsidiaries delivered to Agent and each of the Lenders on or prior to the Closing Date.  If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Financing Document, and either Borrowers or the Required Lenders shall so request, the Agent, the Lenders and Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided, however, that until so amended, (a) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Borrowers shall provide to the Agent and the Lenders financial statements and other documents required under this Agreement which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Debt or other liabilities of any Credit Party or any Subsidiary of any Credit Party at "fair value", as defined therein

**Section 1.3**    Other Definitional and Interpretive Provisions.    References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act, without additional reference, shall be deemed to refer to federal statutes and acts of the United States.  References to any agreement, instrument or document shall include all schedules, exhibits, annexes and other attachments thereto.  As used in this Agreement, the meaning of the term "material" or the phrase "in all material respects" is intended to refer to an act, omission, violation or condition which reflects or could reasonably be expected to result in a Material Adverse Effect. References to capitalized terms that are not defined herein, but are defined in the UCC, shall have the meanings given them in the UCC.  All references herein to times of day shall be references to daylight or standard time, as applicable.

26

Section 1.4    Time is of the Essence.    Time is of the essence in Borrowers' and each other Credit Party's performance under this Agreement and all other Financing Documents.

## ARTICLE 2 - LOANS

Section 2.1    Loans.

(a)    [Reserved]

(b)    Revolving Loans.

(i)    Revolving Loans and Borrowings.    On the terms and subject to the conditions set forth herein and in the Financing Orders, each Lender severally agrees to make loans to Borrowers from time to time as set forth herein (each a "**Revolving Loan**", and collectively, "**Revolving Loans**") equal to such Lender's Revolving Loan Commitment Percentage of Revolving Loans requested by Borrowers hereunder, provided, however, that after giving effect thereto, the Revolving Loan Outstandings shall not exceed the Revolving Loan Limit. Each Borrower and each Revolving Lender hereby authorizes Agent to make Revolving Loans on behalf of Revolving Lenders, at any time in its sole discretion to pay (1) principal owing in respect of the Loans, (2) any interest, fees, expenses and other charges payable by any Credit Party from time to time arising under this Agreement or any other Financing Document, including, without limitation, the Prepetition Repayment Advance; (3) any and all amounts due and payable for Prepetition Term Loan Obligations; and (4) upon the occurrence and during the continuation of an Event of Default, any and all Affiliated Obligations as such Affiliated Obligations become due and payable. Without limiting any other rights and remedies of Agent hereunder or under the other Financing Documents or the Financing Orders, the Revolving Loans shall be subject to Agent's continuing right to withhold from the Borrowing Base reserves, and to increase and decrease such reserves from time to time if and to the extent that in Agent's good faith credit judgment and discretion such reserves are necessary.

(ii)    Funding Procedures.

(A)    Borrower Representative shall deliver to Agent a Notice of Borrowing, together with a Borrowing Base Certificate attached, with respect to each proposed Revolving Loan Borrowing, and Borrower Representative shall submit separate Borrowing Base Certificates for each Borrower. Each Notice of Borrowing shall be delivered no later than 1:00 P.M. (New York Time) two (2) Business Days prior to the date of such proposed borrowing. The Borrowing Base shall be determined by Agent based on the Borrowing Base Certificate for the applicable Borrower delivered to Agent in accordance with this Agreement, and such other information as may be available to Agent.

(B)    Subject to the terms and conditions of this Agreement and the Financing Orders, if the Notice of Borrowing, with the Borrowing Base Certificate attached, is delivered to Agent before 1:00 P.M. (New York Time) two (2) Business Days prior to the date of such proposed Revolving Loan Borrowing,

10844575.1
10844575v.1

Agent will advance, on behalf of Lenders, on the date of such proposed Revolving Loan Borrowing (or the next Business Day if the Notice of Borrowing is delivered to Agent after 1:00 P.M. (New York Time)) to Borrower Representative a Revolving Loan in an amount equal to the lesser of (i) the amount of the Revolving Loan requested by Borrower Representative in the Notice of Borrowing, and (ii) the Revolving Loan Availability as of such date. Any Revolving Loans made by Agent hereunder shall be treated for all purposes as, and shall accrue interest at the same rate applicable to, Revolving Loans.

(iii)    <u>Mandatory Revolving Loan Repayments and Prepayments</u>.

(A)    The Revolving Loan Commitment shall terminate on the Termination Date. On such Termination Date, there shall become due, and Borrowers shall pay, the entire outstanding principal amount of each Revolving Loan, together with accrued and unpaid Obligations pertaining thereto.

(B)    If at any time the Revolving Loan Outstandings exceed the Revolving Loan Limit, then, on the next succeeding Business Day, Borrowers shall repay the Revolving Loans in an amount equal to such excess.

(C)    Principal payable on account of Revolving Loans shall be payable by Borrowers to Agent (I) immediately upon the receipt by any Borrower or Agent of any payments on or proceeds from any of the Accounts, to the extent of such payments or proceeds, as further described in <u>Section 2.11</u>, and (II) in full on the Termination Date.

(iv)    <u>Optional Prepayments</u>. Borrowers may from time to time prepay the Revolving Loans in whole or in part; <u>provided</u>, <u>however</u>, that any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $25,000.

(v)    <u>LIBOR Rate</u>.

(A)    Except as provided in subsection (C) below, Revolving Loans shall accrue interest at the LIBOR Rate *plus* the Applicable Margin.

(B)    The LIBOR Rate may be adjusted by Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any eurodollar deposits or increased costs, in each case, due to changes in applicable Law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest based upon the LIBOR Rate; <u>provided</u>, <u>however</u>, that notwithstanding anything in this Agreement to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued

28

in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law", regardless of the date enacted, adopted or issued. In any such event, the affected Lender shall give Borrowers and Agent notice of such a determination and adjustment and Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, Borrowers may, by notice to such affected Lender (I) require such Lender to furnish to Borrowers a statement setting forth the basis for adjusting such LIBOR Rate and the method for determining the amount of such adjustment, or (II) repay the Loans bearing interest based upon the LIBOR Rate with respect to which such adjustment is made.

(C)    In the event that any change in any law, regulation, treaty, or directive, or any change therein or in the interpretation or application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Loans bearing interest based upon the LIBOR Rate or to continue such funding or maintaining, or to determine or charge interest rates at the LIBOR Rate, such Lender shall give notice of such changed circumstances to Agent and Borrowers and Agent promptly shall transmit the notice to each other Lender and (I) in the case of any outstanding Loans of such Lender bearing interest based upon the LIBOR Rate, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Loans, and interest upon such Lender's Loans thereafter shall accrue interest at Base Rate *plus* the Applicable Margin, and (II) such Loans shall continue to accrue interest at Base Rate *plus* the Applicable Margin until such Lender determines that it would no longer be unlawful or impractical to maintain such Loans at the LIBOR Rate.

(D)    Anything to the contrary contained herein notwithstanding, neither Agent nor any Lender is required actually to acquire eurodollar deposits to fund or otherwise match fund any Obligation as to which interest accrues based on the LIBOR Rate.

(vi)    <u>Restriction on Termination</u>. Notwithstanding any prepayment of the Revolving Loan Outstandings or any other termination of Lenders' Credit Exposure under this Agreement, Agents and Lenders shall have no obligation to release any of the Collateral securing this Agreement while any portion of the Affiliated Obligations shall remain outstanding.

**Section 2.2**    <u>Interest, Interest Calculations and Certain Fees</u>.

(a)    <u>Interest</u>. From and following the Closing Date, except as expressly set forth in this Agreement, Loans and the other Obligations shall bear interest at the sum of the LIBOR Rate *plus* the Applicable Margin. Interest on the Loans shall be paid in arrears on the first (1st) day of each month and on the maturity of such Loans, whether by acceleration or

29

otherwise. Interest on all other Obligations shall be payable upon demand. For purposes of calculating interest, all funds transferred from the Payment Account for application to any Revolving Loans shall be subject to a six Business Day clearance period and all interest accruing on such funds during such clearance period shall accrue for the benefit of Agent, and not for the benefit of the Lenders.

(b)    Unused Line Fee.  From and following the Closing Date, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans, in accordance with their respective Pro Rata Shares, a fee in an amount equal to (i) (A) the Revolving Loan Commitment *minus* (B) the average daily balance of the sum of the Revolving Loan Outstandings during the preceding month, *multiplied by* (ii) one half percent (0.50%) per annum. Such fee is to be paid monthly in arrears on the first day of each month.

(c)    Documentation and Approval Fees and Expenses.  Borrowers shall reimburse, on a current basis, all costs and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses) incurred by Agent (and, after the occurrence and during the continuation of any Event of Default, any Lender) in connection with the preparation, negotiation, documentation and court approval of this Agreement, the other Financing Documents and the Financing Orders, including, without limitation, in connection with (i) the analysis, negotiation, preparation, execution, administration, delivery and termination of this Agreement, the other Financing Documents and the documents and instruments referred to herein and therein, and any amendment, amendment and restatement, supplement, waiver or consent relating hereto or thereto, whether or not any such amendment, amendment and restatement, supplement, waiver or consent is executed or becomes effective, (ii) the analysis, negotiation, and preparation of the Financing Orders, the Asset Sale Documents, the Asset Sale Motion, the Asset Sale Order and any other documents filed in or prepared in connection with the Bankruptcy Cases, and the preparation for, travel to and participation in any hearings or proceedings in connection with any of the foregoing, (iii) the enforcement of Agent's and Lenders' rights hereunder, or the collection of any payments owing from, Borrowers under this Agreement and/or the other Financing Documents or the protection, preservation or defense of the rights of Agent and Lenders hereunder and under the other Financing Documents, and (iv) any lien, litigation and other search costs, the reasonable fees, expenses and disbursements of legal counsel for Agent (and, after the occurrence and during the continuation of any Event of Default, any Lender), including the reasonable charges of internal legal counsel, and reasonable charges of any expert, appraiser, auditor or other consultant to Lender.

(d)    Exit Fee.  Upon repayment of the Revolving Loans, Borrowers shall pay to Agent, for the benefit of all Lenders, a fee equal to an amount determined by *multiplying* the Revolving Loan Commitment *by* two percent (2.00%). All fees payable pursuant to this paragraph shall be deemed fully earned and non-refundable as of the Closing Date.

(e)    Collateral Fee.  Commencing on the date hereof, and continuing on the first day of each month thereafter, a collateral management fee equal to the product of (a) the greater of (i) the average end-of-day principal balance of Revolving Loans outstanding during the immediately preceding month, and (ii) the Minimum Balance, *multiplied by* (b) one and two tenths percent (1.20%) per annum. For purposes of calculating the average end-of-day principal balance of Revolving Loans, all funds paid into the Payment Account (or which were required to

be paid into the Payment Account under this Agreement) or otherwise received by Agent for the account of Borrowers shall be subject to a six Business Day clearance period. The collateral management fee described in this paragraph shall be deemed fully earned when due and payable and, once paid, shall be non-refundable.

(f)    Origination Fee. Contemporaneously with Borrowers' execution of this Agreement, Borrowers shall pay Agent, for the benefit of all Lenders committed to make Revolving Loans on the Closing Date, in accordance with their respective Pro Rata Share, a fee in an amount equal to (i) the Revolving Loan Commitment, *multiplied by* (ii) one percent (1.0%). All fees payable pursuant to this paragraph shall be non-refundable as of the Closing Date.

(g)    Audit Fees. Borrowers shall pay to Agent, for its own account and not for the benefit of any other Lenders, all reasonable fees and expenses in connection with audits and inspections of Borrowers' books and records, audits, valuations or appraisals of the Collateral, audits of Borrowers' compliance with applicable Laws and such other matters as Agent shall deem appropriate, which shall be due and payable on the first Business Day of the month following the date of issuance by Agent of a written request for payment thereof to Borrowers.

(h)    Wire Fees. Borrowers shall pay to Agent, for its own account and not for the account of any other Lenders, on written demand, fees for incoming and outgoing wires made for the account of Borrowers, such fees to be based on Agent's then current wire fee schedule (available upon written request of the Borrowers).

