"***Resident Agreements***" means the singular or collective reference to all patient and resident care agreements, admission agreements and service agreements which include an occupancy agreement and all amendments, modifications or supplements thereto.

"***Third Party Payor***" means Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"***Third Party Payor Programs***" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Borrower participates.

"***TRICARE***" means the program administered pursuant to 10 U.S.C. § 1071 *et. seq*), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

**Section 8.2**    <u>Representations and Warranties</u>.  To induce Agent and Lenders to enter into this Agreement and to make credit accommodations contemplated hereby, Borrowers hereby represent and warrant that, except as disclosed in <u>Schedule 8.2</u>, the following statements are true, complete and correct as of the date hereof, and Borrowers hereby covenant and agree to notify Agent within three (3) Business Days (but in any event prior to Borrowers submitting any requests for advances of reserves or escrows or fundings of credit facility proceeds under this Agreement) following the occurrence of any facts, events or circumstances known to a Borrower, whether threatened, existing or pending, that would make any of the following representations and warranties untrue, incomplete or incorrect (together with such supporting data and information as shall be necessary to fully explain to Agent the scope and nature of the fact, event or circumstance), and shall provide to Agent within two (2) Business Days of Agent's request, such additional information as Agent shall request regarding such disclosure:

    (a)    <u>Healthcare Permits</u>.  Borrowers have (i) each Healthcare Permit and other rights from, and have made all declarations and filings with, all applicable Governmental Authorities, all self regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Projects or the assets of any Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and Borrowers are in material compliance with the terms and conditions of all such Healthcare Permits, except where failure to be in such compliance or for a Healthcare Permit to be valid and in full force and effect would not have a Material Adverse Effect.

    (b)    <u>Specific Licensing</u>.  The Project owned and operated by Medical Center is duly licensed as an acute care hospital under the applicable laws of the State of New York. The Project owned and operated by Nursing Home is duly licensed as a skilled nursing facility under the applicable laws of the State of New York. The Project owned and operated by Mt. Vernon is duly licensed as an acute care hospital under the applicable laws of the State of New York. The licensed bed or unit capacity of each Project is shown on <u>Schedule 8.1</u>. Borrowers have not granted to any third party the right to reduce the number of licensed beds, persons served or units in the Projects or the right to apply for approval to move any and all of the licensed beds, persons

65

served or units in the Projects to any other location, and there are no proceedings in process or contemplated to reduce the number of licensed beds, persons served or units in the Projects.

(c)    Operating Leases.    If required under applicable Healthcare Laws, the Operating Lease has been approved by all necessary Governmental Authorities.    Under applicable Healthcare Laws in the state in which each Project is located, the reimbursement rate of the Operator under applicable Third Party Payor Programs is not affected by the rental rates under the Operating Lease.    The rentals provided for under the Operating Lease comply with all applicable Healthcare Laws and do not exceed the sums permitted to be paid under applicable Healthcare Laws.

(d)    Resident Agreements.    The Resident Agreements comply with all applicable Laws, including Healthcare Laws.    Without the prior written consent of Agent, Borrowers shall not, and shall not permit the Operator to: (i) modify the form of Resident Agreement previously approved by Agent; (ii) accept any payment under any Resident Agreement more than one month in advance of its due date or in violation of the cash management or lockbox provisions of this Agreement; (iii) enter into any subleases with respect to any Project; (iv) modify, amend, renew, surrender, terminate, consent to a sublease of, consent to a transfer of, abate rent or other payments due under or otherwise grant any financial or other concession under any sublease with respect to any Project; or (v) enter into any Resident Agreement for a term of more than one (1) year, or upon rates other than market rates or upon a form that fails to comply with applicable Laws.

(e)    Accreditation.    Borrowers have received and maintain accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of any Operating Lease pertaining to the Project. No Borrower or manager has received of any notice or communication from any Accrediting Organization that a Project is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction.

(f)    Participation Agreements/Provider Status/Cost Reports.

(i)    There is no investigation, audit, claim review, or other action pending or, to the knowledge of any Borrower, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in a Borrower's exclusion from any Third Party Payor Program, nor has any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to any Project, nor have the Borrowers made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to any Project.

(ii)    The Borrowers, and, to the knowledge of the Borrowers, their contractors, have properly and legally billed all intermediaries and Third Party Payors for

10844575.1
10844575v.1

services rendered with respect to the Projects and have maintained their records to reflect such billing practices. No funds relating to Borrowers are now, or, to the knowledge of Borrowers will be, withheld by any Third Party Payor.

(iii)    Borrowers have the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the state or states in which such Borrowers operate (to the extent such Borrower participates in the Medicare or Medicaid program in such state or states) and all other Third Party Payor Programs (including, without limitation, Medicare) which have historically accounted for any portion of the revenues of such Project.

(iv)    All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by the Borrowers are and will be materially accurate and complete and have not been and will not be misleading in any material respects. Other than the Medicare cost reports for the Project for the calendar years 2005 through 2010, no cost reports for the Projects remain "open" or unsettled and there are no current, pending or outstanding Medicare, Medicaid or other Third Party Payor Program reimbursement audits or appeals pending with respect to the Projects or the Borrowers.

(g)    No Violation of Healthcare Laws.

(i)    None of the Projects, the Borrowers or any manager thereof are in violation of any Healthcare Laws, except where any such violation would not have a Material Adverse Effect, provided, that Borrowers' failure to be HIPAA Compliant solely as a result of Agent's and any Lender's access, if any, to Protected Health Information shall not be a breach of the representation and warranty set forth in this Section 8.2(g)(i);

(ii)    Borrowers are HIPAA Compliant, provided, however, that Borrowers' failure to be HIPAA Compliant solely as a result of Agent's and any Lender's access, if any, to Protected Health Information shall not be a breach of the representation and warranty set forth in this Section 8.2(g)(ii); and

(iii)    No Project has received a statement of deficiencies or survey violation within the past three years for which a plan of correction has not been filed with the applicable state authority. No Project is currently subject to any material plan of correction that is currently the subject of a review by the applicable state authority.

(h)    Ancillary Laws. Borrowers have received no notice, and are not aware, of any violation of applicable antitrust laws, employment or landlord-tenant laws of any federal, state or local government or quasi-governmental body, agency, board or other authority with respect to the Projects or the Borrowers.

(i)    Hill-Burton. Except for Mt. Vernon, no Borrower is or will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including, without limitation, those authorized under the

67

Hill-Burton Act (42 U.S.C. 291, et seq.). Mt. Vernon is in full compliance with its obligations under the Hill-Burton Act.

     (j)    <u>Fraud and Abuse</u>.

     (i)    No Borrower or manager has, or to its knowledge has been threatened to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in manager or any Borrower has, engaged in any of the following: (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Healthcare Laws; (E) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (F) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) a facility in order that the facility may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3. All contractual arrangements to which Borrower is a party are in compliance with all Healthcare Laws.

     (ii)    No Borrower or manager has been, or to its knowledge has been threatened to be, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in manager or any Borrower: (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations; (C) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding

seeking to assess such penalty; (D) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (E) has been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any law; or (F) was or has become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving and/or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third Party Payor Programs or its billing practices with respect thereto.

**Section 8.3**   Licensed Facilities.

(a)   Certificates of Need.

(i)   If required under applicable Healthcare Laws, Borrower has and shall maintain in full force and effect a valid CON for no less than the number of beds and units in the applicable Project as of the date of this Agreement. Borrower shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of the applicable Project for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way. Each Borrower that is the owner of the fee simple real estate for the Project shall be the owner of the CON, if any, relating to each Project.

(ii)   No Borrower shall do (or suffer to be done by any Borrower or any Affiliate of any Borrower) any of the following without Agent's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed:

(A)   Replace or transfer all or any part of any Project's units or beds to another site or location;

(B)   Transfer or demise any CON or other Healthcare Permit or rights thereunder to any Person (other than Agent) or to any location other than the Project to which such CON or Healthcare Permit pertains; or

(C)   Pledge or hypothecate any CON or other Healthcare Permit as collateral security for any indebtedness other than indebtedness to Agent.

(iii)   The CON, if any, if not held by Borrower, has been demised to Borrower as part of the Operating Lease.

(b)   Resident Deposits and Resident Agreements. Borrowers will maintain or cause to be maintained all deposits, including, without limitation, deposits relating to patients or Resident Agreements if such deposits are in cash such deposits are to be deposited and held by a Borrower (or the manager under any Management Agreement), as the case may be, at such commercial or savings bank or banks as may be reasonably satisfactory to Agent; if such deposits are in any other form, such deposits are to be maintained as Agent may expressly

69

permit. Any bond or other instrument which a Borrower (or a manager under any Management Agreement), as the case may be, is permitted to hold in lieu of cash deposits under any applicable legal requirements shall be maintained in full force and effect unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Agent, shall, if permitted pursuant to any legal requirements, name Agent as payee or mortgagee thereunder (or at Agent's option, be fully assignable to Agent) and shall, in all respects, comply with any applicable laws and legal requirements and otherwise be reasonably satisfactory to Agent. Borrower shall, upon request, provide Agent with evidence reasonably satisfactory to Agent of Borrower's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Borrower shall, upon Agent's request, if permitted by any applicable legal requirements, turn over to Agent the deposits (and any interest theretofore earned thereon) with respect to the Projects, to be held by Agent subject to the terms of their related agreements. No Resident Agreements (i) deviate or will deviate in any material adverse respect from the standard form approved by Agent prior to Closing, or (ii) conflict with any Laws.

(c)     Manager.   Borrowers shall each operate and manage their respective Projects at all times throughout the term of this Agreement, or shall cause the Projects to be managed by a manager approved by Agent and pursuant to management/operating agreements approved by Agent in writing and that comply with all applicable Healthcare Laws (the "*Management Agreements*"). In addition to (but not in limitation of) the covenants set forth in Section 5.10, Borrowers shall not (i) engage a manager of any Project or make any modification, amendment, termination or cancellation of any Management Agreements or agreements with brokers, (ii) enter into any other agreement relating to the management or operation of any Project, or (iii) waive or release any of its rights and remedies under any Management Agreement, in each case, without the prior written consent of Agent given or withheld in Agent's sole and absolute discretion. Any manager of a Project shall be required to enter into an assignment and subordination of management or operating agreement in form and substance reasonably satisfactory to Agent. Such restrictions and approval rights are solely for the purposes of assuring that the Projects are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Projects as security for the Obligations and shall not place responsibility for the control, care, management or repair of the Projects upon Agent, or make Agent responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Projects.

**Section 8.4**     Healthcare Operations.

(a)     Borrower will:

(i)     timely file or caused to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals and reports (other than cost reports as provided in Section 8.4(a)(ii) below) of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

70

(ii)     timely file or caused to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)     Borrower will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Project for its current use, all Healthcare Permits necessary under Healthcare Laws to carry on the business of Borrowers as it is conducted on the Closing Date.

(c)     Borrower will not suffer or permit to occur any of the following:

(i)     any transfer of a Healthcare Permit or rights thereunder to any Person (other than Borrowers or Agent) or to any location other than a Project approved by Agent in advance in writing;

(ii)     any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than indebtedness to Agent;

(iii)     any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit without Agent's prior written consent, including, without limitation, (A) any change to the authorized units/beds and persons served capacity of any Project and/or the number of units/beds and persons served approved by the applicable Governmental Authority, and (B) any transfer all or any part of any Project's authorized units or beds to another site or location;

(iv)     any voluntary transfer of any resident of any Project to any other facility, unless such transfer is at the request of the resident (without economic incentives being given to the resident by an Affiliate of any Borrower) or its payor or is for reasons relating to non-payment or the health, required level of medical care or safety of the resident to be transferred;

(v)     without Agent's prior written consent, the provision by any Borrower of additional regulated services at any Project, including, without limitation, medical services; or

(vi)     any fact, event or circumstance for which notice to Agent is required under Section 8.2.

(d)     Borrower will maintain a corporate health care regulatory compliance program ("*CCP*") which includes at least the following components and allows Agent and/or any outside consultants from time to time to review such CCP:  (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) specific officer within high-level personnel identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education

71

10844575.1
10844575v.1

programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and other agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (vi) mechanisms to immediately respond to detected violations of the CCP.

(e)    Borrower will at all times be, and cause all managers to be, HIPAA Compliant, provided, that Borrowers' failure to be HIPAA Compliant solely as a result of Agent's and any Lender's access, if any, to Protected Health Information shall not be a breach of this Section 8.4(e).

(f)    If any Project is currently accredited by an Accrediting Organization, Borrower will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

Section 8.5    Third Party Payor Programs.    Neither the Projects, nor any Borrower, shall, other than in the Ordinary Course of Business, change the terms of any Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs). Borrowers will (a) maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Project for its current use, all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third Party Payor Programs in which any Borrower or any Project participates as of the date of this Agreement, and (b) provide to Agent upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrowers. Borrowers shall at all times comply with all requirements, contracts, conditions and stipulations applicable to Borrowers in order to maintain in good standing and without default or limitation all such participation agreements.

Section 8.6    Cures.    If there shall occur any fact, event or circumstance for which Borrowers are required to give Agent notice under Section 8.2 after the Closing Date, Borrowers shall take such action as is necessary to validly challenge or otherwise appropriately respond to such fact, event or circumstance within any timeframe required by applicable Healthcare Laws, and shall thereafter diligently pursue the same to a favorable conclusion, all to the effect that the fact, event or circumstance giving rise to Borrowers' notice obligation under Section 8.2 shall be dismissed, rescinded, eliminated and otherwise cease TO exist on that date which is the earlier to occur of (a) sixty (60) days after the date any Borrower or any of its Affiliates became aware of such fact, event or circumstance, or (b) the expiration of any cure period given under applicable Healthcare Laws; provided, however, that Borrowers will not permit to exist or occur any fact, event or circumstance which could cause any representation or warranty in the following

72

subsections of Section 8.2 to be untrue, incomplete or incorrect or which could trigger a disclosure obligation under such subsections of Section 8.2: (a), (b), (f), (h) and (j).

Section 8.7  Special Lockbox Provisions. The terms of this Section 8.7 supplement Section 2.11 and shall override Section 2.11 where inconsistent. If any of the Account Debtors are Governmental Account Debtors, Borrowers shall establish and maintain additional lockboxes (also herein referred to collectively in the singular as the "*Lockbox*") and related Lockbox Accounts with the Lockbox Bank, subject to the provisions of this Agreement, and shall execute with the Lockbox Bank a Deposit Account Restriction Agreement and such other agreements related to such Lockbox as Agent may require. A separate Lockbox shall be established for each Borrower that is a licensed provider under the Medicaid or Medicare programs, if applicable. Borrowers shall ensure that all collections of Accounts due from Governmental Account Debtors are paid directly from such Account Debtors into the applicable Lockbox and/or Lockbox Account established pursuant to this subsection for deposit into the Lockbox Account established pursuant to this subsection. All funds deposited into a Lockbox Account that is subject (or required to be subject) to a Deposit Account Restriction Agreement shall be transferred into either (at Agent's option) (a) the Payment Account by the close of each Business Day, or (b) the Lockbox Account established pursuant to Section 2.11(a) which such transfer shall be made via an automatic immediate intrabank transfer, and then transferred to the Payment Account by the close of each Business Day.

## ARTICLE 9 - SECURITY AGREEMENT

Section 9.1  Generally.  As security for the payment and performance of the Obligations, and for the payment and performance of all of the Affiliated Obligations under the Affiliated Financing Documents, and without limiting any other grant of a Lien and security interest in any Security Document, Borrowers hereby assign and grant to Agent, for the benefit of itself and Lenders, a continuing first priority Lien on and security interest in, upon, and to the personal property set forth on Schedule 9.1 attached hereto and made a part hereof.

Section 9.2  Representations and Warranties and Covenants Relating to Collateral.

(a)  Schedule 9.2 sets forth (i) each chief executive office and principal place of business of each Borrower and each of their respective Subsidiaries, and (ii) all of the addresses (including all warehouses) at which any of the Collateral is located and/or books and records of Borrowers regarding any of the Collateral are kept, which such Schedule 9.2 indicates in each case which Borrower(s) have Collateral and/or books and records located at such address, and, in the case of any such address not owned by one or more of the Borrowers(s), indicates the nature of such location (e.g., leased business location operated by Borrower(s), third party warehouse, consignment location, processor location, etc.) and the name and address of the third party owning and/or operating such location.

