**Exhibit D**

**Interim Order**

GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A Shah
Proposed Counsel for Debtors
And Debtors in Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                    Chapter 11

SOUND SHORE MEDICAL CENTER OF                             Case No. 13-
WESTCHESTER, *et al.*
                                                         _____

                        Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER: (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION
SECURED, SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C.
§ 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED
CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III)
SCHEDULING A FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND 4001(c)**

Upon consideration of the motion dated May 29, 2013 (Dkt. No. ▓▓) (the "***Motion***") filed

by Sound Shore Medical Center of Westchester ("***SSMC***"), The Mount Vernon Hospital, Inc.

("***MVH***"), and Howe Avenue Nursing Home d/b/a Schaffer Extended Care Center ("***SECC***"), as

debtors and debtors-in-possession herein (each a "***Debtor***" and collectively, the "***Debtors***")[1] in

these cases, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1) and 364(e) of title 11 of the United States Code (the "***Bankruptcy Code***"), Rules 2002,

---

[1]    Certain additional affiliates also filed voluntary Chapter 11 petitions, but each of these have limited
operations and assets. They include: Sound Shore Health System, Inc., NRHMC Services Corporation, The M.V.H.
Corporation, and New Rochelle Sound Shore Housing, LLC (0117). There are certain additional affiliates of the
Debtors who are not debtors in these Chapter 11 Cases and have not sought relief under Chapter 11.

2529656v.5

4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule

4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***")

seeking:

a)        Authorization under sections 364(c) and 364(d) of the Bankruptcy Code and Rule

4001(c) of the Bankruptcy Rules for SSMC, MVH, and SECC to obtain secured, superpriority

postpetition financing consisting of the following:

(i)        a revolving facility with a principal amount of up to Twenty-Three Million

Dollars ($23,000,000) (the "***DIP Revolving Facility***")[2] as set forth in that certain Debtor in

Possession Revolving Credit and Security Agreement, dated as of May ___, 2013, by and

between the Debtors and MidCap Financial, LLC ("***MidCap***") or one of its affiliates (as

lender, the "***DIP Revolving Lender***" and as agent, the "***DIP Revolving Agent***"), a true and

correct copy of which is attached to this Interim Order as **Exhibit A** (the "***DIP Revolving***

***Loan Agreement***"); and

(ii)        a term loan facility in the principal amount of Ten Million Dollars

($10,000,000) (the "***DIP Term Loan***", and together with the DIP Revolving Facility, the

"***DIP Financing***") as set forth in that certain term sheet (the "***DIP Term Loan Term***

***Sheet***"), a true and correct copy of which is attached to this Interim Order as **Exhibit B**,

and which shall be governed by terms substantially similar to those contained in the DIP

Revolving Loan Agreement with such revisions as are customary for a term loan facility to

be memorialized in a Debtor In Possession Term Loan Agreement ( the "***DIP Term Loan***

***Agreement***" and, together with the DIP Revolving Loan Agreement, the "***DIP Credit***

---

[2]        The actual available principal amount at any time under the DIP Revolving Facility shall be the Revolving Loan Availability (as defined in the DIP Revolving Loan Agreement). As further described in the DIP Revolving Loan Agreement, until payment in full of the outstanding Prepetition Revolving Loan Obligations (as defined herein), the Borrowing Base will be solely comprised of (a) the postpetition Eligible Accounts generated by SSMC and SECC and (b) the prepetition and postpetition Eligible Accounts generated by MVH.

*Agreement"*)[3] entered into by and between the Debtors and MidCap or one of its affiliates (as lender, the *"DIP Term Loan Lender"* and as agent, the *"DIP Term Loan Agent"*)[4]

b)    Authorization under section 363 of the Bankruptcy Code and Rules 4001(b) and 6004 of the Bankruptcy Rules for the Debtors to use any cash collateral the Debtors are holding or may obtain, and to use the proceeds from the DIP Financing for the payment of: (i) the obligations owing to MidCap Funding IV, LLC (*"MidCap Funding"*) under the Prepetition Revolving Loan Agreement (the *"Prepetition Revolving Loan Obligations"*); (ii) pay the fees and expenses due DIP Agent under the DIP Credit Agreement; (iii) pay all Prepetition Term Loan Obligations as they become due under the Prepetition Term Credit Agreement; (iii) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (iv) the costs and expenses associated with these Chapter 11 cases (the "Chapter 11 Cases"), all in accordance with the terms of the Debtors' proposed budget (the *"Budget"*), a copy of which is annexed hereto as **Exhibit C**;

c)    authorization for the Debtors to grant security interests, liens, superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code), and related protections to the DIP Agent and DIP Lender to secure all DIP Obligations (as defined herein), in accordance with the provisions of this Interim Order and as set forth in DIP Revolving Loan Agreement and DIP Term Loan Agreement;

d)    authorization for the Debtors to execute and deliver the DIP Revolving Loan Agreement, the DIP Term Loan Term Sheet, the DIP Term Loan Agreement, Prepetition Term

---

[3]    Capitalized terms used in this Interim Order, unless herein defined, are used with the meanings ascribed to such terms in the DIP Credit Agreement.

[4]    The Dip Term Loan Lender, together with the DIP Revolving Loan Lender, shall be referred to as the *"DIP Lender"*. The DIP Term Loan Agent, together with the DIP Revolving Loan Agent, shall be referred to as the *"DIP Agent"*

3

Loan Amendment, a postpetition amendment to the Prepetition Revolving Credit Agreement (if deemed necessary by DIP Agent to effectuate the DIP Financing), and all other loan documents related thereto (collectively, the "***DIP Documents***") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and pursuant to the provisions of this Interim Order and any Final Order (as hereinafter defined) (collectively, the **"Financing Orders"**);

e)    the approval of certain stipulations by the Debtors with respect to the Original Loan (as defined below), Prepetition Revolving Loan, Prepetition Term Loan, and Prepetition Debt (each as defined herein), and the liens and security interests arising with respect thereto;

f)    subject only to and effective upon entry of a final order granting the foregoing relief and such other relief as provided herein and in such final order (the "***Final Order***"), the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

g)    authorization for the Debtors to continue to use the "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "***Cash Collateral***") of the Secured Creditors (as defined herein) and MidCap Funding;

h)    authorization for the Debtors to grant the DIP Agent allowed, superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (as defined herein) for the DIP Financing and all obligations owing thereunder and under the DIP Documents (collectively, and including all "Obligations" as described in the DIP Documents, the "***DIP Obligations***"), as more fully set forth in this Interim Order;

i)    authorization for the Debtors to grant the DIP Agent automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without

4

limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth in Paragraphs 9 and 10 below;

j)      authorization for the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, closing/origination fees, unused line fees, collateral management fees, appraisal and/or audit fees, exit fees, the fees and disbursements of the DIP Agent's attorneys, advisors, accountants, and other consultants, and any other legal expenses of the DIP Agent and DIP Lender, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

k)      authorization for the Debtors to use the proceeds of the DIP Financing in all cases in accordance with the Budget, and as otherwise provided in the DIP Documents;

l)      authorization for the Debtors to provide adequate protection to the Secured Creditors (as defined herein) pursuant to the terms of this Interim Order for any diminution in value of their respective interests in the Prepetition Collateral (as defined below);

m)      to vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order; and

n)      to waive any applicable stay as provided in the Bankruptcy Rules and provide for the immediate effectiveness of this Interim Order.

The Debtors having requested in the Motion that pending a final hearing on the Motion (the "*Final Hearing*"), a hearing be scheduled on an expedited basis (the "*Interim Hearing*") to consider the entry of this order approving the DIP Financing on an interim basis; and upon finding that notice of the Interim Hearing was given, where possible, to: (a) United States Trustee; (b) the Debtors' material prepetition and postpetition secured lenders or any agent therefor; (c) the

5

holders of the 30 largest unsecured claims on a consolidated basis; (d) the following state and local taxing and regulatory authorities: (i) the Centers for Medicare and Medicaid Services, (ii) the New York State Department of Health ("*DOH*"), (iii) the United States Attorney for the Southern District of New York, (iv) the Attorney General of the State of New York; (v) the Westchester County Attorney; (vi) the New Rochelle City Attorney, (vii) the Mount Vernon City Attorney; (viii) the Internal Revenue Service; (ix) the New York State Department of Taxation and Finance; (e) counsel to Montefiore Medical Center ("*MMC*"); (f) the United States Department of Justice, Commercial Litigation; (g) the United States Department of Health and Human Services; (h) all parties known by the Debtors claiming to have Liens on or security interests in any of the Debtors' property; and (i) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "*Notice Parties*"), in accordance with Rules 2002, 4100(b), (c) and (d), and 9014 of the Bankruptcy Rules; and upon finding that this Court has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334; and upon finding that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Interim Hearing to consider the Motion on an interim basis having been held and concluded; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief is fair and reasonable and in the best interest of the Debtors, their estates, and their creditors and equity holders, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and good and sufficient cause appearing therefor, it is hereby found:

A.     *Petition Date*.  On May ___, 2013 (the "*Petition Date*"), each of the Debtors filed a separate voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "*Court*"), thereby commencing the Chapter 11 Cases.

