**GARFUNKEL WILD, P.C.**
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A. Shah

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

SOUND SHORE MEDICAL CENTER OF
WESTCHESTER, et al.

                                        Debtors.
-----------------------------------------------------------x

Chapter 11
Case No. 13-_____ (___)

(Joint Administration Pending)

## DEBTORS' *EX PARTE* APPLICATION FOR ENTRY OF A SCHEDULING ORDER AND DEBTORS' MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' REAL ESTATE AND DESIGNATED PERSONAL PROPERTY ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING RELATED THERETO, (C) APPROVING THE FORM OF NOTICE OF THE AUCTION AND SALE HEARING, (D) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT; AND (II) AN ORDER (A) APPROVING SUCH SALE OF THE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SUCH SALE, (C) ALLOWING THE PAYMENT OF CERTAIN VALID LIEN CLAIMS AND (D) RELATED RELIEF

Sound Shore Medical Center ("**SSMC**") and certain of its debtor affiliates (each a

"**Debtor**" and collectively, the "**Debtors**")[1] in these chapter 11 cases (the "**Chapter 11 Cases**"),

by and through their attorneys, Garfunkel Wild, P.C., hereby file a motion (the "**Motion**") for the

---

[1]    The debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  Sound Shore Health System, Inc. (1398), Sound Shore Medical Center of Westchester (0117), The Mount Vernon Hospital, Inc. (0115), Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended Care Center (0781), NRHMC Services Corporation (9137), The M.V.H. Corporation (1514) and New Rochelle Sound Shore Housing, LLC (0117).  There are certain additional affiliates of the Debtors who are not debtors in these Chapter 11 Cases and have not sought relief under Chapter 11.

2499114v.8

entry of the pre-fixed scheduling order (the "**Scheduling Order**") and (I) the entry of an order substantially in the form attached hereto as Exhibit A (the "**Bidding Procedures Order**") (a) approving bidding procedures and bidder protections (the "**Bidding Procedures**") substantially in the form attached as Schedule 1 to the Bidding Procedures Order for the sale and auction (the "**Auction**") of the Debtors' Acquired Assets (as hereinafter defined); (b) scheduling an Auction and a hearing to approve the sale of the Acquired Assets (the "**Sale Hearing**"); (c) approving the form and manner of the Notice of the Auction and Sale Hearing substantially in the form attached as Schedule 2 to the Bidding Procedures Order (the "**Sale Notice**"); and (d) approving the Break-Up Fee and Expense Reimbursement (as hereinafter defined); and (II) entry of an Order, substantially in the form attached hereto as Exhibit B (the "**Sale Order**"), (i) approving a sale of the Acquired Assets, free and clear of all liens, claims and encumbrances, security interests and other interests except as expressly assumed in the Purchase Agreement (as hereinafter defined), to Montefiore SS Operations, Inc., Montefiore MV Operations, Inc., Montefiore HA Operations, Inc, and Montefiore SS Holdings, LLC, Montefiore MV Holdings, LLC, and Montefiore HA Holdings, LLC, (collectively referred to as "**MMC**" or "**Buyer**") or any other successful bidder at the Auction as determined by the Bidding Procedures; (ii) approving certain procedures related to the assumption and assignment of certain executory contracts and unexpired leases related to the Acquired Assets (the "**Assignment Procedures**"), and fixing the Cure Amounts (as hereinafter defined), and (iii) related relief (the "**Sale Motion**"). In support of the Motion, the Debtors rely in part upon the Affidavit of John Spicer pursuant to Local Rule 1007-2 and in Support of First Day Motions filed on the Petition Date (the "**Spicer Affidavit**"), and respectfully state the following:

## I.    SUMMARY OF RELIEF SOUGHT

2499114v.8

1.    The relief sought by this Motion encompasses a two part request pursuant to which the Debtors are seeking to sell substantially all of their real property and certain related personal property assets (collectively, the "**Acquired Assets**") to MMC, subject to higher or better offers and this Court's approval. After a marketing process described below and extensive negotiations, the Debtors and MMC have entered into an Asset Purchase Agreement dated as of May __, 2013 (the "**Purchase Agreement**"), a copy of which is attached hereto as Exhibit C[2].

2.    In the first instance, the Debtors are requesting entry of a Bidding Procedures Order, substantially in the form of Exhibit A hereto, approving among other things (i) the Bidding Procedures, (ii) the time, date, and place for the Auction of the Acquired Assets and the Sale Hearing, (iii) the Sale Notice, annexed as Schedule 2 to the Bidding Procedures Order, and (iv) approval of, and authorization to pay, a break-up fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**") to MMC in accordance with the terms of the Purchase Agreement (the "**Bidding Procedures Motion**").

3.    By the second prong of this Motion the Debtors seek entry of the Sale Order, substantially in the form of Exhibit B, approving, among other things, at the conclusion of the Sale Hearing, (i) the sale of the Acquired Assets, free and clear of all liens, claims, encumbrances, and other interests with such liens, claims and encumbrances and other interests to attach to the proceeds of such sale, and the assumption and assignment of the Assigned Contracts (as hereinafter defined) to MMC or other Successful Bidder at the Auction; and (ii) the segregation of funds for the payment of the Break-Up Fee and Expense Reimbursement, as may

---

[2] Capitalized terms used in this Motion, unless herein defined, are used with the meanings ascribed to such terms in the Purchase Agreement.

be allowed by the Court (the "**Sale**" or "**Sale Transaction**").  The sale of the Acquired Assets to MMC will maximize value for the Debtors' estates and their creditors.

4.      The continuing losses experienced by the Debtors over the course of the past several years, changing demographics and declining reimbursement rates, all coupled with the Debtors' inability to implement required system updates and capital improvements necessary to streamline their ongoing operations necessitate a prompt consummation of the sale of the Acquired Assets to MMC or any other Successful Bidder.  Indeed, a prompt sale is essential to preserving and maximizing values for the benefit of the Debtors' creditors.

5.      Despite significant efforts by the Debtors and their management to increase revenue and decrease costs, consistent losses and a serious, but ever present erosion of the Debtors' cash position have stymied all efforts to survive as a stand-alone health care system. The Debtors face the eventual and real risk that costs will outstrip its revenue stream, jeopardizing patient care and the Debtors' ability to continue funding operations.  Absent the proposed sale to MMC, the closure of the Medical Centers and a potential forced liquidation of the Debtors' assets could be necessary.  A sale on the other hand, would permit an orderly transition of the Debtors' operations to MMC and allow for the continued delivery of healthcare services at the Debtors' sites under the MMC banner to an underserved population consistent with the Debtors' existing not-for-profit mission.  Significantly, the New York State Department of Health ("**DOH**") has indicated that it supports the proposed transaction.  With DOH's support, the receipt of any required regulatory approvals will be substantially easier to obtain.

6.      Under the circumstances, the proposed sale of the Debtors' Acquired Assets to MMC unquestionably represents an exercise of the Debtors' sound business judgment.  It is further anticipated that the procedures proposed by this Motion and the sale of the Acquired

4

Assets to MMC will maximize value for the Debtors' estates to the benefit of the creditors generally.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N).

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory predicates for the relief sought herein are sections 105(a) and 363(b)(d) and (f), 365, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Southern District of New York (the "**Local Rules**"), and General Order M-383 of the Bankruptcy Court for the Southern District of New York ("**General Order M-383**").

## III.    CASE BACKGROUND AND HISTORY OF DEBTORS

10.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and continue to manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  Contemporaneously with the filing of this Motion, the Debtors have filed an application seeking the joint administration of their cases for procedural purposes only.

11.     No trustee, examiner or creditors' committee has been appointed in these cases.

2499114v.8

## IV.  THE DEBTORS' HISTORY AND THEIR BUSINESSES

12.    A significant portion of the Debtors' core business is focused around Sound Shore Medical Center of Westchester ("**SSMC**").  SSMC is a not-for-profit 242-bed, community-based teaching hospital offering primary, acute, emergency and long-term health care to the working class residents of southern Westchester.  Founded in 1892 and located in New Rochelle, New York, SSMC is a teaching affiliate of New York Medical College.  SSMC is home to a comprehensive orthopedic program and stroke and bariatric centers of recognized excellence. The hospital also boasts the only trauma center in southern Westchester as well as a reputable level 3 perinatal hospital.

13.    SSMC's affiliate, Mount Vernon Hospital ("**MVH**"), is a voluntary, not-for-profit, 176-bed hospital located in Mount Vernon, New York.  Since its founding in 1891, MVH has housed a full range of diagnostic and therapeutic medical and surgical services, specialty programs and ambulatory clinics.  MVH also offers comprehensive inpatient and outpatient behavioral health programs consisting of psychiatric services designed specifically for individuals whose needs have not been met through traditional approaches

14.    Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended Care Center ("**SECC**") is a 150-bed, comprehensive facility offering short-term rehabilitation/sub-acute care, as well as skilled long-term care.  SECC dedicates 100-beds for long-term skilled medical management for individuals with chronic conditions or disabilities who are no longer capable to live independently.  The remaining 50-beds are utilized for short-term stays and rehabilitation to accommodate patients recovering from heart surgery, heart attacks, strokes, and orthopedic surgery.  (SSMC, MVH and SECC are sometimes collectively referred to as the "**Medical Centers**")

2499114v.8

15.    SSMC, MVH and SECC (with their affiliated Debtors) together comprise the Sound Shore Health System, Inc. ("**SSHS**" or the "**System**") which was formed in 1997 when the three affiliated healthcare institutions joined together to create one of the largest regional healthcare systems between New York City and Albany.  Today, the System provides a range of specialized services, including orthopedic surgery, behavioral health, pediatrics, OB/GYN, continuing care facilities, a nursing home and community care clinics providing primary care services for the indigent and uninsured.   Their affiliation with the New York College of Medicine also enables the Debtors to provide a teaching environment in multiple disciplines to their community and patients.

## V.    PREPETITION OPERATIONAL AND LIQUIDITY ISSUES

16.    As the largest "safety net" providers for southern Westchester County, the Medical Centers serve a disproportionate share of patients in the Medicaid and uninsured populations.  Annually, they are responsible for approximately 13,000 acute discharges, 55,000 emergency department visits and 60,000 indigent care clinic visits.

