## ASSET PURCHASE AGREEMENT

### by and among

**Montefiore SS Operations, Inc., Montefiore MV Operations, Inc., and Montefiore HA Operations, Inc., each a New York not-for-profit corporation, and**

**Montefiore SS Holdings, LLC, Montefiore MV Holdings, LLC, and Montefiore HA Holdings, LLC, each a New York limited liability company**

### as Buyer and

**Sound Shore Health System, Inc.,**
**a New York not-for-profit corporation**

**Sound Shore Medical Center of Westchester,**
**a New York not-for-profit corporation**

**The Mount Vernon Hospital,**
**a New York not-for-profit corporation**

**Howe Avenue Nursing Home, Inc. d/b/a Helen and Michael Schaffer Extended Care Center,**
**a New York not-for-profit corporation**

**NRHMC Services Corporation,**
**a New York business corporation**

**The M.V.H. Corporation,**
**a New York not-for-profit corporation**

### and

**New Rochelle Sound Shore Housing LLC,**
**A New York limited liability company**

### as Sellers

### Dated as of May __, 2013

FIRM:23260499v7

## Table of Contents

Page

ARTICLE                                                                          I
DEFINITIONS ................................................................................................................ 1
1.1 ..........................................................................................................Definitions        1
1.2 ....................................................... Other Definitional and Interpretative Provisions    13
ARTICLE                                                                          II
PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ............................. 14
2.1 ........................................................................................ Assets to be Sold to Buyer   14
2.2 ....................................................................................................... Excluded Assets    16
2.3 .................................................................................................. Assumed Liabilities   16
2.4 .................................................................................................. Excluded Liabilities   16
2.5 ........................................................................................................... Cure Amounts    16
2.6 ..............................Agreement Regarding Confidentiality of Patient Information                        17
2.7 ............................................................................................. Accounts Receivable.    17
ARTICLE                                                                          III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING ......................................... 17
3.1 ................................................................................... Payment of Purchase Price.    17
3.2 ................................................................................... Closing and Closing Date.    19
3.3 ..................................................................... Delivery of Records and Contracts     19
3.4 ....................................................................................... Further Conveyances    19
3.5 ...................................................................................................... Bulk Sales Laws   20
3.6 ............................................................................. Allocation of Purchase Price    20
3.7 ............................................................................................................. Deposit    20
ARTICLE                                                                          IV
REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS .............. 20
4.1 .................................................................................................... Organization    21
4.2 ............................................................................. Authorization of Transaction    21
4.3 .................................................................................................. Qualification    21
4.4 .......................................................................................... Non-Contravention    21
4.5 ............................................................................................... Brokers' Fees    22
4.6 ........................................................................................... Events Subsequent    22
4.7 ..................................................................................................... Tax Matters.    23
4.8 ......................................................................................... Property and Assets.    25
4.9 ........................................................................................ Intellectual Property.    26
4.10 ......................................................................................................... Contracts.    27
4.11 ............................................................................. Sellers' Consents and Approvals   29
4.12 ...................................................................................... Powers of Attorney    29
4.13 ...................................................................................................... Litigation.    29
4.14 ................................................................................. Certain Healthcare Matters.    30
4.15 .................................................................................................... Employees.    34
4.16 ..................................................................................... Books and Records    36
4.17 ........................................................................................ Information Systems    36
4.18 ........................................................................................... Foreign Operations    36
4.19 ............................................................................................ Insurance Coverage   37

Table of Contents
(continued)

Page

4.20 .......................................................................... Restrictions on Business Activities    37
4.21 ................................................................................................ Full Disclosure    37
ARTICLE                                                                                                  V
BUYER'S REPRESENTATIONS AND WARRANTIES ..........................................................    37
5.1 ............................................................................................ Organization of Buyer    37
5.2 ...................................................................................... Authorization of Transaction    38
5.3 .................................................................................................. Non-Contravention    38
5.4 ........................................................................................................ Brokers' Fees    38
5.5 ................................................................................................................ Litigation    38
5.6 ............................................................................................................ Full Disclosure    38
5.7 ................................................................................ Owned Real Property Condition    39
5.8 ...................................................................................................... Financial Capability    39
5.9 ................................................................ Healthcare Regulatory Compliance Status.    39
5.10 ............................................ Acknowledgement Regarding Condition of the Business.    40
5.11 .................................................................... Buyer's Consents and Approvals    42
ARTICLE                                                                                                  VI
BANKRUPTCY COURT MATTERS ...............................................................................    42
6.1 ................................................ Approval of Break-Up Fee and Expense Reimbursement.    42
6.2 ...................................................................................... Competing Transaction.    42
6.3 .............................................................................................. Bankruptcy Court Filings    43
6.4 .................................................................................................... Notice of Sale    44
6.5 .......................................................................... Treatment of Monetary Obligations    44
ARTICLE                                                                                                  VII
PRE-CLOSING COVENANTS .........................................................................................    44
7.1 ............................................................................................................ General    44
7.2 .......................................................................................... Regulatory Approvals.    44
7.3 .......................................................................................... Operation of Business    47
7.4 ...................................................................................................................... Access    49
7.5 ............................................................................................ Notice of Developments.    49
7.6 .................................................... Employment and Physician Contracting Matters    50
7.7 ...................................................................................... Management Agreement    50
7.8 .......................................................................................... Temporary Operator    50
7.9 Buyer shall cause Fidelity National Title Insurance Company through Ken Cohen and Neil Clark (the "]
ARTICLE                                                                                                  VIII
POST-CLOSING COVENANTS..........................................................................................    51
8.1 ............................................................................................................ General    51
8.2 .................................................... Cooperation Regarding Restricted Assets    51
8.3 ...................................................................................... Access to Records    52
8.4 ............................................................................................ Non-Disclosure.    52
8.5 .................................................................................... Further Assurances    53
8.6 .............................................................................................. Cost Reports    53
ARTICLE                                                                                                  IX
CONDITIONS TO OBLIGATION TO CLOSE.........................................................................54

FIRM:23260499v7

Table of Contents
(continued)

|  |  | Page |
|---|---|---|
| 9.1 | Conditions to Buyer's Obligation | 54 |
| 9.2 | Conditions to the Sellers' Obligations | 56 |
| ARTICLE | | X |
| REMEDIES FOR BREACHES OF THIS AGREEMENT | | 58 |
| 10.1 | Survival of Representations and Warranties | 58 |
| ARTICLE | | XI |
| DISPUTE RESOLUTION | | 58 |
| ARTICLE | | XII |
| TERMINATION | | 58 |
| 12.1 | Termination of Agreement | 58 |
| 12.2 | Procedure For Termination | 61 |
| 12.3 | Effect of Termination | 61 |
| ARTICLE | | XIII |
| MISCELLANEOUS | | 61 |
| 13.1 | Press Releases and Public Announcements | 61 |
| 13.2 | No Third-Party Beneficiaries | 62 |
| 13.3 | Entire Agreement | 62 |
| 13.4 | Succession and Assignment | 62 |
| 13.5 | Counterparts | 62 |
| 13.6 | Headings | 62 |
| 13.7 | Notices | 62 |
| 13.8 | Governing Law; Waiver of Jury Trial | 63 |
| 13.9 | Submission to Jurisdiction; Consent to Service of Process | 63 |
| 13.10 | Amendments | 64 |
| 13.11 | Severability | 64 |
| 13.12 | Expenses | 64 |
| 13.13 | Construction | 64 |
| 13.14 | Incorporation of Exhibits and Schedules | 64 |
| 13.15 | Tax Disclosure Authorization | 64 |
| 13.16 | No Waiver | 65 |
| 13.17 | Charitable Purposes | 65 |

FIRM:23260499v7

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bidding Procedures Order |
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Bill of Sale and Assignment and Assumption Agreement |
| Exhibit D | Medical Records Custody Agreement |

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Certain Individuals |
| Schedule 2.1(c) | Excluded Furniture, Equipment and Inventory |
| Schedule 2.1(d) | Assigned Contracts |
| Schedule 2.3(ii) | Debt Obligations |
| Schedule 3.6 | Allocation of Purchase Price |
| Schedule 4.1(a) | Organization |
| Schedule 4.3 | Qualification |
| Schedule 4.5 | Brokers' Fees of the Sellers |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(a) | IRS Determination Letters |
| Schedule 4.7(b) | Tax Returns |
| Schedule 4.7(c) | Tax Compliance |
| Schedule 4.7(d) | Tax Jurisdictions |
| Schedule 4.7(e) | Lien or Claims for Taxes |
| Schedule 4.7(h) | Extension or Waiver of Tax |
| Schedule 4.7(i) | Tax Proceedings |
| Schedule 4.8(a-1) | Owned Real Property |
| Schedule 4.8(a-2) | Leased Real Property |
| Schedule 4.8(a-3) | Oral Leases |
| Schedule 4.8(b) | Permitted Encumbrances |
| Schedule 4.8(d) | Condition of Property |
| Schedule 4.8(f) | Real Property Defaults |
| Schedule 4.9 | Intellectual Property |
| Schedule 4.10 | Contracts |
| Schedule 4.10(d) | Notices and Approval for Contracts |
| Schedule 4.10(f) | Related Party Transactions |
| Schedule 4.11 | Consents and Approvals |
| Schedule 4.12 | Powers of Attorney |
| Schedule 4.13 | Litigation of the Sellers |
| Schedule 4.14(a)(ii) | Filing of Cost Reports |
| Schedule 4.14(a)(iii) | Amounts Due Under Cost Reports |
| Schedule 4.14(a)(v) | Hill-Burton Act |
| Schedule 4.14(a)(vi) | Non-Compliance with Government Reimbursement Programs |
| Schedule 4.14(b-1) | Excluded Medical Staff |
| Schedule 4.14(b-2) | Medical Staff Disputes |
| Schedule 4.14(c) | Accreditation |
| Schedule 4.14(d) | Licenses |
| Schedule 4.14(f) | Compliance Audits |
| Schedule 4.14 (i) | Billings |
| Schedule 4.14(j) | Audits |
| Schedule 4.14(k) | Reduction in Medicare Reimbursement |
| Schedule 4.14(l)(i) | Overpayments or Refunds to Payment Programs |
| Schedule 4.14(l)(ii) | Notice of Overpayments or Refunds |
| Schedule 4.15(a) | Employee Schedule |
| Schedule 4.15(b) | Reemployment Rights |

| | |
|---|---|
| Schedule 4.15(c) | Foreign National employees |
| Schedule 4.15(d) | Labor Disputes |
| Schedule 4.15(f) | Collective Bargaining Agreements |
| Schedules 4.15 (g) | Claims Before NLRB or Similar Agency |
| Schedule 4.15 (h) | Violation of Applicable Laws Related to Employees |
| Schedule 4.15(i) | Occupational or Safety Violations |
| Schedule 4.15(j) | Rights in Property by Board, etc. |
| Schedule 4.17 | Information Systems |
| Schedule 4.19 | Insurance Coverage |
| Schedule 5.1 | Organization of Buyer |
| Schedule 5.4 | Brokers' Fees of Buyer |
| Schedule 5.5 | Litigation of Buyer |
| Schedule 5.9 | Healthcare Regulatory |
| Schedule 5.11 | Buyer Consent and Approvals |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of May 29, 2013 (the "Effective Date"), by and among Montefiore SS Operations, Inc., Montefiore MV Operations, Inc., Montefiore HA Operations, Inc., Montefiore SS Holdings, LLC, Montefiore MV Holdings, LLC, and Montefiore HA Holdings, LLC, each being either a New York not-for-profit corporation or a New York limited liability company, as the case may be, or their designees (collectively, the "Buyer"), on the one hand; and Sound Shore Health System, Inc. ("SSHS"), a New York not-for-profit corporation, Sound Shore Medical Center of Westchester ("SSMC"), a New York not-for-profit corporation, The Mount Vernon Hospital ("MVH"), a New York not-for-profit corporation, Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended Care Center ("SECC"), a New York not-for-profit corporation, NRHMC Services Corporation ("Services Corporation"), a New York business corporation, The M.V.H. Corporation ("MVHC"), a New York not-for-profit corporation, and New Rochelle Sound Shore Housing, LLC ("NRSS"), a New York limited liability company, on the other hand.  SSHS, SSMC, MVH, SECC, Services Corporation, MVHC and NRSS, are referred to individually as "Seller" and collectively as the "Sellers".  Buyer and the Sellers are referred to individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, each Seller will be filing substantially contemporaneously herewith a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code") (the date on which such petitions are filed, referred to herein as the "Petition Date"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (collectively, the "Bankruptcy Case"); and

WHEREAS, the Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from the Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of the Acquired Assets and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Definitions.  The following terms, as used herein, have the following meanings:

"Acquired Assets" has the meaning set forth Section 2.1.

"Affiliate" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

FIRM:23260499v7

"Affiliate Agreement" means any agreement between a Seller and an Affiliate of such Seller.

"Agreement" has the meaning set forth in the preface above.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers (i) accept a Competing Bid or (ii) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of reorganization or liquidation, sale, or other similar transaction (by Sellers or otherwise), including a Bankruptcy Court approved stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets, (or agree to do any of the foregoing) in either case to a party or parties other than Buyer.

"Antitrust Bureau" has the meaning set forth in Section 7.2(b).

"Antitrust Division" has the meaning set forth in Section 7.2(b).

"Antitrust Laws" has the meaning set forth in Section 7.2(g).

"Applicable Law" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements or any Health Care Laws and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"Assigned Contracts" shall mean the Contracts described on Schedule 2.1(d).

"Assumed Liabilities" has the meaning set forth Section 2.3(a).

"Assumed Employee Liabilities" has the meaning set forth in Section 2.3(b).

"Bankruptcy Case" has the meaning set forth in the recitals above.

"Bankruptcy Code" has the meaning set forth in the recitals above.

"Bankruptcy Court" has the meaning set forth in the recitals above.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"Bidding Procedures Order" means an order of the Bankruptcy Court, substantially in the form of Exhibit A hereto, with such changes as are acceptable to Buyer and the Sellers.

"Bill of Sale and Assignment and Assumption Agreement" means the Bill of Sale and Assignment and Assumption Agreement in the form attached hereto as Exhibit C.

FIRM:23260499v7

"Board of Directors" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"Break-Up Fee" means a break-up fee in an amount equal to three percent (3%) of the Purchase Price, which together with the Expense Reimbursement, shall cover all rights the Buyer may have against the Sellers that shall arise and be payable pursuant to Section 6.1.

"Budget" means the budget approved under any order entered in the Bankruptcy Cases authorizing any of the Sellers to use cash collateral and/or advances under a debtor in possession loan facility.

"Business" means the business operations of any one Seller or of all of the Sellers, as the context shall require (in each case not including the Excluded Liabilities).

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.11.

"CBA" means collective bargaining agreement.

"Claim" has the meaning ascribed to such term in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.2(a).

"Closing Date" has the meaning set forth in Section 3.2(a).

"CMS" means the Centers for Medicare and Medicaid Services.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 6.2(a).

"CON Application" means the Certificate of Need application with respect to the Business to be submitted by Buyer to DOH.

"Confidential Information" means any oral, written, graphic or other information including, but not limited to, that which relates to works of authorship, copyrightable materials or information, trade secrets, patents, patent applications, research, product plans, products, developments, inventions, processes, designs, drawings, software, engineering, formulae, marketing and business plans, agreements with third parties, services, customer information, provider, patient or member lists, patient information, marketing or financial information of the disclosing party, whether or not identified as "Confidential".

"Contemplated Transactions" has the meaning set forth in Section 2.1.

FIRM:23260499v7

"Contract" means, with respect to any Person, (i) any of the following in writing: contract, agreement, deed, mortgage, lease, license, commitment, promise, undertaking, arrangement or understanding, or other document or instrument (including any document or instrument evidencing or otherwise relating to any Debt) applicable on the Effective Date, and (ii) the oral agreements set forth on Schedule 4.10 of the Disclosure Schedule, in each case to which such Person is a party, or to which, or by which, any property, business, operation or right of such Person is legally bound.

"Cost Reports" means all cost reports related to any of the Facilities filed pursuant to the requirements of any applicable Government Reimbursement Programs for cost-based payments or reimbursement due to or claimed by any Seller from any applicable Government Reimbursement Programs or their fiscal intermediaries or payor agents, including all Cost Report receivables or payables and all related appeals and appeal rights, but excluding from this definition form UB-92, UB-04, CMS 1450, CMS 1500 and other forms or claims filed or submitted by any Seller to any applicable Government Reimbursement Programs or their fiscal intermediaries or payor agents with respect to the Facilities for payment or reimbursement due to or claimed on a fee-for-service, fee schedule or other similar basis.

"Covered Person" means a current or former Employee, officer, director or consultant of any Seller.

"Cure Amounts" has the meaning set forth in Section 2.5.

"DASNY" means the Dormitory Authority of the State of New York.

"Debarment or Suspension" means, with respect to the Sellers, the exclusion of any Seller from participation in any federal healthcare program, including Medicare, Medicaid, or any state health care program, in each case pursuant to 42 U.S.C. § 1320a-7 and 42 C.F.R. §§ 1001 et seq. or the corresponding Applicable Law of the State of New York.

"Debt" means, with respect to any Seller, the aggregate amounts of long-term and short-term indebtedness of such Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan, any Multiemployer Plan or any Union Funds, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by such Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of such Seller.

"Deposit" has the meaning set forth in Section 3.7.

"DIP Budget" has the meaning set forth in Section 7.3.

"Disclosure Schedule" has the meaning set forth in Article IV.

"DOH" means the New York State Department of Health.

4

"DOH Approval" means the written approval of DOH of (a) the acquisition by Buyer of the Acquired Assets from the Sellers as of the Closing as contemplated by this Agreement, and (b) the addition of the acquired inpatient and outpatient clinical facilities of the Seller to the operating certificate of Buyer, in each case without any contingency except as expressly permitted hereby.

