## Schedule 4.10(d)
### Notices and Approval for Contracts

None

2405424v.10

## Schedule 4.10(f)
## Related Party Transactions

Services Corporation has entered into a lease agreement dated 8/31/1996, as modified, with 233rd Street Realty Corp. 233rd Street Realty Corp is owned by Richard Naclerio.

2405424v.10

**Schedule 4.11**
**Consents and Approvals**

None

**Schedule 4.12**
**Powers of Attorney**

None

2405424v.10

### Schedule 4.13
### Litigation of the Sellers

| Case Number | Caption of Suit | Nature of Proceeding | Court or Agency and Location |
|---|---|---|---|
| 09 CV 00010 | Alexis Pena, by his m/n/g, Victoria Trejo v. USA and SSMC | Alleged Medical Malpractice Claim | SDNY |
| 12 Civ. 3614 | Howard Gale v. Smith & Nephew, Inc., SSMC, Specialty Orthopaedics, PLLC, Dr. Steven Zelicof, Dr. Vaishsfee R. Shukla, Dr. Ognian I. Boulev, Dr. Michael S. Ackerman, Dr. Yigal Samoch, Dr. Ira Novich, P.A. Courtney Kuhn, P.A. Craig S. Steinberg, P.A. Michael J. Cicatelli, Nurse. J. Delacruz, Nurse K. Miller, Nurse D. Brown, Nurse Vennetta L/ Doles and Nurse C.D. | Alleged Medical Malpractice Claim | SDNY |
| Index No. 11251/08 | Jocelyn Carter, as Admin. of the Estate of Brian Bennett, deceased v. Dr. Katayun Mama, Elizabeth Mellia,RN, and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 11681/09 | Giovanna Morales v. Dr. Lorecell A. Quintos, Dr. M. Wm. Sloan, Dr. Enyioma Nwankpa, Dr. Chaudry Hameed, Dr. Bruce Walsh, Dr. V. Botabula and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 1412/09 | Aaron Murray v. Westchester County Health Care Corp. and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 1592/05 | Louis J. Galgano v. Dr. Donald Scott Miller, Westchester Heart Specialists, LLP, Dr. Jeffrey Lederman, SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 16152/05 | Yordi Guerra, by his m/n/g, Lilian Guerra v. SSMC, Dr. Kevin Meacham, Dr. Romelle J. Maloney, Dr. Jennifer Harper and Dr. Tristan DaChuna | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 16643/09 | Salvatore Porretto, Indiv. and on behalf of the Estate of Josephine Porretto and Stephen Porretto v. Dr. Maddu S. Rangraj, Dr. Venkatesh Sasthakinar, Dr. Amirhissein Paymon Mahfoozi, SSMC a/k/a SSHS | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 17575/10 | Mary Maher and William Maher v. Dr. Michael A. Mecca, Dr. Ira S. Novich, New Rochelle Radiology Associates, P.C., Dr. Erica Krauss, Dr. Remus Moucha, Dr. Hillary Biberman, Manor Medical Offices, P.C., and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 18821/09 | Ronald Harris & Cynthia Harris v. SSMC, Dr. Richard Karanfilian and Dr. James McWilliam | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 20380/12 | Loretta Dolphus and Nathaniel Graham v. SSMC and TMVH | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 20913/05 | Lizette Rodriguez, m/n/g of Trinity Jenkins and Lizette Rodriguez v. SSMC, Dr. "John" Moneke, Dr. Lorcelli Quintos; Lorcelli Quintos, M.D. P.C., Dr. Jennifer Harper and Jennifer Harper, M.D. P.C. | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 21161/09 | Pedro U. Gonzalez v. SSMC and The Winifred Masterson Burke Rehanilitation | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |

2405424v.10

|  | Hospital |  |  |
|---|---|---|---|
| Index No. 21731/11 | Leslie Trammell and Tracey Mitchell, as Admin. of the Estate of Kathy M. Berryman v. Dr. Peter Ejor Nnaemeka, Dr. Raheel Shafi, Dr. "John/Jane" Rivera, Nurse Peta Ann Gayle, Nurse Elaine Podszus, and SSMC, | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 22877/12 | John Lombardi v. Dr. Bernard Bernhardt, Dr. Elizabeth Phillips, Dr. Warren Geisler, Dr. Howard Kivell, Dr. Stephen C. Klass, Dr. Marc R. Samolsky, Advanced Oncology Associates, LLP, medical Renal Associates, P.C., Associates for Urologic Care, P.C., Stephen C. Klass MD, P.C., SSMC, Emergency Medical Associates, PLLC, Emergency Medical Association-Sound Shore, PLLC and Emergency Medical Associates/CHS, LLC | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 23006/12 | Toure Edjang, An Infant by Kushana Peat-Edjang and Deogracias Edjang, Her parents and atural guardians, and Kushanan Peat-Edjang and Decgracias Edjang, Individually, v. Dr. Rozafa L. Pali, Dr. Kevin L. Meacham, Dr. Scott M. Sickles, Dr. Jeffrey Stein, SSMC, Emergency Medical Associates, PLLC, Emergency Meedical Association-Sound Shore, PLLC, Emergency Medical Associates/CHS, LLC, and We Care Women's medical Services, P.C. | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 23331/05 | Anthony Garrio v. Montefiore Hospital, SSMC and Dr. Michael Palmeri | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 23369/05 | The Estate of Desiree Weeks by Brenda Phillips, Ebony Coleman by Brenda Phillips, Brian Weeks by Brenda Phillips and Brenda Phillips v. Dr. Peter Fauci, Dr. Morton Hantman, SSMC and Dr. Shelly Weiner | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 24358/10 | Jorge Joanen v. Dr. Joseph Ponticello, Dr. Edward Gundy, Dr. Robert Cristofaro, SSMC and The Westchester Medical Group | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 24409/99 | Amari Sherrill, by his m/n/g Marie Ferguson and Marie Ferguson v. SSMC, Dr. Lorceli A.Quintos, Dr. Johannes Hermanto, Dr. Jean Claude Germain, MV Neighborhood Health Center | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 26285/09 | Denise Colombo and John Colombo v. New Rochelle Medical Services, P.C., Dr. Cheryl Y. Counsel, Olga Waters, P.A., Dr. Amy Levav; Dr. Maritza Cruz; Hudson Valley Radiology Associates, PLLC, Central Imaging Associates, PLLC, Dr. Robert F. Mackey, Dr. Nelville Glajchen, Dr. Peter A. Fauci and Peter A. Fauci Jr., M.D., P.C. | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 26856/10 | Dalai Maruri, by her m/n/g Arminda Mauri and Arminda Mauri v. Janice | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |

73

| | Bistritz, N.P., SSMC and Sound Shore Children's Medical Group | | |
|---|---|---|---|
| Index No. 27658/10 | Greg Foster, as Admin. of the Estate of Geneva Ackridge v. SSMC and Dr. Bruce Walsh | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 306572/08 | Carmen Nieves v. Dr. Michael Palmeri, Michael Palmeri M.D., P.L.L.C, Richard Alan Cohen, P.A., "John/Jane" Steinberg, P.A. and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 306725/08 | Patricia Henry as Administrix of the Estate of Verda Henry v. SSMC, Dr. Shashiskekhar Palekar, and Palekar Family Medical Services, P.C. | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 308459/12 | Sergio Lopez, as Administrator of the Estate of Tara Lopez v. NYC Fire Department, Ambulance of NYC, City of New York, Montefiore Medical Center, SSMC and Dumont Center for Rehabilitation and Nursing Care | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 309022/10 | Gloria Felton. As Admin. of the Estate of Pearl Felton v. Montefiore Medical Center and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 310119/11 | Rose Zair v. Dr. Seth Gendler, Dr. Robert Santopietro, Dr. Sherrilyn Detiquez, Dr. Vivek Lingiah, SSMC and Dr. "John/Jane" Habib | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 38010/09 | William P. Furey, as Executor of the Estate of Virginia T. Greco, Deceased v. Sunrise Senior Living, Sunrise Senior Living, Inc., Sunrise Senior Living Management, Inc., Sunrise Senior Living Services, Inc., Sound Shore Medical center of Westchester, Sound Shore Medical Center, Jewish Home Lifecare, SRN Corporation and Sarah Neuman Center for Healthcare and Rehabilitation The Jewish Home and Hospital | Alleged Medical Malpractice Claim | Sup. Court of Suffolk County |
| Index No. 4083/11 | Bernadette Falletta v. Dr. Robert Yarrish, Dr. Douglas Kaiden, Dr. Prasanta Basak and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 4186/11 | Walter L. Brown, as Admin. of the Estate of Dovie L. Patterson, and Walter L. Brown v. SSMC, Helen & Michael Schaffer Extended Care Center and SSHS | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 4546/10 | Joane Faraone, as Admin. of the Goods, Chattels and Credits of the Estate of Amelia A. Marra v. Dr. Madhu S. Rangraj, Dr. Leonard Maffucci, Dr. Venkatesh Sasthakonar Esackimuth, Dr. E. Aquista, Sound Shore Surgical Associates of New Rochelle, LLP, Dr. Joseph E. Casino, Dr. Michael Mandel, Pulmonary and Sleep Specialists of Southern Westchester, LLC, Dr. George Joseph Stivala, Dr. Aaron , Dr. Firas Abdulheim Hamdi, Dr. Samer Arab, Dr. Daniel Paul Hoffman and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |

| Index No. 50006/11 | Maria DiFatta, as Admin. of the Estate of Mario DiFatta v. Dr. Richard Karanfilian, Dr. Anton Galitsky, Dr. Katayun Mama, Dr. Ligija Rociunas, Dr. George Stivala, Dr. Vincent A. Cirillo, Dr. Hershel Ozick and SSMC/Sound Shore Medical Systems, Inc. | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
|---|---|---|---|
| Index No. 50221/11 | Emilia Prince v. Stephen Veefkind, RN and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 50322/11 | Rondeen Walters v. Dr. Madhu Rangraj, Dr. Leonard Muffucci, Dr. Seth Gendler, SSMC, Sound Shore Surgical Associates of New Rochelle, LLP and Sound Shore Bariatric Surgery Center | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 50413/11 | Gaetana E. Ingrassia and Joseph Ingrassia v. Dr. Brian Matier, Dr. Denise McCormack, Ann Thomas, R.N., Dr. Charles Bruce Walsh, Charles Bruce Walsh MD LLP, Sound Shore Surgical Associates of New Rochelle, LLP and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 50470/11 | Patricia Nardozzi, as the Admin. of the Estate of Magdaleno Ignacio Alonso Cruz and Patricia Nardozzi, Individually v. SSMC, Dr. Wayne Abrahams and Dr. Ligija Rociunas | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 50982/12 | Carol D'Ancona, Individually and as Administratrix of the Estate of Philip D'Ancona v. SSMC, Dumont Center for Rehabilitation and Nursing, and Dumont Masonic Nursing Home | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51053/13 | Winifred Haughey, a/k/a Una Haughey v. Dr. Mark Kindschuh and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51100/13 | Frank Allgaier v. Dr. Robert Cristoforo, Dr. John Nelson, SSMC, Cabrini Nursing and Rehabilitation Center | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51216/13 | Aurelia Herrera v. Dr. Robert Santopietro, Dr. Srikanth Parsi and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51706/12 | Clora Jackson, as Admin. of the Estate of Paul Jackson, Sr. v. Dr. Seung Ook Lee, Mohammad Ahsan, Dr. Jeffrey Lederman, Dr. Anna Kazanshaya, Dr. Steven Zelicof, Dr. Michelle Thompson, Dr. Sung Wu Sun, SSHS, Inc., Geriatric Medical Service, PLLC, Specialty Orthopaedics, PLLC, Sung Wu Sun, M.D., P.C., Wartburg Nursing Home, Inc., TMVH, SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51925/12 | Audrey Panteles and Theodore Panteles v. Dr. Benjamin Berenfeld, Specialty Orthopaedics, PLLC, and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 53891/11 | Phyllis Carcia v. Dr. Keneil We Tlaang and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 53917/13 | Javier Rosenzwaig, as Administrator of the Estate of Maximo Rosenzwaig, and Javier Rosenzwaig, Individually v. SSMC, MS Acquisition I, LLC d/b/a Westchester Center for Rehabilitation & Nursing, Dr. Vanessa G. Completo Buot, Dr. Christopher O. Adubor, Dr. Stephen H. Jesmajian and Dr. Daniel H. Pomerantz | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |

2405424v.10

| Index No. 56349/11 | Rhonda Metz v. SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
|---|---|---|---|
| Index No. 5708/10 | Eileen Vega v. Dr. James R. McWilliam, Specialty Orthpadics, PLLC and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 59526/11 | Reinaldo Alves DaCosta v. Dr. Steven S. Klein, Steven S. Klein, M.D., P.C., and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 59576/12 | Public Administrator of Westchester County as Admionistrator of the Estate of Perry Tucker v. Glen Island Nursing and Rehabilitation Center and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 60511/11 | Sandra Weinstein and Johathan Weinstein, as parents and natural guardians of Evan Weinstein, an infant and Sandra Weinstein and Jonathan Weinstein, individually v. Nurse A. Villanueva, Dr. Victor Moneke, Dr. Mostafa S. Hassan, Dr. Stephen Piazza and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 61665/12 | Martha Kathy Guadagnolo and Eugene Guadagnolo v. Dr. Seth L. Gendler | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 62564/12 | Jennifer Slade v. Dr. Ashutosh Kaul, Surgical Intensvists, P.C., Dr. Tunc Aksehirli, Dr. David Cho and Westchester County Health Care Corp. | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 63386/12 | Janet White by Henry White her Power of Attorney and Janet White individually v.SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 66276/12 | Jean Sinatra v. SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 6698/05 | Trevaun Wright by her m/n/g Tracey Wright and Tracey Wright v. Dr. Claudette Anderson, Dr. Thomas Clough, Dr. Lillian Gonzalez, Dr. Jennifer Harper, and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 68016/12 | Sharif Washington v. SSMS and Dr. Hilton Mirels | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 6832/10 | Gwendolyn Snipes v. SSMC, CAN Vanetta "Doe", Nurse "Jane Doe" | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 8349/10 | Jose Salazar v. SSMC, Dr. Rameshchandra Shukla and Dr. Katayun Mama | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 12891/07 | Amari Sherrill by his m/n/g Marie F Ferguson and Marie Ferguson v. Dr. Jean Claude Bermain and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 307712/11 | James Ferguson and Jean Ferguson v. Dr. Melanie Moses, Dr. Herman Lubetsky, Montefiore Medical Group, Montefiore Medical Center, Dr. Robert Wilkins, Robert Wilkins, M.D., P.C. and SSMC | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| Index No. 7377/07 | Darlene Clanton v. Westchester Ambulatory Surgery Center, SSMC and Dr. Michael Palmeri | Alleged Medical Malpractice Claim | Sup. Court of Bronx County |
| CV-10-6003939 | Vivian Gagliano and Philip Gagliano v. Advanced Specialty Care, PC, Joseph R. Gordon, Danbury Hospital, and Venkata Bodavula | Alleged Medical Malpractice Claim | Superior Court of Connecticut |
| | 1199 SEIU | Breach of CBA | AAA (Labor) |

