GARFUNKEL WILD, P.C.
111 Great Neck Road
Great Neck, New York 11021
Telephone: (516) 393-2200
Telefax: (516) 466-5964
Burton S. Weston
Afsheen A Shah
*Proposed Counsel for Debtors*
*And Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

In re:

| | |
|---|---|
| SOUND SHORE MEDICAL CENTER OF WESTCHESTER, et al. | Chapter 11 Case No. 13-_____ (___) |
| Debtors. | (Joint Administration Pending) |

-----------------------------------------------------------x

### AFFIDAVIT OF JOHN SPICER PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF WESTCHESTER | ) |

1.    I am the President and Chief Executive Officer of Sound Shore Health System, Inc. ("**SSHS**") and certain of its subsidiaries and affiliates, including, Sound Shore Medical Center of Westchester ("**SSMC**"), The Mount Vernon Hospital, Inc. ("**MVH**"), and Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended Care Center ("**SECC**") (each a "**Debtor**, and collectively sometimes referred to as the "**Debtors**"). (SSMC, MVH and SECC are sometimes also collectively referred to as the "**Medical Centers**")  I am familiar with the business and financial affairs of SSMC and each of its debtor affiliates[1].

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number include:  Sound Shore Health System, Inc. (1398), Sound Shore Medical Center of Westchester (0117), The Mount Vernon Hospital, Inc. (0115), Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended

2383996v.10

2.    I submit this affidavit (this "**Affidavit**") pursuant to Rule 1007 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") in support of (i) the Debtors' petitions for relief filed on the date hereof (the "**Petition Date**") under Chapter 11, Title 11 of the United States Code (the "**Bankruptcy Code**") in these cases (the "**Chapter 11 Cases**") and (ii) the relief sought by the Debtors in their motions and applications simultaneously filed with the Court (the "**First Day Motions and Applications**").

3.    Unless otherwise stated, the facts set forth in the Affidavit are based upon my personal knowledge as an officer of the Debtors, upon information supplied to me by other members of the Debtors' management and employees of the Debtors, upon my review of relevant documentation and financial information, advice and counsel of the Debtors' professionals, and my opinions based upon my knowledge and information concerning the Debtors' operations and financial affairs.  If called as a witness, I would testify to the facts set forth in this Affidavit.  Unless otherwise indicated, all financial information contained herein is presented on an unaudited basis.  I am authorized to submit this Affidavit.

## INTRODUCTION

4.    On May 28, 2013 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Debtors remain in possession of their assets and continue to manage their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee, examiner or committee of creditors has yet been appointed in these cases.

5.    On May 29, 2013, an asset purchase agreement (the "**APA**") was executed between Montefiore Medical Center ("**MMC**") and the Debtors, providing for the sale of

---

Care Center (0781), NRHMC Services Corporation (9137), The M.V.H. Corporation (1514) and New Rochelle Sound Shore Housing, LLC (0117).  There are certain additional affiliates of the Debtors who are not debtors and have not sought relief under Chapter 11.

2

substantially all of the Debtors' real property and operating assets (the "**Acquired Assets**") and the assumption of certain liabilities (the "**Assumed Liabilities**") by MMC.   Among the overriding concerns of the parties when entering into the APA was to ensure that the Medical Centers' not-for-profit missions would continue to be met by MMC and the provision of healthcare to underserved communities would continue following the proposed sale (the "**Sale Transaction**").

6.      During these Chapter 11 Cases, the Debtors expect to: (i) consummate the Sale Transaction with MMC or to any other party making a higher or better offer for the assets and properties, pursuant to section 363 of the Bankruptcy Code; and (ii) implement an orderly transition of their operations to MMC or any other successful bidder.

## PART I

## THE DEBTORS' HISTORY AND BUSINESS

7.      Through their combined facilities, the Debtors are able to provide a range of specialized medical and related services, including orthopedic surgery, behavioral health, pediatrics, OB/GYN, continuing care facilities, a nursing home and community care clinics providing primary care services.   Their affiliation with the New York College of Medicine also enables the Debtors to provide a teaching environment in multiple disciplines to their community and patients.

8.      As the largest "safety net" providers for southern Westchester County, the Medical Centers serve a disproportionate share of patients in the Medicaid and uninsured populations.   Annually, they are responsible for approximately 13,000 acute discharges, 55,000 emergency department visits and 60,000 indigent care clinic visits.

9.      The Medical Centers also provide employment for approximately 2,000 individuals in southern Westchester County.   Approximately 1,365 of these employees are

3

2383996v.10

unionized and represented by: (i) 1199 SEIU United Healthcare Workers East (“**SEIU 1199**”);

(ii) New York State Nurses Association (“**NYSNA**”); and (iii) Teamsters Local 338. In addition,

approximately 165 physicians are affiliated with the Medical Centers.

10.    As of December 31, 2012, the Debtors’ total assets were valued at book at

$159.63 million and liabilities totaled approximately $200 million. The Debtors’ collective

revenues in 2012 totaled $241.83 million and expenses aggregated $265.50 million. Taking into

account extraordinary items the operating loss in 2012 was $16.35 million. In 2011, the Debtors

had an operating loss of $9.9 million on revenues of $243.31 million.

A.    **Overview of the Debtors**

### 1. **SSMC**

11.    A significant portion of the Debtors’ core business is focused around SSMC.

SSMC is a not-for-profit 242-bed, community-based teaching hospital offering primary, acute,

emergency and long-term health care to the working class residents of southern Westchester.

SSMC is located at 16 Guion Place, New Rochelle, New York 10802. Founded in 1892, SSMC

is a major teaching affiliate of New York Medical College. SSMC is home to a comprehensive

orthopedic program and stroke and bariatric centers of recognized excellence. It also boasts the

only trauma center in southern Westchester and a reputable level 3 perinatal hospital.

12.    In 2012, SSMC discharged approximately 9,583 patients, administered 9,413

surgeries, and treated 36,895 patients in the emergency room. In 2011, for the same time period,

SSMC discharged approximately 9,940 patients, administered 9,850 surgeries, and treated

37,382 patients in the emergency room.

13.    SMMC employs approximately 1,236 people of which 550 belong to the local

chapter of the Service Employees International Union (the “**Local 1199**”), and 250 belong to the

New York State Nurses Association ("**NYSNA**"). SMMC's monthly payroll is approximately $6.5 million inclusive of wage related benefits.

14.    As of December 31, 2012, SSMC's total unrestricted assets as reported on the balance sheet were just under $100 million and its liabilities totaled just under $140 million. SSMC's revenues for the year ending 2012 totaled just under $152 million and expenses aggregated over $170 million. For the year ended December 31, 2011, SSMC had over $155 million in total revenue and expenses aggregated slightly over $163 million.

## 2. SSHS

15.    Sound Shore Health System, Inc. ("**SSHS**" or the "**System**") was formed in 1997 when three affiliated healthcare institutions joined together to create one of the largest regional healthcare systems between New York City and Albany. The System's members include Sound Shore Medical Center of Westchester, Mount Vernon Hospital, and Howe Avenue Nursing Home d/b/a Schaffer Extended Care Center. This association, with the addition of its fourth member in 2001, the Visiting Nurse Association of Hudson Valley, has provided the southern Westchester region with a broad scope of enhanced, quality programs and services since being founded. SSHS holds the membership interests of SSMC and MVH.

## 3. MVH

16.    Mount Vernon Hospital ("**MVH**") is a voluntary, not-for-profit, 176-bed hospital located at 12 North Seventh Avenue, Mount Vernon, New York, serving the City of Mount Vernon, the Pelhams, East Yonkers, New Rochelle and North Bronx. MVH is a sponsor of M.V.H. Corporation ("**MVHC**"), a not-for-profit organization which is inactive. It also operates the Dorothea Hopfer School of Nursing, chartered by New York State since 1901.

17.    Since its founding in 1891, MVH and its affiliated physicians have been providing a full range of diagnostic and therapeutic medical and surgical services. In addition to

5

inpatient services, MVH is also known for its broad spectrum of specialty programs. The MVH facilities include twenty-five ambulatory clinics which provide both primary and specialty care. MVH also offers comprehensive inpatient and outpatient behavioral health programs consisting of psychiatric services designed specifically for individuals whose needs have not been met through traditional approaches.

18.     The MVH facilities also offer patients the most comprehensive and advanced wound management treatment programs currently available. The Beale Chronic Wound Treatment and Hyperbaric Center (the "**Center**") is the largest service of its type in the northeast, specializing in reducing the need for limb amputations. The Center attracts chronic wound patients from all over the country as well as individuals at risk for amputation due to traumatic injury. It is also home to the Assertive Community Treatment Program, The Family Health and Wellness Center and Intensive Case Management Program, the Chronic Wound and Hyperbaric Treatment Center and the Westchester Low Back Pain Center.

19.     MVH employs approximately 590 people of which 291 belong to Local 1199, and 104 belong to NYSNA. MVH's monthly payroll is approximately $3.0 million inclusive of wage related benefits. To improve overall operations and reduce expenses, MVH implemented a significant reduction in its workforce effective August 15, 2012. The reductions resulted in the generation of approximately $1.4 million in savings.

20.     As of December 31, 2011, the hospital's total unrestricted assets as reported on the balance sheet were just under $19.9 million and its liabilities totaled just under $46.7 million. During 2011 MVH incurred a deficiency of expenses over revenue, of $6.4 million. For the year ended December 31, 2011, MVH had over $70.4 million in total revenue and expenses aggregated just over $77.5 million. As of that same date, its current liabilities exceeded current

6

assets by approximately $6.9 million with a deficiency in unrestricted net assets of approximately $13.5 million. Its revenues in 2012 totaled more than $69.8 million and expenses aggregated over $76.6 million.

### 4. SECC

21.    Established in 1971, Howe Avenue Nursing Home d/b/a Helen and Michael Schaffer Extended Care Center ("**SECC**" or the "**Nursing Home**") is a 150-bed, comprehensive facility offering short-term rehabilitation/sub-acute care, as well as skilled long-term care. SECC dedicates 100-beds for long-term skilled medical management for individuals with chronic conditions or disabilities who are no longer capable to live independently. The remaining 50-beds are utilized for short-term stays and rehabilitation to accommodate patients recovering from heart surgery, heart attacks, strokes, and orthopedic surgery.

22.    SECC employs approximately 160 people of which 108 belong to the Local 1199, and 24 belong to NYSNA. SECC's monthly payroll is approximately $.8 million inclusive of wage related benefits. SECC shares payroll obligations with SSMC, with employees of both entities being paid from a joint payroll account.

23.    As of December 31, 2011, SECC's total unrestricted assets as reported on the balance sheet were just under $8.2 million and its liabilities totaled just under $10.9 million. For the year ending December 31, 2011, SECC had just under $17.4 million in total revenue and expenses aggregated just over $19.2 million. In 2012, the Nursing Home's revenues totaled just under $20.2 million and expenses aggregated over $20 million.

### 5. NRHMC

24.    NRHMC Services Corporation ("**NRHMC**") is a for-profit corporation and wholly owned subsidiary of NRHMC, Inc. Its business activities consists primarily of locating, negotiating and providing physicians and other healthcare entities with real estate rentals.