(i)    Late Charges. If payments of principal (other than a final installment of principal upon the Termination Date), interest due on the Obligations, or any other amounts due hereunder or under the other Financing Documents are not timely made and remain overdue for a period of five (5) days, Borrowers, without notice or demand by Agent, promptly shall pay to Agent, for its own account and not for the benefit of any other Lenders, as additional compensation to Agent in administering the Obligations, an amount equal to five percent (5.0%) of each delinquent payment.

(j)    Computation of Interest and Related Fees. All interest and fees under each Financing Document shall be calculated on the basis of a 360-day year for the actual number of days elapsed. The date of funding of a Loan shall be included in the calculation of interest. The date of payment of a Loan shall be excluded from the calculation of interest. If a Loan is repaid on the same day that it is made, one (1) day's interest shall be charged.

Section 2.3    Notes. The portion of the Loans made by each Lender shall be evidenced, if so requested by such Lender, by one or more promissory notes executed by Borrowers on a joint and several basis (each, a "*Note*") in an original principal amount equal to such Lender's Revolving Loan Commitment Amount.

31

**Section 2.4**    [Reserved]

**Section 2.5**    [Reserved]

**Section 2.6**    General Provisions Regarding Payment; Loan Account.

(a)    All payments to be made by each Borrower under any Financing Document, including payments of principal and interest made hereunder and pursuant to any other Financing Document, and all fees, expenses, indemnities and reimbursements, shall be made without set-off, recoupment or counterclaim. If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension (it being understood and agreed that, solely for purposes of calculating financial covenants and computations contained herein and determining compliance therewith, if payment is made, in full, on any such extended due date, such payment shall be deemed to have been paid on the original due date without giving effect to any extension thereto). Any payments received in the Payment Account before 12:00 p.m. (Eastern time) on any date shall be deemed received by Agent on such date, and any payments received in the Payment Account after 12:00 p.m. (Eastern time) on any date shall be deemed received by Agent on the next succeeding Business Day.

(b)    Agent shall maintain a loan account (the "***Loan Account***") on its books to record Loans and other extensions of credit made by the Lenders hereunder or under any other Financing Document, and all payments thereon made by each Borrower. All entries in the Loan Account shall be made in accordance with Agent's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded in Agent's books and records at any time shall be conclusive and binding evidence of the amounts due and owing to Agent by each Borrower absent manifest error; provided, however, that any failure to so record or any error in so recording shall not limit or otherwise affect any Borrower's duty to pay all amounts owing hereunder or under any other Financing Document. Agent shall endeavor to provide Borrowers with a monthly statement regarding the Loan Account (but neither Agent nor any Lender shall have any liability if Agent shall fail to provide any such statement). Unless any Borrower notifies Agent of any objection to any such statement (specifically describing the basis for such objection) within ninety (90) days after the date of receipt thereof, it shall be deemed final, binding and conclusive upon Borrowers in all respects as to all matters reflected therein.

**Section 2.7**    Maximum Interest. In no event shall the interest charged with respect to the Loans or any other Obligations of any Borrower under any Financing Document exceed the maximum amount permitted under the laws of the State of Maryland or of any other applicable jurisdiction. Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable hereunder or under any Note or other Financing Document (the "***Stated Rate***") would exceed the highest rate of interest permitted under any applicable law to be charged (the "***Maximum Lawful Rate***"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, each Borrower shall, to the extent permitted by law, continue to pay interest at the Maximum Lawful Rate until such time as the total interest received is equal to the total interest which

32

would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable. Thereafter, the interest rate payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply. In no event shall the total interest received by any Lender exceed the amount which it could lawfully have received had the interest been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, any Lender has received interest hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other amounts (other than interest) payable hereunder, and if no such principal or other amounts are then outstanding, such excess or part thereof remaining shall be paid to Borrowers. In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate *divided by* the number of days in the year in which such calculation is made.

**Section 2.8** Taxes; Capital Adequacy.

(a) All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp, documentary, payroll, employment, property or franchise taxes and other taxes, fees, duties, levies, assessments, withholdings or other charges of any nature whatsoever (including interest and penalties thereon) imposed by any taxing authority, excluding taxes imposed on or measured by Agent's or any Lender's net income by the jurisdictions under which Agent or such Lender is organized or conducts business (other than solely as the result of entering into any of the Financing Documents or taking any action thereunder) (all non-excluded items being called "***Taxes***"). If any withholding or deduction from any payment to be made by any Borrower hereunder is required in respect of any Taxes pursuant to any applicable Law, then Borrowers will: (i) pay directly to the relevant authority the full amount required to be so withheld or deducted; (ii) promptly forward to Agent an official receipt or other documentation satisfactory to Agent evidencing such payment to such authority; and (iii) pay to Agent for the account of Agent and Lenders such additional amount or amounts as is necessary to ensure that the net amount actually received by Agent and each Lender will equal the full amount Agent and such Lender would have received had no such withholding or deduction been required. If any Taxes are directly asserted against Agent or any Lender with respect to any payment received by Agent or such Lender hereunder, Agent or such Lender may pay such Taxes and Borrowers will promptly pay such additional amounts (including any penalty, interest or expense) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which Agent or such Lender first made written demand therefor.

(b) If any Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Agent, for the account of Agent and the respective Lenders, the required receipts or other required documentary evidence, Borrowers shall indemnify Agent and Lenders for any incremental Taxes, interest or penalties that may become payable by Agent or any Lender as a result of any such failure.

33

(c)    Each Lender that (i) is organized under the laws of a jurisdiction other than the United States, and (ii)(A) is a party hereto on the Closing Date or (B) purports to become an assignee of an interest as a Lender under this Agreement after the Closing Date (unless such Lender was already a Lender hereunder immediately prior to such assignment) (each such Lender a "*Foreign Lender*") shall execute and deliver to each of Borrowers and Agent one or more (as Borrowers or Agent may reasonably request) United States Internal Revenue Service Forms W-8ECI, W-8BEN, W-8IMY (as applicable) and other applicable forms, certificates or documents prescribed by the United States Internal Revenue Service or reasonably requested by Agent certifying as to such Lender's entitlement to a complete exemption from withholding or deduction of Taxes. Borrowers shall not be required to pay additional amounts to any Lender pursuant to this <u>Section 2.8</u> with respect to United States withholding and income Taxes to the extent that the obligation to pay such additional amounts would not have arisen but for the failure of such Lender to comply with this paragraph other than as a result of a change in law.

(d)    If any Lender shall determine in its commercially reasonable judgment that the adoption or taking effect of, or any change in, any applicable Law regarding capital adequacy, in each instance, after the Closing Date, or any change after the Closing Date in the interpretation, administration or application thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation, administration or application thereof, or the compliance by any Lender or any Person controlling such Lender with any request, guideline or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency adopted or otherwise taking effect after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or such controlling Person's capital as a consequence of such Lender's obligations hereunder to a level below that which such Lender or such controlling Person could have achieved but for such adoption, taking effect, change, interpretation, administration, application or compliance (taking into consideration such Lender's or such controlling Person's policies with respect to capital adequacy) then from time to time, upon written demand by such Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail, a copy of which shall be furnished to Agent), Borrowers shall promptly pay to such Lender such additional amount as will compensate such Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is two hundred seventy (270) days prior to the date on which such Lender first made demand therefor; <u>provided</u>, <u>however</u>, that notwithstanding anything in this Agreement to the contrary, (i) Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "change in applicable Law," regardless of the date enacted, adopted or issued.

(e)    If any Lender requires compensation under <u>Section 2.8(d)</u>, or requires any Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.8(a)</u>, then, upon the written request of Borrower Representative, such Lender shall use reasonable efforts to designate a different lending office

34

for funding or booking its Loans hereunder or to assign its rights and obligations hereunder (subject to the terms of this Agreement) to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or materially reduce amounts payable pursuant to any such subsection, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender (as determined in its sole discretion). Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**Section 2.9**    Appointment of Borrower Representative.    Each Borrower hereby designates Borrower Representative as its representative and agent on its behalf for the purposes of issuing Notices of Borrowing and Borrowing Base Certificates, and giving instructions with respect to the disbursement of the proceeds of the Loans, giving and receiving all other notices and consents hereunder or under any of the other Financing Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or Borrowers under the Financing Documents. Borrower Representative hereby accepts such appointment. Notwithstanding anything to the contrary contained in this Agreement, no Borrower other than Borrower Representative shall be entitled to take any of the foregoing actions. The proceeds of each Loan made hereunder shall be advanced to or at the direction of Borrower Representative and if not used by Borrower Representative in its business (for the purposes provided in this Agreement) shall be deemed to be immediately advanced by Borrower Representative to the appropriate other Borrowers hereunder as an intercompany loan (collectively, "***Intercompany Loans***"). All collections of each Borrower in respect of Accounts and other proceeds of Collateral of such Borrower received by Agent and applied to the Obligations shall also be deemed to be repayments of the Intercompany Loans owing by such Borrower to Borrower Representative. Borrowers shall maintain accurate books and records with respect to all Intercompany Loans and all repayments thereof. Agent and each Lender may regard any notice or other communication pursuant to any Financing Document from Borrower Representative as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or all Borrowers hereunder to Borrower Representative on behalf of such Borrower or all Borrowers. Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

**Section 2.10**    Joint and Several Liability; Rights of Contribution; Subordination and Subrogation.

(a)    Borrowers are defined collectively to include all Persons named as one of the Borrowers herein; provided, however, that any references herein to "any Borrower", "each Borrower" or similar references, shall be construed as a reference to each individual Person named as one of the Borrowers herein. Each Person so named shall be jointly and severally liable for all of the obligations of Borrowers under this Agreement. Each Borrower, individually, expressly understands, agrees and acknowledges, that the credit facilities would not be made available on the terms herein in the absence of the collective credit of all of the Persons named as the Borrowers herein, the joint and several liability of all such Persons, and the cross-

35

collateralization of the collateral of all such Persons. Accordingly, each Borrower individually acknowledges that the benefit to each of the Persons named as one of the Borrowers as a whole constitutes reasonably equivalent value, regardless of the amount of the credit facilities actually borrowed by, advanced to, or the amount of collateral provided by, any individual Borrower. In addition, each entity named as one of the Borrowers herein hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement shall be applicable to and shall be binding upon and measured and enforceable individually against each Person named as one of the Borrowers herein as well as all such Persons when taken together. By way of illustration, but without limiting the generality of the foregoing, the terms of <u>Section 10.1</u> are to be applied to each individual Person named as one of the Borrowers herein (as well as to all such Persons taken as a whole), such that the occurrence of any of the events described in <u>Section 10.1</u> as to any Person named as one of the Borrowers herein shall constitute an Event of Default even if such event has not occurred as to any other Persons named as the Borrowers or as to all such Persons taken as a whole.

(b)    Notwithstanding any provisions of this Agreement to the contrary, it is intended that the joint and several nature of the liability of each Borrower for the Obligations and the Liens granted by Borrowers to secure the Obligations, not constitute a Fraudulent Conveyance (as defined below). Consequently, Agent, Lenders and each Borrower agree that if the liability of a Borrower for the Obligations, or any Liens granted by such Borrower securing the Obligations would, but for the application of this sentence, constitute a Fraudulent Conveyance, the liability of such Borrower and the Liens securing such liability shall be valid and enforceable only to the maximum extent that would not cause such liability or such Lien to constitute a Fraudulent Conveyance, and the liability of such Borrower and this Agreement shall automatically be deemed to have been amended accordingly. For purposes hereof, the term "*Fraudulent Conveyance*" means a fraudulent conveyance under Section 548 of Chapter 11 of Title 11 of the Bankruptcy Code or a fraudulent conveyance or fraudulent transfer under the applicable provisions of any fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit, as in effect from time to time.