(b)  Without limiting the generality of Section 3.2, except as indicated on Schedule 3.19 with respect to any rights of any Borrower as a licensee under any license of Intellectual Property owned by another Person, and except for the entry of the Financing Orders, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or consent of any other Person is required for (i) the grant by each Borrower to Agent

10844575.1
10844575v.1

of the security interests and Liens in the Collateral provided for under this Agreement and the other Security Documents (if any), or (ii) the exercise by Agent of its rights and remedies with respect to the Collateral provided for under this Agreement and the other Security Documents or under any applicable Law, including the UCC and neither any such grant of Liens in favor of Agent or exercise of rights by Agent shall violate or cause a default under any agreement between any Borrower and any other Person relating to any such collateral, including any license to which a Borrower is a party, whether as licensor or licensee, with respect to any Intellectual Property, whether owned by such Borrower or any other Person.

(c)     As of the Closing Date, no Borrower has any ownership interest in any Chattel Paper (as defined in Article 9 of the UCC), letter of credit rights, commercial tort claims, Instruments, documents or investment property (other than equity interests in any Subsidiaries of such Borrower disclosed on Schedule 3.4) and Borrowers shall give notice to Agent promptly (but in any event not later than the delivery by Borrowers of the next Compliance Certificate required pursuant to Section 4.1 above) upon the acquisition by any Borrower of any such Chattel Paper, letter of credit rights, commercial tort claims, Instruments, documents, investment property. No Person other than Agent or (if applicable) any Lender has "control" (as defined in Article 9 of the UCC) over any Deposit Account, investment property (including Securities Accounts and commodities account), letter of credit rights or electronic chattel paper in which any Borrower has any interest (except for such control arising by operation of law in favor of any bank or securities intermediary or commodities intermediary with whom any Deposit Account, Securities Account or commodities account of Borrowers is maintained).

(d)     Borrowers shall not, and shall not permit any Credit Party to, take any of the following actions or make any of the following changes unless Borrowers have given at least thirty (30) days prior written notice to Agent of Borrowers' intention to take any such action (which such written notice shall include an updated version of any Schedule impacted by such change) and have executed any and all documents, instruments and agreements and taken any other actions which Agent may request after receiving such written notice in order to protect and preserve the Liens, rights and remedies of Agent with respect to the Collateral:  (i) change the legal name or organizational identification number of any Borrower as it appears in official filings in the jurisdiction of its organization, (ii) change the jurisdiction of incorporation or formation of any Borrower or Credit Party or allow any Borrower or Credit Party to designate any jurisdiction as an additional jurisdiction of incorporation for such Borrower or Credit Party, or change the type of entity that it is, or (iii) change its chief executive office, principal place of business, or the location of its records concerning the Collateral or move any Collateral to or place any Collateral on any location that is not then listed on the Schedules and/or establish any business location at any location that is not then listed on the Schedules.

(e)     Borrowers shall not adjust, settle or compromise the amount or payment of any Account, or release wholly or partly any Account Debtor, or allow any credit or discount thereon (other than adjustments, settlements, compromises, credits and discounts in the Ordinary Course of Business, made while no Default exists and in amounts which are not material with respect to the Account and which, after giving effect thereto, do not cause the Borrowing Base to be less than the Revolving Loan Outstandings) without the prior written consent of Agent. Without limiting the generality of this Agreement or any other provisions of any of the Financing Documents relating to the rights of Agent after the occurrence and during the continuance of an

10844575.1
10844575v.1

Event of Default, Agent shall have the right at any time after the occurrence and during the continuance of an Event of Default to: (i) exercise the rights of Borrowers with respect to the obligation of any Account Debtor to make payment or otherwise render performance to Borrowers and with respect to any property that secures the obligations of any Account Debtor or any other Person obligated on the Collateral, and (ii) adjust, settle or compromise the amount or payment of such Accounts.

(f)     Without limiting the generality of <u>Section 9.2(c)</u> and <u>Section 9.2(e)</u>:

(i)     [Reserved]

(ii)     [Reserved]

(iii)     [Reserved]

(iv)     Except for Accounts and Inventory in an aggregate amount of $25,000, no Accounts or Inventory or other Collateral shall at any time be in the possession or control of any warehouse, consignee, bailee or any of Borrowers' agents or processors without prior written notice to Agent and the receipt by Agent, if Agent has so requested, of warehouse receipts, consignment agreements or bailee lien waivers (as applicable) satisfactory to Agent prior to the commencement of such possession or control. Borrower has notified Agent that Inventory is currently located at the locations set forth on <u>Schedule 9.2</u>. Borrowers shall, upon the request of Agent, notify any such warehouse, consignee, bailee, agent or processor of the security interests and Liens in favor of Agent created pursuant to this Agreement and the Security Documents, instruct such Person to hold all such Collateral for Agent's account subject to Agent's instructions and shall obtain an acknowledgement from such Person that such Person holds the Collateral for Agent's benefit.

(v)     [Reserved]

(vi)     Each Borrower hereby authorizes Agent to file without the signature of such Borrower one or more UCC financing statements relating to liens on personal property relating to all or any part of the Collateral, which financing statements may list Agent as the "secured party" and such Borrower as the "debtor" and which describe and indicate the collateral covered thereby as all or any part of the Collateral under the Financing Documents, in such jurisdictions as Agent from time to time determines are appropriate, and to file without the signature of such Borrower any continuations of or corrective amendments to any such financing statements, in any such case in order for Agent to perfect, preserve or protect the Liens, rights and remedies of Agent with respect to the Collateral. Each Borrower also ratifies its authorization for Agent to have filed in any jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(vii)     As of the Closing Date, no Borrower holds, and after the Closing Date Borrowers shall promptly notify Agent in writing upon creation or acquisition by any Borrower of, any Collateral which constitutes a claim against any Governmental Authority, including, without limitation, the federal government of the United States or

75

any instrumentality or agency thereof, the assignment of which claim is restricted by any applicable Law, including, without limitation, the federal Assignment of Claims Act and any other comparable Law. Upon the request of Agent, Borrowers shall take such steps as may be necessary or desirable, or that Agent may request, to comply with any such applicable Law.

(viii)   Borrowers shall furnish to Agent from time to time any statements and schedules further identifying or describing the Collateral and any other information, reports or evidence concerning the Collateral as Agent may reasonably request from time to time.

## ARTICLE 10 - EVENTS OF DEFAULT

**Section 10.1**   Events of Default.   For purposes of the Financing Documents, the occurrence of any of the following conditions and/or events, whether voluntary or involuntary, by operation of law or otherwise, shall constitute an "***Event of Default***":

(a)   (i) any Borrower shall fail to pay when due any principal, interest, premium or fee under any Financing Document or any other amount payable under any Financing Document, (ii) there shall occur any default in the performance of or compliance with any of the following sections of this Agreement: Section 2.11; Section 4.4; Section 4.6; Section 4.7; Section 4.14; Section 4.15; Article 5; Article 6; and/or Section 8.7; or (iii) there shall occur any default in the performance of or compliance with Section 4.1, and such Default is not remedied by the Borrowers or waived by Agent within five (5) days of such Default.

(b)   any Credit Party defaults in the performance of or compliance with any term contained in this Agreement or in any other Financing Document (other than occurrences described in other provisions of this Section 10.1 for which a different grace or cure period is specified or for which no grace or cure period is specified and thereby constitute immediate Events of Default) and such default is not remedied by the Credit Party or waived by Agent within fifteen (15) days after the earlier of (1) receipt by Borrower Representative of notice from Agent or Required Lenders of such default or (2) actual knowledge of any Borrower or any other Credit Party of such default;

(c)   any representation, warranty, certification or statement made by any Credit Party or any other Person in any Financing Document or in any certificate, financial statement or other document delivered pursuant to any Financing Document is incorrect in any respect (or in any material respect if such representation, warranty, certification or statement is not by its terms already qualified as to materiality) when made (or deemed made);

(d)   (i) failure of any Credit Party to pay when due or within any applicable grace period any principal, interest or other amount on Debt  (other than the Loans), or the occurrence of any breach, default, condition or event with respect to any Debt (other than the Loans), if the effect of such failure or occurrence is to cause or to permit the holder or holders of any such Debt, to cause, Debt or other liabilities having an individual principal amount in excess of $1,000,000 or having an aggregate principal amount in excess of $1,000,000 to become or be declared due prior to its stated maturity, or (ii) the occurrence of any breach or default under any

76

terms or provisions of any Subordinated Debt Document or under any agreement subordinating the Subordinated Debt to all or any portion of the Obligations or the occurrence of any event requiring the prepayment of any Subordinated Debt;

(e)     [reserved];

(f)     [reserved];

(g)     (i) institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Credit Party or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $25,000, (ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA, or (iii) there shall occur any withdrawal or partial withdrawal from a Multiemployer Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Plans as a result of such withdrawal (including any outstanding withdrawal liability that any Credit Party or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $25,000;

(h)     one or more judgments or orders for the payment of money (not paid or fully covered by insurance maintained in accordance with the requirements of this Agreement and as to which the relevant insurance company has acknowledged coverage) aggregating in excess of $25,000 shall have been rendered against any or all Credit Parties and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgments or orders, or (ii) there shall be any period of twenty (20) consecutive days during which a stay of enforcement of any such judgments or orders, by reason of a pending appeal, bond or otherwise, shall not be in effect;

(i)     any Lien created by any of the Security Documents shall at any time fail to constitute a valid and perfected Lien on all of the Collateral purported to be encumbered thereby, subject to no prior or equal Lien except Permitted Liens, or any Credit Party shall so assert;

(j)     the institution by any Governmental Authority of criminal proceedings against any Credit Party;

(k)     a default or event of default occurs under any Guarantee of any portion of the Obligations;

(l)     any Borrower makes any payment on account of any Debt that has been subordinated to any of the Obligations, other than payments specifically permitted by the terms of such subordination;

(m)     if any Borrower is or becomes an entity whose equity is registered with the SEC, and/or is publicly traded on and/or registered with a public securities exchange, such Borrower's equity fails to remain registered with the SEC in good standing, and/or such equity fails to remain publicly traded on and registered with a public securities exchange;

(n)     the occurrence of any fact, event or circumstance (other than the filing of the Bankruptcy Cases) that could reasonably be expected to result in a Material Adverse Effect,

77

if such default shall have continued unremedied for a period of ten (10) days after written notice from Agent;

(o)    agent determines, based on information available to it and in its reasonable judgment, that there is a reasonable likelihood that Borrowers shall fail to comply with one or more financial covenants in Article 6 during the next succeeding financial reporting period;

(p)    there shall occur any default or event of default under the Affiliated Financing Documents or any other Operative Document, including, without limitation, any Asset Sale Document; or

(q)    there shall occur a material adverse change in the financial condition or business prospects of any Borrower or any Project, or if Agent in good faith deems the Lenders insecure as a result of acts or events bearing upon the financial condition of any Borrower or Project or the repayment of the Notes, which default shall have continued unremedied for a period of ten (10) days after written notice from Agent;

(r)    if (i) any of the Bankruptcy Cases is converted to a case under Chapter 7 of the Bankruptcy Code, or (ii) any of the Bankruptcy Cases is dismissed;

(s)    if a Chapter 11 trustee or an examiner with enlarged powers relating to the operations of the Borrowers' business (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed pursuant to Section 1104 of the Bankruptcy Code in any of the Bankruptcy Cases;

(t)    except with respect to the Carve-Out, if any super-priority administrative expense claim or any Lien that is *pari passu* with or senior to those of the Agent and the Lenders is granted to any Person other than Agent, or the authorization to use cash collateral without the consent of the Agent and the Required Lenders is granted to any Person other than the Agent;

(u)    if any Person other than Agent is granted relief from the automatic stay provided for in the Bankruptcy Cases, or such automatic stay is otherwise modified, to permit enforcement of rights by such Person with respect to any asset of any Borrower or Guarantor having a fair market value in excess of $50,000 unless otherwise consented to in writing by Agent;

(v)    if any Borrower's or Guarantor's Board of Directors shall authorize the liquidation of such Borrower's or Guarantor's business pursuant to one or more Section 363 sales or otherwise, or shall file any motion under Section 363 of the Bankruptcy Code, other than pursuant to the Asset Sale Documents, or as otherwise consented to in writing by Agent and the Required Lenders;

(w)    if any Borrower or Guarantor shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Interim Order and the Final Order;

(x)    the failure of the Closing Date to occur within three (3) Business Days after entry of the Interim Order without the prior written consent of the Agent;

10844575.1
10844575v.1

(y)    if the Final Order has not been entered within thirty (30) days after the date the Interim Order is entered without the prior written consent of the Agent;

(z)    if the Borrowers fail to achieve any Reorganization Milestones as and when required, except as otherwise consented to in writing by Agent;

(aa)    except in connection with the Asset Sale, any assumption or rejection of any executory contract without the prior written consent of the Agent;

(bb)    (i) the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the Interim Order, the Final Order, the Asset Sale Order or any other order of the Bankruptcy Court affecting this Agreement, any other Financing Document, the Asset Sale or the transactions contemplated hereby or thereby, in each case, in any manner not acceptable to Agent and the Required Lenders, or (ii) the termination of the Asset Purchase Agreement by Buyer;

(cc)    the order approving the procedures for the Asset Sale set forth in the Asset Sale Motion does not require that all bids bind the submitting bidder, if such bidder is the successful bidder, to (i) guarantee after the Asset Sale Effective Date all Obligations hereunder up to $5,000,000 (the "Buyer Guaranteed Obligations"), and (ii) secure all such Buyer Guaranteed Obligations be secured by a first priority security interest on Accounts generated by the Borrowers' facilities sold pursuant to the Asset Sale, each on terms and conditions acceptable to Agent;

(dd)    the Asset Sale Order does not require that after the Asset Sale Effective Date the Buyer (i) guarantee Buyer Guaranteed Obligations, and (ii) secure all such Buyer Guaranteed Obligations be secured by a first priority security interest on Accounts generated by the Borrowers' facilities sold pursuant to the Asset Sale, each on terms and conditions acceptable to Agent;

(ee)    if the Borrowers fail to pay in full in cash, on the Closing Date, the Prepetition Revolving Loan Obligations, or if the Confirmation Order shall fail to provide for the payment in full, in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations and Affiliated Obligations on or before the Reorganization Effective Date;

(ff)    the circulation or distribution by or on behalf of the Borrowers of any plan of reorganization and/or disclosure statement, or draft thereof (or term sheet or similar indicative statements of terms thereof) that does not provide for repayment in full in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations and Affiliated Obligations before or at the Reorganization Effective Date;

(gg)    if any Plan Documentation is executed, filed, delivered, or any confirmation order is entered which does not provide for repayment in full in cash of all Prepetition Obligations (to the extent not already paid in full in cash with the proceeds of the Obligations) and all Obligations and Affiliated Obligations before or at the Reorganization Effective Date;

10844575.1
10844575v.1

(hh)    if there is a stay or injunction of the Confirmation Order in effect precluding the consummation of the transactions contemplated thereby;

(ii)    if the Borrowers' (i) actual disbursements under any line item on the Budget for any four-week period (as tested weekly) exceed the budgeted disbursements for such four-week period in such line item by more than ten percent (10%) of the budgeted amount for such four-week period, (ii) aggregate actual disbursements under the Budget for any four-week period (as tested weekly) exceed the aggregate budgeted disbursements for such four-week period by more than five percent (5%) of the aggregate budgeted amount for such four-week period, or (iii) aggregate actual cash receipts during any four-week period (as tested weekly) are less than ninety percent (90%) of aggregate projected cash receipts set forth in the Budget for such four-week period; or

(jj)    if the Revolving Loan Availability on the Prepetition Revolving Loan Termination Date is less than that Prepetition Revolving Loan Obligations.

**Section 10.2**    Acceleration and Suspension or Termination of Revolving Loan Commitment.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Financing Order, upon the occurrence and during the continuance of an Event of Default, Agent may, and shall if requested by Required Lenders, (a) by notice to Borrower Representative suspend or terminate the Revolving Loan Commitment and the obligations of Agent and the Lenders with respect thereto, in whole or in part (and, if in part, each Lender's Revolving Loan Commitment shall be reduced in accordance with its Pro Rata Share), and/or (b) by notice to Borrower Representative declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same; provided, however, that in the case of any of the Events of Default specified in subsections (r), (s), (t), (u), (v), (w), (z), (bb), (cc), (dd), (ee), (ff) or (gg) of Section 10.1 without any notice to any Borrower or any other act by Agent or the Lenders, the Revolving Loan Commitment and the obligations of Agent and the Lenders with respect thereto shall thereupon immediately and automatically terminate and all of the Obligations shall become immediately and automatically due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and Borrowers will pay the same.