6

B.    *Debtors in Possession*.  Each of the Debtors is continuing in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and no trustee or examiner has been appointed in these Chapter 11 Cases.  SSMC is a not-for-profit, 252-bed, community-based, teaching hospital offering primary, acute, emergency and long-term health care to the working class residents of southern Westchester.  MVH is a voluntary, not-for-profit, 196-bed hospital located at 12 North Seventh Avenue, Mount Vernon, New York, serving the City of Mount Vernon, the Pelhams, East Yonkers, New Rochelle and North Bronx.  SECC is a 150-bed, comprehensive facility offering short-term rehabilitation, sub-acute care, as well as skilled long-term care.  Together, in furtherance of their charitable mission, the Debtors provide critical healthcare services to uninsured and indigent populations and are designated safety net providers.

C.    *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

D.    *Notice*.  Notice of the Motion, the relief requested in the Motion, and the Interim Hearing was served by the Debtors on the Notice Parties.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing.  Under the circumstances, the notice given by the Debtors of the Motion and the Interim Hearing: (i) was, in the Debtors' good faith belief, the best available under the circumstances; (ii) constitutes due and sufficient notice thereof; and (iii) complies with Rules 4001(b) and 4001(c) of the Bankruptcy Rules.  No further notice of the relief sought at the Interim Hearing is necessary or required.

E.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party in interest (but subject to the limitations thereon contained in subparagraphs (x) and (xi) of Paragraph H of this Interim Order), the Debtors admit, stipulate and agree that:

7

*i.*     *MidCap Prepetition Debt.* Prior to the Petition Date, pursuant to that certain Credit and Security Agreement dated April 8, 2011 and related financing documents (the "*Original Credit Agreement*") by and between SSMC and MidCap, as lender and agent (the "*Prepetition Revolving Loan Agent*"), the Prepetition Revolving Loan Agent made available to SSMC a revolving credit facility in an amount up to Fifteen Million Dollars ($15,000,000) (the "*Original Loan*"), which Original Loan was secured by SSMC's accounts receivable arising out of the performance or delivery of any medical, surgical, diagnostic, dental or other professional services and/or the supply of goods related to such services (the "*Prepetition Accounts*"). The Prepetition Revolving Loan Agent immediately assigned its rights and obligations as agent under the Original Credit Agreement to MidCap Funding. Subsequently, pursuant to a certain Amended and Restated Credit and Security Agreement dated June 8, 2011, and related financing documents (the "*Prepetition Revolving Credit Agreement*"), the Original Credit Agreement was modified to add SECC as a borrower and increase the amount of the Original Loan to a revolving loan in an amount up to Eighteen Million Dollars ($18,000,000) (the "*Prepetition Revolving Loan*"). In addition, in connection with the Prepetition Revolving Credit Agreement and Prepetition Revolving Loan, each of SSMC and SECC granted a lien in their respective Prepetition Accounts to secure the Prepetition Revolving Loan and a certain Prepetition Term Loan.[5] As of the Petition

---

[5]     On the same date, SECC and MidCap, as lender and agent (the *Prepetition Term Loan Agent*") entered into a Credit and Security Agreement and related Mortgage, Assignment of Leases and Rents and Security Agreement (collectively, the "*Prepetition Term Loan Agreement*" and, together with the Original Credit Agreement and Prepetition Revolving Credit Agreement, the "*Prepetition Credit Agreements*"), pursuant to which the Prepetition Term Loan Agent extended SECC a term loan in the original principal amount of Seven Million Dollars ($7,000,000) (the "*Prepetition Term Loan*") secured by a first priority mortgage lien (the "*Prepetition Mortgage*") on SECC's real property located at 75 Glover Johnson Place, New Rochelle, NY (the "*SECC Property*"). The Prepetition Term Loan Agent immediately assigned its rights and obligations as agent under the Prepetition Term Loan Agreement to MidCap Funding. On or prior to the closing of the DIP Revolving Loan Agreement, SECC and MidCap Funding shall amend the Prepetition Term Loan Agreement (the "*Prepetition Term Loan Amendment*") to, *inter alia*, add the DIP Revolving Loan Agreement to the defined term "Affiliated Financing Documents" and the DIP Revolving Facility to the defined term "Affiliated Obligations".

2529656v.5

Date, SSMC and SECC were indebted and liable to MidCap Funding, without defense, counterclaim or offset of any kind, in the outstanding principal amount of approximately $16.2 million on account of the Prepetition Revolving Loan and approximately $5.8 million on account of the Prepetition Term Loan (collectively, the "***MidCap Prepetition Debt***").

      *ii.*    *MidCap Prepetition Liens.* The liens and security interests granted to MidCap Funding pursuant to and in connection with the Original Credit Agreement, Prepetition Revolving Credit Agreement, and Prepetition Term Loan Agreement (collectively, the "***MidCap Prepetition Liens***") are: (i) valid, binding, perfected, enforceable, first-priority liens and security interest in the personal and real property described in the Prepetition Credit Agreements (the "***MidCap Prepetition Collateral***"); and (ii) not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

    F.    *MidCap Prepetition Collateral.* The aggregate value of the MidCap Prepetition Collateral substantially exceeds the aggregate amount of the MidCap Prepetition Debt.

    G.    *Other Secured Creditors.* Without prejudice to the rights of any other party in interest , the Debtors contend that

      *i.*    *Sun Life Assurance Company of Canada (US) ("Sun Life").* On April 4, 2006, SSMC executed a Promissory Note (the "***Sun Life Note***") and Mortgage and Security Agreement (the "***Sun Life Mortgage***") in favor of Sun Life in the original principal amount of $12 million, secured by a first mortgage on the SSMC real property which constitutes the main hospital campus and SSMC's ambulatory care facility and clinics (the "***SSMC Property***"). The Debtors assert there is currently due to Sun Life approximately $8.98 million under the Sun Life Note.

      *ii.*    *Pension Benefit Guaranty Corporation ("PBGC").* PBGC holds two alleged secured claims:

9

1.    First, as security for SSMC's failure to meet the terms of its minimum funding waiver under its defined benefit pension plan ("**SSMC Pension Plan**") for the 1995 and 1997 years (which was guaranteed by PBGC), and to secure its obligations to the PBGC for those amounts (the "**SSMC Pension Plan Claim**") SSMC granted the PBGC mortgage liens in the original principal amount of $2.582 million in April, 1997 and $3.488 million in November, 1998 encumbering certain parking lots (the "**SSMC Lots**") situate on the SSMC hospital campus (the "**PBGC Lot Mortgages**"). As of the Petition Date, the Debtors assert that the outstanding amount of the SSMC Pension Plan Claim is approximately $5.763 million.

2.    On July 31, 2010, MVH terminated the Mount Vernon Hospital Employees' Retirement Plan (the "**MVH Pension Plan**"), and PBGC asserted a claim for unfunded benefit liabilities as of the Plan termination date in the alleged amount of $4.032 million (the "**MVH Pension Plan Claim**"). On July 15, 2010, PBGC filed a Notice of Federal Lien under IRC Section 412(n) against the MVH real and personal property (the "**PBGC MVH Lien**").

iii.    *Dormitory Authority of the State of New York ("DASNY")*. DASNY holds two alleged secured claims:

1.    On August 11, 2009, SSMC and DASNY entered into a Reimbursement Agreement (the "**2009 Reimbursement Agreement**") which provided for working capital advances by DASNY in the amount of $5 million to SSMC (the "**DASNY 2009 SSMC Loan**"). As security for the DASNY 2009 SSMC Loan, DASNY was granted a lien in SECC's real property. To later facilitate the refinancing of SSMC's credit facility under the Prepetition Revolving Credit Agreement, DASNY agreed to subordinate its mortgage lien on SECC's real property to MidCap Funding. As of the Petition Date, DASNY asserts the outstanding amount of the DASNY 2009 SSMC Loan is approximately $5.187 million.