17.    As is true with many community hospitals serving a working class constituency, the Medical Centers have been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors.  Commencing in 2006 and increasingly each year thereafter, the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix.  Operating revenues decreased, leading to significant losses in the years preceding these Chapter 11 filings.  The Debtors' cash book balances were frequently negative, and vendor payables increased to over 225 days past due.  With a substantial portion of their assets liened, the Debtors had limited ability to obtain sufficient working capital financing.

7

Simultaneously, the Debtors are faced with a significant change in demographics and increased competition from other regional healthcare providers.

18.    To address one component of this liquidity crisis, vendor payables, the Debtors engaged in a voluntary restructuring and reduction of unsecured indebtedness and in 2008 effectuated a creditor compromise with respect to a substantial portion of such indebtedness. Indeed, more than $20 million of unsecured indebtedness obligations were settled at significant discounts.   Coupled with cost cutting measures, the Debtors were repositioned to improve financially.

19.    Additionally, in order to increase overall efficiency in their operations, in October 2011, MVH and SSMC implemented a new electronic medical record and billing system. Multiple problems were encountered during the conversion process which still have not been fully remedied. As a result of these issues, MVH and SSMC experienced major delays in billing and cash collections ultimately leading to increased patient account denials and bad-debt write offs.  To avoid continued delays and losses, it became necessary for MVH and SSMC (at a significant cost) to dedicate additional resources to resolve the conversion issues, resulting in a further drain on available cash and resources.  As a consequence, liquidity again became a pressing issue, this time preventing the Debtors from implementing critical system updates vital to improving its infrastructure and physical plant.

20.    Liquidity delays have also extended vendor disbursements.  The mounting trade payable liabilities led, in some cases, to the immediate termination of necessary service relationships.   In other cases, the Debtors were forced to renegotiate their contractual relationships on terms less favorable than previously existing terms including payment in advance or payment upon delivery, as well as the payment of outstanding liabilities.

8

Simultaneously, the Debtors were facing a decrease in volume and a shift over the course of the last two years from the provision of inpatient care to increased ambulatory care at lower reimbursement rates. During this same period of time, provider costs continued to increase.

21.     As the Debtors' financial condition continued to deteriorate, the Debtors began to actively search for a viable healthcare partner or other affiliation for the Medical Centers. The Debtors recognized that a merger or affiliation with a strong healthcare partner was critical to their ability to maintain operations and their charitable mission, achieve administrative efficiencies and reduce overhead costs, attract and retain quality physicians, gain increased access to much needed capital, make necessary capital improvements and implement long overdue technological upgrades.

22.     Thus, commencing in or about, August, 2012, the Debtors set out to explore a potential strategic transaction with another hospital or healthcare institution. Working with their financial advisor, Alvarez & Marsal ("**A&M**"), the Debtors looked at the downstate market and attempted to identify those hospitals or healthcare systems that might have an interest and the financial wherewithal to partner with the Debtors. The Debtors also consulted with DOH, which would have to approve any transaction. DOH advised that would only accept an active parent arrangement, *i.e.* where the acquirer would commit meaningful financial support to the transaction and the ongoing system. Given the not-for-profit hospital structure in New York, the list of potential acquirors was limited and excluded almost all out of state prospects as the substantially majority of those are for profit institutions. The active parent requirement further limited the pool of likely partners.

23.     The Debtors and A&M concluded that Westchester County Health Care Corporation ("**WCHCC**"), the owner of Westchester Medical Center, was the only likely

9

candidate in the Westchester County, New York area; and that no other hospital or system in the region would have the financial ability, experience and strategic design to absorb the Medical Centers. Potential active parents in the New York Metropolitan region included: Montefiore Medical Center ("**MMC**"), North Shore-LIJ Health System, ("**NS/LIJ**") and NYU Medical Center ("**NYU**"). The lone out of state prospect, given its size and not-for profit ownership was Yale-New Haven Health System ("**Yale**").

24.     Each of those potential candidates were approached and provided a sizeable and comprehensive package of information regarding the Debtors, a detailed description of the proposed strategic arrangement and the financial requirements. Furthermore, the process was not run in secret. DOH and DASNY were kept apprised of the Debtors' efforts, and the search for a strategic partner was known generally to the healthcare community at large. Thus, any other party certainly could have expressed interest, but did not. NS/LIJ advised the Debtors early in the review process that the Westchester market was not a priority in their long range strategic plan. NYU and Yale each met with SSHS on a number of occasions but opted out as well. The only two seriously interested parties were MMC and WCHCC. The Debtors' board met and determined to first pursue the WCHCC proposal given WCHCC's expressed desire to pursue the transaction without a bankruptcy.

25.     In November, 2012, SSHS and WCHCC entered into a memorandum of understanding which contemplated a full asset merger between the parties and several months of extensive negotiations followed. However, the parties were unable to finalize a transaction with sufficient purchase consideration.

26.     As a result, the Debtors re-commenced discussions with MMC regarding a potential transaction. Following intensive, arms length, good faith negotiations among the

10

Debtors and MMC, the parties entered into an asset purchase agreement (the "**Purchase Agreement**").  As part of their restructuring strategy, the Debtors intend to sell all of their Owned Real Property, Furniture, Fixtures, Inventory, Assigned Contracts and related operating assets, which collectively comprise the Acquired Assets (all as defined in the Purchase Agreement), to MMC.  The aggregate Purchase Price for the Acquired Assets totals $54,000,000 plus the appraised value of the Furniture, Inventory and Equipment designated by the Buyer. Payment of the Purchase Price is to be made as follows: (a) assumption of the Assumed Liabilities, (b) satisfaction of the Cure Amounts up to a maximum amount of Three Million ($3,000,000) Dollars, (c) payment of amounts due under the Guaranty, (d) assumption of the Assumed Employee Liabilities; and (e) payment of cash in an amount equal to the balance of the Purchase Price.

27.    It is a condition of the Purchase Agreement that the Sale Transaction be consummated pursuant to the provisions of section 363 of the Bankruptcy Code, and subject to higher and better offers.  In furtherance of that effort, the Debtors' respective Boards voted to approve the filing of Chapter 11 petitions for the Debtors.

## VI.    CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS

### A.    Sun Life Assurance Company of Canada  (US) ("Sun Life").

28.    On April 4, 2006, SSMC executed a Promissory Note (the "**Sun Life Note**") and Mortgage and Security Agreement (the "**Sun Life Mortgage**") in favor of Sun Life in the original principal amount of $12 million, secured by a first mortgage on the SSMC main hospital campus and ambulatory care facility.  There is currently due to Sun Life approximately $8.98 million under the Sun Life Mortgage.

11

B.    **Dormitory Authority of the State of New York ("DASNY").**

29.    Pursuant to a First Amended Reimbursement Agreement, dated as of February 13, 2008, DASNY loaned the sum of $2 million to SSMC (the "**First Amended Reimbursement Agreement**") for the purpose of implementing a business plan.    The First Amended Reimbursement Agreement consolidated SSMC's obligations to DASNY under a prior reimbursement agreement, dated January 29, 2002, pursuant to which SSMC had received the first installment of a restructuring pool loan in the amount of $1 million (the "**Original Reimbursement Agreement**").    The loans were based on SSMC's participation and qualification for the Health Facility Restructuring Program established by DASNY and the New York State Housing Finance Agency.    Neither the Original Reimbursement Agreement nor the First Amended Reimbursement Agreement provided for the grant of a security interest in favor of DASNY.

30.    On April 14, 2008, DASNY and SSMC agreed to further amend the terms of the Original and First Amended Reimbursement Agreements through the execution of a Second Amended Reimbursement Agreement (the "**Second Amended Reimbursement Agreement**"), whereby DASNY agreed to loan an additional $2 million to SSMC.    At the time the Second Amended Reimbursement Agreement was executed, SSMC owed DASNY the sum of $2,146,606.91 for its obligations under the Original Reimbursement Agreement and the First Amended Reimbursement Agreement.    Thus, following the execution of the Second Amended Reimbursement Agreement, the aggregate principal loan amount due to DASNY was $4,146,606.91.    The additional funds loaned by DASNY under the Second Amended Reimbursement Agreement were also issued on an unsecured basis.

31.    Subsequently, on August 11, 2009, the parties agreed to enter into a second Reimbursement Agreement (the "**2009 Reimbursement Agreement**") which provided for advances by DASNY in the amount of $5 million to SSMC for the purpose of providing working capital to SSMC and facilitating refinancing of SSMC's existing credit facility with CIT with a facility from MidCap (as defined hereinafter). As security for DASNY's advances under the 2009 Agreement, DASNY was granted a lien in SECC's real property. To later facilitate the refinancing of SSMC's credit facility with MidCap Funding , DASNY agreed to subordinate its mortgage lien on SECC's real property to MidCap Funding. As of the Petition Date, the outstanding amount of the DASNY 2009 SSMC Loan is approximately $5.187 million.

32.    On October 1, 2010, DASNY entered into a First Amended Reimbursement Agreement with MVH (the "**MVH Amended Reimbursement Agreement**"), which provided for the extension of a $2 million loan to MVH. The loan was in addition to a $500,000 loan previously issued to MVH under the first MVH Reimbursement Agreement, dated as of August 31, 2010. Following the execution of the MVH Amended Reimbursement Agreement, the aggregate principal amount of the MVH debt to DASNY was increased to $2.5 million. The funds loaned by DASNY under the MVH Amended Reimbursement Agreement were originally secured by a HEAL grant which was received and utilized by MVH. Thus, this obligation remains unsecured.

33.    Finally, on August 14, 2012, DASNY and SSMC agreed to execute an additional reimbursement agreement (the "**2012 SSMC Agreement**"), pursuant to which DASNY loaned the amount of $2.9 million to SSMC for working capital. As security for the 2012 SSMC Agreement, DASNY was granted a second lien and security interest on the MVH real property

13

2499114v.8

and a lien on the proceeds of any HEAL NY Grants awarded to SSMC. As of the Petition Date, the outstanding balance of the DASNY 2012 SSMC Loan is approximately $2.92 million.