"Effective Date" has the meaning set forth in the preface above.

"Eligible Employees" has the meaning set forth in Section 9.2.

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Sellers or an ERISA Affiliate, or (b) with respect to which Sellers or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Sellers may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employee List" has the meaning set forth in Section 4.15(a).

"Employees" means, as of any date specified herein, all individuals whether or not actively at work as of such date, who are employed by any Seller (and including any employees who are on medical disability or leaves of absence and who worked for any Seller immediately prior to such disability or leave); provided, however, that "Employees" shall not include any director of any Seller's Board of Directors.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person which is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code) of which any Seller is a member.

"Escrow Agent" means a bank, financial institution or other qualified Person mutually agreed to by Buyer and the Sellers prior to the Closing.

"Excepted Warranties" has the meaning set forth in Section 11.1.

"Excluded Assets" has the meaning set forth Section 2.2.

"Excluded Liabilities" has the meaning set forth Section 2.4.

"Expense Reimbursement" means the reimbursement of the reasonable out-of-pocket costs, fees and expenses (including legal, financial advisory, accounting and other similar costs, fees and expenses) incurred by Buyer or its Affiliates in connection with the conduct of due diligence, the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto; provided, that under no circumstances shall the amount of the Expense Reimbursement exceed seven hundred fifty thousand dollars ($750,000) in the aggregate.

"Facility" means each of the Hospitals and the Residential Health Care Facility.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.

"Foundation" shall mean Sound Shore Medical Center of Westchester Foundation, Inc., a New York not-for-profit corporation, the sole member of which is Services Corporation.

"Furniture and Equipment" means all furniture, fixtures, furnishings, machinery, appliances and other equipment (including medical equipment) and leasehold improvements owned by Sellers and used by Sellers exclusively in the conduct of the Business, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment (and, to the extent assignable by Sellers, the telephone numbers associated therewith used in the Ordinary Course of Business), cubicles and miscellaneous office furnishings.

"GAAP" means United States generally accepted accounting principles as in effect from time to time.

"Government Payor" means any Governmental Authority that sponsors or administers a Government Reimbursement Program.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing, including any state Medicaid agency.

6

"Governmental Authorizations" means any approval, consent, license, permit, waiver, registration, accreditation or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Applicable Law.

"Government Reimbursement Programs" means the Medicare program, the Medicare Advantage program, the Medicaid program, the federal TriCare program, and any other, similar or successor federal, state or local health care payment programs with or sponsored by any Governmental Authority.

"Guaranty" means that guaranty by Buyer or its Affiliates of the Sellers' obligations under their debtor-in-possession term loan agreement with MidCap Financial.

"Hazardous Substances" means oil, petroleum and hazardous materials, hazardous substances or hazardous wastes, air emissions, toxic substances, toxic wastes, wastewater, discharges and any chemical material or substance that is listed or regulated under the Environmental Health and Safety Requirements as a "hazardous" or "toxic" substance, material or waste, or as a "contaminant", or is otherwise listed or regulated under the Environmental Health and Safety Requirements because it poses a hazard to human health or to the environment.

"Health Care Laws and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) the provision, payment, reimbursement or administration of health care benefits or insurance, including requirements of or with respect to Government Reimbursement Programs and the Applicable Laws governing insurance, insurance companies, managed care plans, managed care organizations, third party administrators or other payors; (b) the administration of claims or benefits for health care services or processing or payment of claims for health care services, including patient management, disease management or provider network services, including third party administrators, utilization review agents and Persons performing quality assurance, credentialing or coordination of benefits; (c) ERISA; (d) the Patient Privacy Requirements; (e) Title XVIII of the Social Security Act (Medicare); (f) Title XIX of the Social Security Act (Medicaid); (g) the Referral Laws; (h) the False Claims Act, 31, U.S.C. Section 3729 et seq. as amended, and 42 USC Section 1320a-7k(d), 42 U.S.C. 1320a-7a(a); (i) the requirements for accreditation by the Joint Commission; (j) New York State laws and regulations prohibiting false claims and fraud and abuse, including N.Y. State Fin. Law § 187 et seq., 13 N.Y.C.R.R. § 400.1 et. seq., N.Y. Soc. Serv. Law §§ 145-b, 366-b, 18 N.Y.C.R.R. § 515.2 and N.Y. Penal Law § 177.00 et seq.; (k) N.Y. Gen. Bus. Law §§ 349, 350-b; and (l) N.Y. State Fin. Law § 191, N.Y. Lab. Law §§ 740, 741.

"Healthcare Regulatory Consents" means in respect of the Seller or Buyer, as the case may be, such consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Governmental Authority as shall be required to be obtained and such notifications to any Governmental Authority as shall be required to be given by such party in order for it to consummate the transactions contemplated of it by this Agreement in compliance with Applicable Law relating to health care or healthcare services of any kind and shall include

7

obtaining any such consents, approvals, authorizations, waivers, Orders, licenses or Permits, or notices to, the New York State Public Health and Health Planning Council, CMS and DOH and shall include Buyer obtaining a Certificate of Need from DOH with respect to its operation and the parties obtaining any consents, approvals, authorizations, waivers, Orders, licenses or Permits of any Government Authority needed for them to consummate the Contemplated Transactions hereby.

"Hospitals" means Sound Shore Medical Center of Westchester, the hospital operated by SSMC, and Mount Vernon Hospital, the hospital operated by MVH.

"HQI Program" has the meaning set forth in Section 4.14(k).

"Intellectual Property" means any rights and interests that any Seller has in all copyrights (both registered and unregistered), mask works, trademarks (both registered and unregistered), trade names, service marks, service names, patents, patent applications, proprietary information, trade secrets, technical information and data, computer programs and program rights, domain names and other similar intangible property rights and interests (and any goodwill associated with any of the foregoing) arising under all Applicable Laws but excluding any derivatives of such marks, rights and interests.

"Inventory" means all medical supplies, drugs, medications, food, janitorial, housekeeping and office supplies and other consumables located in or used in connection with the operation of the Business.

"Joint Commission" has the meaning set forth in Section 4.14(c).

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after due inquiry of those officers or Representatives of Buyer or of those officers of Sellers or senior managers of the Business as of or prior to the Closing each of which is identified in Schedule 1.1 of the Seller Disclosure Schedule.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Leased Real Property" has the meaning set forth in Section 4.8(a).

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

FIRM:23260499v7

"Lien" means any mortgage, pledge, lien, encumbrance, charge, or other security interest other than (a) liens for Taxes not yet due and payable or for Taxes that (i) the taxpayer is contesting in good faith through appropriate proceedings and (ii) are disclosed in the Disclosure Schedule and (b) purchase money liens incurred in the Ordinary Course of Business and liens securing rental payments under capital lease arrangements, in each case, that are disclosed in the Disclosure Schedule.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (A) the business, operations, property, condition (financial or otherwise), liabilities or results of operations of any Seller or its Business or the Sellers or the Business or the material assets of the Sellers, (B) the value of the Acquired Assets, or (C) the ability of the Sellers to consummate the transactions contemplated hereby on a timely basis, in each case as reasonably determined by the Buyer.

"Material Contracts" has the meaning set forth in Section 4.10(b).

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation proceeding or audit (a) settlement or adjudication of which would (i) cause material breach of this Agreement, (ii) have the effect of making the Contemplated Transactions hereby illegal or (iii) materially prohibit or interfere with the consummation of the Contemplated Transactions hereby or (b) by any Government Authority or Person, including a qui tam whistleblower proceeding, alleging a material violation or noncompliance on the part of any Seller with any Health Care Laws and Requirements.

"Medical Records Custody Agreement" the Medical Records Custody Agreement in the form attached hereto as Exhibit D.

"MidCap Financial" means MidCap Financial, LLC or one of its Affiliates.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which the Sellers or an ERISA Affiliate contribute or have or have had an obligation to contribute.

"MVH" has the meaning set forth in the preface above.

"MVHC" has the meaning set forth in the preface above.

"NRSS" has the meaning set forth in the preface above.

"Ordinary Course of Business" means the ordinary course of business of the applicable Person, consistent with past custom and practice (including with respect to quantity and frequency), subject, however, in respect of the period after the Petition Date, to those actions ordinary and usual in the context of the Bankruptcy Case.

FIRM:23260499v7

"Outside Closing Date" means the date that is one hundred eighty (180) days after the entry of the Sale Order.

"Owned Real Property" has the meaning set forth in Section 4.8(a).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Patient Privacy Requirements" means the applicable requirements of Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, as amended by the American Recovery and Reinvestment Act of 2009, and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form or of any similar state law.

"Payment Programs" has the meaning set forth in Section 4.14(l).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Encumbrances" means those title matters affecting the Owned Real Property set forth on Schedule 4.8(b-1).

"Petition Date" has the meaning set forth in the recitals above.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Physician" means any licensed doctor of medicine or osteopathy, doctor of dental surgery or dental medicine, doctor of podiatric medicine, doctor of optometry, or chiropractor, or any group, partnership, corporation, of whatever form, made up of one or more of such persons.

"Post-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring on or after the Closing Date.

"Pre-Closing Accounts Receivable" means (a) accounts receivable arising out of the rendition of medical, surgical, behavioral, diagnostic or other professional health care services or the sale of medical products in the Ordinary Course of Business for dates of service occurring prior to the Closing Date and (b) any accounts receivable due Sellers from Affiliates as of the Closing Date.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.7(b).

"Predecessor" means (a) any Person that has ever merged with or into any Seller, (b) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity

securities has ever been sold, transferred or assigned by any Seller and (iii) any Person, all, or substantially all, of whose assets has ever been acquired by any Seller.

"Prepaid Deposits" means all deposits (including customer deposits and security deposits for rent, electricity, telephone or other utilities and deposits posted under any Assigned Contract), escrows and prepaid charges and expenses of the Sellers as of the Closing Date in connection with or relating to any Acquired Assets.

"Protected Health Information" shall have the meaning assigned to that term in Section 103 of 45 C.F.R. Part 160.

"Purchase Price" has the meaning set forth in Section 3.1.

"QNet" has the meaning set forth in Section 4.14(k).

"Real Property Laws" all Applicable Laws relating to the Owned Real Property.

"Real Property Lease" has the meaning set forth in Section 4.8(a).

"Receivables Guaranty Reconciliation" has the meaning set forth in Section 3.1(b).

"Referral Laws" means Section 1128B(b) of the Social Security Act, as amended; 42 USC Section 1320a7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute"; Section 1877 of the Social Security Act, as amended; 42 USC Section 1395nn and related regulations (Prohibition Against Certain Referrals), commonly referred to as "Stark Law"; 42 USC Section 1320a-7a(a)(5); N.Y. Soc. Serv. Law § 366-d, -f; N.Y. Pub. Health Law §§ 238-a, -b, 587; 10 N.Y.C.R.R. § 34-2.3, -2.4; N.Y. Educ. Law §§ 6509-a, 6530; 8 N.Y.C.R.R. § 29.1; 10 N.Y.C.R.R. § 34-1 et seq.; 10 N.Y.C.R.R. § 34-2.3, 2.4; 10 N.Y.C.R.R. § 600.9; and 18 N.Y.C.R.R. § 515.2.

"Reimbursement Claims" has the meaning set forth in Section 4.14(l).

"Reimbursement Payment" has the meaning set forth in Section 3.1(b)(i).

"Release" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, leaching, or migrating into the environment.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Residential Health Care Facility" means the Helen and Michael Schaffer Extended Care Center operated by SECC.

"Sale Motion" means the motion or motions of the Sellers, in form and substance reasonably acceptable to Buyer and consistent with this Agreement and the Contemplated Transactions, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

FIRM:23260499v7

"Sale Order" means an order of the Bankruptcy Court substantially in the form of Exhibit B hereto, with such changes as are reasonably acceptable to Buyer and the Sellers.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 8.3(b).

"Sellers" has the meaning set forth in the preface above.

"Sellers' Consents and Approvals" has the meaning set forth in Section 4.11.

"Seller Plan" means any Employee Benefit Plan maintained by or with respect to which contributions are made by the Sellers or any Seller has any liability.

"SECC" has the meaning set forth in the preface above.

"Services Corporation" has the meaning set forth in the preface above.

"Stark Law" has the meaning set forth in Section 4.14(a)(vii).

"SSHS" has the meaning set forth in the preface above.

"SSMC" has the meaning set forth in the preface above.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock or membership interests entitled (without regard to the occurrence of any contingency) to vote in the election of or name directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership, limited liability company, or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Successor Liabilities" means Claims or liabilities of Sellers not expressly assumed by Buyer which, under federal common law or otherwise, might be asserted against Buyer due to Buyer's hiring of Sellers' Employees and/or continuing the Business of Sellers after the Closing.

"Supreme Court Approval" means approval of the Supreme Court of the State of New York pursuant to 510 and 511 of the Not-for-Profit Corporation Law for the sale of all or substantially all of the assets of the Sellers.

"Surviving Representations and Warranties" has the meaning set forth in Section 11.1.

12

"Tax" or "Taxes" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax-Exempt Sellers" means SSHS, SSMC, MVH, SECC, MVHC and NRSS.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Title Company" has the meaning set forth in Section 7.8.

"Title Defect" has the meaning set forth in Section 7.8.

"Title Report" has the meaning set forth in Section 7.8.

"Transaction Documents" means, collectively, this Agreement, the Bill of Sale and Assignment and Assumption Agreement, Medical Records Custody Agreement and each other agreement, document, instrument or certificate required to be delivered by Buyer and the Sellers pursuant to this Agreement.

"Transitional Patient Services" has the meaning set forth in Section 3.1(b).

"Transition Patients" has the meaning set forth in Section 3.1(b).

"Union Funds" means each of the labor unions representing Employees of the Sellers, including but not limited to the 1199 National Benefit Fund and the New York State Nursing Association.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and/or any similar foreign, state, or local law, regulation, or ordinance (as the context shall require).

"Withdrawal Liability" means any sum that may be assessed against Sellers by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from the Sellers ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2     Other Definitional and Interpretative Provisions. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as

a whole and not to any particular provision of this Agreement. The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The terms "Dollars", "dollars" and "$" shall mean United States dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Sold to Buyer</u>.  On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, the Sellers shall sell, transfer, convey, assign and deliver to the Buyer entity designated by Buyer, on the Closing Date, all of their right, title and interest in the assets described in this Section 2.1 (the "<u>Acquired Assets</u>"), free and clear of all Liens and Claims other than Liens securing the Assumed Liabilities to the fullest extent permissible under Section 363(f) of the Bankruptcy Code ("<u>Contemplated Transactions</u>").  The Acquired Assets shall be comprised of:

(a)    All Owned Real Property of the Sellers including without limitation the Owned Real Property listed on <u>Schedule 4.8(a-1)</u>;

FIRM:23260499v7

(b)    The interests of the Sellers, whether as landlord or tenant, under the Real Property Leases for the Leased Real Property listed on <u>Schedule 4.8(a-2)</u>;

(c)    Sellers' Furniture and Equipment and Inventory other than the Furniture, Equipment and Inventory identified by the Buyer on <u>Schedule 2.1(c)</u>, no later than sixty (60) days following the Effective Date;

(d)    All Assigned Contracts listed on Schedule 2.1(d), including all of Sellers' rights of set-off under such Assigned Contracts, which Schedule shall be delivered by Buyer to the Sellers no later than thirty-five (35) days following the Effective Date, provided that Buyer shall be permitted to remove any Contract from Schedule 2.1(d) by written notice to the Sellers at any time on or before the thirtieth (30th) Day prior to the Closing Date and to add any Contract not previously included as an Assigned Contract on Schedule 2.1(d) but as to which the Buyer notifies the Sellers, at any time on or before the thirtieth (30th) Day prior to the Closing Date, that it intends to include as an Assigned Contract;

(e)    All Intellectual Property of Sellers including without limitation the Intellectual Property listed on <u>Schedule 4.9</u> related to the Acquired Assets or used in the Business;

(f)    Subject to Section 2.6, all books, records, and data of the Sellers of every kind, whether in hard copy, electronic or digital format and however maintained or stored, excepting only the corporate minute books of the Sellers; provided, however, with respect to Sellers' medical records, only those medical records for (i) in-patients of SSMC, MVH and/or SECC as of the Closing Date, and (ii) outpatients undergoing an active course of treatment during the three (3) month period prior to the Closing Date shall constitute Acquired Assets;

(g)    Intentionally Omitted;

(h)    Any Prepaid Deposits;

(i)    Subject to the Sellers' right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of the Sellers' insurance and unliquidated or unsatisfied claims that relate to property damage with respect to Owned Real Property or Leased Real Property of the Sellers occurring prior to the Closing, and all other insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments or self-insured requirements) arising from any claim made under the Sellers' insurance policies with respect to the Acquired Assets but excluding insurance proceeds and insurance proceeds receivable in respect of tort liabilities such as medical malpractice claims and other Excluded Liabilities;

(j)    All rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided to the Sellers after the Closing or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(k)    The going concern value and goodwill of the Business of each of the Sellers; and

FIRM:23260499v7

(l)    Donor restricted assets and endowment funds held by, or for the benefit of, the Sellers, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of the Sellers' missions, operations, programs, services, assets and/or facilities (collectively, the "Restricted Assets") to the extent transferable and subject to any approvals required by Applicable Law.

2.2    Excluded Assets.  Notwithstanding anything in Section 2.1 to the contrary, the Sellers shall only be obligated to sell, and Buyer shall only be obligated to purchase, the Acquired Assets, and the Sellers shall not have any obligation to sell to Buyer, nor shall Buyer have any purchase rights with respect to, any assets of the Sellers not described in Section 2.1 (all such assets not described in Section 2.1, collectively, the "Excluded Assets") including but not limited to the Furniture and Equipment and/or Inventory listed on Schedule 2.1(c).