2405424v.10

| Index No. 121551/06 | New York Dialysis Services, Inc. and Fresenius USA, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
|---|---|---|---|
| Index No. 6291/11 | Sound Shore Medical Center v. Romelle Maloney, M.D | Breach of Contract | Sup. Court Westchester County |
| Docket No. MJ-38123-CV-0000065-2013 | Advanced Surgical v. Sound Shore Medical Center of Westchester | Breach of Contract | Commonwealth of PA; Montgomery Co. |
| A-022213-1077 | Apogee Consulting Group, Inc. v. Sound Shore Health System, Inc. | Breach of Contract | American Health Lawyers |
| 13-CV-0225 | Boston Scientific, Corp v. Sound Shore Medical Center of Westchester | Breach of Contract | US District Court; SO. District |
| Index No. 53119/13 | Carstens, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
| Index No. 51337/13 | Complete Management Solutions, LLC v. Sound Shore Health System, Inc. | Breach of Contract | Sup. Court Westchester County |
| Index No. 55701/13 | Health/Resources of Optimization, Inc v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
| Index No. 600916/13 | Mullooly, Jefferey, Rooney & Flynn, LLP v. Sound Shore Medical Center of Westchester and Sound Shore Health System, Inc. | Breach of Contract | Sup. Court Nassau Co. |
| 12-CV-7872 | National Wound Care & Hyberbaric Services Inc. v. Sound Shore Health System, Inc. | Breach of Care | US District Crt, SD of NY |
| Index No. 54262/13 | Peak Performance, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
| Claim. No. 002-OF4-WU4 | QualCode, Inc. v. Sound Shore Health System, Inc. | Breach of Contract | AAA (commercial) |
| Index No. 55150/13 | Smith's Medical ASD, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
| CV-443-13 | Stephen Bluth, ADR, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | City Court, City of NR |
| Index No. 53540/13 | The Trio Company, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court Westchester County |
| Index No. 501776/13 | White Glove Placement, Inc. v. Sound Shore Health System, Inc. | Breach of Contract | Sup. Court Kings Co. |
| Index No. 63680/12 | Zimmet Healthcare Services Group, L.L.C. v. Sound Shore Health System, Inc. | Breach of Contract | Sup. Court Westchester County |
| Case No. 10158460 | Djoka Nikac v. Sound Shore Medical Center of Westchester | Claim of Discrimination | NYSDHR |
| Case No. 10158973 | Macclaring Blanchard v. Sound Shore Medical Center of Westchester | Claim of Discrimination | NYSDHR |
| Index No. 60196/12 | Globus Medical, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court of Westchester County |
| Index No. 7494/12 | Graybar Electric Co., Inc. v. The Mount Vernon Hospital, Sound Shore Medical Center of Westchester and Sound Shore Health System, Inc. | Breach of Contract | Sup. Court of Westchester County |
| Index No. 70203/12 | New York Medical College v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court of Westchester County |
| Index No. 51091/12 | NuEnergen, LLC v. Sound Shore Medical Center of Westchester, The Mount Vernon Hospital and Howe Avenue Nursing Home, Inc. d/b/a Schaffer Extended Care Center | Breach of Contract | Sup. Court of Westchester County |

2405424v.10

| | | | |
|---|---|---|---|
| Claim No. 13-506-E-02323-12 | Pride Healthcare v. Sound Shore Medical Center of Westchester | Breach of Contract | AAA (Commercial) |
| CC-001652-12/NR | Robertson Enterprises, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | City Court, City of New Rochelle |
| 12CV6917 | Summ-it Healthcare, LLC v. Sound Shore Medical Center of Westchester | Breach of Contract | US District Court, SD of NY |
| Index No. 7584/12 | Telehealth Services, a division of Telerent Leasing Corporation v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court of Westchester County |
| Index No. 68761/12 | Whitaker Medical, LLC v. Sound Shore Medical Center of Westchester and Mount Vernon Hospital | Breach of Contract | Sup. Court of Westchester County |
| LT-2665/12 | 175 Medical Vision Properties, LLC-Suite 2-2 v. Sound Shore Medical Center of Westchester | Breach of Contract | City Court, City of New Rochelle |
| LT-62-2013 LT-63-2013 | C.W. Northridge v. NRHMC Services Corporation | Breach of Contract | City Court, City of NR |
| LT-2535-12 | Lockwood Realty, LLC-Suite 104 v. NRHMC Services Corporation | Breach of Contract | City Court, City of NR |
| LT-2532-12 | Lockwood Realty, LLC-Suite 205-207 v. NRHMC Services Corporation | Breach of Contract | City Court, City of New Rochelle |
| LT-2533-12 | Lockwood Realty, LLC-Suite 300 v. New Rochelle Medical Services, P.C. | Breach of Contract | City Court, City of NR |
| LT-2534-12 | Lockwood Realty-Suite 18 v. NRHMC Services Corporation | Breach of Contract | City Court, City of NR |
| Index No. 402038 | Magenta Realty, LLC v. Sound Shore Medical Center of Westchester and NRHMC Services Corp. | Breach of Contract | City Court, City of Bronx |
| Index No. 61558/12 | Medical Specialties Distributors, LLC. v. Sound Shore Medical Center of Westchester and Sound Shore Health System, Inc. | Breach of Contract | Sup. Court of Westchester County |
| Index No. 51337/13 | AMH Healthcare, Inc. v. Sound Shore Health System, Inc. | Breach of Contract | Sup. Court Westchester County |
| Index No. 01-12974 | Teligent, Inc. v. Sound Shore Medical Center of Westchester | Preferential Payments Made to SSMC by Telegent | Bankruptcy Court, SD of NY |
| Case No. 13 300 2700-10 | 1199 SEIU Health Care Workers East and Sound Shore Medical Center of Westchester | Termination of Irene Andrades | AAA (Labor) |
| Index No. 51584/13 | Angela Lasorsa and Joanne Lasalle-Herliby, as Co-Administrators of the Estate of Rose Ann Tocco v. Dr. Ognian Bouhlev and Sound Shore Medical center of Westchester | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 51182/13 | Andrew Encarcion v. Sound Shore Medical Center of Westchester | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 55545/13 | Francis Massaro v. Sound Shore Medical center of Westchester | Alleged Medical Malpractice Claim | Sup. Court of Westchester County |
| Index No. 53518/13 | Coratolo & Carrieri Associates, LLC v. New Rochelle Sound Shore Housing, LLC and Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court of Westchester County |
| Index No. 57565/13 | The Outsource Group, Inc. v. Sound Shore Medical Center of Westchester | Breach of Contract | Sup. Court of Westchester County |
| Index No. 21777/12 | Denise Vinson, as Administratrix of the Goods, Chattels and Credit which were of Keith Robinson, Deceased v. Dr. Hiyad Al- | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |

2405424v.10

|  | Husaini, Dr. John Rao, Dr. Raj Kumar and TMVH |  |  |
|---|---|---|---|
| Index No. 105293/09 | Bernarda Perez and Ivelisse Perez-Ali, Co-Admin. of the Estate of Victor Farfan v. Dr. Keith Edwards and TMVH | Alleged Medical Malpractice Claim | Sup. Court New York Country |
| Index No. 107608/11 | Theoplis Mutry v. TMVH and Dr. James Goldszer | Alleged Medical Malpractice Claim | Sup. Court NY Country |
| Index No. 11895/10 | Anyiah Smith, an Infant by her Custodian and Next Friend, Patricia Copeland v. Dr. Joytsna Deshmukh and Michael Pellegrino | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 20169/10 | Douglas Bryan v. TMVH, Dr. Priti Borker and Dr. Mahdi Abdullah | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 20380/12 | Loretta Dolphus and Nathaniel Graham v. SSMC and TMVH | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |
| Index No. 30108/10 | Mary Ann Cioffi and Ralph Cioffi v. Wartburg Adult Care Community and Dr. Sung Wu Sun | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 305675/10 | Mary Lyn Gordon v. Dr. Kyung Sun Park, Dr. Guirlaine Agnant, Dr. Kyung Sun Park, M.D., P.C., Guirlaine Agnant, M.D., P.C., Women's Medical Wellness of Westchester, PLLC and TMVH | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |
| Index No. 306000/09 | Jettie Brown and Ian Brown v. Dr. Sung Wu Sun, Dr. Ogedi Alexander Ohajekwe, Dr. Lee Adam Berk, Katherine M. Lai, D.P.M., Healing Feet, LLC, TMVH, Joseph J. Geldwert, D.P.M. | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |
| Index No. 3364/06 | Angela Santoro, as Amin. of the Estate of Concetta Santoro v. TMVH, Dr. Shin Yi, Dr. Kyung Kim, Dr. James Efiong, Dr Chi Ho Chang | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 4246/11 | Brenda Alvarado and Nicholas Alvarado v. Dr. Donald F. Roland, Donald F. Roland, M.D., P.C., TMVH and SSHS | Alleged Medical Malpractice Claim | Sup. Court Queens Country |
| Index No. 4289/09 | Ralph Oyague v. Dr. Stephen O. Schwartz and TMVH | Alleged Medical Malpractice Claim | Sup. Court Sullivan Country |
| Index No. 50503/12 | Patsy Mack-Botwe v. Dr. Barry M. Baylis, Dr. Balasa L. Prasad, Mt. Vernon Anesthesia, Anesthesia Group at Mt. Vernon Hospital, Dr. Aaron Roth | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 50843/12 | David Katz and Shirley Katz v. Mount Vernon Dialysis, LLC, SSHS, Individually and d/b/a TMVH, Dr. Muhammed Irfan Qudir, Nurse Neida Delgado Zayas, John Doe and Jane Doe | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 51706/12 | Clora Jackson, as Administratrix of the Estate of Paul Jackson, Sr., Deceased v. Dr. Seung Ook Lee, Dr. Mohammad Ahsan, Dr. Jeffrey Lederman, Dr. Anna Kazanskaya, Dr. Steven Zelicof, Dr. Michelle Thompson, Dr. Sung Wu Sun, SSHS, Inc, Geriatric Medical Service, PLLC, Specialty Orthopaedics, PLLC, Sung Wu Sun, MD, P.C., Wartburg Nursing Home, Inc., TMVH and SSMC | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |

| | | | |
|---|---|---|---|
| Index No. 52296/12 | Adrienne Lewis v. Dr. Sung Sun, TMVH, Mount Vernon Hospital Clinic | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 52665/11 | Beena John v. TMVH, MS Acquisition I, LLC, Dr. Satyavathi Sharma, Dr. Francois Tellus and Dr. Zoran Svorcan | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index No. 5706/10 | Robert Gentile v. Dr. Bangaruraj Kolanuvada, Dr. Paul Koltovich, Dr. Thomas J. Price, Jr., Dr. Pavan Madadi, Dr. Dariush Alaie, Dr. "John" Raju, MVH Medical, P.C. and TMVH | Alleged Medical Malpractice Claim | Sup. Court Westchester Country |
| Index. No. 307816/11 | Leonard Reece, Individually and as Administrator of the Esate of Silvia Kelly-Reese, Deceased v. Dr. Dhansukhal Patel, TMVH, Dr. Alma Day Anghirang, Dr. Kevin Reilly, Montefiore Medical Center North and Montefiore Medical Center | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |
| Index No. 22876/12 | Clement Ferguson v. Dr. Preiti Borker, Dr. Bhargavi Mandipalle and The Mount Vernon Hospital | Alleged Medical Malpractice Claim | Sup. Court Bronx Country |
| 12-CV-3345 | Roger Crique v. Dr. Richard Magil, Dr. Kun-Young Chung and The Mount Vernon Hospital | Alleged Medical Malpractice Claim | SDNY |
| | 1199 SEIU | Breach of CBA | AAA (Labor) |
| | 1199 SEIU | Breach of CBA | AAA (Labor) |
| | 1199 SEIU | Breach of CBA | AAA (Labor) |
| 13-CV-00410 | TGC, LLC v. Sound Shore Health System, Inc. | Breach of Contract | US District Court; District of MD |
| Index No. 70973/12 | Control Point Associates, Inc. v. The Mount Vernon Hospital. | Breach of contract | Sup. Court Westchester Country |
| Index No. 69324/12 | Shin I Yi,MD,P.C. | Failure to pay balance of promissory note | Sup. Court Westchester Country |
| Index No. 64542/12 | Proformance, inc. v. Mount Vernon Hospital | Breach of Contract | Sup. Court Westchester Country |
| Index No. 9806/13 | United Rentals, Inc. v. Mount Vernon Hospital and Sound Shore Medical Center. | Breach of contract | Supreme Court, Queens County |

2405424v.10

## Schedule 4.14(a)(ii)
## Filing of Cost Reports

Costs reports for 2012 were not filed.

## Schedule 4.14(a)(iii)
## Amounts Due Under Cost Reports

None

2405424v.10

**Schedule 4.14(a)(v)**
**Hill-Burton Act**

2405424v.10

**Schedule 4.14(a)(vi)**
**Non-Compliance with Government Reimbursement Programs**

See Attached

2405424v.10



RECEIVED MAR - 8 2012

State of New York
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT
Civil Enforcement Division, One Blue Hill Plaza PO Box 1747
Pearl River, NY 10965-1747
(845) 732-7550    Fax: (845) 732-7557

ERIC T. SCHNEIDERMAN
Attorney General

MONICA J. HICKEY-MARTIN
Special Deputy Attorney General

March 5, 2012

Kathleen McKay
Compliance Officer
Sound Shore Health System
16 Guion Place
New Rochelle, New York 10802

Re: Medicaid Only Drug Billing By Mount Vernon
Hospital (Provider ID Nos. 00274117 & 03000222)

Dear Ms. McKay:

Enclosed please find an original fully executed Settlement Agreement between The
Mount Vernon Hospital and this office. Thank you for your cooperation and assistance in
resolving this matter.

Sincerely,

Laura J. Meehan
Special Assistant Attorney General

Enclosure

## SETTLEMENT AGREEMENT

AGREEMENT dated the 1st day of March, 2012, by and between the STATE OF NEW YORK (hereinafter "STATE"), by the Office of the Attorney General, Medicaid Fraud Control Unit (hereinafter "MFCU"), and THE MOUNT VERNON HOSPITAL (hereinafter "MVH") (collectively referred to as the "Parties"),

WHEREAS, MVH, a hospital with its main campus located at 12 North Seventh Avenue, Mount Vernon, New York, was enrolled in the Medicaid program, under provider numbers 00274117 and 03000222, as a provider, among other things, of ambulatory services during the period, during the period February 3, 2005 through January 24, 2011; and

WHEREAS, MVH is required, pursuant to New York Social Services Law 367-a 9(a), to submit any claims to the Medicaid program for drugs administered to Medicaid recipients at their respective acquisition cost; and

WHEREAS, the MFCU conducted an investigation of claims submitted by MVH to the Medicaid program for drugs administered to Medicaid recipients and conducted an audit of such claims for dates of service from February 3, 2005 through January 24, 2011 (hereinafter the "Audit Period"); and

WHEREAS, the STATE has certain causes of action against MVH for the following conduct (hereinafter the "Covered Conduct"):

During the Audit Period, MVH in violation of New York State Finance Law § 189, *et seq.*, and New York Social Services Law § 367-a 9(a) submitted claims to Medicaid and secured payment thereon for drugs

administered to Medicaid recipients at amounts in excess of MVH's actual

cost of said drugs, and the New York State Medicaid program was thereby

overbilled.