7

## 6. MVHC

25.     M.V.H. Corporation ("**MVHC**") is a not-for-profit corporation which owns the parking garage located adjacent to the MVH property. Its average revenues for the last three years have been less than $25,000 per year. It does not have any current operations, existing debt or other liabilities.

## 7. NRSS

26.     New Rochelle Sound Shore Housing, LLC ("**NRSS**") is a wholly owned, not-for-profit subsidiary of SSMC. It previously owned and operated two apartment buildings that provided housing for the staff members and employees of SSMC on a month-to-month basis. NRSS presently owns the Goldstein Pavilion which is leased to SSMC and houses certain ambulatory care services, the adult day care , physician offices, an auditorium and an outpatient pharmacy. It has limited revenues and no significant fixed liabilities.

## B. Charitable Services.

27.     In furtherance of their charitable mission, the Debtors provide critical healthcare services to large uninsured and indigent populations. As a designated safety net provider, the System has been recognized by New York State as a leading provider of charitable care to the residents of southern Westchester County.

28.     The Debtors provide free care on a sliding scale basis to patients who are financially unable to pay for medical services. The Debtors do not pursue amounts due for charity care through collection. Accordingly, any such amounts due to the Debtors are not reported as revenue. However, the Debtors are entitled to distributions from the New York State Charity Care pools for the provision of such charitable care. In 2011, the Debtors provided over $22.3 million in charitable care.

## C. The Non-Debtors

8

29.     The Debtors also have certain non-debtor affiliates:

(a)     Sound Shore Medical Center of Westchester Foundation, Inc. ("**The Foundation**"). The Foundation is a not-for-profit subsidiary of Sound Shore Health System whose principal activity is the solicitation, receipt, holding, investment and administration of contributions on behalf of the Debtors.

(b)     NRHMC, Inc. ("**NRHMC**"). NRHMC is a for-profit corporation which acts primarily as a holding company for NRHMC Services Corporation.

(c)     Dorothea Hopfer School of Nursing ("**School of Nursing**"). The School of Nursing is a private, registered nursing program that offers a two year Associates Degree (ADN) program, based out of MVH. The School of Nursing offers both day and evening programs for nursing students and prides itself on being at the forefront of nursing education for over 100 years.

## D. Corporate Governance

30.     The separate boards of trustees for each of the Debtors are listed in Exhibit A annexed hereto.

31.     In addition, in August of 2012, Alvarez & Marsal Healthcare Industry Group, LLC ("**A&M**") (was retained by the System to provide consulting and restructuring advisory services to the Debtors, including matters relating to potential sale transactions, strategic mergers or partnership transactions for SSMC and MVH. A&M has been assisting the Debtors and their management in developing and implementing strategic and tactical options designed to improve liquidity. A&M has also assisted the Debtors in negotiating with potential purchasers of their assets as well as other entities seeking to explore partnerships. It is anticipated that A&M will

9

continue working with the Debtors and their remaining professionals in the administration of the Debtors' Chapter 11 Cases.

## E. Events Leading to Filings

32.    As is true with many community hospitals serving a working class constituency, the Medical Centers have been beset by the financial pressures caused by cuts in Medicare and Medicaid funding, declining indigent pool payments, and changing demographics in the communities served by the Debtors. Commencing in 2006 and increasingly each year thereafter, the Debtors experienced a progressive decline in patient volume and discharges and reduction in acuity of the case mix. Operating revenues decreased, leading to significant losses in the years preceding these filings. Cash book balances were frequently negative, and vendor payables increased to over 225 days past due. With a substantial portion of their assets liened, the Debtors had limited ability to obtain sufficient working capital financing. Simultaneously, the Debtors are faced with increased competition from other regional healthcare providers.

33.    The Debtors sought to address one component of this liquidity crisis, vendor payables, through a voluntary restructuring and reduction of unsecured indebtedness and in 2008 effectuated a creditor compromise. More than $20 million of unsecured indebtedness obligations were settled at significant discounts. Coupled with cost cutting measures, the Debtors were repositioned to improve financially.

34.    Additionally, in order to increase overall efficiency in their operations, in October 2011, MVH and SSMC executed a conversion to a new electronic medical record and billing system. Multiple problems were encountered during the conversion process which still have not been fully remedied. Major delays in billing and cash collections resulting from the conversion led to increased patient account denials and bad-debt write offs. To avoid continued delays and losses, it became necessary (at significant cost) to dedicate additional resources to resolve the

10

conversion issues, resulting in a further drain on available cash and resources. As a consequence, liquidity again became a pressing issue, this time preventing the Debtors from implementing critical system updates vital to improving its infrastructure and physical plant.

35.    Liquidity delays have also extended vendor disbursements. The mounting trade payable liabilities led, in some cases, to the immediate termination of necessary service relationships. In other cases, the Debtors were forced to renegotiate existing terms and payment of outstanding liabilities. Simultaneously, the Debtors were facing a decrease in volume and a shift over the course of the last two years from the provision of inpatient care to increased ambulatory care at lower reimbursement rates. During this same period of time, provider costs continued to increase.

## F. Marketing Process:

36.    As the Debtors' financial condition continued to deteriorate, the Debtors began to actively search for a viable healthcare partner or other affiliation for the Medical Centers. The Debtors recognized that a merger or affiliation with a strong healthcare partner was critical to their ability to maintain operations and their charitable mission, achieve administrative efficiencies and reduce overhead costs, attract and retain quality physicians, gain increased access to much needed capital, make necessary capital improvements and implement long overdue technological upgrades.

37.    Thus, commencing in or about, August, 2012, the Debtors set out to explore a potential strategic transaction with another hospital or healthcare institution. Working with their financial advisor, Alvarez & Marsal ("**A&M**"), the Debtors looked at the downstate market and attempted to identify those hospitals or healthcare systems that might have an interest and the financial wherewithal to partner with the Debtors. The Debtors also consulted with NYS Department of Health ("**DOH**"), which would have to approve any transaction. DOH advised

11

2383996v.10

that would only accept an active parent arrangement, *i.e.* where the acquirer would commit meaningful financial support to the transaction and the ongoing system. Given the not-for-profit hospital structure in New York, the list of potential acquirors was limited and excluded almost all out of state prospects as the substantially majority of those are for profit institutions. The active parent requirement further limited the pool of likely partners.

38.     The Debtors and A&M initially concluded that Westchester County Health Care Corporation (**"WCHCC"**), the owner of Westchester Medical Center, was the only likely candidate in the Westchester area; that no other hospital or system in the region would have the financial ability, experience and strategic design to absorb the Medical Centers. Potential active parents in the New York Metropolitan region included: Montefiore Medical Center (**"MMC"**), North Shore-LIJ Health System, (**"NS/LIJ"**) and NYU Medical Center ("NYU"). The lone out of state prospect, given its size and not-for-profit ownership was Yale-New Haven Health System (**"Yale"**).[2]

39.     Each of those potential candidates were approached and provided a sizeable and comprehensive package of information regarding the Debtors, a detailed description of the proposed strategic arrangement and the financial requirements. Furthermore, the process was not run in secret. DOH and DASNY were kept advised of the Debtors efforts, and the search for a strategic partner was known generally to the healthcare community at large. Thus, any other party certainly could have expressed interest, but did not. NS/LIJ advised the Debtors early in the review process that the Westchester market was not a priority in their long range strategic plan. NYU and Yale each with SSHS on a number of occasions but opted out as well. The only

---

[2]      There were other larger New York metropolitan hospitals that were considered, but dismissed for a variety of reasons. New York Presbyterian's affiliation structure utilizes a largely passive parent arrangement. Mount Sinai and the Continuum Hospital System (Beth Israel Hospital, St. Luke's Hospital and Roosevelt Hospital) were themselves engaged in active merger discussions at the time and thus were not viewed as likely candidates.

2383996v.10

two seriously interested parties were MMC and WCHCC. The Debtors' board met and determined to first pursue the WCHCC proposal given WCHCC's expressed desire to pursue the transaction without a bankruptcy.

40.    In November, 2012, SSHS and WCHCC entered into a memorandum of understanding which contemplated a full asset merger between the parties and several months of extensive negotiations followed. However, the parties were unable to finalize a transaction with sufficient purchase consideration.

41.    As a result, the Debtors re-commenced discussions with MMC regarding a potential transaction. Following intensive, arms length, good faith negotiations among the Debtors and MMC, the parties entered into an asset purchase agreement (the "**Purchase Agreement**"). As part of their restructuring strategy, the Debtors intend to sell all of their Owned Real Property, Furniture, Fixtures, Inventory, Assigned Contracts and related operating assets, which collectively comprise the Acquired Assets (all as defined in the Purchase Agreement), to MMC. The aggregate Purchase Price for the Acquired Assets totals $54 million, plus the appraised value of the Furniture, Equipment and Inventory, payable in cash at the closing subject to adjustments. These adjustments include, *inter alia*, any repayment of DIP Term Loan or Revolving Loans made by MMC pursuant to its guaranty, any Assumed Liabilities, any Cure Amounts (not to exceed $3 million) and any assumed Employee Liabilities.

42.    It is a condition of the Purchase Agreement that the Sale Transaction be consummated pursuant to the provisions of section 363 of the Bankruptcy Code, and subject to higher and better offers. In furtherance of that effort, the Debtors' respective Boards voted to approve the filing of Chapter 11 petitions for the Debtors.

2383996v.10

### G. **CAPITAL STRUCTURE AND PREPETITION INDEBTEDNESS**

43.     **Sun Life Assurance Company of Canada (US) ("Sun Life")**.  On April 4,

2006, SSMC executed a Promissory Note (the "**Sun Life Note**") and Mortgage and Security

Agreement (the "**Sun Life Mortgage**") in favor of Sun Life in the original principal amount of

$12 million, secured by a first mortgage on the SSMC real property which constitutes the main

hospital campus and SSMC's ambulatory care facility.  There is currently approximately $9.4

million under the Sun Life Mortgage

44.     **Dormitory Authority of the State of New York ("DASNY")**.  Pursuant to a

First Amended Reimbursement Agreement, dated as of February 13, 2008, DASNY loaned the

sum of $2 million to SSMC (the "First Amended Reimbursement Agreement") for the purpose of

supporting implementation of the Medical Center's business plan.   The First Amended

Reimbursement Agreement consolidated SSMC's obligations to DASNY under a prior

reimbursement agreement, dated January 29, 2002, pursuant to which SSMC had received the

first installment of a restructuring pool loan in the amount of $1 million (the "**Original**

**Reimbursement Agreement**").    The loans were based on SSMC's participation and

qualification for the Health Facility Restructuring Program established by DASNY and the New

York State Housing Finance Agency.  Neither the Original Reimbursement Agreement nor the

First Amended Reimbursement Agreement provided for the grant of a security interest in favor

of DASNY.

45.     On April 14, 2008, DASNY and SSMC agreed to further amend the terms of the

Original Reimbursement Agreement through the execution of a Second Amended

Reimbursement Agreement (the "**Second Amended Reimbursement Agreement**"), whereby

DASNY agreed to loan an additional $2 million to SSMC.  At the time the Second Amended

Reimbursement Agreement was executed, SSMC owed DASNY the sum of $2,146,606.91 for

14

obligations under the Original Reimbursement Agreement and the First Amended Reimbursement Agreement. Thus, following the execution of the Second Amended Reimbursement Agreement, the aggregate principal loan amount due to DASNY was $4,146,606.91. The additional funds loaned by DASNY under the Second Amended Reimbursement Agreement were also issued on an unsecured basis.