(c)    Agent is hereby authorized, without notice or demand (except as otherwise specifically required under this Agreement) and without affecting the liability of any Borrower hereunder, at any time and from time to time, to (i) renew, extend or otherwise increase the time for payment of the Obligations; (ii) with the written agreement of any Borrower, change the terms relating to the Obligations or otherwise modify, amend or change the terms of any Note or other agreement, document or instrument now or hereafter executed by any Borrower and delivered to Agent for any Lender; (iii) accept partial payments of the Obligations; (iv) take and hold any Collateral for the payment of the Obligations or for the payment of any guaranties of the Obligations and exchange, enforce, waive and release any such Collateral; (v) apply any such Collateral and direct the order or manner of sale thereof Agent, in its sole discretion, may determine; and (vi) settle, release, compromise, collect or otherwise liquidate the Obligations and any Collateral therefor in any manner, all surety defenses being hereby waived by each Borrower. Except as specifically provided in this Agreement or any of the other Financing Documents, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from any Borrower or any other source, and such determination shall be binding on all Borrowers. All such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of the Obligations that Agent shall determine,

in its sole discretion, without affecting the validity or enforceability of the Obligations of the other Borrower.

(d)     Each Borrower hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (i) the absence of any attempt to collect the Obligations from any obligor or other action to enforce the same; (ii) the waiver or consent by Agent with respect to any provision of any instrument evidencing the Obligations, or any part thereof, or any other agreement heretofore, now or hereafter executed by a Borrower and delivered to Agent; (iii) failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Obligations; (iv) the Bankruptcy Cases or Agent's election of the application of Section 1111(b)(2) of the Bankruptcy Code; (v) any other borrowing or grant of a security interest by a Borrower to any third party in the Bankruptcy Cases; (vi) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Agent's claim(s) for repayment of any of the Obligations; or (vi) any other circumstance other than payment in full of the Obligations which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.

(e)     The Borrowers hereby agree, as between themselves, that to the extent that Agent, on behalf of Lenders, shall have received from any Borrower any Recovery Amount (as defined below), then the paying Borrower shall have a right of contribution against each other Borrower in an amount equal to such other Borrower's contributive share of such Recovery Amount; provided, however, that in the event any Borrower suffers a Deficiency Amount (as defined below), then the Borrower suffering the Deficiency Amount shall be entitled to seek and receive contribution from and against the other Borrowers in an amount equal to the Deficiency Amount; and provided, further, that in no event shall the aggregate amounts so reimbursed by reason of the contribution of any Borrower equal or exceed an amount that would, if paid, constitute or result in Fraudulent Conveyance. Until all Obligations have been paid and satisfied in full, no payment made by or for the account of a Borrower including, without limitation, (i) a payment made by such Borrower on behalf of the liabilities of any other Borrower, or (ii) a payment made by any other Guarantor under any Guarantee, shall entitle such Borrower, by subrogation or otherwise, to any payment from such other Borrower or from or out of such other Borrower's property. The right of each Borrower to receive any contribution under this Section 2.10(e) or by subrogation or otherwise from any other Borrower shall be subordinate in right of payment to the Obligations and such Borrower shall not exercise any right or remedy against such other Borrower or any property of such other Borrower by reason of any performance of such Borrower of its joint and several obligations hereunder, until the Obligations have been indefeasibly paid and satisfied in full, and no Borrower shall exercise any right or remedy with respect to this Section 2.10(e) until the Obligations have been indefeasibly paid and satisfied in full. As used in this Section 2.10(e), the term *"Recovery Amount"* means the amount of proceeds received by or credited to Agent from the exercise of any remedy of the Lenders under this Agreement or the other Financing Documents, including, without limitation, the sale of any Collateral. As used in this Section 2.10(e), the term *"Deficiency Amount"* means any amount that is less than the entire amount a Borrower is entitled to receive by way of contribution or subrogation from, but that has not been paid by, the other Borrowers in respect of any Recovery Amount attributable to the Borrower entitled to contribution, until the Deficiency Amount has been reduced to zero through contributions and reimbursements made under the terms of this Section 2.10(e) or otherwise.

10844575.1
10844575v.1

**Section 2.11**   Collections and Lockbox Account.

(a)   Borrowers shall each maintain a lockbox (the "***Lockbox***") with a United States depository institution designated from time to time by Agent (the "***Lockbox Bank***"), subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Control Agreement and such other agreements related to such Lockbox as Agent may require. Borrowers shall ensure that all collections of Accounts (other than Accounts for which the Account Debtor is a Governmental Account Debtor) are paid directly from Account Debtors (i) into the Lockbox for deposit into the Lockbox Account and/or (ii) directly into the Lockbox Account; provided, however, unless Agent shall otherwise direct by written notice to Borrowers, Borrowers shall be permitted to cause Account Debtors who are individuals to pay Accounts directly to Borrowers, which Borrowers shall then administer and apply in the manner required below.

(b)   All funds deposited into a Lockbox Account shall be transferred into the Payment Account by the close of each Business Day.

(c)   Notwithstanding anything in any lockbox agreement or Deposit Account Control Agreement to the contrary, Borrowers agree that they shall be liable for any fees and charges in effect from time to time and charged by the Lockbox Bank in connection with the Lockbox, the Lockbox Account, and that Agent shall have no liability therefor. Borrowers hereby indemnify and agree to hold Agent harmless from any and all liabilities, claims, losses and demands whatsoever, including reasonable attorneys' fees and expenses, arising from or relating to actions of Agent or the Lockbox Bank pursuant to this Section or any lockbox agreement or Deposit Account Control Agreement or similar agreement, except to the extent of such losses arising solely from Agent's gross negligence or willful misconduct.

(d)   Agent shall apply, on a daily basis, all funds transferred into the Payment Account pursuant to this Section to reduce the outstanding Revolving Loans, the Obligations, and the Prepetition Obligations in such order of application as Agent shall elect. If as the result of collections of Accounts pursuant to the terms and conditions of this Section, a credit balance exists with respect to the Loan Account, such credit balance shall not accrue interest in favor of Borrowers, but Agent shall transfer such funds into an account designated by Borrower Representative for so long as no Event of Default exists.

(e)   To the extent that any collections of Accounts or proceeds of other Collateral are not sent directly to the Lockbox or Lockbox Account but are received by any Borrower, such collections shall be held in trust for the benefit of Agent pursuant to an express trust created hereby and immediately remitted, in the form received, to applicable Lockbox or Lockbox Account. No such funds received by any Borrower shall be commingled with other funds of the Borrowers. If any funds received by any Borrower are commingled with other funds of the Borrowers, or are required to be deposited to a Lockbox or Lockbox Account and are not so deposited within two (2) Business Days, then Borrower shall pay to Agent, for its own account and not for the account of any other Lenders, a compliance fee equal to $500 for each day that any such conditions exist.

38

(f)    Borrowers acknowledge and agree that compliance with the terms of this Section is essential, and that Agent and Lenders will suffer immediate and irreparable injury and have no adequate remedy at law, if any Borrower, through acts or omissions, causes or permits Account Debtors to send payments other than to the Lockbox or Lockbox Accounts or if any Borrower fails to promptly deposit collections of Accounts or proceeds of other Collateral in the Lockbox Account as herein required. Accordingly, in addition to all other rights and remedies of Agent and Lenders hereunder, Agent shall have the right to seek specific performance of the Borrowers' obligations under this Section, and any other equitable relief as Agent may deem necessary or appropriate, and Borrowers waive any requirement for the posting of a bond in connection with such equitable relief.

(g)    Borrowers shall not, and Borrowers shall not suffer or permit any Credit Party to, (i) withdraw any amounts from any Lockbox Account, (ii) change the procedures or sweep instructions under the agreements governing any Lockbox Accounts, or (iii) send to or deposit in any Lockbox Account any funds other than payments made with respect to and proceeds of Accounts or other Collateral. Borrowers shall, and shall cause each Credit Party to, cooperate with Agent in the identification and reconciliation on a daily basis of all amounts received in or required to be deposited into the Lockbox Accounts. If more than five percent (5%) of the collections of Accounts received by Borrowers during any given fifteen (15) day period is not identified or reconciled to the reasonable satisfaction of Agent within ten (10) Business Days of receipt, Agent shall not be obligated to make further advances under this Agreement until such amount is identified or is reconciled to the reasonable satisfaction of Agent, as the case may be. In addition, if any such amount cannot be identified or reconciled to the reasonable satisfaction of Agent, Agent may utilize its own staff or, if it deems necessary, engage an outside auditor, in either case at Borrowers' expense (which in the case of Agent's own staff shall be in accordance with Agent's then prevailing customary charges (*plus* expenses)), to make such examination and report as may be necessary to identify and reconcile such amount.

(h)    If any Borrower breaches its obligation to direct payments of the proceeds of the Collateral to the Lockbox Account, Agent, as the irrevocably made, constituted and appointed true and lawful attorney for Borrowers, may, by the signature or other act of any of Agent's officers (without requiring any of them to do so), direct any Account Debtor to pay proceeds of the Collateral to Borrowers by directing payment to the Lockbox Account.

**Section 2.12**    Termination; Restriction on Termination.

(a)    Termination by Lenders. In addition to the rights set forth in Section 10.2 and in the Financing Orders, Agent may, and at the direction of Required Lenders shall, terminate this Agreement without (i) notice upon or after the occurrence and during the continuance of an Event of Default or (ii) further application to or order of the Bankruptcy Court.

(b)    Termination by Borrowers. Upon at least thirty (30) days' prior written notice to Agent and Lenders, Borrowers may, at their option, terminate this Agreement; provided, however, that no such termination shall be effective until Borrowers have (i) paid or collateralized to Agent's satisfaction all of the Obligations in immediately available funds, (ii) complied with Section 2.2, and (iii) paid in full all of the Affiliated Obligations in immediately

available funds and terminated the Affiliated Financing Documents. Any notice of termination given by Borrowers shall be irrevocable unless all Lenders otherwise agree in writing and no Lender shall have any obligation to make any Loans on or after the termination date stated in such notice. Borrowers may elect to terminate this Agreement in its entirety only. No section of this Agreement or type of Loan available hereunder may be terminated singly.

(c)     Effectiveness of Termination. Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without further application to or order of the Bankruptcy Court, all of the Obligations shall be immediately due and payable upon the Termination Date. All undertakings, agreements, covenants, warranties and representations of Borrowers contained in the Financing Documents shall survive any such termination and Agent shall retain its Liens in the Collateral and Agent and each Lender shall retain all of its rights and remedies under the Financing Documents notwithstanding such termination until all Obligations and Affiliated Obligations have been discharged or paid, in full, in immediately available funds, including, without limitation, all Obligations under Section 2.2 resulting from such termination. Notwithstanding the foregoing or the payment in full of the Obligations, Agent shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Agent may incur as a result of dishonored checks or other items of payment received by Agent from Borrower or any Account Debtor and applied to the Obligations, Agent shall, at its option, (i) have received a written agreement satisfactory to Agent, executed by Borrowers and by any Person whose loans or other advances to Borrowers are used in whole or in part to satisfy the Obligations, indemnifying Agent and each Lender from any such loss or damage or (ii) have retained cash Collateral or other Collateral for such period of time as Agent, in its discretion, may deem necessary to protect Agent and each Lender from any such loss or damage.

## ARTICLE 3 - REPRESENTATIONS AND WARRANTIES

To induce Agent and Lenders to enter into this Agreement and to make the Loans and other credit accommodations contemplated hereby, each Borrower hereby represents and warrants to Agent and each Lender that:

**Section 3.1**     Existence and Power. Each Credit Party is an entity as specified on Schedule 3.1, is duly organized, validly existing and in good standing under the laws of the jurisdiction specified on Schedule 3.1 and no other jurisdiction, has the same legal name as it appears in such Credit Party's Organizational Documents and an organizational identification number (if any), in each case as specified on Schedule 3.1, and has all powers and all Permits necessary or desirable in the operation of its business as presently conducted or as proposed to be conducted, except where the failure to have such Permits could not reasonably be expected to have a Material Adverse Effect. Each Credit Party is qualified to do business as a foreign entity in each jurisdiction in which it is required to be so qualified, which jurisdictions as of the Closing Date are specified on Schedule 3.1, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect. Except as set forth on Schedule 3.1, no Credit Party (a) has had, over the five (5) year period preceding the Closing Date, any name other than its current name, or (b) was incorporated or organized under the laws of any jurisdiction other than its current jurisdiction of incorporation or organization.