**Section 10.3**    Additional Remedies.

(a)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Financing Orders, upon the occurrence of and during the continuance of an Event of Default under this Agreement or the other Financing Documents, Agent, in addition to all other rights, options, and remedies granted to Agent under this Agreement or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC in effect in the applicable jurisdiction(s) and under any other applicable Law; including, without limitation:

80

(i)    the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;

(ii)    the right to (by its own means or with judicial assistance) enter any of Borrowers' premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrowers' original books and records, to obtain access to Borrowers' data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrowers shall not resist or interfere with such action (if Borrowers' books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrowers hereby irrevocably authorize such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);

(iii)    the right to require Borrowers at Borrowers' expense to assemble all or any part of the Collateral and make it available to Agent at any place designated by Lender;

(iv)    the right to notify postal authorities to change the address for delivery of Borrowers' mail to an address designated by Agent and to receive, open and dispose of all mail addressed to any Borrower; and/or

(v)    the right to enforce Borrowers' rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for Lenders) and to charge the collection costs and expenses, including attorneys' fees, to Borrowers, and (ii) the right, in the name of Agent or any designee of Agent or Borrowers, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, telegraph or otherwise, including, without limitation, verification of Borrowers' compliance with applicable Laws. Borrowers shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process. Such verification may include contacts between Agent and applicable federal, state and local regulatory authorities having jurisdiction over the Borrowers' affairs, all of which contacts Borrowers hereby irrevocably authorize.

(b)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Financing Orders, each Borrower agrees that a notice received by it at least ten (10) days before the time of any intended public sale, or the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any perishable Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Agent without prior notice to Borrowers. At any sale or disposition of Collateral, Agent may (to the extent permitted by applicable law) purchase all or any part of the Collateral, free from any right of redemption by Borrowers, which right is hereby waived and

81

released. Each Borrower covenants and agrees not to interfere with or impose any obstacle to
Agent's exercise of its rights and remedies with respect to the Collateral. Agent shall have no
obligation to clean-up or otherwise prepare the Collateral for sale. Agent may comply with any
applicable state or federal law requirements in connection with a disposition of the Collateral and
compliance will not be considered to adversely affect the commercial reasonableness of any sale
of the Collateral. Agent may sell the Collateral without giving any warranties as to the
Collateral. Agent may specifically disclaim any warranties of title or the like. This procedure
will not be considered to adversely affect the commercial reasonableness of any sale of the
Collateral. If Agent sells any of the Collateral upon credit, Borrowers will be credited only with
payments actually made by the purchaser, received by Agent and applied to the indebtedness of
the purchaser. In the event the purchaser fails to pay for the Collateral, Agent may resell the
Collateral and Borrowers shall be credited with the proceeds of the sale. Borrowers shall remain
liable for any deficiency if the proceeds of any sale or disposition of the Collateral are
insufficient to pay all Obligations.

(c)    Without restricting the generality of the foregoing and for the purposes
aforesaid, each Borrower hereby appoints and constitutes Agent its lawful attorney-in-fact with
full power of substitution in the Collateral, upon the occurrence and during the continuance of an
Event of Default, to (i) use unadvanced funds remaining under this Agreement or which may be
reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in
excess of the face amount of the Notes, (ii) pay, settle or compromise all existing bills and
claims, which may be Liens or security interests, or to avoid such bills and claims becoming
Liens against the Collateral, (iii) execute all applications and certificates in the name of such
Borrower and to prosecute and defend all actions or proceedings in connection with the
Collateral, and (iv) do any and every act which such Borrower might do in its own behalf; it
being understood and agreed that this power of attorney in this subsection (c) shall be a power
coupled with an interest and cannot be revoked.

(d)    Agent and each Lender is hereby granted a non-exclusive, royalty-free
license or other right to use, without charge, Borrowers' labels, mask works, rights of use of any
name, any other Intellectual Property and advertising matter, and any similar property as it
pertains to the Collateral, in completing production of, advertising for sale, and selling any
Collateral and, in connection with Agent's exercise of its rights under this Article, Borrowers'
rights under all licenses (whether as licensor or licensee) and all franchise agreements inure to
Agent's and each Lender's benefit.

**Section 10.4**    Terminated Use of Cash Collateral. Without limitation of any of the
remedies set forth in this Agreement and the other Financing Documents, upon the occurrence
and during the continuance of any Event of Default, or upon the occurrence of the Termination
Date, no Borrower or Guarantor shall have any right to use or seek to use any cash collateral (as
defined in Section 363(a) of the Bankruptcy Code) in which Agent, the Lenders, Prepetition
Agent, or the Prepetition Lenders has an interest.

**Section 10.5**    Default Rate of Interest. Notwithstanding the provisions of Section 362 of
the Bankruptcy Code and subject to the terms of the Financing Orders, at the election of Agent or
Required Lenders, after the occurrence of an Event of Default and for so long as it continues, the

Loans and other Obligations shall bear interest at rates that are three percent (3.0%) per annum in excess of the rates otherwise payable under this Agreement.

**Section 10.6**    Setoff Rights.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the terms of the Financing Orders, during the continuance of any Event of Default, each Lender is hereby authorized to set off and to appropriate and to apply any and all (a) balances held by such Lender or any of such Lender's Affiliates at any of its offices for the account of such Borrower or any of its Subsidiaries (regardless of whether such balances are then due to such Borrower or its Subsidiaries), and (b) other property at any time held or owing by such Lender to or for the credit or for the account of such Borrower or any of its Subsidiaries, against and on account of any of the Obligations; except that no Lender shall exercise any such right without the prior written consent of Agent.    Any Lender exercising a right to set off shall purchase for cash (and the other Lenders shall sell) interests in each of such other Lender's Pro Rata Share of the Obligations as would be necessary to cause all Lenders to share the amount so set off with each other Lender in accordance with their respective Pro Rata Share of the Obligations.    Each Borrower agrees, to the fullest extent permitted by law, that any Lender and any of such Lender's Affiliates may exercise its right to set off with respect to the Obligations as provided in this Section 10.6.

**Section 10.7**    Application of Proceeds.

(a)    Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, each Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by Agent from or on behalf of such Borrower or any Guarantor of all or any part of the Obligations, and, as between Borrowers on the one hand and Agent and Lenders on the other, Agent shall have the continuing and exclusive right to apply and to reapply any and all payments received against the Obligations and Prepetition Obligations in such manner as Agent may deem advisable notwithstanding any previous application by Agent.

(b)    Following the occurrence and continuance of an Event of Default, but absent the occurrence and continuance of an Acceleration Event, Agent shall apply any and all payments received by Agent in respect of the Obligations and Prepetition Obligations, and any and all proceeds of Collateral received by Agent, in such order as Agent may from time to time elect.

(c)    Notwithstanding anything to the contrary contained in this Agreement, if an Acceleration Event shall have occurred, and so long as it continues, Agent shall apply any and all payments received by Agent in respect of the Obligations, and any and all proceeds of Collateral received by Agent, in the following order: *first*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to Agent with respect to this Agreement, the other Financing Documents or the Collateral; *second*, to all fees, costs, indemnities, liabilities, obligations and expenses incurred by or owing to any lender with respect to this Agreement, the other Financing Documents or the Collateral; *third*, to accrued and unpaid interest on the Prepetition Obligations (including any interest which, but for the provisions of the Bankruptcy Code, would have accrued on such amounts); *fourth*, to accrued and unpaid interest on the Obligations; *fifth*, to any other indebtedness or obligations of Borrowers owing to Agent

83

or any Lender under the Financing Documents; _sixth_, to any and all of the other Affiliated Obligations in the order and manner determined by Agent. Any balance remaining shall be delivered to Borrowers or to whoever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct. In carrying out the foregoing, (y) amounts received shall be applied in the numerical order provided until exhausted prior to the application to the next succeeding category, and (z) each of the Persons entitled to receive a payment in any particular category shall receive an amount equal to its Pro Rata Share of amounts available to be applied pursuant thereto for such category.

**Section 10.8**   Waivers.

(a)   Except as otherwise provided for in this Agreement and to the fullest extent permitted by applicable law, each Borrower waives: (i) presentment, demand and protest, and notice of presentment, dishonor, intent to accelerate, acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all Financing Documents, the Notes or any other notes, commercial paper, accounts, contracts, documents, Instruments, Chattel Paper and Guarantees at any time held by Lenders on which any Borrower may in any way be liable; (ii) all rights to notice and a hearing prior to Agent's or any Lender's taking possession or control of, or to Agent's or any Lender's replevy, attachment or levy upon, any Collateral or any bond or security which might be required by any court prior to allowing Agent or any Lender to exercise any of its remedies; and (iii) the benefit of all valuation, appraisal and exemption Laws. Each Borrower acknowledges that it has been advised by counsel of its choices and decisions with respect to this Agreement, the other Financing Documents and the transactions evidenced hereby and thereby.

(b)   Each Borrower for itself and all its successors and assigns, (i) agrees that its liability shall not be in any manner affected by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Lender; (ii) consents to any indulgences and all extensions of time, renewals, waivers, or modifications that may be granted by Agent or any Lender with respect to the payment or other provisions of the Financing Documents, and to any substitution, exchange or release of the Collateral, or any part thereof, with or without substitution, and agrees to the addition or release of any Borrower, endorsers, guarantors, or sureties, or whether primarily or secondarily liable, without notice to any other Borrower and without affecting its liability hereunder; (iii) agrees that its liability shall be unconditional and without regard to the liability of any other Borrower, Agent or any Lender for any tax on the indebtedness; and (iv) to the fullest extent permitted by law, expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.

(c)   To the extent that Agent or any Lender may have acquiesced in any noncompliance with any requirements or conditions precedent to the closing of the Loans or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Agent or any Lender of such requirements with respect to any future disbursements of Loan proceeds and Agent may at any time after such acquiescence require Borrowers to comply with all such requirements. Any forbearance by Agent or Lender in exercising any right or remedy under any of the Financing Documents, or otherwise afforded by applicable law, including any failure to accelerate the maturity date of the Loans, shall not be a

waiver of or preclude the exercise of any right or remedy nor shall it serve as a novation of the Notes or as a reinstatement of the Loans or a waiver of such right of acceleration or the right to insist upon strict compliance of the terms of the Financing Documents. Agent's or any Lender's acceptance of payment of any sum secured by any of the Financing Documents after the due date of such payment shall not be a waiver of Agent's and such Lender's right to either require prompt payment when due of all other sums so secured or to declare a default for failure to make prompt payment. The procurement of insurance or the payment of taxes or other Liens or charges by Agent as the result of an Event of Default shall not be a waiver of Agent's right to accelerate the maturity of the Loans, nor shall Agent's receipt of any condemnation awards, insurance proceeds, or damages under this Agreement operate to cure or waive any Credit Party's default in payment of sums secured by any of the Financing Documents.

(d)      Without limiting the generality of anything contained in this Agreement or the other Financing Documents, each Borrower agrees that if an Event of Default is continuing (i) Agent and Lenders shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Agent or Lenders shall remain in full force and effect until Agent or Lenders have exhausted all remedies against the Collateral and any other properties owned by Borrowers and the Financing Documents and other security instruments or agreements securing the Loans have been foreclosed, sold and/or otherwise realized upon in satisfaction of Borrowers' obligations under the Financing Documents.

(e)      Nothing contained herein or in any other Financing Document shall be construed as requiring Agent or any Lender to resort to any part of the Collateral for the satisfaction of any of Borrowers' obligations under the Financing Documents in preference or priority to any other Collateral, and Agent may seek satisfaction out of all of the Collateral or any part thereof, in its absolute discretion in respect of Borrowers' obligations under the Financing Documents. In addition, Agent shall have the right from time to time to partially foreclose upon any Collateral in any manner and for any amounts secured by the Financing Documents then due and payable as determined by Agent in its sole discretion, including, without limitation, the following circumstances: (i) in the event any Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Agent may foreclose upon all or any part of the Collateral to recover such delinquent payments, or (ii) in the event Agent elects to accelerate less than the entire outstanding principal balance of the Loans, Agent may foreclose all or any part of the Collateral to recover so much of the principal balance of the Loans as Lender may accelerate and such other sums secured by one or more of the Financing Documents as Agent may elect. Notwithstanding one or more partial foreclosures, any unforeclosed Collateral shall remain subject to the Financing Documents to secure payment of sums secured by the Financing Documents and not previously recovered.

(f)      To the fullest extent permitted by law, each Borrower, for itself and its successors and assigns, waives in the event of foreclosure of any or all of the Collateral any equitable right otherwise available to any Credit Party which would require the separate sale of any of the Collateral or require Agent or Lenders to exhaust their remedies against any part of the Collateral before proceeding against any other part of the Collateral; and further in the event

85

of such foreclosure each Borrower does hereby expressly consent to and authorize, at the option of Agent, the foreclosure and sale either separately or together of each part of the Collateral.

**Section 10.9**   Injunctive Relief. The parties acknowledge and agree that, in the event of a breach or threatened breach of any Credit Party's obligations under any Financing Documents, Agent and Lenders may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including, without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including, without limitation, maintaining any cash management and collection procedure described herein. However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement. Each Credit Party waives, to the fullest extent permitted by law, the requirement of the posting of any bond in connection with such injunctive relief. By joining in the Financing Documents as a Credit Party, each Credit Party specifically joins in this Section as if this Section were a part of each Financing Document executed by such Credit Party.

**Section 10.10**   Marshalling; Payments Set Aside. Neither Agent nor any Lender shall be under any obligation to marshal any assets in payment of any or all of the Obligations. To the extent that Borrower makes any payment or Agent enforces its Liens or Agent or any Lender exercises its right of set-off, and such payment or the proceeds of such enforcement or set-off is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone, then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefore, shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or set-off had not occurred.

## ARTICLE 11 - AGENT

**Section 11.1**   Appointment and Authorization.   Each Lender hereby irrevocably appoints and authorizes Agent to enter into each of the Financing Documents to which it is a party (other than this Agreement) on its behalf and to take such actions as Agent on its behalf and to exercise such powers under the Financing Documents as are delegated to Agent by the terms thereof, together with all such powers as are reasonably incidental thereto. Subject to the terms of Section 11.16 and to the terms of the other Financing Documents, Agent is authorized and empowered to amend, modify, or waive any provisions of this Agreement or the other Financing Documents on behalf of Lenders. The provisions of this Article 11 are solely for the benefit of Agent and Lenders and neither any Borrower nor any other Credit Party shall have any rights as a third party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Credit Party. Agent may perform any of its duties hereunder, or under the Financing Documents, by or through its agents or employees.

**Section 11.2**   Agent and Affiliates. Agent shall have the same rights and powers under the Financing Documents as any other Lender and may exercise or refrain from exercising the same as though it were not Agent, and Agent and its Affiliates may lend money to, invest in and

generally engage in any kind of business with each Credit Party or Affiliate of any Credit Party as if it were not Agent hereunder.

**Section 11.3**    <u>Action by Agent</u>.    The duties of Agent shall be mechanical and administrative in nature.    Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Lender.    Nothing in this Agreement or any of the Financing Documents is intended to or shall be construed to impose upon Agent any obligations in respect of this Agreement or any of the Financing Documents except as expressly set forth herein or therein.

**Section 11.4**    <u>Consultation with Experts</u>.    Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

**Section 11.5**    <u>Liability of Agent</u>.    Neither Agent nor any of its directors, officers, agents or employees shall be liable to any Lender for any action taken or not taken by it in connection with the Financing Documents, except that Agent shall be liable with respect to its specific duties set forth hereunder but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.    Neither Agent nor any of its directors, officers, agents or employees shall be responsible for or have any duty to ascertain, inquire into or verify (a) any statement, warranty or representation made in connection with any Financing Document or any borrowing hereunder; (b) the performance or observance of any of the covenants or agreements specified in any Financing Document; (c) the satisfaction of any condition specified in any Financing Document; (d) the validity, effectiveness, sufficiency or genuineness of any Financing Document, any Lien purported to be created or perfected thereby or any other instrument or writing furnished in connection therewith; (e) the existence or non-existence of any Default or Event of Default; or (f) the financial condition of any Credit Party.    Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, facsimile or electronic transmission or writing) believed by it to be genuine or to be signed by the proper party or parties.    Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

**Section 11.6**    <u>Indemnification</u>.    Each Lender shall, in accordance with its Pro Rata Share, indemnify Agent (to the extent not reimbursed by Borrowers) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by Agent hereunder or thereunder.    If any indemnity furnished to Agent for any purpose shall, in the opinion of Agent, be insufficient or become impaired, Agent may call for additional indemnity

87

and cease, or not commence, to do the acts indemnified against even if so directed by Required Lenders until such additional indemnity is furnished.