2.      On August 14, 2012, DASNY and SSMC executed an additional reimbursement agreement (the "*2012 SSMC Agreement*"), pursuant to which DASNY advanced a working capital loan in the amount of $2.9 million to SSMC ("*DASNY 2012 SSMC Loan*"). As security for the DASNY 2012 SSMC Loan, DASNY was granted a second lien and security interest on the MVH real property and a lien on the proceeds of any HEAL NY Grants awarded to SSMC. As of the Petition Date, DASNY asserts the outstanding balance of the DASNY 2012 SSMC Loan is approximately $2.92 million..

iv.      *Hudson Valley Bank ("HVB")*. On April 6, 2004 and October 28, 2005, MVH procured two revolving lines of credit from HVB in the amounts of $2 million and $3 million respectively, which were ultimately consolidated into a single revolving line of credit (the "*HVB Revolving Loan*") pursuant to a mortgage modification and extension agreement, dated as of October 28, 2005. As security for the HVB Revolving Loan, MVH was granted a first lien in the MVH Property. In addition, HVB was granted a first lien on all of MVH's revenues, receipts, income, accounts, accounts receivables, inventory, personal property and general intangibles As part of the arrangement, MVH also executed an Assignment of Leases and Rents, assigning all of MVH's rights as lessor under any leases affecting the Property was also executed. As of the Petition Date, the Debtors assert HVB is owed approximately $702,790.

v.      *Internal Revenue Service ("IRS")*. The IRS holds two alleged secured claims:

1.      On April 16, 2013, the IRS filed a Notice of Federal Tax Lien against the property of MVH in the amount of $736,805.90 ("MVH Tax Lien"), covering unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30 and September 30, 2012. Any underlying tax and interest has been paid. Since the filing of the MVH Tax Lien, the IRS has issued a waiver of penalties. Thus, the Debtors contend that although there

11

has been no formal release of lien as of the Petition Date, the underlying liability has been satisfied and the lien is of no force and effect.

2.    On March 28, 2013, the IRS filed a Notice of Federal Tax Lien against the property of SSMC in the amount of $1461,400 ("**SSMC Tax Lien**"). The lien covered unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30 and September 30, 2012. The underlying taxes and interest have been paid. The Debtors have been advised that a waiver of penalties has been granted and a release of lien is forthcoming.

        *vi.    Other Judgments and Liens* (the "***Other Judgment and Lien Creditors***").

1.    1199 SEIU Healthcare Workers ("**Local 1199**"), one of the Debtors' principal unions, has obtained multiple judgments against each of SSMC and MVH for unpaid contributions and benefit payments due the 1199 Funds and has recorded the judgments against SSMC and MVH real property. Local 1199 currently asserts judgments liens on the SSMC and MVH real property in the approximate amount of $908,000 and $496,000 respectively. New York State Department of Labor has recorded judgments against SSMC in the aggregate amount of $21,800 and against MVH in the aggregate amount of $117,670.

2.    Various mechanics lien have also been asserted of record as follows: SSMC: (i) Graybar Electric Company, Inc- $17,458 recorded May 29, 2012; (ii) D&D Elevator Maintenance, Inc - $525,880 recorded August 22, 2012; and (iii) Omega Environmental Services, Inc. - $138,742, recorded February 13, 2013. and MVH: (i) StonCor Group, Inc. - $4995.40, recorded May 25, 2012.[6]

---

[6]    Sun Life, PBGC, DASNY, HVB, IRS and the Other Judgment and Lien Creditors are collectively referred to herein as the "*Secured Creditors*". The prepetition liens and claims of the Secured Creditors and MidCap Funding are collectively referred to the "*Prepetition Liens*"), and the real and personal property in which the Secured Creditors and MidCap Funding hold Prepetition Liens is collectively referred to herein at the "*Prepetition Collateral*"). The prepetition claims and obligations of the Secured Creditors and MidCap Funding secured by their respective Prepetition Liens in Prepetition Collateral are collectively referred to as the "*Prepetition Obligations*".

H.    *Findings Regarding the DIP Financing*.

i.    *Good Cause*. Good cause has been shown for the entry of this Interim Order.

ii.    *Immediate Need*. The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral. The access of the Debtors to sufficient working capital and liquidity through the incurrence of the DIP Financing and concomitant financial accommodations, along with the use of Cash Collateral, is vital to the preservation and maintenance of the going concern value of the Debtors. Absent the DIP Financing, the Debtors will not have sufficient sources of working capital to continue as a community based, acute care provider of essential medical services and maintain the value of their assets. The ability of the Debtors to pay their medical staff and other employees, provide critical patient care, maintain business relationships with vendors and suppliers, purchase new inventory, and otherwise finance their operations is essential to the Debtors' continued viability and the ultimate process of selling the Debtors' assets on a going concern basis to a stronger financial partner. Without the DIP Financing, serious and irreparable harm could result not only to the operations, but to the very persons who depend upon the Debtors' operations including, but not limited to, the Debtors' underserved patient population.

iii.    *No Credit Available on More Favorable Terms*. Given the Debtors' current financial condition, financing arrangements, capital structure, and other factors described in the Motion, the Debtors are unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Financing. The Debtors have been unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code or solely in exchange for the grant of a special administrative expense priority pursuant to section 364(c)(1) of the Bankruptcy Code. The Debtors have also been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 502(b),

13

507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not otherwise subject to a lien pursuant to section 364(c)(2) of the Bankruptcy Code; or (c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien pursuant to section 364(c)(3) of the Bankruptcy Code. Within the timeframe required, financing on a postpetition basis is not otherwise available without granting the DIP Agent: (a) perfected security interest in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth in Paragraphs 9 and 10 hereof; (b) superpriority claims with the priorities set forth in Paragraph 11 hereof; and (c) the other protections, terms and conditions set forth in this Interim Order.

   *iv.* *Fair and Reasonable Terms.* The terms of the DIP Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

   *v.* *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of the DIP Financing and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Financing was negotiated in good faith and at arms' length among the Debtors and the DIP Agent. The credit extended under the DIP Financing shall be deemed to have been so extended in good faith and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Agent is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order will not be affected by any subsequent reversal or modification on appeal of this Interim Order or any other order.

14

vi.     *Priming of Liens and Other Security Interests.*  The priming of the Secured Creditors' Prepetition Liens to the extent set forth below pursuant to section 364(d) of the Bankruptcy Code is necessary to obtain the DIP Financing.  In exchange for the priming of the Prepetition Liens set forth below, the Secured Creditors shall be entitled to receive adequate protection, as set forth in this Interim Order, pursuant to sections 361, 363 and 364 of the Bankruptcy Code for any diminution in the value of their respective interests in the Prepetition Collateral resulting from, among other things, the subordination to the Carve Out (as defined herein) and to the DIP Liens (as defined herein), the Debtors' use, sale or lease of such Prepetition Collateral, and the imposition of the automatic stay from and after the Petition Date (collectively, and solely to the extent of such diminution in value, the *"Diminution in Value"*).

vii.    *Use of Proceeds of the DIP Financing.*  As a condition to the entry into the DIP Documents and the extension of credit under the DIP Revolving Facility and DIP Term Loan, the DIP Agent requires, and the Debtors have agreed, that the proceeds of the DIP Financing shall be used in a manner consistent with the terms and conditions of the DIP Documents, including any covenant contained therein pertaining to compliance with the Budget as the same may be modified from time to time in accordance with the consents required under the DIP Documents (the *"Budget Compliance Covenant"*), solely for: (a) subject to entry of a Final Order, refinancing the Prepetition Revolving Loan; (b) payment of all amounts owing on the Prepetition Term Loan as they come due pursuant to the terms of the Prepetition Term Loan Agreement; (c) working capital and other general corporate purposes; (d) permitted payment of costs of administration of the Chapter 11 Cases (subject to the limitations of the Carve Out); and (e) payment of fees and expenses due according to the terms of the DIP Documents.

viii.   *Application of Proceeds of Collateral.*  As a condition to the entry into the DIP Documents and the extension of credit under the DIP Facility, the Debtors have agreed that as

15

of and commencing on the date of entry of the Order, the Debtors shall apply the proceeds of DIP

Collateral as set forth in the DIP Documents.

       ix.    *Irreparable Harm.*  The Debtors have requested entry of this Interim Order

pursuant to Rules 4001(b)(2) and Rule 4001(c)(2) of the Bankruptcy Rules and Rule 4001-2 of the

Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be

immediately and irreparably harmed.  Consummation of the DIP Financing and the use of Cash

Collateral in accordance with the provisions of this Interim Order and the DIP Documents is

therefore in the best interests of the Debtors' estates.

       x.    *Challenge Period.*  Notwithstanding anything contained herein to the

contrary, all acknowledgments, admissions, and confirmations of the Debtors above regarding the

extent, validity, priority, perfection, and enforceability of the MidCap Prepetition Liens are for all

purposes subject to the rights of any party in interest (including any committee appointed under

section 1102 of the Bankruptcy Code (the "***Committee***") and any trustee appointed or elected in

the Chapter 11 Cases), other than the Debtors or any of their affiliates, to file a complaint pursuant

to Rule 7001 of the Bankruptcy Rules seeking to invalidate, subordinate, or otherwise challenge

(collectively, the "***Challenges***") the MidCap Prepetition Liens; provided, however, that any such

Challenges must be filed in this Court within the later of sixty (60) days after the entry of a Final

Order or any subsequent date ordered by the Bankruptcy Court, or that may be agreed to in writing

by MidCap Funding with respect to the time to file any such Challenges.  If no such Challenges

are filed within such time period, then: (a) any and all Challenges shall be, without further notice

to or order of the Court, deemed to have been forever relinquished, extinguished, released, and

waived as to such Committee and other parties in interest; and (b) any and all claims and defenses

against MidCap Funding shall be deemed, immediately and without further action, to have been

2529656v.5

forever relinquished, extinguished, released, and waived as to such Committee and other parties in interest.

   *xi.*    *Avoidance Rights of the Debtor.*  Nothing herein shall prejudice or adversely impact the right of the Debtors or any of their affiliates to seek to avoid any Prepetition Lien of any other Secured Creditor in accordance with the terms of the Bankruptcy Code.

   Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

   **IT IS HEREBY ORDERED that:**

   1.    *DIP Financing Approved*.  The DIP Financing is authorized and approved on an interim basis, subject to the terms and conditions set forth in this Interim Order, the DIP Documents and the Budget.  Subject to and upon entry of the Final Order, the Debtors are authorized and directed on a final basis to use proceeds of the DIP Revolving Facility to refinance the  Prepetition Revolving Loan Obligations; provided, however, until the refinancing of the Prepetition Revolving Loan Obligations has been made, the Prepetition Revolving Loan Obligations shall receive adequate protection and adequate protection payments, and after the refinancing of the Prepetition Revolving Loan Obligations, the Debtors' indemnification obligations under the Prepetition Revolving Credit Agreement shall become DIP Obligations.

   2.    *Objections Overruled*.  All objections to the entry of this Interim Order are hereby overruled to the extent they have not otherwise been resolved or withdrawn.

   3.    *Authorization of the DIP Financing and DIP Documents*.  The DIP Documents are hereby approved for the DIP Financing on an interim basis.  Subject to the limitations herein provided, the Debtors are expressly and immediately authorized, empowered and directed to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to

17

deliver all instruments and documents which may be required or necessary for performance by the

Debtors of their obligations in respect of the DIP Financing and the creation and perfection of the

DIP Liens (as defined below) described in and provided for by this Interim Order and the DIP

Documents.  The Debtors are hereby authorized and directed to pay the principal, interest, fees,

expenses and other amounts described in the DIP Documents as such become due and without

need to obtain further Court approval, all to the extent provided in the DIP Documents, including,

without limitation, origination fees, collateral fees, an unused line fee, appraisal and inspection

fees and, whether or not the transactions contemplated hereby are consummated, any pre-closing

fees and expenses, closing fees and expenses, audit fees to which DIP Agent is entitled and the

reasonable fees and disbursements of the DIP Agent's attorneys, advisers, accountants, and other

consultants.  Upon payment, such amounts shall be deemed fully earned, indefeasibly paid, and

non-refundable.  The professional fees and expenses incurred by the DIP Agent and DIP Lender

are not subject to the provisions of sections 327, 328, 329, 330, or 331 of the Bankruptcy Code,

and shall be paid by the Debtors pursuant to the DIP Documents without further order of the

Court; provided, that no disbursement shall be made by the Debtors on account of the fees and/or

costs incurred by DIP Agent's or the DIP Lender's attorney, advisors, accountants or other

consultants without (i) copies of detailed monthly invoices (redacted as necessary to protect

privileged matters) for DIP Agent's and DIP Lender's professional fees and expenses having been

provided at least ten (10) days in advance to (x) counsel for the Debtors, (y) counsel for any

Committee and (z) the Office of the United States Trustee and (ii) unless no written objection as to

the reasonableness of those fees and/or costs has been filed with this Court by the Debtors or the

Committee within such ten (10) day period or such objection has been overruled by this Court or

withdrawn.  Professionals for the DIP Agent and DIP Lender shall not be required to file fee

applications or comply with the U.S. Trustee fee guidelines.

4.    *Deposit of Proceeds*. All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. So long as the DIP Credit Agreement remains in effect or there are outstanding DIP Obligations, Debtors shall cause all proceeds of the DIP Collateral to be remitted to one or more lockboxes designated by the DIP Documents via electronic funds transfer, but if any such proceeds are received by Debtors, the same shall be promptly deposited to a dominion account or concentration account in the name or under the control of DIP Agent or, solely with respect to governmental lockbox accounts under the control of Debtors with standing instructions to transfer all amounts on deposit therein to DIP Agent on a daily basis, all as more fully set forth in the DIP Documents. Each of Debtors' deposit accounts, including, without limitation, those to which proceeds of DIP Collateral are deposited, shall be subject to such transfer instructions and other account agreements as are set forth in the DIP Documents or are required by the DIP Agent pursuant thereto, or which are otherwise necessary to effectuate the liens on and security interests in the DIP Collateral granted to DIP Agent herein. The DIP Agent shall be authorized to apply all such proceeds (subject to final payment or collection in the case of checks or other payment items) to the DIP Obligations in accordance with the DIP Documents. Prior to the remittance to the DIP Agent of any proceeds of the DIP Collateral, Debtors shall be deemed to hold such proceeds for the benefit of the DIP Agent. Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with their terms. All instructions and account agreements implemented in connection with Prepetition Revolving Credit Agreement shall remain in effect until otherwise agreed to in writing by the DIP Agent.

19

5.    *Authorization to Borrow*.  Until the earlier of (a) the Termination Date (as defined in Section 1.1 of the DIP Revolving Loan Agreement), (b) the termination of obligations under the DIP Documents by the DIP Agent upon the occurrence and during the continuation of an Event of Default (as defined below), and (c) the date of the filing of any Challenges (such earlier date, the "*Expiration Date*"), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to request, and DIP Agent shall provide to the Debtors, extensions of credit under the DIP Financing (in the form of loans).

6.    *Authorization to Use of Cash Collateral*.  The Debtors shall be authorized to use the Cash Collateral derived from the operations of SSMC, MVH, SECC and their real and personal property in accordance with the terms of this Interim Order, including, without limitation, in accordance with the Budget and Budget Compliance Covenant.  For purposes of this Interim Order, Cash Collateral includes (a) all cash proceeds of Prepetition Collateral in which the Secured Creditors and MidCap Funding have an interest, whether such interest existed as of the Petition Date or arises thereafter pursuant to this Interim Order, any other order of this Court, applicable Law or otherwise, and (b) proceeds of the MidCap Prepetition Debt or the Prepetition Obligations.  With respect to collections of Cash Collateral after the Petition Date that are proceeds of the MidCap Prepetition Collateral, MidCap Funding shall be permitted to apply such amounts against the Prepetition Revolving Loan Obligations and, after payment, in full of the Prepetition Revolving Loan Obligations, such amount shall be remitted to the DIP Revolving Agent for application against the DIP Revolving Facility Obligations.  Notwithstanding the foregoing, in no event shall any Secured Creditor be required to fund any overdraft or overadvance or otherwise extend credit to any of the Debtors and any obligations to honor disbursements shall be based on collected funds.

20

7.    *DIP Obligations*. The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations, which DIP Obligations shall be enforceable against the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "*Successor Cases*"). Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Lender under the DIP Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses and other amounts owed pursuant to the DIP Documents. The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date (as defined herein).