34.    As of the Petition Date, DASNY was owed an aggregate outstanding principal balance of approximately $11.5 million with respect to all DASNY loans. The outstanding principal balances of the indebtedness: (i) under the 2009 Reimbursement Agreement secured by a subordinate mortgage lien on SECC's real property is approximately $5.0 million and (ii) under the 2012 SSMC Agreement secured by a second lien on the MVH real property is approximately $2.9 million.

## C.    Hudson Valley Bank ("HVB").

35.    On April 6, 2004 and October 28, 2005, MVH procured two revolving lines of credit from HVB in the amounts of $2 million and $3 million respectively, which were ultimately consolidated into a single revolving line of credit (the "**HVB Revolving Loan**") in the aggregate amount of $5 million pursuant to a mortgage modification and extension agreement, dated as of October 28, 2005. As security for the HVB Revolving Loan, HVB was granted a first lien in the MVH real property. In addition, HVB was granted a first lien on all of MVH's revenues, receipts, income, accounts, accounts receivables, inventory, personal property and general intangibles. As part of the arrangement, MVH also executed an Assignment of Leases and Rents, assigning all of MVH's rights as lessor under any leases affecting the Property. As of the Petition Date, HVB is owed approximately $702,970.

## D.    MidCap Financial, LLC and MidCap Funding IV, LLC ("MidCap").

36.    Pursuant to that certain Credit and Security Agreement dated April 8, 2011 and related financing documents (the "**Original Credit Agreement**") by and between SSMC and MidCap Financial, LLC (the "**Prepetition Revolving Loan Agent**"), the Prepetition Revolving

14

Loan Agent made available to SSMC a revolving credit facility in an amount up to Fifteen Million Dollars ($15,000,000) (the "**Original Loan**"), which Original Loan was secured by SSMC's accounts receivable arising out of the performance or delivery of any medical, surgical, diagnostic, dental or other professional services and/or the supply of goods related to such services (the "**Prepetition Accounts**"). The Prepetition Revolving Loan Agent immediately assigned its rights and obligations as agent under the Original Credit Agreement to MidCap Funding IV, LLC ("**MidCap Funding**").

37.    Subsequently, pursuant to a certain Amended and Restated Credit and Security Agreement dated June 8, 2011, and related financing documents (the "**Prepetition Revolving Credit Agreement**"), the Original Credit Agreement was modified to add SECC as a borrower and increase the amount of the Original Loan to a revolving loan in an amount up to Eighteen Million Dollars ($18,000,000) (the "**Prepetition Revolving Loan**"). In addition, in connection with the Prepetition Revolving Credit Agreement and Prepetition Revolving Loan, each of SSMC and SECC granted a lien in their respective Prepetition Accounts to secure the Prepetition Revolving Loan and a certain Prepetition Term Loan (as defined below). The outstanding principal balance of the Prepetition Revolving Loan Obligations is approximately $16.2 million

38.    On the same date, SECC and MidCap Financial, as lender and agent, entered into a Credit and Security Agreement and related Mortgage, Assignment of Leases and Rents and Security Agreement (collectively, the "**Prepetition Term Loan Agre**ement"), pursuant to which MidCap extended SECC a $7 million term loan (the "**Prepetition Term Loan**") secured by a first priority mortgage lien (the "Prepetition Mortgage") on SECC's real property at 75 Glover Johnson Place, New Rochelle, NY (the "SECC Property"). The outstanding principal balance of the Prepetition Term Loan Obligations is approximately $5.8 million.

2499114v.8

**E.**     <u>Pension Plan/Pension Benefit Guaranty Corporation ("PBGC").</u>

39.     SSMC sponsored the Cash Balance Retirement Plan for the benefit of its employees (the "**SSMC Pension Plan**") which was a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation (the "**PBGC**") under Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), 29 U.S.C. §§ 1301-1461, et seq. The Pension Plan was subject to the minimum funding requirements of ERISA and § 412 of the Internal Revenue Code.

40.     SSMC failed to meet the terms of its minimum funding waiver under the SSMC Pension Plan for the 1995 and 1997. Consequently, to secure its obligations to the PBGC, SSMC granted PBGC mortgage liens in the original principal amount of $2.582 million in April, 1997 and $3.488 million in November, 1998 encumbering certain parking lots (the "**SSMC Lots**") situate on the SSMC hospital campus (the "**PBGC Lot Mortgages**"). As of the Petition Date, the outstanding amount of the SSMC Pension Plan Claim is approximately $5.763 million.

41.     In 2003, SSMC was again unable to meet its minimum funding requirements under the SSMC Pension Plan and a voluntary distress termination of the plan ensued. On October 31, 2003, as amended on December 31, 2008, SSMC and the PBGC entered into a Settlement Agreement pursuant to which SSMC remains obligated under a note to PBGC for termination payments aggregating approximately $15.820 million (the "**Settlement Amount**"). In addition to the lien on the SSMC Lots under the PBGC Lot Mortgages, the Settlement Amount was to be further secured by a subordinated security interest in the amount of $9.620 million on the SSMC hospital campus (the "**PBGC Subordinated Lien**"). It does not appear, however, that the PBGC Subordinated Lien was ever perfected by the filing of a mortgage or other recording instrument.

16

2499114v.8

42.    On July 31, 2010, MVH terminated the Mount Vernon Hospital Employees' Retirement Plan (the "**MVH Pension Plan**").  PBGC asserted a claim for unfunded benefit liabilities as of the Plan termination date, *i.e.* the shortfall in plan assets necessary to pay all benefits promised under the MVH Pension Plan in the alleged amount of $4.032 million (the "**MVH Pension Plan Claim**").  On July 15, 2010, PBGC filed a Notice of Federal Lien under IRC Section 412(n) against the MVH hospital real and personal property (the "**PBGC MVH Lien**").

## F.    Other Judgments and Liens.

43.    1199 SEIU Healthcare Workers ("**1199**"), one of the Debtors' principal unions, has obtained multiple judgments against each of SSMC and MVH for unpaid contributions and benefit payments due the 1199 Funds and has recorded the judgments against SSMC and MVH real property.  1199 currently asserts judgments liens on the SSMC and MVH real property in the amount of $908,000 and $494,000 respectively.  New York State Department of Labor, in turn, has recorded judgments against SSMC in the aggregate amount of $21,800 and against MVH in the aggregate amount of $117,670.

44.    Various mechanics lien have also been asserted of record as follows (collectively, the "**Mechanics Liens**"): (A) as against SSMC: (i) Graybar Electric Company, Inc- $17,458 recorded May 29, 2012; (ii) D&D Elevator Maintenance, Inc - $525,880 recorded August 22, 2012; and (iii) Omega Environmental Services, Inc. - $138,742, recorded February 13, 2013; and (B) as against MVH: (i) StonCor Group, Inc. - $4995.40, recorded May 25, 2012.

## VII.    THE PROPOSED SALE

## A.    The Sale to MMC

45.     As noted above, after the failed negotiations with WCHCC and a period of extensive discussions and negotiations with MMC, the Debtors entered into the Purchase Agreement with MMC.  Pursuant to the Purchase Agreement MMC has agreed to purchase the Acquired Assets, free and clear of liens, claims and encumbrances (except as expressly assumed) for aggregate consideration to the Debtors' estates in the amount of $54,000,000 (the "**Purchase Price**").  The total Purchase Price is comprised of: (a) assumption of the Assumed Liabilities, (b) satisfaction of the Cure Amounts, and (c) payment of amounts due under the Guaranty, (d) assumption of the Assumed Employee Liabilities in an amount of up to $9,000,000; and (e) payment of cash in an amount equal to the balance of the Purchase Price.  The Purchase Agreement contemplates the sale of substantially all of the Debtors' real estate and operating assets to MMC.

46.     In addition, as the stalking horse bidder, MidCap required, and  Buyer has agreed to provide, *inter alia*, a Guaranty in an amount of $7 million to $10  million to collateralize certain of the Debtors' postpetition loan obligations and has agreed to grant a continuing lien in post-closing  accounts receivable to guaranty any shortfall in the collection of certain of the Debtors' postpetition revolving loan obligations in an amount not to exceed $5 million.  Absent the Guaranty, MidCap would not have provided the DIP Financing.

47.     The Debtors believe that MMC has the financial capability and logistical resources to purchase and integrate the Acquired Assets and implement critical upgrades to existing systems and facilities so as to ensure the continued provision of health care to the communities currently served by the Medical Centers for years to come.  MMC also has the experience and reputation as one of the State's finest hospitals, which the Debtors hope will facilitate and expedite the approval process.

2499114v.8

48.     An expeditious sale of the Debtors' assets will (i) ensure the continuation of essential healthcare services to two communities with underserved populations without interruption and (ii) optimize the value of the Debtors assets, all of which will inure to the benefit of the Debtors, their employees, patients, creditors, and communities at large. The Debtors fully expect to continue operating in the ordinary course of business pending the consummation of the sale, which is anticipated to occur not later than October 31, 2013. Absent such a sale, the Debtors will face a liquidity crisis which could force them to immediately curtail and ultimately shut down operations entirely, to the detriment of their patients, the communities they serve and the public interest.

49.     The Debtors believe that the Purchase Agreement is fair and reasonable and in the best interest of the Debtors' estates, their creditors and all other parties in interest. Notwithstanding, it is contemplated that the proposed Sale will be tested by an additional solicitation process and Auction during which higher and/or better offers will be considered. Accordingly, in order to ensure that the highest and best offer is realized for the Acquired Assets, the Debtors are seeking approval of the Bidding Procedures which will enable the Debtors to continue marketing the Acquired Assets, and conduct an Auction if additional parties are interested in making higher or better offers. The Debtors believe the Bidding Procedures, in conjunction with the Purchase Agreement, are the best possible means for maximizing value for the benefit of the Debtors' estates and their respective creditors.