2.3    Assumed Liabilities.

(a)    On the terms and subject to the conditions of this Agreement, Buyer agrees that at Closing it will assume, and agree to fully and faithfully pay, perform and discharge, as the case may be, when due, only the obligations and Liabilities under (i) the Assigned Contracts, but only to the extent of contractual obligations and Liabilities which are to be initially performed or which accrue from and after the Closing Date and relate solely to dates of service from and after the Closing Date, (ii) the Debt of the Sellers listed on Schedule 2.3(ii) and subject to the satisfaction of the conditions in Section 10.1, (iii) Liabilities incurred on or after the Closing Date by Buyer, (iv) certain liabilities accruing to eligible former employees of Sellers as set forth in Section 2.3(b), and (v) the Cure Amounts as required by Section 2.5 hereto up to the maximum amount of three million dollars ($3,000,000) (collectively, the liabilities described in this 2.3, the "Assumed Liabilities"); and

(b)    Liabilities, in the aggregate amount not to exceed nine million dollars ($9,000,000) to individual eligible Employees of Sellers hired by Buyer in accordance with Article IX below and as determined by the Buyer in its sole discretion, or as otherwise may be agreed to by the parties (the "Assumed Employee Liabilities").

2.4    Excluded Liabilities.  Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall have the obligation to assume only the Assumed Liabilities, and Buyer shall not have any obligation with respect to any other Liabilities of the Sellers, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

2.5    Cure Amounts.  At the Closing and pursuant to Section 365 of the Bankruptcy Code, the Sellers shall assume and assign to Buyer, the Assigned Contracts.  The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of the Sellers under the Assigned Contracts shall be paid by the Buyer at Closing up to the maximum amount of three million dollars ($3,000,000), if any, and Sellers shall have no liability for any such cure amount.

The cure amounts to be paid by the Buyer in accordance with the foregoing provisions of this Section 2.5 are hereinafter sometimes referred to as the "Cure Amounts".

2.6    Agreement Regarding Confidentiality of Patient Information.    Sellers shall have no obligation to provide Buyer with custody of Patient records upon the Closing until Sellers and Buyer enter into a Medical Records Custody Agreement in the form attached hereto as Exhibit D, and then any such obligation of Sellers is subject to Buyer's compliance with the Medical Records Custody Agreement.

2.7    Accounts Receivable.

(a)    For the avoidance of doubt, Sellers shall be entitled to bill for and receive all Pre-Closing Accounts Receivable, to the extent permitted by Applicable Law.

(b)    Buyer agrees that it will pay over or cause to be paid over to the Sellers, insofar as practicable within five (5) Business Days of receipt, and until so paid, and shall hold in trust for the Sellers all sums received by it or any of its Affiliates in respect of or on account of the Pre-Closing Accounts Receivable. The provisions of this Section 2.7(b) shall survive the Closing to the extent contemplated herein.

(c)    Sellers agree that they will pay over or cause to be paid over to the Buyer, insofar as practicable within five (5) Business Days of receipt, and until so paid, shall hold in trust for the Buyer all sums received by any of them in respect of or on account of any Post-Closing Accounts Receivable. The provisions of this Section 2.7(c) shall survive the Closing to the extent contemplated herein.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    Payment of Purchase Price.

(a)    In consideration of the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer at Closing, and in consideration for the representations, warranties, covenants and agreements of the Sellers contained herein, Buyer shall pay, satisfy or assume liabilities equal to fifty-four million dollars ($54,000,000) plus the appraised value of the Furniture and Equipment and Inventory acquired by Buyer pursuant to Section 2.1(c) (as determined by mutually acceptable appraisal firm within thirty (30) days following the Effective Date) (the "Purchase Price"), consisting of the following: (i) assumption of the Assumed Liabilities, (ii) satisfaction of the Cure Amounts pursuant to Section 2.5 hereof, (iii) payment of any amounts pursuant to the Guaranty, (iv) assumption of the Assumed Employee Liabilities; and (v) payment of cash in an amount equal to the balance of the Purchase Price, subject to the reconciliation set forth in Section 3.1(b).

(b)    Purchase Price Adjustment. Buyer shall be entitled to a post-Closing Date adjustment of the Purchase Price for any and all amounts collected by MidCap Financial pursuant to that certain Conditional Non-Recourse Secured Guaranty (Limited) between Buyer and MidCap Financial dated _____, 2013. Buyer and Sellers shall determine such adjustment

17

(the "Receivables Guaranty Reconciliation") on a date not later than ninety (90) days after the Closing Date. To the extent that the aggregate amount in Section 3.1(a)(i) - (iv) above requires the Buyer to make a cash payment to the Sellers to satisfy the Purchase Price, the Buyer shall place up to five million dollars ($5,000,000) of such cash payment in escrow on terms mutually agreeable to Buyer and Sellers, subject to completion of the Receivables Guaranty Reconciliation. If the Buyer is not required to make a cash payment to Sellers to satisfy the Purchase Price, or to the extent that the cash payment necessary to satisfy the Purchase Price is less than five million dollars ($5,000,000), Buyer shall receive, on account of the deficiency by which the cash payment necessary to satisfy the Purchase Price is less than five million dollars ($5,000,000), (i) a subordinate security interest in and lien on any collateral pledged by the Sellers to MidCap Financial, and Sellers shall promptly seek and use their best efforts to obtain Bankruptcy Court approval for the grant of such security interest, and (ii) to the extent the deficiency is not recovered from such collateral, Buyer shall receive a claim entitled to super priority administrative status in the Bankruptcy Case.

(c)    Transition Patient Payments. To compensate Sellers for services rendered and medicine, drugs, and supplies provided on or before the Closing Date ("Transitional Patient Services") with respect to individuals who are patients of the Sellers on or before the Closing Date but who are not discharged until after the Closing Date ("Transition Patients"), the Sellers and Buyer shall take the following actions:

(i)    As soon as practicable after the Closing Date, Sellers shall deliver to Buyer a statement itemizing the Transitional Patient Services provided by Sellers on or through the Closing Date to Transition Patients whose care is reimbursed by Medicare, Medicaid or other healthcare insurance or reimbursement programs, including all private health plans, on a diagnostic related group or other "all-inclusive" or "global" fee basis ("Reimbursement Payment"). With respect to such Transition Patients, the Sellers shall, unless otherwise required by Applicable Law, be entitled to receive from Buyer as hereinafter provided an amount equal to (x) the Reimbursement Payment plus the outlier payments, if any, received by Buyer in respect of a Transition Patient, multiplied by a fraction of which the numerator shall be the inpatient length of stay of the Transition Patient prior to the Closing Date and of which the denominator shall be the entire length of stay of the Transition Patient (as calculated in accordance with Medicare/Medicaid regulations) minus (y) the sum of any deposits or co-payments received by the Sellers in respect of such Transition Patient to Seller; provided, however, that, if the fraction described in clause (x) of this sentence (which fraction is to be multiplied by the Reimbursement Payment plus the outlier payments, if any, received by Buyer in respect of a Transition Patient) is greater than 1, then such fraction shall be deemed to be equal to 1. Such payment shall be made by Buyer to the Sellers within thirty (30) days after receipt of such Reimbursement Payment or outlier payment, accompanied by copies of remittances and other supporting documentation as reasonably required by the Sellers. To the extent the Sellers received a Reimbursement Payment with respect to Transition Patients in excess of amounts to which they were entitled, such excess shall be taken into account in determining the amount of the payment to be made by Buyer pursuant to the immediately preceding sentence. In the event the Sellers and Buyer are unable to agree on the amount to be paid to the Sellers under this Section 3.1(c), then such amount shall be determined by an accounting firm mutually and reasonably acceptable to Buyer and the Sellers, the cost of engagement of which shall be shared half by Buyer and half by the Sellers. Buyer and the Sellers acknowledge and agree that the intent of this Section 3.1(c) is to ensure that each

18

of them gets properly compensated for services to Transition Patients performed by such party. Accordingly, Buyer and the Sellers each agree to use their best efforts to carry out such intent.

(ii)    Immediately prior to the Closing Date, the Sellers shall prepare cut-off billings for all then patients of the Sellers not covered by Section 3.1(c)(i) (which shall include Medicare patients whose care is reimbursed on a per diem basis). The Sellers shall be entitled to bill for and receive all amounts collected in respect of such cut-off billings and Buyer shall have no right thereto.

3.2    Closing and Closing Date.

(a)    The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at a location agreed upon by Buyer and the Sellers, within ten (10) days after receipt of applicable Governmental Authorizations (including without limitation Hart-Scott-Rodino approval, if necessary), subject to the satisfaction or waiver of all other conditions to the obligations of the Sellers and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions the respective Sellers and Buyer will take at the Closing) or such other date as Buyer and the Sellers may mutually determine in writing (the "Closing Date").

(b)    Unless otherwise agreed by Buyer and the Sellers in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of the Sellers in any asset to be acquired by Buyer hereunder, and any Assumed Liability and all risk of loss with respect to the Business, shall be considered to have passed to Buyer as of 12:01 a.m. (New York time) on the Closing Date.

3.3    Delivery of Records and Contracts. The Sellers shall make available to Buyer at the premises of the Business on the Closing Date all business records, books, and other data in the Sellers' possession as of the Closing Date constituting the Acquired Assets under Section 2.1 subject to Section 2.6. After the Closing, the Buyer shall afford to the Sellers and their accountants and attorneys reasonable access, during normal business hours and upon reasonable advance notice, to the books and records of the Sellers delivered or made available to the Buyer under this Section 3.3 and shall permit the Sellers, at the Sellers' expense, to make extracts and copies therefrom to the extent reasonably requested in connection with financial reporting and accounting, litigation, tax matters and any other reasonable business purpose. For a period of six (6) years after the Closing Date, the Buyer shall not dispose of such books and records without first offering to surrender the same to the Sellers in writing upon not less than sixty (60) days prior to such proposed disposition.

3.4    Further Conveyances. From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Transaction Documents, to ensure that Buyer is relieved of all Excluded Liabilities including Successor Liabilities, and to assure fully to the Sellers and their Affiliates and their successors

and assigns the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the other Transaction Documents, and to otherwise make effective the Contemplated Transactions and thereby. In the event that Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to the Sellers. In the event that the Sellers or their Affiliates retain or receive any Acquired Assets (or any payments or proceeds related thereto) following the Closing, the Sellers shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.5    Bulk Sales Laws. The Parties hereto hereby waive compliance by the Sellers with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.6    Allocation of Purchase Price. The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) set forth in attached Schedule 3.6, as determined by Buyer.

3.7    Deposit. Buyer shall have made a cash deposit upon signing this Agreement in the sum of to ten percent (10%) of the Purchase Price (the "Deposit") upon signing of this Agreement. The Deposit shall be held in escrow pursuant to terms of an escrow agreement in form and substance mutually satisfactory to Buyer and Sellers. The Deposit shall be promptly returned to the Buyer within three (3) Business Days of written notice from Buyer of Sellers' breach of this Agreement which, among other things, shall include failure to meet the dates by which the Bid Procedures Order and the Sale Order must be entered by the Bankruptcy Court and approval of the Break-Up Fee and the Expense Reimbursement pursuant to Section 6.1. The Sellers shall retain the Deposit as a credit against the cash portion of the Purchase Price at Closing or as liquidated damages if Buyer breaches its obligations under this Agreement, or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to closing have been satisfied and the Sellers have not breached their obligations under this Agreement.

3.8    Escrow. At the Closing, out of the Purchase Price, Buyer shall deposit nine million dollars ($9,000,000), relating to the Assumed Employee Liabilities, in escrow with Garfunkel Wild, P.C. (the "Escrow Agent"). Sellers and Buyer shall compute the amount of the Assumed Employee Liabilities. Upon the written consent of the Buyer and Sellers, Escrow Agent shall release such funds to the Buyer. One hundred and twenty (120) days after the Closing, the Escrow Agent, upon seven (7) days written notice to the Buyer, shall release any excess funds to the Sellers. In the event that the Buyer does not object in writing to Escrow Agent within such seven (7) day period, Buyer shall have been deemed to consent to such release. In the event of an objection or dispute between the Parties, the Bankruptcy Court shall retain jurisdiction over such claim or dispute.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE SELLERS

Each Seller represents and warrants to Buyer that the statements contained in this Article IV are correct and complete as of the Effective Date and will be correct and complete as of the

Closing Date (as though made then and as though the Closing Date were substituted for the Effective Date throughout this Article IV), except as set forth in the disclosure schedule accompanying this Agreement and initialed by the Parties (the "Disclosure Schedule"). The Disclosure Schedule will be arranged in sections corresponding to the lettered and numbered sections and subsections contained in this Article IV. It is understood that no Seller shall have liability to Buyer for any breach or default in respect of any representation or warranty set forth in this Article IV other than pursuant to Article X and that the remedy of Buyer for any such breach or default shall be pursuant to the indemnification provisions of Article X.

4.1     Organization. As set forth on Schedule 4.1(a) of the Disclosure Schedule, each Seller (i) is a business corporation, limited liability company or not-for-profit corporation, as the case may be, duly organized, validly existing, and in good standing under the laws of the State of New York and (ii) has full power and authority and to own, lease and operate its properties and assets and to conduct its Business as presently conducted.

4.2     Authorization of Transaction. Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for) and DOH Approval, each Seller has full power and authority (including full not-for-profit corporate power and authority) to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Supreme Court Approval and DOH Approval, to perform its obligations hereunder. Without limiting the generality of the foregoing, the Board of Directors of each Seller has duly authorized the execution, delivery, and performance of this Agreement by such Seller. This Agreement constitutes and any and all other Transaction Documents to be executed by the Sellers pursuant hereto, when executed, will constitute, the valid and legally binding obligation of the Sellers, enforceable in accordance with their terms and conditions.

4.3     Qualification. Each Seller is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification. All such jurisdictions are set forth on Schedule 4.3 of the Disclosure Schedule.

4.4     Non-Contravention. Subject to DOH Approval, Supreme Court Approval and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Transaction Document required to be delivered by the Sellers at Closing), nor the fulfillment of the terms hereof by the Sellers, will (i) violate or result in a breach of any of the terms and provisions of, constitute a default under, conflict with, or create in any party the right to accelerate, terminate, modify, cancel or require any notice under any agreement (including any Material Contract), mortgage, bond, indenture, franchise or other instrument or obligation to which any Seller is a party or by which it is bound; (ii) violate any order or award of any court, administrative agency or governmental body applicable to any Seller; (iii) result in the imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iv) constitute a violation by any Seller of any Applicable Law; (v) result in the breach of any of the terms or conditions of, or constitute a default under, or otherwise cause any impairment of, any permit, license or other Governmental Authorization held by any Seller; (vi) breach or result in any liability or expense to any Seller

under any CBAs, if any, to which such Seller is a party; or (vii) conflict with or violate any charter document, operating agreement or partnership agreement of any Seller. All of the Assigned Contracts will be assignable to Buyer at the Closing pursuant to Section 365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Authority, as applicable.

4.5     Brokers' Fees. Except as set forth in Schedule 4.5 of the Disclosure Schedule, no Seller has any liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

4.6     Events Subsequent. Except as set forth in Schedule 4.6 of the Disclosure Schedule, since July 1, 2012, there have not been any of the following:

(a)     Any transaction entered into or carried out by any Seller other than in the Ordinary Course of Business;

(b)     Any material written modification or termination of any Material Contract;

(c)     Any written modification or termination of any License;

(d)     Any entry into, termination of, or receipt of notice of termination of any Material Contract;

(e)     Any action taken by any Seller or, to the Knowledge of the Sellers, by another Person on behalf of any Seller that will or may reasonably be expected to cause or constitute a breach of any provision of this Agreement or any Material Contract (other than non-payment of accounts payable that are included in the Cure Amounts) or cause or be reasonably expected to cause a Material Adverse Change;

(f)     To the Knowledge of the Sellers, any material abandonment, lapse or infringement of any Intellectual Property owned by or licensed to any Seller;

(g)     Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of organization (or similar organizational documents) or corporate structure or ownership of any Seller;

(h)     Any material damage to or destruction or loss of any Acquired Assets or Owned Real Property or Leased Real Property of any Seller, whether or not covered by insurance, material adversely affecting the Acquired Assets, Business, financial condition or prospects of any Seller or the Business;

(i)     Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the ordinary course of business or if such item has been rendered obsolete;

(j)     Any change in any Tax election or Tax status of any Seller; or

FIRM:23260499v7

(k)    Any claims made or actions, suits or proceedings or, to the Knowledge of the Sellers, any investigation by a Governmental Authority commenced or, to the Knowledge of the Sellers, threatened, against any Seller or any institution except those that the Sellers have settled.

4.7    Tax Matters.

(a)    Each of the Tax-Exempt Sellers has received a determination letter from the Internal Revenue Service to the effect that such Tax-Exempt Seller is exempt from federal income taxation under §501(a) of the Code as an organization described in §501(c)(3) of the Code. Copies of such determination letters are included in Schedule 4.7(a). Such determination letters have never been amended or modified and there have been no changes to the factual basis for their original issuance. No Tax-Exempt Seller has taken any action that is inconsistent with or omitted to take any action that is required in order to maintain, the tax-exempt status of such Tax-Exempt Seller, or that could reasonably be expected to lead to a determination by the Internal Revenue Service that such Tax-Exempt Seller is not eligible to be treated as an organization exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code. Except as disclosed on the Disclosure Schedule, each Tax-Exempt Seller has received recognition of its tax-exempt status from all state and local Taxes in all jurisdictions in which it conducts Business. Such tax-exempt status has never been revoked or suspended, there are not currently any proceedings to revoke or suspend such tax-exempt status, nor has there been any conduct by any Tax-Exempt Seller of such nature that would warrant modification, limitation or revocation of the determination letters. Each Tax-Exempt Seller has, since its incorporation, been classified as a public charity under Section 509(a) of the Code and has been operated consistent with the requirements for qualification under Section 501(c)(3) of the Code and has never received notice from a Governmental Authority that such Tax-Exempt Seller's classification was in jeopardy.