WHEREAS, MVH cooperated fully with the MFCU throughout the audit process;

WHEREAS, MVH and the STATE have agreed to resolve the issues raised by the

STATE'S investigation;

NOW, THEREFORE, in consideration of the mutual covenants and undertakings set

forth herein, MVH and the STATE agree as follows:

1. The STATE represents that it has the authority to enter into this settlement and to

   effectuate a final resolution with regard to the alleged Medicaid overpayments and

   civil claims on behalf of the State of New York.   It is understood that MVH is

   entering into this settlement in reliance on this representation.

2. MVH agrees to pay the STATE the sum of EIGHTY-FIVE THOUSAND FOUR

   HUNDRED NINETY-SEVEN DOLLARS AND NINETY CENTS ($85,497.90) in

   principal and pre-settlement interest (the "Full Payment") in a single payment to be

   made upon full execution of this Settlement Agreement.

3. The Full Payment due hereunder shall be by check payable to the "NYS Attorney

   General Medicaid Fraud Control Restitution Fund" delivered to the Office of the

   Attorney General, MFCU, Special Projects Unit, One Blue Hill Plaza, 6th Floor, Pearl

   River, New York 10965-1747, or by electronic funds transfer pursuant to written

   instructions to be provided by the Attorney General..

4. In consideration of the foregoing payment by MVH, the payment made hereunder

   shall be received in full satisfaction of the obligations of MVH for the Covered

Conduct during the Audit Period, and the STATE shall not seek to impose any other financial obligation due to the Covered Conduct and the STATE further agrees to release and discharge MVH and its respective employees, agents, officers and directors, from, any and all claims for repayment of Medicaid funds, including interest and monetary penalties thereon, by the STATE against MVH which arose or could have arisen as a result of the Covered Conduct.

5. The making of this Agreement is not intended, and shall not be construed as an admission that MVH knowingly or intentionally overbilled the Medicaid program or violated any law, ordinance or regulation, but MVH admits that MVH received Medicaid overpayments due to the Covered Conduct.

6. This Agreement is intended to be for the benefit of the Parties only, and, by this instrument, the Parties do not release any claims against any other person or entity.

7. MVH will not submit additional or adjusted claims for the Covered Conduct.

8. MVH agrees not to further contest MFCU's determinations concerning the Covered Conduct and hereby waives all administrative and procedural rights, if any, with respect to the MFCU investigation.

9. Notwithstanding any terms of the Agreement, the relief provided for herein relates solely to Medicaid compensation paid to or claimed by MVH pursuant to any statutes, rules, regulations and official directives governing Medicaid payment with respect to the Covered Conduct and not to any other relationship between MVH and STATE.

10. Nothing in this Agreement shall relieve MVH from obligations imposed by any applicable state or federal law or regulation or other applicable law, except as specifically set forth herein.

11. MVH agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in this Agreement or creating the impression that this Agreement is without factual basis. Nothing in this paragraph affects MVH's (a) testimonial obligations or (b) right to take legal or factual positions in defense of litigation or other legal proceedings to which the Attorney General is not a party.

12. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to choice of law or conflict of laws principles. The Parties consent to the jurisdiction of the Supreme Court of the State of New York, New York County, in any action to enforce or interpret this Agreement.

13. Any failure by the STATE to insist upon the strict performance by MVH of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and the STATE, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Agreement by MVH.

14. If this Agreement is cancelled or voided for any reason, all payments made by MVH pursuant to this Agreement, and any interest and income accrued thereon, shall be retained by the STATE and credited against any potential cause of action concerning the Covered Conduct. The STATE shall retain full rights to assert any and all causes of action against MVH, and MVH shall retain any and all defenses thereto.

15. This Agreement is binding upon all parties and upon the assigns, transferees, purchasers and any successors-in-interest of MVH.

16. The Agreement shall be deemed to have been mutually prepared by the Parties hereto and shall not be construed against any of them solely by reason of authorship.

17. MVH acknowledges that it has entered into this Agreement freely and voluntarily and upon due deliberation, with the advice of counsel, and without coercion or duress.

18. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

19. This Agreement constitutes the complete and full agreement reached by the STATE and MVH, and may not be changed in any respect, except by a writing duly executed by the parties or their authorized representatives.

WHEREFORE, the Parties have read the foregoing Agreement and accept and agree to the provisions contained therein and hereby have caused this Agreement to be signed as of the date set forth above.

AGREED TO:

THE MOUNT VERNON HOSPITAL

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT

By: _____
John R. Spicer
President & Chief Executive Officer
The Mount Vernon Hospital
12 North Seventh Avenue
Mount Vernon, New York 10550

By: _____
Laura J. Meehan
Special Assistant Attorney General
Office of the Attorney General
Medicaid Fraud Control Unit
One Blue Hill Plaza, 6th Floor
Pearl River, New York 10965

APR 2 1 2012

State of New York
## OFFICE OF THE ATTORNEY GENERAL
### MEDICAID FRAUD CONTROL UNIT
Civil Enforcement Division, One Blue Hill Plaza PO Box 1747
Pearl River, NY 10965-1747
(845) 732-7550    Fax: (845) 732-7557

ERIC T. SCHNEIDERMAN
Attorney General

MONICA J. HICKEY-MARTIN
Special Deputy Attorney General

April 20, 2012

Kathleen McKay
Compliance Officer
Sound Shore Health System
16 Guion Place
New Rochelle, New York 10802

Re: Medicaid Only Drug Billing By Sound Shore Medical
Center of Westchester (Provider ID No. 00274126)

Dear Ms. McKay:

Enclosed please find an original fully executed Settlement Agreement between Sound Shore Medical Center of Westchester and this office. Also enclosed is a copy of the Confession of Judgment, which per the agreement will remain unfiled at this time. Thank you for your cooperation and assistance in resolving this matter.

Sincerely,

Laura J. Meehan
Special Assistant Attorney General

Enclosures

## SETTLEMENT AGREEMENT

AGREEMENT dated the *16* day of April, 2012, by and between the STATE OF NEW YORK (hereinafter "STATE"), by the Office of the Attorney General, Medicaid Fraud Control Unit (hereinafter "MFCU"), and SOUND SHORE MEDICAL CENTER OF WESTCHESTER (hereinafter "SSMC") (collectively referred to as the "Parties").

WHEREAS, SSMC, a hospital with its main campus located at 16 Guion Place, New Rochelle, New York, was enrolled in the Medicaid program, under provider number 00274126, as a provider, among other things, of ambulatory services during the period, during the period October 3, 2004 through January 31, 2011; and

WHEREAS, SSMC is required, pursuant to New York Social Services Law 367-a 9(a), to submit any claims to the Medicaid program for drugs administered to Medicaid recipients at their respective acquisition cost; and

WHEREAS, the MFCU conducted an investigation of claims submitted by SSMC to the Medicaid program for drugs administered to Medicaid recipients and conducted an audit of such claims for dates of service from October 3, 2004 through January 31, 2011 (hereinafter the "Audit Period"); and

WHEREAS, the STATE has certain civil and administrative causes of action against SSMC for the following conduct (hereinafter the "Covered Conduct"):

During the Audit Period, SSMC in violation of New York State Finance Law § 189, *et seq.*, and New York Social Services Law § 367-a 9(a) submitted claims to Medicaid and secured payment thereon for drugs administered to Medicaid recipients at amounts in excess of SSMC's

actual cost of said drugs, and the New York State Medicaid program was thereby overbilled.

WHEREAS, SSMC cooperated fully with the MFCU throughout the audit process;

WHEREAS, SSMC and its affiliated entities, Howe Avenue Nursing Home, Inc. (the "nursing home") and New Rochelle Sound Shore Housing, LLC (the "housing company"), are currently seeking to refinance the existing mortgages on their on-campus real estate, and specifically mortgages on SSMC itself, the nursing home, and the housing company's apartments (a "Refinancing Event");

WHEREAS, SSMC and the STATE have agreed to resolve the issues raised by the STATE'S investigation;

NOW, THEREFORE, in consideration of the mutual covenants and undertakings set forth herein, SSMC and the STATE agree as follows:

1. The STATE represents that it has the authority to enter into this settlement and to effectuate a final resolution with regard to the alleged Medicaid overpayments and civil claims on behalf of the State of New York. It is understood that SSMC is entering into this settlement in reliance on this representation.

2. SSMC agrees to pay the STATE the sum of TWO MILLION TWO HUINDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS AND THIRTY-FIVE CENTS ($2,241,760.35) in principal and pre-settlement interest pursuant to the following schedule (hereinafter, "SCHEDULED PAYMENTS"):

(a) An initial SCHEDULED PAYMENT of ONE HUNDRED THOUSAND DOLLARS ($100,000.00), to be made upon the execution of this agreement on or before April 13, 2012; and,

(b) The balance of TWO MILLION ONE HUNDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS AND THIRTY-FIVE CENTS ($2,141,760.35), and interest calculated thereon at the rate of Nine Percent (9%) per annum, for a total of TWO MILLION FOUR HUNDRED FORTY-THREE THOUSAND SIX HUNDRED FOURTEEN DOLLARS AND FIFTY-THREE CENTS ($2,443,614.53) to be paid pursuant to a schedule of the principal and interest payments due hereunder ("Scheduled Payments") as set forth on Exhibit "A";

(c) The first of the SCHEDULED PAYMENTS shall be made on or before May 1, 2012. All subsequent SCHEDULED PAYMENTS shall be made on or before the 1st day of each succeeding month.

(d) Upon the occurrence of a Refinancing Event, all Scheduled Payments shall be immediately due and payable, and SSMC shall pay the STATE, at the closing of the Refinancing Event, the remaining principal then due, together with any interest accrued thereon, in full satisfaction of this agreement. SSMC further states and agrees that at such closing, other than the holders of the mortgages referred to in the recitals to this Agreement, no other creditor will be paid ahead of the STATE. This term is a material term of this Agreement.

(e) Notwithstanding paragraph 2(b) and 2(d) above, SSMC may at anytime, and without penalty, pay the remaining principal then due, together with any interest accrued thereon, in full satisfaction of this agreement.

3. All SCHEDULED PAYMENTS due hereunder shall be by check payable to the "NYS Attorney General Medicaid Fraud Control Restitution Fund" delivered to the Office of the Attorney General, MFCU, Special Projects Unit, One Blue Hill Plaza, 6th Floor, Pearl River, New York 10965-1747, or by electronic funds transfer pursuant to written instructions to be provided by the Attorney General.

4. In the event of the commencement of a bankruptcy proceeding by or against SSMC, or the withdrawal or disqualification of SSMC from participation in the Medicaid program (the "Acceleration Events"), SSMC shall give notice of such Acceleration Event to MFCU by overnight courier service by the earlier of (a) any determination by SSMC to participate in such Acceleration Event or upon receipt of notice from any third-party that such Acceleration Event may occur; or (b) no later than twenty-four (24) hours after the Acceleration Event if SSMC lacked advance notice of such Acceleration Event. If such an Acceleration Event occurs, the entire unpaid balance, including interest, due to the STATE under the terms of this Agreement shall become immediately due and payable.

5. In return for MFCU's agreement to accept installment payments for the amounts due under this Agreement, SSMC shall provide the STATE, upon execution of this Agreement, a signed confession of judgment in the form annexed as Exhibit "B" hereto in the amount of TWO MILLION ONE HUNDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS AND THIRTY-FIVE CENTS

($2,141,760.35) plus interest calculated as set forth in "2b" above. If SSMC fails to make a payment by the first day of the month, then the STATE shall provide SSMC five (5) business days written notice to cure the default. If payment is not made by the expiration of said five (5) business days, the STATE may file the Confession of Judgment without further notice to SSMC. Upon the occurrence of any other circumstance which would give the STATE good cause to believe that SSMC will default upon its obligation, including but not limited to the occurrence of an Acceleration Event, the STATE may file said Confession of Judgment without notice to SSMC. In such event, the STATE may execute upon the Judgment without notice to SSMC, in the full amount of the unpaid balance due under this Agreement.

6. In consideration of the foregoing payment by SSMC, the payments made hereunder shall be received in full satisfaction of the obligations of SSMC for the Covered Conduct during the Audit Period, and the STATE shall not seek to impose any other financial obligation due to the Covered Conduct and the STATE further agrees to release and discharge SSMC and its respective employees, agents, officers and directors, from, any and all claims for repayment of Medicaid funds, including interest and monetary penalties thereon, by the STATE against SSMC which arose or could have arisen as a result of the Covered Conduct.

7. The making of this Agreement is not intended, and shall not be construed as an admission that SSMC knowingly or intentionally overbilled the Medicaid program or violated any law, ordinance or regulation, but SSMC admits that SSMC received Medicaid overpayments due to the Covered Conduct.

8. This Agreement is intended to be for the benefit of the Parties only, and, by this instrument, the Parties do not release any claims against any other person or entity.

9. SSMC will not submit additional or adjusted claims for the Covered Conduct.

10. SSMC agrees not to further contest MFCU's determinations concerning the Covered Conduct and hereby waives all administrative and procedural rights, if any, with respect to the MFCU investigation.

11. Notwithstanding any terms of the Agreement, the relief provided for herein relates solely to Medicaid compensation paid to or claimed by SSMC pursuant to any statutes, rules, regulations and official directives governing Medicaid payment with respect to the Covered Conduct and not to any other relationship between SSMC and STATE.

12. Nothing in this Agreement shall relieve SSMC from obligations imposed by any applicable state or federal law or regulation or other applicable law, except as specifically set forth herein.

13. SSMC agrees not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in this Agreement or creating the impression that this Agreement is without factual basis. Nothing in this paragraph affects SSMC's (a) testimonial obligations or (b) right to take legal or factual positions in defense of litigation or other legal proceedings to which the Attorney General is not a party.

14. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to choice of law or conflict of laws principles.

The Parties consent to the jurisdiction of the Supreme Court of the State of New York, New York County, in any action to enforce or interpret this Agreement.

15. Any failure by the STATE to insist upon the strict performance by SSMC of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, and the STATE, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Agreement by SSMC.

16. If this Agreement is cancelled or voided for any reason, all payments made by SSMC pursuant to this Agreement, and any interest and income accrued thereon, shall be retained by the STATE and credited against any potential cause of action concerning the Covered Conduct. The STATE shall retain full rights to assert any and all causes of action against SSMC, and SSMC shall retain any and all defenses thereto.

17. This Agreement is binding upon all parties and upon the assigns, transferees, purchasers and any successors-in-interest of SSMC.

18. The Agreement shall be deemed to have been mutually prepared by the Parties hereto and shall not be construed against any of them solely by reason of authorship.

19. SSMC acknowledges that it has entered into this Agreement freely and voluntarily and upon due deliberation, with the advice of counsel, and without coercion or duress.

20. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement.

21. This Agreement constitutes the complete and full agreement reached by the STATE and SSMC, and may not be changed in any respect, except by a writing duly executed by the parties or their authorized representatives.

WHEREFORE, the Parties have read the foregoing Agreement and accept and agree to

the provisions contained therein and hereby have caused this Agreement to be signed as of

the date set forth above.