46.    Subsequently, on August 11, 2009, the parties agreed to enter into a second Reimbursement Agreement (the "**2009 Reimbursement Agreement**") which provided for advances by DASNY in the amount of $5 million to SSMC (the "**DASNY 2009 SSMC Loan**") for the purpose of providing working capital to SSMC and facilitating refinancing of SSMC's existing credit facility with CIT with a facility from Midcap. As security for the DASNY 2009 SSMC Loan, DASNY was granted a lien in SECC's real property. To later facilitate the refinancing of SSMC's credit facility with Midcap, SECC agreed to subordinate its mortgage lien on SECC's real property to Midcap.). As of the Petition Date, the outstanding amount of the DASNY 2009 SSMC Loan is approximately $5,187 million.

47.    On October 1, 2010, DASNY entered into a First Amended Reimbursement Agreement with MVH (the "**MVH Amended Reimbursement Agreement**"), which provided for the extension of a $2 million loan to MVH. The loan was in addition to a $500,000 loan previously issued to MVH under the first MVH Reimbursement Agreement, dated as of August 31, 2010. Following the execution of the MVH Amended Reimbursement Agreement, the aggregate principal amount of the MVH debt to DASNY was increased to $2.5 million. The funds loaned by DASNY under the MVH Amended Reimbursement Agreement were provided on an unsecured basis.

15

48.    Finally, on August 14, 2012, DASNY and SSMC executed an additional reimbursement agreement (the "**2012 SSMC Agreement**"), pursuant to which DASNY loaned the amount of $2.9 million to SSMC for working capital purposes ("**DASNY 2012 SSMC Loan**"). As security for the DASNY 2012 SSMC Loan, DASNY was granted a second lien and security interest on the MVH real property and a lien on the proceeds of any HEAL NY Grants awarded to SSMC. As of the Petition Date, the outstanding balance of the DASNY 2012 SSMC Loan is approximately $2.92 million.

49.    As of the Petition Date, DASNY was owed an aggregate outstanding principal balance of approximately $11.5 million with respect to all DASNY loans.

50.    **Hudson Valley Bank ("HVB").**

(a)    On April 6, 2004 and October 28, 2005, MVH entered into two revolving lines of credit from HVB in the amounts of $2 million and $3 million respectively, which were ultimately consolidated into a single revolving line of credit (the "**HVB Revolving Loan**") in the aggregate amount of $5 million pursuant to a mortgage modification and extension agreement, dated as of October 28, 2005. As security for the HVB Revolving Loan, HVB was granted a first lien in the MVH real property. In addition, HVB was granted a first lien on all of MVH's revenues, receipts, income, accounts, accounts receivables, inventory, personal property and general intangibles. As part of the arrangement, MVH also executed an Assignment of Leases and Rents, assigning all of MVH's rights as lessor under any leases affecting the Property. As of the Petition Date, obligations under the HVB Revolving Loan are owed approximately $700,000.

51.    **Midcap Financial, LLC and Midcap Funding IV, LLC ("Midcap").**

(a)    On or about April 8, 2011, pursuant to a Credit and Security Agreement of even date and related financing documents (the "**Original Credit Agreement**") with SSMC,

16

2383996v.10

Midcap Financial LLC ("**Midcap Financial**") made available to SSMC a $15 million revolving credit facility secured by the hospital's accounts receivable arising out of the performance or delivery of any medical, surgical, diagnostic, dental or other professional services and/or the supply of goods related to such services (the "**Prepetition Accounts**"). Midcap Financial immediately assigned its rights and obligations as agent under the Agreement to Midcap Funding IV, LLC ("**Midcap Funding**" and together with Midcap Financial, "**Midcap**").

(b)    On June 8, 2011, pursuant to an Amended and Restated Credit and Security Agreement and related financing documents (as the same has been amended and modified, the "**Prepetition Revolving Credit Agreement**"), the Original Credit Agreement was modified to add SECC as a borrower, increase the revolving credit commitment to $18 million (the "**Prepetition Revolving Loans**"), and provide for the each of the borrowers to grant a lien in their respective Prepetition Accounts (the "**Prepetition Lien**") to secure the obligations under Prepetition Revolving Credit Agreement (the "**Prepetition Revolving Loan Obligations**") and the Prepetition Term Term Credit Agreement (as hereinafter defined) (the "**Prepetition Term Loan Obligations**"). The outstanding principal balance of the Prepetition Revolving Loan Obligations is approximately $16.2 million

(c)    On the same date, SECC and Midcap Financial entered into a Credit and Security Agreement and related Mortgage, Assignment of Leases and Rents and Security Agreement (collectively, the "**Prepetition Term Loan Agreement**"), pursuant to which Midcap extended SECC a $7 million term loan (the "Prepetition Term Loan") secured by a first priority mortgage lien (the "**Midcap Prepetition Mortgage**") on SECC's real property at 75 Glover Johnson Place, New Rochelle, NY (the "**SECC Property**"). The outstanding principal balance of the Prepetition Term Loan Obligations is approximately $5.8 million.

17

52.   **Pension Plan/Pension Benefit Guaranty Corporation ("PBGC")**.

(a)   SSMC sponsored the Cash Balance Retirement Plan for the benefit of its employees (the "**SSMC Pension Plan**") which was a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation (the "**PBGC**") under Title IV of the Employee Retirement Income Security Act of 1974 ("**ERISA**"), 29 U.S.C. §§ 1301-1461, et seq.  The Pension Plan is subject to the minimum funding requirements of ERISA and § 412 of the Internal Revenue Code.

(b)   SSMC failed to meet the terms of its minimum funding waiver under the SSMC Pension Plan for the 1995 and 1997 years, and to secure its obligations to the PBGC for those amounts (the "**SSMC Pension Plan Claim**") granted the PBGC mortgage liens in the original principal amount of $2.582 million in April, 1997 and $3.488 million in November, 1998 encumbering certain parking lots (the "**SSMC Lots**") situate on the SSMC hospital campus (the "**PBGC Lot Mortgages**").  As of the Petition Date, the outstanding amount of the SSMC Pension Plan Claim is approximately $5.763 million.

(c)   In 2003, SSMC was again unable to meet its minimum funding requirements under the SSMC Pension Plan and a voluntary distress termination of the plan ensued.  On October 31, 2003, as amended on December 31, 2008, SSMC and the PBGC entered into a Settlement Agreement pursuant to which SSMC remains obligated under a note to PBGC for termination payments aggregating approximately $15.820 million (the "**Settlement Amount**").  In addition to the lien on the SSMC Lots under the PBGC Lot Mortgages, the Settlement Amount was to be further secured by a subordinated security interest in the amount of $9.620 million on the SSMC hospital campus (the "**PBGC Subordinated Lien**").  It does not appear, however, that the PBGC Subordinated Lien was perfected by the filing of a mortgage or other recording instrument.

18

2383996v.10

(d)    On July 31, 2010, MVH terminated the Mount Vernon Hospital Employees' Retirement Plan (the "**MVH Pension Plan**"). PBGC asserted a claim for unfunded benefit liabilities as of the Plan termination date, i.e. the shortfall in plan assets necessary to pay all benefits promised under the MVH Pension Plan in the alleged amount of $4.032 million (the "**MVH Pension Plan Claim**"). On July 15, 2010, PBGC filed a Notice of Federal Lien under IRC Section 412(n) against the MVH real and personal property (the "**PBGC MVH Lien**")

53.    **Internal Revenue Service**

(a)    On April 16, 2013, the Internal Revenue Service ("IRS") filed a Notice of Federal Tax Lien against the property of MVH in the amount of $736,805.90 ("**MVH Tax Lien**"). The lien covered unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30 and September 30, 2012. Any underlying tax and interest has been paid. Since the filing of the MVH Tax Lien, the IRS has issued a waiver of penalties. Thus, although there has been no formal release of lien as of the Petition Date, the underlying liability has been satisfied and the lien is of no force and effect.

(b)    On March 28, 2013, the IRS filed a Notice of Federal Tax Lien against the property of SSMC in the amount of $1461,400 ("**SSMC Tax Lien**"). The lien covered unpaid penalties relating to the late payment of §941 withholding taxes for the periods ending March 31, June 30 and September 30, 2012. The underlying taxes and interest have been paid. There is pending a request for the waiver of penalties. If granted, the lien will be of no force and effect. If not, the Debtors believe the SSMC Tax Lien is otherwise voidable on multiple grounds.

54.    **Other Judgments and Liens**. SEIU 1199, one of the Debtors' principal labor unions, has obtained multiple judgments against each of SSMC and MVH for unpaid

19

contributions and benefit payments due the 1199 Funds and has recorded the judgments against SSMC and MVH real property. 1199 currently asserts judgments liens on the SSMC and MVH real property in the amount of $6,083,497.19 and $4,156,460.01 respectively. New York State Department of Labor, in turn, has recorded judgments against SSMC in the aggregate amount of $21,800 and against MVH in the aggregate amount of $117,670.

55.    Various mechanics lien have also been asserted of record as follows: SSMC: (i) Graybar Electric Company, Inc- $17,458 recorded May 29, 2012; (ii) D&D Elevator Maintenance, Inc - $525,880 recorded August 22, 2012; and (iii) Omega Environmental Services, Inc. - $138,742, recorded February 13, 2013; and MVH: (i) StonCor Group, Inc. - $4995.40, recorded May 25, 2012.

## LOCAL BANKRUPTCY RULE 1007-2 SCHEDULES

56.    Attached hereto as <u>Exhibit B</u> and incorporated herein by reference are various schedules setting forth information required pursuant to Local Bankruptcy Rule 1007-2. Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meaning ascribed to them in preceding paragraphs of this Affidavit.

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

57.    Simultaneously with the filing of their Chapter 11 petitions, the Debtors filed their First Day Motion and Applications in order to minimize the adverse impact of the commencement of the Debtors' bankruptcy cases on their business and the sale process. I believe the approval of the First Day Motions and Applications is critical to the success of the Chapter 11 Cases. I have reviewed the factual background in support of each First Day Motion and Application and certify the facts contained therein are true and correct to the best of my

information, knowledge and belief.  A brief overview and summary of the more significant First

Day Motions and Applications is set forth herein.[3]

**A.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors (A) To Obtain Postpetition Secured Superpriority Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, AND 364 And (B) To Utilize Cash Collateral Pursuant To 11 U.S.C. § 363; (II) Granting Adequate Protection to the Prepetion Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363 AND 364; And(III) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(B) AND 4001(C)[4]**

58.    Access to DIP Financing and the use of Cash Collateral is essential to ensure that

the Debtors can fund their post-petition operating requirements so that they can preserve and

maintain their properties and the infrastructure of their business pending a sale of a substantial

portion of its assets to MMC.  As currently fully operational acute care facilities, it is essential

that continued operations be maintained in order to ensure patient safety, maintain the employee

workforce and provide an essential community service to an underserved population.  Having

adequate financing in place also will provide the Debtors' vendors and suppliers with the

comfort of knowing that the Debtors will have the financial ability to fund the ongoing purchase

of goods and services and otherwise pay their postpetition obligations as they become due.  Of

no less import is the fact that absent adequate funding, the Debtors would not have the ability to

satisfy the conditions of the sale agreement with MMC and effectuate an orderly sale of their

assets and preserve value for the benefit of their creditors.