10844575.1
10844575v.1

**Section 3.2**    Organization and Governmental Authorization; No Contravention.    The execution, delivery and performance by each Credit Party of the Operative Documents to which it is a party are within its powers, have been duly authorized by all necessary action pursuant to its Organizational Documents, require no further action by or in respect of, or filing with, any Governmental Authority and do not violate, conflict with or cause a breach or a default under (a) any Law applicable to any Credit Party or any of the Organizational Documents of any Credit Party, or (b) any agreement or instrument binding upon it, except for such violations, conflicts, breaches or defaults as could not, with respect to this clause (b), reasonably be expected to have a Material Adverse Effect.

**Section 3.3**    Binding Effect.    Each of the Operative Documents to which any Credit Party is a party constitutes a valid and binding agreement or instrument of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws relating to the enforcement of creditors' rights generally and by general equitable principles.

**Section 3.4**    Capitalization.    The authorized equity securities of each of the Credit Parties as of the Closing Date is as set forth on Schedule 3.4. All issued and outstanding equity securities of each of the Credit Parties are duly authorized and validly issued, fully paid, nonassessable, free and clear of all Liens other than those in favor of Agent for the benefit of Agent and Lenders, and such equity securities were issued in compliance with all applicable Laws. The identity of the holders of the equity securities of each of the Credit Parties and the percentage of their fully-diluted ownership of the equity securities of each of the Credit Parties as of the Closing Date is set forth on Schedule 3.4. No shares of the capital stock or other equity securities of any Credit Party, other than those described above, are issued and outstanding as of the Closing Date. Except as set forth on Schedule 3.4, as of the Closing Date there are no preemptive or other outstanding rights, options, warrants, conversion rights or similar agreements or understandings for the purchase or acquisition from any Credit Party of any equity securities of any such entity.

**Section 3.5**    Financial Information.    All information delivered to Agent and pertaining to the financial condition of any Credit Party fairly presents the financial position of such Credit Party as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year end adjustments and the absence of footnote disclosures). Since December 31, 2012, except for the filing of the Bankruptcy Cases and the Asset Sale, there has been no material adverse change in the business, operations, properties, prospects or condition (financial or otherwise) of any Credit Party.

**Section 3.6**    Litigation.    Except as set forth on Schedule 3.6, as of the Closing Date, and except as hereafter disclosed to Agent in writing, there is no Litigation pending against, or to such Borrower's knowledge threatened against or affecting, any Credit Party or, to such Borrower's knowledge, any party to any Operative Document other than a Credit Party. There is no Litigation pending in which an adverse decision could reasonably be expected to have a Material Adverse Effect or which in any manner draws into question the validity of any of the Operative Documents.

41

**Section 3.7**   Ownership of Property. Each Borrower and each of its Subsidiaries is the lawful owner of, has good and marketable title to and is in lawful possession of, or has valid leasehold interests in, all properties and other assets (real or personal, tangible, intangible or mixed) purported or reported to be owned or leased (as the case may be) by such Person.

**Section 3.8**   No Default. No Event of Default, or to such Borrower's knowledge, Default, has occurred and is continuing. Except as a result of the filing of the Bankruptcy Cases, no Credit Party is in breach or default under or with respect to any contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect.

**Section 3.9**   Labor Matters. As of the Closing Date, there are no strikes or other labor disputes pending or, to any Borrower's knowledge, threatened against any Credit Party. Hours worked and payments made to the employees of the Credit Parties have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters. All payments due from the Credit Parties, or for which any claim may be made against any of them, on account of wages and employee and retiree health and welfare insurance and other benefits have been paid or accrued as a liability on their books, as the case may be. The consummation of the transactions contemplated by the Financing Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which it is a party or by which it is bound.

**Section 3.10**   Regulated Entities. No Credit Party is an "investment company" or a company "controlled" by an "investment company" or a "subsidiary" of an "investment company," all within the meaning of the Investment Company Act of 1940.

**Section 3.11**   Margin Regulations. None of the proceeds from the Loans have been or will be used, directly or indirectly, for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Federal Reserve Board), for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry any "margin stock" or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation T, U or X of the Federal Reserve Board.

**Section 3.12**   Compliance with Laws; Anti-Terrorism Laws.

(a)   Each Credit Party is in compliance with the requirements of all applicable Laws, except for such Laws the noncompliance with which could not reasonably be expected to have a Material Adverse Effect, provided, that Borrowers' failure to be HIPAA Compliant solely as a result of Agent's and any Lender's access, if any, to Protected Health Information shall not be a breach of the representation and warranty set forth in this Section 3.12.

(b)   None of the Credit Parties and, to the knowledge of the Credit Parties, none of their Affiliates (i) is in violation of any Anti-Terrorism Law, (ii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law, (iii) is a Blocked Person, or is controlled by a Blocked Person, (iv) is acting or will act for or on behalf of a Blocked Person, (v) is associated with, or will become associated with, a Blocked Person or (vi)

42

is providing, or will provide, material, financial or technical support or other services to or in support of acts of terrorism of a Blocked Person. No Credit Party nor, to the knowledge of any Credit Party, any of its Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement, (A) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person, or (B) deals in, or otherwise engages in any transaction relating to, any property or interest in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law.

**Section 3.13**    Taxes. Except as set forth on Schedule 3.13 hereto, all federal, state and local tax returns, reports and statements required to be filed by or on behalf of each Credit Party have been filed with the appropriate Governmental Authorities in all jurisdictions in which such returns, reports and statements are required to be filed and, except to the extent subject to a Permitted Contest, all Taxes (including real property Taxes) and other charges shown to be due and payable in respect thereof have been timely paid prior to the date on which any fine, penalty, interest, late charge or loss may be added thereto for nonpayment thereof. Except to the extent subject to a Permitted Contest, all state and local sales and use Taxes required to be paid by each Credit Party have been paid. All federal and state returns have been filed by each Credit Party for all periods for which returns were due with respect to employee income tax withholding, social security and unemployment taxes, and, except to the extent subject to a Permitted Contest, the amounts shown thereon to be due and payable have been paid in full or adequate provisions therefor have been made.

**Section 3.14**    Compliance with ERISA.

(a)    Each ERISA Plan (and the related trusts and funding agreements) complies in form and in operation with, has been administered in compliance with, and the terms of each ERISA Plan satisfy, the applicable requirements of ERISA and the Code in all material respects. Each ERISA Plan which is intended to be qualified under Section 401(a) of the Code is so qualified, and the United States Internal Revenue Service has issued a favorable determination letter with respect to each such ERISA Plan which may be relied on currently. No Credit Party has incurred liability for any material excise tax under any of Sections 4971 through 5000 of the Code.

(b)    Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect, each Borrower and each Subsidiary is in compliance with the applicable provisions of ERISA and the provision of the Code relating to Plans and the regulations and published interpretations therein. During the thirty-six (36) month period prior to the Closing Date or the making of any Loan, (i) no steps have been taken to terminate any Pension Plan, and (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA. No condition exists or event or transaction has occurred with respect to any Pension Plan which could result in the incurrence by any Credit Party of any material liability, fine or penalty. Except as set forth on Schedule 3.14 hereto, no Credit Party has incurred liability to the PBGC (other than for current premiums) with respect to any employee Pension Plan. All contributions (if any) have been made on a timely basis to any Multiemployer Plan that are required to be made by any Credit Party or any other member of the Controlled Group under the terms of the plan or, except as set

43

forth on Schedule 3.14 hereto, of any collective bargaining agreement, or by applicable Law; no Credit Party nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan, and no Credit Party nor any member of the Controlled Group has received any notice that any Multiemployer Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

**Section 3.15**    Consummation of Operative Documents; Brokers.    Except for fees payable to Agent and/or Lenders, no broker, finder or other intermediary has brought about the obtaining, making or closing of the transactions contemplated by the Operative Documents, and no Credit Party has or will have any obligation to any Person in respect of any finder's or brokerage fees, commissions or other expenses in connection herewith or therewith.

**Section 3.16**    Related Transactions.    All transactions contemplated by the Operative Documents to be consummated on or prior to the date hereof have been so consummated (including, without limitation, the disbursement and transfer of all funds in connection therewith) in all material respects pursuant to the provisions of the applicable Operative Documents, true and complete copies of which have been delivered to Agent, and in compliance with all applicable Law, except for such Laws the noncompliance with which would not reasonably be expected to have a Material Adverse Effect, and approved by the Bankruptcy Court.

**Section 3.17**    Material Contracts.    Except for the Operative Documents and the other agreements set forth on Schedule 3.17 (collectively with the Operative Documents, the "***Material Contracts***"), as of the Closing Date there are no (a) employment agreements covering the management of any Credit Party, (b) collective bargaining agreements or other similar labor agreements covering any employees of any Credit Party, (c) agreements for managerial, consulting or similar services to which any Credit Party is a party or by which it is bound, (d) agreements regarding any Credit Party, its assets or operations or any investment therein to which any of its equity holders is a party or by which it is bound, (e) real estate leases, Intellectual Property licenses or other lease or license agreements to which any Credit Party is a party, either as lessor or lessee, or as licensor or licensee (other than licenses arising from the purchase of "off the shelf" products), (f) customer, distribution, marketing or supply agreements to which any Credit Party is a party, in each case with respect to the preceding clauses (a) through (f) requiring payment of more than $250,000 in any year, except with that with respect to supply agreements, such agreements if requiring payment of more than $1,000,000 in any year, (g) partnership agreements to which any Credit Party is a general partner or joint venture agreements to which any Credit Party is a party, (h) third party billing arrangements to which any Credit Party is a party, or (i) any other agreements or instruments to which any Credit Party is a party, and the breach, nonperformance or cancellation of which, or the failure of which to renew, could reasonably be expected to have a Material Adverse Effect. Schedule 3.17 sets forth, with respect to each real estate lease agreement to which any Borrower is a party (as a lessee) as of the Closing Date, the address of the subject property and the annual rental (or,

44

where applicable, a general description of the method of computing the annual rental). The consummation of the transactions contemplated by the Financing Documents will not give rise to a right of termination in favor of any party to any Material Contract (other than any Credit Party), except for such Material Contracts the noncompliance with which would not reasonably be expected to have a Material Adverse Effect.

**Section 3.18**   Compliance with Environmental Requirements; No Hazardous Materials. Except in each case as set forth on Schedule 3.18:

(a)   no notice, notification, demand, request for information, citation, summons, complaint or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending, or to such Borrower's knowledge, threatened by any Governmental Authority or other Person with respect to any (i) alleged violation by any Credit Party of any Environmental Law, (ii) alleged failure by any Credit Party to have any Permits required in connection with the conduct of its business or to comply with the terms and conditions thereof, (iii) any generation, treatment, storage, recycling, transportation or disposal of any Hazardous Materials, or (iv) release of Hazardous Materials; and

(b)   no property now owned or leased by any Credit Party and, to the knowledge of each Borrower, no such property previously owned or leased by any Credit Party, to which any Credit Party has, directly or indirectly, transported or arranged for the transportation of any Hazardous Materials, is listed or, to such Borrower's knowledge, proposed for listing, on the National Priorities List promulgated pursuant to CERCLA, or CERCLIS (as defined in CERCLA) or any similar state list or is the subject of federal, state or local enforcement actions or, to the knowledge of such Borrower, other investigations which may lead to claims against any Credit Party for clean-up costs, remedial work, damage to natural resources or personal injury claims, including, without limitation, claims under CERCLA. For purposes of this Section 3.18, each Credit Party shall be deemed to include any business or business entity (including a corporation) that is, in whole or in part, a predecessor of such Credit Party.