**Section 11.7**    Right to Request and Act on Instructions.    Agent may at any time request instructions from Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the Financing Documents Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any Person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required Lenders or all or such other portion of the Lenders as shall be prescribed by this Agreement. Without limiting the foregoing, no Lender shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting under this Agreement or any of the other Financing Documents in accordance with the instructions of Required Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) and, notwithstanding the instructions of Required Lenders (or such other applicable portion of the Lenders), Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable Law or exposes Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 11.6.

**Section 11.8**    Credit Decision.    Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Financing Documents.

**Section 11.9**    Collateral Matters.    Lenders irrevocably authorize Agent, at its option and in its discretion, to (a) release any Lien granted to or held by Agent under any Security Document (i) upon termination of the Loan Commitment and payment in full of all Obligations; or (ii) constituting property sold or disposed of as part of or in connection with any disposition permitted under any Financing Document (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the sale or other disposition of property being made in full compliance with the provisions of the Financing Documents); and (b) release or subordinate any Lien granted to or held by Agent under any Security Document constituting personal property described in Section 5.6 (it being understood and agreed that Agent may conclusively rely without further inquiry on a certificate of a Responsible Officer as to the identification of any personal property described in Section 5.6). Upon request by Agent at any time, Lenders will confirm Agent's authority to release and/or subordinate particular types or items of Collateral pursuant to this Section 11.9.

**Section 11.10**    Agency for Perfection.    Agent and each Lender hereby appoint each other Lender as agent for the purpose of perfecting Agent's security interest in assets which, in accordance with the Uniform Commercial Code in any applicable jurisdiction, can be perfected by possession or control. Should any Lender (other than Agent) obtain possession or control of any such assets, such Lender shall notify Agent thereof, and, promptly upon Agent's request

88

therefor, shall deliver such assets to Agent or in accordance with Agent's instructions or transfer
control to Agent in accordance with Agent's instructions. Each Lender agrees that it will not
have any right individually to enforce or seek to enforce any Security Document or to realize
upon any Collateral for the Loan unless instructed to do so by Agent (or consented to by Agent,
as provided in Section 11.5), it being understood and agreed that such rights and remedies may
be exercised only by Agent.

Section 11.11    Notice of Default. Agent shall not be deemed to have knowledge or notice
of the occurrence of any Default or Event of Default except with respect to defaults in the
payment of principal, interest and fees required to be paid to Agent for the account of Lenders,
unless Agent shall have received written notice from a Lender or a Borrower referring to this
Agreement, describing such Default or Event of Default and stating that such notice is a "notice
of default". Agent will notify each Lender of its receipt of any such notice. Agent shall take
such action with respect to such Default or Event of Default as may be requested by Required
Lenders (or all or such other portion of the Lenders as shall be prescribed by this Agreement) in
accordance with the terms hereof. Unless and until Agent has received any such request, Agent
may (but shall not be obligated to) take such action, or refrain from taking such action, with
respect to such Default or Event of Default as it shall deem advisable or in the best interests of
Lenders.

Section 11.12    Assignment by Agent; Resignation of Agent; Successor Agent.

(a)    Agent may at any time assign its rights, powers, privileges and duties
hereunder to (i) another Lender, or (ii) any Person to whom Agent, in its capacity as a Lender,
has assigned (or will assign, in conjunction with such assignment of agency rights hereunder)
50% or more of its Loan, in each case without the consent of the Lenders or Borrowers.
Following any such assignment, Agent shall give notice to the Lenders and Borrowers. An
assignment by Agent pursuant to this subsection (a) shall not be deemed a resignation by Agent
for purposes of subsection (b) below.

(b)    Without limiting the rights of Agent to designate an assignee pursuant to
subsection (a) above, Agent may at any time give notice of its resignation to the Lenders and
Borrowers. Upon receipt of any such notice of resignation, Required Lenders shall have the
right to appoint a successor Agent. If no successor shall have been so appointed by
Required Lenders and shall have accepted such appointment within ten (10) Business Days after
the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the
Lenders, appoint a successor Agent; provided, however, that if Agent shall notify Borrowers and
the Lenders that no Person has accepted such appointment, then such resignation shall
nonetheless become effective in accordance with such notice from Agent that no Person has
accepted such appointment and, from and following delivery of such notice, (i) the retiring Agent
shall be discharged from its duties and obligations hereunder and under the other Financing
Documents, and (ii) all payments, communications and determinations provided to be made by,
to or through Agent shall instead be made by or to each Lender directly, until such time as
Required Lenders appoint a successor Agent as provided for above in this paragraph.

(c)    Upon (i) an assignment permitted by subsection (a) above, or (ii) the
acceptance of a successor's appointment as Agent pursuant to subsection (b) above, such

successor shall succeed to and become vested with all of the rights, powers, privileges and duties
of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties
and obligations hereunder and under the other Financing Documents (if not already discharged
therefrom as provided above in this paragraph).  The fees payable by Borrowers to a successor
Agent shall be the same as those payable to its predecessor unless otherwise agreed between
Borrowers and such successor.  After the retiring Agent's resignation hereunder and under the
other Financing Documents, the provisions of this Article and Section 11.12 shall continue in
effect for the benefit of such retiring Agent and its sub-agents in respect of any actions taken or
omitted to be taken by any of them while the retiring Agent was acting or was continuing to act
as Agent.

> Section 11.13    Payment and Sharing of Payment.

> > (a)    Revolving Loan Advances, Payments and Settlements; Interest and Fee
Payments.

> > > (i)    Agent shall have the right, on behalf of Revolving Lenders to
disburse funds to Borrowers for all Revolving Loans requested or deemed requested by
Borrowers pursuant to the terms of this Agreement.  Agent shall be conclusively entitled
to assume, for purposes of the preceding sentence, that each Revolving Lender, other than
any Non-Funding Revolving Lenders, will fund its Pro Rata Share of all Revolving Loans
requested by Borrowers.  Each Revolving Lender shall reimburse Agent on demand, in
accordance with the provisions of the immediately following paragraph, for all funds
disbursed on its behalf by Agent pursuant to the first sentence of this clause (i), or if
Agent so requests, each Revolving Lender will remit to Agent its Pro Rata Share of any
Revolving Loan before Agent disburses the same to a Borrower.  If Agent elects to
require that each Revolving Lender make funds available to Agent, prior to a
disbursement by Agent to a Borrower, Agent shall advise each Revolving Lender by
telephone, facsimile or e-mail of the amount of such Revolving Lender's Pro Rata Share
of the Revolving Loan requested by such Borrower no later than noon (Eastern time) on
the date of funding of such Revolving Loan, and each such Revolving Lender shall pay
Agent on such date such Revolving Lender's Pro Rata Share of such requested Revolving
Loan, in same day funds, by wire transfer to the Payment Account, or such other account
as may be identified by Agent to Revolving Lenders from time to time.  If any Lender
fails to pay the amount of its Pro Rata Share of any funds advanced by Agent pursuant to
the first sentence of this clause (i) within one (1) Business Day after Agent's demand,
Agent shall promptly notify Borrower Representative, and Borrowers shall immediately
repay such amount to Agent.  Any repayment required by Borrowers pursuant to this
Section 11.13 shall be accompanied by accrued interest thereon from and including the
date such amount is made available to a Borrower to but excluding the date of payment at
the rate of interest then applicable to Revolving Loans.  Nothing in this Section 11.13 or
elsewhere in this Agreement or the other Financing Documents shall be deemed to
require Agent to advance funds on behalf of any Lender or to relieve any Lender from its
obligation to fulfill its commitments hereunder or to prejudice any rights that Agent or
any Borrower may have against any Lender as a result of any default by such Lender
hereunder.

(ii)    On a Business Day of each week as selected from time to time by Agent, or more frequently (including daily), if Agent so elects (each such day being a *"Settlement Date"*), Agent will advise each Revolving Lender by telephone, facsimile or e-mail of the amount of each such Revolving Lender's percentage interest of the Revolving Loan balance as of the close of business of the Business Day immediately preceding the Settlement Date. In the event that payments are necessary to adjust the amount of such Revolving Lender's actual percentage interest of the Revolving Loans to such Lender's required percentage interest of the Revolving Loan balance as of any Settlement Date, the Revolving Lender from which such payment is due shall pay Agent, without setoff or discount, to the Payment Account not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date the full amount necessary to make such adjustment. Any obligation arising pursuant to the immediately preceding sentence shall be absolute and unconditional and shall not be affected by any circumstance whatsoever. In the event settlement shall not have occurred by the date and time specified in the second preceding sentence, interest shall accrue on the unsettled amount at the rate of interest then applicable to Revolving Loans.

(iii)    On each Settlement Date, Agent shall advise each Revolving Lender by telephone, facsimile or e-mail of the amount of such Revolving Lender's percentage interest of principal, interest and fees paid for the benefit of Revolving Lenders with respect to each applicable Revolving Loan, to the extent of such Revolving Lender's Revolving Loan Exposure with respect thereto, and shall make payment to such Revolving Lender not later than 1:00 p.m. (Eastern time) on the Business Day following the Settlement Date of such amounts in accordance with wire instructions delivered by such Revolving Lender to Agent, as the same may be modified from time to time by written notice to Agent; provided, however, that, in the case such Revolving Lender is a Defaulted Lender, Agent shall be entitled to set off the funding short-fall against that Defaulted Lender's respective share of all payments received from any Borrower.

(iv)    On the Closing Date, Agent, on behalf of Lenders, may elect to advance to Borrowers the full amount of the initial Loans to be made on the Closing Date prior to receiving funds from Lenders, in reliance upon each Lender's commitment to make its Pro Rata Share of such Loans to Borrowers in a timely manner on such date. If Agent elects to advance the initial Loans to Borrower in such manner, Agent shall be entitled to receive all interest that accrues on the Closing Date on each Lender's Pro Rata Share of such Loans unless Agent receives such Lender's Pro Rata Share of such Loans by 3:00 p.m. (Eastern time) on the Closing Date.

(v)    It is understood that for purposes of advances to Borrowers made pursuant to this Section 11.13, Agent will be using the funds of Agent, and pending settlement, (A) all funds transferred from the Payment Account to the outstanding Revolving Loans shall be applied first to advances made by Agent to Borrowers pursuant to this Section 11.13, and (B) all interest accruing on such advances shall be payable to Agent.

(vi)    The provisions of this Section 11.13(a) shall be deemed to be binding upon Agent and Lenders notwithstanding the occurrence of any Default or Event

of Default, or any insolvency or bankruptcy proceeding pertaining to any Borrower or any other Credit Party.

(b)     [Reserved]

(c)     Return of Payments.

(i)     If Agent pays an amount to a Lender under this Agreement in the belief or expectation that a related payment has been or will be received by Agent from a Borrower and such related payment is not received by Agent, then Agent will be entitled to recover such amount from such Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)     If Agent determines at any time that any amount received by Agent under this Agreement must be returned to any Borrower or paid to any other Person pursuant to any insolvency law or otherwise, then, notwithstanding any other term or condition of this Agreement or any other Financing Document, Agent will not be required to distribute any portion thereof to any Lender. In addition, each Lender will repay to Agent on demand any portion of such amount that Agent has distributed to such Lender, together with interest at such rate, if any, as Agent is required to pay to any Borrower or such other Person, without setoff, counterclaim or deduction of any kind.

(d)     Defaulted Lenders.  The failure of any Defaulted Lender to make any payment required by it hereunder shall not relieve any other Lender of its obligations to make payment, but neither any other Lender nor Agent shall be responsible for the failure of any Defaulted Lender to make any payment required hereunder.  Notwithstanding anything set forth herein to the contrary, a Defaulted Lender shall not have any voting or consent rights under or with respect to any Financing Document or constitute a "*Lender*" (or be included in the calculation of "*Required Lenders*" hereunder) for any voting or consent rights under or with respect to any Financing Document.

(e)     Sharing of Payments.  If any Lender shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Section 2.8(d)) in excess of its Pro Rata Share of payments entitled pursuant to the other provisions of this Section 11.13, such Lender shall purchase from the other Lenders such participations in extensions of credit made by such other Lenders (without recourse, representation or warranty) as shall be necessary to cause such purchasing Lender to share the excess payment or other recovery ratably with each of them; provided, however, that if all or any portion of the excess payment or other recovery is thereafter required to be returned or otherwise recovered from such purchasing Lender, such portion of such purchase shall be rescinded and each Lender which has sold a participation to the purchasing Lender shall repay to the purchasing Lender the purchase price to the ratable extent of such return or recovery, without interest.  Each Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this clause (e) may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 10.6) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers

92

in the amount of such participation). If under any applicable bankruptcy, insolvency or other similar law, any Lender receives a secured claim in lieu of a setoff to which this clause (e) applies, such Lender shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Lenders entitled under this clause (e) to share in the benefits of any recovery on such secured claim.

**Section 11.14** <u>Right to Perform, Preserve and Protect</u>. If any Credit Party fails to perform any obligation hereunder or under any other Financing Document, Agent itself may, but shall not be obligated to, cause such obligation to be performed at Borrowers' expense. Agent is further authorized by Borrowers and the Lenders to make expenditures from time to time which Agent, in its reasonable business judgment, deems necessary or desirable to (a) preserve or protect the business conducted by Borrowers, the Collateral, or any portion thereof, and/or (b) enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Obligations. Each Borrower hereby agrees to reimburse Agent on demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this <u>Section 11.14</u>. Each Lender hereby agrees to indemnify Agent upon demand for any and all costs, liabilities and obligations incurred by Agent pursuant to this <u>Section 11.14</u>, in accordance with the provisions of <u>Section 11.6</u>.

**Section 11.15** <u>Additional Titled Agents</u>. Except for rights and powers, if any, expressly reserved under this Agreement to any bookrunner, arranger or to any titled agent named on the cover page of this Agreement, other than Agent (collectively, the "**_Additional Titled Agents_**"), and except for obligations, liabilities, duties and responsibilities, if any, expressly assumed under this Agreement by any Additional Titled Agent, no Additional Titled Agent, in such capacity, has any rights, powers, liabilities, duties or responsibilities hereunder or under any of the other Financing Documents. Without limiting the foregoing, no Additional Titled Agent shall have nor be deemed to have a fiduciary relationship with any Lender. At any time that any Lender serving as an Additional Titled Agent shall have transferred to any other Person (other than any Affiliates) all of its interests in the Loan, such Lender shall be deemed to have concurrently resigned as such Additional Titled Agent.

**Section 11.16** <u>Amendments and Waivers</u>.

(a)    No provision of this Agreement or any other Financing Document may be materially amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by Borrowers, the Required Lenders and any other Lender to the extent required under <u>Section 11.16(b)</u>; provided, however, that Agent shall be entitled, in its sole and absolute discretion, to waive any financial covenant of any Credit Party (for no more than two consecutive quarters).

(b)    In addition to the required signatures under <u>Section 11.16(a)</u>, no provision of this Agreement or any other Financing Document may be amended, waived or otherwise modified unless such amendment, waiver or other modification is in writing and is signed or otherwise approved by the following Persons:

(i)    if any amendment, waiver or other modification would increase a Lender's funding obligations in respect of any Loan, by such Lender; and/or

(ii)    if the rights or duties of Agent are affected thereby, by Agent;

provided, however, that, in each of (i) and (ii) above, no such amendment, waiver or other modification shall, unless signed or otherwise approved in writing by all the Lenders directly affected thereby, (A) reduce the principal of, rate of interest on or any fees with respect to any Loan or forgive any principal, interest (other than default interest) or fees (other than late charges) with respect to any Loan; (B) postpone the date fixed for, or waive, any payment (other than any mandatory prepayment pursuant to Section 2.1(b)(iii)) of principal of any Loan, or of interest on any Loan (other than default interest) or any fees provided for hereunder (other than late charges) or postpone the date of termination of any commitment of any Lender hereunder; (C) change the definition of the term Required Lenders or the percentage of Lenders which shall be required for Lenders to take any action hereunder; (D) release all or substantially all of the Collateral, authorize any Borrower to sell or otherwise dispose of all or substantially all of the Collateral or release any Guarantor of all or any portion of the Obligations or its Guarantee obligations with respect thereto, except, in each case with respect to this clause (D), as otherwise may be provided in this Agreement or the other Financing Documents (including in connection with any disposition permitted hereunder); (E) amend, waive or otherwise modify this Section 11.16(b) or the definitions of the terms used in this Section 11.16(b) insofar as the definitions affect the substance of this Section 11.16(b); (F) consent to the assignment, delegation or other transfer by any Credit Party of any of its rights and obligations under any Financing Document or release any Borrower of its payment obligations under any Financing Document, except, in each case with respect to this clause (F), pursuant to a merger or consolidation permitted pursuant to this Agreement; or (G) amend any of the provisions of Section 10.7 or amend any of the definitions Pro Rata Share, Revolving Loan Commitment, Revolving Loan Commitment Amount, Revolving Loan Commitment Percentage, or that provide for the Lenders to receive their Pro Rata Shares of any fees, payments, setoffs or proceeds of Collateral hereunder. It is hereby understood and agreed that all Lenders shall be deemed directly affected by an amendment, waiver or other modification of the type described in the preceding clauses (C), (D), (E), (F) and (G) of the preceding sentence.