8.    *Payment of Principal, Interest, Fees, Etc.*. The Debtors shall pay to the DIP Agent and MidCap Funding, on account of the Prepetition Term Loan, principal and interest as provided in the DIP Documents and in accordance with the procedures set forth therein. In consideration of the financial accommodations made by the DIP Agent and DIP Lender under this Interim Order and the DIP Documents, in accordance with Paragraph 3 of this Interim Order, the Debtors are hereby authorized, without further order of this Court and as set forth in the DIP Documents, to: (a) pay to the DIP Agent all reasonable fees and charges, including, but not limited to, origination fees, collateral management fees, and any other administrative or service fees payable under the DIP Documents; and (b) reimburse the DIP Agent and DIP Lender for all reasonable out-of-pocket expenses, professional fees, and other disbursements incurred by them in connection with the preparation of the DIP Documents or other aspects of these Chapter 11 Cases.

21

9.    *DIP Liens and DIP Collateral*.  Effective immediately upon the entry of this

Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy

Code:

(a)    the DIP Revolving Loan Agent, as security and collateral for the DIP

Revolving Facility, is hereby granted continuing, valid, binding, enforceable, non-avoidable and

automatically and properly perfected: (i) first priority security interests in and liens on, and

pledges of, such now existing and hereafter acquired assets of SSMC and SECC to the same extent

as described in the Prepetition Revolving Credit Agreement; (ii) first priority security interests in

and liens on the "Collateral" (as defined in Schedule 9.1 of the DIP Revolving Loan Agreement);

(iii) subject and subordinate to any pre-existing liens, including the first mortgage lien presently

existing in favor of Sun Life , any judgment liens in favor of the 1199 Funds and any other pre-

existing liens of any other Judgment and Lien Creditor, security interests in and liens on all of the

real and personal property comprising the Sound Shore Medical Center located at 16 Guion Place,

New Rochelle, NY; (iv) subject and subordinate to any pre-existing liens, including the first

mortgage lien presently existing in favor of HVB, any liens in favor of DASNY and PBGC, any

judgment liens in favor of the1199 Funds, and any other pre-existing lines of any other Judgment

and Lien Creditor, security interests in and liens on all of the real and personal property

comprising the Mount Vernon Hospital located at 12 N 7th Ave, Mt. Vernon, NY 10550;

(v) subject and subordinate to any pre-existing liens, including the first mortgage lien presently

existing in favor of MidCap Funding as per that certain Subordination Agreement, as may have

been amended from time to time, made as of June 8, 2011 by and among DASNY and MidCap

Funding, as successor to the Prepetition Term Loan Agent, any liens in favor of DASNY and

PBGC, and any other pre-existing liens of any Other Judgment and Lien Creditor, security

interests in and liens on all of the real and personal property comprising Howe Avenue Nursing

Home, d/b/a Schaffer Extended Care Center located at 16 Guion Place, New Rochelle, NY 10801, and (vi) all proceeds and products of the foregoing ((i)-(vi) collectively the "*DIP Revolving Facility Collateral*");[7] and

      (b)    the DIP Term Loan Agent, as security and collateral for the DIP Term Loan, shall receive: an irrevocable, unconditional, transferable standby letter of credit (the "*Letter of Credit*") payable on sight draft only, the form and substance of which is acceptable to DIP Term Loan Agent in its sole and absolute discretion, with an initial expiration date of not less than one (1) year and with an evergreen provision (i.e., automatic renewals for one (1) year periods), provided by MMC in favor of DIP Term Loan Agent and entitling DIP Term Loan Agent to draw thereon in New York, New York or Washington, DC or in such other city as DIP Term Loan Agent may permit in writing in its sole and absolute discretion, issued by a nationally recognized bank or the U.S. agency or branch of a foreign bank acceptable to DIP Term Loan Agent in its sole and absolute discretion and approved in writing by DIP Term Loan Agent (the "*DIP Term Loan Collateral*" and together with the DIP Revolving Facility Collateral, the "*DIP Collateral*")[8]; provided, however, pursuant to the Debtors' proposed sale of assets to MMC that any successful bidder or purchaser other than MMC or its affiliate shall assume and be assigned all of MMC's obligations under MMC's guaranty of certain of the DIP Obligations, including the Letter of Credit, and provided further, that the Debtors and the DIP Revolving Agent stipulate and agree

---

[7]    As set forth more fully in the DIP Revolving Loan Agreement, in connection with the proposed sale of the Debtors' assets, the purchaser thereof shall guarantee on a limited basis any shortfall in the collection of outstanding obligations under the DIP Revolving Loan Agreement after seventy-five (75) days after closing of such sale up to a maximum amount $5,000,000, plus any costs of enforcement, and secure all such guaranteed obligations with a first priority security interest on all "Collateral" (as defined in Schedule 9.1 of the DIP Revolving Loan Agreement) generated by or in connection with the operation of the Debtors' assets acquired in such sale pursuant to a limited recourse guaranty in a form mutually agreeable to DIP Agent and MMC.

[8]  All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Documents. All terms not specifically defined in the DIP Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code.

that certain collateral pledged to the DIP Revolving Agent by Debtors, subject and subordinate to

pre-existing liens as described above, specifically, the DIP Collateral by each of the Borrowers, is

pledged to MMC as security for MMC's right to seek payment from the Debtors in the event that

there is a draw under the Letter of Credit with such security interest so granted being subordinate

to the security interest of the DIP Revolving Agent in the subject DIP Collateral. Notwithstanding

anything contrary herein or in the DIP Documents, the DIP Collateral shall exclude any

commercial tort claims and any claims under chapter 5 of the Bankruptcy Code, including, in each

instance, any and all proceeds thereof.

10.    *DIP Lien Priority*. The DIP Liens securing the DIP Revolving Credit Facility shall

be junior in payment and priority to the extent hereinabove provided and further only to the Carve

Out. Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with

any lien or security interest hereinafter granted in the Chapter 11 Cases or any Successor Cases.

The DIP Liens shall be senior to all other rights in the DIP Term Loan Collateral.

Notwithstanding anything in this Interim Order to the contrary, the DIP Term Loan Collateral

shall not be subject to the Carve Out. The DIP Liens shall be valid and enforceable against any

trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases,

upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy

Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases

or Successor Cases. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the

Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant

to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the DIP Liens.

11.    *DIP Superpriority Claims*. Upon entry of this Interim Order, the DIP Agent is

hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority

administrative expense claim in each of the Chapter 11 Cases and any Successor Cases

24

(collectively, the "**DIP Superpriority Claims**") for all DIP Obligations. The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, except as set forth herein, and (b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or other estate representative, to the extent permitted by law. The DIP Superpriority Claims shall not extend to (i) commercial tort claims or (ii) any avoidance actions or claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds of (i) and (ii), except that the DIP Superpriority Claim shall extend to any avoidance actions or claims in each case arising under section 549 of the Bankruptcy Code and the proceeds thereof. The Debtors and the DIP Revolving Agent stipulate and agree that MMC is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed, subordinated superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**MMC Superpriority Claims**"), subordinated in right to the DIP Superpriority Claims of the DIP Revolving Agent, as security for MMC's right to seek payment from the Debtors in the event that there is a draw under the Letter of Credit. Notwithstanding anything contrary herein or in the DIP Documents, the MMC Superpriority Claim shall exclude any commercial tort claims and any claims under chapter 5 of the Bankruptcy Code, including, in each instance, any and all proceeds thereof.

2529656v.5

12.    *Adequate Protection Liens*.  The Secured Creditors and MidCap Funding are entitled to receive adequate protection on account of their respective interests in the Prepetition Collateral pursuant to sections 361, 362, and 364 of the Bankruptcy Code to the extent of any Diminution in Value of their respective interests in their Prepetition Collateral.  Pursuant to sections 361, 364 and 507(b), but only to the extent that: (i) the Prepetition Obligations remain outstanding, (ii) the Secured Creditors and MidCap Funding hold valid and perfected Prepetition Liens in the Prepetition Collateral, and (iii) any Diminution in Value of their respective interests in the Prepetition Collateral, the Secured Creditors and MidCap Funding will receive hereby as adequate protection: (a) automatically perfected, replacement liens on the DIP Collateral to the same extent and priority of their respective Prepetition Liens and against each Debtor in which such Secured Creditor holds an Adequate Protection Lien (an "*Applicable Debtor*").  The Adequate Protection Liens shall be deemed a Permitted Lien within the meaning of the DIP Revolving Loan Agreement.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases.  The Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with or senior to the Adequate Protection Liens (for any lien or interest avoided other than the Prepetition Liens).