50.     Additionally, as is customary in a Sale Transaction of this nature, the Purchase Agreement provides for the payment of a Break-Up Fee in the amount equal to three percent (3%) of the Purchase Price and an Expense Reimbursement not to exceed $750,000, each subject to this Court's approval, in the event that a higher or better offer (a "**Competing Bid**") is

19

accepted by Seller and the Bankruptcy Court issues a Sale Order approving the proposed transaction with the party making such Competing Bid or confirming a plan which does not involve the Sale of the Assets to MMC (an "**Alternate Transaction**").  The Break-Up Fee and Expense Reimbursement are in consideration of MMC having expended considerable time and effort in negotiating the Purchase Agreement.  The Break-Up Fee and Expense Reimbursement are payable solely from the proceeds of the Alternate Transaction and upon the consummation of a sale resulting from a Competing Bid.

51.     The Sale Transaction and Purchase Agreement are also conditioned upon (i) Attorney General and New York State Supreme Court approval consistent with the New York Not-For-Profit Laws; and (ii) all requisite approvals required by DOH and any other regulatory authority asserting jurisdiction over the Debtors.

**B.     The Purchase Agreement**

52.     The following is a summary of the material terms of the Purchase Agreement[3]:

(a)     Purchase Price.  Buyer shall provide Sellers with aggregate consideration of $54,000,000, plus the appraised value of the Furniture, Equipment and Inventory identified by Buyer.  The Purchase Price shall be payable as follows: (a) assumption of the Assumed Liabilities; (b) satisfaction of the Cure Amounts, (c) payments of amounts due under the Guaranty, (d) assumption of the Assumed Employee Liabilities; and (e) payment of cash in an amount equal to the balance of the Purchase Price.

(b)     Deposit.  Buyer shall deposit a sum equal to ten percent (10%) of the Purchase Price upon the execution of the Purchase Agreement, to be held in escrow pending the approval of the Sale

---

[3] The summary contained below is intended to provide the Court and parties in interest with the salient terms of the Purchase Agreement, to the extent there are any inconsistencies between the summary description of the Purchase Agreement contained herein and the actual terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement control.  Capitalized terms contained in the summary description of the Purchase Agreement that are not defined herein shall have the meaning ascribed to them in the Purchase Agreement.

2499114v.8

(c)    Acquired Assets. The assets being sold to MMC include, inter alia, (a) all Owned Real Property of the Sellers; (b) the interests of the Sellers, whether as landlord or tenant, under the Real Property Leases for the Leased Real Property; (c) all Furniture and Equipment and Inventory identified by Buyer; (d) Assigned Contracts; (e) Intellectual Property; (f) all books and records, unless otherwise specified in the Purchase Agreement; (g) all Prepaid Deposits; (h) insurance claims relating to any Acquired Asset; (i) all supplier warranties relating to any Acquired Asset; and (j) goodwill; and (k) to the extent transferable, any donor restricted assets and endowment funds held by the Sellers.

(d)    Excluded Assets. Property excluded from the Sale includes all assets which are not being expressly purchased by Buyer (the "Excluded Assets").

(e)    Assumed Liabilities. The Buyer has agreed to assume liabilities of any Seller that are owed solely under (a) the Assigned Contracts, but only to the extent of they accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date; (b) all Debt of the Sellers listed on Schedule 2.3(b) of the Purchase Agreement; and (c) all Liabilities incurred or accrued on or after the Closing Date by Buyer; (d) certain liabilities accruing to eligible former employees of the Sellers as set forth in Section 2.3 of the Purchase Agreement; and (e) the Cure Amounts relating to the Assigned Contracts up to Three Million ($3,000,000) Dollars.

(f)    Excluded Liabilities. Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of (or Claim against) any Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise.

(g)    Warranties. Except as expressly set forth in the Purchase Agreement, neither Sellers nor any of their respective affiliates make any representation or warranty, express or implied, at law or in equity, as to the accuracy or completeness of any information regarding the Sellers, the Business, the Acquired Assets, or Liabilities (including the Assumed Liabilities), or the transactions contemplated by the Agreement, and shall not have any liability to Buyer for the distribution of such information.

(h)    As Is Transaction. Seller is transferring and Buyer shall accept the Acquired Assets at the Closing "as is" and "where is."

(i)    Employees. MMC is not assuming any of the Debtors' collective bargaining agreements or any other obligations relating to the Sellers' employees. Notwithstanding, MMC expects to offer employment on a probationary basis to substantially all employees of the Debtors who: (a) at the time this Agreement was signed were employed by the Debtors; (b) in Buyer's sole discretion, meet Buyer's job qualifications as of the Closing and (c) agree to resign from employment with Debtors.

(j)    Closing Conditions Required by MMC. Other than regulatory and governmental approvals and legal constraints, including any approvals required under applicable non-bankruptcy law, MMC's closing conditions include, among other things: (i) the accuracy of the Sellers' representations and warranties; (ii) compliance by the Sellers with all of their covenants and agreements hereunder in all material respects through the Closing;

(iii) all authorizations, consents, and approvals of, or no notices of objections from Governmental Authorities; (iv) no Material Adverse Change shall have occurred with respect to Seller, (v) Buyer shall have received reasonably acceptable assurances from appropriate regulatory agencies that Buyer shall have no successor liability from the contemplated transaction (vi) DASNY, PBGC and the 1199 Funds shall not have objected to the sale of the Acquired Assets or any objections shall be overruled; (vii) entry of the Bidding Procedures Order within 35 days of the Petition Date and entry of the Sale Order within 100 days of the Petition Date; and (viii) the delivery of customary closing deliverables, including ancillary agreements and regulatory requirements .

(k)    <u>Closing Conditions Required by the Debtors</u>. Other than regulatory and governmental approvals and legal constraints, the Debtors' closing conditions will be limited, among other things, to: (i) the accuracy of MMC's representations and warranties; (ii) MMC's compliance with covenants and performance of agreements and obligations; (iii) DASNY, PBGC and the 1199 Funds shall not have objected to the sale of the Acquired Assets or any objections shall be overruled; (iv) the delivery of customary closing deliverables, including ancillary agreements; and (v) entry of the Bidding Procedures Order and the Sale Order.

(l)    <u>Termination of the Purchase Agreement</u>. The Purchase Agreement may be terminated upon, including, but not limited to, the occurrence of the following events:

(i)    by mutual agreement of the Parties;

(ii)    if an Alternate Transaction is approved;

(iii)    if: (A) the Bidding Procedures Order is not entered within thirty five (35) days after the Petition Date; (B) the Bankruptcy Court has not entered the Sale Order within one hundred (100) days of the Petition Date; (C) if an order approving a Competing Bid (subject to the limitations in the Bidding Procedures Order); or (D) the sale of substantially all of the assets of Sellers occurs;

(iv)    dismissal or conversion of the Chapter 11 Cases or the appointment of a Chapter 11 trustee, examiner or other person with expanded powers in the Debtors' Chapter 11 Cases;

(v)    granting of relief from the automatic stay to permit foreclosure or the exercise of other remedies on the material assets of any the Debtor;

(vi)    Debtor's modification or consent to any modification of the Purchase Agreement, in each case, without the prior agreement of the Purchaser;

(vii)    by Buyer if there is a Material Adverse Effect;

(viii)    by Seller, if there is a material breach by Buyer of any provisions of this Agreement.

C.    **Break-Up Fee and Expense Reimbursement**

2499114v.8

53.    As noted above, the Purchase Agreement contemplates the payment of the Break-Up Fee and Expense Reimbursement in certain circumstances.  The Break-Up Fee will be granted an administrative expense priority pursuant to Bankruptcy Code sections 503(b) and 507(b) and shall be payable solely from the first proceeds of such Alternate Transaction.

54.    The Debtors believe that (a) approval of the Break-Up Fee and Expense Reimbursement is an integral part of the Purchase Agreement, (b) in the absence of the Debtors' obligation to pay the Break-Up Fee and Expense Reimbursement, MMC would not have entered into the Purchase Agreement, (c) the entry of the Purchase Agreement is necessary for preservation of the Debtors' estates and is beneficial to the Debtors, and (d) the Break-Up Fee and Expense Reimbursement are reasonable in relation to MMC's efforts and to the magnitude of the transactions and consideration contemplated by the Purchase Agreement.

55.    The Purchase Agreement further provides that if the Break-Up Fee and Expense Reimbursement are not approved by the Bankruptcy Court, MMC shall have the right, but not the obligation, to terminate the Purchase Agreement and neither party shall have any further obligations to the other.

## VIII.    THE PROPOSED BIDDING PROCEDURES AND AUCTION

### A.    The Scheduling Order

56.    The Debtors seek entry of the prefixed Scheduling Order setting the time and notice requirements for the hearing on the Bidding Procedures and the Break-Up Fee and Expense Reimbursement.  Specifically, the Debtor requests that notice of the hearing on the Bidding Procedures, Break-up Fee, Expense Reimbursement and related relief be sufficient if the Scheduling Order and the Motion are served by (i) overnight mail, or (ii) electronic transmission

2499114v.8

followed by regular first class mail, within two (2) days of entry of the Scheduling Order on: (a) the Debtor's thirty (30) largest unsecured creditors (on a consolidated basis) and, upon its appointment, counsel for the official committee of unsecured creditors (the "**Creditors Committee**"); (b) each of the Debtor's five (5) largest secured creditors (c) the Office of the United States Trustee for the Southern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) all counter-parties to the Assigned Contracts (hereinafter defined); (f) the following state and local taxing and regulatory authorities: (i) the Centers for Medicare and Medicaid Services, (ii) the New York State Department of Health, (iii) the United States Attorney for the Southern District of New York, (iv) the Attorney General of the State of New York; (v) the Westchester County Attorney; (vi) the New Rochelle City Attorney, (vii) the Mount Vernon City Attorney; (viii) the Internal Revenue Service; (ix) the New York State Department of Taxation and Finance; (g) counsel to the Buyer; (h) the United States Department of Justice, Commercial Litigation Division; (i) the United States Department of Health and Human Services; and (j) all parties who are known to assert a Lien on the Purchased Assets and Properties (collectively, the "**Notice Parties**").

57.    The shortened notice period is necessary given the limited remaining resources of the Debtors and the surmounting losses being incurred by the Debtors on a continual basis.