(b)    Except as disclosed on Schedule 4.7(b), all Tax Returns with respect to the Sellers, Business or the Acquired Assets, to the extent required to be filed with any Governmental Authority with respect to any period prior to Closing by or on behalf of each Seller (collectively, the "Pre-Closing Tax Returns"), have been prepared in accordance with all Applicable Laws and have been filed when due (taking into account extensions of filing due dates) in accordance with all Applicable Laws, and all such Pre-Closing Tax Returns are true, correct and complete in all material respects and copies of the Pre-Closing Tax Returns for the calendar years 2009, 2010, 2011 and 2012 have been provided to or made available to Buyer, along with copies of all examination reports of any Pre-Closing Tax Return by any Governmental Authority and statements of deficiencies assessed by any Governmental Authority with respect to the Pre-Closing Tax Returns.

(c)    Except as disclosed on Schedule 4.7(c), each Seller has duly and timely paid in accordance with all Applicable Law, all material Taxes with respect to the Business and the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable. Except as disclosed on Schedule 4.7(c), each Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to such Seller, the Business or the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

FIRM:23260499v7

(d)    Schedule 4.7(d) contains a list of all material jurisdictions (whether foreign or domestic) to which (i) any Tax is properly payable or (ii) any Tax Return is required to be filed by each Seller.

(e)    Except as disclosed on Schedule 4.7(e), to Sellers' Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to (i) result in a Lien or Claim on the Acquired Assets or the Business in any taxable period (or portion thereof) ending after the Closing Date or (ii) threaten the tax-exempt status of any Tax-Exempt Seller.

(f)    None of the Acquired Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for federal income tax purposes.

(g)    All information relating to Tax matters set forth in the financial statements (including the notes thereto) of each Seller referred to herein is accurate in all material respects.

(h)    No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to any Seller; and no Seller has entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax of any Seller affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired except as disclosed in Schedule 4.7(h).

(i)    No Governmental Authority has asserted in writing or, to the Sellers' Knowledge, orally (i) an adjustment that could result in an additional Tax for which any Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or such Seller's Business or (ii) a threat to the tax-exempt status of a Tax-Exempt Seller. Except as set forth in the Disclosure Schedule, there is no proceeding pending relating to any Liability for any Tax or asset of any Seller or the tax-exempt status of any Tax-Exempt Seller and, to the Sellers' Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim except as disclosed in Schedule 4.7(i).

(j)    There is no outstanding closing agreement, ruling request, request to change a method of accounting, subpoena or request for information with or by any Governmental Authority with respect to any Seller. No Seller has executed or entered into any agreement with, or obtained any consents or clearances from, any Governmental Authority respecting Taxes, or has been subject to any ruling guidance specific to such Seller respecting Taxes that would be binding on the Sellers for any taxable period (or portion thereof) ending after the Closing Date.

(k)    No Seller has been a party to a "listed transaction" within the meaning of Treasury Regulations Section 1.6011 4(b)(2).

(l)    No Seller is a party to any Tax allocation or sharing agreement. No Seller is a party to any agreement, or understanding or arrangement, that constitutes, or the

24

consummation of which constitutes, an excess benefit transaction under Section 4958 of the Code.

4.8    Property and Assets.

(a)    Schedule 4.8(a-1) of the Disclosure Schedule contains a complete list of all real property to which the Sellers own fee simple title together with any material property rights ("Owned Real Property").    Schedule 4.8(a-2) of the Disclosure Schedule contains a complete list by address of all real property leased, subleased, licensed, operated or used by any Sellers (whether as lessor, lessee, licensor or licensee) indicating the nature of their respective interest therein (the "Leased Real Property") and specifies the lessor(s), lessee(s), licensor(s) or licensee(s) of such Leased Real Property and identifies each lease or any other Contract under which such property is leased, subleased, licensed or otherwise occupied, including all amendments and/or modifications thereto (together with all amendments, extensions, renewals, guaranties, and other agreements thereto, each a "Real Property Lease"). No Seller has received any written notice of any pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Owned Real Property or Leased Real Property or, to the Sellers' Knowledge, that any such activities are currently being threatened. There are no oral leases or subleases and, except as set forth on Schedule 4.8(a-3) of the Disclosure Schedule, there are no (x) written subleases or (y) written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Owned Real Property or the Leased Real Property or any portion thereof and there is no Person in possession of the Owned Real Property or the Leased Real Property or any portion thereof other than the Sellers. The real property identified on Schedule 4.8(a-1), Schedule 4.8(a-2) and Schedule 4.8(a-3) of the Disclosure Schedule represents all of the real property owned, leased, subleased, licensed or otherwise occupied by the Sellers that is utilized in the operation of the Business.

(b)    Each Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Assumed Liabilities. The foregoing notwithstanding, with respect to the Owned Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company which is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with their standard form of title policy, clear of all Liens, subject to the Permitted Encumbrances in Schedule 4.8(b). Except as otherwise provided, the Owned Real Property shall be conveyed in its "as-is" condition and state of repair together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Owned Real Property, and (b) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Owned Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Owned Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Owned Real Property by reason of a change of grade of any street, road or avenue.

FIRM:23260499v7

(c)    To the Sellers' Knowledge, other than with respect to the Owned Real Property and the Leased Real Property, the Acquired Assets (i) are in good working order, operating condition and state of repair (subject to reasonable wear and tear and to deferred maintenance), (ii) have no material defects (whether patent or latent), subject to reasonable wear and tear, and (iii) have been maintained in a reasonable manner (subject to reasonable wear and tear and to deferred maintenance). Other than with respect to the Owned Real Property and the Leased Real Property, none of the Acquired Assets owned or leased by the Sellers is subject to any sublease or sublicense or any other agreement granting to any other Person by the Sellers any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)    Except as disclosed on Schedule 4.8(d) of the Disclosure Schedule, all of the fixtures and other improvements that constitute the Owned Real Property or the Leased Real Property and all of the Sellers' tangible personal property, other than inventory, included in the Acquired Assets, and including motor vehicles, if any, are adequate and suitable for the present use by the Sellers, ordinary wear and tear excluded.

(e)    The Sellers have delivered to the Buyer true, accurate and complete copies of each Real Property Lease.

(f)    Except as listed on Schedule 4.8(f), there exists no default, breach or dispute on the part of any Seller under any Real Property Lease nor has any event occurred which, with the passage of time or the giving of notice or both, would constitute a default or breach by such Seller under a Real Property Lease.

(g)    There exists no default or breach by the landlord, sublessor, licensor or other obligor under each Real Property Lease nor, to the Sellers' Knowledge, has any event occurred which, with the passage of time or the giving of notice or both, would constitute a default or breach by any such Person under a Real Property Lease.

(h)    Schedule 4.8(a-1) of the Disclosure Schedule sets forth a true and correct listing of each Owned Real Property. Schedule 4.8(a-2) of the Disclosure Schedule sets forth a true and correct listing of each Real Property Lease.

(i)    No portion of the Owned Real Property or the Leased Real Property has suffered any damage by fire or other casualty which heretofore has not been repaired and restored.

(j)    Except for the Excluded Assets, the Acquired Assets constitute all of the assets of the Sellers that are used or useful in connection with the operation of the Business.

4.9    Intellectual Property.

(a)    Schedule 4.9 of the Disclosure Schedule under the heading "List of Intellectual Property" sets forth a complete and accurate list of all Intellectual Property used by such Seller in connection with the Business. No Seller owns or exclusively licenses any trademarks, service marks or patents.

FIRM:23260499v7

(b)    Each Seller either owns or validly licenses, and possesses the valid and enforceable right to sell to Buyer, all Intellectual Property which is necessary for the operation of the Business and without any known conflict with the rights of others, and no Person has made any claims or threatened that any Seller or any Intellectual Property owned or used by any Seller is in violation or has infringed any such Intellectual Property of such third party. No legal proceedings are pending or, to the Sellers' Knowledge, threatened against any Seller that challenge the validity or enforceability of, or the rights of such Seller in, any of the Intellectual Property owned or used by such Seller. No assignments, grants or licenses to use such Intellectual Property have been granted by any Seller. All licenses, permits and approvals with respect to the Intellectual Property material to the Business (other than off-the-shelf computer software licenses) are listed in Schedule 4.9 of the Disclosure Schedule and are valid and in full force and effect and each of such licenses, permits and approvals shall, following the consummation of the Contemplated Transactions, be valid and fully enforceable.

(c)    No Seller has Knowledge that any third party is infringing any Intellectual Property owned by such Seller.

4.10    Contracts.

(a)    The Disclosure Schedule sets forth in Schedule 4.10 a complete and correct list of the following:

(i)    each Contract (or group of related Contracts), in each case, the performance of which will extend over a period of more than one year from the Effective Date or which provides for annual payments to or by any Seller in excess of $50,000;

(ii)    each Contract that relates to the borrowing or lending by any Seller of any money or that creates or continues any Lien or Claim against, or right of any third party with respect to, any asset of any Seller, except for those Liens and Claims not related to the borrowing of any money but arising in the Ordinary Course of Business;

(iii)    each Contract under which any other Person has guaranteed any Debt of any Seller;

(iv)    each Contract (or group of related Contracts) (A) under which such Seller has created, incurred, assumed or guaranteed any Debt, or (B) under which such Seller has permitted any Acquired Asset to become encumbered;

(v)    each Contract by which any Seller leases any real or personal property or pursuant to which such any Seller is a lessor of, or permits any third party to operate, any real or personal property of such Seller;

(vi)    each Contract to purchase any amount of materials, supplies, medicine or other items or services having a purchase price in excess of $50,000;

(vii)    each CBA to which any Seller is a party;

27

(viii)    each Contract under which any Seller is, or may become, obligated to pay any amount in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (i) acquisition or disposition of assets or securities, (ii) merger, consolidation or other business combination, or (iii) series or group of related transactions or events of the type specified in clauses (i) and (ii) above;

(ix)    each Contract with an Affiliate, or with any entity in which an officer or director of any Seller holds an interest, including any agreement whereby any Seller has advanced or loaned any amount to any director, officer or Employee;

(x)    each Contract in the form of a partnership, limited liability company or joint venture agreement;

(xi)    each Contract (other than any Contract to which Buyer is a party) relating to confidentiality, non-competition or non-solicitation (in cases where any Seller is subject to such obligations) or containing a "most favored nation" clause;

(xii)    each Contract under which any Seller has or may have any Liability to any investment bank, broker, financial advisor, finder or other similar Person;

(xiii)    any Contract under which any Seller has advanced or loaned an amount to any of its Affiliates or Employees that remains outstanding on the Effective Date; and

(xiv)    any Contract with any insurance company, prepaid health plan, health maintenance organization, preferred provider organization, independent practice association, private or public healthcare program, or any other entity to provide services to enrollees, beneficiaries or patients; and

(xv)    any Physician Contract;

provided, however, that an Employee Benefit Plan shall not constitute a Material Contract and need not be listed on Schedule 4.10 of the Disclosure Schedule.

(b)    As used in this Agreement, the term "Material Contracts" means all of the Contracts of the Sellers required to be disclosed in the Disclosure Schedule under this Section which are Assigned Contracts. Except (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of such Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the applicable Seller. Except for Cure Amounts there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)    The Sellers have delivered to the Buyer true, accurate and complete copies of each Assigned Contract, in each case, as amended or otherwise modified and in effect as of the Effective Date.

(d)    Each Assigned Contract is enforceable against the applicable counterparty and is in full force and effect, and, subject to obtaining any necessary consents or delivering any necessary notices, as disclosed on Schedule 4.10(d) of the Disclosure Schedules, will continue to be so enforceable and in full force and effect following the consummation of the Contemplated Transactions.

(e)    (i) Each Seller has the right to assign to Buyer each of the Assigned Contracts on the Closing Date under Section 365 of the Bankruptcy Code and upon such assignment at Closing in the manner contemplated by this Agreement, Buyer shall have all of the rights of such Seller thereunder, and (ii) no Assigned Contract to which such Seller is a party may be terminated by any other party thereto as a result of the transactions contemplated by this Agreement.

(f)    Except as disclosed in the Disclosure Schedule, there are no notes receivable of any Seller or any other amount payable to any Seller owing by any director, officer, member or Employee of any Seller. Except as set forth on Schedule 4.10(f) of the Disclosure Schedule under the heading "Related Party Transactions", no Seller, Employee, officer, director, shareholder or Affiliate of any Seller, no individual, related by blood, marriage or adoption to any such individual, and no entity in which any such Person or individual owns any beneficial interest is a party to any agreement, contract, commitment or transaction with any Seller or any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of the Sellers, or has any interest in any property, tangible or intangible, used by any Seller. The agreements, contracts, commitments or transactions set forth on Schedule 4.10(f) of the Disclosure Schedule under the heading "Related Party Transactions" were negotiated at arms-length by the applicable Seller with the other party thereto.

4.11    Sellers' Consents and Approvals.    Schedule 4.11 of the Disclosure Schedule lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by the Sellers to consummate the Contemplated Transactions (including each Transaction Document required to be delivered by the Sellers at Closing) (collectively, "Sellers' Consents and Approvals"), other than (a) DOH Approval, (b) entry of the Sale Order, and (c) Supreme Court Approval and approval under Antitrust Laws, if applicable).

4.12    Powers of Attorney.    Except as set forth in the Schedule 4.12, there are no outstanding powers of attorney executed on behalf of any Seller.

4.13    Litigation.

(a)    Except as set forth on Schedule 4.13 of the Disclosure Schedules, (i) there is no action, suit, investigation or proceeding pending or, to the Sellers' Knowledge, threatened (x) against the Sellers with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of any of the Contemplated Transactions or that questions the validity, legality or propriety of the

FIRM:23260499v7

Contemplated Transactions or that could reasonably be expected to have a Material Adverse Effect; and (ii) no Seller is subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets or the Business involving an amount in excess of $50,000.

(b)    The Sellers have delivered or made available to Buyer a true, correct and complete copy of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on <u>Schedule 4.13</u> of the Disclosure Schedules.

4.14    <u>Certain Healthcare Matters</u>.

(a)    <u>Government Reimbursement Programs</u>.

(i)    Each of the Facilities, (A) has been granted any and all Governmental Authorizations necessary to carry on its business as such business has been conducted, and to own the assets thereof, all of which are currently valid and in full force and effect, (B) has complied in all material respects with the terms and conditions of its Governmental Authorizations, and there has occurred no event nor is there any event, action, investigation or proceeding pending or threatened which could cause or permit revocation or suspension of or otherwise adversely affect the maintenance of any such Governmental Authorization, (C) is not subject to any material administrative fines in connection with any Governmental Authorizations, (D) is qualified for participation in, and has current and valid provider contracts with, the Government Reimbursement Programs and/or their fiscal intermediaries or paying agents and is in compliance with the conditions of participation and requirements applicable with respect such participation and (E) is eligible for payment under the Government Reimbursement Programs for services rendered to qualified beneficiaries. At no time since January 1, 2010 has any Seller received any written or oral notice from any Governmental Authority indicating that its qualification as a participating provider in any Governmental Reimbursement Program may be terminated or withdrawn. To the Knowledge of the Sellers, there has been no decision not to renew any provider agreement relating to the Facilities or the Business.

(ii)    Except as set forth on <u>Schedule 4.14(a)(ii)</u> of the Disclosure Schedule under the heading "Cost Reports," the Cost Reports for each of the Facilities that provides services to beneficiaries of Government Reimbursement Programs were filed when due, and have been audited (with Notices of Program Reimbursement issued), for the Cost Report periods particularly described on <u>Schedule 4.14(a)(ii)</u> of the Disclosure Schedule under the heading "Cost Reports". All Cost reports accurately reflect the information required to be included thereon.

(iii)    Except as set forth on <u>Schedule 4.14(a)(iii)</u> of the Disclosure Schedule under the heading "Cost Reports", all amounts shown as due from any of the Facilities in the Cost Reports either were remitted with such Cost Reports or will be remitted when required by Applicable Law and are appropriately reflected in the financial statements, and all amounts shown in the Notices of Program Reimbursement as due have been, or prior to Closing will be, paid when required by Applicable Law.

FIRM:23260499v7

(iv)    No Seller has received or submitted any claim for payment to the Government Reimbursement Programs (or their fiscal intermediaries or paying agents) with respect to any Facility in excess of the amount provided by Applicable Law or applicable provider contract, and no Seller has received written or oral notice of any dispute or claim by any Governmental Authority, fiscal intermediary or other Person regarding any of the Facilities and the Government Reimbursement Programs or the participation by any of the Facilities in such Government Reimbursement Programs.

(v)    No Seller is subject to, or the beneficiary of, any outstanding loan, grant or loan guarantee pursuant to the Hill Burton Act (42 USC Section 291a, *et seq.*) except as set forth in Schedule 4.14(v).

(vi)    Except as set forth on the Schedule 4.14(a)(vi) of the Disclosure Schedule, since January 1, 2007, no Seller has been subject to any finding, agreement, settlement or fine regarding noncompliance with any Applicable Law (including fraudulent procedures or practices) relating to the Government Reimbursement Programs.