AGREED TO:

SOUND SHORE MEDICAL CENTER
OF WESTCHESTER

STATE OF NEW YORK
OFFICE OF THE ATTORNEY GENERAL
MEDICAID FRAUD CONTROL UNIT

By: _____
   Albert M. Farina
   Chief Financial Officer
   Sound Shore Medical Center of Westchester
   16 Guion Place
   New Rochelle, New York 10802

By: _____
   Laura J. Meehan
   Special Assistant Attorney General
   Office of the Attorney General
   Medicaid Fraud Control Unit
   One Blue Hill Plaza, 6th Floor
   Pearl River, New York 10965

# EXHIBIT A
# TO THE SOUND SHORE MC WESTCHESTER SETTLEMENT AGREEMENT

| | | | | | |
|---|---|---|---|---|---|
| Total Restitution Amount | $2,241,760.35 | | | | |
| Less: Downpayment | ($100,000.00) | | | | |
| Paydown Principal | $2,141,760.35 | | | | |
| Annual Interest | 9% | | | | |
| Periods per Year | 12 | | | | |
| Period Interest | 0.75% | | | | |
| Number of Years | 3 | | | | |
| Number of Periods | 36 | | | | |
| | | | | | |
| Period Payment Amount | $67,600.40 | | | | |

| Payment Number | Payment Date | Period Payment | Period Interest | Period Principal | Remaining Balance |
|---|---|---|---|---|---|
| 1 | 5/1/2012 | $67,600.40 | $0.00 | $67,600.40 | $2,074,159.95 |
| 2 | 6/1/2012 | $67,600.40 | $15,556.20 | $52,044.20 | $2,022,115.75 |
| 3 | 7/1/2012 | $67,600.40 | $15,165.87 | $52,434.53 | $1,969,681.22 |
| 4 | 8/1/2012 | $67,600.40 | $14,772.61 | $52,827.79 | $1,916,853.43 |
| 5 | 9/1/2012 | $67,600.40 | $14,376.40 | $53,224.00 | $1,863,629.43 |
| 6 | 10/1/2012 | $67,600.40 | $13,977.22 | $53,623.18 | $1,810,006.25 |
| 7 | 11/1/2012 | $67,600.40 | $13,575.05 | $54,025.35 | $1,755,980.90 |
| 8 | 12/1/2012 | $67,600.40 | $13,169.86 | $54,430.54 | $1,701,550.35 |
| 9 | 1/1/2013 | $67,600.40 | $12,761.63 | $54,838.77 | $1,646,711.58 |
| 10 | 2/1/2013 | $67,600.40 | $12,350.34 | $55,250.06 | $1,591,461.52 |
| 11 | 3/1/2013 | $67,600.40 | $11,935.96 | $55,664.44 | $1,535,797.08 |
| 12 | 4/1/2013 | $67,600.40 | $11,518.48 | $56,081.92 | $1,479,715.16 |
| 13 | 5/1/2013 | $67,600.40 | $11,097.86 | $56,502.54 | $1,423,212.62 |
| 14 | 6/1/2013 | $67,600.40 | $10,674.09 | $56,926.31 | $1,366,286.31 |
| 15 | 7/1/2013 | $67,600.40 | $10,247.15 | $57,353.25 | $1,308,933.06 |
| 16 | 8/1/2013 | $67,600.40 | $9,817.00 | $57,783.40 | $1,251,149.66 |
| 17 | 9/1/2013 | $67,600.40 | $9,383.62 | $58,216.78 | $1,192,932.88 |
| 18 | 10/1/2013 | $67,600.40 | $8,947.00 | $58,653.40 | $1,134,279.48 |
| 19 | 11/1/2013 | $67,600.40 | $8,507.10 | $59,093.30 | $1,075,186.17 |
| 20 | 12/1/2013 | $67,600.40 | $8,063.90 | $59,536.50 | $1,015,649.67 |
| 21 | 1/1/2014 | $67,600.40 | $7,617.37 | $59,983.03 | $955,666.64 |
| 22 | 2/1/2014 | $67,600.40 | $7,167.50 | $60,432.90 | $895,233.74 |
| 23 | 3/1/2014 | $67,600.40 | $6,714.25 | $60,886.15 | $834,347.60 |
| 24 | 4/1/2014 | $67,600.40 | $6,257.61 | $61,342.79 | $773,004.80 |
| 25 | 5/1/2014 | $67,600.40 | $5,797.54 | $61,802.86 | $711,201.94 |
| 26 | 6/1/2014 | $67,600.40 | $5,334.01 | $62,266.39 | $648,935.55 |
| 27 | 7/1/2014 | $67,600.40 | $4,867.02 | $62,733.38 | $586,202.17 |
| 28 | 8/1/2014 | $67,600.40 | $4,396.52 | $63,203.88 | $522,998.29 |
| 29 | 9/1/2014 | $67,600.40 | $3,922.49 | $63,677.91 | $459,320.37 |
| 30 | 10/1/2014 | $67,600.40 | $3,444.90 | $64,155.50 | $395,164.88 |
| 31 | 11/1/2014 | $67,600.40 | $2,963.74 | $64,636.66 | $330,528.21 |
| 32 | 12/1/2014 | $67,600.40 | $2,478.96 | $65,121.44 | $265,406.77 |
| 33 | 1/1/2015 | $67,600.40 | $1,990.55 | $65,609.85 | $199,796.93 |
| 34 | 2/1/2015 | $67,600.40 | $1,498.48 | $66,101.92 | $133,695.00 |
| 35 | 3/1/2015 | $67,600.40 | $1,002.71 | $66,597.69 | $67,097.32 |
| 36 | 4/1/2015 | $67,600.55 | $503.23 | $67,097.32 | ($0.00) |
| Totals | | $2,433,614.55 | $291,854.20 | $2,141,760.35 | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------)(
STATE OF NEW YORK,

                        Plaintiff,

                -against-

SOUND SHORE MEDICAL CENTER OF
WESTCHESTER,

                       Defendant.
------------------------------------------------------------------)(

Index No. _____

AFFIDAVIT OF
CONFESSION OF
JUDGMENT

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF WESTCHESTER )

Albert M. Farina, being duly sworn, deposes and says:

1.     I am the Chief Financial Officer of SOUND SHORE MEDICAL CENTER OF
WESTCHESTER (hereinafter "SSMC"), a not for profit corporation duly organized and existing
under the laws of the State of New York. SSMC's principal place of business is located at 16
Guion Place, New Rochelle, County of Westchester, New York. In the period October 3, 2004
through January 31, 2011, SSMC, a provider with the New York State Medical Assistance
Program, commonly known as Medicaid, provided care and services to Medicaid recipients.
SSMC's Medicaid Management Information System number is 00274126.

2.     In my capacity as Chief Financial Officer of SSMC and acting within the scope of
my authority and on behalf of SSMC, I hereby confess judgment against SSMC and authorize
entry thereof in favor of the State of New York (the "STATE") in the sum of **TWO MILLION
ONE HUNDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS
AND THIRTY-FIVE CENTS ($2,141,760.35)** plus NINE PERCENT (9%) interest thereon, as

1

detailed in paragraph 2b of the Settlement Agreement, incorporated herein by reference, and a true and correct copy of which is attached hereto, and which I executed on behalf of SSMC.

3.      In my official capacity as Chief Financial Officer of SSMC, I hereby authorize entry of judgment against SSMC in New York County, in the State of New York, and in any other county in which SSMC owns property, including Westchester County.

4.      This Confession of Judgment is for a debt due the STATE arising out of SSMC's participation as a provider in the Medicaid Program.  As set forth in the attached Settlement Agreement, SSMC received overpayments from the Medicaid Program during the period of October 3, 2004 through January 31, 2011.

5.      The overpayment amounts due and owing to the Medicaid Program total **TWO MILLION ONE HUNDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS AND THIRTY-FIVE CENTS ($2,141,760.35)** plus interest thereon, as set forth in paragraph 2 herein and in paragraph 2b of the attached Settlement Agreement.

6.      In my official capacity as Chief Financial Officer of SSMC, I expressly authorize entry of judgment based on this Affidavit of Confession of Judgment against SSMC at any time in the amount of **TWO MILLION ONE HUNDRED FORTY-ONE THOUSAND SEVEN HUNDRED SIXTY DOLLARS AND THIRTY-FIVE CENTS ($2,141,760.35),** plus interest thereon as set forth in paragraph 2 herein and in paragraph 2b of the attached Settlement Agreement, less any amounts that may have been paid to the STATE pursuant to the Settlement Agreement.

SOUND SHORE MEDICAL

CENTER OF WESTCHESTER

By: _Albt a F_

*Chief Financial Officer*


STATE OF NEW YORK          )
                          ) ss:
COUNTY OF WESTCHESTER )

On this /0th day of April , 2012, before me personally came Albert M. Farina, to me
known, who being by me duly sworn, did depose and say that he resides in Westchester
County; that he is the Chief Financial Officer of Sound Shore Medical Center of Westchester, the
Not For Profit Corporation which is described in the above instrument; that he signed his name
thereto in his capacity as Chief Financial Officer of said Corporation.

_Stephanie Kate Boyer_

Notary Public

STEPHANIE KATE BOYER
NOTARY PUBLIC-STATE OF NEW YORK
No. 01BO6235215
Qualified in Westchester County
My Commission Expires February 07, 2015

3

**SOUND SHORE MEDICAL CENTER OF WESTCHESTER**
New Rochelle, New York 10802

5001611

1-2/210

PAY
TO THE
ORDER OF    NYS Attorney General Medicaid Fraud Control Restitution Fund    $ 100,000.00

DATE  04/16/12

THE SUM ********* DOL'S 00 CTS _____ DOLLARS

JPMorgan Chase Bank, N.A.
New York, NY

FOR

⑀500161⑀ ⑁021000021⑀ 9701702520⑀

DETACH AT PERFORATION BEFORE DEPOSITING CHECK

| MEMO | DATE | INVOICE NO. | PURCHASES (GROSS) | DEDUCTIONS | BALANCES |
|------|------|-------------|-------------------|------------|----------|
| Payment for legal settlement. | | | | | |

BY ENDORSEMENT THE ATTACHED CHECK WHEN PAID IS ACCEPTED
IN FULL PAYMENT OF THE ABOVE ITEMIZED ACCOUNT
**SOUND SHORE MEDICAL CENTER OF WESTCHESTER**
NEW ROCHELLE, N.Y.

**Schedule 4.14(b-1)**
**Excluded Medical Staff**

Dr. Stephen Klass was on list and now currently off list.

**Schedule 4.14(b-2)**
**Medical Staff Disputes**

None

2405424v.10

**Schedule 4.14(c)**
**Accreditation**

See Attached

2405424v.10

# The Mount Vernon Hospital

## Mount Vernon, NY

### has been Accredited by



## The Joint Commission

Which has surveyed this organization and found it to meet the requirements for the

## Hospital Accreditation Program

## May 27, 2010

Accreditation is customarily valid for up to 39 months.

_David A. Whiston, D.D.S._
Chairman of the Board

Organization ID #: 5804
Print/Reprint Date: 09/01/10

_Mark Chassin, M.D._
President

The Joint Commission is an independent, not-for-profit, national body that oversees the safety and quality of health care and other services provided in accredited organizations. Information about accredited organizations may be provided directly to The Joint Commission at 1-800-994-6610. Information regarding accreditation and the accreditation performance of individual organizations can be obtained through The Joint Commission's web site at www.jointcommission.org.

  

This reproduction of the original accreditation certificate has been issued for use in regulatory/payer agency verification of accreditation by The Joint Commission. Please consult Quality Check on The Joint Commission's website to confirm the organization's current accreditation status and for a listing of the organization's locations of care.

# The Mount Vernon Hospital
# Methadone Maintenance Program
## Mount Vernon, NY

### has been Accredited by



# The Joint Commission

Which has surveyed this organization and found it to meet the requirements for the

## Behavioral Health Care Accreditation Program

## May 17, 2012

Accreditation is customarily valid for up to 36 months.

Isabel V. Hoverman, MD, MACP
Chair, Board of Commissioners

Organization ID #: 379671
Print/Reprint Date: 07/23/12

Mark R. Chassin, MD, FACP, MPP, MPH
President

The Joint Commission is an independent, not-for-profit, national body that oversees the safety and quality of health care and other services provided in accredited organizations. Information about accredited organizations may be provided directly to The Joint Commission at 1-800-994-6610. Information regarding accreditation and the accreditation performance of individual organizations can be obtained through The Joint Commission's web site at www.jointcommission.org.

  

This reproduction of the original accreditation certificate has been issued for use in regulatory/payer agency verification of accreditation by The Joint Commission. Please consult Quality Check on The Joint Commission's website to confirm the organization's current accreditation status and for a listing of the organization's locations of care.


**The Joint Commission**

April 15, 2013

John R. Spicer                                    Joint Commission ID #: 5807
President and CEO                                 Program: Hospital Accreditation
Sound Shore Medical Center of Westchester         Accreditation Activity:  Unannounced Full
16 Guion Place                                    Event
New Rochelle, NY 10802                            Accreditation Activity Completed:
                                                  03/07/2013

Dear Mr. Spicer:

The Joint Commission would like to thank your organization for participating in the accreditation process. This process is designed to help your organization continuously provide safe, high - quality care, treatment, and services by identifying opportunities for improvement in your processes and helping you follow through on and implement these improvements. We encourage you to use the accreditation process as a continuous standards compliance and operational improvement tool.

With that goal in mind, your organization received Requirement(s) for Improvement during its recent survey. These requirements have been summarized in the Accreditation Report provided by the survey team that visited your organization.

Please be assured that The Joint Commission will keep the report confidential, except as required by law. To ensure that The Joint Commission's information about your organization is always accurate and current, our policy requires that you inform us of any changes in the name or ownership of your organization or the health care services you provide.

Please visit  Quality Check®  on The Joint Commission web site for updated information related to your accreditation decision.

Sincerely,

*Mark Pelletier*

Mark G. Pelletier, RN, MS

Chief Operating Officer

Division of Accreditation and Certification Operations

 The Joint Commission

April 15, 2013

John R. Spicer
President and CEO
Sound Shore Medical Center of Westchester          HCO ID: #5807
16 Guion Place
New Rochelle, New York 10802

Dear Mr. Spicer:

We appreciate your patience while we reviewed your clarification request regarding the findings of the March 5-7, 2013 full resurvey of your hospital program. Our review is now complete. Careful consideration was given to the original survey findings and the documentation submitted by your organization. Based on our review, below you will find information specific to each of the clarifications submitted and the impact on your organization's final report.

- **EC.02.03.03, EP 1** – The clarification submitted at this standard/ep was accepted. The documentation submitted for review contained sufficient evidence to demonstrate that your organization was compliant with the requirements of this EP at the time of your survey. As a result, the findings at EP 1 have been removed from your report. Please note, EC.02.03.03 remains listed as a Requirement for Improvement on your official accreditation report, due to the finding that remains at EP 2.

- **EC.02.05.01, EP 6** – Based on our central office review, the finding made at this standard /ep remains based on information submitted still citing an air flow deficiency. However, based on the observation cited and the specific room locations identified in the clarification, the finding has been reduced from a Condition-level deficiency to a Standard-level deficiency. Within your Evidence of Standards Compliance corrective action documentation, please show that decontamination is negative and sterile room is positive to the adjoining corridor. If you have specific questions regarding this review, please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-5900, option 6.