59.    Given the Debtor's financial condition, current financing arrangements, and

capital structure, the Debtors do not have significant unencumbered funds and are otherwise

unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense.  Financing on a post-petition unsecured or solely on a superpriority

---

[3] In the interest of brevity, summaries of all First Day Motions and Applications has not been included.
[4] Capitalized terms used in this Section II(A) are used with the meanings ascribed to such terms in the Financing Motion.

2383996v.10

basis is not available. Midcap is willing to provide the DIP Revolving Facility and DIP Term Loan pursuant to section 364(c)(1) of the Bankruptcy Code, provided that Midcap has priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens (including priming liens) upon the property described below pursuant to sections 364(c) and (d) of the Bankruptcy Code.

60.    The Debtors have made inquiry of other lenders and are unable to obtain from another lender the necessary post-petition financing that they need on terms more favorable in the aggregate than those provided in the DIP Credit Agreement (as discussed below). Four other potential lenders were contacted. Two passed on the opportunity after initial due diligence. The other two presented proposals containing collateral and guaranty terms which were less advantageous or otherwise could not be satisfied by the Debtors. Thus, Midcap presented the only viable program for postpetition financing.

61.    Under the proposed DIP Credit Agreement, Midcap and the other Lenders will make cash advances and other extensions of credit in a maximum principal amount not to exceed $33.0 million on a revolving credit ($23 million) and term basis ($10 million) under and subject to the terms and conditions of DIP Documents.

62.    The proceeds of the DIP Revolving Facility and DIP Term Loan under the DIP Documents will be used by the Debtors to: (i) repay the Prepetition Revolving Loan Obligations owing to Midcap Funding; (ii) pay the fees and expenses due DIP Agent under the DIP Credit Agreement; (iii) pay all Prepetition Term Loan Obligations as they become due under the Prepetition Term Credit Agreement; (iii) for general working capital purposes and general corporate purposes relating to the postpetition operations; and (iv) the costs and expenses

22

associated with these Chapter 11 Cases, including the fees, costs, expenses and disbursements of professionals retained by the Debtors and any statutory committee appointed in these Chapter 11 Cases (the "**Committee**"), and other bankruptcy related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, .all in accordance with the terms of the Debtors' proposed Budget.

63.    The proposed DIP Revolving Facility will operate in two stages. First, under the proposed Interim Order, the initial loans and advances will be limited to $4.5 million  (the "**Interim Amount**") which amount shall be used to pay the Debtors' working capital needs and operating requirements during the Interim Period, subject to the Budget and the DIP Documents. Upon entry of the Final Order, the Debtors shall use the remaining proceeds of the DIP Revolving Facility to repay any balance of the Prepetition Revolving Loan Obligations. However, prior to the entry of the Final Order, any collection of Prepetition Accounts that are proceeds of the MidCap Prepetition Collateral, shall be used by MidCap Funding to repay the amount of the Prepetition Revolving Loan Obligations.

64.    Upon approval at the Final Hearing to consider this Motion, any remaining availability under the DIP Revolving Facility, together with the proceeds of the DIP Term Loan will become available for the Debtors' use subject to the DIP Documents.

65.    As security for the full and timely payment of DIP Revolving Facility, Midcap, as the DIP Revolving Loan Agent, shall be granted, pursuant to sections 364(c) and (d): (i) first priority security interests in and liens on, and pledges of, such now existing and hereafter acquired assets of SSMC and SECC to the same extent as described in the Prepetition Revolving Credit Agreement; (ii) first priority security interests in and liens on the postpetition accounts (the "**Postpetition Accounts**"); (iii) subject and subordinate to any pre-existing liens

2383996v.10

(collectively, the "**Permitted Liens**"), including the first mortgage lien presently existing in favor of Sun Life , any judgment liens in favor of the 1199 Funds and any other pre-existing liens of any Other Judgment and Lien Creditor, security interests in and liens on all of the real and personal property comprising the Sound Shore Medical Center located at 16 Guion Place, New Rochelle, NY; (iv) subject and subordinate to any pre-existing liens, including the first mortgage lien presently existing in favor of HVB, any liens in favor of DASNY and PBGC, any judgment liens in favor of the 1199 Funds, and any other pre-existing lines of any Other Judgment and Lien Creditor, security interests in and liens on all of the real and personal property comprising the Mount Vernon Hospital located at 12 N 7th Ave, Mt. Vernon, NY 10550; (v) subject and subordinate to any pre-existing liens, including the first mortgage lien presently existing in favor of MidCap Funding, any liens in favor of DASNY and PBGC, and any other pre-existing lines of any Other Judgment and Lien Creditor, security interests in and liens on all of the real and personal property comprising Howe Avenue Nursing Home, d/b/a Schaffer Extended Care Center located at 16 Guion Place, New Rochelle, NY 10801 and (vi) all proceeds and products of the foregoing (collectively, "**DIP Revolving Loan Facility Colllateral**") The DIP Revolving Loan Facility Collateral excludes any and all causes of action and proceeds therefrom of the Debtor or any of their estates under sections 544, 545, 547, 548, 550 and 724 of the Bankruptcy Code (the "Avoidance Actions").

66.    The DIP Term Loan Agent, as security and collateral for the DIP Term Loan, shall receive: (i) an irrevocable, unconditional, transferable standby letter of credit, with an initial expiration date of not less than one (1) year and with an evergreen provision, provided by MMC in favor of DIP Term Loan Agent; (the "**DIP Term Loan Collateral**" and together with the DIP Revolving Facility Collateral, the "**DIP Collateral**").

24

67.     As additional security for Midcap, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations shall have the status of an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (collectively, the "**DIP Superpriority Claims**").   The DIP Superpriority Claims shall be subordinate in payment and priority only to the Carve Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases.  The DIP Superpriority Claims shall not extend to (i) commercial tort claims or (ii) any Avoidance Actions under chapter 5 of the Bankruptcy Code except claims arising under section 549 of the Bankruptcy Code.

68.     As noted above, among the security granted Midcap for the DIP Revolving Facility is a priming lien in the Postpetition Accounts.  The MVH Tax Lien and SSMC Tax Lien (collectively, the "**Tax Liens**") asserted by the IRS purports to cover the SSMC Accounts. There has been a waiver of penalties by the IRS against MVH and SSMC, and, upon information and belief, the alleged Tax Liens were intended to only cover such now discharged penalty obligations.  Further, the Debtors contend such liens are voidable as preferences having attached within 90 days of the filing.  Even if the Tax Liens are valid, the IRS would remain adequately protected with a junior continuing lien on the SSMC and MVH Prepetition Accounts and a junior Adequate Protection Lien (as hereinafter defined) in the SSMC and MVH Postpetition Accounts. SSMC's and MVH's combined average net collectable accounts receivable base is in excess of $26 million, far in excess of the $21 million Midcap Postpetition Revolving Loan Commitment relating to these two entities.  The Tax Liens at a maximum do not exceed $1.5 million.  The Debtors submit that their equity in the Accounts constitutes sufficient adequate protection for the IRS to the extent its Lien is valid.

2383996v.10

69.    In the ordinary course of business, the proceeds of substantially all of the Debtors

receivables, including the Prepetition Accounts and any payments from the rental from the

hospital offices and Parking Lots, are deposited in the lockbox accounts and Midcap, as

prepetition lender, applies the Prepetition Accounts against its loans and passes through and

reimburses the Debtor's operating accounts with the non-collateral proceeds such as lease

payments and parking fees.    These funds had been used by the Debtors to fund ongoing

operations.  The Debtors propose to use the proceeds of the Secured Creditors' collateral (the

"**Cash Collateral**") in accordance with the Budget, and provide the Secured Creditors and

MidCap Funding Adequate Protection Liens (as defined below).

70.    Pursuant to sections 361, 364 and 507(b) of the Bankruptcy Code, as adequate

protection to the Secured Creditors against any diminution of their respective interests in the

Prepetition Collateral (to the extent they hold valid and perfected Prepetition Liens therein)

resulting from, among other things, their subordination to the Carve Out and the DIP Liens and

the Debtors' use, sale or lease of such Prepetition Collateral ( the "**Diminution in Value**"), the

Debtors propose to grant the Secured Creditors (a) automatically perfected, replacement liens on

the DIP Collateral (an "**Adequate Protection Lien**") to the same extent and priority of their

respective Prepetition Liens and against each Debtor in which such Secured Lender holds an

Adequate Protection Lien (an "**Applicable Debtor**").  The Adequate Protection Liens shall be

deemed a Permitted Lien within the meaning of the DIP Revolving Loan Agreement.   The

Adequate Protection Liens shall be valid and enforceable against any trustee or other estate

representative appointed in the Chapter 11 Cases or any Successor Cases.

71.    To the extent Adequate Protection Liens fail to protect the Secured Creditors

against any Diminution in Value, the Secured Creditors shall be entitled, pursuant to sections

26

503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases of the Applicable Debtors (collectively, the "**Prepetition Secured Creditor Superpriority Claims**"), subordinate in payment and priority only to the DIP Superpriority Claims and the Carve Out, and otherwise with priority over any and all administrative expenses and unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases..  The Prepetition Secured Creditor Superpriority Claims, however, shall not extend to (i) commercial tort claims or (ii) any Avoidance Actions (except claims under section 549 of the Bankruptcy Code).

**B.   Motion For Order Pursuant to 11 U.S.C. 105(A) And 363 Authorizing Continued Use of Debtors' (I) Bank Accounts (II) Cash Management System; and (III) Business Forms**

72.    The Debtors filed a Motion pursuant to 11 U.S.C. §105(A) and 363 seeking authorization for, <u>inter alia</u>, the continued use of the Debtors' Bank Accounts, Cash Management System, and existing Business Forms (the "**Cash Management Motion**").