**Section 3.19**   Intellectual Property.   Each Credit Party owns, is licensed to use or otherwise has the right to use, all Intellectual Property that is material to the condition (financial or other), business or operations of such Credit Party. All Intellectual Property existing as of the Closing Date which is issued, registered or pending with any United States or foreign Governmental Authority (including, without limitation, any and all applications for the registration of any Intellectual Property with any such United States or foreign Governmental Authority) and all licenses under which any Borrower is the licensee of any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person are set forth on Schedule 3.19. Such Schedule 3.19 indicates in each case whether such registered Intellectual Property (or application therefore) is owned or licensed by such Credit Party, and in the case of any such licensed registered Intellectual Property (or application therefore), lists the name and address of the licensor and the name and date of the agreement pursuant to which such item of Intellectual Property is licensed and whether or not such license is an exclusive license and indicates whether there are any purported restrictions in such license on the ability to such Credit Party to grant a security interest in and/or to transfer any of its rights as a licensee under such license. Except as indicated on Schedule 3.19, the applicable Credit Party is the sole and exclusive owner of the entire and unencumbered right,

45

title and interest in and to each such registered Intellectual Property (or application therefore) purported to be owned by such Credit Party, free and clear of any Liens and/or licenses in favor of third parties or agreements or covenants not such sue third parties for infringement. All registered Intellectual Property of each Credit Party is duly and properly registered, filed or issued in the appropriate office and jurisdictions for such registrations, filings or issuances, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect. No Credit Party is party to, nor bound by, any material license or other agreement with respect to which any Credit Party is the licensee that prohibits or otherwise restricts such Credit Party from granting a security interest in such Borrower's interest in such license or agreement or other property. To such Borrower's knowledge, each Credit Party conducts its business without infringement or claim of infringement of any Intellectual Property rights of others and there is no infringement or claim of infringement by others of any Intellectual Property rights of any Credit Party, which infringement or claim of infringement could reasonably be expected to have a Material Adverse Effect.

    **Section 3.20**    [Reserved].

    **Section 3.21**    Full Disclosure. None of the written information (financial or otherwise) furnished by or on behalf of any Credit Party to Agent or any Lender in connection with the consummation of the transactions contemplated by the Operative Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which such statements were made. All financial projections delivered to Agent and the Lenders by Borrowers (or their agents) have been prepared on the basis of the assumptions stated therein. Such projections represent each Borrower's best estimate of such Borrower's future financial performance and such assumptions are believed by such Borrower to be fair and reasonable in light of current business conditions; provided, however, that Borrowers can give no assurance that such projections will be attained.

    **Section 3.22**    Interest Rate. The rate of interest paid under the Notes and the method and manner of the calculation thereof do not violate any usury or other law or applicable Laws, any of the Organizational Documents, or any of the Operative Documents.

    **Section 3.23**    Subsidiaries. Borrowers do not own any stock, partnership interests, limited liability company interests or other equity securities except for Permitted Investments. Borrowers do not own any stock, partnership interests, limited liability company interests or other equity securities in any Subsidiary.

    **Section 3.24**    Representations and Warranties Incorporated from Operative Documents. As of the Closing Date, each of the representations and warranties made in the Operative Documents by each of the parties thereto is true and correct in all material respects, and such representations and warranties are hereby incorporated herein by reference with the same effect as though set forth in their entirety herein, as qualified therein, except to the extent that such representation or warranty relates to a specific date, in which case such representation and warranty shall be true as of such earlier date.

**Section 3.25**   Appointment of a trustee or Examiner; Liquidation.  No order has been entered in any Bankruptcy Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with expanded powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1104 of the Bankruptcy Code, (c) to convert any Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, or (d) to dismiss any Bankruptcy Case.

**Section 3.26**   Reorganization Matters.

(a)   The Bankruptcy Cases were commenced on the Petition Date in accordance with applicable Law and proper notice thereof.

(b)   Proper notice for (i) the motion seeking approval of this Agreement, the other Financing Documents, the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order (the "***Interim Hearing***") and (iii) the hearing for approval of the Final Order has been given.  The Borrowers and Guarantors have given, on a timely basis as specified in the Interim Order and the Final Order, all notices required to be given to all parties specified in the Interim Order and Final Order.

(c)   From and after the entry of the Interim Order, and pursuant to and to the extent provided in the Interim Order, the Liens securing the Obligations are valid and enforceable, perfected Liens on all of the Collateral of the Agent and Lenders with the priority required by the Financing Orders with respect to all Collateral.

(d)   After entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and Final Order, the Obligations will constitute allowed administrative expense claims in the Bankruptcy Case, having priority over all administrative expense claims and unsecured claims against the Borrowers and Guarantors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c) 726 (to the extent permitted by Law), 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out.

(e)   The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified, or amended.

(f)   Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or Final Order and Section 10.2, as the case may be, on the Termination Date the Agent and Lenders shall be entitled to payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

(g)   Proper notice for (i) the Asset Sale Motion and the Asset Sale Order, and (ii) the hearing for the approval of Asset Sale Order has been given. Borrowers and Guarantors have given on a timely basis all notices required to be given to all parties specified in the Asset Sale Motion and Asset Sale Order.

47

## ARTICLE 4 - AFFIRMATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 4.1**     Financial Statements and Other Reports.  Each Borrower will deliver to Agent: (a) prior to the Closing Date, the Budget, and on the first Business Day of each week thereafter, an updated "rolling" 13-week budget in a form similar to the initial Budget, which, once approved in writing by the Agent in its sole discretion, shall supplement and replace the prior Budget without further notice, motion, application to, order of, or hearing before the Bankruptcy Court; (b) as soon as available, but no later than forty-five (45) days after the last day of each month, a company prepared consolidated balance sheet, cash flow and income statement covering Borrowers' and its Consolidated Subsidiaries' consolidated operations during the period, prepared under GAAP, consistently applied, certified by a Responsible Officer and in a form acceptable to Agent; (c) as soon as available, but no later than one hundred fifty (150) days after the last day of each Borrower's fiscal year, audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm acceptable to Agent in its reasonable discretion; (d) within five (5) days of delivery or filing thereof, copies of all statements, reports and notices made available to each Borrower's security holders or to any holders of Subordinated Debt and copies of all reports and other filings made by Borrower with any stock exchange on which any securities of any Borrower are traded and/or the SEC; (e) a report, as part of the Compliance Certificate to be delivered pursuant to this section, of any legal actions pending or threatened against any Borrower or any of its Affiliates that could reasonably be expected to result in uninsured losses to any Borrower or any of its Subsidiaries of Two Hundred Fifty Thousand Dollars ($250,000) or more; (f) prompt written notice of an event that materially and adversely affects the value of any Intellectual Property; (g) budgets, sales projections, operating plans and other financial information and information, reports or statements regarding the Borrowers, their business and the Collateral as Agent may from time to time reasonably request; and (h) within one (1) Business Day following the close of each payroll period, evidence that all Payroll Taxes have been timely and fully paid to the applicable Governmental Authorities (including, without limitation, copies of any documentation, calculations, cancelled checks, wire or ACH confirmations pertaining to Borrowers' Payroll Taxes).  Each Borrower will, within forty-five (45) days after the last day of each month, deliver to Agent with the monthly financial statements, a duly completed Compliance Certificate signed by a Responsible Officer setting forth calculations showing compliance with the financial covenants set forth in this Agreement.  Promptly upon their becoming available, Borrowers shall deliver to Agent copies of all Material Contracts.  Each Borrower will, within ten (10) days after the last day of each month, deliver to Agent a duly completed Borrowing Base Certificate signed by a Responsible Officer, with aged listings of accounts receivable and accounts payable (by invoice date).  Simultaneously with the Borrowers' delivery of each Budget pursuant to clause (a) above, Borrowers shall provide (i) a weekly and rolling four-week reconciliation of budgeted and actual amounts, and (ii) a written narrative explanation if (1) actual disbursements under any line item on the Budget for any week or any four-week period exceed the budgeted disbursements for either such period in such line item by more than ten percent (10%), (2) aggregate actual disbursements under the Budget for any week or four-week period exceed the aggregate budgeted disbursements for either such period by more than five percent (5%), or (iii) aggregate

48

actual cash receipts during any week or four-week period are less than ninety percent (90%) of aggregate projected cash receipts set forth in the Budget for either such period.

**Section 4.2**    Payment and Performance of Obligations.    Subject to the entry of appropriate orders of the Bankruptcy Court, each Borrower (a) will pay and discharge, and cause each Subsidiary to pay and discharge, at or prior to maturity, all of their respective obligations and liabilities, including all Payroll Taxes and other tax liabilities, except for such obligations and/or liabilities (i) that may be the subject of a Permitted Contest, and (ii) the nonpayment or nondischarge of which could not reasonably be expected to have a Material Adverse Effect or result in a Lien against any Collateral, except for Permitted Liens, (b) will maintain, and cause each Subsidiary to maintain, to the extent required in accordance with GAAP, appropriate reserves for the accrual of all of their respective obligations and liabilities, and (c) will not breach or permit any Subsidiary to breach, or permit to exist any default under, the terms of any lease, commitment, contract, instrument or obligation to which it is a party, or by which its properties or assets are bound, except for such breaches or defaults which could not reasonably be expected to have a Material Adverse Effect.

**Section 4.3**    Maintenance of Existence.    Each Borrower will preserve, renew and keep in full force and effect and in good standing, and will cause each Subsidiary to preserve, renew and keep in full force and effect and in good standing, their respective existence and their respective rights, privileges and franchises necessary or desirable in the normal conduct of business.

**Section 4.4**    Maintenance of Property; Insurance.

(a)    Each Borrower will keep, and will cause each Subsidiary to keep, all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.  If all or any part of the Collateral useful or necessary in its business, or upon which any Borrowing Base is calculated, becomes damaged or destroyed, each Borrower will, and will cause each Subsidiary to, promptly and completely repair and/or restore the affected Collateral in a good and workmanlike manner, regardless of whether Agent agrees to disburse insurance proceeds or other sums to pay costs of the work of repair or reconstruction.

(b)    Subject to entry of an appropriate order or orders of the Bankruptcy Court, Borrowers will pay or cause to be paid all Taxes on or prior to the date due, and in any event, prior to the date upon which any fine, penalty, interest or cost for nonpayment could be imposed, and furnish to Agent, upon request, receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Agent evidencing the payment thereof.  If Borrowers shall fail to pay any Taxes in accordance with this section and is not contesting or causing a contesting of such Taxes pursuant to a Permitted Contest, or if there are insufficient funds in the applicable reserves or escrows under Article 2 to pay an such Taxes, Agent shall have the right, but shall not be obligated, to (for the account of all Lenders) pay such Taxes, and Borrowers shall repay to Agent, on written demand, any amount paid by Agent, with interest thereon from the date of the advance thereof to the date of repayment, at the rate applicable during periods of Default hereunder, and such amount shall constitute a portion of the Obligations.  Borrowers shall not pay any Taxes or other obligations in installments unless permitted by applicable Laws,

49

and shall, upon the request of Agent, deliver copies of all notices and bills relating to any Taxes or other charge covered by this section to Agent.

(c)    Subject to entry of an appropriate order or orders of the Bankruptcy Court, upon completion of any Permitted Contest, Borrowers shall, and will cause each Subsidiary to, promptly pay the amount due, if any, and deliver to Agent proof of the completion of the contest and payment of the amount due, if any, following which Agent shall return the security, if any, deposited with Agent pursuant to the definition of Permitted Contest.

(d)    Subject to entry of an appropriate order or orders of the Bankruptcy Court, each Borrower will maintain (i) casualty insurance on all real and personal property on an all risks basis (including the perils of flood, windstorm and quake), covering the repair and replacement cost of all such property and coverage, business interruption and rent loss coverages with extended period of indemnity (for the period required by Agent from time to time) and indemnity for extra expense, in each case without application of coinsurance and with agreed amount endorsements, (ii) general and professional liability insurance (including products/completed operations liability coverage), and (iii) such other insurance coverage in such amounts and with respect to such risks as Agent may reasonably request from time to time in connection with the growth and/or expansion of Borrowers' business; provided, however, that in no event shall such insurance be in amounts or with coverage less than, or with carriers with qualifications inferior to, any of the insurance or carriers in existence as of the Closing Date (or required to be in existence after the Closing Date under a Financing Document) and described in the Insurance Certificates attached hereto as Schedule 4.4. All such insurance shall be provided by insurers having an A.M. Best policyholders rating reasonably acceptable to Agent.