**Section 11.17**    Assignments and Participations.

(a)    Assignments.

(i)    Any Lender may at any time assign to one or more Eligible Assignees all or any portion of such Lender's Loan together with all related obligations of such Lender hereunder. Except as Agent may otherwise agree, the amount of any such assignment (determined as of the date of the applicable Assignment Agreement or, if a "Trade Date" is specified in such Assignment Agreement, as of such Trade Date) shall be in a minimum aggregate amount equal to $1,000,000 or, if less, the assignor's entire interests in the outstanding Loan; provided, however, that, in connection with simultaneous assignments to two or more related Approved Funds, such Approved Funds shall be treated as one assignee for purposes of determining compliance with the minimum assignment size referred to above. Borrowers and Agent shall be entitled to continue to deal solely and directly with such Lender in connection with the interests so assigned to an Eligible Assignee until Agent shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the

94

applicable parties thereto and a processing fee of $3,500 to be paid by the assigning Lender; provided, however, that only one processing fee shall be payable in connection with simultaneous assignments to two or more related Approved Funds.

(ii)     From and after the date on which the conditions described above have been met, (A) such Eligible Assignee shall be deemed automatically to have become a party hereto and, to the extent of the interests assigned to such Eligible Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder, and (B) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights and obligations hereunder (other than those that survive termination pursuant to Section 12.1). Upon the request of the Eligible Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, each Borrower shall execute and deliver to Agent for delivery to the Eligible Assignee (and, as applicable, the assigning Lender) Notes in the aggregate principal amount of the Eligible Assignee's Loan (and, as applicable, Notes in the principal amount of that portion of the principal amount of the Loan retained by the assigning Lender). Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrower Representative any prior Note held by it.

(iii)     Agent, acting solely for this purpose as an agent of Borrower, shall maintain at its offices located in Bethesda, Maryland a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of each Lender, and the commitments of, and principal amount of the Loan owing to, such Lender pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded therein pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. Such register shall be available for inspection by Borrower and any Lender, at any reasonable time upon reasonable prior notice to Agent.

(iv)     Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, however, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(v)     Notwithstanding the foregoing provisions of this Section 11.17(a) or any other provision of this Agreement, Agent has the right, but not the obligation, to effectuate assignments of Loan via an electronic settlement system acceptable to Agent as designated in writing from time to time to the Lenders by Agent (the "*Settlement Service*"). At any time when the Agent elects, in its sole discretion, to implement such Settlement Service, each such assignment shall be effected by the assigning Lender and proposed assignee pursuant to the procedures then in effect under the Settlement Service, which procedures shall be consistent with the other provisions of this Section 11.17(a). Each assigning Lender and proposed Eligible Assignee shall comply with the

95

requirements of the Settlement Service in connection with effecting any assignment of Loan pursuant to the Settlement Service. With the prior written approval of Agent, Agent's approval of such Eligible Assignee shall be deemed to have been automatically granted with respect to any transfer effected through the Settlement Service. Assignments and assumptions of the Loan shall be effected by the provisions otherwise set forth herein until Agent notifies Lenders of the Settlement Service as set forth herein.

(b)    Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or Agent, sell to one or more Persons participating interests in its Loan, commitments or other interests hereunder (any such Person, a "*Participant*"). In the event of a sale by a Lender of a participating interest to a Participant, (i) such Lender's obligations hereunder shall remain unchanged for all purposes, (ii) Borrowers and Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder, and (iii) all amounts payable by each Borrower shall be determined as if such Lender had not sold such participation and shall be paid directly to such Lender. Each Borrower agrees that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; provided, however, that such right of set-off shall be subject to the obligation of each Participant to share with Lenders, and Lenders agree to share with each Participant, as provided in Section 10.6.

(c)    Replacement of Lenders. Within thirty (30) days after: (i) receipt by Agent of notice and demand from any Lender for payment of additional costs as provided in Section 2.8(d), which demand shall not have been revoked, (ii) any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.8(a), (iii) any Lender is a Defaulted Lender, and the circumstances causing such status shall not have been cured or waived; or (iv) any failure by any Lender to consent to a requested amendment, waiver or modification to any Financing Document in which Required Lenders have already consented to such amendment, waiver or modification but the consent of each Lender, or each Lender affected thereby, is required with respect thereto (each relevant Lender in the foregoing clauses (i) through (iv) being an "*Affected Lender*") each of Borrower Representative and Agent may, at its option, notify such Affected Lender and, in the case of Borrowers' election, the Agent, of such Borrower Representative's intention to obtain, at Borrowers' expense, a replacement Lender ("*Replacement Lender*") for such Lender, which Replacement Lender shall be an Eligible Assignee and, in the event the Replacement Lender is to replace an Affected Lender described in the preceding clause (iv), such Replacement Lender consents to the requested amendment, waiver or modification making the replaced Lender an Affected Lender. In the event Borrowers or Agent, as applicable, obtains a Replacement Lender within ninety (90) days following notice of its intention to do so, the Affected Lender shall sell, at par, and assign all of its Loan and funding commitments hereunder to such Replacement Lender in accordance with the procedures set forth in Section 11.17(a); provided, however, that (A) Borrowers shall have reimbursed such Lender for its increased costs and additional payments for which it is entitled to reimbursement under Section 2.8(a) or Section 2.8(d), as applicable, of this Agreement through the date of such sale and assignment, and (B) Borrowers shall pay to Agent the $3,500 processing fee in respect of such assignment. In the event that a replaced Lender does not execute an Assignment Agreement pursuant to Section 11.17(a) within five

96

(5) Business Days after receipt by such replaced Lender of notice of replacement pursuant to this Section 11.17(c) and presentation to such replaced Lender of an Assignment Agreement evidencing an assignment pursuant to this Section 11.17(c), such replaced Lender shall be deemed to have consented to the terms of such Assignment Agreement, and any such Assignment Agreement executed by Agent, the Replacement Lender and, to the extent required pursuant to Section 11.17(a), Borrowers, shall be effective for purposes of this Section 11.17(c) and Section 11.17(a). Upon any such assignment and payment, such replaced Lender shall no longer constitute a "*Lender*" for purposes hereof, other than with respect to such rights and obligations that survive termination as set forth in Section 12.1.

(d)    Credit Party Assignments.  No Credit Party may assign, delegate or otherwise transfer any of its rights or other obligations hereunder or under any other Financing Document without the prior written consent of Agent and each Lender.

**Section 11.18**  Funding and Settlement Provisions Applicable When Non-Funding Lenders Exist.  So long as Agent has not waived the conditions to the funding of Revolving Loans set forth in Section 7.2, any Lender may deliver a notice to Agent stating that such Lender shall cease making Revolving Loans due to the non-satisfaction of one or more conditions to funding Loans set forth in Section 7.2, and specifying any such non-satisfied conditions. Any Lender delivering any such notice shall become a non-funding Lender (a "*Non-Funding Lender*") for purposes of this Agreement commencing on the Business Day following receipt by Agent of such notice, and shall cease to be a Non-Funding Lender on the date on which such Lender has either revoked the effectiveness of such notice or acknowledged in writing to each of Agent the satisfaction of the condition(s) specified in such notice, or Required Lenders waive the conditions to the funding of such Loans giving rise to such notice by Non-Funding Lender. Each Non-Funding Lender shall remain a Lender for purposes of this Agreement to the extent that such Non-Funding Lender has Revolving Loans Outstanding in excess of zero; provided, however, that during any period of time that any Non-Funding Lender exists, and notwithstanding any provision to the contrary set forth herein, the following provisions shall apply:

(a)    For purposes of determining the Pro Rata Share of each Revolving Lender under clause (c) of the definition of such term, each Non-Funding Lender shall be deemed to have a Revolving Loan Commitment Amount as in effect immediately before such Lender became a Non-Funding Lender.

(b)    Except as provided in clause (a) above, the Revolving Loan Commitment Amount of each Non-Funding Lender shall be deemed to be zero.

(c)    The Revolving Loan Commitment at any date of determination during such period shall be deemed to be equal to the sum of (i) the aggregate Revolving Loan Commitment Amounts of all Lenders, other than the Non-Funding Lenders as of such date *plus* (ii) the aggregate Revolving Loan Outstandings of all Non-Funding Lenders as of such date.

(d)    Agent shall have no right to make or disburse Revolving Loans advances for the account of any Non-Funding Lender pursuant to Section 11.13, or to assume that any

97

Non-Funding Lender will fund its Pro Rata Share of any Revolving Loans requested by Borrower during such period.

(e)    Agent shall have no right to make or disburse Revolving Loans for the account of any Non-Funding Lender pursuant to Section 2.1(b)(i) to pay interest, fees, expenses and other charges of any Credit Party.

(f)    [Reserved]

(g)    To the extent that Agent applies proceeds of Collateral or other payments received by Agent to repayment of Revolving Loans pursuant to Section 10.7, such payments and proceeds shall be applied first in respect of Revolving Loans made at the time any Non-Funding Lenders exist, and second in respect of all other outstanding Revolving Loans.

**Section 11.19**    Buy-Out Upon Refinancing.    MCF shall have the right to purchase from the other Lenders all of their respective interests in the Loan at par in connection with any refinancing of the Loan upon one or more new economic terms, but which refinancing is structured as an amendment and restatement of the Loan rather than a payoff of the Loan.

**Section 11.20**    Definitions.    As used in this Article 11, the following terms have the following meanings:

"*Additional Titled Agents*" has the meaning set forth in Section 11.15.

"*Affected Lender*" has the meaning set forth in Section 11.17(c).

"*Approved Fund*" means any (a) investment company, fund, trust, securitization vehicle or conduit that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the Ordinary Course of Business, or (b) any Person (other than a natural person) which temporarily warehouses loans for any Lender or any entity described in the preceding clause (a) and that, with respect to each of the preceding clauses (a) and (b), is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender, or (iii) a Person (other than a natural person) or an Affiliate of a Person (other than a natural person) that administers or manages a Lender.

"*Assignment Agreement*" means an assignment agreement in form and substance acceptable to Agent.

"*Defaulted Lender*" means, so long as such failure shall remain in existence and uncured, any Lender which shall have failed to make any Loan or other credit accommodation, disbursement, settlement or reimbursement required pursuant to the terms of any Financing Document.

"*Eligible Assignee*" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other Person (other than a natural person) approved by Agent; provided, however, that notwithstanding the foregoing, (x) "*Eligible Assignee*" shall not include any Borrower or any of a Borrower's Affiliates, and (y) no proposed assignee intending to assume all or any portion of the Revolving Loan Commitment shall be an Eligible Assignee unless such

98

proposed assignee either already holds a portion of such Revolving Loan Commitment or Term Loan Commitment, or has been approved as an Eligible Assignee by Agent.

"*Federal Funds Rate*" means, for any day, the rate of interest per annum (rounded upwards, if necessary, to the nearest whole multiple of 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day, provided, however, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day, and (b) if no such rate is so published on such next preceding Business Day, the Federal Funds Rate for such day shall be the average rate quoted to Agent on such day on such transactions as determined by Agent.

"*Replacement Lender*" has the meaning set forth in Section 11.17(c).

"*Settlement Service*" has the meaning set forth in Section 11.17(a)(v).

## ARTICLE 12 - MISCELLANEOUS

**Section 12.1**    Survival.  All agreements, representations and warranties made herein and in every other Financing Document shall survive the execution and delivery of this Agreement and the other Financing Documents and the other Operative Documents.  The provisions of Section 2.9 and Articles 11 and 12 shall survive the payment of the Obligations (both with respect to any Lender and all Lenders collectively) and any termination of this Agreement and any judgment with respect to any Obligations, including any final foreclosure judgment with respect to any Security Document, and no unpaid or unperformed, current or future, Obligations will merge into any such judgment.

**Section 12.2**    No Waivers.  No failure or delay by Agent or any Lender in exercising any right, power or privilege under any Financing Document shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by law.  Any reference in any Financing Document to the "continuing" nature of any Event of Default shall not be construed as establishing or otherwise indicating that any Borrower or any other Credit Party has the independent right to cure any such Event of Default, but is rather presented merely for convenience should such Event of Default be waived in accordance with the terms of the applicable Financing Documents.

**Section 12.3**    Notices.

(a)    All notices, requests and other communications to any party hereunder shall be in writing (including prepaid overnight courier, facsimile transmission or similar writing) and shall be given to such party at its address, facsimile number or e-mail address set forth on the signature pages hereof (or, in the case of any such Lender who becomes a Lender after the date hereof, in an assignment agreement or in a notice delivered to Borrower Representative and Agent by the assignee Lender forthwith upon such assignment) or at such other address, facsimile number or e-mail address as such party may hereafter specify for the

10844575.1
10844575v.1

purpose by notice to Agent and Borrower Representative; provided, however, that notices, requests or other communications shall be permitted by electronic means only in accordance with the provisions of <u>Section 12.3(b)</u> and <u>(c)</u>. Each such notice, request or other communication shall be effective (i) if given by facsimile, when such notice is transmitted to the facsimile number specified by this Section and the sender receives a confirmation of transmission from the sending facsimile machine, or (ii) if given by mail, prepaid overnight courier or any other means, when received or when receipt is refused at the applicable address specified by this <u>Section 12.3(a)</u>.

(b)     Notices and other communications to the parties hereto may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved from time to time by Agent, <u>provided</u>, <u>however</u>, that the foregoing shall not apply to notices sent directly to any Lender if such Lender has notified the Agent that it is incapable of receiving notices by electronic communication. The Agent or Borrower Representative may, in their discretion, agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it; <u>provided</u>, <u>however</u>, that approval of such procedures may be limited to particular notices or communications.

(c)     Unless the Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; <u>provided</u>, <u>however</u>, that if any such notice or other communication is not sent or posted during normal business hours, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day.

**Section 12.4**     <u>Severability</u>. In case any provision of or obligation under this Agreement or any other Financing Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**Section 12.5**     <u>Headings</u>. Headings and captions used in the Financing Documents (including the Exhibits, Schedules and Annexes hereto and thereto) are included for convenience of reference only and shall not be given any substantive effect.

**Section 12.6**     <u>Confidentiality</u>. Agent and each Lender shall hold all non-public information regarding the Credit Parties and their respective businesses identified as such by Borrowers and obtained by Agent or any Lender pursuant to the requirements hereof in accordance with such Person's customary procedures for handling information of such nature, except that disclosure of such information may be made (a) to their respective agents, employees, Subsidiaries, Affiliates, attorneys, auditors, professional consultants, rating agencies, insurance

100

industry associations and portfolio management services, (b) to prospective transferees or purchasers of any interest in the Loans, the Agent or a Lender, provided, however, that any such Persons are bound by obligations of confidentiality, (c) as required by Law, subpoena, judicial order or similar order and in connection with any litigation, (d) as may be required in connection with the examination, audit or similar investigation of such Person, and (e) to a Person that is a trustee, investment advisor, collateral manager, servicer, noteholder or secured party in a Securitization (as hereinafter defined) in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization. For the purposes of this Section, "*Securitization*" shall mean (i) the pledge of the Loans as collateral security for loans to a Lender, or (ii) a public or private offering by a Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans. Confidential information shall include only such information identified as such at the time provided to Agent and shall not include information that either: (y) is in the public domain, or becomes part of the public domain after disclosure to such Person through no fault of such Person, or (z) is disclosed to such Person by a Person other than a Credit Party, provided, however, Agent does not have actual knowledge that such Person is prohibited from disclosing such information. The obligations of Agent and Lenders under this Section 12.6 shall supersede and replace the obligations of Agent and Lenders under any confidentiality agreement in respect of this financing executed and delivered by Agent or any Lender prior to the date hereof.

**Section 12.7**   Waiver of Consequential and Other Damages.   To the fullest extent permitted by applicable law, no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnitee (as defined below), on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Financing Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Financing Documents or the transactions contemplated hereby or thereby.