13.    *Prepetition Lender Superpriority Claims*.  Junior only to the DIP Superpriority Claims, the MMC Superpriority Claims  and the Carve Out, and only to the extent Adequate Protection Liens fail to protect the Secured Creditors against any Diminution in Value, the

Secured Creditors and MidCap Funding shall, upon such demonstration that the Adequate

Protection Liens fail to protect the Secured Creditors and MidCap Funding against any Diminution

in Value, be entitled, pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, to an

allowed superpriority administrative expense claim in each of the Chapter 11 Cases of the

Applicable Debtors and any Successor Cases of the Applicable Debtors (collectively, the

"*Prepetition Lender Superpriority Claims*") for all Diminution in Value claims.  The Prepetition

Lender Superpriority Claims, if permitted, shall be subordinate in payment and priority only to the

DIP Superpriority Claims and the Carve Out, and shall (a) otherwise have priority over any and all

administrative expenses and unsecured claims against the Debtors or their estates in any of the

Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature

whatsoever, including, without limitation, administrative expenses of the kinds specified in or

ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c),

507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law),

1113 and 1114, and any other provision of the Bankruptcy Code, except as set forth herein, and

(b) at all times be senior to the rights of the Debtors and their estates, and any successor trustee or

other estate representative, to the extent permitted by law.  The Prepetition Lender Superpriority

Claims, if permitted, shall not extend to (i) commercial tort claims or (ii) any avoidance actions or

claims arising under chapter 5 of the Bankruptcy Code, or any of the proceeds of (i) and (ii),

except that the Prepetition Lender Superpriority Claims shall extend to any avoidance actions or

claims in each case arising under section 549 of the Bankruptcy Code and the proceeds thereof.

14.     *No Obligation to Extend Credit*.  Subject to Paragraph 29(b), the DIP Lender shall

not have any obligation to make any loan or advance under the DIP Documents, unless all of the

conditions precedent to the making of such extension of credit under the applicable DIP

27

Documents and this Interim Order have been satisfied in full or waived by the DIP Lender in its sole discretion.

15.    _Use of DIP Financing Proceeds_.  From and after the Petition Date until entry of the Final Order, the Debtors shall use advances of DIP Financing credit only for the purposes specifically set forth in this Interim Order, the DIP Documents and in compliance with the Budget Compliance Covenant.  Notwithstanding any first-day orders entered authorizing the Debtors to pay any prepetition or other expenses, all such payments not otherwise paid before the entry of this Interim Order, shall be made in accordance with the Budget and Budget Compliance Covenant.

16.    _Amendment of the DIP Documents_. The DIP Documents may from time to time be amended, modified or supplemented by the parties thereto without notice or a hearing if:  (a) the amendment, modification, or supplement is (i) in accordance with the DIP Documents, (ii) beneficial to the Debtors, (iii) not prejudicial in any material respect to the rights of third parties, and (iv) does not increase the amount of the DIP Term Loan or the "Applicable Margin" or the "Revolving Loan Commitment" (each as defined in the DIP Revolving Loan Agreement) or extend the "Termination Date" (as defined in the DIP Revolving Loan Agreement); (b) the amendment, modification or supplement is filed with the Court; and (c) a copy (which may be provided through electronic mail or facsimile) of the substantially final amendment, modification or supplement is provided to counsel for any Committee, counsel for each of the Secured Creditors and MMC and the U.S. Trustee at least three (3) days (or such shorter period agreed to by the Secured Creditors, MMC, any Committee appointed by this Court and U.S. Trustee) prior to the effective date of such amendment, modification or supplement.  Except as otherwise provided in this Paragraph, no waiver, modification, or amendment of any of the provisions of any DIP Document shall be effective unless set forth in writing, signed on behalf of the Debtors and

28

2529656v.5

with the necessary consents required under and executed in accordance with the DIP Documents, and approved by the Court on notice.

17.    *Budget Maintenance*. The Budget shall be in form and substance acceptable to and approved by the DIP Agent and MMC in their individual sole discretion. The Budget may be amended or modified in writing from time to time only with the written consents required under the DIP Documents. The Debtors shall update the Budget as provided in the DIP Documents (provided that any update shall be in form and substance acceptable to the DIP Agent and MMC in their individual sole discretion), with delivery to the DIP Agent in accordance with the DIP Documents, with copies to be provided to the counsel to MMC, any Committee appointed by this Court, the Secured Creditors and the U.S. Trustee within one (1) business day. The Debtors may exceed the Budget Compliance Covenant with the consent of the DIP Agent and MMC in their individual sole discretion. Notwithstanding anything herein to the contrary, to the extent that the Debtors have not expended the full disbursement amount for a category of expense for a specified time period set forth in the Budget, the Debtors may use the unexpended amount to pay items of the same type for a subsequent time period.

18.    *Modification of Automatic Stay*. Subject to the terms of Paragraph 25, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims, the MMC Superpriority Claims, and Prepetition Lender Superpriority Claims, if permitted; (b) permit the Debtors to incur all liabilities and obligations under the DIP Documents, the DIP Financing and this Interim Order; (c) permit the Debtors to perform such other acts as are necessary to effectuate the terms of this Interim Order; (d) authorize the Debtors to pay, and the DIP Agent and MidCap Funding to retain and apply, payments made in accordance

with the terms of this Interim Order; and (e) permit MidCap Funding and/or DIP Agent to apply

the proceeds of the MidCap Prepetition Collateral to the Prepetition Revolving Loan Obligations

in accordance with the terms of this Interim Order.

19.     *Perfection of DIP Liens and Adequate Protection Liens*.  This Interim Order shall

be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and

Adequate Protection Liens without the necessity of filing or recording any financing statement,

mortgage, notice of lien or other instrument or document which may otherwise be required under

the law or regulation of any jurisdiction or the taking of any other action (including, for the

avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in

accordance with applicable nonbankruptcy law) the DIP Liens and Adequate Protection Liens, or

to entitle the DIP Agent, MMC and the Secured Creditors to the priorities granted herein.

Notwithstanding the foregoing, each of the DIP Agent, MMC and the Secured Creditors is

authorized to file, as it deems necessary in its sole discretion, such financing statements,

mortgages, notices of liens and other similar documents to perfect in accordance with applicable

nonbankruptcy law or to otherwise evidence the applicable DIP Liens or Adequate Protection

Liens, and all such financing statements, mortgages, notices and other documents shall be deemed

to have been filed or recorded as of the Petition Date; provided, however, that no such filing or

recordation shall be necessary or required in order to create or perfect the DIP Liens or the

Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver

promptly upon demand to the DIP Agent and Secured Creditors all such financing statements,

mortgages, notices and other documents as any of the DIP Agent or Secured Creditors may

reasonably request.  The DIP Agent and Secured Creditors, each in its discretion, may file a

photocopy of this Interim Order as a financing statement with any filing or recording office or

with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

20.    *Proceeds of Subsequent Financing*.  If the Debtors, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in these Chapter 11 Cases or any Successor Cases, other than a receiver appointed pursuant to New York law, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Lender's obligation to extend credit under the DIP Financing, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in the DIP Documents.  Any surplus shall be held in escrow for the benefit of MidCap Funding and the other Secured Creditors to the extent of any Diminution in Value claims, and thereafter to any party entitled thereto as determined by further order of the Court.

21.    *Maintenance of DIP Collateral*.  Until the payment in full in cash of all DIP Obligations, and the termination of the DIP Documents and the DIP Lender's obligations to extend credit under the DIP Revolving Facility and DIP Term Loan, the Debtors shall:  (a) insure the DIP Collateral as required pursuant to the terms of the DIP Credit Agreement; and (b) maintain the cash management system which has first been agreed to by the required consents under the DIP Documents, or as otherwise required by the DIP Documents.

22.    *Disposition of DIP Collateral; Rights of DIP Agent*.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral other than as permitted in the DIP Documents without the prior written consents as required under the DIP Documents, and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent, Secured Creditors, or an order of this Court.

2529656v.5

23.    *DIP Termination*. On the Expiration Date, all DIP Obligations shall be immediately due and payable, and all commitments to extend credit with respect to the DIP Financing will terminate.

24.    *Events of Default*. The occurrence of an "Event of Default" under the DIP Credit Agreement (subject to any extensions or waivers as permitted under the DIP Documents), shall constitute an event of default under the DIP Documents and this Interim Order, unless expressly waived in writing by the DIP Agent in accordance with the consents required in the DIP Documents (collectively, the "*Events of Default*").