**B.    Summary of the Bidding Procedures**

58.    In order to ensure that the maximum potential value for the Acquired Assets is obtained, the Debtors seek entry of the Bidding Procedures Order and approval of the Bidding Procedures. The Debtors believe that the solicitation procedures and Auction contemplated pursuant to the Bidding Procedures will maximize value of the Assets.

2499114v.8

59.    The Bidding Procedures (annexed as <u>Schedule 1</u> to the Bidding Procedures Order)

provide, in relevant part, as follows:

(a)    <u>Qualified Bidders</u>:    In order to participate in the bidding process and to have a bid considered by the Debtors, each potential bidder (a "**Potential Bidder**") must deliver a written, irrevocable offer, for some or all of the Debtors' Acquired Assets, satisfying the below criteria.  A BID MAY BE MADE FOR ALL OR ONLY A PORTION OF THE ASSETS.  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that in the Debtors' discretion, after consultation with the Creditors Committee, satisfies the following (a "**Qualified Bid**"):

(i)    <u>Bid Deadline</u>.  Each Bid Package (as defined below) must be delivered in written form to: (i) counsel to the Debtors, Burton Weston, Esq., and Afsheen Shah, Esq., Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, (ii) counsel for the Creditors Committee, _____, Attn: _____., and (iii) counsel for any postpetition debtor in possession lender (the "**DIP Lender**"), Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attn: Katie G. Stenberg and Daniel Flournoy, in each case so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on June ____, 2013 (the "**Bid Deadline**").

(ii)    <u>Bid Package</u>.  Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable offer stating that (x) the bidder offers to consummate a sale transaction on terms and conditions no less favorable than in the Purchase Agreement and in an amount at least equal to the Minimum Bid (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order (as defined below), and (ii) closing with the Successful Bidder and (z) that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided with Modified Purchase Agreement (as defined below); (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "**Modified Purchase Agreement**"); and (iii) an electronic markup of the Agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtors) and the electronic markup of the Purchase Agreement.  The Debtors, in consultation with the Creditors Committee and the DIP Lender, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid.

(iii)    <u>Minimum Bid</u>.  The amount of the purchase price in such bid must provide for net cash (or cash equivalent) that is at least in the amount of: $100,000 more than the base price contained in the Purchase Agreement, plus the amount of the

Break Up Fee and Expense Reimbursement (the "**Minimum Bid**").   Any Minimum Bid must provide for the guaranty and/or repayment of any postpetition financing to the same extent repayment is agreed to by Buyer.  Buyer has agreed to provide a Guaranty in an amount of $7 million to $10 million to collateralize certain of the Debtors' postpetition loan obligations and has agreed to grant a continuing lien in post-closing accounts receivable to guaranty any shortfall in the collection of certain of the Debtors' postpetition revolving loan obligations in an amount not to exceed $5 million.  Any Minimum Bid must provide for these terms; and for the avoidance of doubt, in the event that a Qualified Bidder, other than the Buyer, becomes the Successful Bidder (as defined below), the Successful Bidder shall assume all of Buyer's obligations, with respect to the Guaranty, and Buyer shall be made whole in connection therewith.

(iv)     Financial Information.  The Bid Package must contain such financial and other information that will allow the Debtors to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Purchase Agreement, including any proposed conditions to Closing and adequate assurance of such bidder's ability to perform under any Assigned Contracts (and to pay all cure amounts required to assume and assign any such Assigned Contracts.

(v)     Additional Bid Protections.   The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment.

(vi)     Identity of Bidders.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Acquired Assets, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtors.  Potential Bidders shall be required to provide such additional information as the Debtors may require regarding a bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(vii)     Due Diligence.  The bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Acquired Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

2499114v.8

(viii)    Consents.    Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its competing bid and to enter into and perform the Modified Purchase Agreement.

(ix)    Deposit. A Potential Bidder must deposit 10% of the initial purchase price set forth in Modified Purchase Agreement, plus the amount of the Break-Up Fee and Expense Reimbursement, with the Debtors in the form of a certified check or wire transfer on or before the Bid Deadline. The Potential Bidder or the Backup Bidder (defined below) shall forfeit the Deposit if (i) the Potential Bidder of the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtors' selection of the Successful Bidder, or (ii) the bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtors' consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the Modified Purchase Agreement. The Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder, provided, however, in the event MMC is not the Successful Bidder, its Deposit shall be returned to it promptly upon termination of the Purchase Agreement but in no event later than five (5) business days from such termination. The Debtors will maintain any Deposit in a non-interest bearing Debtor account.

(x)    As Is. Where Is:  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in the Modified Purchase Agreement of the Successful Bidder. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Acquired Assets prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(xi)    Debtors' Considerations:    The Debtors, after consultation with the Creditor's Committee, will have the right to determine that a bid is not a Qualified Bid if either of the following conditions is satisfied: (A)  the ability of the Potential Bidder to use the Acquired Assets is not consistent with the Debtors' mission; or (B) the terms of the bid are materially more burdensome or conditional than the terms of the Purchase Agreement and are not offset by a material increase in purchase price, which determination may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees and the Breakup Fee); (3) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (4) any other

2499114v.8

factors the Debtors, after consultation with the Creditor's Committee, may deem relevant. For avoidance of doubt, the Purchase Agreement is deemed a Qualifying Bid, and MMC is deemed a Qualifying Bidder.[4]

(b)      Sale to MMC. If no Qualified Bid other than Buyer's is submitted by the Bid Deadline, the Debtors shall not hold the Auction, but may proceed with the Sale Hearing and seek approval of the Purchase Agreement and the transactions contemplated thereby

(c)      Auction.      In the event that the Debtors timely receive at least one Qualified Bid (excluding Purchaser's) by the Bid Deadline for all or any portion of the Acquired Assets, the Debtors shall conduct the Auction with respect to the Acquired Assets. The Auction will take place at the offices of counsel to the Debtors, Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021 on June _____, 2013, starting at 10:00 a.m. (prevailing Eastern Time), or at such other later date and time or other place, as may be determined by the Debtors at or prior to the Auction. The Auction shall be governed by the following procedures:

(d)      Participation. Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder). In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith. The Debtors, in consultation with the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for all or any portion of the Assets, and otherwise complies with the bid requirements set forth herein, as the "**Starting Auction Bid**". The Debtors may consider a variety of factors to determine the Starting Auction Bid including changes to the Purchase Agreement and the Qualified Bidder's ability to consummate the Sale.

(e)      Bidding. Bidding at the Auction shall commence at the amount of the Starting Auction Bid. Qualified Bidders may then submit successive bids in increments of $100,000 (the "**Bid Increment**"); provided, however, that the Debtors, in consultation with the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction. Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(f)      Higher and Better. The Debtors reserve the right, in consultation with the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtors may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain the necessary regulatory approvals, whether the bid is materially more burdensome than the terms of the Modified Purchase Agreement, any proposed conditions to closing, whether

---

[4] Notwithstanding the Qualifying Bid procedures, the Debtors reserve the right to entertain bids for the Assets that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures.

2499114v.8

the bid includes any non-cash components and provides significant cash consideration for the payment of required costs of the transaction, and any other factors deemed relevant.

(g)     Successful Bid. The Auction shall continue until there is only one collective offer or separate offers for separate Assets, that the Debtors, in consultation with the Creditors' Committee, determines, subject to Court approval, is (or are) the highest or otherwise best offer(s) from among the Qualified Bids submitted at the Auction (the "**Successful Bid(s)**"). The bidder submitting such Successful Bid shall become the "Successful Bidder(s)," and shall have such rights and responsibilities of the purchaser, as set forth in the Modified Purchase Agreement, or the Purchase Agreement, as applicable. Within one business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder(s) shall (i) complete and execute all Purchase Agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid(s) was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals 10% of the Successful Bid(s) plus the amount required for the payment of the Expense Reimbursement.

(h)     Anti-Collusion. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other bidder or potential bidder with respect to the bidding or the sale contemplated by the Purchase Agreement (the "**Sale**").

(i)     Conduct of Auction. The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtors or its counsel may meet privately with any Qualified Bidder to negotiate the terms of its bid. The Debtors, in consultation with the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in their judgment, will better promote the goals of the Auction.

(j)     Backup Bid. At the conclusion of the Auction, the Debtors will also announce the second highest or otherwise best bid(s) from among the Qualified Bids submitted at the Auction (the "**Backup Bid(s)**"). The bidder(s) submitting such Backup Bid(s) shall become the "Backup Bidder(s)," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement or the Purchase Agreement, as applicable. The Backup Bid shall remain open and irrevocable until the earlier of (x) ninety (90) days following entry of the Sale Order and (y) closing of the Sale, provided, however, if the Buyer's bid is deemed the Backup Bid, the Buyer's rights and obligations with respect to such bid shall be subject to the terms of the Purchase Agreement. The Backup Bidder's Deposit will be returned by the Debtors upon consummation of the Sale of the Acquired Assets to the Successful Bidder(s) or will be otherwise applied or forfeited as provided in Section (ix) above, and the Bid Procedures, if the Backup Bidder is determined to be the Successful Bidder, except for the Deposit of the Buyer, if deemed the Backup Bidder, which shall be subject to the terms of the Purchase Agreement.

(k)     Extensions/Adjournment. The Debtors reserve their rights, in the exercise of their judgment, in consultation with the Creditors' Committee, to modify any non-material

2499114v.8

provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the Purchase Agreement and Bid Procedures Order.

**C.    Auction and Sale Hearing Notice**

60.    Within three (3) days after entry of the Bid Procedures Order, the Debtors shall serve copies of the Bid Procedures Order, the Bidding Procedures and the notice of the hearing on the Notice Parties.  In addition, within three (3) business day after entry of the Bid Procedures Order, the Debtors shall cause to be served a copy of the Sale Notice on the Notice Parties, all creditors of the Debtors who are listed on the Schedules filed by the Debtors or who have filed proofs of claim against the Debtors' estates ("**Scheduled and Filed Creditors**") and all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 ("**2002 Parties**").