(vii)    No Seller has established or maintains a "financial relationship," as that term is defined by The Ethics in Patient Referrals Act, 42 U.S.C. Section 1395nn, and the regulations promulgated thereunder (the "Stark Law"), with any physician or with an immediate family member of any physician who makes referrals to any Seller for "designated health services," as that term is used in the Stark Law, unless such financial relationship or referral, as applicable, meets an exception to the Stark Law.

(b)    Medical Staff. The Sellers have made available to Buyer true, correct and complete copies of the bylaws, rules and regulations of the medical staffs of the Hospitals and the Residential Health Care Facility and all Contracts with Physicians, Physician groups or other members of the medical staff of each Hospital and the Residential Health Care Facility. Except as set forth on Schedule 4.14(b) of the Disclosure Schedule under the heading "Medical Staff Disputes", there is no pending or, to the Sellers' Knowledge, threatened dispute with medical staff member of any Hospital or the Residential Health Care Facility with respect to medical staff privileges or credentialing. With respect to each Physician or nurse (including registered professional nurses, nurse practitioners and licensed practical nurses) who is a member of the medical staff of any Hospital or the Residential Health Care Facility, the credentialing process for such physician included queries to the New York State Board for Medicine, the New York State Board for Nursing, the New York State Board for Professional Medical Conduct, the National Practitioner Data Bank and the National Council of State Boards of Nursing. Based upon and in reliance upon the Sellers' review of (i) the "List of Excluded Individuals/Entities" on the website of the United States Health and Human Services Office of Inspector General (http://exclusions.oig.hhs.gov/), and (ii) the "List of Parties Excluded From Federal Procurement and Nonprocurement Programs" on the website of the United States General Services Administration (http://www.epls.gov), no member of the medical staff of a Facility, other than as set forth on Schedule 4.14(b-1), has been in the last six (6) years or is currently excluded from participation in any Governmental Reimbursement Program. Schedule 4.14(b-2) of the Disclosure Schedules under the heading "Medical Staff" sets forth a complete and accurate list of the name and specialty, if any, of each member of the medical staff of each Facility.

31

(c)    Accreditation; Survey Reports. The Residential Health Care Facility is
not accredited. Each Hospital is accredited by The Joint Commission (the "Joint Commission")
for the period set forth on Schedule 4.14(c) of the Disclosure Schedule under the heading
"Accreditation". With respect to each Hospital, the Sellers have made available to Buyer a true
and complete copy of such Hospital's most recent Joint Commission accreditation survey report
and deficiency list, if any; the most recent Statement of Deficiencies and Plan of Correction on
Form HCFA-2567; the most recent state licensing report and list of deficiencies, if any; the most
recent fire marshal's survey and deficiency list, if any, and the corresponding plans of correction
or other responses, each as set forth on Schedule 4.14(c) of the Disclosure Schedule under the
heading "Accreditation".

(d)    Licenses. All Licenses of the Sellers are listed on Schedule 4.14(d) of the
Disclosure Schedule under the heading "Licenses". The Licenses are all of the licenses
necessary for the Sellers' operation of the Acquired Assets and the Business. Each of SSMC and
MVH is duly licensed by the State of New York to operate the applicable Hospital as a general
acute care hospitals having that number and type of licensed beds as set forth on each Hospital's
current general acute care hospital license. SECC is duly licensed by the State of New York to
operate the Residential Health Care Facility as a residential health care facility having that
number and type of licensed beds as set forth in SECC's current residential health care facility
license. Such Licenses are in full force and effect and no proceeding is pending or, to the
Sellers' Knowledge, threatened, seeking the revocation, termination, suspension, restriction,
modification or limitation of any such License. No Seller is in default under, and to the
Knowledge of the Sellers no condition exists that with notice or the lapse of time or both would
constitute a default under any License.

(e)    Compliance. Each Seller is and has been in material compliance in all
respects with all Applicable Laws, including all Healthcare Laws and Requirements, governing
the conduct or operation of its business (including the Business), and all of its Licenses. Each
Seller has timely filed all reports, data and other information related to the Business required to
be filed by the Sellers with Governmental Authorities. All such reports, data and other
information were true, correct and complete in all material respects when filed, complied in all
material respects with Applicable Law in effect when filed, and no material deficiencies have
been asserted by any such Governmental Authority with respect to such reports, data and other
information that have not yet been satisfied, or, if not yet satisfied, where satisfaction is not yet
due. No Seller has received any written or oral notice of any violation of any such Applicable
Law, including all Healthcare Laws and Requirements or License, and, to the Sellers'
Knowledge, no written or oral notice of such violation has been threatened at any time for the
past five (5) years. There is no outstanding, or, to the Sellers' Knowledge, threatened order or
allegation from any Governmental Authority of any alleged, actual, or potential violation of any
Applicable Law. No investigation or review by any Governmental Authority is pending or to
Sellers' Knowledge threatened, nor has any Governmental Authority notified any Seller in
writing or orally within the five (5) year period prior to the Effective Date of its intention to
conduct the same. No Seller has received any written notice indicating that the qualification of
such Seller as a participating provider in any Governmental Reimbursement program may be
terminated or withdrawn, nor, to the Knowledge of the Sellers is there any reason to believe that
such qualification may be terminated or withdrawn.

FIRM:23260499v7

(f)    Compliance Programs. No Seller (i) is a party to a Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, (ii) has reporting obligations pursuant to any Settlement Agreement entered into with any Governmental Authority, (iii) has in the last five (5) years been a defendant in any qui tam/False Claims Act litigation, or (iv) has in the last five (5) years been served with or received any search warrant, subpoena, civil investigative demand, or contact letter by or from any federal or state enforcement agency (except in connection with medical services provided to third-parties who may be defendants or the subject of investigation into conduct unrelated to the operation of the healthcare businesses conducted by the System or its Subsidiaries). Schedule 4.14(f) of the Disclosure Schedules includes a description of each audit and investigation conducted by the Sellers pursuant to their compliance programs during the last five (5) years. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the Office of Inspector General of the Department of Health and Human Services. The Sellers have provided to Buyer a copy of the current compliance program materials for the Sellers, including, all program descriptions, compliance officer and committee descriptions, ethics and risk area policy materials, training and education materials, auditing and monitoring protocols, reporting mechanisms, and disciplinary policies.

(g)    Convictions; Exclusions. No Seller nor any director, officer or Employee of any Seller has been in the last six (6) years or is excluded from participating in the Medicare program or any other Government Reimbursement Programs. None of the Sellers' officers, directors, agents or managing employees (as that term is defined in 42 U.S.C. § 1320a-5(b)), has been (i) excluded from participating in the Medicare program or any other applicable Government Reimbursement Program, (ii) subject to sanction pursuant to 42 U.S.C. § 1320a-7a or 1320a-8, (iii) convicted of, a criminal offense under the Anti-Kickback Statute (42 U.S.C. § 1320a-7b) or (iv) charged with, or to the Sellers' Knowledge, investigated, for any violation of Applicable Law related to fraud, theft, embezzlement, breach of fiduciary responsibility, financial misconduct, obstruction of any investigation, or controlled substances.

(h)    Licensed Employees. All Employees of the Sellers are properly licensed, as required, and in good standing with the applicable Governmental Authority.

(i)    Billings. All billings of the Sellers with respect to applicable Government Reimbursement Programs have been in the last six (6) years and current are in compliance in all respects with Applicable Law, and, to Sellers' Knowledge, no Seller has billed or received payment or reimbursement in excess of amounts allowed by Applicable Law (other than refunds, claims, deficiencies, offsets or adjustments allowed by Applicable Law) except as disclosed on Schedule 4.14(i).

(j)    Audits; Settlements. Schedule 4.14(j) of the Disclosure Schedule under the heading "Audits and Settlements" sets forth a summary description of (i) any audits of the Sellers performed within five (5) years prior to the Effective Date by any Governmental Authority or other contract auditor on behalf of a Governmental Authority, an identification of any settlement agreements and, to the Sellers' Knowledge, any unresolved matters raised in writing with the Sellers by any such Governmental Authority, or other contract auditor on behalf of a Governmental Authority, and (ii) the percentage of overpayments to the total charges audited in each audit of the Sellers performed within two (2) years prior to the Effective Date by

33

a RAC auditor, an identification of any settlement agreements and, to the Sellers' Knowledge, any unresolved matters raised in writing with the Sellers by such auditor.

(k)    HQI Program. The Sellers have each registered with the QNet Exchange ("QNet") as required by CMS under its Hospital Quality Initiative Program (the "HQI Program"). The Sellers have each submitted all material quality data with respect to the Facilities required under the HQI Program to CMS or its agent for all calendar quarters concluded prior to the date of this Agreement, except for any quarter for which the respective reporting deadlines have not yet expired. All such submissions of quality data have been made in all material respects in accordance with applicable reporting deadlines and in the form and manner required by CMS. Except as set forth on Schedule 4.14(k) to the Disclosure Schedule, none of the Sellers have received notice of any reduction in reimbursement under the Medicare program with respect to the Facilities resulting from its failure to report quality data to CMS or its agent as required under the HQI Program. The Sellers have provided Buyer with the HQI Program "validation results" received by the Sellers with respect to the Facilities for all calendar quarters concluded prior to the date of this Agreement, except for any quarter for which the respective reporting deadlines have not yet expired.

(l)    Third Party Payment Programs. The Sellers currently participate in health maintenance organizations, preferred provider organizations, health benefit plans, health insurance plans and other third party reimbursement and payment programs (the "Payment Programs"). Except as set forth on Schedule 4.14(l)(i) of the Disclosure Schedules, to the Knowledge of the Sellers, the Sellers have no outstanding overpayments or refunds due to any Payment Programs in excess of five hundred thousand dollars ($500,000) in the aggregate. To the Knowledge of the Sellers, all claims for reimbursement ("Reimbursement Claims") that the Sellers or Facilities have submitted are timely, comply in all respects with all Laws and all Payment Program contracts, provider manuals, policies and reimbursement requirements governing reimbursement and payment of claims and do not contain any material errors, omissions or disallowances. Except as set forth on Schedule 4.14(l)(ii), to the Knowledge of the Sellers, no Seller or Facility has received notice of any disallowance, overpayment, refund or dispute regarding any Reimbursement Claims, and there are no facts or circumstances which may reasonably be expected to give rise to any disallowance, overpayment, refund or dispute, in each case

4.15    Employees.

(a)    Schedule 4.15(a) is a true and complete list of all of Sellers' Employees as of the date set forth therein, including the following information, as applicable:  (i) current position, department and work location; (ii) date of hire; (iii) hourly, weekly, and annualized base rate of pay; (iv) shift differential pay, experience differential pay, and/or certification pay; (v) accrued vacation, holidays, personal leave, and/or sick leave as a result of the individual's employment with the Sellers; (v) health benefits plan (if any), coverage amount, and premium amount; (vi) union status and bargaining representative (the "Employee List").

(b)    Schedule 4.15(b) identifies all individuals who may have reemployment rights required by Applicable Law with respect to such individual as of or following the Closing

Date. Except as described on Schedule 4.15(b), no other individual is anticipated to have reemployment rights after the Closing Date.

(c)     Schedule 4.15(c) identifies all foreign national individuals employed by Sellers who have been hired or who are working subject to a work permit or visa, including (i) the name of the individual, (ii) the position held, (iii) the type of visa or work permit; (iv) the expiration date thereof; (v) the applicable bargaining unit, if any.

(d)     To Sellers' Knowledge, except as set forth on Schedule 4.15(d) of the Disclosure Schedule, no Seller has experienced any strike or grievance, claim of unfair labor practices, or other collective bargaining dispute within the past three years. Within the past three years, no Seller has committed any unfair labor practice, and no Seller has implemented any plant closing or layoff of Employees that could implicate the WARN Act. Sellers have made available to Buyer complete and accurate copies of each employment, consulting, enrollment, appointment, training and similar agreement pertaining to the Business to which Sellers are a party. Except as disclosed on Schedule 4.15(d), Sellers are not a party to or bound by any written agreement or any consent decree, court order or statutory obligation (other than WARN Acts and regulations) pertaining to the Business (i) for the employment, enrollment, appointment or training of any individual, or the provision of services by any individual, who is not terminable by Sellers without penalty prior to the Closing Date, or (ii) relating to the payment of any severance or termination payment, bonus or death benefit to any Employee, former Employee or his or her estate or designated beneficiary. In the event of any agreement for such severance or termination payment or death benefit, Sellers represent that Sellers shall satisfy such obligation as provided by the terms of such agreement.

(e)     Sellers shall be solely responsible for any notices to Employees that may be required under WARN Acts or COBRA as a consequence of the Contemplated Transaction, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

(f)     Schedule 4.15(f) identifies the CBAs applicable to the Employees. The Sellers have delivered to Buyer true, accurate and complete copies of each such CBA. The Sellers have no written obligation to negotiate any other CBA. The Sellers represent and warrant that they have fulfilled any and all obligations they may have under the National Labor Relations Act to negotiate with the labor unions representing their employees concerning Sellers' decision to enter into the Contemplated Transactions or its effects.

(g)     Except as disclosed in Schedule 4.15(g), there is no representation claim or petition pending before the U.S. National Labor Relations Board or any similar state or local labor agency of which any Seller has been notified in writing by any Governmental Authority and, to the Sellers' Knowledge, no question concerning representation has been raised or threatened in writing to any Seller by any Governmental Authority respecting the Employees of such Seller.

(h)     Except as disclosed in Schedule 4.15(h), Sellers are in compliance with all Applicable Laws including Labor and Employment Laws and Requirements, and Sellers have received no written or oral notice within the twelve (12) months immediately preceding the

Effective Date of any complaint or proceeding filed against any Seller that is unresolved claiming that such Seller has violated any Applicable Laws relating to employment, denial of employment, or employment opportunity or termination of employment, or, to the Sellers' Knowledge, against any Seller or any of the Employees of such Seller or threatened to be filed against such Seller before any federal, state or local agency or labor relations board, including the National Labor Relations Board, the Equal Employment Opportunity Commission, the New York State Division of Human Rights or any similar local government agency, the Federal Department of Labor and the New York State Department of Labor that are unresolved. No written notice that remains unresolved has been received by the Sellers of the intent of any federal, state or local agency responsible for the enforcement of Applicable Law related to labor or employment to conduct an investigation of any Seller, and, to the Sellers' Knowledge, no such investigation is in progress.

(i)    Except as a result of the Bankruptcy Case and otherwise set forth in Schedule 4.15(i) of the Disclosure Schedule, there are no outstanding orders or charges against any Seller under any occupational health or safety legislation and, to the Sellers' Knowledge, within the twelve (12) months immediately preceding the Effective Date, no such outstanding orders or charges have been threatened. As of the Effective Date, there are no pending worker compensation claims of which the Sellers have received written notice.

(j)    Except as set forth on Schedule 4.15(j) of the Disclosure Schedule, none of the Sellers, nor any of such Sellers current or former Employees, consultants, officers, directors, distributors, resellers, vendors or customers owns, directly or indirectly, or has any right, title or interest (economic or otherwise), in whole or in part, in any Intellectual Property, Leased Real Property, proprietary asset or other rights claimed or used by such Seller.

4.16    Books and Records.  The books of account and other financial records of each Seller, all of which shall have been made available to Buyer prior to Closing, are accurate and complete in all material respects. Each transaction of each Seller is properly and accurately recorded on the books and records of such Seller except for immaterial omissions or inaccuracies, the effect of which is insubstantial. To the extent permitted by Applicable Law and to the extent that doing so would not reasonably be expected to result in the waiver of privilege, each Seller has made available to Buyer a correct and complete copy of the minutes maintained by such Seller's quality assurance committee since January 1, 2010. All business records of each Seller are in the custody and under the control of such Seller.

4.17    Information Systems.   Schedule 4.17 lists all of the material software and hardware (including computers, servers and peripheral devices and telecommunications devices) owned or leased by the Sellers and used by the Sellers in the Business as now conducted. Except as set forth in the Disclosure Schedule, the Sellers have not used any outside personnel (including consultants or other independent contractors) in connection with the development of any material hardware system, program or software developed by any Seller. To the Knowledge of the Sellers, no software developed by any Seller and used in the Business as now conducted contains any embedded code owned by a third party.

4.18    Foreign Operations.  The Sellers have no operations outside the United States.

36

4.19    Insurance Coverage. The Disclosure Schedule sets forth in Schedule 4.19 a true, correct and complete list of, and the Sellers have furnished to Buyer true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the assets, Liabilities, Business, operations, Employees, officers or directors of the Sellers. The policy limits and deductibles of such policies are not subject to claims by any Affiliates of Sellers or other entities. All premiums currently due and payable under all such policies and bonds have been paid in full. The Disclosure Schedule lists in Schedule 4.19 the professional liability, commercial general liability and fiduciary liability coverage currently under which each Seller is covered.

4.20    Restrictions on Business Activities. There is no agreement, judgment, injunction, order or decree binding upon the Sellers of the Acquired Assets or, to the Sellers' Knowledge, threatened, that has or could reasonably be expected to have the effect of prohibiting or materially impairing the use of the Acquired Assets, the conduct by Buyer of the business of any Seller as currently conducted or any business practice of any Seller, including the Business, the acquisition of property, the provision of services, the hiring of employees, and the solicitation of customers, in each case either individually or in the aggregate.

4.21    Full Disclosure. No representation or warranty made by the Sellers in this Agreement, or the Disclosure Schedule, and no statement, schedule or certificate required to be furnished to Buyer pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading. Each of the separate representations and warranties set forth in Article IV is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein.

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to the Sellers that the statements contained in this Article V are correct and complete as of the Effective Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Effective Date throughout this Article V), except as set forth in the Disclosure Schedule. The Disclosure Schedule will be arranged in sections corresponding to the lettered and numbered paragraphs contained in this Article V.