- **EC.02.05.07, EP 4** – The clarification submitted at this standard/ep was not accepted. The documentation submitted for review did not contain sufficient evidence to demonstrate that your organization was compliant with the requirements of this EP at the time of your survey. As a result, EC.02.05.07 remains listed as a Requirement for Improvement on your official accreditation report. If you have specific questions regarding this review, please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-5900, option 6.

- **EC.02.05.07, EP 6** - The clarification submitted at this standard/ep was not accepted. The documentation submitted for review did not contain sufficient evidence to demonstrate that your organization was compliant with the requirements of this EP at the time of your survey. As a result, EC.02.05.07 remains listed as a Requirement for Improvement on your official accreditation report. If you have specific questions regarding this review, please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-5900, option 6.

- **LD.04.03.09, EP 5** – The clarification submitted at this standard/ep was accepted, as there was sufficient evidence submitted to demonstrate that expectations were written into the contract dialysis service. As a result, the findings at EP 5 have been removed from your

report. Please note, LD.04.03.09 remains listed as a Requirement for Improvement on your
official accreditation report, due to the findings that remain at EP 6 and EP 7.

- **LD.04.03.09, EP 6** — The clarification submitted at this standard/ep was not accepted, as the
  documentation submitted for review did not demonstrate that quarterly evaluations were being
  monitored. Documents submitted show that although quarterly evaluations were being
  submitted, the supporting documents did not demonstrate that an accurate evaluation of the
  dialysis services were being performed. As a result, LD.04.03.09 remains listed as a
  Requirement for Improvement on your official accreditation report. If you have specific
  questions regarding this review, please contact the Standards Interpretation reviewer, Heidi
  Beckstrom, at 630-792-5900, option 6.

- **LS.04.03.09, EP 7** — The clarification submitted at this standard/ep was not accepted. The
  organization provided quarterly reports of dialysis machine maintenance which did not meet
  the expectation, but no action was taken. As a result, LD.04.03.09 remains listed as a
  Requirement for Improvement on your official accreditation report. Please note, the finding at
  this EP has been downgraded from a Condition-level deficiency to a Standard-level deficiency.
  If you have specific questions regarding this review, please contact the Standards
  Interpretation reviewer, Heidi Beckstrom, at 630-792-5900, option 6.

- **LS.01.02.01, EP 1** — The clarification submitted at this standard/ep was accepted, based on
  Fire Watch Policy in place at time of survey. As a result, LS.01.02.01 no longer appears as a
  Requirement for Improvement on your official accreditation report.

- **LS.02.01.10, EP 4** — The clarification submitted at this standard/ep was not accepted. The
  PFI in system does not identify locations of deficient doors. The doors cited on survey cannot
  be linked to the PFI. As a result, LS.02.01.10 remains listed as a Requirement for
  Improvement on your official accreditation report. If you have specific questions regarding this
  review, please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-
  5900, option 6.

- **LS.02.01.30, EP 2** — The clarification submitted at this standard/ep was not accepted. The
  PFI in system does not identify locations of deficient doors. The doors cited on survey cannot
  be linked to the PFI. As a result, LS.02.01.30 remains listed as a Requirement for
  Improvement on your official accreditation report. If you have specific questions regarding this
  review, please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-
  5900, option 6.

- **LS.02.01.34, EP 2** — The clarification submitted at this standard/ep was not accepted, as the
  disclosure of items in the PPR process does not exempt the items from being cited on survey.
  In addition, the fire alarm system PFI referenced deficiencies found during annual testing -
  missing locations. As a result, LS.02.01.34 remains listed as a Requirement for Improvement
  on your official accreditation report. If you have specific questions regarding this review,
  please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-5900,
  option 6.

- **LS.02.01.34, EP 4** - The clarification submitted at this standard/ep was not accepted, as the
  disclosure of items in the PPR process does not exempt the items from being cited on survey.
  In addition, the fire alarm system PFI referenced deficiencies found during annual testing -
  missing locations. As a result, LS.02.01.34 remains listed as a Requirement for Improvement
  on your official accreditation report. If you have specific questions regarding this review,
  please contact the Standards Interpretation reviewer, Anne Guglielmo, at 630-792-5900,
  option 6.

- **LS.02.01.35, EP 14** – The clarification submitted at this standard/ep was not accepted. The Joint Commission does not reference the 2011 edition of NFPA 25 nor is Annex material enforceable; only guidance. Also, the NFPA interpretation stated "it is part of the system and should be replaced" and the observations do not discuss system performance as discussed in the NFPA interpretation. The NFPA comment as quoted further demonstrates that the maintenance was lacking for the resultant observation. As a result, LS.02.01.35 remains listed as a Requirement for Improvement on your official accreditation report. If you have specific questions regarding this review, please contact the Standards Interpretation reviewer, John Maurer, at 630-792-5900, option 6.

Please feel free to contact me at 630-792-5737 with any questions.

Sincerely,

*Kelli Jacobs*

Kelli Jacobs
Sr. Account Executive
Accreditation and Certification Operations

cc:    Thomas Barton, Field Director, The Joint Commission
Mary Janda, Field Representative, The Joint Commission
Anthony Lombardino, MD, Field Representative, The Joint Commission
Pamela Stewart, Field Representative, The Joint Commission
Kenneth Blackwell, Field Representative, The Joint Commission

One Renaissance Boulevard          Member Organizations          American Dental Association
Oakbrook Terrace, IL 60181         American College of Physicians  American Hospital Association
(630) 792-5000                     American College of Surgeons    American Medical Association
http://www.jcaho.org

**The Joint Commission**

# Sound Shore Medical Center of Westchester
## 16 Guion Place
## New Rochelle, NY 10802
### Organization Identification Number: 5807

| **Program(s)** | **Survey Date(s)** |
|---|---|
| Hospital Accreditation | 03/05/2013-03/07/2013 |

### Executive Summary

**Hospital Accreditation :**  As a result of the accreditation activity conducted on the above date(s), Requirements for Improvement have been identified in your report.

You will have follow-up in the area(s) indicated below:

- Evidence of Standards Compliance (ESC)

If you have any questions, please do not hesitate to contact your Account Executive.

Thank you for collaborating with The Joint Commission to improve the safety and quality of care provided to patients.

# The Joint Commission
## Summary of Findings

**Evidence of DIRECT Impact Standards Compliance is due within 45 days from the day the survey report was originally posted to your organization's extranet site:**

| Program: | Hospital Accreditation Program | |
|---|---|---|
| Standards: | EC.02.04.03 | EP5 |
| | EC.02.05.01 | EP6 |
| | EC.02.05.07 | EP4,EP6 |
| | EM.02.02.13 | EP5 |
| | LS.02.01.34 | EP2,EP4 |
| | MM.03.01.01 | EP7 |
| | MM.05.01.07 | EP1 |
| | PC.01.02.07 | EP3 |
| | PC.02.01.03 | EP1 |

**Evidence of INDIRECT Impact Standards Compliance is due within 60 days from the day the survey report was originally posted to your organization's extranet site:**

| Program: | Hospital Accreditation Program | |
|---|---|---|
| Standards: | EC.02.03.03 | EP2 |
| | EC.02.03.05 | EP6 |
| | IC.02.02.01 | EP4 |
| | LD.04.03.09 | EP6,EP7 |
| | LS.02.01.10 | EP4 |
| | LS.02.01.20 | EP13,EP29 |
| | LS.02.01.30 | EP2,EP23 |
| | LS.02.01.35 | EP14 |
| | MM.04.01.01 | EP10 |
| | MS.06.01.03 | EP6 |
| | MS.06.01.05 | EP12 |
| | MS.08.01.01 | EP3 |
| | RC.01.01.01 | EP19 |

## The Joint Commission
## Summary of CMS Findings

**CoP:** §482.23    **Tag:** A-0385    **Deficiency:** Standard

**Corresponds to:** HAP

**Text:** §482.23 Condition of Participation: Nursing Services

The hospital must have an organized nursing service that provides 24-hour nursing services. The nursing services must be furnished or supervised by a registered nurse.

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.23(c) | A-0404 | HAP - PC.02.01.03/EP1 | Standard |
| §482.23(b)(6) | A-0398 | HAP - LD.04.03.09/EP7 | |

**CoP:** §482.24    **Tag:** A-0431    **Deficiency:** Standard

**Corresponds to:** HAP

**Text:** §482.24 Condition of Participation: Medical Record Services

The hospital must have a medical record service that has administrative responsibility for medical records. A medical record must be maintained for every individual evaluated or treated in the hospital.

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.24(c)(2) | A-0450 | HAP - RC.01.01.01/EP19 | Standard |
| §482.24(c)(1) | A-0450 | HAP - RC.01.01.01/EP19 | Standard |

**CoP:** §482.25    **Tag:** A-0490    **Deficiency:** Standard

**Corresponds to:** HAP

**Text:** §482.25 Condition of Participation: Pharmaceutical Services

The hospital must have pharmaceutical services that meet the needs of the patients. The institution must have a pharmacy directed by a registered pharmacist or a drug storage area under competent supervision. The medical staff is responsible for developing policies and procedures that minimize drug errors. This function may be delegated to the hospital's organized pharmaceutical service.

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.25(b)(1) | A-0501 | HAP - MM.05.01.07/EP1 | Standard |

**CoP:** §482.41    **Tag:** A-0700    **Deficiency:** Standard

**Corresponds to:** HAP

**Text:** §482.41 Condition of Participation: Physical Environment

The hospital must be constructed, arranged, and maintained to ensure the safety of the patient, and to provide facilities for diagnosis and treatment and for special hospital services appropriate to the needs of the community.

## The Joint Commission
## Summary of CMS Findings

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.41(c)(2) | A-0724 | HAP - EC.02.05.07/EP4, EP6 | Standard |
| §482.41(b)(7) | A-0714 | HAP - EC.02.03.03/EP2 | Standard |
| §482.41(b)(1)(l) | A-0710 | HAP - EC.02.03.05/EP6, LS.02.01.10/EP4, LS.02.01.20/EP13, EP29, LS.02.01.30/EP2, EP23, LS.02.01.34/EP2, EP4, LS.02.01.35/EP14 | Standard |

**CoP:**  §482.51  **Tag:** A-0940  **Deficiency:**  Standard

**Corresponds to:** HAP - EC.02.05.01/EP6

**Text:**  §482.51 Condition of Participation: Surgical Services

If the hospital provides surgical services, the services must be well organized and provided in accordance with acceptable standards of practice. If outpatient surgical services are offered the services must be consistent in quality with inpatient care in accordance with the complexity of services offered.

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.51(b) | A-0951 | HAP - IC.02.02.01/EP4 | Standard |

**CoP:**  **Tag:**  **Deficiency:**

**Corresponds to:** HAP

**Text:**

| CoP Standard | Tag | Corresponds to | Deficiency |
|---|---|---|---|
| §482.12(e)(1) | A-0084 | HAP - LD.04.03.09/EP6 | Standard |

## The Joint Commission
## Findings

| | |
|---|---|
| **Chapter:** | Emergency Management |
| **Program:** | Hospital Accreditation |
| **Standard:** | EM.02.02.13 |

(ESC 45 days)

| | |
|---|---|
| **Standard Text:** | During disasters, the hospital may grant disaster privileges to volunteer licensed independent practitioners.
Note: A disaster is an emergency that, due to its complexity, scope, or duration, threatens the organization's capabilities and requires outside assistance to sustain patient care, safety, or security functions. |
| **Primary Priority Focus Area:** | Credentialed Practitioners |

**Element(s) of Performance:**

5. Before a volunteer practitioner is considered eligible to function as a volunteer licensed independent practitioner, the hospital obtains his or her valid government-issued photo identification (for example, a driver's license or passport) and at least one of the following:
- A current picture identification card from a health care organization that clearly identifies professional designation
- A current license to practice
- Primary source verification of licensure
- Identification indicating that the individual is a member of a Disaster Medical Assistance Team (DMAT), the Medical Reserve Corps (MRC), the Emergency System for Advance Registration of Volunteer Health Professionals (ESAR-VHP), or other recognized state or federal response organization or group
- Identification indicating that the individual has been granted authority by a government entity to provide patient care, treatment, or services in disaster circumstances
- Confirmation by a licensed independent practitioner currently privileged by the hospital or by a staff member with personal knowledge of the volunteer practitioner's ability to act as a licensed independent practitioner during a disaster

**Scoring**

| | |
|---|---|
| **Category :** | A |
| **Score :** | Insufficient Compliance |

**Observation(s):**

EP 5
Observed in Credentialing and Privileging at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
It was observed that the medical staff bylaws did not require a government-issued photo identification card in addition to one other form of identification. Based on the wording, a practitioner would be eligible for disaster privileges by presenting just a "picture hospital ID card".

---

| | |
|---|---|
| **Chapter:** | Environment of Care |
| **Program:** | Hospital Accreditation |
| **Standard:** | EC.02.03.03 |

(ESC 60 days)

| | |
|---|---|
| **Standard Text:** | The hospital conducts fire drills. |
| **Primary Priority Focus Area:** | Communication |

## The Joint Commission
## Findings

### Element(s) of Performance:

2. The hospital conducts fire drills every 12 months from the date of the last drill in all freestanding buildings classified as business occupancies and in which patients are seen or treated.
Note: In leased or rented facilities, drills need be conducted only in areas of the building that the hospital occupies.



### Scoring
**Category :**     A
**Score :**     Insufficient Compliance

### Observation(s):

EP 2
§482.41(b)(7) - (A-0714) - (7) The hospital must have written fire control plans that contain provisions for prompt reporting of fires; extinguishing fires; protection of patients, personnel and guests; evacuation; and cooperation with fire fighting authorities.
This Standard is NOT MET as evidenced by:
Observed in Tracer Activities at Sound Shore Medical Center of Westchester Cardiac Rehab (2365 Boston Post Road, Larchmont, NY) site for the Hospital deemed service.
Discussion with staff at the outpatient cardiac rehabilitation clinic revealed that they had not had a fire drill in the clinic. They stated there had been safety rounds but not a fire drill.

| | |
|---|---|
| **Chapter:** | Environment of Care |
| **Program:** | Hospital Accreditation |
| **Standard:** | EC.02.03.05 |
| **Standard Text:** | The hospital maintains fire safety equipment and fire safety building features. Note: This standard does not require hospitals to have the types of fire safety equipment and building features described below. However, if these types of equipment or features exist within the building, then the following maintenance, testing, and inspection requirements apply. |
| **Primary Priority Focus Area:** | Communication |



### Element(s) of Performance:

6. For automatic sprinkler systems: Every week, the hospital tests fire pumps under no-flow conditions. The completion date of the tests is documented.
Note: For additional guidance on performing tests, see NFPA 25, 1998 edition.

### Scoring
**Category :**     C
**Score :**     Insufficient Compliance

### Observation(s):

## The Joint Commission
### Findings

EP 6

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.

This Standard is NOT MET as evidenced by:

Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
For the period of March 2012 - June 2012, the organization's weekly fire pump testing documentation didn't include the suction/discharge pressures or the run time.

Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
For the period of July 2012 - September 2012, the organization's weekly fire pump testing documentation didn't include the suction/discharge pressures or the run time.

Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
For the period of October 2012 - February 2013, the organization's weekly fire pump testing documentation didn't include the suction/discharge pressures or the run time.

---

**Chapter:**            Environment of Care

**Program:**            Hospital Accreditation

**Standard:**           EC.02.04.03                                    (ESC 45 days)

**Standard Text:**      The hospital inspects, tests, and maintains medical equipment.

**Primary Priority Focus Area:**   Communication

**Element(s) of Performance:**

5. The hospital performs equipment maintenance and chemical and biological testing of water used in hemodialysis. These activities are documented. 

**Scoring**
**Category :**      A
**Score :**         Insufficient Compliance

**Observation(s):**

EP 5
Observed at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
There was an open bottle of residual chlorine strips in the cabinet that did not have an open date or expiration date.
The recommendations printed on the container read they were good for 90 days from the open date.

---

**Chapter:**            Environment of Care

**Program:**            Hospital Accreditation

## The Joint Commission
### Findings

| | |
|---|---|
| **Standard:** | EC.02.05.01 |

ESC 45 days

| | |
|---|---|
| **Standard Text:** | The hospital manages risks associated with its utility systems. |
| **Primary Priority Focus Area:** | Physical Environment |

**Element(s) of Performance:**

6. In areas designed to control airborne contaminants (such as biological agents, gases, fumes, dust), the ventilation system provides appropriate pressure relationships, air-exchange rates, and filtration efficiencies.
Note: Areas designed for control of airborne contaminants include spaces such as operating rooms, special procedure rooms, delivery rooms for patients diagnosed with or suspected of having airborne communicable diseases (for example, pulmonary or laryngeal tuberculosis), patients in 'protective environment' rooms (for example, those receiving bone marrow transplants), laboratories, pharmacies, and sterile supply rooms. For further information, see Guidelines for Design and Construction of Health Care Facilities, 2010 edition, administered by the Facility Guidelines Institute and published by the American Society for Healthcare Engineering (ASHE).



**Scoring**
**Category :**    A
**Score :**    Insufficient Compliance

**Observation(s):**

EP 6
§482.51 - (A-0940) - §482.51 Condition of Participation: Condition of Participation: Surgical Services
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The Sterile processing  decontamination room airflow was positive to the back corridor that separated the sterile and dirty rooms respectively.  The airflow test was conducted utilizing a tissue.

| | |
|---|---|
| **Chapter:** | Environment of Care |
| **Program:** | Hospital Accreditation |
| **Standard:** | EC.02.05.07 |

ESC 45 days

| | |
|---|---|
| **Standard Text:** | The hospital inspects, tests, and maintains emergency power systems. Note: This standard does not require hospitals to have the types of emergency power equipment discussed below. However, if these types of equipment exist within the building, then the following maintenance, testing, and inspection requirements apply. |
| **Primary Priority Focus Area:** | Communication |

## The Joint Commission
## Findings

**Element(s) of Performance:**

4. Twelve times a year, at intervals of not less than 20 days and not more than 40 days, the hospital tests each emergency generator for at least 30 continuous minutes. The completion dates of the tests are documented.



**Scoring**
**Category :**        A
**Score :**        Insufficient Compliance

6. Twelve times a year, at intervals of not less than 20 days and not more than 40 days, the hospital tests all automatic transfer switches. The completion date of the tests is documented.



**Scoring**
**Category :**        A
**Score :**        Insufficient Compliance

**Observation(s):**

EP 4
§482.41(c)(2) - (A-0724) - (2) Facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality.
This Standard is NOT MET as evidenced by:
Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The organization's monthly generator (150 KW) testing documentation reflected there was less than 20 days between the test dated November 15, 2012 and December 2, 2012 respectively.


Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The organization's monthly generator (600 KW) testing documentation reflected there were less than 20 days between the test dated October 28, 2012 and November 15, 2012 respectively.


EP 6
§482.41(c)(2) - (A-0724) - (2) Facilities, supplies, and equipment must be maintained to ensure an acceptable level of safety and quality.
This Standard is NOT MET as evidenced by:
Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The organization's monthly automatic transfer switch (150 KW generator) testing documentation reflected there was less than 20 days between the test dated November 15, 2012 and December 2, 2012 respectively.


Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The organization's monthly automatic transfer switch (600 KW generator) testing documentation reflected there was less than 20 days between the test dated October 28, 2012 and November 15, 2012 respectively.

| | |
|---|---|
| **Chapter:** | Infection Prevention and Control |
| **Program:** | Hospital Accreditation |
| **Standard:** | IC.02.02.01 |

ESC 60 days

## The Joint Commission
### Findings

**Standard Text:**                    The hospital reduces the risk of infections associated with medical
                                      equipment, devices, and supplies.

**Primary Priority Focus Area:**  Infection Control

**Element(s) of Performance:**

4. The hospital implements infection prevention and control activities
when doing the following: Storing medical equipment, devices, and
supplies.



**Scoring**
**Category :**        C
**Score :**           Insufficient Compliance

**Observation(s):**

EP 4
§482.51(b) - (A-0951) - §482.51(b) Standard: Delivery of Service

Surgical services must be consistent with needs and resources. Policies governing surgical care must be designed
to assure the achievement and maintenance of high standards of medical practice and patient care.
This Standard is NOT MET as evidenced by:
Observed in Tracer Activities at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
It was observed on unit 3 North that laryngoscope blades were stored uncovered in a plastic tray,
intermixed with other packaged and unpackaged items. There was no way to ascertain if these blades had been
disinfected, nor were they stored in a way to maintain cleanliness.

Observed in Tracer Activities at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
It was observed in the Operating Suite that laryngoscope blades were stored uncovered in a crash cart drawer,
intermixed with other medical items. There was no way to ascertain if these blades had been disinfected, nor were
they packaged in a manner to maintain cleanliness.

Observed in Tracer Activities at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
The intubation blades stored in the crash cart in ICU and the crash cart on the telemetry unit were not stored in a
manner to prevent contamination. The unwrapped blades were stored in an open bin under other supplies in the
bottom drawer of the cart.

---

**Chapter:**         Leadership

**Program:**         Hospital Accreditation

**Standard:**        LD.04.03.09                    (ESC 60 days)

**Standard Text:**   Care, treatment, and services provided through contractual agreement are
                     provided safely and effectively.

**Primary Priority Focus Area:**  Organizational Structure

## The Joint Commission
## Findings

### Element(s) of Performance:

6. Leaders monitor contracted services by evaluating these services in relation to the hospital's expectations. 

**Scoring**
**Category :**      A
**Score :**         Insufficient Compliance

7. Leaders take steps to improve contracted services that do not meet expectations. 
Note: Examples of improvement efforts to consider include the following:
- Increase monitoring of the contracted services.
- Provide consultation or training to the contractor.
- Renegotiate the contract terms.
- Apply defined penalties.
- Terminate the contract.

**Scoring**
**Category :**      A
**Score :**         Insufficient Compliance

### Observation(s):

# The Joint Commission
## Findings

EP 6

§482.12(e)(1) - (A-0084) - (1) The governing body must ensure that the services performed under a contract are provided in a safe and effective manner.

This Standard is NOT MET as evidenced by:

Observed in Tracer Visit at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.

Discussion with leadership verified that the organization was not monitoring the contracted dialysis service when the following observations were shared with them.

During the tracer visit to inpatient dialysis on the fourth floor, it was noted there was dust on top of the sharps container, at the bottom of the medication cart and on the counter behind the area of water sampling. There was a stained ceiling tile near the window and a broken ceiling tile above machine F57. On the counter, there was a holder of four plastic bottles containing liquid. One bottle was labeled with the initials RO and a date of 3/5/13. In the tubing of this bottle there were areas of black spots. The third bottle was labeled as conductivity solution. This bottle's tubing was entirely black on the inside. The Fresenius staff member was not able to explain what these bottles were used for, what the date represented or why the tubes on these two bottles were discolored. There was a phoenix meter, containing a filled syringe, attached to one of the bottles. The calibration sticker on the meter documented it was calibrated on 4/20/11 and the next calibration due date was 4/20/12. There was an open bottle of residual chlorine strips in the cabinet that did not have an open date or expiration date. The recommendations printed on the container read they were good for 90 days from the open date. The log book for patients having been dialyzed contained only the date and name of patient. When the medication cart was opened, there were two open multi-dose vials of Heparin which had a marking that was not legible by the staff. Also, in the medication cart, there were multiple, pre-signed photocopied, blank Physician Order Templates. These order set forms had blank areas to be filled in for dialyzer, treatment hours, fluid removal goal, dialysis flow rate, bicarbonate bath, heparin, etc. These order sets were already signed by the Nephrologist. When I reviewed an inpatient record, the order set blanks were filled in and was signed with the nurse's initials and a date of 1/23/ 2013. There was also a date of 1/23/2013 beside the photocopy physician signature. Upon discussing the process for obtaining the dialysis order, the dialysis nurse stated she calls the nephrologist and obtains the order, fills in the blanks and places the date beside the photocopied signature. There was no documentation to indicate this order was a telephone order. There was no time on the dialysis order for 1/23/13, 2/6/13 and 2/7/13.

EP 7

§482.23(b)(6) - (A-0398) - (6) Non-employee licensed nurses who are working in the hospital must adhere to the policies and procedures of the hospital. The director of nursing service must provide for the adequate supervision and evaluation of the clinical activities of non-employee nursing personnel which occur within the responsibility of the nursing services.

This Standard is NOT MET as evidenced by:

Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.

In meeting with management, it was admitted that there have been no attempts to mitigate or improve the deficiencies enumerated in the findings of EP 6, including performance issues of the non-employed nursing dialysis staff, as they were unaware those deficiencies were present.

---

**Chapter:**              Life Safety

**Program:**              Hospital Accreditation

**Standard:**             LS.02.01.10                                          (ESC 60 days)

**Standard Text:**        Building and fire protection features are designed and maintained to minimize the effects of fire, smoke, and heat.

**Primary Priority Focus Area:**  Physical Environment

## The Joint Commission
## Findings

**Element(s) of Performance:**

4. Openings in 2-hour fire-rated walls are fire rated for 1 1/2 hours.
(See also LS.02.01.20, EP 3; LS.02.01.30, EP 1) (For full text and any
exceptions, refer to NFPA 101-2000: 8.2.3.2.3.1)



**Scoring**
**Category :**       A
**Score :**          Insufficient Compliance

**Observation(s):**

EP 4
§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life
Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has
approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by
reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at
the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and
Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or
go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If
any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal
Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
The mechanical room fire door located at top of stairwell G had penetrations around the door handle.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
The telecom room fire door located at top of stairwell G had penetrations around the door handle.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
The fire door leading into stairwell G 8th floor rating label was covering with paint.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY)
site for the Hospital deemed service.
The door leading into stairwell A 7th floor was missing a rating label.

---

| | |
|---|---|
| **Chapter:** | Life Safety |
| **Program:** | Hospital Accreditation |
| **Standard:** | LS.02.01.20 |
| **Standard Text:** | The hospital maintains the integrity of the means of egress. |
| **Primary Priority Focus Area:** | Physical Environment |

(BSC 60 days)

## The Joint Commission
### Findings

**Element(s) of Performance:**

13. Exits, exit accesses, and exit discharges are clear of obstructions or impediments to the public way, such as clutter (for example, equipment, carts, furniture), construction material, and snow and ice. (For full text and any exceptions, refer to NFPA 101-2000: 7.1.10.1)



**Scoring**
**Category :**    C
**Score :**    Partial Compliance

29. Stairs serving five or more stories have signs on each floor landing in the stairwell that identify the story, the stairwell, the top and bottom, and the direction to and story of exit discharge. The signs are placed 5 feet above the floor landing in a position that is easily visible when the door is open or closed. (For full text and any exceptions, refer to NFPA 101-2000: 7.2.2.5.4)



**Scoring**
**Category :**    C
**Score :**    Insufficient Compliance

**Observation(s):**

# The Joint Commission
## Findings

EP 13

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
There was a clean linen cart stored in the Endoscopy corridor adjacent to the 8th floor PACU (corrected on survey).

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
There was a row of chairs stored in the corridor across from the Infusion room.

EP 29

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 9th floor stairwell landing was missing egress signage.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 8th floor stairwell landing signage located in stairwell D was posted on the back of the fire door.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 7th floor stairwell landing signage located in stairwell D was posted on the back of the fire door.

---

**Chapter:**                  Life Safety

**Program:**               Hospital Accreditation

**Standard:**              LS.02.01.30          (ESC 60 days)

**Standard Text:**       The hospital provides and maintains building features to protect individuals from the hazards of fire and smoke.

**Primary Priority Focus Area:**    Physical Environment

## The Joint Commission

### Element(s) of Performance:

2. All hazardous areas are protected by walls and doors in accordance with NFPA 101-2000; 18/19.3.2.1. (See also LS.02.01.10, EP 5; LS.02.01.20, EP 18) Hazardous areas include, but are not limited, to the following: 
Boiler/fuel-fired heater rooms
- Existing boiler/fuel-fired heater rooms have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the rooms have 1-hour fire-rated walls and 3/4-hour fire-rated doors.
- New boiler/fuel-fired heater rooms have sprinkler systems and have 1 -hour fire-rated walls and 3/4-hour fire-rated doors.
Central/bulk laundries larger than 100 square feet
- Existing central/bulk laundries larger than 100 square feet have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the laundries have 1-hour fire-rated walls and 3/4-hour fire-rated doors.
- New central/bulk laundries larger than 100 square feet have sprinkler systems and have 1-hour fire-rated walls and 3/4-hour fire-rated doors.
Flammable liquid storage rooms (See NFPA 30-1996:4-4.2.1 and 4-4.4.2)
- Existing flammable liquid storage rooms have 2-hour fire-rated walls with 1 1/2-hour fire-rated doors.
- New flammable liquid storage rooms have sprinkler systems and have 2-hour fire-rated walls with 1 1/2-hour fire-rated doors.
Laboratories (See NFPA 45-1996 to determine if a laboratory is a 'severe hazard' area)
- Existing laboratories that are not severe hazard areas have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the laboratories have walls fire rated for 1 hour with 3/4-hour fire-rated doors.
- New laboratories that are not severe hazard areas have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices.
- Existing laboratories that are severe hazard areas (See NFPA 99-1999: 10-3.1.1) have 2-hour fire-rated walls with 1 1/2-hour fire-rated doors. When there is a sprinkler system, the walls are fire rated for 1 hour with 3/4-hour fire-rated doors.
- New laboratories that are severe hazard areas (See NFPA 99-1999: 10-3.1.1) have sprinkler systems and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.
- Existing flammable gas storage rooms in laboratories have 2-hour fire-rated walls with 1 1/2-hour fire-rated doors. (See NFPA 99-1999: 10-10.2.2)
- New flammable gas storage rooms in laboratories have sprinkler systems and have 2-hour fire-rated walls with 1 1/2-hour fire-rated doors. (See NFPA 99-1999: 10-10.2.2)
Maintenance repair shops
- Existing maintenance repair shops have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the shops have 1-hour fire-rated walls with at least 3/4-hour fire-rated doors.
- New maintenance repair shops have sprinkler systems and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.
Piped oxygen tank supply rooms (See NFPA 99-1999: 4-3.1.1.2)
- Existing piped oxygen tank supply rooms have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

## The Joint Commission
## Findings

- New piped oxygen tank supply rooms have sprinkler systems and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

Paint shops that are not severe hazard areas

- Existing paint shops that are not severe hazard areas have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the shops have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

- New paint shops that are not severe hazard areas have sprinkler systems and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

Soiled linen rooms

- Existing soiled linen rooms have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the rooms have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

- New soiled linen rooms have sprinkler systems and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

Storage rooms

- Existing storage rooms for combustible materials larger than 50 square feet have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the rooms have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

- New storage rooms for combustible materials 50 to 100 square feet are sprinklered, resist the passage of smoke, and have doors with self-closing or automatic-closing devices.