73.    A list of the Debtors' bank accounts (collectively, the "**Bank Accounts**") is annexed as <u>Exhibit B</u> to the Cash Management Motion.  Bank Accounts are maintained at the following institutions:

| Entity | Bank | Account # |
|---|---|---|
| Sound Shore Medical Center | Bank of America | 9428382661 |
| Sound Shore Medical Center | JP Morgan Chase | 6701702520 |
| Sound Shore Medical Center | JP Morgan Chase | 816900310 |
| Sound Shore Medical Center | JP Morgan Chase | 134773683 |
| Sound Shore Medical Center | PNC | 8611722228 |
| Sound Shore Medical Center | PNC | 8611722236 |
| Sound Shore Medical Center | JP Morgan Chase | 6709080596 |
| Sound Shore Medical Center | JP Morgan Chase | 6709085512 |
| Sound Shore Medical Center | JP Morgan Chase | 6709009158 |
| Sound Shore Medical Center | Hudson Valley Bank | 1204412126 |
| Sound Shore Physicians Services, PC | JP Morgan Chase | 753658756 |
| NR Medical Services PC | JP Morgan Chase | 6700794952 |
| NR Geriatrics PC | JP Morgan Chase | 6700997284 |

| | | |
|---|---|---|
| NR OB/GYN PC | JP Morgan Chase | 6703818720 |
| NR Pathology PC | JP Morgan Chase | 6709083587 |
| Sound Shore Medical Center | JP Morgan Chase | 4181516396 |
| Sound Shore Pharmacy | JP Morgan Chase | 6701129936 |
| SECC | JP Morgan Chase | 937382794 |
| SECC | JP Morgan Chase | 937382786 |
| SECC | JP Morgan Chase | 4201069327 |
| SECC | JP Morgan Chase | 3002224891 |
| SECC | JP Morgan Chase | 4201070507 |
| The Mount Vernon Hospital | KeyBank | 21006807 |
| The Mount Vernon Hospital | KeyBank | 21007005 |
| The Mount Vernon Hospital | JP Morgan Chase | 816900831 |
| The Mount Vernon Hospital | JP Morgan Chase | 816900823 |
| The Mount Vernon Hospital | Hudson Valley Bank | 1202095801 |
| The Mount Vernon Hospital | Hudson Valley Bank | 1201715901 |
| The Mount Vernon Hospital | Hudson Valley Bank | 1201714001 |
| Foundation | JP Morgan Chase | 6700997802 |
| Foundation | JP Morgan Chase | 6709092616 |
| NRHMC Services Corp | JP Morgan Chase | 6700790914 |

74.     The Bank Accounts and the Debtors' practice and procedures with respect to the collection of deposits, periodic funding by the Debtors' accounts receivable lender, the payment of disbursements and the making of payroll comprise the Debtors' centralized cash management system (the "**Cash Management System**").   The Debtors maintain lockbox accounts, an operating account, a payroll account, government and non-government collections accounts and a refund account which are integrated to form the Debtors' Cash Management System.

75.     The Debtors derive most of their revenue from third party payors, including reimbursement from Medicare and Medicaid.  Cash is also remitted by commercial insurers as well as private payors.  Receivables from SSMC and SECC are deposited daily in lockbox accounts and swept by Midcap into its collection accounts.  Each day Midcap applies funds in the collection account to pay fees, interest and expenses on its loan, any borrowing base deficiency, required principal payments, reserves, and funds SSMC's and SECC's operating requirements subject to availability under the borrowing base and the commitment.  Funds are

28

deposited by Midcap in the operating account and the Cash Management System transfers funds into the payroll account and other affiliates to meet ordinary course requirements.

76.     The Cash Management System utilized by the Debtors is not dissimilar to those commonly employed by other healthcare organizations.  Because the Cash Management System constitutes the Debtors' usual, ordinary and essential business practices, the Debtors seek the Court's authorization to continue such practices during the Cases.  The Debtors' existing Cash Management System is essential to the ordinary operations of the Debtors' businesses. Requiring the Debtors to establish a new, segregated cash management structure at the early and critical stages of the cases would be expensive, disruptive and create unnecessary administrative difficulties.

77.     Any disruption could have a severe adverse impact on the Debtors' operations and prospects for a successful conclusion to the case.  Maintenance of the existing Cash Management System is not only essential, but in the best interests of all the creditors and parties of interest.  It will permit uninterrupted flow of essential operating funds, minimize operating costs and provide the same efficiencies that existed before the Petition Date.  It will permit the Debtors to trace receipts and disbursements and efficiently manage liquidity.

78.     Asking payors to remit payments to new or different accounts may result in a significant slowdown in the Debtors' collections just at the time when prompt collection is most critical.  In addition, the Debtors' Cash Management System is especially delicate in light of its reliance upon receivables proceeds from both Medicare and Medicaid.  A disruption in the Debtors' ability to collect receivables from the Medicare and Medicaid programs could take several weeks to correct and deny the Debtors much needed cash.

2383996v.10

79.     It goes without saying that JP Morgan Chase, PNC, Bank of America, Hudson Valley Bank and Key Bank, the depositories where accounts are maintained, are financially stable and FDIC insured.  The Debtors accordingly believe that the funds on deposit are safe and any risks associated with such accounts are so *de minimus* that it be a waste of estate resources to incur the cost required to close such accounts and establish new ones.

80.     As of the Petition Date, the Debtors have instructed the Banks to stop payment on all outstanding checks issued to vendors or other trade creditors on account of prepetition debts or liabilities, with the exception of those checks to employees for wages or employee benefits, as described fully in the Motion For Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement and (II) Authorizing and Directing Banks To Honor Checks With Respect Thereto (the "**Wage Authorization Motion**").

81.     As noted in the Wage Authorization Motion, filed contemporaneously herewith, the Debtors request that the Court direct the Debtors' Banks to continue to honor payroll checks (to the extent sufficient funds are on deposit to honor such checks) without regard to when such payroll checks were issued.  Such relief is necessary to implement, to the extent granted, and shall be subject to, the relief requested by the Debtors in the Wage Authorization Motion.  The Debtors intend to provide notice of entry of the order granting this Motion to the Debtor's Banks within one (1) business day of the entry of such an order.

82.     Furthermore, the Debtors also request permission to use their existing business forms and stationary without alteration or change.  The Debtors do not print their own business forms and stationary.  Thus, substantial time and expense would be required if the Debtors were required to print new business forms and stationary merely to indicate "debtor in possession."  Post petition, the Debtors intend to execute new signature cards with respect to its Bank

30

Accounts to indicate "debtor in possession." The Debtors will also stamp all checks "DIP" post

petition.

**C. Motion Pursuant to Sections 105(a), 363(b), 507(a)(4) and (a)(5) and 541(a) of the Bankruptcy Code for an Order (I) Authorizing Payment of Prepetition Wages, Employee Benefits and Expense Reimbursement, (II) Authorizing and Directing Banks to Honor Checks with Respect Thereto (Wage Authorization Motion)**

83.    The Debtors' reorganization efforts require the continued and uninterrupted

service of its employees in order to support continuing operations and to maintain consistent,

high-quality standards necessary for proper patient care.   To avoid the significant risks of

resignations and of discontent or loss of morale among essential employees, and in view of the

priority awarded to wage claims, it is necessary and appropriate that the Debtors be granted the

authorization to pay outstanding prepetition wages, benefits and expenses.

84.    The Debtors have a total of approximately 2000 employees, both union and non-

union (the "**Employees**").   Historically, the Debtors have paid employees bi-weekly.  In August,

2012, executive payroll was held for one week, separating wage payments into two bi-weekly

payrolls, executive and non-executive pay.   The executive payroll each pay period aggregates

approximately $1.7 million and the non-executive payroll aggregates approximately $3.6 million

inclusive of payroll related benefits.

85.    The payroll for Employees for the pay period from May 6, 2013 to May 20, 2013

was paid on May 23 for non-management and is to be paid on May 30 for management.  All

wages and benefits earned by Employees during this pay period constitute prepetition wages and

payroll related benefits.  In addition, for the pay period from May 20, 2013 through the Petition

Date there are prepetition wages and benefits which will be paid in the ordinary course on June

6, 2013 for non-management and June 13, 2013 for management.

86.     Thus, the Wage Motion seeks authority to any open pay prepetition wages for the period from May 6, 2013 through Petition Date (approximately $4.28 million in the aggregate, or average of $2,140 per employee, including wage related benefits).  The debtor seeks to pay the wages for all employees in the ordinary course when the first obligations come due on June 6 and June 13, 2013, including obligations not yet due.

87.     In addition, in the ordinary course of their businesses, the Debtors contribute to several benefit funds that provide benefits to the Debtors' union employees in addition to providing direct benefits to non-union employees (collectively, the "**Employee Benefits**").  The Employee Benefits to non-union employees, include but are not limited to, health insurance, COBRA coverage vacation pay, sick pay, holiday pay, workers' compensation, disability, 401(k) and related programs.  The estimated aggregate cost to the Debtors of funding the unpaid Employee Benefits to both union and nonunion employees through Petition Date is approximately $2.1 million.

88.     The gross weekly payroll and Employee Benefits for the employees for the above-mentioned periods is less than $12,425 for each employee, excluding executives and various management positions.  To the extent the prepetition wages owed any executive or member of management would exceed the priority cap, they will be paid only up to the priority amount.

89.     The Debtors further request that this Court authorize the Banks to process, honor and pay all prepetition checks issued by, and fund transfer made from, the Debtors with respect to employee wages and Employee Benefits that were not processed, honored or paid as of Petition Date, provided, however, the Banks will not honor checks: (a) for services rendered 180 days prior to the Petition Date, or (b) if payment of same would cause the employee to exceed the maximum $12,425 maximum priority allowance under Bankruptcy Code section 507(a)(4).

2383996v.10

The monies distributed pursuant to this authorization shall be processed, honored, and paid from the following accounts:

| Entity | Bank | Account # |
|---|---|---|
| Sound Shore Medical Center | JP Morgan Chase | 6701702520 |
| Sound Shore Medical Center | JP Morgan Chase | 816900310 |
| NR Medical Services PC | JP Morgan Chase | 6700794952 |
| NR Geriatrics PC | JP Morgan Chase | 6700997284 |
| Sound Shore Pharmacy | JP Morgan Chase | 6701129936 |
| The Mount Vernon Hospital | Hudson Valley Bank | 1201714001 |
| The Mount Vernon Hospital | JP Morgan Chase | 816900831 |
| The Mount Vernon Hospital | JP Morgan Chase | 816900823 |

90.    The total amount of reimbursement by the Debtors for employee expenses in the ordinary course of business shall not exceed an aggregate amount of $5,000.00. The Debtors fully anticipate that there will be sufficient cash available to pay all prepetition compensation, deductions, benefits, trust fund taxes and expenses; as such amounts become due in the ordinary course of business.

91.    The obligations for which the Debtors seeks authorization to honor were earned by individuals employed by the Debtors, and are services rendered within one hundred and eighty (180) days before commencement of the Debtors' case. The obligations are for wages and payroll taxes based on such wages, and for the other Employee Benefits mentioned above.

92.    The Debtors submit that the Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein. Without the requested relief, the Debtors' stability would likely be seriously undermined at the outset of these Chapter 11 Cases. Any delay in paying prepetition wages, benefits, and deductions or expenses would seriously harm the Debtors' relationship with its Employees and could irreparably impair employee morale at the very time the deduction, confidence and cooperation of the Employees in

2383996v.10

most critical. Nor can the Debtors afford to jeopardize patient safety by the destabilization of the employee workforce.