(e)    On or prior to the Closing Date, and at all times thereafter, each Borrower will cause Agent to be named as an additional insured on each insurance policy required to be maintained pursuant to this Section 4.4 pursuant to endorsements in form and substance acceptable to Agent. Borrowers shall deliver to Agent (i) on the Closing Date, a certificate from Borrowers' insurance broker dated such date showing the amount of coverage as of such date, and that if all or any part of such policy is canceled, terminated or expires, the insurer will forthwith endeavor to give notice thereof to each additional insured that no cancellation, reduction in amount or material change in coverage thereof shall be effective until at least thirty (30) days after receipt by each additional insured of written notice thereof, (ii) upon the request of Agent from time to time full information as to the insurance carried, (iii) within five (5) days of receipt of notice from any insurer, a copy of any notice of cancellation, nonrenewal or material change in coverage from that existing on the date of this Agreement, and (iv) forthwith, notice of any cancellation or nonrenewal of coverage by any Borrower, and (v) at least 5 Business Days prior to expiration of any policy of insurance, evidence of renewal of such insurance upon the terms and conditions herein required.

**Section 4.5**    Compliance with Laws. Each Borrower will comply, and cause each Subsidiary to comply, with the requirements of all applicable Laws and Material Contracts, except to the extent that failure to so comply could not reasonably be expected to (a) have a Material Adverse Effect, or (b) result in any Lien upon either (i) a material portion of the assets of any such Person in favor of any Governmental Authority, or (ii) any Collateral which is part of the Borrowing Base, provided, that Borrowers' failure to be HIPAA Compliant solely as a

50

result of Agent's and any Lender's access, if any, to Protected Health Information shall not constitute a breach of the covenant to comply with the requirements of all applicable Laws set forth in this Section 4.5.

**Section 4.6**    Inspection of Property, Books and Records.

(a)    Each Borrower will keep, and will cause each Subsidiary to keep, proper books of record substantially in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to its business and activities.

(b)    The Borrowers will cause the Bankruptcy Court to provide access, pursuant to court order, to and will permit, and will cause each Subsidiary to permit, at the sole cost of the applicable Borrower or any applicable Subsidiary, representatives of Agent and of any Lender, and each of their duly authorized representatives, to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective operations and the Collateral, to verify the amount and age of the Accounts, the identity and credit of the respective Account Debtors, to review the billing practices of Borrowers and to discuss their respective affairs, finances and accounts with their respective officers, employees and independent public accountants as often as may reasonably be desired. Agent or any Lender exercising any rights pursuant to this Section 4.6 shall give the applicable Borrower two (2) Business Days' prior notice of such exercise, provided, however, that no notice shall be required during the existence and continuance of any Default or any time during which Agent believes a Default exists.

**Section 4.7**    Use of Proceeds.

(a)    Borrowers shall use the proceeds of Revolving Loans solely for (i) the Prepetition Repayment Advance, (ii) payment of all Prepetition Term Loan Obligations as they come due pursuant to the Prepetition Term Loan Credit Agreement, (iii) payment of all fees and expenses due to Agent and Lenders pursuant to Section 2.2, (iv) financing ongoing debtor in possession working capital needs, general corporate purposes relating to postpetition operations and related costs, fees and expenses of the Bankruptcy Cases, and (v) payment of the costs of administration of the Bankruptcy Cases as approved by the Bankruptcy Court.

(b)    No portion of the proceeds of the Loans will be used for family, personal, agricultural or household use.

(c)    Notwithstanding anything to the contrary set forth herein or in any other Financing Document, no portion of the Revolving Loans, the Collateral, the Carve-Out funds or cash collateral of Agent, Lenders, Prepetition Agent and/or Prepetition Lenders may be used to fund any activities: (i) preventing, hindering, or delaying any of the Agent's, the Lenders', Prepetition Agent's or the Prepetition Lenders' enforcement or realization upon any of the Collateral; (ii) using or seeking to use Agent's or any Lenders' cash collateral or selling or otherwise disposing of any of the Collateral without the consent of the Agent and the Required Lenders; (iii) using or seeking to use any insurance proceeds constituting Collateral without the consent of the Agent and the Required Lenders; (iv) except as permitted under Section 5.1, incurring Debt without the prior consent of the Agent and the Required Lenders; (v) objecting or

51

challenging in any way any claims, Liens, Collateral (including cash collateral) or any collateral securing any obligations pursuant to any Affiliated Financing Document, held by or on behalf of any of Agent, the Lenders, Prepetition Agent, or the Prepetition Lenders; (vi) asserting any claims or causes of action including, without limitation, any action under Chapter 5 of the Bankruptcy Code, against any of Agent, the Lenders, Prepetition Agent, the Prepetition Lenders, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees; (vii) prosecuting an objection to, or contesting in any manner, or raising defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Obligations, the Liens of the Agent or Prepetition Agent securing the Obligations, the Prepetition Obligations, the Liens securing the Prepetition Obligations or any other rights or interests of any of the Agent, the Lenders, Prepetition Agent, or the Prepetition Lenders; or (viii) taking any action which (A) has or could have the effect of adversely modifying or compromising the rights and remedies of the Agent, the Lenders, Prepetition Agent, or Prepetition Lenders, (B) is contrary, in a manner that adverse to the Agent, the Lenders, Prepetition Agent or the Prepetition Lenders, to any term or condition set forth in any of the Financing Documents, the Financing Orders or the Affiliated Financing Documents, or (C) results in the occurrence of an Event of Default.

**Section 4.8**    Estoppel Certificates. After written request by Agent, Borrowers, within fifteen (15) days and at their expense, will furnish Agent with a statement, duly acknowledged and certified, setting forth (a) the amount of the original principal amount of the Notes, and the unpaid principal amount of the Notes, (b) the rate of interest of the Notes, (c) the date payments of interest and/or principal were last paid, (d) any offsets or defenses to the payment of the Obligations, and if any are alleged, the nature thereof, (e) that the Notes and this Agreement have not been modified or if modified, giving particulars of such modification, and (f) that there has occurred and is then continuing no Default or if such Default exists, the nature thereof, the period of time it has existed, and the action being taken to remedy such Default. After written request by Agent, Borrowers, within fifteen (15) days and at their expense, will furnish Agent with a certificate, signed by a Responsible Officer of Borrowers, updating all of the representations and warranties contained in this Agreement and the other Financing Documents and certifying that all of the representations and warranties contained in this Agreement and the other Financing Documents, as updated pursuant to such certificate, are true, accurate and complete as of the date of such certificate.

**Section 4.9**    Notices of Litigation and Defaults. Borrowers will give prompt written notice to Agent (a) of any litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party which would reasonably be expected to have a Material Adverse Effect with respect to Borrowers or any other Credit Party or which in any manner calls into question the validity or enforceability of any Financing Document, (b) upon any Borrower becoming aware of the existence of any Default or Event of Default, (c) if any Credit Party is in breach or default under or with respect to any Material Contract, or if any Credit Party is in breach or default under or with respect to any other contract, agreement, lease or other instrument to which it is a party or by which its property is bound or affected, which breach or default could reasonably be expected to have a Material Adverse Effect, (d) of any strikes or other labor disputes pending or, to any Borrower's knowledge, threatened against any Credit Party, (e) if there is any infringement or claim of infringement by any other Person with respect to any Intellectual Property rights of any Credit Party that could reasonably be expected to have a Material Adverse Effect, or if there is any claim by any other Person that any Credit

10844575.1
10844575v.1

Party in the conduct of its business is infringing on the Intellectual Property Rights of others, and (f) of all returns, recoveries, disputes and claims that could reasonably be expected to result in uninsured losses of more than $100,000. Borrowers represent and warrant that Schedule 4.9 sets forth a complete list of all matters existing as of the Closing Date for which notice could be required under this Section and all litigation or governmental proceedings pending or threatened (in writing) against Borrowers or other Credit Party as of the Closing Date.

**Section 4.10**    Hazardous Materials; Remediation.

(a)    If any release or disposal of Hazardous Materials shall occur or shall have occurred on any real property or any other assets of any Borrower or any other Credit Party, such Borrower will cause, or direct the applicable Credit Party to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, each Borrower shall, and shall cause each other Credit Party to, comply with each Environmental Law requiring the performance at any real property by any Borrower or any other Credit Party of activities in response to the release or threatened release of a Hazardous Material.

(b)    Borrowers will provide Agent within thirty (30) days after written demand therefor with a bond, letter of credit or similar financial assurance evidencing to the reasonable satisfaction of Agent that sufficient funds are available to pay the cost of removing, treating and disposing of any Hazardous Materials or Hazardous Materials Contamination and discharging any assessment which may be established on any property as a result thereof, such demand to be made, if at all, upon Agent's reasonable business determination that the failure to remove, treat or dispose of any Hazardous Materials or Hazardous Materials Contamination, or the failure to discharge any such assessment could reasonably be expected to have a Material Adverse Effect.

**Section 4.11**    Further Assurances.

(a)    Each Borrower will, at its own cost and expense, to promptly and duly take, execute, acknowledge and deliver all such further acts, documents and assurances as may from time to time be necessary or as Agent or the Required Lenders may from time to time reasonably request in order to carry out the intent and purposes of the Financing Documents and the transactions contemplated thereby, including all such actions to (i) establish, create, preserve, protect and perfect a first priority Lien (subject only to Permitted Liens) in favor of Agent for itself and for the benefit of the Lenders on the Collateral (including Collateral acquired after the date hereof), and (ii) unless Agent shall agree otherwise in writing, cause all Borrowers to be jointly and severally obligated with the other Borrowers under all covenants and obligations under this Agreement, including the obligation to repay the Obligations. Without limiting the generality of the foregoing, (x) Borrowers shall, at the time of the delivery of any Compliance Certificate disclosing the acquisition by an Credit Party of any registered Intellectual Property or application for the registration of Intellectual Property, deliver to Agent a duly completed and executed Supplement to the applicable Credit Party's Patent Security Agreement or Trademark Security Agreement in the form of the respective Exhibit thereto, and (y) at the request of Agent, following the disclosure by Borrowers on any Compliance Certificate of the acquisition by any

Credit Party of any rights under a license as to any registered Intellectual
Property or application for the registration of any Intellectual Property owned by another Person,
Borrowers shall execute any documents requested by Agent to establish, create, preserve, protect
and perfect a first priority lien in favor of Agent, to the extent legally possible, in such
Borrower's rights under such license and shall use their commercially reasonable best efforts to
obtain the written consent of the licensor which such license to the granting in favor of Agent of
a Lien on such Borrower's rights as licensee under such license.

(b)     Upon receipt of an affidavit of an officer of Agent or a Lender as to the
loss, theft, destruction or mutilation of any Note or any other Financing Document which is not
of public record, and, in the case of any such mutilation, upon surrender and cancellation of such
Note or other applicable Financing Document, Borrowers will issue, in lieu thereof, a
replacement Note or other applicable Financing Document, dated the date of such lost, stolen,
destroyed or mutilated Note or other Financing Document in the same principal amount thereof
and otherwise of like tenor.

(c)     [Reserved]

(d)     Upon the request of Agent, Borrowers shall obtain a landlord's agreement
or mortgagee agreement, as applicable, from the lessor of each leased property or mortgagee of
owned property with respect to any business location where any portion of the Collateral
included in or proposed to be included in the Borrowing Base, or the records relating to such
Collateral and/or software and equipment relating to such records or Collateral, is stored or
located, which agreement or letter shall be reasonably satisfactory in form and substance to
Agent. Borrowers shall timely and fully pay and perform its obligations under all leases and
other agreements with respect to each leased location where any Collateral, or any records
related thereto, is or may be located.