**Section 12.8**   GOVERNING LAW; SUBMISSION TO JURISDICTION.

(a)   THIS AGREEMENT, EACH NOTE AND EACH OTHER FINANCING DOCUMENT, AND ALL MATTERS RELATING HERETO OR THERETO OR ARISING THEREFROM (WHETHER SOUNDING IN CONTRACT LAW, TORT LAW OR OTHERWISE), SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MARYLAND, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

(b)   EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION (OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION, ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION LOCATED IN THE STATE OF MARYLAND) TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES

HERETO, ON THE ONE HAND, AND ANY AGENT OR ANY LENDER, ON THE OTHER HAND, PERTAINING TO THE AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER FINANCING DOCUMENTS; <u>PROVIDED THAT</u> EACH PARTY ACKNOWLEDGES THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; <u>PROVIDED</u>, <u>FURTHER</u>, THAT NOTHING IN THE AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE ANY AGENT OR ANY LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS, AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.

(c)     Each Borrower, Agent and each Lender agree that each Loan (including those made on the Closing Date) shall be deemed to be made in, and the transaction contemplated hereunder and in any other Financing Documents shall be deemed to have been performed in, the State of Maryland.

**Section 12.9**   <u>WAIVER OF JURY TRIAL</u>.  **EACH BORROWER, AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE FINANCING DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH BORROWER, AGENT AND EACH LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER FINANCING DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS.    EACH BORROWER, AGENT AND EACH LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

**Section 12.10**   <u>Publication; Advertisement</u>.

(a)     <u>Publication</u>.  Except as required in connection with the Bankruptcy Cases, no Credit Party will directly or indirectly publish, disclose or otherwise use in any public disclosure, advertising material, promotional material, press release or interview, any reference to the name, logo or any trademark of MCF or any of its Affiliates or any reference to this Agreement or the financing evidenced hereby, in any case except (i) as required by Law,

subpoena or judicial or similar order, in which case the applicable Credit Party shall give Agent prior written notice of such publication or other disclosure, or (ii) with MCF's prior written consent.

(b)     Advertisement.    Each Lender and each Credit Party hereby authorizes MCF to publish the name of such Lender and Credit Party, the existence of the financing arrangements referenced under this Agreement, the primary purpose and/or structure of those arrangements, the amount of credit extended under each facility, the title and role of each party to this Agreement, and the total amount of the financing evidenced hereby in any "tombstone", comparable advertisement or press release which MCF elects to submit for publication.    In addition, each Lender and each Credit Party agrees that MCF may provide lending industry trade organizations with information necessary and customary for inclusion in league table measurements after the Closing Date.    With respect to any of the foregoing, MCF shall provide Borrowers with an opportunity to review and confer with MCF regarding the contents of any such tombstone, advertisement or information, as applicable, prior to its submission for publication and, following such review period, MCF may, from time to time, publish such information in any media form desired by MCF, until such time that Borrowers shall have requested MCF cease any such further publication.

Section 12.11   Counterparts; Integration.    This Agreement and the other Financing Documents may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Signatures by facsimile or by electronic mail delivery of an electronic version of any executed signature page shall bind the parties hereto.    This Agreement and the other Financing Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, relating to the subject matter hereof.

Section 12.12   No Strict Construction.    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

Section 12.13   Lender Approvals.    Unless expressly provided herein to the contrary, any approval, consent, waiver or satisfaction of Agent or Lenders with respect to any matter that is the subject of this Agreement, the other Financing Documents may be granted or withheld by Agent and Lenders in their sole and absolute discretion and credit judgment.

Section 12.14   Administrative Expenses; Indemnity

(a)     Borrowers hereby agree to promptly pay (i) all costs and expenses of Agent (including, without limitation, the fees, costs and expenses of counsel to, and independent appraisers and consultants retained by Agent) in connection with the examination, review, due diligence investigation, documentation, negotiation, closing and syndication of the transactions contemplated by the Financing Documents, in connection with the performance by Agent of its rights and remedies under the Financing Documents and in connection with the continued administration of the Financing Documents including (A) any amendments, modifications,

103

consents and waivers to and/or under any and all Financing Documents, and (B) any periodic public record searches conducted by or at the request of Agent (including, without limitation, title investigations, UCC searches, fixture filing searches, judgment, pending litigation and tax lien searches and searches of applicable corporate, limited liability, partnership and related records concerning the continued existence, organization and good standing of certain Persons); (ii) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with (A) protecting, storing, insuring, handling, maintaining or selling any Collateral, (B) any litigation, dispute, suit or proceeding relating to any Financing Document, and (C) any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all of the Financing Documents; (iv) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder; and (v) all costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not Agent or Lenders are a party thereto.  If Agent or any Lender uses in-house counsel for any of these purposes, Borrowers further agree that the Obligations include reasonable charges for such work commensurate with the fees that would otherwise be charged by outside legal counsel selected by Agent or such Lender for the work performed.

(b)    Each Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and the officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel of Agent and Lenders (collectively called the "*Indemnitees*") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of a Credit Party, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than any broker retained by Agent or Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Operative Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under this Agreement) and the use or intended use of the proceeds of the Loans, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from the gross negligence or willful misconduct of such Indemnitee, as determined by a

final non-appealable judgment of a court of competent jurisdiction. To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.

(c)     Notwithstanding any contrary provision in this Agreement, the obligations of Borrowers under this Section 12.14 shall survive the payment in full of the Obligations and the termination of this Agreement. NO INDEMNITEE SHALL BE RESPONSIBLE OR LIABLE TO THE BORROWERS OR TO ANY OTHER PARTY TO ANY FINANCING DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER THIS AGREEMENT OR ANY OTHER FINANCING DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**Section 12.15**   [Reserved]

**Section 12.16**   Reinstatement. This Agreement shall remain in full force and effect and continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a fraudulent preference reviewable transaction or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**Section 12.17**   Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Borrowers and Agent and each Lender and their respective successors and permitted assigns.

**Section 12.18**   USA PATRIOT Act Notification. Agent (for itself and not on behalf of any Lender) and each Lender hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record certain information and documentation that identifies Borrowers, which information includes the name and address of Borrower and such other information that will allow Agent or such Lender, as applicable, to identify Borrowers in accordance with the USA PATRIOT Act.

**Section 12.19**   Cross Default and Cross Collateralization to Affiliated Obligations.

(a)     Cross-Default. As stated in Section 10.1, an Event of Default under any of the Affiliated Financing Documents shall be an Event of Default under this Agreement. In addition, a Default or Event of Default under any of the Financing Documents shall be an Event of Default under the Affiliated Financing Documents.

10844575.1
10844575v.1

(b)    <u>Cross Collateralization</u>.    Borrowers acknowledge and agree that the Collateral securing this Loan also secures the Affiliated Obligations.

(c)    <u>Consent</u>.    Nursing Home, Medical Center and Mt. Vernon, as the Borrowers under the Affiliated Financing Documents, authorize Agent from time to time to:

(i)    compromise, settle, renew, extend the time for payment, change the manner or terms of payment, discharge the performance of, decline to enforce, or release all or any of the Affiliated Obligations, or grant other indulgences to Nursing Home, Medical Center or Mt. Vernon in respect thereof, or modify in any manner any documents relating to the Affiliated Obligations;

(ii)    declare all Affiliated Obligations due and payable upon the occurrence and during the continuance of an Event of Default;

(iii)    take and hold security for the performance of the Affiliated Obligations of Nursing Home, Medical Center or Mt. Vernon and exchange, enforce, waive and release any such security;

(iv)    apply and reapply such security and direct the order or manner of sale thereof as Agent, in its sole discretion, may determine;

(v)    release, surrender or exchange any deposits or other property securing the Affiliated Obligations or on which Agent at any time may have a Lien; and

(vi)    apply payments received by Agent from Borrower to any Obligations or Affiliated Obligations, as permitted in accordance with the terms of this Agreement and in such order as Agent shall determine.

[SIGNATURES APPEAR ON FOLLOWING PAGES]

*(Signature Page to Credit and Security Agreement)*

**IN WITNESS WHEREOF,** intending to be legally bound, and intending that this Agreement constitute an agreement executed under seal, each of the parties have caused this Agreement to be executed under seal the day and year first above mentioned.

**BORROWERS:**                    **SOUND SHORE MEDICAL CENTER OF WESTCHESTER**

By: _____ (SEAL)
Name: _____
Title: _____

**HOWE AVENUE NURSING HOME, INC.**

By: _____ (SEAL)
Name: _____
Title: _____

**THE MOUNT VERNON HOSPITAL**

By: _____ (SEAL)
Name: _____
Title: _____

Address:

Sound Shore Medical Center of Westchester
16 Guion Place
New Rochelle, NY 10801
Attn: John Spicer, President and CEO
Facsimile: (914) 632-4938
E-Mail: jspicer@sshsw.org

4423923.6
10844575.1
10844575v.1

*(Signature Page to Credit and Security Agreement)*

**AGENT:**                              **MIDCAP FINANCIAL, LLC**, as Agent

By:_____

Name:  Brett Robinson

Title:    Managing Director

Address:

7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Attn:  Account Manager for Sound Shore DIP
transaction
Facsimile:  301-941-1450

Payment Account Designation:

Wells Fargo Bank, N.A.
(McLean, VA)
ABA #:  121-000-248
Account Name:  MidCap Funding IV, LLC - Collections
Account #:  2000036282803
Attention:  Sound Shore DIP Loan

10844575.1
10844575v.1

*(Signature Page to Credit and Security Agreement)*

**LENDER:**                          **MIDCAP FINANCIAL, LLC**, as Lender

By:_____
Name:  Brett Robinson
Title:    Managing Director

<u>Address:</u>

7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814
Attn:  Account Manager for Sound Shore DIP Loan
Facsimile:  301-941-1450

## ANNEXES, EXHIBITS AND SCHEDULES

### ANNEXES

| | |
|---|---|
| Annex A | Commitment Annex |

### EXHIBITS

| | |
|---|---|
| Exhibit A | [Reserved] |
| Exhibit B | Compliance Certificate |
| Exhibit C | Borrowing Base Certificate |
| Exhibit D | Notice of Borrowing |
| Exhibit E | Budget |

### SCHEDULES

| | |
|---|---|
| Schedule 3.1 | Existence, Organizational ID Numbers, Foreign Qualification, Prior Names |
| Schedule 3.4 | Capitalization |
| Schedule 3.6 | Litigation |
| Schedule 3.13 | Taxes |
| Schedule 3.14 | ERISA |
| Schedule 3.17 | Material Contracts |
| Schedule 3.18 | Environmental Compliance |
| Schedule 3.19 | Intellectual Property |
| Schedule 4.4 | Insurance |
| Schedule 4.9 | Litigation, Governmental Proceedings and Other Notice Events |
| Schedule 5.1 | Debt; Contingent Obligations |
| Schedule 5.2 | Liens |
| Schedule 5.7 | Permitted Investments |
| Schedule 5.8 | Affiliate Transactions |
| Schedule 5.11 | Business Description |
| Schedule 5.14 | Deposit Accounts and Securities Accounts |
| Schedule 7.4 | Post-Closing Obligations |
| Schedule 8.1 | Licensing |
| Schedule 8.2 | Exceptions to Healthcare Representations and Warranties |
| Schedule 9.1 | Collateral |
| Schedule 9.2 | Location of Collateral |

4423923.6
10844575.1
10844575v.1

**Annex A to Credit Agreement (Commitment Annex)**

| Lender | Revolving Loan Commitment Amount | Revolving Loan Commitment Percentage |
|---|---|---|
| MidCap Financial, LLC | $23,000,000 | 100% |
| TOTALS: | $23,000,000 | 100% |

**Exhibit A to Credit Agreement (Reserved)**

4423923.6
10844575.1
10844575v.1

**Exhibit B to Credit Agreement (Compliance Certificate)**

**[BORROWER REPRESENTATIVE LETTERHEAD]**

**COMPLIANCE CERTIFICATE**

Date:      _____, 201_

     This Compliance Certificate is given by _____, a Responsible Officer of Sound Shore Medical Center of Westchester, as Borrower Representative (the "**Borrower Representative**"), pursuant to that certain Debtor In Possession Revolving Credit and Security Agreement dated as of May ___, 2013 by and among the Borrower Representative, Howe Avenue Nursing Home, Inc., The Mount Vernon Hospital, and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV, LLC, individually as a Lender and as Agent (as assigned to it by MidCap Financial, LLC), and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

     The undersigned Responsible Officer hereby certifies to Agent and Lenders that:

     (a)    The financial statements delivered with this certificate in accordance with Section 4.1 of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrowers and their Consolidated Subsidiaries as of the dates and the accounting period covered by such financial statements.

     (b)    I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrowers and their Consolidated Subsidiaries during the accounting period covered by such financial statements, and such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any condition or event that constitutes a Default or an Event of Default, except as set forth in Schedule 1 hereto, which includes a description of the nature and period of existence of such Default or an Event of Default and what action Borrowers have taken, are undertaking and propose to take with respect thereto. [If none, then so state "None" on Schedule 1.]

     (d)    Schedule 9.2 and Schedule 3.1 to the Credit Agreement contain a complete and accurate list of all business locations of Borrowers and Guarantors and all names under which Borrowers or Guarantors currently conduct business, and there have been no changes in the names under which Borrowers or Guarantors conduct business.

     (e)    Except as noted on Schedule 2 attached hereto, the undersigned has no knowledge of any federal or state tax liens having been filed against the Borrowers, Guarantors or any Collateral, and except as noted on Schedule 2 attached hereto, the undersigned has no knowledge of any failure of the Borrowers or Guarantors to make required payments of withholding or other tax obligations of the Borrowers or Guarantors during the accounting period to which the attached statements pertain or any subsequent period. [If none, then so state "None" on Schedule 2.]

     (f)    Schedule 5.14 to the Credit Agreement contains a complete and accurate statement of all deposit or investment accounts maintained by Borrowers or Guarantors.

(g)    Except as described in Schedule 3.6 of the Credit Agreement and except as noted on Schedule 3 attached hereto, the undersigned has no knowledge of any current, pending or threatened:

(i)    litigation against the Borrowers, Guarantors or any Affiliates that that could reasonably be expected to result in uninsured losses to any Borrower or any of its Subsidiaries of Two Hundred Fifty Thousand Dollars ($250,000) or more;

(ii)    inquiries, investigations or proceedings concerning the business affairs, practices, licensing or reimbursement entitlements of Borrowers or Guarantors;

(iii)    default by Borrowers or Guarantors under any material contract to which either of them is a party, including, without limitation, any leases.

[If None, then so state "None" on Schedule 3.]

(h)    No Borrower or Guarantor has acquired, by purchase, by the approval or granting of any application for registration (whether or not such application was previously disclosed to Agent by Borrowers) or otherwise, any Intellectual Property that is registered with any United States or foreign Governmental Authority, or has filed with any such United States or foreign Governmental Authority, any new application for the registration of any Intellectual Property, or acquired rights under a license as a licensee with respect to any such registered Intellectual Property (or any such application for the registration of Intellectual Property) owned by another Person, that has not previously been reported to Agent on Schedule 3.17 to the Credit Agreement.

(i)    Except as noted on Schedule 4 attached hereto, no Borrower or Guarantor has acquired, by purchase or otherwise, any Chattel Paper, Letter of Credit Rights, Instruments, Documents or Investment Property that has not previously been reported to Agent on any Schedule 4 to any previous Compliance Certificate delivered by Borrower Representative to Agent.

(j)    Except as noted on Schedule 5 attached hereto, no Borrower or Guarantor is aware of any Commercial Tort Claim that has not previously been reported to Agent on any Schedule 5 to any previous Compliance Certificate delivered by Borrower Representative to Agent.

(k)    Borrower and Guarantor are in compliance with the covenants contained in Article 6 of the Credit Agreement, and in any Guarantee constituting a part of the Financing Documents, as demonstrated by the calculation of such covenants below, except as set forth below; in determining such compliance, the following calculations have been made: _____. Such calculations and the certifications contained therein are true, correct and complete.

(l)    There has been no change to the Organizational Documents of the Borrower since the Closing Date.

## Schedules to Compliance Certificate

Schedule 1 – Defaults or Events of Default
Schedule 2 – Federal or State Tax Liens against the Collateral; Withholdings or Tax Obligations
Schedule 3 – Pending Litigation, Inquiries or Investigations; Defaults under Material Contracts
Schedule 4 – Chattel Paper, Letter of Credit Rights, Instruments, Documents or Investment Property
Schedule 5 – Commercial Tort Claims

The foregoing certifications and computations are made as of _____, _____ (end of month) and delivered this _____ day of _____, 201__.