25.    *Rights and Remedies Upon Event of Default*. Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent, as provided in the DIP Documents, may declare: (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable; (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains; and/or (c) the termination of the DIP Credit Agreement and any other DIP Document as to any future obligation of the DIP Agent or DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations (any such declaration by the DIP Agent shall be referred to herein as a "*Termination Declaration*"). The Termination Declaration shall be given by email (or other electronic means) to counsel to the Debtors, counsel to the Secured Creditors, counsel to any Committee appointed by this Court (or if no Committee is appointed, to the Debtors' twenty (20) largest unsecured creditors), counsel to MMC and the U.S. Trustee (the earliest date any such Termination Declaration is made shall be referred to herein as the "*Termination Declaration Date*"). The DIP Obligations shall be due and payable, without notice or demand, on the Termination Declaration Date. Any automatic stay otherwise applicable to the DIP Agent is hereby modified so that beginning on the seventh (7th) day after the Termination Declaration Date (such seven day period being the "*Remedies Notice*

2529656v.5

*Period*"), the DIP Agent shall be entitled to exercise all rights and remedies against the DIP

Collateral in accordance with the DIP Documents and this Interim Order, and shall be permitted to

satisfy the DIP Obligations and DIP Superpriority Claims, subject to, with respect to the DIP

Revolving Credit Collateral, the Carve Out.  Notwithstanding anything to the contrary, during the

first five (5) days of the Remedies Notice Period, the Debtors or any Committee appointed by this

Court shall be entitled to continue to use cash on hand, including any Cash Collateral, in

accordance with the Budget.  During the Remedies Notice Period, the Debtors or any Committee

appointed by this Court shall be entitled seek an emergency hearing with the Court for the sole

purpose of contesting whether an Event of Default has occurred and/or is continuing.  Unless the

Court determines during the Remedies Notice Period that an Event of Default has not occurred

and/or is not continuing, the automatic stay shall automatically be terminated at the end of the

Remedies Notice Period without further notice or order, and the DIP Agent shall be permitted to

exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Documents, as

applicable, and as otherwise available at law against the DIP Collateral without any further order

of or application or motion to the Court, and without restriction or restraint by any stay under

sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and

security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent

with respect thereto pursuant to the DIP Credit Agreement, DIP Documents, or this Interim Order.

In addition, notwithstanding the foregoing, and without order of or application or motion to the

Court, if an Event of Default exists, the DIP Agent may do any one or more of the following at

any time, including during the Remedies Notice Period, and in any order: (u) reduce the amount of

the Revolving Loan Commitment or the Borrowing Base under the DIP Documents; (x) restrict

the amount of or refuse to make loans under the DIP Loan Documents; (y) terminate the DIP

Lender's commitment to lend under the DIP Documents; or (z) declare the DIP Financing to be

33

immediately due and payable. The DIP Agent's failure to exercise any or all of its rights under this Paragraph shall not constitute a waiver of any of its rights hereunder or under the DIP Documents.

26.    *Indemnification of the DIP Agent*. The Debtors shall defend, indemnify and hold harmless DIP Agent and each of its Affiliates (as defined in the DIP Credit Agreement) and their respective successors and assigns, and the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing and each other Person (as defined in the DIP Credit Agreement), if any, who controls DIP Agent, its Affiliates or any of the foregoing (the "***Indemnified Parties***"), to the extent and as set forth in the DIP Documents. Nothing herein shall limit the DIP Agent's exercise of its discretionary rights granted under the DIP Documents, including an Indemnified Party's right to select its own counsel with respect to any litigation, or preparation therefor, related to the enforcement of this Interim Order or its rights and remedies under the DIP Documents, which counsel's reasonable fees and expenses shall be promptly paid by the Debtors.

27.    *Reporting Requirements*. Debtors shall observe and comply with all of the financial reporting and performance covenants and conditions set forth in the DIP Documents.

28.    *Rights of Access and Information*. Without limiting the rights of access and information afforded the DIP Agent under the DIP Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and the Secured Creditors reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents or any applicable agreements between the Secured Creditors, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers and consultants to cooperate, consult with, and

34

provide to the DIP Agent and the Secured Creditors all such information as may be reasonably

requested with respect to the business, results of operations and financial condition of any

Borrower.  Notwithstanding anything to the contrary, any and all of the Debtors' obligations under

this Paragraph shall be subject to the Debtors' and their advisors' fiduciary duties under the

Bankruptcy Code, applicable privileges and reasonable and customary confidentiality agreements

not entered into for purposes of protecting information pursuant to this Paragraph.

29.    *Carve Out.*

(a)    *Carve Out.*  As used in this Interim Order, the *"Carve Out"* shall encompass

the following expenses: (a) following the occurrence of a Triggering Event (as defined below):

(i) allowed fees, and reimbursement for disbursements of professionals retained by the Debtors

(the *"Debtors' Professional Fee Payments"*) in an aggregate amount for all the Debtors'

Professional Fee Payments not to exceed $250,000 incurred after the Triggering Event; (ii)

allowed fees and reimbursements for disbursements of professionals retained by any Committee

appointed by this Court (the *"Committee's Professional Fee Payments"*) in an aggregate amount

for all of the Committee's Professional Fee Payments not to exceed $150,000 incurred after the

Triggering Event (collectively, (i) and (ii), the *"Carve Out Amount"*); (iii) quarterly fees pursuant

to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court; and (iv) fees

payable to a chapter 7 trustee in an aggregate amount not to exceed $15,000; and (b) without

reducing the Carve Out Amount, all Debtors' Professional Fee Payments and Committee's

Professional Fee Payments allowed, or subsequently allowed, and payable under sections 330 and

331 of the Bankruptcy Code, to the extent incurred prior to such Triggering Event (the *"Pipeline*

*Period"*).  The Debtors shall and are hereby authorized on a monthly basis to accrue, up to the

Carve Out Amount, and hold in escrow in an interest bearing deposit account (the *"Professional*

*Fee Account"*) the amount contained in the Budget relating to the Debtors' Professional Fee

Payments and Committee's Professional Fee Payments, which amount is earmarked for, and shall be applied toward, the payment, upon proper application to, and allowance by, the Court, of such professionals' fees, including as provided in any order entered by this Court with respect to the procedures for seeking compensation and reimbursement for expenses (an "***Administrative Fee Order***"). As used in this Paragraph, the term "***Triggering Event***" shall mean the earlier to occur of: (a) the date the DIP Agent provides to the Borrowers and any Committee appointed by this Court, with a copy to Borrowers' counsel at the address set forth in the DIP Documents and to counsel for any Committee appointed by this Court, a notice of (i) an Event of Default and (ii) termination of the Pipeline Period for purposes of the Carve Out; or (b) the date upon which a failure of the Borrowers to notify the DIP Agent of the occurrence of a Default (as defined in the DIP Documents) or Event of Default (of which the DIP Agent is not otherwise aware of on such date) constitutes a failure to comply with the requirement to give such a notice under the DIP Documents.

     (b)    *No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.* With the exception that the DIP Agent must make available funds previously swept from the Debtors' bank accounts or resulting from the sale or other disposition of the DIP Collateral in order that the Debtors' Professional Fee Payments and Committee's Professional Fee Payments can be satisfied up to the Carve Out Amount (to the extent there are not sufficient funds in the Professional Fee Account or otherwise available) as provided for by the terms of this Interim Order, the DIP Agent and DIP Lender shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any professionals retained by the Debtors and/or any Committee appointed by this Court incurred in connection with the Chapter 11 Cases or any Successor Cases. Until the occurrence of a Triggering Event, the allowed Debtors' Professional Fee Payments and Committee's Professional Fee Payments shall be paid in accordance with the

2529656v.5

Administrative Fee Order, subject to the Budget, or further Order of this Court, and any payment

made on account of the Debtors' Professional Fee Payments or the Committee's Professional Fee

Payments on account of the Pipeline Period shall not reduce the Carve Out Amount. Except for

funding the Carve Out Amount as provided above (to the extent there are not sufficient funds in

the Professional Fee Account), nothing in this Interim Order or otherwise shall be construed: (i) to

obligate the DIP Agent or DIP Lender, in any way to pay compensation to, or to reimburse

expenses of, any professionals retained by the Debtors or any committee appointed by this Court,

or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement;

(ii) to increase the Carve Out Amount if actual Debtors' Professional Fee Payments and

Committee's Professional Fee Payments incurred after or due and owing as of a Triggering Event

exceed the Carve Out Amount; (iii) as consent to the allowance of any professional fees or

expenses of any professionals retained by the Debtors or any Committee appointed by this Court;

or (iv) to affect the right of the DIP Agent to object to the allowance and payment of such fees and

expenses.