61.    No later than twenty-one (21) days prior to the Sale Hearing, the Debtors shall supplement service by causing a copy of the Sale Notice (annexed as Schedule 2 to the Bid Procedures Order) to be served on any additional parties disclosed by the title reports asserting a lien on or interest in the Acquired Assets.  Further, as soon as practicable after entry of the Bidding Procedures Order, the Debtors will submit the Sale Notice to be published once in the New York Times (Local Edition).

**D.    Objections to Bidding Procedures and Sale**

62.    The Debtors propose that objections, if any: (i) to the Bidding Procedures shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven days prior to the Bidding Procedures Hearing (the "**Bidding Objection Deadline**"), and (ii) to the Sale Motion shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven days prior to the Auction (the "**Sale Objection Deadline**"), by:

(a) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attn: Susan D. Golden, Esq. and William E. Curtin, Esq., (b) counsel to the Debtors, Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck New York, 11021, Attn: Burton Weston, Esq. and Afsheen Shah, Esq.; (c) counsel for MMC, Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attention: Frank A. Oswald, Esq.; (d) counsel to the DIP Lender, Waller Lansden Dortch & Davis, LLP, 511 Union Street, Suite 2700, Nashville, TN 37219, Attn: Katie G. Stenberg and Daniel Flournoy; and (e) counsel to the Creditors' Committee, _____.

### E.      Sale Hearing

63.    The Successful Bid and Backup Bid will each be subject to entry of the Sale Order after the Sale Hearing that the Debtors propose take place on or around _____, 2013. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court. Upon approval of the Backup Bid by the Court, the Backup Bid (except for the Buyer if its bid is deemed the Backup Bid) shall remain open and irrevocable until the consummation of the Successful Bid.

## IX.    EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

64.    Pursuant to this Court's Guidelines for the Conduct of Asset Sales, adopted by General Order No. 383, dated as of December 1, 2009, the Debtors are required to highlight any "extraordinary provisions" of the proposed Sale. The extraordinary provisions in the proposed Sale are as follows:

(a)    Use of Proceeds. Under the Purchase Agreement, the first proceeds from the Sale pursuant to a Competing Bid will be used to pay the Break-Up Fee and Expense

2499114v.8

Reimbursement. The Sale Order also provides that: the liens existing on the Acquired Assets will attach to the net proceeds of the sale to the same extent, validity and priority that existed prior to the sale after taking into account the costs of the Sale and the Debtors shall be authorized to use such proceeds to pay any such secured claims in the order of their relative priority, as allowed by the Court.

(b)    Record Retention. The Purchase Agreement provides that the Debtors will retain or otherwise have reasonable access to their books and records to enable the Debtors to be able to administer their estates. Patient records will be maintained in accordance with applicable law.

(c)    Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtors submit such relief is appropriate under the circumstances because there is an immediate need for the successful Buyer to commence the lengthy DOH approval process.

(d)    Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Buyer's successor liability. The parties intend that the transfer of the Acquired Assets to MMC will not subject MMC to any liability other than Assumed Liabilities and a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law. The Debtors propose to provide notice of the Sale in accordance with the notice procedures set forth herein and submit that such notice is appropriate and adequate under the circumstances.

## X.    ASSIGNED CONTRACTS

65.    Section 365 of the Bankruptcy Code provides in relevant part, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the Debtors." 11 U.S.C. § 365(a). Pursuant to Schedule 2.1(d) of the Purchase Agreement, the Assigned Contracts consist of specified executory contracts and unexpired leases which have been designated to be assumed by the Debtors and assigned to Buyer.

66.    In connection with the Sale of the Assets, the Debtor may seek to assume and assign to MMC, and may if provided by the Successful Bid, assume and assign to the Successful Bidder(s) if different from MMC, certain executory contracts and/or leases designated by MMC or another Successful Bidder (the "**Assigned Contracts**") pursuant to Section 365 of the

32

Bankruptcy Code and in accordance with the procedures set forth herein (the "**Assignment Procedures**").

67.     The Debtor will file a schedule of the Assigned Contracts (the "**Assumption Schedule**") no later than fifteen (15) days prior to the Objection Deadline, and to concurrently serve notice of such filing upon all counterparties to the Assigned Contracts, the Notice Parties the 2002 Parties.  The Assumption Schedule will include any amount the Debtor believes is required to be paid pursuant to section 365(b) of the Bankruptcy Code to cure any defaults under the agreements listed on the Assumption Schedule (the "**Cure Amounts**").  Subject to the terms of the APA, the Successful Bidder(s) will be fully responsible for satisfying the requirements of section 365(b), including payment of the Cure Amounts and establishing adequate assurance of future performance.

68.     Counter-parties to the Assigned Contracts will have until the Objection Deadline to file an objection to the proposed assumption and assignment of any Assigned Contract or any Cure Amount.  Any such objection must set forth with specificity the basis for the objection and, if applicable, any counter-proposed Cure Amount.

69.     The Debtor, with the consent of MMC or the Successful Bidder(s), as applicable, shall have the right to amend the Assumption Schedule at any time prior to thirty (30) business days before the Closing Date to add or remove an Assigned Contract.  In such event, the Debtor shall file and serve an applicable notice of amendment (the "**Amendment Notice**"), reflecting appropriate changes to the Assumption Schedule, including changes to any proposed Cure Amounts, on all counter-parties to the Assigned Contracts removed or added to, or otherwise modified by, the amendment to the Assumption Schedule.  All affected parties shall thereafter have fifteen (15) days to object to file an Assumption Objection to the Amendment Notice.

33

70.    If an Assumption Objection is filed, and is not consensually resolved, the Debtors propose the Court hold a hearing on the objection on a date specified by the Court. To the extent the objection relates solely to a proposed Cure Amount, the Debtors propose that they have the right to have the Assigned Contract assumed and assigned to MMC or Successful Bidder(s), as applicable, with an appropriate amount being held in escrow for payment of the Cure Amount pending the resolution of the Assumption Objection by the parties or the Court. The Debtors further request that the parties be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts without the need for further Court Order or notice to other parties.

71.    If no Assumption Objection is timely filed and served, and subject to entry of an Order by this Court at the Sale Hearing approving the Sale and proposed assumption and assignment of the Assigned Contracts in connection therewith, the Cure Amounts set forth in the Assumption Schedule, as may be amended, shall be controlling, notwithstanding anything to the contrary in such Assigned Contracts, and the non-debtor parties shall be barred from asserting against the Debtors or the Buyer (or the Successful Bidder(s)) any other claim arising from the applicable Assigned Contracts.

72.    The effective date of the assumption and assignment of any Assigned Contract shall be the Closing Date of the Sale. All Cure Amounts will be paid by MMC (or Successful Bidder(s)) either prior to, upon, or promptly after the closing of the Sale, or as otherwise agreed upon between the parties to the Assigned Contracts.

## XI.    THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED

### A.    The Bidding Procedures Should be Approved

2499114v.8

73.    The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtors' estates receive the greatest benefit available from the sale of the Acquired Assets.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Acquired Assets while allowing the Debtors the flexibility to select the bid or bids that provide the greatest overall value to the Debtors' estates giving weight to the Debtors' not-for-profit healthcare mission and the best likelihood of closing.  Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Acquired Assets.

74.    The Debtors submit that the Bidding Procedures are reasonably designed to ensure that the Debtors' estates receive the maximum benefit available from the sale of the Acquired Assets, and therefore warrant Court approval.

**B.     The Break-Up Fee And Expense Reimbursement Should Be Approved**

75.    The Debtors are also requesting approval of the provisions of the Purchase Agreement and the Bidding Procedures regarding the Break-Up Fee equal to approximately 3% of the Purchase Price and Expense Reimbursement no to exceed $750,000.  The Break-Up Fee and Expense Reimbursement are payable solely from the first proceeds of an Alternate Transaction.

76.    As noted above, approval of the Break-Up Fee and Expense Reimbursement is an integral part of the Purchase Agreement, in the absence of which MMC would not have entered into Purchase Agreement.  The Debtors submit that the Break-Up Fee and Expense Reimbursement are reasonable in relation to MMC's efforts and to the magnitude of the transactions and consideration contemplated by the Purchase Agreement.  Further, MMC's bid

35

establishes an appropriate floor value for the Acquired Assets after diligent marketing and discussions with numerous potentially interested bidders.

77.    Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee and Expense Reimbursement under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the Trustee's or Debtors' decision to agree to the break-up fee is not tainted by bad faith or self-dealing, (ii) the break-up fee does not hamper bidding, and (iii) the amount of the break-up fee is reasonable.   See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). A break-up fee serves as an "incentive payment" offered to an unsuccessful bidder who places the Debtors' property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, break-up fees (i) attract or retain a potentially successful bid, (ii) establish a bid standard or minimum for other bidders to follow, and (iii) attract additional bidders. Integrated Res., at 661-62.

78.    In the instant case, the Break-Up Fee and Expense Reimbursement is the product of good faith, arm's-length negotiations between the Debtors and MMC, each of whom was represented by counsel. The Break-Up Fee and Expense Reimbursement provide a material benefit to the estates by enabling the Debtors to obtain a commitment from the Buyer which has and will continue to expend money, time and effort formulating and negotiating an offer for the Acquired Assets, notwithstanding that Purchase Agreement is subject to higher or better offers. In the Debtors' business judgment, the Break-Up Fee is fair and reasonable when considering the time, effort, cost, and expense that MMC has incurred in negotiating the Purchase Agreement, and necessary to reimburse MMC for its costs and expenses in the event an Alternate Transaction is consummated.

36

79.     Moreover, the Break-Up Fee and Expense Reimbursement do not hamper any

other party's ability to offer a higher or better bid for the Acquired Assets.  Given the size of the

Break-Up Fee and Expense Reimbursement relative to the total amount of consideration

provided for the Acquired Assets pursuant to the Purchase Agreement, and relative to the

"overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a

"chilling effect" on other prospective bidders' interest in the Acquired Assets.  Because the

Purchase Agreement has created a floor for any additional bids, MMC has provided significant

value to the Debtors' estates.  The Debtors submit that the Break-Up Fee and Expense

Reimbursement is appropriate under these circumstances.