5.1    Organization of Buyer. Each of Montefiore SS Operations, Inc., Montefiore MV Operations, Inc., and Montefiore HA Operations, Inc. is a not-for-profit corporation, and each of Montefiore SS Holdings, LLC, Montefiore MV Holdings, LLC and Montefiore HA Holdings, LLC is a limited liability company. Each Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification. All such jurisdictions are set forth on Schedule 5.1 of the Disclosure Schedule.

5.2     Authorization of Transaction. Subject to approval by Montefiore Health System, Inc. and Montefiore Medical Center, (a) Buyer has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and to perform its obligations hereunder; (b) the execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer; and (c) this Agreement constitutes, and any and all other Transaction Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions.

5.3     Non-Contravention.

(a)     Subject to DOH Approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Transaction Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)     Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the transactions contemplated by this Agreement (including each Transaction Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to DOH Approval and those required by the Bankruptcy Court.

5.4     Brokers' Fees. Except as set forth in Schedule 5.4 of the Disclosure Schedule, Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

5.5     Litigation. Schedule 5.5 sets forth each instance in which Buyer (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party to any action, suit, proceeding, hearing, or investigation of, in, or before any Governmental Authority of any federal, state, local, or foreign jurisdiction, which, in each case, would have the effect of preventing or delaying the Closing of the transactions contemplated by this Agreement or to have a Material Adverse Effect on the ability of the Buyer to perform its obligations under this Agreement.

5.6     Full Disclosure. No representation or warranty made by Buyer in this Agreement, or the Disclosure Schedule, and no statement, schedule or certificate required to be furnished to the Sellers pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading. Each of the separate representations and warranties set forth in Article V is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein.

FIRM:23260499v7

No oral or other representation not expressly set forth in this Agreement is made by Buyer to the Sellers.

5.7    Owned Real Property Condition. Except for the representations and warranties contained herein, the Owned Real Property is being sold by Sellers and Buyer agrees to accept the Owned Real Property in "as-is" and "where-is" condition on the Closing Date. Buyer acknowledges, represents and warrants that (i) Buyer has had an opportunity to make an independent investigation and examination of the Owned Real Property (and all matters related thereto), and to become fully familiar with the physical and environmental condition of the Owned Real Property, and (ii) Sellers and its employees, residents, interns, fellows, agents, members, directors, and officers have not made and shall not make any verbal or written representations, warranties or statements of any nature or kind whatsoever to Buyer, whether express or implied, with respect to the above, and, in particular, except as expressly set forth herein, no representations or warranties have been made or shall be made with respect to (a) the physical condition or operation of the Owned Real Property; (b) the zoning and other legal requirements applicable to the Owned Real Property, including the Real Property Laws (d) the nature and extent of any matter affecting title to the real estate or to any personalty, or (e) any other matter or thing affecting or relating to the Owned Real Property, or any portion thereof, the interests therein to be conveyed to Buyer pursuant to the terms of the Contemplated Transactions.

5.8    Financial Capability. Buyer has or on the Closing Date will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and Buyer has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities. On the Closing Date, Buyer will be capable of satisfying the conditions contained in Sections 365(b)(1)(c) and 365(f) of the Bankruptcy Code regarding the Assigned Contracts.

5.9    Healthcare Regulatory Compliance Status.

(a)    Except as described on Schedule 5.9, neither Buyer nor any of its Affiliates is involved in any litigation, proceeding, or investigation by or with any Governmental Authority which, if determined or resolved adversely, would have a material adverse impact on the ability of Buyer to obtain or maintain any governmental qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations necessary for Buyer to conduct the Business and to own or use the Acquired Assets, as the Business, as conducted and the Acquired Assets are owned and used on the date hereof, where the failure to have such qualifications, registrations, filings, licenses, permits, orders, approvals or authorizations could reasonably be expected to prevent or materially delay the consummation of the Contemplated Transactions by Buyer or the performance by Buyer of any of its material obligations under this Agreement.

(b)    Neither Buyer nor any of its respective officers, directors, employees, residents, interns, fellows, members or providers has knowingly engaged in any activities that are prohibited under 42 U.S. Code Section 1320a-7a and 7b, or the regulations promulgated pursuant to such statutes, or similar or related state or local statutes or regulations or (y) by rules of professional conduct or which otherwise constitute fraud, including the following: (i) making or causing to be made a false statement or misrepresentation of a material fact in any application for

any benefit or payment; (ii) making or causing to be made any false statement or misrepresentation of a material fact for use in determining rights to any benefit or payment; (iii) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment on its behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; and (iv) soliciting, paying or receiving any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by the healthcare programs or any private payor source or (B) in return for purchasing, leasing, or ordering or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part by the healthcare programs or any private payor source that would have a Material Adverse Effect on the ability of Buyer to consummate the Contemplated Transactions. Neither Buyer nor any of its respective members, directors, officers or managers has (i) been indicted or convicted of a crime, (ii) been suspended or excluded from the healthcare programs, (iii) had a professional license suspended or revoked, or (iv) had a Certificate of Need application denied or deferred based on failure to pass a character and competency review by DOH or comparable Governmental Authority of another state, that would have a Material Adverse Effect on the ability of Buyer to consummate the Contemplated Transactions. To the Knowledge of Buyer, there is no reason why Buyer's officers and directors should fail to obtain character and competency approval by DOH in connection with DOH's review of the CON Application.

5.10    Acknowledgement Regarding Condition of the Business.

(a)    Buyer acknowledges and agrees that, except for the representations and warranties contained herein, the Acquired Assets and the Business are being transferred to Buyer on a "where is" and, as to condition, "as is" basis. Without in any way limiting the foregoing, **SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS.** Any claims Buyer may have for breach of representation or warranty shall be based solely on the representations and warranties of Sellers set forth in Article IV hereof (as modified by the Schedules hereto as supplemented or amended). Buyer further represents that neither the Sellers nor any of their respective Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Sellers, the Business or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and the Sellers, their Affiliates or any other Person will not have or be subject to any liability to Buyer or any other Person resulting from the distribution to Buyer or its Representatives or the use by Buyer or its Affiliates of, any such information, including any confidential memoranda distributed on behalf of the Sellers relating to the Business or other publications or data room information provided to Buyer or its Representatives, or any other document or information in any form provided to Buyer or its Representatives in connection with the sale of the Business and the Contemplated Transactions. Buyer acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated by this Agreement, Buyer has, or will have, relied on the results of its own independent investigation.

FIRM:23260499v7

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE OWNED REAL PROPERTY IS BEING SOLD BY SELLERS AND BUYER AGREES TO ACCEPT THE OWNED REAL PROPERTY IN "AS-IS" AND "WHERE-IS" CONDITION ON THE CLOSING DATE. BUYER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) BUYER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION PHYSICAL CONDITION OF THE OWNED REAL PROPERTY, ALL PROPERTIES THAT ARE THE SUBJECT OF A REAL PROPERTY LEASE, AND ANY PERSONAL PROPERTY COMPRISING PART OF THE ACQUIRED ASSETS (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE OWNED REAL PROPERTY AND ALL PROPERTIES THAT ARE THE SUBJECT OF A REAL PROPERTY LEASE, AND (II) SELLERS AND THEIR EMPLOYEES, RESIDENTS, INTERNS, FELLOWS, AGENTS, MEMBERS, DIRECTORS, AND OFFICERS HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO BUYER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE OWNED REAL PROPERTY OR ANY PROPERTIES THAT ARE THE SUBJECT OF A REAL PROPERTY LEASE, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS- CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE OWNED REAL PROPERTY OR PROPERTIES THAT ARE THE SUBJECT OF A REAL PROPERTY LEASE, (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE OWNED REAL PROPERTY OR ANY PROPERTIES THAT ARE THE SUBJECT OF A REAL PROPERTY LEASE INCLUDING BUT NOT LIMITED TO ZONING OR THE COMPLIANCE OF THE OWNED REAL PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE OWNED REAL PROPERTY OR ANY PROPERTIES THAT ARE THE SUBJECT OF A PURCHASED REAL PROPERTY LEASE, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO BUYER PURSUANT TO THE TERMS OF THE CONTEMPLATED TRANSACTIONS.

(b)    Except as set forth in this Agreement, the Sellers hereby specifically disclaim any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in Section 5.10(a) above and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Owned Real Property. Buyer declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Buyer hereunder and, as an inducement for Sellers to proceed with this transaction, Buyer

further declares and acknowledges that this disclaimer has been brought to the attention of Buyer and explained in detail and that Buyer has voluntarily and knowingly consented thereto.

5.11    Buyer's Consents and Approvals.    Schedule 5.11 of the Disclosure Schedule lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by the Buyer to consummate the Contemplated Transactions (including each Transaction Document required to be delivered by the Buyer at Closing) (collectively, "Buyer's Consents and Approvals"), other than (a) DOH Approval, (b) entry of the Sale Order, and (c) Supreme Court Approval and approval under Antitrust Laws, if applicable).

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1    Approval of Break-Up Fee and Expense Reimbursement.

(a)    Subject to the approval of the Bankruptcy Court, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, the Bidding Procedures Order shall provide that if Buyer's bid embodied in this Agreement is exceeded by a Competing Bid or Sellers enter into an Alternate Transaction, the Bankruptcy Court enters an order approving a Competing Bid or Alternate Transaction and the Competing Bid or Alternate Transaction is consummated, Sellers shall, or shall cause the competing bidder or purchaser in an Alternate Transaction to, pay to Buyer the Break-Up Fee and Expense Reimbursement, upon the consummation of the Alternate Transaction.    In addition, the competing bidder or purchaser shall assume all of Buyer's obligations under the Guaranty, and Buyer shall be made whole in connection therewith, no later than the closing of an Alternate Transaction.  The Sellers acknowledge and agree that (a) the approval of the Break-Up Fee and Expense Reimbursement is an integral part of the transactions contemplated by this Agreement, (b) Buyer would not have entered into this Agreement absent a Break-Up Fee and Expense Reimbursement, (c) the entry of Buyer into this Agreement is necessary for preservation of the estate of the Sellers and is beneficial to the Sellers, (d) the Break-Up Fee and Expense Reimbursement are reasonable in relation to Buyer's efforts and to the magnitude of the Contemplated Transactions, and (e) time is of the essence with respect to entry of the Bidding Procedures Order.

(b)    The provisions of this Agreement regarding the payment of the Break-Up Fee and Expense Reimbursement shall be subject to the approval of the Bankruptcy Court as part of the Bidding Procedures Order.  Notwithstanding the foregoing, and any other provision of this Agreement to the contrary, Buyer shall not be entitled to be paid a Break-Up Fee and Expense Reimbursement if this Agreement is terminated pursuant to Sections 12.1(a)(i), 12.1(a)(ii), 12.1(a)(iii), 12.1(a)(v), 12.1(b)(i) or (iii), 12.1(c), or 12.1(d)(i), (iii), (iv) or (v) of this Agreement.

6.2    Competing Transaction.

42

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Sellers of higher or better competing bids (each, a "Competing Bid").

(b)    Notwithstanding execution of this Agreement, the Sellers are permitted to cause their Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any part of the Acquired Assets, alone or in connection with the sale or other disposition of any other asset of the Sellers. In addition, the Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Acquired Assets and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of the Sellers to prospective purchasers. Prior to the Sellers furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, the Sellers must enter into a customary confidentiality agreement with such Person on terms no less favorable to the Sellers than those contained in Section 8.3

(c)    If a Competing Bid is selected at Auction but such bidder does not consummate the purchase of the Acquired Assets and the Buyer is the second highest bidder, Buyer shall have the option to close the transactions contemplated by this Agreement in accordance with the terms of this Agreement; provided that in such event, the Buyer informs the Sellers in writing of its decision whether to proceed with the Contemplated Transactions within ten (10) Business Days of receipt of written notice from the Sellers that the selected bidder submitting the Competing Bid failed to consummate the purchase of the Acquired Assets. If Buyer successfully appeals any such Order approving a Competing Bid, Buyer agrees it will either waive any entitlement it may have to the Break-Up Fee and Expense Reimbursement hereunder, or agree to reinstate this Agreement and consummate the transactions contemplated herein in accordance with the terms set forth in this Agreement (as the same may hereafter be modified or amended pursuant to the provisions of this Agreement or by Buyer at the Auction).

(d)    The Break-Up Fee and Expense Reimbursement shall be paid to Buyer, without further order of the Bankruptcy Court, solely upon the consummation of an Alternative Transaction from the proceeds of such Alternative Transaction paid at the Closing thereof.

(e)    If the Break-Up Fee and Expense Reimbursement payable under this Section 6.2 shall not be approved by the Bankruptcy Court, Buyer shall have the right, but not the obligation, to terminate this Agreement within five (5) Business Days of entry of the Bidding Procedures Order by delivery of written notice to Seller, and receive the prompt return of the Deposit, together with all accrued interest thereon, and upon the payment thereof to Buyer, neither party shall have any further obligations to the other. If Buyer does not timely terminate this Agreement in accordance with the foregoing, Buyer's termination right under this Section 6.2(e) shall be null and void and of no further force and effect.

6.3    Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, but in no event later than five (5) Business Days after the later of the Effective Date and the Petition Date, the Sellers shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, and the entry by the Bankruptcy Court of the Bidding Procedures

43

Order approving the payment of the Break-Up Fee and Expense Reimbursement. Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each Party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, the Sellers shall promptly notify Buyer of such appeal or stay request and provide to Buyer a copy of the relevant notice of appeal or order of stay. The Sellers shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

6.4    Notice of Sale. Notice of the sale of Acquired Assets contemplated in this Agreement shall be in a form and manner reasonably acceptable to Buyer and be served in accordance with Applicable Law (including, to the extent applicable, Bankruptcy Rules 2002 and 6004 and any local rules or orders of the Bankruptcy Court) on all Persons required to receive notice by this Agreement, the Bankruptcy Court and Applicable Law.

6.5    Treatment of Monetary Obligations. The Break-Up Fee and Expense Reimbursement payable to Buyer under this Agreement, shall be entitled to administrative expense priority in the Sellers' Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.

ARTICLE VII
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Effective Date and the Closing:

7.1    General. Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in Article IX) and to ensure that Buyer is relieved of all Excluded Liabilities including Successor Liabilities.

7.2    Regulatory Approvals.

(a)    Buyer shall, at its own cost and expense, (i) promptly following the Effective Date, but no later than fourteen (14) days following the Effective Date, provide to the Sellers a draft of the CON Application (which draft CON Application and the contents thereof shall be kept strictly confidential by the Sellers, not disclosed to any third party without the written consent of Buyer, and only disclosed to Representatives who need to see the draft CON Application for the purpose of effectuating the Contemplated Transactions and who agree to keep it confidential) and shall consult with the Sellers regarding such application; (ii) shall,

44

following the Effective Date of this Agreement, cooperate with the Sellers in initiating informal discussions with DOH concerning the form and substance of the CON Application; (iii) shall within ten (10) Business Days after the entry of the Bid Procedures Order by the Bankruptcy Court, formally submit the CON Application to DOH, unless DOH requires Buyer to obtain establishment approval by the New York State Public Health and Health Planning Council, in which case Buyer shall formally submit the CON Application to DOH as soon as it is permitted to do so, and (iv) shall promptly after the entry of the Bid Procedures Order by the Bankruptcy Court, submit to DOH, and any other Governmental Authority all other applications for any Healthcare Regulatory Consents required in order for Buyer to consummate the Contemplated Transactions and to operate the Business in accordance with Law.  Buyer shall provide the Sellers with an opportunity to review the CON Application in advance of filing, and both parties shall cooperate in the preparation and prosecution of the CON Application.  Buyer shall diligently prosecute the CON Applications and shall timely submit all information and documents requested in connection therewith by DOH and any other Government Body. Without limiting the generality of the foregoing, Buyer shall take such actions as may be reasonably necessary to cure any character or competency objection that DOH may raise to the CON Application, including removing or replacing any officer or director that fails to obtain character and competency approval from DOH.  Buyer shall provide the Sellers with prompt written notice of Buyer's submission of a CON Application.  Within five (5) Business Days of its submission or receipt, Buyer shall deliver to the Sellers a complete copy of all correspondence to or from DOH or any other applicable Governmental Authority having jurisdiction concerning a CON Application.  Buyer shall provide the Sellers with periodic reports of Buyer's efforts to obtain all Healthcare Regulatory Consents.  In addition, Buyer shall provide the Sellers with notice as promptly as practicable of its receipt of DOH's approval, contingent approval or a rejection of the CON Application, along with a copy of any documentation related thereto. Buyer shall not knowingly take any action prior to the Closing intended to disqualify Buyer as an established and licensed operator of the Business.

(b)    If necessary, each of Buyer and the Sellers shall use its reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under Antitrust Laws with respect to the Contemplated Transactions (including such submission to the Antitrust Bureau of the Office of the Attorney General of the State of New York (the "Antitrust Bureau") as may be required in connection with the CON Application under the Donnelly Act (New York General Business Law Sections 340 through 347)) as promptly as practicable and, in any event, within five (5) Business Days of the Effective Date in connection with all submissions to the Antitrust Bureau in connection with the CON Application and within five (5) Business Days of the Effective Date in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under Antitrust Laws for information, documents, or other materials received by each of them or any of their respective Affiliates from the FTC, the Antitrust Division of the United States Department of Justice (the "Antitrust Division"), the Antitrust Bureau or any other Governmental Authority in respect of such filings or the transactions contemplated by this Agreement, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any

45

of the FTC, the Antitrust Division, the Antitrust Bureau or any other Governmental Authority under any Antitrust Laws with respect to any such filing or any such transaction.

(c)    As necessary, Sellers and Buyer will promptly confer with the appropriate federal, state and local regulators to obtain their support for the approval of the Contemplated Transactions, including, but not limited to: (i) DOH; (ii) the Office of the New York State Attorney General, Charities Bureau and Anti-Trust Bureau; (iii) FTC or Antitrust Division (whichever is applicable); (iv) and The Joint Commission.