- New storage rooms for combustible materials larger than 100 square feet are sprinklered and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

Trash collection rooms

- Existing trash collection rooms have sprinkler systems, resist the passage of smoke, and have doors with self-closing or automatic-closing devices; or the rooms have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

- New trash collection rooms are sprinklered and have 1-hour fire-rated walls with 3/4-hour fire-rated doors.

**Scoring**
**Category :**        C
**Score :**           Partial Compliance

23. Doors in smoke barriers are self-closing or automatic-closing, constructed of 1 3/4-inch or thicker solid bonded wood core or equivalent, and fitted to resist the passage of smoke. The gap between meeting edges of door pairs is no wider than 1/8 inch, and undercuts are no larger than 3/4 inch. Doors do not have nonrated protective plates more than 48 inches above the bottom of the door. (For full text and any exceptions, refer to NFPA 101-2000: 18/19.3.7.5, 18/19.3.7.6, and 8.3.4.1)

**Scoring**
**Category :**        C
**Score :**           Partial Compliance

**Observation(s):**

## The Joint Commission
## Findings

**EP 2**

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The Endoscopy dirty utility room door didn't latch during the functional test.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 8th floor linen/trash chute room door had a hole located at the top of the cypher lock.

**EP 23**

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The smoke barrier door located at the entrance to 5 Joyce didn't latch during the functional test.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The smoke barrier door located at the entrance to the 4 floor med-surge unit didn't latch during the functional test.

---

**Chapter:**                          Life Safety

**Program:**                          Hospital Accreditation

**Standard:**                         LS.02.01.34                    (ESC 46 days)

**Standard Text:**                    The hospital provides and maintains fire alarm systems.

**Primary Priority Focus Area:**   Physical Environment

## The Joint Commission
### Findings

**Element(s) of Performance:**

2. The master fire alarm control panel is located in a protected
environment (an area enclosed with 1-hour fire-rated walls and 3/4-
hour fire-rated doors) that is continuously occupied or in an area with a
smoke detector. (See also LS.02.01.10, EP 5) (For full text and any
exceptions, refer to NFPA 101-2000: 9.6.4 and NFPA 72-1999: 1-5.6
and 3-8.41)



**Scoring**
**Category :**        A
**Score :**           Insufficient Compliance

4. The hospital meets all other Life Safety Code fire alarm
requirements related to NFPA 101-2000: 18/19.3.4.



**Scoring**
**Category :**        C
**Score :**           Partial Compliance

**Observation(s):**

## The Joint Commission
### Findings

EP 2

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The main fire alarm panel was located in room that was not continuously occupied or equipped with a smoke detector.

EP 4

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 4th floor Doctor's on-call room #1 wasn't equipped with a smoke detector.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The 4th floor Doctor's on-call room #2 wasn't equipped with a smoke detector.

---

| | |
|---|---|
| **Chapter:** | Life Safety |
| **Program:** | Hospital Accreditation |
| **Standard:** | LS.02.01.35 |
| **Standard Text:** | The hospital provides and maintains systems for extinguishing fires. |
| **Primary Priority Focus Area:** | Physical Environment |

(ESC 60 days)

**Element(s) of Performance:**

14. The hospital meets all other Life Safety Code automatic extinguishing requirements related to NFPA 101-2000: 18/19.3.5.



**Scoring**
**Category :**    C
**Score :**    Insufficient Compliance

## The Joint Commission
## Findings

**Observation(s):**

EP 14

§482.41(b)(1)(i) - (A-0710) - (i) The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association. The Director of the Office of the Federal Register has approved the NFPA 101®2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The sprinkler head located just before the entrance to the 8th floor stair tower B was missing an escutcheon plate.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The sprinkler head located within the 4th floor med-surge clean utility room was missing an escutcheon plate.

Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
The sprinkler head located outside of the 8th floor conference room was missing an escutcheon plate.

---

| | |
|---|---|
| **Chapter:** | Medical Staff |
| **Program:** | Hospital Accreditation |
| **Standard:** | MS.06.01.03      (RSC 60 days) |
| **Standard Text:** | The hospital collects information regarding each practitioner's current license status, training, experience, competence, and ability to perform the requested privilege. |
| **Primary Priority Focus Area:** | Credentialed Practitioners |

**Element(s) of Performance:**

6. The credentialing process requires that the hospital verifies in writing and from the primary source whenever feasible, or from a credentials verification organization (CVO), the following information:
- The applicant's current licensure at the time of initial granting, renewal, and revision of privileges, and at the time of license expiration
- The applicant's relevant training
- The applicant's current competence
(See also PC.03.01.01, EP 1)

⚠

**Scoring**
**Category :**    A
**Score :**    Insufficient Compliance

**Observation(s):**

# The Joint Commission
## Findings

EP 6
Observed in Credentialing and Privileging at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
It was observed that the credentialing and privileging sections of the medical staff bylaws did not include language requiring that primary source verification be used, whenever feasible, when confirming licensure, training or competence. The hospital was using primary source verification, but the bylaws did not require it.

---

| | |
|---|---|
| **Chapter:** | Medical Staff |
| **Program:** | Hospital Accreditation |
| **Standard:** | MS.06.01.05 |
| **Standard Text:** | The decision to grant or deny a privilege(s), and/or to renew an existing privilege(s), is an objective, evidence-based process. |
| **Primary Priority Focus Area:** | Credentialed Practitioners |

(ESC 60 days)

**Element(s) of Performance:**

12. Information regarding each practitioner's scope of privileges is updated as changes in clinical privileges for each practitioner are made.

⚠

**Scoring**
**Category :**    A
**Score :**    Insufficient Compliance

**Observation(s):**

EP 12
Observed in Credentialing and Privileging at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
It was observed that the medical staff did not review or update a provider's privilege list at the time of re-credentialing. Physicians who were on staff for many years maintained the same privileging form that was used during initial appointment. There was no process to identify which of those privileges the physician was still exercising, nor the quality of his/her performance regarding the individual privileges listed.

---

| | |
|---|---|
| **Chapter:** | Medical Staff |
| **Program:** | Hospital Accreditation |
| **Standard:** | MS.08.01.01 |
| **Standard Text:** | The organized medical staff defines the circumstances requiring monitoring and evaluation of a practitioner's professional performance. |
| **Primary Priority Focus Area:** | Credentialed Practitioners |

(ESC 60 days)

## The Joint Commission
## Findings

**Element(s) of Performance:**

3. The performance monitoring process is clearly defined and includes
each of the following elements:
- Criteria for conducting performance monitoring
- Method for establishing a monitoring plan specific to the requested
privilege
- Method for determining the duration of performance monitoring
- Circumstances under which monitoring by an external source is
required



**Scoring**
**Category :**    A
**Score :**    Insufficient Compliance

**Observation(s):**

EP 3
Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle,
NY) site.
It was observed that the medical staff did not have a clearly defined written procedure for performance monitoring
of credentialed practitioners. On initial appointment, practitioners were placed on provisional status until such time
as the department chairman released them from provisional based on the practitioner's general performance.
Thereafter, focused performance evaluation was conducted at the discretion of the department chairman based on
undefined criteria. Neither the method and duration of monitoring, nor the circumstances requiring outside
monitoring were defined in writing in the bylaws or any other medical staff policy.

---

**Chapter:**    Medication Management

**Program:**    Hospital Accreditation

**Standard:**    MM.03.01.01    ESC 45 days

**Standard Text:**    The hospital safely stores medications.

**Primary Priority Focus Area:**    Information Management

**Element(s) of Performance:**

7. All stored medications and the components used in their preparation
are labeled with the contents, expiration date, and any applicable
warnings.

**Scoring**
**Category :**    C
**Score :**    Insufficient Compliance

**Observation(s):**

# The Joint Commission
## Findings

EP 7

Observed In Tracer Activities at Sound Shore Medical Center of Westchester (16 Gulon Place, New Rochelle, NY) site.
It was observed In the operating room that solution used for wound Irrigation was being stored In a warmer without the bottles being labeled with an expiration date. The manufacturer's Instructions stated that the solution was only good for 60 days after being warmed above room temperature. The nurse manager stated that the solution Is not labeled because It Is used so frequently that It never stays In the warmer longer than 60 days.

Observed In Tracer Activities at Sound Shore Medical Center of Westchester (16 Gulon Place, New Rochelle, NY) site.
In a second finding, It was observed that solution used for instrument Irrigation was being stored In a warmer without the bottles being labeled with an expiration date. The manufacturer's Instructions stated that the solution was only good for 60 days after being warmed above room temperature.

Observed In Individual Tracer at Sound Shore Medical Center of Westchester (16 Gulon Place, New Rochelle, NY) site.
During the tracer activity on the labor and delivery unit, it was noted there was an open vial of penicillin in the medication refrigerator.  The vial was labeled with a date of 3/1/13.  There was no way to know If this was the open date or expiration date.  The hospital's policy stated, "multiple dose vials can be reused until the labeled date of expiration as long as they are stored according to the manufacturer's recommendations and aseptic technique is used while withdrawing contents".  The manufacturer's recommendations for this vial of penicillin stated, "all solutions should be stored In a refrigerator and when refrigerated, penicillin solutions may be stored for seven days without significant loss of potency".

Observed In Tracer Activities at Sound Shore Medical Center of Westchester (16 Gulon Place, New Rochelle, NY) site.
Two opened Insulin vials In the medication refrigerator on the telemetry unit were not labeled with the date of expiration which would be 28 days after the vial was opened.

Observed In Tracer Activities at Sound Shore Medical Center of Westchester (16 Gulon Place, New Rochelle, NY) site.
When the medication cart was opened, there were two open multi-dose vials of Heparin which had a marking that was not legible by the staff.

---

**Chapter:**                         Medication Management

**Program:**                        Hospital Accreditation

**Standard:**                        MM.04.01.01                                        (ESC 60 days)

**Standard Text:**                Medication orders are clear and accurate.

**Primary Priority Focus Area:**   Medication Management

**Element(s) of Performance:**

10. The hospital defines, in writing, the circumstances for which weight
-based dosing is required for pediatric populations. (See also
MM.01.01.01, EP 1)

**Scoring**
**Category :**          A
**Score :**             Insufficient Compliance

**Observation(s):**

# The Joint Commission
## Findings

EP 10
Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
During the individual tracer of a pediatric patient on 4 Joyce, it was noted the ED physician ordered an adult dose of acetaminophen (120mg) for a 4 month old pediatric patient. When requested to see the hospital's policy for weight-based dosing for pediatric patients, it was noted they did not have one.

| | |
|---|---|
| **Chapter:** | Medication Management |
| **Program:** | Hospital Accreditation |
| **Standard:** | MM.05.01.07 |
| **Standard Text:** | The hospital safely prepares medications. |
| **Primary Priority Focus Area:** | Medication Management |

*(ESC 45 days)*

**Element(s) of Performance:**

1. A pharmacist, or pharmacy staff under the supervision of a pharmacist, compounds or admixes all compounded sterile preparations except in urgent situations in which a delay could harm the patient or when the product's stability is short.



**Scoring**
Category :    A
Score :    Insufficient Compliance

**Observation(s):**

EP 1
§482.25(b)(1) - (A-0501) - (1) All compounding, packaging, and dispensing of drugs and biologicals must be under the supervision of a pharmacist and performed consistent with State and Federal laws.
This Standard is NOT MET as evidenced by:
Observed in Medical Management Session at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
It was identified that a number of sterile intravenous medications were being routinely admixed by the nursing staff on the nursing units prior to administration, including medication identified as high-alert by the organization, such as intravenous insulin for infusion. These medications were not needed urgently, nor did they have a short expiry. The organization explained that they made the decision to do this some time ago due to challenges they faced preparing all sterile medications in the pharmacy.

Observed in Tracer Visit at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
During the tracer visit on 4 Joyce, it was noted in the medication room there were four vials of vancomycin in a plastic bag in the medication area. The nursing staff verbalized they mix any odd dose medications in the medication room. There was no counter space in this particular medication room. The mixing of the medication was being done by the nursing staff on top of the medication cart.

| | |
|---|---|
| **Chapter:** | Provision of Care, Treatment, and Services |
| **Program:** | Hospital Accreditation |
| **Standard:** | PC.01.02.07 |
| **Standard Text:** | The hospital assesses and manages the patient's pain. |
| **Primary Priority Focus Area:** | Assessment and Care/Services |

*(ESC 45 days)*

## The Joint Commission
### Findings

**Element(s) of Performance:**

3. The hospital reassesses and responds to the patient's pain, based on its reassessment criteria.



**Scoring**
**Category :**     C
**Score :**        Partial Compliance

**Observation(s):**

EP 3
Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
During the individual tracer on 4 Joyce, it was noted the patient received pain medication (hydromorphone) at 1200 on 3/3/13 and there was no reassessment of pain. The hospital policy was for pain to be reassessed within one hour of receiving pain medication.

Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
During the individual tracer on 4 Joyce, it was noted the patient was given pain medication at 0400 and was not reassessed until 0707. The hospital policy was for patients to be reassessed within one hour of receiving pain medication.

---

**Chapter:**                Provision of Care, Treatment, and Services

**Program:**                Hospital Accreditation

**Standard:**               PC.02.01.03                                    (ESC 45 days)

**Standard Text:**          The hospital provides care, treatment, and services as ordered or prescribed, and in accordance with law and regulation.

**Primary Priority Focus Area:**  Communication

**Element(s) of Performance:**

1. For hospitals that use Joint Commission accreditation for deemed status purposes: Prior to providing care, treatment, and services, the hospital obtains or renews orders (verbal or written) from a licensed independent practitioner or other practitioner in accordance with professional standards of practice; law and regulation; hospital policies; and medical staff bylaws, rules, and regulations. *
Footnote *: For law and regulation guidance pertaining to those responsible for the care of the patient, refer to 42 CFR 482.12(c).