**D. Motion Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code for an Order Authorizing the Debtors to Continue Workers Compensation Programs, All Other Insurance Policies, Bonds, and Agreements Relating Thereto, and to Pay All Obligations in Respect Thereof**

93.    In connection with the operation of its business and management of its facilities, the Debtors maintain various insurance programs (the "**Insurance Programs**") including insurance for workers' compensation, general liability and excess coverage, hospital professional liability, employee benefits liability, automobile and personal injury protection, commercial property coverage, directors and officers liability, fiduciary liability, crime insurance and ERISA bond. The existing programs required to be maintained by the Debtors as follows

## INSURANCE COVERAGE

| Carrier | Term | Premium | Type | Broker | Entity |
|---|---|---|---|---|---|
| Aspen Insurance Company | 07/01/12 - 07/01/13 | 7,484 | Commercial Umbrella | Hagedom | NRSSH |
| Aspen Insurance Company | 07/01/12 – 07/01/13 | 84,901 | Commercial Umbrella | Hagedom | SSMC |
| Federal Insurance Company | 01/01/13 – 01/01/14 | 47,651 | Business Automobile | Hagedom | MVH |
| First Mercury Insurance Company | 07/01/12 – 07/01/13 | 3,382 | 2nd Excess Liability | Hagedom | NRSSH |
| First Mercury Insurance Company | 07/01/12 – 07/01/13 | 83,810 | 2nd Excess Liability | Hagedom | SSMC |
| Great Northern Insurance Company | 01/01/13 – 01/01/14 | 137,451 | Property | Hagedom | MVH |
| Navigators Insurance Company | 07/01/12 – 07/01/13 | 1,069 | 3rd Excess Liability | Hagedom | NRSSH |
| Navigators Insurance Company | 07/01/12 – 07/01/13 | 30,931 | 3rd Excess Liability | Hagedom | SSMC |
| Physicians Reciprocal Insurers | 07/01/12 – 07/01/13 | 2,916,710 | Malpractice Liability | AON | SSMC |
| Physicians Reciprocal Insurers | 07/01/12 – 07/01/13 | 238,497 | General Liability | AON | SSMC |
| Scottsdale | 01/01/13 – | 108,210 | General Liability | Hagedom | MVH |

2383996v.10

| Carrier | Term | Premium | Type | Broker | Entity |
|---|---|---|---|---|---|
| Insurance Company | 01/01/14 | | | | |
| Scottsdale Insurance Company | 01/01/13 – 01/01/14 | 62,647 | Commercial Umbrella | Hagedom | MVH |
| Starr Indemnity and Liability Company | 11/15/12 – 11/15/13 | 196,412 | Excess Liability | AON | SSMC |
| Starr Indemnity and Liability Company | 11/15/12 – 11/15/13 | 58,240 | Excess Liability | AON | MVH |
| Northriver Insurance | 11/15/12 – 11/15/13 | 58,865 | Directors & Officer Liability | AON | SSMC |
| State Insurance Fund | 12/03/12 – 12/02/13 | 1,181,458 | Worker's Compensation | The Risk Management Group | SSMC |
| State Insurance Fund | 12/03/12 – 12/02/13 | 666,124 | Worker's Compensation | The Risk Management Group | MVH |
| Travelers Property & Casualty Ins. Co. | 07/01/12 – 07/01/13 | 46,484 | Business Automobile | Hagedom | SSMC |
| US Specialty Ins. Co. | 07/01/11 – 07/01/14 | 0 | Special Crime | Hagedom | MVH |
| US Specialty Ins. Co. | 07/01/11 – 07/01/14 | 5,000 | Special Crime | Hagedom | SSMC |
| Vigilant Insurance Company | 10/01/12 – 10/01/13 | 30,508 | Property | Hagedom | NRSSH |
| Vigilant Insurance Company | 10/01/12 – 10/01/13 | 285,290 | Property | Hagedom | SSMC |
| Zurich American Insurance Company | 04/01/13 – 04/01/14 | 15, 142 | Crime | Hagedom | SSMC |

94.    The continuation of the Debtor's existing Insurance Programs is essential to the Hospital's viability and the preservation of patient care levels. Moreover, the cost of renewal coverage is likely to be far less than the expense that will be required to put into place new replacement coverage. Thus to the extent a premium or deductible reimbursement relating to a period prior to the Petition Date is outstanding or becomes due with respect to any insurance policy, including any renewal, extension or replacement thereof, the Debtors seek the authority to make such payment in the same manner that such payments were made prior to the Petition Date.

95.    If the Insurance Programs expire or lapse, the Debtors could be exposed to substantial liability for damages resulting to person or property. Maintenance of such coverage

2383996v.10

is critical to the success of the reorganization effort and the preservation of the Debtors' assets and their estates.

**E. Motion Pursuant to Sections 102(1), 105(a), and 105(d) of the Bankruptcy Code and Rules 1015(c), 2002(m), 9006, 9007, 9014 and 9036 of the Federal Rules of Bankruptcy Procedure for an Order Establishing Case Management Procedures**

96.     In order to streamline the administration of the Debtors' estates and increase overall efficiencies, the Debtors are seeking to establish certain procedures (the "**Case Management Procedures**") which will govern and alleviate certain noticing and related administrative burdens and costs for the Court, the Debtors' estates and all parties in interest. The Debtors anticipate that these cases will be large and complex, involving many secured and unsecured claims — some of which may be disputed and potentially litigated. It is expected that many of these potential claimants and parties-in-interest will file requests for notice of filings pursuant to Bankruptcy Rule 2002(i). The Debtors also expect the filing of numerous motions and applications in these cases. The proposed Case Management Procedures will permit the orderly and efficient presentation of such claims and filings to the Court.

97.     The Case Management Procedures (a) establish requirements for filing and serving notices, motions, applications, declarations, objections, responses, memoranda, briefs, supporting documents and other papers filed in these Chapter 11 Cases, (b) delineate standards for service of notices of hearings and agenda letters; (c) fix periodic omnibus hearing dates and articulate mandatory guidelines for scheduling hearings and objection deadlines; and (d) limit matters that are required to be heard by the Court. Given the size and scope of these Chapter 11 Cases, the Debtors believe that the Case Management Procedures will facilitate the efficient administration of these Chapter 11 Cases and permit less burdensome and costly service of Court Papers while still ensuring that appropriate notice is provided. Thus, pursuant to Bankruptcy

36

Rule 2002 and Local Rule 2002-2, the Debtors are seeking approval for the Case Management Procedures and request that the procedures be implemented.

**F.  Motion Pursuant to 11 U.S.C. §§ 105 and 366 of the Bankruptcy Code Prohibiting Utilities from Altering, Refusing or Discontinuing Service to, or Discriminating Against the Debtors, Determining Utilities are Adequately Protected and Establishing Procedures for Determining Requests for Adequate Assurance of Payment**

98.    In connection with the operation of their businesses and management of their properties, the Debtors obtain water, heat, natural gas, oil, electricity, trash removal, telephone and other similar services (collectively, "**Utility Services**") at the Debtors' facilities, including those listed on <u>Exhibit B</u> to the motion (the "**Utility Service List**").  Uninterrupted utility services are essential to the Debtors' ongoing operations, and to their reorganization efforts. Should any utility company (the "**Utility Providers**") refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, which could pose life threatening hazards and consequences for the Debtors' patient population.  It is therefore absolutely critical that utility services continue uninterrupted.

99.    In the past twelve (12) months, the Debtors paid an average of approximately $518,841.00 per month on account of Utility Services.

100.    The Debtors intend to pay all postpetition obligations owed to their utility companies in a timely manner.  To that end, the Debtors have developed a postpetition budget that contemplates full payment of their utility obligations.  In addition, the Debtors propose to deposit, as adequate assurance, $260,000.00 into a newly created, segregated escrow account (the "**Utility Reserve**") for the benefit of utilities providing services to the Medical Centers within 20 days of the Petition Date.  The Utility Reserve equals 15 days of the Debtors'

2383996v.10

estimated aggregate postpetition utility expenses for the Medical Centers, based upon average usage for the last 12 months.

101.    The Debtors submit that the Utility Reserve, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "**Proposed Adequate Assurance**"), constitutes sufficient adequate assurance to the Utility Providers. Nonetheless, if any Utility Provider believes additional assurance is required, the Debtors propose that such Utility Provider be required to adhere to the adequate assurance procedures (the "**Adequate Assurance Procedures**") detailed in the motion. The Adequate Assurance Procedures will permit the Debtors to evaluate requests for additional adequate assurance on a case-by-case basis and allow the Debtors to work with the Utility Providers to consensually resolve any adequate assurance issues.

102.    As further detailed in the motion, the relief requested pursuant to the motion is necessary, fair to the Utility Providers, and in the best interests of the Debtors' estates and creditors.

## G. Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention of Garfunkel Wild, P.C. as Counsel for the Debtors

103.    The Debtors have been informed that the members and associates of Garfunkel Wild, P.C. ("GW") who will be engaged in these Chapter 11 Cases and who will appear before this Court are admitted to practice before this Court. The Debtors have selected GW as their general bankruptcy counsel because GW and its attorneys have extensive experience and knowledge in the fields of debtors' and creditors' rights, debt restructuring and corporate reorganizations, healthcare, tax law, real estate matters, employee benefits and commercial litigation, among other areas.

38

104.   GW has represented the Debtors on numerous legal matters in the past, and brings

to this case a unique perspective and knowledge base.   Among other things, GW represented

SSMC and MVH in 2008 in connection with a balance sheet restructuring of their unsecured

indebtedness pursuant to a voluntary creditor compromise, has subsequently provided

reorganization and related financial advice and over the years has afforded general healthcare

and regulatory representation.   As a consequence, GW is intimately familiar with the Debtors'

business and financial affairs, and given the length of its representation, GW is uniquely

positioned to represent the Debtors in these cases.

105.   In November, 2012, as the Debtors' financial circumstances continued to

deteriorate, GW was retained by SSHS to among other things, (i) assist in the development of a

restructuring plan that addressed existing indebtedness (ii) assist in the negotiation,

documentation and closing of any potential transaction to partner with another healthcare system

for the preservation and expansion of healthcare delivery in the System's communities; (iii)

interface with the NYS Department of Health, CMS and any other regulatory agencies in the

implementation of any restructuring or merger plan; (iv) provide any related transactional or

litigation counsel or advice that may be required; and (v) provide representation and counsel in

developing and implementing strategies to deal with creditor constituencies.

106.   In the months leading up to the Chapter 11 filing, GW has been actively involved

in this engagement.   In addition to the significant work required to prepare the filing, including,

inter alia, the preparation of the petitions, schedules, statement of affairs, ancillary documents

and first day motions, the negotiation and documentation of loan facilities and drafting of a

motion to approve DIP financing, GW has devoted a substantial amount of time over the last

several months negotiating the terms of an asset purchase agreement with two potential buyers

and preparing to file a motion to approve bid procedures and the sale of substantially all of the Debtors' operating and real estate assets.

107.    Given the level of GW's involvement to date, the firm is uniquely and well qualified and able to continue to represent the Debtors for the matters in respect of which the firm is to be engaged in this case in a most efficient and timely manner.  If the Debtors are required to retain attorneys other than GW in connection with these Chapter 11 Cases, the Debtors and their estates would be prejudiced by the time and expense necessary for such attorneys to become familiar with the Debtors' business operations.  In addition, the Debtors have directed GW to work cooperatively with the other professionals retained in this case to avoid duplication and inefficiency.

108.    GW received prepetition retainer in the aggregate amount of $200,000 for, among other things, preparation of the bankruptcy filing and for the prosecution of the Chapter 11 Cases.  I am advised that GW will apply against the Retainer any open time in connection with these services incurred prior to the filing and retain the balance.  Within the 90 days prior to the Petition Date, GW was paid an aggregate of $478,161.75 (exclusive of the retainer) and applied these amounts for services expended in connection with the negotiation and documentation of the potential sale of the Debtors' assets as part of these proceedings and in preparation of these Chapter 11 Cases.