**Section 4.12**    Right of First Refusal. Borrowers hereby agree that if, at any time during
the term hereof, any Borrower receives from a third party an offer, term sheet or commitment, or
any Borrower makes a proposal substantially acceptable to or accepted by any person or entity
(all of the foregoing being referred to as an "**Offer**"), which Offer provides for working capital
financing, accounts receivable financing, or inventory financing (but excluding financings
completed through the public or private placement of bonds or with the Dormitory Authority of
the State of New York), the applicable Borrower shall first forward the Offer to MCF, which
shall have five (5) Business Days after receipt thereof (the "**Option Period**") to agree to provide
similar financing in the place of such person or entity upon the terms and conditions set forth in
the Offer and to notify the applicable Borrower in writing of MCF's acceptance of the Offer (the
"**Acceptance Notice**"). If the Borrower has not received an Acceptance Notice within the Option
Period, the Borrower shall be free, subject to approval of the Bankruptcy Court, to consummate
the transaction described in the Offer with the third party providing the Offer (the "**Financing
Transaction**"); provided, however, that the foregoing, and MCF's failure to respond to issue an
Acceptance Notice, shall not be construed as a waiver of any of the terms, covenants or
conditions of the Financing Documents. In the event that the Financing Transaction is not
consummated under similar terms with such person or entity during the one hundred twenty
(120) day period following the expiration of the Option Period, or any material term is changed,
the applicable Borrower shall not be permitted to consummate the Financing Transaction without

54

again complying with this Section. The right of first refusal granted to MCF hereunder shall survive until the Termination Date. For purposes of this Section, "*MCF*" shall mean and include either of MCF or any other parent company, subsidiary or Affiliate of MCF, and the Acceptance Notice and consummation of such financing transaction may be executed by MCF or any other parent company, subsidiary or Affiliate of MCF. Nothing in this Section is intended, or shall be construed, to constitute Agent's, MCF's or any other Lender's consent to the consummation of any transaction described in any Offer.

**Section 4.13**    Power of Attorney. Each of the officers of Agent is hereby irrevocably made, constituted and appointed the true and lawful attorney for Borrowers (without requiring any of them to act as such) with full power of substitution to do the following:  (a) endorse the name of Borrowers upon any and all checks, drafts, money orders, and other instruments for the payment of money that are payable to Borrowers and constitute collections on Borrowers' Accounts; (b) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action, execute in the name of Borrowers any schedules, assignments, instruments, documents, and statements that Borrowers are obligated to give Agent under this Agreement; (c) after the occurrence and during the continuance of an Event of Default, take any action Borrowers are required to take under this Agreement; (d) so long as Agent has provided not less than three (3) Business Days' prior written notice to Borrower to perform the same and Borrower has failed to take such action, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce any Account or other Collateral or perfect Agent's security interest or Lien in any Collateral; and (e) after the occurrence and during the continuance of an Event of Default, do such other and further acts and deeds in the name of Borrowers that Agent may deem necessary or desirable to enforce its rights with regard to any Account or other Collateral.  This power of attorney shall be irrevocable and coupled with an interest.

**Section 4.14**    Borrowing Base Collateral Administration.

(a)    All data and other information relating to Accounts or other intangible Collateral shall at all times be kept by Borrowers, at their respective principal offices and shall not be moved from such locations without (i) providing prior written notice to Agent, and (ii) obtaining the prior written consent of Agent, which consent shall not be unreasonably withheld.

(b)    Borrowers shall provide prompt written notice to each Person who either is currently an Account Debtor or becomes an Account Debtor at any time following the date of this Agreement that directs each Account Debtor to make payments into the Lockbox, and hereby authorizes Agent, upon Borrowers' failure to send such notices within ten (10) days after the date of this Agreement (or ten (10) days after the Person becomes an Account Debtor), to send any and all similar notices to such Person.  Agent reserves the right to notify Account Debtors that Agent has been granted a Lien upon all Accounts.

**Section 4.15**    Payroll Taxes; Third Party Payroll Administrator. The Borrowers shall at all times engage a third-party payroll administrator to manage, administer and ensure the timely payment of any and all Payroll Taxes due and owing by the Borrowers from time to time to any applicable Governmental Authorities.

**Section 4.16**    Reorganization Milestones. The Borrowers shall timely comply with the Reorganization Milestones, it being expressly understood that time is of the essence.

**Section 4.17**    Bankruptcy Reports. Promptly after the sending, receiving or filing thereof, copies of all reports, motions, affidavits, statements and other documents that any Borrower sends, receives or files in connection with the Bankruptcy Cases, including all correspondence with the Bankruptcy Court, shall be delivered to Agent and Lenders.

## ARTICLE 5 - NEGATIVE COVENANTS

Each Borrower agrees that, so long as any Credit Exposure exists:

**Section 5.1**    Debt; Contingent Obligations. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, incur, assume, guarantee or otherwise become or remain directly or indirectly liable with respect to, any Debt, except for Permitted Debt. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume, incur or suffer to exist any Contingent Obligations, except for Permitted Contingent Obligations.

**Section 5.2**    Liens. No Borrower will, or will permit any Subsidiary to, directly or indirectly, create, assume or suffer to exist any Lien on any asset now owned or hereafter acquired by it, except for Permitted Liens.

**Section 5.3**    Restricted Distributions. No Borrower will, or will permit any Subsidiary to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Distribution.

**Section 5.4**    Restrictive Agreements. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) enter into or assume any agreement (other than the Financing Documents and any agreements for purchase money debt permitted under clause (c) of the definition of Permitted Debt) prohibiting the creation or assumption of any Lien upon its properties or assets, whether now owned or hereafter acquired, or (b) create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind (except as provided by the Financing Documents) on the ability of any Subsidiary to: (i) pay or make Restricted Distributions to any Borrower or any Subsidiary; (ii) pay any Debt owed to any Borrower or any Subsidiary; (iii) make loans or advances to any Borrower or any Subsidiary; or (iv) transfer any of its property or assets to any Borrower or any Subsidiary.

**Section 5.5**    Payments and Modifications of Subordinated Debt. Borrower will not, and will not permit any Subsidiary to, directly or indirectly (a) declare, pay, make or set aside any amount for payment in respect of Subordinated Debt, except for payments made in full compliance with and expressly permitted under the Subordination Agreement, (b) amend or otherwise modify the terms of any Subordinated Debt, except for amendments or modifications made in full compliance with the Subordination Agreement, (c) declare, pay, make or set aside

10844575.1
10844575v.1

any amount for payment in respect of any Debt hereinafter incurred that, by its terms, or by separate agreement, is subordinated to the Obligations, except for payments made in full compliance with and expressly permitted under the subordination provisions applicable thereto, or (d) amend or otherwise modify the terms of any such Debt if the effect of such amendment or modification is to (i) increase the interest rate or fees on, or change the manner or timing of payment of, such Debt, (ii) accelerate or shorten the dates upon which payments of principal or interest are due on, or the principal amount of, such Debt, (iii) change in a manner adverse to any Credit Party or Agent any event of default or add or make more restrictive any covenant with respect to such Debt, (iv) change the prepayment provisions of such Debt or any of the defined terms related thereto, (v) change the subordination provisions thereof (or the subordination terms of any guaranty thereof), or (vi) change or amend any other term if such change or amendment would materially increase the obligations of the obligor or confer additional material rights on the holder of such Debt in a manner adverse to Borrower, any Subsidiaries, Agents or Lenders. Borrower shall, prior to entering into any such amendment or modification, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy thereof.

**Section 5.6**    Consolidations, Mergers and Sales of Assets; Change in Control. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) consolidate or merge or amalgamate with or into any other Person, or (b) consummate any Asset Dispositions other than Permitted Asset Dispositions. No Borrower will suffer or permit to occur any Change in Control with respect to itself, any Subsidiary or any Guarantor.

**Section 5.7**    Purchase of Assets, Investments. No Borrower will, or will permit any Subsidiary to, directly or indirectly (a) acquire or enter into any agreement to acquire any assets other than in the Ordinary Course of Business or as permitted under clause (g) of the definition of Permitted Investments; (b) engage or enter into any agreement to engage in any joint venture or partnership with any other Person; (c) acquire or own or enter into any agreement to acquire or own any Investment in any Person other than Permitted Investments, or (d) acquire or own or enter into any agreement to acquire or own any Investment in any Subsidiary.

**Section 5.8**    Transactions with Affiliates. Except as otherwise disclosed on Schedule 5.8, no Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service or extension of any credit) with any Affiliate of any Borrower. For the avoidance of doubt, at no time shall Borrower extend any credit to, be owed any trade payable from or be owed any other amount pursuant to any other financing or lending arrangement from, any Affiliate other than as set forth on Schedule 5.8.

**Section 5.9**    Modification of Organizational Documents. No Borrower will, or will permit any Subsidiary to, directly or indirectly, amend or otherwise modify any Organizational Documents of such Person, except for Permitted Modifications.

**Section 5.10**    Modification of Certain Agreements. No Borrower will, or will permit any Subsidiary to, directly or indirectly, amend or otherwise modify any Asset Sale Document or other any Material Contract, which amendment or modification in any case: (a) is contrary to the terms of this Agreement or any other Financing Document; (b) could reasonably be expected to be adverse to the rights, interests or privileges of the Agent or the Lenders or their ability to

57

enforce the same; (c) results in the imposition or expansion in any material respect of any obligation of or restriction or burden on any Borrower or any Subsidiary; or (d) reduces in any material respect any rights or benefits of any Borrower or any Subsidiary (it being understood and agreed that any such determination shall be in the discretion of the Agent). Each Borrower shall, prior to entering into any amendment or other modification of any of the foregoing documents, deliver to Agent reasonably in advance of the execution thereof, any final or execution form copy of amendments or other modifications to such documents, and such Borrower agrees not to take, nor permit any of its Subsidiaries to take, any such action with respect to any such documents without obtaining such approval from Agent.

**Section 5.11**    Conduct of Business.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, engage in any line of business other than those businesses engaged in on the Closing Date and described on Schedule 5.11 and businesses reasonably related thereto.  No Borrower will, or will permit any Subsidiary to, other than in the Ordinary Course of Business, change its normal billing payment and reimbursement policies and procedures with respect to its Accounts (including, without limitation, the amount and timing of finance charges, fees and write-offs).

**Section 5.12**    Lease Payments.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, incur or assume (whether pursuant to a Guarantee or otherwise) any liability for rental payments except in the Ordinary Course of Business.

**Section 5.13**    Limitation on Sale and Leaseback Transactions.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, enter into any arrangement with any Person whereby, in a substantially contemporaneous transaction, any Borrower or any Subsidiary sells or transfers all or substantially all of its right, title and interest in an asset and, in connection therewith, acquires or leases back the right to use such asset.

**Section 5.14**    Deposit Accounts and Securities Accounts; Payroll and Benefits Accounts.  No Borrower will, or will permit any Subsidiary to, directly or indirectly, establish any new Deposit Account or Securities Account in to which the Accounts and/or proceeds of Accounts are, or are to be, deposited, without prior written notice to Agent, and unless Agent, such Borrower or such Subsidiary and the bank, financial institution or securities intermediary at which the account is to be opened enter into a Deposit Account Control Agreement, Deposit Account Restriction Agreement or Securities Account Control Agreement prior to or concurrently with the establishment of such Deposit Account or Securities Account.  Borrowers represent and warrant that Schedule 5.14 lists all of the Deposit Accounts and Securities Accounts of each Borrower as of the Closing Date.