**SOUND SHORE MEDICAL CENTER OF WESTCHESTER,**
as Borrower Representative

By: _____

Name: _____

Title:   Authorized Signatory

**Exhibit C to Credit Agreement (Borrowing Base Certificate)**

**Exhibit D to Credit Agreement (Notice of Borrowing)**

**[BORROWER LETTERHEAD]**

<u>**Notice of Borrowing**</u>

Date: _____, 201_

  This Notice of Borrowing is given by _____, a Responsible Officer of Sound Shore Medical Center of Westchester, as Borrower Representative (the "**Borrower Representative**"), pursuant to that certain Debtor In Possession Revolving Credit and Security Agreement dated as of May ___, 2013 by and among the Borrower Representative, Howe Avenue Nursing Home, Inc., The Mount Vernon Hospital and any additional Borrower that may hereafter be added thereto (collectively, "**Borrowers**"), MidCap Funding IV, LLC, individually as a Lender and as Agent (as assigned to it by MidCap Financial, LLC), and the financial institutions or other entities from time to time parties hereto, each as a Lender (as such agreement may have been amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

  The undersigned Responsible Officer hereby gives notice to Agent of Borrower Representative's request to borrow $_____ of Revolving Loans on _____ ____, 201__. Attached is a Borrowing Base Certificate complying in all respects with the Credit Agreement and confirming that, after giving effect to the requested advance, the Revolving Loan Outstandings will not exceed the Revolving Loan Limit.

  The undersigned officer hereby certifies that, both before and after giving effect to the request above (a) each of the conditions precedent set forth in Section 7.2 have been satisfied, (b) all of the representations and warranties contained in the Credit Agreement and the other Financing Documents are true, correct and complete as of the date hereof, except to the extent such representation or warranty relates to a specific date, in which case such representation or warranty is true, correct and complete as of such earlier date, and (c) no Default or Event of Default has occurred and is continuing on the date hereof.

  **IN WITNESS WHEREOF**, the undersigned officer has executed and delivered this certificate this ____ day of _____, 201__.

         **SOUND SHORE MEDICAL CENTER OF WESTCHESTER,**
         as Borrower Representative

         By: _____
         Name: _____
         Title:  Authorized Signatory

## Schedule 7.4 – Post Closing Schedule

Borrowers shall satisfy and complete each of the following obligations, or provide Agent each of the items listed below, as applicable, on or before the date indicated below, all to the satisfaction of Agent in its sole and absolute discretion:

1.

Any Borrower's failure to complete and satisfy any of the above obligations on or before the date indicated above, or failure to deliver any of the above listed items on or before the date indicated above, shall constitute an immediate and automatic Event of Default, unless waived or extended in writing by Agent.

### Schedule 9.1 – Collateral

The Collateral consists of all of Borrowers' right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, and all proceeds and products of the following: (i) all accounts, payment intangibles, instruments and other rights to receive payments of any Borrower (including without limitation, all Accounts), whether now existing or hereafter arising or acquired, (ii) all related general intangibles (including without limitation, contract rights and intellectual property), chattel paper, documents, supporting obligations, letter of credit rights, commercial tort claims, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the property in subpart (i) above, including without limitation, all rights of enforcement and collection, (iii) all of Borrowers' now owned or hereafter acquired Deposit Accounts or Securities Accounts into which Accounts or the proceeds of Accounts are deposited, including the Lockbox Account, all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same, (iv) all books and records of any Borrower evidencing or relating to or associated with the foregoing, (v) all information and data compiled or derived by Borrower with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (vi) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

As used in this Schedule 9.1 and this Agreement, the term "**Accounts**" means a right to payment of a monetary obligation, whether or not earned by performance for services rendered or to be rendered or for a secondary obligation incurred or to be incurred, including but not limited to (a) the third party reimbursable portion of accounts receivable owing to any Borrower (whether billed or unbilled) arising out of the delivery by any Borrower of medical, surgical, diagnostic or other professional, medical or dental services and/or the supply of goods related to any of such services (whether such services are supplied by a Borrower or a third party), including all rights to reimbursement under any agreements with an Account Debtor and any amounts received in settlement of a dispute, appeal or other arrangement with Medicare or Medicaid, (b) all accounts, general intangibles, rights, remedies, guarantees, and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under this Agreement in respect of the foregoing, (c) all information and data compiled or derived by a Borrower in respect of such accounts receivable, subject to the confidentiality rights under applicable law, and (d) all proceeds of any of the foregoing. The term "**Accounts**" includes health-care insurance receivables. Notwithstanding anything else herein to the contrary, the term "**Accounts**" or "accounts" shall be not be deemed to include payments received from a Governmental Authority in respect of grants or gifts issued to Borrower pursuant to the following state and federal programs: the Women, Infant and Children program (WIC grants), the Healthcare Workforce Retraining Initiative program (HWRI grants), the Health Care Efficiency and Affordability Law program (HEAL grants), the Health Resources and Services Administration program (HRSA grants), the National Bioterrorism Hospital Preparedness Program (Bioterrorism grants), and the Women's Health program, and the foregoing grants shall not be deemed to part of Agent's Collateral.

**Exhibit B**

**Term Loan Term Sheet**

2422510v.8

### Exhibit ____ to Interim DIP Order

### Summary of Terms for DIP Term Loan

| | |
|---|---|
| Borrowers: | collectively, jointly and severally, Sound Shore Medical Center of Westchester ("SSMC"), The Mount Vernon Hospital, Inc. ("MVH"), and Howe Avenue Nursing Home d/b/a Schaffer Extended Care Center ("SECC"), each as debtor-in-possession under separate bankruptcy cases to be filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"; and such cases collectively, the "Chapter 11 Case") |
| Agent: | MidCap Financial, LLC or one of its affiliates |
| Senior DIP Credit Facility: | collectively, that certain debtor-in-possession senior secured revolving credit facility in the maximum aggregate amount of $23,000,000 to be provided by DIP Lenders to Borrowers pursuant to that certain Debtor in Possession Credit and Security Agreement dated as of May __, 2013 by and among Agent, DIP Lenders and Borrowers (the "DIP Revolving Loan") and the DIP Term Loan |
| DIP Lenders: | MidCap Financial, LLC and such other banks and financial institutions as may be arranged by Agent |
| Loan Amount: | $10,000,000 |
| Term: | The earliest of (a) twelve (12) months from the date of closing, (b) the termination of the DIP Revolving Loan, or (c) the occurrence of a DIP Credit Facility Termination Event (as defined below) (the "DIP Credit Facility Maturity Date"). The term "DIP Credit Facility Termination Event" has the meaning set forth in the last paragraph of this Term Sheet. |
| Use of Proceeds: | The proceeds of the DIP Term Loan will be used to fund operating deficits and shortfalls of Borrowers incurred throughout the Chapter 11 Case in accordance with the Budget (as defined in the Interim Order (defined below)). |
| Principal Repayment: | All obligations under the DIP Term Loan shall be due and payable in full by Borrowers to Agent at the DIP Credit Facility Maturity Date. |
| Interest and Fees: | Interest on the outstanding balance of the DIP Term Loan shall be payable monthly in arrears at an annual rate of 30-day, reserve adjusted, LIBOR (subject to a 2.50% floor) plus 6.50%, reset monthly. Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year. |
| Collateral: | All obligations of Borrowers under the DIP Term Loan (collectively, the "Obligations") will be secured by a letter of credit in favor of Agent issued by a nationally recognized banking institution |

acceptable to Agent in its sole and absolute discretion, and the form and substance of which must be acceptable to Agent in its sole and absolute discretion (the "Collateral"). Accordingly, the Collateral shall secure no other obligations of the Borrowers and shall be subject to no other liens of any party.

**Financial Covenants:**

Financial covenants shall include (a) a $1,000,000 minimum liquidity covenant and (b) a budget compliance and variance covenant, each in form and substance substantially similar to those set forth in the DIP Revolving Loan.

**Conditions to Closing:**

Customary conditions for financings of this type, including but not limited to:

- Execution of all necessary credit documentation, including a credit and security agreement incorporating the terms and conditions set forth in this Term Sheet, and otherwise on substantially similar terms as the credit documentation for the DIP Revolving Loan, together with customary closing instruments, documents, certificates, resolutions, opinions and assurances as are reasonable and customary for similar loans, and other items reasonably requested by the Agent, in each case in form and substance satisfactory to the Agent in its sole discretion (collectively, the "DIP Term Loan Documentation," and along with the credit documentation for the DIP Revolving Loan, the "Senior DIP Credit Facility Documentation").

- Payment of all fees and expenses.

- Execution by a stalking horse bidder of an asset purchase agreement (the "Stalking Horse APA") for the purchase of all or substantially all of the Borrower's assets in the Chapter 11 Case pursuant to Section 363 of the Bankruptcy Code (the "363 Sale") which is subject to no conditions other than Bankruptcy Court approval.

- The Bankruptcy Court shall have entered an interim financing order authorizing the secured financing under the Senior DIP Credit Facility on the terms and conditions contemplated by this Term Sheet and the Senior DIP Credit Facility Documentation, granting to Agent the security interests and liens and super-priority administrative expense claim status described above, modifying the automatic stay and other provisions required by Agent and its counsel (the "Interim Order"). The Interim Order shall limit the debtor's right to surcharge any of the Collateral.

- All obligations under that certain Amended and Restated Credit and Security Agreement, dated June 8, 2011, by and among SSEC and SSMC, as borrowers, and MidCap Funding IV, LLC, as successor agent and lender, shall have been repaid in full with the proceeds of the DIP Revolving Loan.

- All of the orders entered in the Chapter 11 Case shall be in form

and substance satisfactory to the Agent and its counsel.

- The Agent shall have received the Budget and the Budget shall have been satisfactory to the Agent in its sole discretion.

- Upon a DIP Credit Facility Termination Event, the DIP Term Loan shall be indefeasibly paid and satisfied in full by the purchaser of substantially all of Borrower's assets in the Chapter 11 Case ("Purchaser").

**Senior DIP Credit Facility Costs:**

All reasonable costs associated with the Facility, including, but not limited to Agent's out-of-pocket expenses associated with the transaction, professional fees, search fees and filing fees will be paid by Borrowers regardless of whether the transaction closes.

**DIP Credit Facility Termination Events:**

Any of the following events further constitute a DIP Credit Facility Termination Event:

- the occurrence of an event of default under any of the DIP Term Loan Documentation or any Bankruptcy Court order approving the Senior DIP Credit Facility;

- the indefeasible payment in full of the indebtedness and obligations under the Senior DIP Credit Facility;

- a sale of all or substantially all or any material portion of the assets of any Borrower;

- the conversion of the Chapter 11 Case to a case under Chapter 7;

- the appointment of a trustee or examiner;

- failure of the Borrowers to have the Bankruptcy Court enter a final financing order authorizing the Senior DIP Credit Facility and approving all other terms provided in this Term Sheet, the Senior DIP Credit Facility Documentation and the Interim Order, unless otherwise agreed by Agent, within thirty (30) days of the Interim Order;

- failure of the Borrowers to file a motion (the "Sale Motion") within ten (10) days of filing of the Chapter 11 Case seeking entry of an order approving the 363 Sale, procedures for the 363 Sale and the form of the Stalking Horse APA;

- the failure of Borrowers to have the Bankruptcy Court enter an order within thirty-five (35) days of the filing of the Chapter 11 Case in form and substance acceptable to the Agent (a) approving the form of Stalking Horse APA and bidding procedures proposed in the Sale Motion, and (b) scheduling an auction for the sale of the assets in accordance with those bidding procedures (the "Auction") and a sale hearing with respect thereto;

- the failure of Borrowers to have the Bankruptcy Court enter an order approving the 363 Sale to Purchaser or other Successful Bidder, subject to the terms of the sale procedures approved by

the Bankruptcy Court, within one hundred (100) days following
the filing of the Chapter 11 Case;

- the failure of Borrowers to close the 363 Sale on or before
December 6, 2013, or such other date as agreed upon in the DIP
Term Loan Documentation;

- the filing of a plan of reorganization or liquidation that is not in a
form satisfactory to the Agent; and

- such other events as designated by Agent in the DIP Term Loan
Documentation or set forth in the Bankruptcy Court order(s)
approving the Senior DIP Credit Facility.

**Exhibit C**

**Budget**

2422510v.4

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY
AMOUNTS SUBJECT TO CHANGE

As of:
5/29/2013
**SSHS Cash Flow - Weekly**

| | Projection 31-May | Projection 7-Jun | Projection 14-Jun | Projection 21-Jun | Projection 28-Jun | Projection 5-Jul |
|---|---|---|---|---|---|---|
| **Beginning Book Balance** | $ - | $ 97,186 | $ 363,032 | $ 402,063 | $ 273,032 | $ 1,170,145 |
| **Receipts from Operations** | | | | | | |
| Medicare | $ 618,972 | $ 1,537,926 | $ 1,007,574 | $ 1,529,891 | $ 987,423 | $ 1,317,314 |
| Medicaid | 635,217 | 635,217 | 635,217 | 622,512 | 622,512 | 622,512 |
| Commercial | 1,476,725 | 2,030,496 | 1,845,906 | 1,831,139 | 1,808,988 | 1,447,190 |
| Pool Receipts | | | | | 953,976 | |
| Self-Pay | 7,445 | 9,306 | 9,306 | 9,306 | 9,306 | 7,445 |
| Physicians & Clinics | 72,663 | 90,829 | 90,829 | 90,829 | 90,829 | 72,663 |
| Meaningful Use | - | - | - | - | - | - |
| Medicare Settlements | - | - | - | - | - | - |
| Other Receipts | 330,506 | 420,902 | 410,951 | 402,226 | 410,951 | 321,781 |
| **Total Receipts from Operations** | $ 3,141,527 | $ 4,724,676 | $ 3,999,783 | $ 4,485,903 | $ 4,883,685 | $ 3,788,905 |
| **Disbursements from Operations** | | | | | | |
| Payroll & Taxes | $ 1,717,178 | $ 3,520,335 | $ 1,717,178 | $ 3,520,335 | $ 1,717,178 | $ 3,520,335 |
| Contract Labor | 116,200 | 47,000 | 47,000 | 47,000 | 116,200 | 47,000 |
| Benefits (Union) | 411,000 | 1,250,000 | 175,000 | - | 61,000 | 1,100,000 |
| Benefits (Non-Union) | 224,000 | 480,000 | 280,000 | 280,000 | 280,000 | 534,000 |
| AP Vendors & Supplies | 943,685 | 1,105,996 | 996,238 | 1,269,446 | 903,718 | 930,868 |
| Utilities | - | - | 399,550 | - | - | - |
| Insurance | - | 58,500 | 16,786 | 90,000 | - | 1,183,500 |
| Rent | - | 24,000 | - | - | - | 24,000 |
| Pool Disbursements | - | - | 304,000 | - | - | - |
| Secured Debt Payments | - | 112,429 | - | - | - | 112,429 |
| Other | - | 750 | 25,000 | - | - | 750 |
| **Total Disbursements from Operations** | $ 3,412,063 | $ 6,599,010 | $ 3,960,752 | $ 5,206,781 | $ 3,078,096 | $ 7,452,882 |
| **Net Cash Flows from Operations** | $ (270,536) | $ (1,874,334) | $ 39,031 | $ (720,878) | $ 1,805,589 | $ (3,663,978) |
| **Non-Recurring Receipts/(Disbursements)** | | | | | | |
| HEAL | $ - | $ - | $ - | $ - | $ - | $ - |
| Payroll Tax Payment (Arrears) | - | - | - | - | - | - |
| Restructuring Related Disbursements | (732,278) | - | - | - | (875,000) | (605,000) |
| Sale of Asset | - | - | - | - | - | - |
| Intercompany | - | - | - | - | - | - |
| **Total Non-Recurring Activities** | $ (732,278) | $ - | $ - | $ - | $ (875,000) | $ (605,000) |
| **Net Cash Flows including Non-Recurring** | $ (1,002,814) | $ (1,874,334) | $ 39,031 | $ (720,878) | $ 930,589 | $ (4,268,978) |
| **Net Financing Activity (MidCap)** | $ 1,100,000 | $ 2,140,180 | $ - | $ 591,847 | $ (33,476) | $ 3,334,467 |
| **Ending Book Balance** | $ 97,186 | $ 363,032 | $ 402,063 | $ 273,032 | $ 1,170,145 | $ 235,634 |
| **Outstanding Checks** | 388,068 | 533,917 | 458,110 | 651,077 | 396,094 | 449,815 |
| **Ending Bank Balance** | $ 485,254 | $ 896,949 | $ 860,173 | $ 924,109 | $ 1,566,239 | $ 685,449 |
| **MidCap Financing Activities** | | | | | | |
| **Beginning Balance** | $ 16,200,000 | $ 17,300,000 | $ 19,440,180 | $ 19,440,180 | $ 20,032,027 | $ 19,998,551 |
| MidCap Paydown | (1,571,891) | (3,066,027) | (2,394,149) | (2,897,776) | (2,670,566) | (2,532,195) |
| MidCap Advances | 2,671,891 | 4,880,045 | 2,394,149 | 3,489,623 | 2,637,090 | 5,500,582 |
| Mortgage, Interest & Fees | | 326,162 | | | | 366,080 |
| **Ending Balance per BB** | $ 17,300,000 | $ 19,440,180 | $ 19,440,180 | $ 20,032,027 | $ 19,998,551 | $ 23,333,017 |
| **SSMC BB Balance** | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 7,733,017 |
| **SECC BB Balance** | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| **MVH BB Balance** | 1,100,000 | 3,240,180 | 3,240,180 | 3,832,027 | 3,798,551 | 4,400,000 |
| **Term Loan Balance** | | | | | | 10,000,000 |
| **Term Loan Reserve** | - | - | - | - | - | 7,266,983 |