30.     _Limitations on the DIP Financing, DIP Collateral, and Carve Out_. The DIP

Financing, DIP Collateral, Carve Out and proceeds thereof may not be used: (a) in connection

with or to finance any action, suit, arbitration, proceeding, application, motion or other litigation

of any type (i) adverse to the DIP Agent's rights and remedies under the DIP Documents or this

Interim Order, as applicable, including, without limitation, for the payment of any services

rendered by the professionals retained by the Debtors or any Committee appointed by this Court in

connection with the assertion of or joinder in any claim, counterclaim, action, proceeding,

application, motion, objection, defense or other contested matter, the purpose of which is to seek,

or the result of which would be to obtain, any order, judgment determination, declaration or

similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the

37

DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Agent or

DIP Lender or its collateral contrary to the DIP Documents or this Interim Order, or

(iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent of any rights

and/or remedies permitted under this Interim Order, the DIP Documents, or applicable law, or the

enforcement or realization (whether by foreclosure, credit bid, further order of the Court or

otherwise) by the DIP Agent upon any of the DIP Collateral; (b) to make any distribution under a

plan of reorganization in any of the Chapter 11 Cases while the DIP Documents remains in effect

or any DIP Obligations remain outstanding; (c) to make any payment in excess of $50,000 in

settlement of any claim, action or proceeding, before any court, arbitrator or other governmental

body without the prior written consents required under the DIP Documents; (d) to pay any fees or

similar amounts to any person who has proposed or may propose to purchase interests in any of

the Debtors without the prior written consents required under the DIP Documents; (e) to object to,

contest, or interfere with in any way the DIP Agent's enforcement or realization upon any of the

DIP Collateral once an Event of Default has occurred, except as to any challenge as to the

occurrence of such an Event of Default as provided for herein; (f) to sell or otherwise dispose of

DIP Collateral without the consents required under the DIP Documents; (g) to use or seek to use

any insurance proceeds constituting DIP Collateral other than as set forth in the DIP Documents;

(h) to incur Debt (as defined in the DIP Credit Agreement) outside the ordinary course of business

without the prior consents required under the DIP Documents; (i) to object to or challenge in any

way the claims, liens, or interests (including interests in the Prepetition Collateral or DIP

Collateral) held by or on behalf of the DIP Agent or the repayment or refinancing of the

Prepetition Revolving Loan; (j) to assert, commence or prosecute any claims or causes of action

whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code,

against the DIP Agent or DIP Lender; (k) to prosecute an objection to, priority, or enforceability of

38

any of the DIP Obligations or DIP Liens or any other rights or interests of DIP Agent or DIP Lender; or (l) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by the DIP Agent of any rights and remedies granted under this Interim Order; provided, however, that notwithstanding anything else herein to the contrary, the Committee and its professionals may use the proceeds of the DIP Financing, DIP Collateral or Carve Out to investigate the liens and claims of the Secured Creditors, the DIP Lender, and the DIP Agent and, subject to any applicable law with respect to standing, commence and prosecute any related proceedings as a representative of the Debtors' estates at an aggregate expense for such investigation and prosecution not to exceed $50,000.

31.    _No Third Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

32.    _No Deemed Control_.  In making decisions to advance any extensions of credit under the DIP Financing, or in taking any other actions related to this Interim Order or the DIP Documents (including, without limitation, the exercise of its approval rights with respect to any budget), the DIP Agent and DIP Lender shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), and the DIP Agent's relationship with the Debtors shall not constitute or be deemed to constitute a joint venture or partnership of any kind.

33.    _Section 506(c) Claims_.  Subject only to entry of a Final Order, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor

39

2529656v.5

Cases at any time shall be charged against the DIP Agent, or any of their claims or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Agent, and no such consent shall be implied from any other action, inaction, or acquiescence by such lender.

34.    _No Marshaling/Applications of Proceeds_.  Neither the DIP Agent nor DIP Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral and proceeds shall be received and applied pursuant to the DIP Documents or such applicable Prepetition Loan Documents.

35.    _Joint and Several Liability_.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of the DIP Facility and the DIP Documents.

36.    _Discharge Waiver_.  The Debtors expressly stipulate, and the Court finds and adjudicates that, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization.  Unless otherwise agreed to by the DIP Agent, none of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of reorganization or sale, of all DIP Obligations and the cancellation, backing, or cash collateralization of all letters of credit issued under the DIP Documents.

2529656v.5

37.    *Rights Preserved*.  Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, the Debtors, any Committee appointed by this Court and the Secured Creditors are preserved.

38.    *No Waiver by Failure to Seek Relief*.  The failure of the DIP Agent or any of the Secured Creditors, as the case may be, to seek relief or otherwise exercise its rights and remedies under this Interim Order, the DIP Documents (in the case of the DIP Agent), applicable prepetition claims (in the case of the Secured Creditors) or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent or such Secured Creditor.

39.    *Binding Effect of Order*.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, DIP Agent, Secured Creditors, all other creditors of any of the Debtors or any Committee appointed by this Court in the Chapter 11 Cases, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

40.    *No Modification of Order*.  Until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consents required in the DIP Documents: (i) any modification, stay, vacatur or amendment to this Interim Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter

41

11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims, other than the Carve Out; and (b) without the prior written consents required under the DIP Documents, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens. The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent, as provided in the foregoing, of the DIP Agent and Secured Creditors, as applicable, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent or applicable Secured Creditors.

41.    _Reservation_. Notwithstanding anything to the contrary herein, if a Challenge is properly brought in accordance with this Interim Order, and if such Challenge regarding the validity, enforceability, extent, perfection, or priority of the MidCap Prepetition Liens is successful, this Court expressly reserves the right to unwind the repayment of the MidCap Prepetition Debt and reverse, modify, or otherwise amend any findings or determinations set forth in this Interim Order regarding the validity, extent, or priority of the MidCap Prepetition Liens.

42.    _Order Controls_. In the event of any inconsistency between the terms and conditions of the DIP Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

43.    _Survival_. The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases. The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent and Secured Creditors pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall

42

continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until all DIP Obligations and Diminution in Value claims have been indefeasibly paid in full and all commitments to extend credit under the DIP Facility are terminated. The terms and provisions concerning the indemnification of the DIP Agent shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the DIP Documents and/or the repayment of the DIP Obligations.

44.    *Governmental Authorities*.

a.    Notwithstanding anything to the contrary herein, nothing in this Interim Order shall modify any right of the Department of Health and Human Services and the Center for Medicare and Medicaid Services to administer the Debtors' Medicare provider agreements in accordance with federal law.

b.    Except as expressly provided herein, nothing contained in this Interim Order shall impair or modify any rights, claims or defenses available in law or equity to the IRS.

c.    If at any time the Debtors anticipate that the cash flows from the Debtors' operations will be insufficient to fund non-insider payroll for any given week, the Debtors will notify the U.S. Attorney, the State of New York Office of the Attorney General, and the DIP Agent at least three (3) days in advance of such payroll coming due.

45.    *Immediate Docketing and Effect of this Interim Order*. The Clerk of the Court is hereby directed to forthwith enter this Interim Order on the docket of this Court maintained in regard to the Chapter 11 Cases. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Rule 7052 of the Bankruptcy Rules and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. To the extent

2529656v.5

necessary, findings of fact shall be deemed conclusions of law, and conclusions of law shall be deemed findings of fact.

46.    *Final Hearing; Notice of Final Hearing*.  The Final Hearing shall be held on June ___, 2013 at 10:00 a.m. (prevailing Eastern time).  The Debtors shall, within two (2) days of entry of this Interim Order, mail copies of a notice of the entry of this Interim Order, together with a copy of the Motion and a notice of the Final Hearing on each of the Notice Parties and to counsel for any Committee (if appointed).  The notice of Final Hearing shall state that any party in interest objection to the DIP Financing shall file written objections with the Clerk of this Court no later than 4:00 p.m. (prevailing Eastern time) on June ___, 2013, and that objections shall be served so that they are received on or before such date and time by: (a) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attention: Burton Weston; (b) Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attention Katie G. Stenberg, Esq. and Robert P. Sweeter, Esq.; (c) Togut, Segal & Segal, LLP, One Penn Plaza, New York, NY 10119, Attention Frank Oswald, Esq. and Brian Moore, Esq. and (d) the Office of the United States Trustee for the Southern District of New York.

47.    *Retention of Jurisdiction*.  The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

Dated: May ___, 2013
       White Plains, New York


                                    _____
                                    Honorable Robert D. Drain
                                    United States Bankruptcy Judge