80.     Finally, the Break-Up Fee and Expense Reimbursement are reasonable in relation

to the size of the proposed sale and under the facts and uncertainties of this transaction.  The

Break-Up Fee and Expense Reimbursement together equal approximately three percent (3%) of

the Purchase Price.  Courts in this District have approved breakup fees in approximately the

same amount as measured in proportion to the proposed purchase price offered for a debtor's

assets.  See In re New York Westchester Square Medical Center, Case No. 06-13050 (Bankr.

S.D.N.Y. Feb. 1, 2013); (approving a break-up fee of 3% on a $15.3 million assets sale); In re

HMX Acquisition Corp., Case No. 12-14300 (ALG) (Bankr. S.D.N.Y. Nov. 29, 2012)

(approving breakup fee of approximately 3.0% of the purchase price); In re Bos. Generating,

LLC, No. 10-14419 (SCC) (Bankr. S.D.N.Y. Oct. 12, 2010);   In re Saint Vincent Catholic

Medical Center, et al., Case No. 10-11963 (Bankr S.D.N.Y, June 30, 2011) (approving a break-

up fee of 2% on a $34 million sale of assets); In re Cabrini Med. Ctr., Case No. 09-14398 (AJG)

(Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% for an $80 million sale); In

re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Sept. 23, 2009) (approving a break-

up fee and expense reimbursement totaling 3.7% of total purchase price); In re Bearingpoint,

37

2499114v.8

Inc., No. 09-10691 (REG) (Bank. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of 3% on a $350 million sale); In re Silicon Graphics, Inc., Case No. 09-11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving a break-up fee and expense reimbursement totaling approximately 6% of total purchase price); In re Fortunoff Fine Jewelry & Silverware, LLC, No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving breakup fee of 2.8% of the purchase price); In re Bally Total Fitness of Greater N.Y., Inc., Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving breakup fee of 4.3% of the purchase price).

## C.    The Auction and Sale Hearing Notice Should be Approved

81.    Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtors are required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale. The Sale Notice sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Acquired Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

82.    The Debtors submit that the Sale Notice as proposed complies with Bankruptcy Rule 2002 and Administrative Order No. 383, and constitutes good and adequate notice of the sale and the proceedings with respect thereto. Because the Debtors are providing notice of this Motion, the Bidding Procedures and the Auction to all Notice Parties and Scheduled and Filed Creditors, the Debtors submit that the notice requirements of Bankruptcy Rules 2002(2) and 6004 are satisfied. The Debtors also propose to publish the Auction and Sale Notice in The New York Times (Local Edition) pursuant to Bankruptcy Rule 2002(l). Therefore, the Debtors

2499114v.8

respectfully request that the Court approve the Auction and Sale Notice and the notice procedures proposed above.

## XII.   THE SALE ORDER SHOULD BE ENTERED

### A.   Sales Outside the Ordinary Course of Business

83.   Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtors in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1) and (f).

84.   The terms of such sale are generally within the sound discretion of the Debtors. See In re Ionosphere Clubs, Inc., 100 B.R. 670 (Bankr.S.D.N.Y. 1989) (sale of Debtors' airline shuttle assets approved where representing the exercise of independent good faith and non-coerced business judgment by the Debtors, the Debtors articulated a compelling business reason for the sale and represented fair value).

85.   As recognized by the Second Circuit in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d. Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

86.   Bankruptcy Rule 6004(f)(1) further provides that sales of property outside the ordinary course may be conducted by private sale or public auction.  See F.R.B.P. 6004(f)(1). Generally, a bankruptcy court has wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under section 363(b).

See In re Ancor Exploration Company, 30 B.R. 802 (Bankr. N.D. Okla. 1983). However, each proposed sale must be examined from its own facts to determine whether the proposed sale is justified with detailed factual findings being made in support thereof.

**B.      The Sale of the Debtors' Assets Represents
        the Debtors' Sound Business Judgment**

87.      Under applicable law, a proposed sale must represent the reasonable exercise of business judgment on the part of a debtor-in-possession in order to be approved under section 363(b) of the Bankruptcy Code. See, e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); In re Lionel Corp., 772 F.2d at 1071. See also, In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr.S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (stating that the business judgment rule is applicable in bankruptcy and presumes that when making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company).

88.      Furthermore, Chapter 11 debtors may, in some circumstances, sell all or substantially all of their assets pursuant to section 363(b) prior to confirmation of a plan. In re Lionel Corp., supra, 722 F.2d at 1071. Such a sale can even be made prior to filing a plan of reorganization. In re Naron & Wagner, Chartered, 88 B.R. 85 (Bankr.D.Md. 1988). However, in approving such a sale, a court must be able, based on the evidence, "...to articulate sound business justifications for [its] decisions." In re Lionel Corp. at 1066. A court should consider all of the salient factors and act to further the diverse interests of the debtors, creditors and equity holders alike. Id. at 1070. See also, In re Chateaugay Corporation, 973 F.2d 141 (2nd Cir. 1992); In re Ionosphere Clubs, Inc., 100 B.R. at 675.

40

89.    The Second Circuit has indicated that the following factors should be considered during the sale approval process: (i) the proportionate value of the assets to the estate as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value. See Lionel, 722 F.2d at 1071. The factors highlighted by the *Lionel* decision are often cited and applied by other courts when determining requests to approve a sale of all or substantially all of the assets of a debtors' estate. See, e.g., In re Narong & Wagner, Chartered, supra; In re Delaware & Hudson Railway Co., 124 B.R. 169 (D.Del. 1991); In re Thomson McKinnon Securities, Inc., 120 B.R. 301 (Bankr.S.D.N.Y. 1990); In re Engineering Products Co., Inc., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Channel One Communications Inc., 117 B.R. 493 (Bankr. E.D.Mo. 1990); In re Brethren Care of South Bend, Inc., 98 B.R. 927 (Bankr. N. D. Ind. 1989).

90.    As indicated above, the decision to sell the Acquired Assets was one of necessity and resulted from a lack of remaining viable alternatives. Absent a sale of their Acquired Assets to a third party, the Debtors would likely be forced to liquidate their assets or otherwise conduct an orderly wind-down of their operations. Indeed, a prompt sale of the Acquired Assets is necessary in order to prevent the accrual of unnecessary and burdensome administrative expenses and stop the hemorrhaging of cash from the Debtors' operations.

91.    Currently, the Debtors' projected "cash burn" rate is approximately $1.5 million to $2 million per month. The Debtors have extremely limited cash reserves and limited postpetition financing options. Further, the sale process to MMC or any other healthcare user

41

will require regulatory approvals. This alone could take up to six or more months after entry of a Sale Order. Thus, an immediate sale is necessary if the Debtors are to be able to maintain operations and census levels until the regulatory approval process is complete and a closing can occur.

92.    Absent consummation of the proposed sale the Debtors could exhaust their cash resources and be compelled to close the Medical Centers. Closure will also impose a significant hardship upon the Debtors' community which will be forced to rely on alternative, less convenient sources of medical care. By selling the Acquired Assets to MMC who will continue providing vital care to the Debtors' patients and community, a significantly greater value can be captured from the assets than would be achieved through liquidation. Moreover, the needs of the community currently serviced by the Debtors would continue to be met. The Debtors' patients will continue receiving basic care without significant disruption and the Debtors' not-for-profit healthcare mission would be continued.

93.    As indicated above, the Debtors are well established in their community and continue to provide a high level of quality care, despite their financial difficulties. MMC fully appreciates the needs of the Debtors' patients. MMC also possesses the financial resources required to proceed with the proposed transaction and intends to invest significant capital subsequent to the purchase to renovate and modernize the facilities. Thus, a compelling business justification exists for the approval of this Motion.

94.    The Debtors further submit that the offer represents fair value for the Acquired Assets and provides the only feasible alternative to a closure of the Debtors' facilities. Recent appraisals also indicate the approximate aggregate value of the real property, to be approximately $65-70 million. As such, the Debtors submit that the sale of the Medical Centers and related

42

facilities to MMC offers the greatest benefit to the estates and are within the sound business judgment of the Debtors.

95.    As contemplated, a Sale of the Acquired Assets will result in the sale of a substantial portion of the Debtors' assets outside of a Chapter 11 plan, although the Debtors intend to propose and file a plan of liquidation as soon as practicable following the sale.

96.    To the extent the Sale is approved, subject to the receipt of DOH and New York State Supreme Court approval, it is essential that the proposed sale be closed as quickly as possible to avoid continuing losses and maximize asset values.  A prompt sale will ensure a seamless transition while providing the greatest potential benefit to creditors.

## C.    Section 363(d) of the Bankruptcy Code is Satisfied

97.    Pursuant to Section 363(d) of the Bankruptcy Code, a transfer of property by a not-for-profit entity must be made in compliance with applicable nonbankruptcy law governing such transfer.  Specifically, section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section only – (1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation that is not a moneyed, business or commercial corporation...." 11 U.S.C. § 363 (d).

98.    In accordance with these provisions, the Debtors and MMC will request and expect to obtain, after entry of any Sale Order and prior to the closing, all required regulatory approvals for the Sale.  The Debtors anticipate obtaining approvals from the New York State Attorney General, the DOH as well as any other regulatory authority asserting jurisdiction over the Debtors.  To the extent any regulatory body or governmental agency fails to provide approval for the transaction with MMC, the Debtors reserve all rights to challenge any such determination.

43

2499114v.8

The inclusion of section 363(d) of the Bankruptcy Code was not intended to provide states with a "veto" of sales of a debtor's assets under the Bankruptcy Code that otherwise take into account legitimate interests of the state over the transfer or sale of a non-profit's assets. See H. REP. NO. 109-31, pt. 1, title XII (Judiciary. Comm.) (listing section 1221 of the BAPCPA under the heading "Technical Amendments").

99.    The Debtors submit that the Sale complies with applicable non-bankruptcy law. The Acquired Assets consist primarily of real estate and their transfer does not invoke specific regulatory requirements which might restrict the transfer of the property. The Debtors thus submit that the terms of the Purchase Agreement comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and any applicable federal laws. Accordingly, the Purchase Agreement satisfies the requirements of section 363(d) of the Bankruptcy Code.