(d)    If necessary, each of Buyer and the Sellers shall use their reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any applicable Law, other than those referred to in Sections 7.2(a) or 7.2(b), including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedules 4.11 or 5.11, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Authority in respect of such filings or the transactions contemplated by this Agreement, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Authority under such Laws with respect to any such filing or any such transaction.

(e)    Each of Buyer and the Sellers shall use their reasonable best efforts to furnish to each other through counsel all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transactions contemplated by this Agreement.  To the extent allowed by Applicable Law, each such party shall promptly inform the other parties through counsel of any material oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction.  No such party shall independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other parties prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate.

(f)    Subject to applicable law, Buyer and the Sellers will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under Antitrust Laws. Each such party may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 7.2 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials.

(g)    Each of Buyer and the Sellers shall use their reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Authority with respect

46

to the transactions contemplated by this Agreement under the Sherman Act, as amended, the Clayton Act, as amended, the FTC Act, as amended, the Donnelly Act, as amended, the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws").  In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement as being in violation of any Antitrust Law, each of the parties hereto shall cooperate and use its reasonable best efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Buyer and the Sellers decide that litigation is not in their respective reasonable best interests.  Each such party shall use its reasonable best efforts to take such action as may be required to cause the expiration of the notice periods under Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement.  In connection with and without limiting the foregoing, each of Buyer and the Seller agrees to use its reasonable best efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable Buyer and the Sellers to close the Contemplated Transactions as expeditiously as possible.  Notwithstanding anything to the contrary provided herein, Buyer and its Affiliates shall not be required to accept or comply with any conditions, qualifications or other restrictions imposed in connection with obtaining any required approval under any Antitrust Laws other than conditions, qualifications and restrictions that would not constitute a Material Adverse Effect or have a material adverse effect on Buyer and its Affiliates, taken as a whole.  Under no circumstances will Buyer be required under Antitrust Laws to hold separate or divest any of its or their businesses or assets.

7.3    Operation of Business.  The Sellers will operate the Business in the Ordinary Course of Business in accordance with any budget prepared in connection with the Sellers' debtor-in-possession financing (the "DIP Budget"), which DIP Budget shall have been approved by Buyer in its discretion.  The Sellers will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business (except for transactions specified in this Agreement) and will use best efforts to preserve its goodwill, to keep intact its business organization and relationships with Governmental Authorities, suppliers, customers and other third parties, and to keep available the services of its present officers and Employees.  The Sellers will use their best efforts to maintain their tax-exempt status.  Without limiting the generality of the foregoing, no Seller will without Buyer's prior written consent which shall not be unreasonably withheld or delayed:

(a)    enter into or amend any Material Contract;

(b)    terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract or as may be necessary to maintain appropriate levels of patient care and quality;

47

(c)     fail to perform when due all material obligations under the Assigned Contracts except to the extent such performance is excused under the Bankruptcy Code or by the Bankruptcy Court;

(d)     hire any clinical employee except to maintain necessary levels of patient care and quality;

(e)     hire any non-clinical employee except to replace departed Employees;

(f)     add or close any line of clinical services unless approved in advance in writing by Buyer, which approval shall not be unreasonably withheld, or file a certificate of need application or plan of closure for such purpose;

(g)     Intentionally Omitted;

(h)     change the compensation of any Employee except as may be required by CBAs or other contracts;

(i)     change any welfare plans or Current Seller Plans except (with prior notice to Buyer) to the extent required by law;

(j)     fail to give prompt notice to Buyer of the commencement of or any Material Development in any Material Litigation or Proceeding;

(k)     fail to give prompt notice to Buyer of any Material Adverse Change;

(l)     sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business and replaced if necessary with adequate replacement equipment);

(m)     adopt or propose any change to its governing documents or admit any new corporate member;

(n)     merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

(o)     change any of its accounting methods;

(p)     except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to the Buyer and excluding any accounts payable arising in the Ordinary Course of Business of a Seller;

(q)     enter into any operating lease;

(r)     terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Sellers;

FIRM:23260499v7

(s)    terminate or fail to exercise any right of renewal under any Real Property Lease or any Assigned Contract except as such expires by its terms or by termination by the counterparty;

(t)    terminate or waive any right of substantial value, including any rights with respect to the Real Property Leases except as such expires by its terms or by termination by the counterparty;

(u)    fail to promptly disclose to Buyer the grant of any severance, retention or termination pay to any director, officer or other Employee of any Seller;

(v)    except with respect to any claims made by any Party to this Agreement (or any other Transaction Document) against any other Party thereto, commence a lawsuit with respect to any Acquired Asset other than (A) for the routine collection of bills, or (B) in such cases where it in good faith determines that failure to commence suit would result in the material impairment of a valuable aspect of its business, provided that it consults with the Buyer prior to the filing of such a suit;

(w)    fail to give any notices or other information required to be given to the Employees of any Seller, any labor union representing any collective bargaining unit of Employees of any Seller, and any applicable government authority under the National Labor Relations Act, the Code, COBRA, WARN Acts, and other applicable law in connection with the transactions provided for in this Agreement;

(x)    remove from any Seller's premises or modify (other than in the ordinary course of business) any books or records of such Seller;

(y)    fail to keep in full force and effect its Licenses;

(z)    utilize, invade or otherwise divest themselves of the Restricted Assets or any rights thereto unless Attorney General or Supreme Court of the State of New York reject the transfer to Buyer or donor expressly chooses to transfer Restricted Assets to party other than Buyer; or

(aa)    agree or commit to do any of the foregoing.

7.4    Access.    The Sellers will permit Representatives of Buyer (including its accountants) to have access at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Sellers, to the premises, properties, personnel, books, records (including Tax records and unredacted copies of the minutes of the Board of Directors and quality management committee, if any, of any Seller, provided that those portions of any records or discussions pertaining to the entry into or consummation of the transactions contemplated by this Agreement may be withheld and/or redacted), contracts, and documents of or pertaining to the Sellers.

7.5    Notice of Developments.

(a)    Each Seller shall promptly notify Buyer of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(ii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(iii)    its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Transaction Document.

(b)    The Sellers shall promptly notify Buyer of any event or occurrence not in the Ordinary Course of Business and any written notice of any termination, default or event that, with notice or lapse of time or both, would become a default, received by any Seller subsequent to the Effective Date, under any Real Property Lease, any Affiliate Agreement, or any other Material Contract.

(c)    No notification under this Section 7.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6    <u>Employment and Physician Contracting Matters</u>.    From and after the Effective Date, Buyer shall have the right to contact the Employees of the Sellers, the Physicians who are parties to the Physician Contracts with any Seller and any labor union with which any Seller has a CBA to discuss the terms on which, subject to the occurrence of the Closing, (i) Buyer may offer employment-at-will to such Employees at the time of the Closing, (ii) Buyer may offer to enter into contracts with the Physicians at the time of the Closing and (iii) Buyer may offer to enter into a CBA with such labor unions.    Nothing in this Agreement shall obligate Buyer to offer (x) employment to any Employee of any Seller, (y) to enter into any contract with a Physician or (z) to enter into any CBA with any labor union.

7.7    <u>Management Agreement</u>.    Upon request by DOH, Buyer and Seller may, but shall not be required to, enter into a management agreement between Buyer and the Sellers on terms mutually agreeable by the Parties.

7.8    <u>Temporary Operator</u>.    If so requested by DOH, the Sellers shall cooperate with the appointment of a temporary operator by DOH for one or more of the Sellers pursuant to Public Health Law Section 2806-a, and the Sellers shall not object to such appointment, and shall waive any and all requirements as to reviewing and contesting any findings, the development and implementation of a plan of correction, and the opportunity for a hearing as to the appointment of such temporary operator.

7.9    Buyer shall cause Fidelity National Title Insurance Company through Ken Cohen and Neil Clark (the "<u>Title Company</u>") to make periodic updates and continuation searches of title

prior to the Closing (the "Title Report"). Prior to the Closing, Buyer shall notify Seller, in writing ("Buyer's Objection Notice"), of any other objections to title reflected in the Title Report and any other objections not reflected in the Title Report promptly after Buyer becomes aware of such objections (collectively and individually, a "Title Defect"). The Parties acknowledge that Seller shall rely on the Sale Order to remove Title Defects from the Title Report and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's delivery of title in the condition required in accordance with this Agreement. In the event Seller elects to attempt to cure or remove any Title Defect and is unable to do so on or before the Closing Date, Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of up to thirty (30) days. In the event Seller elects not to cure or remove a Title Defect or shall, for any reason, be unable to cure or remove any Title Defect within the time periods set forth in the preceding sentence, Seller shall have the right to terminate this Agreement; provided, however, if Seller elects to terminate this Agreement, Buyer shall have the right to void such termination and accept such title to the Owned Real Property as Seller shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller. Without limiting the generality of the foregoing, it is specifically agreed that the Seller shall not be required to bring any action, proceeding or incur any expense to obtain such title as it has agreed to convey hereunder. In the event that the Title Report shall disclose a Permitted Encumbrance which shall constitute an item pursuant to Schedule 4.8(b-1)(xii) and shall not be an item which is removed by virtue of the Sale Order, Seller agrees that it shall use commercially reasonable efforts after the Closing Date to remove such items from the applicable recording office's records, provided, however, that same shall not require Seller to expend greater than $2,000 (including, but not limited to legal or other out of pocket expenses).

### ARTICLE VIII
### POST-CLOSING COVENANTS.

The Parties agree as follows with respect to the period following the Closing:

8.1    General. After the Closing, each of the Parties will take such further action as is necessary on its part to carry out the purposes of this Agreement (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expenses). Without limiting the foregoing, each of the Parties will cooperate in providing access to all books, records, ledgers, files, documents, correspondence, lists and other documents and information related to the matters covered by this Agreement as any other Party may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expense).

8.2    Cooperation Regarding Restricted Assets and Foundation.

(a)    The Sellers shall use their best efforts and take all reasonable actions required to facilitate the transfer of the Restricted Assets to the Buyer, including, but not limited to, filing an application with the New York State Supreme Court for an order approving the modification of any restrictions relating to the Restricted Assets which the Buyer shall determine to be necessary to permit the Restricted Assets to be transferred to, and maintained, administered

51

and used by, the Buyer to support the Buyer's mission(s), operations, programs, services and/or facilities consistent with the applicable restrictions on the Restricted Assets. Nothing herein shall require such transfer of the Restricted Assets to the Buyer if, despite Sellers' best efforts, the transfer is not approved by the New York State Supreme Court or the Attorney General or the donor decides to transfer the Restricted Assets to party other than Buyer. Sellers' inability to transfer the Restricted Assets to Buyer as provided in this Section 8.2 shall not constitute grounds for the Buyer to terminate this Agreement.

(b)    The Sellers shall use their best efforts and take all reasonable actions required to cause, as of the Closing: (i) Montefiore SS Operations, Inc., or its designee, to become the sole member of the Foundation, and (ii) the purposes of the Foundation to be amended to provide for the assets of the Foundation to be used exclusively to support the mission and purposes of Montefiore SS Operations, Inc. and Montefiore SS Holdings, LLC, including, but not limited to, filing an application with the New York State Supreme Court for an order approving the modification of the Foundation's purposes as set forth in the Foundation's Certificate of Incorporation and the modification of any donor-designated or other restrictions on the Foundation's assets which the Buyer shall determine to be necessary to permit the Foundation to use its current and future assets to support Montefiore SS Operations, Inc.'s and Montefiore SS Holdings, LLC's missions, operations, programs, services and/or facilities. Nothing herein shall require the foregoing actions relating to the Foundation specified in clause (ii) of the preceding sentence if, despite Sellers' best efforts, the required approvals are not granted by the New York State Supreme Court or the Attorney General. Sellers' inability to consummate the actions specified in clause (ii) of the first sentence of this paragraph (b) shall not constitute grounds for the Buyer to terminate this Agreement.

8.3    Access to Records.    After the Closing Date, each Seller shall retain for a period consistent with such Seller's record-retention policies and practices and Applicable Law its books and records related to the Business that do not constitute part of the Acquired Assets

8.4    Non-Disclosure.

(a)    Except as may be necessary to enforce this Agreement or any other Transaction Document, Buyer shall treat and hold as confidential any Confidential Information of the Sellers pertaining to the Excluded Assets or the Excluded Liabilities (collectively, the "Seller Confidential Information"), refrain from using any of the Seller Confidential Information, except in connection with this Agreement and deliver promptly to the Sellers, upon the written request of the Sellers, all tangible embodiments (and all copies) of the Seller Confidential Information that are in its possession or under its control. The term "Seller Confidential Information" shall not include information that is or becomes generally available to the public by actions of Persons other than the Buyer or that pertains to either of the Acquired Assets or the Assumed Liabilities. If the Buyer is required to disclose any Seller Confidential Information in order to avoid violating any Applicable Law, the Buyer will use commercially reasonable efforts to provide the Sellers with prompt notice of such requirement. To the extent legally permissible and at the Sellers' sole expense, the Buyer shall provide the Sellers, in advance of any such disclosure, with copies of any Seller Confidential Information that the Buyer intends to disclose (and, if applicable, the text of the disclosure language itself) and shall reasonably cooperate with

52

the Sellers, at the Sellers' sole expense, if permitted by Applicable Law, to the extent the Sellers may reasonably seek to limit such disclosure in a manner consistent with Applicable Law.

8.5    Further Assurances. Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummation of the Contemplated Transactions (including each Transaction Document required to be delivered by the Sellers at Closing) and to facilitate Buyer's operation of the Business after the Closing Date.

8.6    Cost Reports. The Sellers shall prepare and file with its fiscal intermediary the final Medicare cost reports covering its operation of the Business through the Closing Date as soon as reasonably practicable after the Closing Date, but in no event later than the date on which such final cost report is required to be filed by Applicable Law under the terms of the Medicare program, and will provide the fiscal intermediary or CMS with any information needed to support claims for reimbursement made by the Sellers either in such final cost report or in any cost reports filed for prior cost reporting periods, it being specifically understood and agreed that the intent and purpose of this provision is to ensure that the reimbursement paid to the Buyer after it becomes the operator of the Business is not reduced or offset in any manner as a result of the Sellers' failure to timely file, or filing an inaccurate or incomplete, final cost report or supporting documentation with respect to any past reimbursement claims, including, but not limited to, those included in the final cost report. Simultaneously with such filing, the Sellers shall provide the Buyer with a copy of the final Medicare cost reports and such supporting documentation reasonably requested by the Buyer in writing.

ARTICLE IX
EMPLOYEES

9.1    Buyer Not Assuming Seller's CBAs. Buyer is not assuming any of Sellers' CBAs or Employee Benefit Plans. Seller represents that prior to Closing it will take all necessary steps to terminate any and all of its Employee Benefits Plans (other than Multi-Employer Plans), as defined above, effective as of the Closing Date.

9.2    Offers of Employment Made to Sellers' Employees.    Buyer shall offer employment on a probationary basis to certain Employees of Sellers who (a) at the time of Closing were employed by Sellers; (b) in Buyer's sole discretion, meet Buyer's job qualifications as of the Closing and complete Buyer's application process, which includes background checks and pre-employment drug testing; and (c) agree to resign from employment with Sellers ("Eligible Employees"). Buyer shall be the sole judge of the qualifications of Seller's Employees. Employment shall be offered to such Eligible Employees on such new terms and conditions of employment as may be established by Buyer in its sole discretion, and not on the terms of Sellers' CBAs with any of the unions representing Sellers' Employees. Offers made to Eligible Employees shall be for employment commencing immediately following the Closing and any offers made prior to the Closing shall be subject to the Closing. Buyer may impose a reasonable time period within which Eligible Employees must respond to an offer of employment. Such Eligible Employees shall serve a probationary period as established by Buyer.

FIRM:23260499v7

9.3    Except as to specific liabilities which Buyer expressly assumed in writing, if any, Buyer shall have no liability, as successor or otherwise, for any breach by Sellers of any of their CBAs nor for any arrears by Sellers in payments to Employees or contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, or for any liability or claim arising out of or relating to the termination of Sellers' obligations under any CBA or any trust agreement, including termination of Sellers' obligations to contribute to any Multiemployer Plan.    Sellers shall remain liable for all of their pre-petition and post-petition arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

ARTICLE X
CONDITIONS TO OBLIGATION TO CLOSE

10.1    Conditions to Buyer's Obligation.    Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in Article IV shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date.