**Scoring**
**Category :**     A
**Score :**        Insufficient Compliance

**Observation(s):**

## The Joint Commission
### Findings

EP 1
§482.23(c) - (A-0404) - §482.23(c) Standard: Preparation and Administration of Drugs

(c) Standard: Preparation and administration of drugs. (1)Drugs and biologicals must be prepared and administered in accordance with Federal and State laws, the orders of the practitioner or practitioners responsible for the patient's care as specified under §482.12(c), and accepted standards of practice.
This Standard is NOT MET as evidenced by:
Observed in Building Tour at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
There were multiple, pre-signed photocopied, blank Physician Order Templates. These order set forms had blank areas to be filled in for dialyzer, treatment hours, fluid removal goal, dialysis flow rate, bicarbonate bath, heparin, etc. These order sets were already signed by the Nephrologist. When I reviewed an inpatient record, the order set blanks were filled in and was signed with the nurse's initials and a date of 1/23/ 2013. There was also a date of 1/23/2013 beside the photocopy physician signature. Upon discussing the process for obtaining the dialysis order, the dialysis nurse stated she calls the nephrologist and obtains the order, fills in the blanks and places the date beside the photocopied signature. There was no documentation to indicate this order was a telephone order.

| | |
|---|---|
| **Chapter:** | Record of Care, Treatment, and Services |
| **Program:** | Hospital Accreditation |
| **Standard:** | RC.01.01.01    (ESC 60 days) |
| **Standard Text:** | The hospital maintains complete and accurate medical records for each individual patient. |
| **Primary Priority Focus Area:** | Information Management |

**Element(s) of Performance:**

19. For hospitals that use Joint Commission accreditation for deemed status purposes: All entries in the medical record, including all orders, are timed.    ⚠

**Scoring**
| | |
|---|---|
| **Category :** | C |
| **Score :** | Insufficient Compliance |

**Observation(s):**

13-22840-rdd    Doc 17-5    Filed 05/29/13    Entered 05/29/13 19:14:38    Disclosure
Schedules (2)    Pg 75 of 86

**The Joint Commission**
**Findings**

EP 19
§482.24(c)(1) - (A-0450) - (1) All patient medical record entries must be legible, complete, dated, timed, and authenticated in written or electronic form by the person responsible for providing or evaluating the service provided, consistent with hospital policies and procedures.
This Standard is NOT MET as evidenced by:
Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
It was observed in the record of a patient who underwent an upper endoscopy that the consent form was dated, but the area designated for entry of the time was left blank.

§482.24(c)(2) - (A-0450) - (2) All orders, including verbal orders, must be dated, timed, and authenticated promptly by the ordering practitioner or by another practitioner who is responsible for the care of the patient only if such a practitioner is acting in accordance with State law, including scope-of-practice laws, hospital policies, and medical staff bylaws, rules, and regulations.
This Standard is NOT MET as evidenced by:
Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site for the Hospital deemed service.
It was observed in the record of a patient who underwent a colonoscopy that the consent form was dated, but the section designated for entry of the time was left blank.

Observed in Individual Tracer at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
There was no time on the dialysis order for 1/23/13, 2/6/13 and 2/7/13

SSMC

45 DY.

**Program: HAP    Standard: EC.02.04.03    EP: 5**

**Corrective Action Taken:**                                    **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Senior VP for Patient Care Services is ultimately responsible for the corrective action and the overall and ongoing compliance.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
All contracted Renal Dialysis RNs were in- serviced on the appropriate labeling of residual chlorine strips once the container is opened. The label should include the expiration date once the container is opened.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
All contracted Renal Dialysis RNs were in-serviced immediately and on March 14, 2013 regarding the appropriate labeling of residual chlorine strips once the container is opened. Emphasis on labeling the container with the expiration date.

**HOW:** A description of how the policy or process was implemented.
Compliance will be sustained with this element of performance by the following action: weekly Unit rounds include checking containers for appropriate labeling which include the expiration date if the container is opened. This information is reported monthly to the Renal Dialysis Quality Improvement Committee.

Close    Print

SSMC

Program: **HAP**    Standard: **EC.02.05.01**    EP: 5

**Corrective Action Taken:**                                        **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Administrator of Support Services is responsible for the corrective action, implementation and compliance of the Utility Policies.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
The Supply and Exhaust vents in the decontamination room were readjusted in order to make the sterile room positive to the interior passageway. The decontamination room supply and exhaust vents were not touched as the room was already negative to the interior passageway. The Policy on Installing & Maintaining Appropriate Pressure Relationships will be revised to include monthly inspections of all areas requiring positive or negative pressure relationships.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
All work was completed during the survey on 3/6/13. The policy was revised and presented and approved by the EOC Committee on 4/11/13.

**HOW:** A description of how the policy or process was implemented.
The Administrator of Support Services, or his designee, will assign engineering staff to perform Bi-Monthly inspections of all areas requiring positive or negative pressure relationships. These inspections will be kept in an inspection log in the engineering office. Results of these inspection reports will be made to the EOC Committee quarterly

Close    Print

SSMC

Program: **HAP**    Standard: **EC.02.05.07**    EP: **4**

**Corrective Action Taken:**                    **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Administrator of Support Services is responsible for the corrective action, implementation and compliance of the Utility Policies.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
Review and additional education of the existing policy was performed to all staff directly responsible for the testing of the generators and ATS. It was emphasized that all tests must be within the 20 and 40 day time frames set by The Joint Commission.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
The review and education of staff was completed on 3/14/13.

**HOW:** A description of how the policy or process was implemented.
Review of the generator inspections logs will occur monthly by the Administrator of Support Services, or his designee. These inspection reports will be submitted to the EOC Committee Quarterly.



*SSmC*

Program: **HAP**    Standard: **EC.02.05.07**    EP: **6**

**Corrective Action Taken:**                                    **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Administrator of Support Services is responsible for the corrective action, implementation and compliance of the Utility Policies.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
Review and additional education of the existing policy was performed to all staff directly responsible for the testing of the generators and ATS. It was emphasized that all tests must be within the 20 and 40 day time frames set by The Joint Commission.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
The review and education of staff was completed on 3/14/13.

**HOW:** A description of how the policy or process was implemented.
Review of the generator inspections logs will occur monthly by the Administrator of Support Services, or his designee. These inspection reports will be submitted to the EOC Committee Quarterly.

[Close]  [Print]

SSmc

Program: **HAP**    Standard: **EM.02.02.13**    EP: **6**

**Corrective Action Taken:**                                    (**This display is not editable**)

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Medical Director is ultimately responsible for the corrective action and the overall and ongoing compliance.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
A new policy was written "Credentialing of Licensed Independent Practitioners in a Disaster". The policy states two forms of identification are required; one must be a government issued photo ID and one other from a list of forms of identification. Bylaws have been revised to include the same requirements stated in the policy mentioned above.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
"The Credentialing of Licensed Independent Practitioner in a Disaster" policy was developed March 10th, 2013. The revision of the Bylaws was approved May 1st, 2013. The revision will be presented to the Board of Governors on May 22nd 2013.

**HOW:** A description of how the policy or process was implemented.
Compliance will be sustained with this element of performance by the following action: If a Disaster occurs a list of volunteers with the primary source of identification (government issued photo ID and a secondary identification) will be completed.

 

**SSmc**

Logged-in, Francine Ciesinski    Extranet Home
Sound Shore Medical Center of Westchester
16 Guion Place
New Rochelle, NY 10802
HCO ID:5807

The Joint Commission

# Connect™ / ESC-MOS    Evidence of Standards Compliance

## Evidence Of Standards Compliance Form

Select Event
Print Form
Esc Form
Summary

Resource
Documents
• How To
   Navigate
• Clarification
   Instructions
• ESC
   Instructions
• ESC FAQs

Program: HAP            Event: ESC46            Standard: LS.01.02.01

The Due Date for your ESC46 is 06/02/2013.

**Standard Text**

The hospital protects occupants during periods when the Life Safety Code is not met or during periods of construction.

**Surveyor Findings**

EP 1
Observed in Document Review at Sound Shore Medical Center of Westchester (16 Guion Place, New Rochelle, NY) site.
The organization's interim Life Safety Measure (ILSM) plan/program didn't address notifying the fire department and initiating a fire watch when the fire alarm or sprinkler system is out of service more than 4 hours in a 24-hour period in an occupied building.

Please select/highlight the element of performance (EP) you would like to respond to.

| EP | Type | Element Of Performance (EP) Text | Ten Day Clarif | Ten Day Clarif Status |
|----|------|----------------------------------|----------------|------------------------|
| 1 | A | 1. The hospital notifies the fire department (or other emergency response group) and initiates a fire watch when a fire alarm or sprinkler system is out of service more than 4 hours in a 24-hour period in an occupied building. Notification and fire watch times are documented. (For full text and any exceptions, refer to NFPA 101-2000: 9.6.1.8 and 9.7.6.1) (See also LS.01.01.01, EP 3) | ☑ | Accepted |

**Clarification Documentation:**    [ Enlarge Text ]

**WHO:** The title of who approved the policy or procedure.    [Spell Check]

•    The Administrator of Support Services is responsible for the implementation and compliance of the Life Safety Policies.

**WHAT:** A description of the policy, procedure, or process that was present prior to the survey. Include a description of the associated implementation as well as a description of how the surveyor's observation(s) actually met the requirements of the policy, procedure, or process.    [Spell Check]

•    As part of the ILSM Program, we have the Fire Watch Policy & Procedure.  This policy states:
o    "A Fire Watch is required when the fire alarm system or the fire protection system, such as sprinklers, is inoperative for any four hours in a 24-hour period, or when "hot work" is being conducted, such as cutting, torching, or welding.  The Engineering Department personnel will conduct

**WHEN:** The date the policy, procedure, or process was approved, as well as the effective date of implementation and date when training occurred. If the policy/procedure has been revised since the initial approval, please include all "reviewed" and "revised" dates.    [Spell Check]

•    Initial date the policy was January 2001 and revised 2004, 2007, 2010, 2012 and 2013.

**HOW:** The description of how the information was disseminated to staff members prior to the survey.    [Spell Check]

•    Policies are reviewed with engineering staff directly having responsibility upon hire,
annually and every time the policy is reviewed or changed.

[ Save ]

© Copyright 2013 - The Joint Commission - All Rights Reserved

SSmc

Program: **HAP**    Standard: **LS.02.01.34**    EP: **5**

**Corrective Action Taken:**                    (This display is not editable)

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who
approved the action, policy, or procedure. Title of who was trained.
The Administrator of Support Services is responsible for the corrective action, implementation and
compliance of the Life Safety Policies.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance
was addressed.
Battery operated smoke detectors were placed in each of the on-call room and one in the main fire panel
room. This work is done as an interim step to the project for upgrading of the main fire alarm system,
which at that time hard wired smoke detectors will be installed into these areas.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
New battery operated smoke detectors were installed on 4/11/13. The project to upgrade the entire Fire
Alarm System on Campus is scheduled to begin October 2013 and to be completed by October 2016

**HOW:** A description of how the policy or process was implemented.
The Administrator of Support Services will assign engineering staff to perform Monthly inspections
battery operated smoke detectors. These inspections will be kept in an inspection log in the engineering
office. Results of these inspection reports will be made to the EOC Committee quarterly.





Program: **HAP**    Standard: **LS.02.01.34**    EP: **4**

**Corrective Action Taken:**                                      (This display is not editable)

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Administrator of Support Services is responsible for the corrective action, implementation and compliance of the Life Safety Policies.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
Battery operated smoke detectors were placed in each of the on-call rooms and one in the main fire panel room. This work is done as an interim step to the project for upgrading of the main fire alarm system, which at that time hard wired smoke detectors will be installed into these areas.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
New battery operated smoke detectors were installed on 4/11/13. The project to upgrade the entire Fire Alarm System on Campus is scheduled to begin October 2013 and to be completed by October 2016

**HOW:** A description of how the policy or process was implemented.
The Administrator of Support Services will assign engineering staff to perform Monthly inspections battery operated smoke detectors. These inspections will be kept in an inspection log in the engineering office. Results of these inspection reports will be made to the EOC Committee quarterly.

 

SSmc

Program: **HAP**    Standard: **MM.03.01.01**    EP: **4**

**Corrective Action Taken:**                                    **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Senior VP of Patient Care Services is ultimately responsible for the corrective action and overall and ongoing compliance.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
In-services were provided for the Nursing staff regarding the policy for labeling solutions and multidose vials. Emphasis placed on labeling with the expiration date.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
Inservices were provided for the Nursing staff regarding the policy for labeling solutions and multidose vials beginning March 6th, and continued through April 26th, 2013.

**HOW:** A description of how the policy or process was implemented.
To evaluate ongoing compliance, unit based data will be collected monthly regarding labeling of solutions and dating of multidose vials.

Close    Print

SSmc

Program: **HAP**    Standard: **MM.03.01.01**    EP: **4**

**Evaluation Method:**                                                                      **(This display is not editable)**

Random audits of solutions and multidose vials being labeled with expiration dates will be done for 4 consecutive months. 50 solutions and multidose vials per month will be audited. The denominator will equal the number of vials observed. The numerator will equal the number of solutions and multidose vials correctly labeled with the expiration date. The audit results will be reported monthly to the Hospital Quality Improvement Committee, the Quality Care Committee and to the Board of Governors.

Close    Print



Program: **HAP**    Standard: **MM.05.01.07**    EP: **4**

**Corrective Action Taken:**                                    **(This display is not editable)**

**WHO:** Title of who is responsible for the corrective action and ongoing compliance. Title of who approved the action, policy, or procedure. Title of who was trained.
The Pharmacy Administrator is ultimately responsible for the corrective action and for overall and ongoing compliance.

**WHAT:** A description of the action taken, of the policy or process and how the element of performance was addressed.
On March 25th Nursing and Pharmacy met to develop a timeline for changes with the Medication Admix program in order to reduce the Number of IV compounding done by Nursing. Pharmacy expanded their services to include an increase in compounding of IV products. The list of medications given by Nursing was revised to include Pharmacy additions. On 4/8/2013 the Pharmacy implemented the first change which included compounding High Risk medications and antibiotics. All High Risk medications are compounded by the Pharmacy during hours of operation. Medications that are emergent and/or have a short shelf life are mixed by Nursing when the Pharmacy is unavailable. In each medication room a countertop space has been designated for mixing medications. As of April 18th, the Pharmacy began the process of removing vials of IV medications from the Nursing Units and was replaced with premixed bags. Additional Pharmacy staff will be hired to facilitate compounding of IV products. Hiring process will be completed by July 1st, 2013. Pharmacy staff was informed of expansion of services and changes in the Admix program at the April Pharmacy Staff meeting. In-service education regarding the revision to the Admix program was provided to the Nursing staff through April 26th, 2013.

**WHEN:** A date of when each action, policy, procedure, and/or training was completed.
Pharmacy expansion of services as of April 8th, 2013. Admix policy revised April 8th, 2013. Removal of IV medication vials began April 18th, 2013; Countertop space designated in each medication room April 26th, 2013. New employee hiring process will be completed by July 1st, 2013. Pharmacy staff informed of expansion of services and changes in the Admix policy at the Pharmacy April Staff meeting. In-service education was provided to the nursing staff regarding changes in the Admix policy staff began on April 8th and continued through April 26th, 2013.

**HOW:** A description of how the policy or process was implemented.
The Pharmacy will report on a monthly basis to the Medication Safety Committee a review of the number of IV medications and the name of medications mixed by Nursing during hours of operation and when the Pharmacy is closed. Reports will facilitate identifying IV medications mixed by the Nursing Staff and will prompt investigating why this occurred. Compliance will be sustained by observing practice to ensure the policy is being adhered to. The Nursing Care Coordinator of each unit will observe nurses use of designated countertops for mixing medications and cleaning in between use. Compliance will be sustained by observing practice to ensure the policy is being adhered to.

Close    Print