## H. Application Pursuant to Section 327(a) of the Bankruptcy Code Authorizing the Employment and Retention Retain Alvarez & Marsal as Financial Consultants

109.    In August of 2012, A&M was retained by the System to provide consulting and restructuring advice to the Debtors, including matters relating to potential strategic mergers or partnership transactions for the System, including SSMC and MVH.  Specifically, A&M was engaged to: (a) lead an effort to develop options to improve strategic position and financial

2383996v.10

performance and position; (b) provide assistance in achieving and managing forbearance of defaults with A/R lender Midcap Financial; (c) provide advice with respect the financial viability of various restructuring alternatives; (d) generally assist with creditor negotiations and negotiations with other healthcare systems with respect to partnership; (e) assisting the Debtors to manage the solicitation and negotiation of a potential sale and/or merger; and (f) consulting on other critical financial issues as and when necessary.

110.    A&M has, in fact, assisted the Debtors and their management in developing and implementing strategic and tactical options designed to improve liquidity. A&M also led the effort to find a strategic partnership with another healthcare system to assure the continued delivery of patient care in underserved communities, and met with more than five different systems in trying to fashion a viable arrangement.

111.    A&M has assisted the Debtors in negotiating and securing near term operating liquidity including negotiating with the New York Department of Health and with DASNY on access to restructuring pool loans and the timing and use of HEAL NY grant funding. A&M has also worked closely with Midcap to obtain continuing renewal of forbearance agreements and occasional short term increases in available liquidity.

112.    A&M has assisted the Debtors in managing and negotiating with existing key vendors with regard to payment issues and key contract terms including addressing key default issues with critical revenue cycle vendor and has assisted management in development and implementation of cash acceleration options.

113.    A&M played a vital role in directly interfacing with each of the prospective purchasers and had a major responsibility in developing the concept of what was going to be a

41

full asset merger with WCHCC. When months of negotiations could not generate a deal at sufficient levels of consideration, A&M facilitated the reintroduction of MMC into the discussions. During the entire process, A&M has played a primary role in developing a due diligence room, generating and otherwise assembling and organizing substantial volumes of relevant information, and developing cash budgeting models and advising the System on liquidity management (including support in connection with certain asset sales) in a manner that has enabled these Debtors to continue healthcare operations while the sale process has been finalized. A&M has also had a role in negotiating the business terms of the arrangement with MMC.

114.    As it became clear that any partnership and sale arrangement would have to be effected through a bankruptcy, A&M has been critical in assisting the Debtors with preparing their respective bankruptcy pleadings and coordinating the essential flow of information with bankruptcy counsel. A&M has also led the effort to finalize an essential postpetition financing facility with Midcap and in negotiating lien priority issues with the existing secured creditor base. The Debtors are seeking A&M's retention *nunc pro tunc* to the Petition Date.

115.    A&M has extensive experience and expertise in restructuring matters in relation to healthcare entities. A&M has acted as a consultant in several hospital and healthcare restructuring cases and is well versed in its field. Given A&M's level of involvement to date, and the valuable services they have provided, it is necessary and in the best interests of the estate that they be retained in this case to continue providing the services.

116.    A&M received $100,000.00 as a retainer and has applied open time in connection with preparing for and conducting the filing of these Chapter 11 cases against it. A&M will hold

2383996v.10

the unapplied residual retainer until the end of the Chapter 11 Cases. In the 90 days prior to the Petition Date, A&M received retainers and payments totaling $1,261,522.90 in the aggregate for services performed for the Debtors. A&M has applied these funds to amounts due for services rendered and expenses incurred prior to the Petition Date.

I. **Application Pursuant to 28 U.S.C. § 156(c) and 11 U.S.C. § 105(a) Appointing GCG, Inc. as Claims and Noticing Agent for the Debtors**

117.    The Debtors are seeking the appointment of GCG, Inc. ("**GCG**") to act as the official claims and noticing agent for these Chapter 11 Cases, and assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' Chapter 11 cases. The Debtors anticipate that there will be in excess of 3000 entities to be noticed in these cases. In view of the number of anticipated claimants and complexity of these cases, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors, their estates and all creditors.

118.    By appointing GCG as the Claims and Noticing Agent in these Chapter 11 cases, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

119.    GCG has acted as the claims and noticing agent in numerous cases of comparable size in this District, many of which are currently pending before the Court. GCG has significant expertise in these matters and is well qualified to act as the claims and noticing agent in these cases. Prior to the Petition Date the Debtors provided Claims and Noticing Agent a retainer in the amount of $30,000.00. No other payments have been made by the Debtors to GCG in the year preceding the filing of their Chapter 11 cases.

2383996v.10

## CONCLUSION

120.    As discussed above, the Debtors determined to seek relief under Chapter 11 in order to preserve and maximize value for the benefit of all creditors and parties in interest. To that end, the breathing spell afforded by Chapter 11 will permit Debtors, with the assistance of their professionals, to consummate a proposed sale transaction that will ensure the highest realization of value for the Debtors' assets and properties while addressing their obligations to creditors under a Chapter 11 plan and the auspices of this Court.

John Spicer, President and CEO

Sworn to me this 28th day
of May, 2013

Notary Public

BURTON S. WESTON
Notary Public, State of New York
No. 02WE4941755
Qualified in Nassau County
Commission Expires Aug. 29, 20 14

44

**Exhibit A**
**<u>Boards of Trustee</u>**

## SOUND SHORE MEDICAL CENTER OF WESTCHESTER

| NAME | TITLE |
|---|---|
| MAURO C. ROMITA | CHAIRMAN |
| HON. NOAM BRAMSON | EX-OFFICIO MEMBER |
| THEODORE KELTZ, M.D. | EX-OFFICIO MEMBER |
| JOHN R. SPICER | EX-OFFICIO MEMBER |
| STEPHEN TRAUZZI, M.D. | EX-OFFICIO MEMBER |
| MARK WEIGLE, M.D. | EX-OFFICIO MEMBER |
| ROBERT P. BALACHANFRAN | GOVERNOR |
| DANIEL F. CREMINS | GOVERNOR |
| KATHIE E. DAVIDSON | GOVERNOR |
| JOHN J. DOONER | GOVERNOR |
| LOUIS B. FROST | GOVERNOR |
| RICHARD C. GAY | GOVERNOR |
| JOHN A. GEOGHEGAN | GOVERNOR |
| LORRI S. GORMAN | GOVERNOR |
| TIMOTHY C. IDONI | GOVERNOR |
| CHARLES H. MCCABE | GOVERNOR |
| THOMAS M. MCEVOY | GOVERNOR |
| STEWART J. MCMILLAN | GOVERNOR |
| MARY M. SAVAGE | GOVERNOR |
| STEPHEN J. TENORE | GOVERNOR |
| MARYELLEN JOHNSTON | GOVERNOR |
| DARREN DEVERNA | PRESIDENT |
| JEFFREY R. POWERS | SECRETARY |
| LAWRENCE J. RUISI | TREASURER |
| GEORGE T. ERBE | VICE CHAIRMAN |
| CAROL A. PETRILLO | VICE CHAIRMAN |
| REV. TROY PRESTON DECOHEN | VICE PRESIDENT |

## THE MOUNT VERNON HOSPITAL

| NAME | TITLE |
|------|-------|
| DARIUSH ALAIE, MD | BOARD OF TRUSTEE |
| REV. WENDELL ELLIOTT BAISDEN | BOARD OF TRUSTEE |
| VINCENT M. BUFANO | BOARD OF TRUSTEE |
| PAT CAPASSO | BOARD OF TRUSTEE |
| SAMUEL CONSOLAZIO | BOARD OF TRUSTEE |
| HON. ERNEST DAVIS | BOARD OF TRUSTEE |
| ANTHONY DEBELLIS | BOARD OF TRUSTEE |
| REV. TROY PRESTON DECOHEN | BOARD OF TRUSTEE |
| DARREN DEVERNA | BOARD OF TRUSTEE |
| RICHARD PETRIOLLO, MD | BOARD OF TRUSTEE |
| RAMESH NAIK, MD | PRESIDENT |
| DANNA WOOD | SECRETARY |
| RICHARD NACLERIO | VICE PRESIDENT |
|  |  |

## HOWE AVENUE NURSING HOME

| NAME | TITLE |
|------|-------|
| MAURO C. ROMITA | CHAIRMAN |
| GEORGE T. ERBE | VICE CHAIRMAN |
| JOHN R. SPICER | PRESIDENT |
| CAROL A. PETRILLO | SECRETARY |
| LAWRENCE J. RUISI | TREASURER |
| STAN BUTURLA | ACTING ASSISTANT TREASURER |
| BARBARA A. LANGBEIN | ASSISTANT SECRETARY |
| LOUIS B. FROST | DIRECTOR |
| MARY M. SAVAGE | DIRECTOR |
| JEFFREY R. POWERS | DIRECTOR |
|  |  |

**Exhibit B**
**Rule 1007-2 Schedules**

## Schedule A-1

### <u>List of Committees Formed Prior to the Petition Date</u>

None.

**Schedule A-2**
**Consolidated List of 30 Largest Creditors**

Contemporaneously with the filing of their petitions, the Debtors filed a motion requesting, among other things, authority to file a consolidated list of the 30 largest unsecured creditors (the "Top 30 List") in lieu of separate lists of each Debtor's 20 largest unsecured creditors. Attached hereto is the Top 30 List which is based on the Debtors' books and records as of approximately May 13, 2013. The Top 30 List was prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in the Debtors' Chapter 11 Cases. The Top 30 List does not include: (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101; or (2) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims. The Top 30 List is provided pursuant to Local Rule 1007-2(a)(4).