**Section 5.15**    Compliance with Anti-Terrorism Laws.  Agent hereby notifies Borrowers that pursuant to the requirements of Anti-Terrorism Laws, and Agent's policies and practices, Agent is required to obtain, verify and record certain information and documentation that identifies Borrowers and its principals, which information includes the name and address of each Borrower and its principals and such other information that will allow Agent to identify such party in accordance with Anti-Terrorism Laws. No Borrower will, or will permit any Subsidiary to, directly or indirectly, knowingly enter into any Material Contracts with any Blocked Person or any Person listed on the OFAC Lists. Each Borrower shall immediately notify Agent if such

Borrower has knowledge that any Borrower, any additional Credit Party or any of their respective Affiliates or agents acting or benefiting in any capacity in connection with the transactions contemplated by this Agreement is or becomes a Blocked Person or (a) is convicted on, (b) pleads nolo contendere to, (c) is indicted on, or (d) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering. No Borrower will, or will permit any Subsidiary to, directly or indirectly, (i) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224, any similar executive order or other Anti-Terrorism Law, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law.

**Section 5.16**    Interim Order; Final Order; Asset Sale Order; Administrative Expense Priority; Payments.

(a)    No Borrower will seek, consent to or suffer to exist at any time any modification, stay, vacation or amendment of the Interim Order, the Final Order or the Asset Sale Order, except for modifications and amendments joined in or agreed to in writing by Agent.

(b)    No Borrower will suffer to exist at any time a priority for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code) equal or superior to the priority of Agent and the Lenders in respect of the Obligations, except for the Carve-Out.

(c)    Prior to the date on which the Obligations have been indefeasibly paid in full, all in accordance with the terms of this Agreement, and this Agreement has been terminated, no Borrower will (i) pay any administrative expenses pursuant to Section 503(b) of the Bankruptcy Code, except (A) administrative expenses incurred in the Ordinary Course of Business of the Borrowers or approved by an order of the Bankruptcy Court and (B) Allowed Fees payable under Section 330 and 331 of the Bankruptcy Code, or (ii) permit or seek to permit the granting of adequate protection in favor of any Person.

(d)    Except as provided in the Financing Orders, no Borrower will waive any claims under Section 506(c) of the Bankruptcy Code, or take any other action Agent deems adverse to Agent or the Lenders or their rights and remedies under the Financing Documents.

**Section 5.17**    Bankruptcy Actions.

(a)    No Borrower shall enter into any agreement to return any of its inventory or other Collateral outside the Ordinary Course of Business to any of its creditors for application against any prepetition Debt prepetition trade payables, or other prepetition claims under Section 546(h) of the Bankruptcy Code.

10844575.1
10844575v.1

(b)    No Borrower shall make (i) any payments on account of any creditor's claims against any Borrowers, (ii) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program, or (iv) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court and (B) are expressly permitted by the Budget, or otherwise approved by the Agent in writing.

(c)    No Borrower shall obtain, or seek to obtain, any stay on the exercise of the remedies of the Agent or any Lender hereunder, under any Financing Document, Affiliated Financing Document or the Financing Orders.

## ARTICLE 6 - FINANCIAL COVENANTS

**Section 6.1**    Definition of Minimum Liquidity. "**Minimum Liquidity**" means the sum of Revolving Loan Availability plus cash and cash equivalents that are (a) owned by any Borrower, and (b) not subject to any Lien other than a Lien in favor of Agent.

**Section 6.2**    Minimum Liquidity. Borrowers will not permit the Minimum Liquidity at any time during the term of this Agreement to be less than $1,000,000.

**Section 6.3**    Evidence of Compliance. Borrowers shall furnish to Agent, together with the financial reporting required of Borrowers in Section 4.1, evidence (in form and content satisfactory to Agent) of Borrowers' compliance with the covenants in this Article and evidence that no Event of Default specified in this Article has occurred. Such evidence shall include, without limitation, (a) a statement and report, on a form approved by Agent, detailing Borrowers' calculations, and (b) if requested by Agent, back-up documentation (including, without limitation, invoices, receipts and other evidence of costs incurred during such quarter as Agent shall reasonably require) evidencing the propriety of the calculations.

## ARTICLE 7 CONDITIONS

**Section 7.1**    Conditions to Closing. The obligation of each Lender to make the initial Loans on the Closing Date shall be subject to the receipt by Agent of each agreement, document and instrument set forth on the closing checklist prepared by Agent or its counsel, each in form and substance satisfactory to Agent, and such other closing deliverables reasonably requested by Agent and Lenders, and to the satisfaction of the following conditions precedent, each to the satisfaction of Agent and Lenders and their respective counsel in their sole discretion:

(a)    the Interim Order shall be in effect and shall not have been reversed, modified, amended or stayed, and no motion seeking a reversal, modification, amendment or stay shall have been filed by any Person;

(b)    the Agent shall have received the Budget, dated no more than seven (7) days prior to the Interim Hearing and covering the period of the first thirteen (13) weeks after the Closing Date, in form and substance satisfactory to the Agent;

(c)    the Agent shall have received the Financing Documents, Amendment No.
8 to the Prepetition Term Credit Agreement and the Asset Sale Documents, each duly executed
by an authorized officer of the Borrower and other parties thereto;

(d)    evidence of the consummation of the transactions contemplated by the
Operative Documents, including, without limitation, the Asset Sale;

(e)    the payment of all fees, expenses and other amounts due and payable
under the Financing Documents and the Interim Order;

(f)    other than the filing of the Bankruptcy Cases, since December 31, 2012,
the absence of any material adverse change in any aspect of the business, operations, properties,
prospects or condition (financial or otherwise) of any Credit Party or any seller of any assets or
business to be purchased by any Borrower contemporaneous with the Closing Date, or any event
or condition which could reasonably be expected to result in such a material adverse change; and

(g)    the receipt of the initial Borrowing Base Certificate, prepared as of the
Closing Date; and

(h)    the Agent shall have received original certificates of all insurance policies
of the Borrowers confirming that they are in effect and that the premiums due and owing with
respect thereto have been paid in full and endorsements naming Agent, for the benefit of itself
and Lenders, as loss payee or additional insured, as appropriate.

Each Lender, by delivering its signature page to this Agreement, shall be deemed to have
acknowledged receipt of, and consented to and approved, each Financing Document, each
additional Operative Document and each other document, agreement and/or instrument required
to be approved by Agent, Required Lenders or Lenders, as applicable, on the Closing Date.

**Section 7.2**    Conditions to Each Loan.

The obligation of the Lenders to make a Loan or an advance in respect of any Loan is
subject to the satisfaction of the following additional conditions:

(a)    in the case of a Revolving Loan, receipt by Agent of a Notice of
Borrowing (or telephonic notice if permitted by this Agreement) and updated Borrowing Base
Certificate;

(b)    the fact that, immediately after such borrowing and after application of the
proceeds thereof or after such issuance, the Revolving Loan Outstandings will not exceed the
Revolving Loan Limit;

(c)    the fact that, immediately before and after such advance or issuance, no
Default or Event of Default shall have occurred and be continuing;

(d)    the fact that the representations and warranties of each Credit Party
contained in the Financing Documents shall be true, correct and complete on and as of the date
of such borrowing or issuance, except to the extent that any such representation or warranty

61

relates to a specific date in which case such representation or warranty shall be true and correct as of such earlier date;

(e)    the fact that no adverse change in the condition (financial or otherwise), properties, business, prospects, or operations of Borrowers or any other Credit Party shall have occurred and be continuing with respect to Borrowers or any Credit Party since the date of this Agreement;

(f)    the continued compliance by Borrowers with all of the terms, covenants and conditions of Article 8 and, unless Agent shall elect otherwise from time to time, the absence of any fact, event or circumstance for which Borrower is required to give Agent notice under Article 8; and

(g)    in the case of any Revolving Loan that Borrowers request to be made on or after the Prepetition Revolving Loan Termination Date, the Agent has received the proceeds of the Prepetition Repayment Advance and all Prepetition Revolving Loan Obligations have been indefeasibly satisfied and paid in full in cash.

Each giving of a Notice of Borrowing hereunder and each acceptance by any Borrower of the proceeds of any Loan made hereunder shall be deemed to be (y) a representation and warranty by each Borrower on the date of such notice or acceptance as to the facts specified in this Section, and (z) a restatement by each Borrower that each and every one of the representations made by it in any of the Financing Documents is true and correct as of such date (except to the extent that such representations and warranties expressly relate solely to an earlier date).

**Section 7.3**    Searches. Before the Closing Date, and thereafter (as and when determined by Agent in its discretion), Agent shall have the right to perform, all at Borrowers' expense, the searches described in clauses (a), (b), and (c) below against Borrowers and any other Credit Party, the results of which are to be consistent with Borrowers' representations and warranties under this Agreement and the satisfactory results of which shall be a condition precedent to all advances of Loan proceeds:  (a) UCC searches with the Secretary of State of the jurisdiction in which the applicable Person is organized; (b) judgment, pending litigation, federal tax lien, personal property tax lien, and corporate and partnership tax lien searches, in each jurisdiction searched under clause (a) above; and (c) searches of applicable corporate, limited liability company, partnership and related records to confirm the continued existence, organization and good standing of the applicable Person and the exact legal name under which such Person is organized.

**Section 7.4**    Post Closing Requirements.  Borrowers shall complete each of the post closing obligations and/or provide to Agent each of the documents, instruments, agreements and information listed on Schedule 7.4 attached hereto on or before the date set forth for each such item thereon, each of which shall be completed or provided in form and substance satisfactory to Agent.

## ARTICLE 8 – REGULATORY MATTERS

**Section 8.1**     Additional Defined Terms.     The following additional definitions are hereby appended to Section 1.1 of this Agreement:

"*Accrediting Organization*" means any Person from which any Borrower has received an accreditation as of the Closing Date or thereafter.

"*CMS*" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"*CON*" means any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.

"*Deposit Account Restriction Agreement*" means an agreement, in form and substance satisfactory to Agent, among Agent, a Borrower and each bank in which such Borrower maintains a Deposit Account and into which Deposit Account proceeds of Accounts from Governmental Account Debtors are paid directly by the Governmental Account Debtor, and which agreement provides that (a) such bank shall not enter into an agreement with respect to such Deposit Account pursuant to which the bank agrees to comply with instructions originated by any Person, other than the Borrower that owns the Deposit Account, directing disposition of the funds in such Deposit Account, and (b) such bank shall agree that it shall have no Lien on, or right of setoff or recoupment against, such Deposit Account or the contents thereof, other than in respect of usual and customary service fees and returned items for which Agent has been given value, in each such case expressly consented to by Agent, and containing such other terms and conditions as Agent may require, including as to any such agreement pertaining to any Lockbox Account, providing that such bank shall wire, or otherwise transfer, in immediately available funds, on a daily basis to the Payment Account and/or a Lockbox Account subject to a Deposit Account Control Agreement (as Agent shall elect and direct at the time such agreement is signed) all funds received or deposited into such Lockbox Account and associated Lockbox unless the applicable Borrower shall otherwise instruct the bank in writing, subject to the limitations set forth in the Deposit Account Restriction Agreement and the other Financing Documents.

"*Governmental Account Debtor*" means any Account Debtor that is a Governmental Authority, including, without limitation, Medicare and Medicaid.

"*Healthcare Laws*" means all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) quality, safety and accreditation standards and requirements of all applicable state laws or

63

regulatory bodies, (g) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (h) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (h) as may be amended from time to time.

"*Healthcare Permit*" means a Permit (a) issued or required under Healthcare Laws applicable to the business of any Borrower or any of its Subsidiaries or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of any Borrower or any of its Subsidiaries, (b) issued by any Person from which any Borrower has, as of the Closing Date, received an accreditation, and/or (c) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of a Borrower.

"*HIPAA*" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"*HIPAA Compliant*" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"*Medicaid*" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"*Medicare*" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 et seq.

"*Operator*" means the singular or collective (as the context requires) reference to the following Persons: (a) any Borrower that is properly licensed to operate a Project, or is otherwise providing or furnishing goods or services, or is otherwise providing or furnishing goods or services (other than the mere leasing of a Project as a lessor and the collection of rentals in connection therewith) from a Project, and/or (b) any Person with whom a Borrower has contracted for management or other services for a Project.

"*Project*" means any facility from which a Borrower provides or furnishes goods or services, and includes, without limitation, any business location of a Borrower which is subject to any Healthcare Permit.