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY
AMOUNTS SUBJECT TO CHANGE

As of:
**5/29/2013**

**SSHS Cash Flow - Weekly**

| | Projection 12-Jul | Projection 19-Jul | Projection 26-Jul | Projection 2-Aug | Projection 9-Aug | Projection 16-Aug |
|---|---|---|---|---|---|---|
| **Beginning Book Balance** | $ 235,634 | $ 291,218 | $ 14,112 | $ 622,307 | $ 19,650 | $ 19,650 |
| **Receipts from Operations** | | | | | | |
| Medicare | $ 987,423 | $ 1,514,167 | $ 987,423 | $ 1,514,167 | $ 987,423 | $ 1,514,167 |
| Medicaid | 622,512 | 622,512 | 622,512 | 622,512 | 622,512 | 622,512 |
| Commercial | 1,881,347 | 1,917,527 | 1,808,988 | 1,808,988 | 1,808,988 | 1,808,988 |
| Pool Receipts | - | - | - | 953,676 | - | - |
| Self-Pay | 9,306 | 9,306 | 9,306 | 9,306 | 9,306 | 9,306 |
| Physicians & Clinics | 90,829 | 90,829 | 90,829 | 90,829 | 90,829 | 90,829 |
| Meaningful Use | - | - | - | - | - | - |
| Medicare Settlements | - | - | - | - | - | - |
| Other Receipts | 418,421 | 413,432 | 410,951 | 402,226 | 410,951 | 402,226 |
| **Total Receipts from Operations** | $ 4,009,839 | $ 4,567,773 | $ 3,930,009 | $ 5,401,704 | $ 3,930,009 | $ 4,448,028 |
| **Disbursements from Operations** | | | | | | |
| Payroll & Taxes | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 | $ 3,726,635 |
| Contract Labor | 47,000 | 47,000 | 47,000 | 116,200 | 47,000 | 47,000 |
| Benefits (Union) | - | 175,000 | - | 1,161,000 | - | 175,000 |
| Benefits (Non-Union) | 280,000 | 280,000 | 280,000 | 480,000 | 280,000 | 280,000 |
| AP Vendors & Supplies | 1,081,528 | 1,060,366 | 1,152,636 | 977,949 | 1,084,447 | 967,366 |
| Utilities | 399,550 | | | | 399,550 | |
| Insurance | 125,000 | 141,786 | 125,000 | 183,500 | 125,000 | 141,786 |
| Rent | - | - | - | 24,000 | - | - |
| Pool Disbursements | 304,000 | - | - | - | 304,000 | - |
| Secured Debt Payments | - | - | - | 112,429 | - | - |
| Other | - | 25,000 | - | - | 750 | 25,000 |
| **Total Disbursements from Operations** | $ 3,954,255 | $ 5,455,787 | $ 3,321,814 | $ 6,781,713 | $ 3,957,925 | $ 5,362,787 |
| **Net Cash Flows from Operations** | $ 55,584 | $ (888,014) | $ 608,195 | $ (1,380,009) | $ (27,916) | $ (914,759) |
| **Non-Recurring Receipts/(Disbursements)** | | | | | | |
| HEAL | $ - | $ - | $ - | $ - | $ - | - |
| Payroll Tax Payment (Arrears) | - | - | - | - | - | - |
| Restructuring Related Disbursements | - | - | - | (990,000) | - | - |
| Sale of Asset | - | - | - | - | - | - |
| Intercompany | - | - | - | - | - | - |
| **Total Non-Recurring Activities** | $ - | $ - | $ - | $ (990,000) | $ - | $ - |
| **Net Cash Flows Including Non-Recurring** | $ 55,584 | $ (888,014) | $ 608,195 | $ (2,370,009) | $ (27,916) | $ (914,759) |
| **Net Financing Activity (MidCap)** | $ - | $ 610,908 | $ - | $ 1,767,352 | $ 27,916 | $ 914,759 |
| **Ending Book Balance** | $ 291,218 | $ 14,112 | $ 622,307 | $ 19,650 | $ 19,650 | $ 19,650 |
| **Outstanding Checks** | 430,342 | 523,813 | 595,229 | 447,479 | 472,678 | 469,413 |
| **Ending Bank Balance** | $ 721,560 | $ 537,925 | $ 1,217,536 | $ 467,129 | $ 492,327 | $ 489,063 |
| **MidCap Financing Activities** | | | | | | |
| **Beginning Balance** | $ 23,333,017 | $ 23,333,017 | $ 23,943,926 | $ 23,943,926 | $ 25,711,277 | $ 25,739,193 |
| MidCap Paydown | (2,415,236) | (2,957,684) | (2,350,397) | (3,197,311) | (2,350,397) | (2,877,142) |
| MidCap Advances | 2,415,236 | 3,568,592 | 2,350,397 | 4,549,124 | 2,378,313 | 3,791,901 |
| Mortgage, Interest & Fees | - | - | - | 415,538 | - | - |
| **Ending Balance per BB** | $ 23,333,017 | $ 23,943,926 | $ 23,943,926 | $ 25,711,277 | $ 25,739,193 | $ 26,653,952 |
| SSMC BB Balance | 7,733,017 | 8,343,926 | 8,343,926 | 10,111,277 | 10,139,193 | 11,053,952 |
| SECC BB Balance | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| MVH BB Balance | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 |
| Term Loan Balance | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| Term Loan Reserve | 7,266,983 | 6,656,074 | 6,656,074 | 4,888,723 | 4,860,807 | 3,946,048 |

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY
AMOUNTS SUBJECT TO CHANGE

As of:
5/29/2013

**SSHS Cash Flow - Weekly**

| | Projection 23-Aug | Projection 30-Aug | Projection 6-Sep | Projection 13-Sep | Projection 20-Sep | Projection 27-Sep |
|---|---|---|---|---|---|---|
| **Beginning Book Balance** | $ 19,650 | $ 487,130 | $ 774,114 | $ 585,927 | $ 69,915 | $ 509,901 |
| **Receipts from Operations** | | | | | | |
| Medicare | $ 987,423 | $ 1,514,167 | $ 790,569 | $ 1,514,167 | $ 991,440 | $ 1,537,926 |
| Medicaid | 622,512 | 622,512 | 622,512 | 622,512 | 622,512 | 635,217 |
| Commercial | 1,808,988 | 1,808,988 | 1,447,190 | 1,989,887 | 1,816,371 | 1,845,906 |
| Pool Receipts | - | 953,676 | - | - | - | - |
| Self-Pay | 9,306 | 9,306 | 7,445 | 9,306 | 9,306 | 9,306 |
| Physicians & Clinics | 90,829 | 90,829 | 72,663 | 90,829 | 90,829 | 90,829 |
| Meaningful Use | - | - | - | - | - | - |
| Medicare Settlements | - | - | - | - | - | - |
| Other Receipts | 410,951 | 402,226 | 330,506 | 420,902 | 410,951 | 402,226 |
| **Total Receipts from Operations** | $ 3,930,009 | $ 5,401,704 | $ 3,270,885 | $ 4,647,604 | $ 3,941,410 | $ 4,521,409 |
| **Disbursements from Operations** | | | | | | |
| Payroll & Taxes | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 | $ 3,726,635 |
| Contract Labor | 47,000 | 116,200 | 47,000 | 47,000 | 47,000 | 47,000 |
| Benefits (Union) | - | 61,000 | 1,100,000 | 175,000 | | |
| Benefits (Non-Union) | 280,000 | 280,000 | 424,000 | 280,000 | 280,000 | 280,000 |
| AP Vendors & Supplies | 1,293,351 | 805,885 | 1,189,868 | 962,366 | 1,307,246 | 765,918 |
| Utilities | | | | 399,550 | | |
| Insurance | 125,000 | 125,000 | 183,500 | 141,786 | 125,000 | 125,000 |
| Rent | - | - | - | 24,000 | - | - |
| Pool Disbursements | - | - | - | 304,000 | | |
| Secured Debt Payments | - | - | 112,429 | - | - | - |
| Other | - | - | 750 | - | 25,000 | - |
| **Total Disbursements from Operations** | $ 3,462,528 | $ 5,114,721 | $ 4,798,725 | $ 6,036,337 | $ 3,501,424 | $ 4,944,553 |
| **Net Cash Flows from Operations** | $ 467,480 | $ 286,984 | $ (1,527,840) | $ (1,388,733) | $ 439,986 | $ (423,144) |
| **Non-Recurring Receipts/(Disbursements)** | | | | | | |
| HEAL | $ - | $ - | $ - | $ - | $ - | $ - |
| Payroll Tax Payment (Arrears) | - | - | - | - | - | - |
| Restructuring Related Disbursements | - | - | (415,000) | - | - | - |
| Sale of Asset | - | - | - | - | - | - |
| Intercompany | - | - | - | - | - | - |
| **Total Non-Recurring Activities** | $ - | $ - | $ (415,000) | $ - | $ - | $ - |
| **Net Cash Flows including Non-Recurring** | $ 467,480 | $ 286,984 | $ (1,942,840) | $ (1,388,733) | $ 439,986 | $ (423,144) |
| **Net Financing Activity (MidCap)** | $ - | $ - | $ 1,754,653 | $ 872,721 | $ - | $ - |
| **Ending Book Balance** | $ 487,130 | $ 774,114 | $ 585,927 | $ 69,915 | $ 509,901 | 86,757 |
| **Outstanding Checks** | 647,801 | 349,828 | 569,015 | 423,013 | 689,317 | 317,854 |
| **Ending Bank Balance** | $ 1,134,931 | $ 1,123,942 | $ 1,154,942 | $ 492,927 | $ 1,199,217 | 404,611 |
| **MidCap Financing Activities** | | | | | | |
| **Beginning Balance** | $ 26,653,952 | $ 26,653,952 | $ 26,653,952 | $ 28,408,606 | $ 29,281,326 | $ 29,281,326 |
| MidCap Paydown | (2,350,397) | (3,117,570) | (2,091,877) | (3,015,837) | (2,358,221) | (2,924,501) |
| MidCap Advances | 2,350,397 | 3,117,570 | 3,385,134 | 3,888,557 | 2,358,221 | 2,924,501 |
| Mortgage, Interest & Fees | | | 461,396 | | | |
| **Ending Balance per BB** | $ 26,653,952 | $ 26,653,952 | $ 28,408,606 | $ 29,281,326 | $ 29,281,326 | $ 29,281,326 |
| SSMC BB Balance | 11,053,952 | 11,053,952 | 12,808,606 | 13,681,326 | 13,681,326 | 13,681,326 |
| SECC BB Balance | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| MVH BB Balance | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 |
| Term Loan Balance | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| Term Loan Reserve | 3,946,048 | 3,946,048 | 2,191,394 | 1,318,674 | 1,318,674 | 1,318,674 |

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY
AMOUNTS SUBJECT TO CHANGE

As of:
5/29/2013

**SSHS Cash Flow - Weekly**

| | Projection 4-Oct | Projection 11-Oct | Projection 18-Oct | Projection 25-Oct | Projection 1-Nov |
|---|---|---|---|---|---|
| **Beginning Book Balance** | $ 86,757 | $ 42,543 | $ (384,340) | $ (468,211) | $ (1,102,006) |
| **Receipts from Operations** | | | | | |
| Medicare | $ 1,007,574 | $ 1,537,926 | $ 806,703 | $ 1,537,926 | $ 1,007,574 |
| Medicaid | 635,217 | 635,217 | 635,217 | 635,217 | 635,217 |
| Commercial | 1,845,906 | 1,845,906 | 1,476,725 | 2,030,496 | 1,845,906 |
| Pool Receipts | 953,676 | | | | 953,676 |
| Self-Pay | 9,306 | 9,306 | 7,445 | 9,306 | 9,306 |
| Physicians & Clinics | 90,829 | 90,829 | 72,663 | 90,829 | 90,829 |
| Meaningful Use | - | - | - | - | - |
| Medicare Settlements | | | | | |
| Other Receipts | 410,951 | 402,226 | 330,506 | 420,902 | 410,951 |
| **Total Receipts from Operations** | $ 4,953,459 | $ 4,521,409 | $ 3,329,258 | $ 4,724,676 | $ 4,953,459 |
| **Disbursements from Operations** | | | | | |
| Payroll & Taxes | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 | $ 3,726,635 | $ 1,717,178 |
| Contract Labor | 116,200 | 47,000 | 47,000 | 47,000 | 116,200 |
| Benefits (Union) | 1,161,000 | - | 175,000 | - | 1,161,000 |
| Benefits (Non-Union) | 590,000 | 280,000 | 224,000 | 280,000 | 480,000 |
| AP Vendors & Supplies | 1,118,668 | 943,728 | 1,083,166 | 1,179,836 | 961,011 |
| Utilities | - | 399,550 | | | |
| Insurance | 183,500 | 125,000 | 141,786 | 125,000 | 183,500 |
| Rent | 24,000 | | - | - | 24,000 |
| Pool Disbursements | - | 304,000 | | | |
| Secured Debt Payments | 112,429 | - | | | 112,429 |
| Other | - | 750 | 25,000 | - | - |
| **Total Disbursements from Operations** | $ 5,022,975 | $ 5,826,663 | $ 3,413,130 | $ 5,358,471 | $ 4,755,318 |
| **Net Cash Flows from Operations** | $ (69,516) | $ (1,305,254) | $ (83,872) | $ (633,795) | $ 198,141 |
| **Non-Recurring Receipts/(Disbursements)** | | | | | |
| HEAL | $ - | $ - | $ - | $ - | $ - |
| Payroll Tax Payment (Arrears) | - | - | - | - | - |
| Restructuring Related Disbursements | (415,000) | - | - | - | (280,000) |
| Sale of Asset | - | - | - | - | - |
| Intercompany | - | - | - | - | - |
| **Total Non-Recurring Activities** | $ (415,000) | $ - | $ - | $ - | $ (280,000) |
| **Net Cash Flows Including Non-Recurring** | $ (484,516) | $ (1,305,254) | $ (83,872) | $ (633,795) | $ (81,859) |
| **Net Financing Activity (MidCap)** | $ 440,303 | $ 878,371 | $ - | $ - | $ (0) |
| **Ending Book Balance** | $ 42,543 | $ (384,340) | $ (468,211) | $ (1,102,006) | $ (1,183,866) |
| **Outstanding Checks** | 528,055 | 392,102 | 530,053 | 588,989 | 441,929 |
| **Ending Bank Balance** | $ 570,598 | $ 7,762 | $ 61,842 | $ (513,017) | $ (741,937) |
| **MidCap Financing Activities** | | | | | |
| **Beginning Balance** | $ 29,281,326 | $ 29,721,629 | $ 30,600,000 | $ 30,600,000 | $ 30,600,000 |
| MidCap Paydown | (2,714,318) | (2,843,133) | (2,131,197) | (3,066,027) | (2,714,318) |
| MidCap Advances | 2,656,419 | 3,721,504 | 2,131,197 | 3,066,027 | 2,218,786 |
| Mortgage, Interest & Fees | 498,203 | | | | 495,532 |
| **Ending Balance per BB** | $ 29,721,629 | $ 30,600,000 | $ 30,600,000 | $ 30,600,000 | $ 30,600,000 |
| **SSMC BB Balance** | 14,121,629 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 |
| **SECC BB Balance** | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 | 1,200,000 |
| **MVH BB Balance** | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 | 4,400,000 |
| **Term Loan Balance** | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 | 10,000,000 |
| **Term Loan Reserve** | 878,371 | - | - | - | - |