**D.    Assumption of the Assigned Contracts and
Assignment Procedures Should be Approved**

100.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor".

101.    The business judgment test is the standard applied by courts to determine whether an executory contract or unexpired lease should be assumed. See, e.g., In re Old Carco LL (f/k/a Chrysler LLC), 406 B.R. 180, 188 (Bankr. S.D.N.Y. 2009); see also Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures), 4 F.3d 1095, 1099 (2d Cir. 1993); Richmond Leasing Co v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985) ("[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with

44

the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"). A court should approve assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate. See, e.g., Old Carco, 406 B.R. at 196-97; In re Child World, Inc., 142 B.R. 87, 89-90 (Bankr. S.D.N.Y. 1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr.S.D.N.Y. 1989); see also Sharon Steel Corp v. National Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.), 872 F.2d 36, 40 (3d Cir. 1989).

102.    When assuming an executory contract, section 365(b) of the Bankruptcy Code requires the debtor to cure any defaults under the contract or provide adequate assurance that it will promptly cure such defaults. If there has been a default, the debtor must also provide adequate assurance of future performance under the contract.

103.    Assuming and assigning the Assigned Contracts to the Buyer (or the successful Bidder) pursuant to the Assignment Procedures is an appropriate exercise of the Debtors' business judgment. As the Debtors are selling the Acquired Assets, the Assigned Contracts will no longer have any value to the Debtors. By assuming and assigning the Assigned Contracts to the Buyer (or the Successful Bidder) the Debtors' estates will benefit from avoiding the damage claims that would arise from rejecting the Assigned Contracts.

104.    In addition, the Buyer has sufficient capital and financing commitments to provide adequate assurance of future performance on all of the Assigned Contracts and the Debtors are requiring any Qualified Bidder similarly to demonstrate its ability to provide adequate assurance of future performance.

45

105. The Assignment Procedures proposed by the Debtors for determining Cure Amounts and providing the counterparties to the Assigned Contracts notice and an opportunity to object to the assumption and assignment and/or the Cure Amounts are fair to all parties and satisfies the notice requirements of Bankruptcy Rule 6006(c).

106. Therefore, because assuming and assigning the Assigned Contracts to the Successful Bidder(s) avoids the costs of rejecting those executory contracts and unexpired leases and increases the value to be realized from the Sale of the Acquired Assets, assumption and assignment to the Successful Bidder(s) of the Assigned Contracts is clearly an exercise of the Debtors' sound business judgment which warrants approval by this Court.

## XIII.   The Acquired Assets Should be Sold Free and Clear of Liens

107. Under section 363(f) of the Bankruptcy Code, a debtor may sell property under the Bankruptcy Code free and clear of liens, claims and encumbrances, provided that: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interests; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) (Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers to acquire assets without any accompanying liabilities); In re Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

46

108.    In accordance with the provisions of the Purchase Agreement and section 363(f), the Debtors request that they be authorized to conduct the Sale free and clear of all Liens, other than Assumed Liabilities and Permitted Exceptions (as set forth in the Purchase Agreement). All parties holding liens on the Acquired Assets will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in this Motion and any such entity that does not object to the sale shall be deemed to have consented. See, e.g., Futuresource LLC v. Reuters, Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. 343, 345 (Bankr. E.D.Pa. 1988) citing to In re Gabel, 61 B.R. 661 (Bankr. W.D. La. 1985). See also, In re Enron Corp., 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

109.    Thus, to the extent any parties holding a Lien on the Acquired Assets fail to object to the relief requested in the Motion, a sale of the Acquired Assets free and clear of all Liens, with the exception of any Assumed Liabilities and Permitted Exceptions, satisfies section 363(f)(2) of the Bankruptcy Code.

110.    Alternatively, section 363(f)(5) is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens. Initially, it should be noted that the proposed Purchase Price (and resulting sale proceeds) is in excess of existing Lien amounts. Further, under the Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its lien. The Purchase Agreement also provides that Liens on the Assets shall attach to the proceeds of the Sale, subject to any claims and defenses the Debtors

47

may have with respect thereto. Liens which cannot be satisfied through a monetary judgment (if any) are included among the Permitted Exceptions or Assumed Liabilities and will not attach to the proceeds of the Sale. Therefore, it is submitted that section 363(f)(5) can be deemed satisfied upon a sale of the Assets being conducted free and clear of all Liens.

## XIV.    Successor Liability

111.    The Debtors are also seeking to sell the Acquired Assets free and clear of any successor liability claims relating to the Acquired Assets. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. See, e.g., In re Gen. Motors Corp. (n/k/a Motors Liquidation Corp.), Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (authorizing the sale of assets free and clear of successor liability claims); In re Old Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr.S.D.N.Y. Jun. 1, 2009) (same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363 (f) barred successor liability claims for employment discrimination and rights under travel voucher program).

112.    The ability of the Debtors to transfer the Acquired Assets free and clear from successor liability is critical to the sale transaction. In order to dispose of their assets and induce the Buyer to proceed with the Sale, the Debtors must be able to convey the assets free and clear of potential successor liability claims. Absent such assurance, the Buyer may be unwilling to proceed and significant value for the Debtors' estates may be lost. See Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d. Cir. 1997) (stating that a sale pursuant to § 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance

48

of finality, purchasers could demand a large discount for investing in a property that is laden

with the risk of endless litigation as to who has rights to estate property").

113.   Further, under New York State law as well as the principles of traditional

common law, a purchaser of another company's assets will be found liable only for the seller's

liabilities where (i) the successor expressly or impliedly assumes the predecessor's tort liability,

(ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere

continuation of the seller, and (iv) the transaction is fraudulent. See N.Y. v. Nat'l Serv. Indus.,

Inc., 460 F.3d 201, 209 (2d Cir. 2006). None of these factors are applicable to the proposed Sale

Transaction herein. As such, the Court may authorize the transfer of the Acquired Assets free

and clear of any successor liability claims. See Douglas v. Stamco, Case No. 09-1390-cv, 2010

WL 337043 (2d. Cir. Feb. 1, 2010) (holding that sale pursuant to § 363 extinguished successor

liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii)

mere continuation of the seller, or (iv) fraud).

114.   Accordingly, based on the foregoing, the Debtors respectfully submit that the

Acquired Assets should be transferred to the Buyer free and clear of all liens, claims,

encumbrances and other interests, including rights or claims based on successor liability.

## XV.   MMC Should be Afforded Protection Under Section 363(m)

115.   Section 363(m) affords protection to a good faith Buyer in any interest in property

purchased from the Debtors, notwithstanding that the sale conducted was later reversed or

modified on appeal. Section 363(m) provides, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] ... does not affect the validity of a sale ... to an
> entity that purchased ... such property in good faith, whether or not

49

> such entity knew of the pendency of the appeal, unless such
> authorization and such sale ... were stayed pending appeal

11 U.S.C. § 363(m).  See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y.

1994) ("Section 363(m) provides that good faith transfer of property will not be affected by

the reversal or modification on appeal of an unstayed order, whether or not the transferee

knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162

(Bankr.S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are

protected from the reversal of a sale on appeal unless there is a stay pending appeal.)

116.    The Second Circuit has held that a party would have to show fraud or collusion

between a purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of

good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

good faith status at a judicial sale involves fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders").  See also,

In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

117.    Here, the parties have established that MMC is a good faith purchaser as required

by section 363(m) of the Bankruptcy Code.  As previously indicated, the Purchase Agreement is

the product of extensive, good-faith arms length negotiations between the Debtors, its advisors

and MMC.  Accordingly, the Debtors request that the Court determine that MMC was acting in

good faith and is entitled to the protections of a good faith purchaser under section 363(m).

## XVI.   THE SALE SHOULD BE EXEMPT FROM TRANSFER AND SIMILAR TAXES

118.    Pursuant to N.Y. Tax Law §1405(b)(8), the Debtors submits that the Sale is

exempt from New York State real estate transfer tax because it is being consummated under the

Bankruptcy Code. In addition, the transfer of the Acquired Assets is exempt from New York City real property transfer tax because the Debtors are not-for-profit corporations. See N.Y. Admin. Code Sec. 11-2106(b)(2). Accordingly, the Debtors respectfully requests that the Court find that these exemptions apply and that the Debtors' estates are exempt from real estate transfer taxes.

## XVII. THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004(H)

119.    Under Rule 6004(h) of the Bankruptcy Code, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court. Fed. R. Bankr.P. 6004(h). The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

120.    Although little guidance is provided by either Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure". See 10 Collier on Bankruptcy § 6004.09 (Lawrence P. King, et al. eds, 15th ed. rev. rel. 2003). Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id. It is thus respectfully requested that the Court waive the 14 day stay period required under Rule 6004(h) or, in the alternative, if an objection is filed to the proposed Sale, reduce the stay period to the minimum amount of time reasonably necessary for the objecting party to file a stay pending appeal. This relief is both necessary and appropriate under the circumstances of this

2499114v.8

case given the importance of the successful purchaser's immediate need to commence the otherwise lengthy DOH approval process.

## XVIII. <u>NO PRIOR REQUEST</u>

121.    No previous request for the relief sought herein has been made to this or any other court.

## XIX.    <u>CONCLUSION</u>

122.    The case law cited herein provides ample authority and justification for the approval of the proposed transaction. The facts set forth herein also support a finding in favor of an order approving the Sale. For these reasons, it is submitted that the Sale should be approved on the terms and provisions set forth in the Purchase Agreement.

**WHEREFORE** the Debtors respectfully request that the Court enter an order substantially similar to the proposed order, attached hereto as <u>Exhibit B</u>, granting the relief requested herein, and granting the Debtors such other and further relief as is just and proper.

Dated:    May 29, 2013
          Great Neck, New York

GARFUNKEL WILD, P.C.

By: _____
Burton S. Weston
Afsheen A. Shah
111 Great Neck Road
Great Neck, NY  11021
Telephone: (516) 393-2200
Facsimile: (516) 466-5964

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

2499114v.8