(b)    The Sellers shall have performed and complied with all of their covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case the Sellers shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)    No breach or default on the part of any Seller shall have occurred under any covenant or agreement hereunder or any Transaction Document or any other agreement of the Parties;

(d)    No Material Adverse Change shall have occurred with respect to any Seller;

(e)    Each Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified in Section 10.1(a), Section 10.1(b), Section 10.1(c) and Section 10.1(d) is satisfied in all respects;

(f)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued which would have the effect of (i) making the transactions contemplated by this Agreement illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of such transactions;

54

(g)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(h)    The Sellers and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.13, Section 5.3 and Section 7.2, as applicable, all of which shall be in form and substance reasonably satisfactory to Buyer;

(i)    Buyer shall have received (i) a secretary's certificate of each Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of such Seller's Board of Directors approving the transactions contemplated by this Agreement and such other customary items as Buyer may reasonably request) and (ii) a certificate of good standing of the state of New York with respect to each Seller (dated within 10 Business Days prior to the Closing Date) all of which shall be in form and substance reasonably satisfactory to Buyer;

(j)    The Sellers shall have executed the Transaction Documents to which it is a party;

(k)    No Debarment or Suspension shall have occurred with respect to any Seller, and no proceeding shall be pending or threatened seeking a Debarment or Suspension with respect to any Seller;

(l)    The Sellers shall have received all other Sellers' Consents and Approvals;

(m)    DASNY, PBGC, the Union Funds, the Multiemployer Plans to which Seller is required to contribute pursuant to CBAs, and the Internal Revenue Service shall not have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any of DASNY, PBGC, the Union Funds and/or the Internal Revenue Service shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(n)    The Bankruptcy Court shall have entered the Bidding Procedures Order no later than thirty-five (35) days after the Petition Date;

(o)    The Bankruptcy Court shall have entered the Sale Order no later than one hundred (100) days after the Petition Date and the Sale Order shall have become a Final Order;

(p)    All actions to be taken by the Sellers in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transactions shall be reasonably satisfactory in form and substance to Buyer;

(q)    Buyer shall have received reasonably acceptable assurances, in Buyer's sole discretion, from counsel and/or appropriate regulatory agencies that Buyer shall have no successor liability resulting from the Contemplated Transaction;

FIRM:23260499v7

(r)    The Boards of Trustees of Montefiore Health System, Inc. and Montefiore Medical Center shall have approved the Contemplated Transactions no later than the date of the hearing on the Sale Motion with respect to the Sellers' request for entry of the Bidding Procedures Order;

(s)    Buyer, Montefiore Health System, Inc. and Montefiore Medical Center shall have received all necessary consents and approvals for the Contemplated Transactions from their lenders and mortgage insurers, including without limitation, the Federal Housing Administration, acting through the United States Department of Housing and Urban Development;

(t)    Buyer shall have received audited financial statements for SSMC, MVH and SECC for the years ending December 31, 2011 and December 31, 2012;

(u)    Buyer shall have received Form 990s, as filed with the Internal Revenue Service for SSMC, MVH and SECC for the years ending December 31, 2011 and December 31, 2012;

(v)    Buyer shall have confirmed to its reasonable satisfaction the accuracy of the Sellers' financial and operational reports, including without limitation (i) the audited financial statements for each of the Sellers for the years ending December 31, 2011 and December 31, 2012, and (ii) the Form 990s, as filed with the Internal Revenue Service for each of the Sellers for the years ending December 31, 2011 and December 31, 2012 and confirmed that no Seller has experienced a Material Adverse Change subsequent to January 1, 2011; and

(w)    The Bankruptcy Court shall have approved and authorized the Sellers' assumption and assignment of the Assigned Contracts to the Buyer, and the Cure Amounts for such Assigned Contracts shall not exceed three million dollars ($3,000,000) in the aggregate.

Buyer may waive in its sole and absolute discretion any condition specified in this Section 10.1 if it executes a writing so stating at or prior to the Closing. The Sellers will remain liable for damages proximately caused by any Seller's breach of this Agreement which prevents the consummation of the transaction contemplated by this Agreement.

10.2    <u>Conditions to the Sellers' Obligations</u>.  The Sellers' obligations to consummate the transactions to be performed by the Sellers in connection with the Closing is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in Article V shall be true and correct in all material respects at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the Closing Date;

(b)    Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material

FIRM:23260499v7

Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)    No breach or default on the part of Buyer shall have occurred under any covenant or agreement hereunder or any Transaction Document or any other agreement of the Parties;

(d)    Buyer shall have delivered to the Sellers a certificate to the effect that each of the conditions specified in Section 10.2(a), Section 10.2(b) and Section 10.2(c) is satisfied in all respects;

(e)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued which would have the effect of (i) making the transactions contemplated by this Agreement illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of such transactions;

(f)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(g)    The Sellers and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.13, Section 5.3 and Section 7.2, as applicable;

(h)    The Sellers shall have received (i) a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board of Directors approving the transactions contemplated by this Agreement and such other customary items as the Sellers may reasonably request) and (ii) a certificate of good standing of the State of New York with respect to Buyer (dated within 10 Business Days prior to the Closing Date), all of which shall be in form and substance reasonably satisfactory to the Sellers;

(i)    Buyer shall have executed the Transaction Documents to which it is a party;

(j)    DASNY, PBGC, the Union Funds, the Multiemployer Plans to which Seller is required to contribute pursuant to CBAs, and the Internal Revenue Service shall have received timely notification of the Petition, shall not have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if DASNY, PBGC, the Internal Revenue Service or any Union Fund shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(k)    The Bankruptcy Court shall have entered the Bidding Procedures Order;

(l)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order;

(m)    All actions to be taken by Buyer in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transactions shall be reasonably satisfactory in form and substance to the Sellers; and

(n)    The Buyer shall have received all other Buyer's Consents and Approvals.

(o)    Buyer shall have paid, or shall pay simultaneously with the Closing, any and all Cure Amounts with respect to the Assigned Contracts.

The Sellers may waive any condition specified in this Section 10.2 if it executes a writing so stating at or prior to the Closing (and for such purpose each Seller hereby irrevocably appoints SSHS as the agent of such Seller to grant all waivers and consents hereunder on behalf of all Sellers). Buyer will remain liable for damages proximately caused by Buyer's breach of this Agreement which prevents the consummation of the transaction contemplated by this Agreement.

## ARTICLE XI
### REMEDIES FOR BREACHES OF THIS AGREEMENT

11.1    <u>Survival of Representations and Warranties</u>.   In the absence of fraud, provided that the Closing shall occur, each of the representations and warranties of the Sellers and Buyer in the following Sections of this Agreement shall terminate and expire at Closing: 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.11, 4.12, 4.17, 4.18, 4.19, 4.20, 4.21, 5.1, 5.2, 5.3 and 5.4 ("<u>Excepted Warranties</u>").  The representations and warranties of the Sellers in Sections 4.10, 4.13, 4.14, 4.15, 4.16 and the representations and warranties of Buyer in Sections 5.5, 5.6, 5.7, 5.8, 5.9, 5.10 and 5.11 (collectively, the "<u>Surviving Representations and Warranties</u>") shall survive the Closing and continue in full force and effect for a period of six (6) months thereafter.  Notwithstanding the preceding sentence, any representation or warranty in respect of which indemnity may be sought under this Agreement shall survive the time at which it would otherwise terminate pursuant to the preceding sentence, if notice of the inaccuracy of such representation or warranty giving rise to such right of indemnity shall have been given to the Party against whom such indemnity may be sought prior to such time.

## ARTICLE XII
### DISPUTE RESOLUTION

The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

## ARTICLE XIII
### TERMINATION

13.1    <u>Termination of Agreement</u>.   In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)    <u>Termination Due to Events in Bankruptcy Case</u>.  Unless otherwise agreed to in writing by the Buyer, this Agreement shall terminate immediately if: (i) the Bankruptcy

Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) the Procedures Order shall not have been entered by the Bankruptcy Court by the date that is thirty-five (35) days after the Petition Date (or such later date as Buyer may have designated in writing to Sellers); (iii) a final Sale Order shall not have been entered by the Bankruptcy Court by the date that is one hundred (100) days after the Petition Date (or such later date as Buyer may have designated in writing to Sellers); (iv) the sale of substantially all of the assets of the Sellers to a Person other than Buyer occurs; (v) the granting of relief from the automatic stay to permit foreclosure or the exercise of other remedies on the material assets of the Sellers occurs; or (vi) the Sellers consent to any modification of this Agreement, in each case, without the prior agreement of the Buyer.

(b)    Termination by Buyer. Prior to the Closing Date, Buyer may terminate this Agreement upon written notice to Sellers of the occurrence of any of the following, unless Buyer is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Sellers hereunder shall be of no further force and effect:

(i)    if any of the conditions to the obligations of Buyer that are set forth in Section 10.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(ii)    if there shall be a material breach by the Sellers of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within thirty (30) Business Days after the giving of written notice by Buyer to the Sellers of such breach;

(iii)    if there is a Material Adverse Effect; or

(iv)    if Sellers (x) fail to obtain either interim or final orders from the Bankruptcy Court authorizing and approving post-petition debtor-in-possession financing, or (y) breach and are in default of any agreement relating to such debtor-in-possession financing, causing a termination of funding to the Sellers.

(c)    Termination by the Sellers. Prior to the Closing Date, the Sellers may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Sellers are in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Sellers hereunder shall be of no further force and effect:

(i)    if any of the conditions to the obligations of the Seller to close that are set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by the Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by the Sellers; or

(ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this

59

Agreement, which breach cannot be cured or has not been cured within thirty (30) Business Days after the giving of written notice by the Sellers to Buyer of such breach; or

(iii)    if there shall exist a Title Defect which is not waived by the Buyer and the Seller shall be unwilling or unable to remove in accordance with Section 7.8.

(d)    Termination by Buyer or the Sellers.  Either Buyer or the Sellers may terminate this Agreement upon the occurrence of any of the following:

(i)    by mutual written consent of the Sellers and Buyer prior to the Closing Date;

(ii)    if the Bankruptcy Court shall enter an order approving a Competing Bid, subject to the limitations set forth in the Bid Procedures Order and subject to Buyer's right to payment of the Break-Up Fee and Expense Reimbursement in accordance with the provisions of this Agreement and the Bid Procedures Order and in addition to the provisions in Section 6.2(d) regarding the Buyer being the second highest bid;

(iii)    upon twenty (20) Business Days' written notice to the other party after ninety (90) days after the entry of the Sale Order by the Bankruptcy Court, Buyer or the Sellers may terminate this Agreement under this Section 13.1(d)(iii) if DOH has disapproved or indicated that it will disapprove the CON Application provided that no such termination shall occur if within such twenty (20) Business Day period DOH approves the CON Application; or

(iv)    upon written notice to the other party if the Closing shall not have occurred by the close of business on Outside Closing Date, unless extended by mutual written agreement of the Parties; provided, however, that, if (A) the Closing shall not have occurred by the close of such date due to an action or failure to act by a Governmental Authority that prevents the consummation of the Contemplated Transactions and (B) the non-terminating party is otherwise capable of satisfying the conditions to its obligations to consummate the Contemplated Transactions set forth in Article IX, a termination under this Section 13.1(d)(iv) shall not be effective for forty-five (45) days after the provision of written notice; provided, further, that such termination shall not be effective if all conditions to the obligations of the non-terminating party to consummate the Contemplated Transactions set forth in Article IX shall have been satisfied or otherwise waived and the Closing shall have occurred within such forty-five (45) day period.

(v)    upon thirty (30) days written notice to the other party if the date of the Closing shall not have occurred thirty (30) days after all closing conditions have been satisfied, or by the Outside Closing Date unless otherwise agreed to, in writing by Sellers or Buyer subject to Section 13.1(d)(iv).

(e)    Additional Termination Rights.    Notwithstanding anything in this Agreement to the contrary, but without limiting any other termination rights expressly provided in this Agreement, this Agreement may be terminated at any time prior to the Closing as follows:

(i)    if the Bankruptcy Court enters a Sale Order approving the sale of the Acquired Assets (or any portion thereof) to any Competing Bidder, and Buyer is the second

highest bidder and bound to close pursuant to the terms of such Sale Order, then this Agreement shall automatically terminate the earlier of: (A) the date Sellers consummate the Sale of the Acquired Assets (or any portion thereof) to any Competing Bidder, or (B) ninety (90) days following entry of the Sale Order;

(ii)    if (i) the Bankruptcy Court enters an order approving the sale of the Acquired Assets (or any portion thereof) to any Competing Bidder, and (ii) Buyer is not the second highest bidder and bound to close pursuant to the terms of such Sale Order in the event that all Competing Bidders fail to close, then this Agreement shall terminate automatically upon the earlier of (a) ten days after the Auction; or (b) the entry of such Sale Order by the Bankruptcy Court;

(iii)    if this Agreement is terminated in accordance with clause (i) or (ii) of this Section 13.1(e), then from and after such termination neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination of this Agreement), except that Buyer shall receive a return of the Deposit upon such termination and payment of the Break-Up Fee and Expense Reimbursement to the extent otherwise due and payable in accordance with Article VI.

(f)    Extension of Time Periods.    The time periods for termination of this Agreement set forth in this Section 13.1 may be extended upon the written agreement of the parties without the further approval of the Bankruptcy Court.

13.2    Procedure For Termination.    In the event of termination of this Agreement by Buyer or the Sellers, or both, pursuant to Section 13.1, written notice thereof shall promptly be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 13.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 12.3, without further action by the parties.

13.3    Effect of Termination.

If any Party terminates this Agreement pursuant to Section 13.1, except as otherwise provided herein, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); provided that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XIV
MISCELLANEOUS

14.1    Press Releases and Public Announcements.    No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party such approval not to be unreasonably withheld or delayed; provided, however, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be

FIRM:23260499v7

made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

14.2   No Third-Party Beneficiaries.   This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.3   Entire Agreement.   This Agreement and the other Transaction Documents constitute the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.4   Succession and Assignment.   This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party provided, however, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, including any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in any Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

14.5   Counterparts.   This Agreement may be executed in one or more counterparts (including by means of facsimile), each of which shall be deemed an original but all of which together will constitute one and the same instrument. The delivery of an executed signature page of this Agreement or any other Transaction Document by portable document (.pdf) format shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

14.6   Headings.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.7   Notices.   All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one Business Day after being sent to the recipient by facsimile transmission, or (iv) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| If to the Sellers: | Sound Shore Health System, Inc. |
| | [TBD] |
| | [TBD] |
| | Attn: [TBD] |
| | Fax: [TBD] |
| | |
| Copy to: | Garfunkel Wild, P.C. |

FIRM:23260499v7

111 Great Neck Road, Suite 600
Great Neck, New York 11021
Attn: Burton S. Weston, Esq.
Fax: (516) 466-5964

If to Buyer:     Montefiore Health System, Inc.
111 East 210th Street
Bronx, New York 10467
Attn: Christopher S. Panczner, Esq.
Fax: (718) 652-3404

Copy to:     Togut, Segal & Segal LLP
One Penn Plaza
New York, New York 10119
Attn: Frank Oswald, Esq.
Fax: (212) 967-4258

and

Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10199
Attn: Jay E. Gerzog, Esq.
Fax: (212) 878-8604

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.8    Governing Law; Waiver of Jury Trial. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

14.9    Submission to Jurisdiction; Consent to Service of Process. Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.7 hereof; provided, however, that, if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the

63

exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 14.7.

14.10  Amendments.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and each Seller.  The Sellers may consent to any such amendment at any time prior to the Closing with the prior authorization of each Seller's Board of Directors.

14.11  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.12  Expenses.  Except with respect to the Break-Up Fee and Expense Reimbursement, each of Buyer and each Seller will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transactions, except that Buyer on the one hand and the Sellers on the other hand shall each bear fifty percent (50%) of any and all real property transfer taxes payable with respect to the conveyance of the Owned Real Property and the assignment of the Real Property Leases, if any.

14.13  Construction.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel. Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

14.14  Incorporation of Exhibits and Schedules.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Effective Date with the Buyer's consent, which consent shall not be unreasonably withheld.

14.15  Tax Disclosure Authorization.  Notwithstanding anything herein to the contrary, the Parties (and each Affiliate and Person acting on behalf of any Party) agree that each Parry (and each employee, representative, and other agent of such party) may disclose to any and all Persons, without limitation of any kind, the transaction's tax treatment and tax structure (as such terms are used in Code §§6011 and 6112 and regulations thereunder) contemplated by this agreement and all materials of any kind (including opinions or other tax analyses) provided to such party or such Person relating to such tax treatment and tax structure, except to the extent necessary to comply with any applicable federal or states securities laws; provided, however, that such disclosure may not be made until the earlier of date of (x) public announcement of

discussions relating to the transaction, (y) public announcement of the transaction, or (z) execution of this Agreement. This authorization is not entitled to permit disclosure of any other information including (without limitation) (a) any portion of any materials to the extent not related to the transaction's tax treatment or tax structure, (b) the identities of participants or potential participants, (c) the existence or status of any negotiations, (d) any pricing or financial information (except to the extent such pricing or financial information is related to the transaction's tax treatment or tax structure), or (e) any other Confidential Information or term or detail not relevant to the transaction's tax treatment or the tax structure.

14.16  No Waiver.  The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

14.17  Charitable Purposes.  Nothing in this Agreement shall prevent Buyer and/or the Sellers from taking any actions to carry out their respective charitable missions, provided that no such action shall excuse any breach of the terms hereof that occurs thereby.

[SIGNATURES ARE ON NEXT PAGE]

FIRM:23260499v7

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

Buyer:

Montefiore SS Operations, Inc.

By: _____
Name: Steven M. Safyer, MD
Its: _____

Montefiore MV Operations, Inc.

By: _____
Name: Steven M. Safyer, MD
Its: _____

Montefiore HA Operations, Inc.

By: _____
Name: Steven M. Safyer, MD
Its: _____

Montefiore SS Holdings, LLC

By: _____
Name: Steven M. Safyer, MD
Its: _____

Montefiore MV Holdings, LLC

By: _____
Name: Steven M. Safyer, MD
Its: _____

Montefiore HA Holdings, LLC

By: _____
Name: Steven M. Safyer, MD
Its: _____

2486364v.4

SSHS:

Sound Shore Health System, Inc.

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

SSMC:

Sound Shore Medical Center of Westchester

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

MVH:

The Mount Vernon Hospital, Inc.

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

SECC:

Howe Avenue Nursing Home d/b/a Schaffer
Extended Care Center

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

NRHMC:

NRHMC, Inc.

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

MVHC:

M.V.H. Corporation

By: _John R. Spicer_
Name: John R. Spicer
Its: _Vice President_

NRSS:

New Rochelle Sound Shore Housing LLC

By: _John R. Spicer_
Name: John R. Spicer
Its: _President_

65

2486364v.4

# DISCLOSURE SCHEDULES ARE ON FILE
# WITH THE COURT.