The information contained herein ,including any claim amounts, shall not constitute an admission of liability by, nor is it binding, upon the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| (1)<br>*Name of creditor and complete mailing address including zip code* | (2)<br>*Name, telephone number and complete mailing address, including zip code, of employee, agent, or department of creditor familiar with claim who may be contacted* | (3)<br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br>*Amount of claim [if secured, also state value of security'* |
|---|---|---|---|
| Allscripts Healthcare, LLC | P.O. Box 8538-0133<br>Lockbox #077133<br>Philadelphia, PA 19171-0133<br>Attn: Todd Seiffer<br>(312) 447-2459 | Trade Debt | 6,671,180.17 |
| Amerisourcebergen Drug Cor | 101 Norfolk Street<br>Mansfield, MA 02048<br>Attn: Luz Bermudez<br>(856) 384-3232 | Trade Debt | 1,587,973.02 |
| Stryker Orthopaedics | 480 South Dean Street<br>New Jersey Sales Office<br>Englewood, NJ 07631<br>Attn: Robert A. Passanante<br>(201) 831-5320 | Trade Debt | 2,432,653.04 |

| | | | |
|---|---|---|---|
| Convergent Revenue Cycle M | 1357 Heathcott Blvd. Suite 300 Gainsville, VA 20155 Attn: Glenn M. Getner (412) 980-9742 | Trade Debt | 935,464.46 |
| 1199 SEIU National Benefit | 330 West 42nd Street New York, New York 10036 Timothy Wells | Trade Debt | 5,504,020.55 |
| Crothall Service Group | 955 Chesterbrook Blvd, Suite 300 Wayne, PA 19087 Attn: Gene Bettencourt (508) 965-5613 | Trade Debt | 908,391.63 |
| New York Medical College | 40 Sunshine Cottage Road Attn: Dr. Marc Wallack Valhalla, NY 10595 Attn: Jim Salerno (914) 594-4455 | Trade Debt | 877,934.09 |
| TGC LLC | c/o Theodore N. Giovanis PO Box 130 Highland, MD 20777 (301) 854-2496 | Trade Debt | 869,079.00 |
| Miller & Milone, P.C. | 100 Quentin Roosevelt Blvd Garden City, NY 11530 Attn: Karen A. Till (516) 296-1000 ext. 302 | Trade Debt | 778,059.83 |
| West City Health Care Corp. | 100 Woods Road Valhalla, NY 10595 Attn: Debbie Manolios (914) 493-2903 | Trade Debt | 705,209.64 |
| New York Radiology Alliance | 25983 Network Place Chicago, IL 60673-1259 Attn: Jonathan Schwartz (914) 666-2220 | Trade Debt | 646,200.79 |
| Health/ROI | PO Box 362 344 Main Street Metuchen, NJ 08840 (732) 906-8700 | Trade Debt | 619,549.14 |
| Healthcare Assoc of NYS | 74 North Pearl St. Albany, New York 10087-5535 Attn: Larry Edinger (518) 431-7790 | Trade Debt | 382,692.00 |

| | | | |
|---|---|---|---|
| Emergency Medical Associat | Attn: Benjamin Carrino<br>651 W. Mt. Pleasant Avenue<br>Livingston, NJ 07039<br>(800) 345-0064 | Trade Debt | 512,207.03 |
| Medtronic USA Inc. | 4642 Collection Center Drive<br>Chicago, IL 60693<br>Attn: John Hauwiller<br>(763) 505-6543 | Trade Debt | 485,197.92 |
| Nutrition Mgmt Services Co. | 2071 Kimberton Rd.<br>Kimberton, PA 19442<br>Attn: George<br>(610) 935-2050 ext. 5217 | Trade Debt | 520, 811.00 |
| Modern Medical Systems | 170 Finn Court, Suite 1<br>Farmingdale, NY 11735<br>Attn: WM Pope<br>(631) 844-1700 | Trade Debt | 436,619.21 |
| Children's Phy. of West LL | New York Medical College<br>Valhalla, NY 10595<br>(914) 594-4280 | Trade Debt | 415,069.68 |
| Enterprise Systems Software, LLC- ESD | 5151 Monroe Street, Suite 101<br>Toledo, OH 43623<br>Attn: David Mikola<br>(678) 557-3806 | Trade Debt | 410,489.11 |
| Fresenius Management Ser | 16343 Collections Center Drive<br>Chicago, IL 60693<br>Attn: Karen Vaughin<br>(330) 896-4771 | Trade Debt | 372,315.35 |
| Michael Anthony Contracting | 161 Rail Road Avenue<br>Garden City Park, NY 11040<br>Attn: John Ballo<br>(212) 972-9800 | Trade Debt | 360,739.73 |
| Cannon Design | 360 Madison Avenue<br>New York, NY 10017<br>Attn; Jennie M. Muscarella, Esq.<br>(212) 972-9800 | Trade Debt | 344,316.55 |
| New York Blood Center | 1200 Prospect Avenue<br>Westbury, NY 11590<br>Attn: Melissa<br>(516) 478-5224 | Trade Debt | 465,420.73 |

2512684v.1

| | | | |
|---|---|---|---|
| Medline Industries | One Medline Place<br>Mundelein, IL 60060-4485<br>Attn: Dave Gilligan<br>(551) 804-9312 | Trade Debt | 397,219.33 |
| Pension Benefit Guaranty Corp | P.O. Box 64880<br>Baltimore, MD 21264-4880<br>Attn: Franklin G. Tate, Jr.<br>(203)326-4000 ext. 3558 | Unsecured Debt | 9,620,000.00 |
| Dormitory Authority of SNY | Attn: S. Stevens Counsels Office<br>515 Broadway<br>Albany, NY 12207<br>Attn: Larry N.Volk<br>(518) 257-3160 | Unsecured Debt | 3,350,000.00 |
| McKesson Information Sol | P.O. Box 98347<br>Chicago, IL 60693<br>(866) 455-9430 | Trade Debt | 949,760.27 |
| Apollo Health Street, Inc. | 2 Brighton Road<br>Suite 300<br>Clifton, NJ 07012<br>Attn: Amab Sen<br>(973) 405-5002 | Trade Debt | 524,928.57 |
| Westchester Medical Center | 100 Woods Road<br>Valhalla, NY 10595<br>Attn: Julie Switzer<br>(914) 493-7000<br>switzerj@wcmc.com | Unsecured Debt | 2,5000,000.00 |
| Greystone Servicing Corporation, Inc. | 111 Rockville Pike, Suite 1150<br>Rockville, MD 20850<br>(301) 354-5006 | Trade Debt | 512,200.00 |

## Schedule A-3
## Five Largest Secured Creditors

Pursuant to Local Rule 1007-2(a)(5), attached hereto is a schedule of the holders of the five largest secured claims for the Debtors on a consolidated basis, prepared in accordance with the Debtors' books and records as of May 13, 2013.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, or that a claim amount exceeds the value of the collateral securing such claim. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

Sun Life Assurance Company of Canada (US)
One Sun Life Executive Park
Wellesley Hills, M 02481

Hudson Valley Bank
21 Scarsdales Road
Yonkers, New York 10707

Midcap Financial, LLC and Midcap Funding IV, LLC
Attn: Lisa J. Lenderman
Deputy General Counsel
7255 Woodmont Avenue, Suite 200
Bethesda, MD 20814

Pension Plan/Pension Benefit Guaranty Corporation
Attn: Franklin G. Tate, Jr.
Lead Financial Analyst
Asset Control and Liquidation Group
Corporate Investments Department
1200 K Street, NW Suite 675
Washington, D 20005

1199 SEIU Healthcare Workers
310 West 43rd Street
New York, NY 10036

**Schedule A-4**
**Summary of Debtors' Assets and Liabilities**

In accordance with Local Rule 1007-2(a)(6), the Debtors' estimated assets and liabilities, as of December 31, 2012, on a consolidated basis, are as follows:

|  |  |
|---|---|
| Total Assets | $159.63 million |
| Total Liabilities | $200 million |

The financial data set forth herein shall not constitute an admission of liability by the Debtors. The Debtors further reserve all rights to assert that any claim or debt listed herein as liquidated or fixed is in fact a disputed claim or debt. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt.

**Schedule A-5**
**Publicly Held Securities**

N/A – the Debtors are not-for-profit organizations.

### Schedule A-6
### Debtors' Property in Possession of Third Parties

Pursuant to Local Rule 1007-2(a)(8), to the best of the Debtors' knowledge, none of the Debtors has any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or any agent for any such entity, other than, if any:

(i) bank accounts that may be subject to claims of setoff by the Debtors' lenders, or their agents (collectively, the "Lenders");

(ii) various security deposits held by certain lessors, utility companies, regulatory agencies and others; and

(iii) property transferred by the Debtors to third parties for purposes of storage, repair, and/or delivery, in their ordinary course of business.

The foregoing information contained shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt. The Debtors further reserve the right to supplement this schedule if additional property is identified as being held by a third party.

**Schedule A-7**
**List of Premises Owned and Leased from Which the Debtors Operate**

Pursuant to Local Rule 1007-2(a)(9), attached is a list of the premises owned, leased or held under other arrangements, from which the Debtors operate their business.

**Schedule A-8**
**Location of Debtors' Substantial Assets and Books and Records**

Pursuant to Local Rule 1007-2(a)(10), the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside of the territorial limits of the United States is as follows:

*Location of Debtors' Substantial Assets*

16 Guion Place
New Rochelle, NY 10802

*Location of Debtors' Books and Records*

16 Guion Place
New Rochelle, NY 10802

*Nature, Location and Value of Assets Held Outside of the United States*

None.

**Schedule A-9**
**Schedule of Pending Litigation**

Pursuant to Local Rule 1007-2(a)(11), and to their best knowledge, the Debtors are not aware of any actions or proceedings, pending or threatened, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.

**Schedule A-10**
**Schedule of Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experiences is as follows:

**[need summary from client]**

| NAME | TITLE | RESPONSIBILITY |
|------|-------|----------------|
| John Spicer | President | John Spicer has been President and Chief Executive Officer of Sound Shore Health System and their member medical centers, Sound Shore Medical Center of Westchester, The Mount Vernon Hospital and Schaffer Extended Care Center for the past 25 years. Mr. Spicer has primary responsibility for all operational, financial and regulatory related aspects of the Medical Centers' and oversees the Medical Centers' remaining executive staff. Prior to his position at Sound Shore, Mr. Spicer spent eight years as Administrative Director of NYU Hospital and Rusk Institute. |
| Clark Walter | General Counsel | Since October 2012, Clark E. Walter has served as Senior Vice President and General Counsel to Sound Shore Health System, Inc. In that capacity he is responsible for the overall legal affairs of Sound Shore Medical Center of Westchester, The Mount Vernon Hospital, the Shaffer Extended Care Center and each of their corporate affiliates. His duties include advice to the Boards of the above entities; the preparation of corporate documents; formulation and review or corporate policies and procedures; review of and advice relating to healthcare legislation and regulations; review and updating of hospital and medical staff bylaws; and review of hospital contracts. Mr. Walter has responsibility for the purchase and administration of the professional liability, general liability and director and officer liability insurance policies issued to the entities above. He oversees the professional and general liability cases handled by outside counsel, is responsible for the litigation handled internally by the Office of General Counsel, and handles the legal aspects of the Risk Management Department and Corporate |

| | | Compliance. |
| | | Prior to his appointment at Sound Shore Health System, Inc., Mr. Walter was Chairman of the Board of Governors at Sound Shore Medical Center of Westchester and a partner at the law firm of Dewey Ballantine LLP, where his law practice involved complex commercial litigation and arbitration, including patents and copyrights, products liability, bankruptcy, antitrust, art law, ERISA, banking, employment, entertainment and insurance. |

## Schedule B-1
## Estimated 30-Day Weekly Payroll - Employees

Pursuant to Local Rule 1007-2(b)(1), the estimated consolidated amount of weekly payroll to all of the Debtors' employees (exclusive of directors, officers, stockholders and partners) for the 30-day period following the Petition Date is approximately $7.2 million.

**Schedule B-2**
**30 Day Weekly Payroll – Officers, Directors, and Stockholders**

Pursuant to Local Rule 1007-2(b)(2), the Debtors will not make any payroll payments to directors and officers for the 30-day period following the Petition Date.

**Schedule B-3**
**Estimated Accrued Obligations for Non-Professional Fees for 30 Day Period**

Pursuant to Local Rule 1007-2(b)(3), the following is a summary of the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30 day period following the Petition Date:

| Category | Estimated Amount |
|---|---|
| Cash Receipts | $20,752,780 |
| Cash Disbursements | $21,753,069 |
| Net Cash Gain (Loss) | $1,760,289 |
| Accrued Obligations | $1,072,000 |
| Accrued Receivables | $14,250,000 |